**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CITADEL SECURITIES AMERICAS LLC,
CITADEL SECURITIES AMERICAS SERVICES LLC,
CITADEL SECURITIES (EUROPE) LIMITED, and
CITADEL MANAGEMENT (EUROPE) II LIMITED,

        *Plaintiffs*,

        *v.*

PORTOFINO TECHNOLOGIES AG,
PORTOFINO TECHNOLOGIES USA, INC.,
JEAN CANZONERI, and JOHN DOES 1-10,

        *Defendants*.

Case No. 23 Civ. 5222 (GHW)

**AMENDED COMPLAINT AND JURY DEMAND**

---

Plaintiffs Citadel Securities Americas LLC, Citadel Securities Americas Services LLC, Citadel Securities (Europe) Limited, and Citadel Management (Europe) II Limited (collectively, "Citadel Securities"), by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.     On September 15, 2022, two former Citadel Securities employees launched a media blitz to promote Portofino, a new high-frequency trading firm that they had co-founded. Portofino—named after a Ferrari renowned for its speed—was, for the first time, emerging from "stealth mode." Its founders explained to reporters that although Portofino was just now making itself public, the firm had been operating for the last year in secret and had already traded billions of dollars' worth of assets. Along with boasting about the firm's success from its "stealth" trading, Portofino's founders touted their own and other recently recruited employees' experience at Citadel Securities and other high-frequency trading firms. They told reporters that, though Portofino was headquartered in Switzerland, its focus included growing its New York office and increasing its U.S. presence.

2.      What Portofino failed to disclose, however, was that in order to build and launch the company, its founders—Leonard Lancia and Alex Casimo—had engaged in a brazen scheme to steal Citadel Securities' trade secrets, lie to their Citadel Securities colleagues, and raid the ranks of Citadel Securities' employees.  Although Portofino's founders took steps to conceal their deceit, including communicating primarily off Citadel Securities' networks and telling bold-faced lies to their colleagues about their activities and intentions, Citadel Securities now knows that Portofino was built by two of its employees while they were on Citadel Securities' clock in an effort to use its confidential information and resources to benefit Portofino.

3.      Citadel Securities' investigation has revealed that by September 2020, nearly six months before notifying Citadel Securities of their intent to resign, Portofino's founders were already deep into their efforts to build and raise capital for their new company.   In a September 28, 2020 email to a partner at the early-stage investment firm 7percent Ventures Ltd. ("7percent"),[1] Casimo thanked the 7percent partner for his "guidance" regarding Portofino's "initial funding requirements," and offered to introduce his "co-founder" for a more "technical" conversation.  Specifically, Casimo suggested that the 7percent partner and Lancia could have "a very good conversation on e.g. latency considerations for HFT trading"—information that both of Portofino's founders knew was highly confidential and proprietary to Citadel Securities.

---

[1] 7percent is a self-proclaimed "entrepreneur led, network-driven, trans-Atlantic early stage fund" that "invest[s] early in technology which is transformative and can monopolize a big market." *7percent Ventures*, LinkedIn, https://www.linkedin.com/company/7pcventures/ (last visited May 16, 2023).



4.      Following multiple communications between the Portofino founders and the partner at 7percent, and ahead of one of their meetings in October 2020, Casimo sent the 7percent partner a "[p]itch document" that summarized Portofino's early efforts to sell itself to potential investors.  That document stated explicitly that Portofino's founders were working to launch a "Crypto-Currency HFT Market Maker."  Significantly, it touted the Portofino founders' specific roles and experience at Citadel Securities as precisely why Portofino would be able to successfully set up this new opportunity in the marketplace:

**The founding team has significant experience in building profitable algorithmic market making businesses at scale**
- Both are senior leaders at a global High Frequency Trading firm, have a track record of building market making businesses, and manage teams with revenues exceeding $100m p.a.
- Their skill sets also align with the organizational structure of the proposed business. **We believe this is a crucial differentiating factor.** Their roles:
    - *Founder 1: European Quantitative Research lead. Significant experience building trading systems, and predictive models for on exchange trading at a number of the world's largest algorithmic market makers*
    - *Founder 2: COO across all business units (including equities, derivatives for proprietary and client trading) in Europe at the world's largest algorithmic market maker*

5.      The pitch document was also explicit about the market opportunities that Portofino would exploit once in operation, noting that "[t]here is a growing appetite from Professional & Retail investment [sic] in cryptocurrency assets," and that "[e]nd customers will require market

makers in order to source liquidity efficiently."  In fact, it boasted that "a successful market making team operating at scale can generate $2.5bn / annum," and that "[f]or market makers with the right skill-set, these revenues can be achieved rapidly."

6.      By the time Portofino's founders were soliciting 7percent as an investor in October 2020, they had—for some time—been hard at work executing on their scheme to launch Portofino. For example, in emails with the 7percent partner in mid-October 2020—months before Portofino's founders resigned from their positions at Citadel Securities—Casimo responded to a question about when he and Lancia would be free to "focus on" Portofino by assuring the 7percent partner that "we have (and are) putting in a LOT of focus into this project now."  These communications further reflect that the 7percent partner was impressed that Portofino had "the right founding team experience" and asked questions about funding.  In response, the Portofino founders confirmed that in "[f]ull disclosure, we are actively discussing this with a few VCs [venture capital firms] that have shown interest," and stated that "[i]ndicatively February 2021 would be our official start date."

7.      Moreover, Portofino's founders left no doubt about how they intended to use and were using Citadel Securities' trade secrets to benefit Portofino.  In a pitch deck sent to 7percent in October 2020, the founders boasted that Portofino's objective was to "[r]eplicate the most successful trading business model in traditional financial markets in crypto-currency markets."  In other words, Portofino intended to use Citadel Securities' trade secrets to "replicate" Citadel Securities' business.

# Cryptocurrency High Frequency Trading (*HFT*) market maker



**The leading HFT crypto-currency market maker**

*Our objective:*

*- Replicate the most successful trading business model in traditional financial markets in crypto-currency markets*

*- Become the largest market maker in crypto-currency markets*

**The business model**

1. An **on exchange trading unit** that connects to all major cryptocurrency cash and derivatives exchanges. Using HFT trading strategies

2. A **client facing unit** that will offer bi-lateral 'OTC' liquidity to end customers (e.g. retail brokers, Hedge Funds, etc.) using automated quoting strategies

**Our KPIs**

1. **30% market share.** In traditional markets, market leading market makers can account for > 30% of the market

2. **$2.5bn in revenues.** Once operating at scale across on exchange and client 'OTC' trading

8.     In that pitch deck, they also stated that Portofino had built—while its founders still had 24/7 access to Citadel Securities' systems and proprietary strategies, code, algorithms and all the resources of its market making and HFT businesses—an "MVP HFT market making model" and a "[b]eta version of 'rebate collection' strategy."  The pitch deck also noted that "[t]he founding team are senior leaders at the world's largest HFT market maker," and that "[b]oth have a track record of building businesses, and have a deep understanding of how HFT businesses operate 'front to back.'"

9.     Despite the founders' best efforts, on information and belief, 7percent did not invest in Portofino.  But Portofino was not deterred.  It continued to covertly court investors and, by January 2021, had secured seed-funding from Jean Canzoneri, an entrepreneur, investor, and "business angel."  In January 2021, Portofino's founders still worked for Citadel Securities.  Portofino's founders did not disclose Canzoneri's investment (as they were obligated to), and

instead continued to operate secretly.[2]  And in February 2021, the 7percent partner introduced Casimo to another crypto-focused investment firm, Greenfield Capital:



10.     At the time, Portofino's founders were exploiting their Citadel Securities experience in an effort to raise capital for Portofino.  By design, it would have been readily apparent to any investor or potential investor that Portofino's founders were employed by Citadel Securities—even if one of them did not slip up and send an email from their Citadel Securities account, as they did with 7percent.  Indeed, the Portofino pitch documents said so:  "[t]he founding team *are* senior leaders at the world's largest HFT market maker" (emphasis added).  Casimo is listed as "COO … *at the world's largest HFT market maker*" (emphasis added), a description that would be clear to anyone in the industry as a reference to Citadel Securities.  Moreover, Portofino's founders each have LinkedIn accounts that identify their roles as Citadel Securities employees and, on information and belief, they both had public profiles at the time they were

---

[2] Until as recently as mid-February 2023, Canzoneri advertised on LinkedIn that he had been a seed investor with Portofino since January *2020*.  Whether January 2020 or January 2021, that investment was made while Portofino's founders were still Citadel Securities employees.

approaching potential investors.  Indeed, Casimo connected with the 7percent partner on October 25, 2020 through his LinkedIn account.  In addition, Casimo sent at least one email about Portofino to the 7percent partner from his Citadel Securities account.

11.      Given Portofino's clear, intentional efforts to make its potential investors aware of its founders' ties to Citadel Securities, these same potential investors would have known—or at a minimum, should have known, as any sophisticated investor would—that the founders were subject to industry-standard fiduciary and contractual obligations regarding confidentiality and proprietary information as Citadel Securities employees.

12.      In fact, it was not until March 2021 that Portofino's founders resigned, within days of each other, from Citadel Securities.  When they left, they took with them a host of valuable trade secrets owned and developed at great cost by Citadel Securities.  The stolen trade secrets included Citadel Securities' research methodology; its bespoke set of trading techniques and technologies; its confidential and proprietary asset-neutral trading strategies; its testing and validating simulations; and its business plans and business strategies for high-frequency trading across asset classes, including cryptocurrency.

13.      It is also clear that while Portofino's founders were bragging about Portofino in private to potential investors, they were openly lying to their Citadel Securities colleagues about their plans.  In his exit interview, Lancia told Citadel Securities unequivocally that he was not leaving his job for a new role.  He denied outright having any offers of employment and purported to still be thinking about whether to stay in finance.  All of this was a lie.  Casimo gave similar false answers in his exit interview, conducted a few days later.  He told the interviewer that he did not have a new job, and he complained about Citadel Securities' non-compete policies.

14.      These lies, viewed in retrospect, were clear attempts to prevent Citadel Securities from learning the truth, which was that Portofino's founders—while employed and generously

compensated by Citadel Securities—had conceived of, developed, and originated a competitor company using Citadel Securities' trade secrets and other confidential information. Portofino's founders understood that, under the terms of their employment agreements, Portofino itself was "work product" that rightfully belonged to Citadel Securities, and they were determined to prevent Citadel Securities from discovering this fact.

15.     Portofino registered its website on March 13, 2021, the *day after* Lancia's exit interview. It incorporated on April 27, 2021. It hired employees. It continued to solicit tens of millions of dollars from investors. It began raising debt financing from BlockFi, Celsius Network, and Maven 11. And it secretly used Citadel Securities' commercially valuable trade secrets and confidential information to sell itself and develop its competing business.

16.     Over the next year, Portofino continued its deceptive conduct, even going so far as to attempt to raid Citadel Securities of its employees, including Vincent Prieur, Citadel Securities' New York-based "aggregator of all things crypto," in an effort to capitalize on his knowledge of Citadel Securities' trade secrets and confidential business plans. In December 2021, the company incorporated a U.S. arm in Delaware. And up until the big reveal in September 2022, Portofino—as it bragged to reporters—operated in "stealth mode," all the while using Citadel Securities' trade secrets to "replicate" and compete with Citadel Securities' business.

17.     This is an action for misappropriation of trade secrets and confidential information, tortious interference, unfair competition, and unjust enrichment arising from the secret development and operation of Defendants Portofino Technologies AG and Portofino Technologies USA, Inc. (collectively, "Portofino")—a high-frequency trading business that touts itself as operating like Citadel Securities, but focusing on a single asset class: cryptocurrency ("crypto")—as well as the aiding and abetting of Portofino's misconduct by its early investors, Jean Canzoneri and John Does 1-10 (collectively, the "Investor Defendants").

## **PARTIES**

18.     Plaintiff Citadel Securities Americas LLC is a Delaware limited liability company with its headquarters and principal place of business in Miami, Florida.

19.     Plaintiff Citadel Securities Americas Services LLC is a Delaware limited liability company with its headquarters and principal place of business in Miami, Florida.

20.     Plaintiff Citadel Securities (Europe) Limited is a private limited company incorporated and domiciled in the United Kingdom, with its principal place of business in London. Citadel Securities (Europe) Limited is owned by its sole shareholder, CSHC Europe LLC, a Delaware limited liability company.

21.     Plaintiff Citadel Management (Europe) II Limited is a private limited company incorporated and domiciled in the United Kingdom, with its principal place of business in London. Citadel Management (Europe) II Limited is owned by its sole shareholder, Citadel Hedge Fund Holdings II LP, a Delaware limited partnership.

22.     Defendant Portofino Technologies AG is a Swiss corporation registered at Gotthardstrasse 3, 6300 Zug, Switzerland that holds itself out as having offices in Zug, London, New York, Amsterdam, and Singapore.[3]

23.     Defendant Portofino Technologies USA, Inc. is a Delaware corporation.

24.     Defendant Jean Canzoneri is an early-stage investor in Portofino who, on information and belief, is domiciled in Milan, Italy with a place of business in Paris, France, as well as New York, New York.  On information and belief, Canzoneri is a French citizen.

---

[3]  *See, e.g.*, *Portofino Technologies*, LinkedIn, *https://www.linkedin.com/company/portofino-technologies/about* (last visited May 16, 2023) (listing Portofino Technologies as maintaining offices in Zug, New York, London, Amsterdam, and Singapore).

25.     Defendants John Does 1-10 (the "Doe Investor Defendants") are, on information and belief, additional Investor Defendants who provided early-stage funding to Portofino.  The true names, whether individual, corporate, or otherwise, of the Doe Investor Defendants, are currently unknown to Citadel Securities, who therefore sues the Doe Investor Defendants by fictitious names.

26.     Based on its investigative efforts to date, Citadel Securities has identified Defendant Canzoneri as one of the Investor Defendants who aided and abetted Portofino's misconduct.  While Citadel Securities has been unable to learn the identities of any of the Doe Investor Defendants to date, Citadel Securities expects to learn, through discovery obtained from Portofino and others, their names and roles in the misconduct alleged herein, which information will allow Citadel Securities to amend its Complaint to name the Doe Investor Defendants by their actual names.

## JURISDICTION AND VENUE

27.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Citadel Securities' federal law claims brought under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

28.     This Court has supplemental subject matter jurisdiction over Citadel Securities' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are related to Citadel Securities' federal law claims under the Defend Trade Secrets Act and are part of the same case or controversy under Article III of the United States Constitution.

29.     As the law of the forum where this action is brought, New York law governs whether this Court has personal jurisdiction over Defendants.

30.     Portofino Technologies USA, Inc. is an alter ego of Portofino Technologies AG, and the two entities are treated as one for jurisdictional purposes.  *See Transfield ER Cape Ltd. v. Industrial Carriers, Inc.*, 571 F.3d 221, 224 (2d Cir. 2009).  Specifically, Portofino Technologies

AG and Portofino Technologies USA, Inc. share common owners who operate the collective Portofino entities as a single economic unit. Portofino Technologies USA, Inc. is financially dependent on these common owners and its corporate form is disregarded such that it primarily transacts the business of Portofino Technologies AG. Portofino Technologies USA, Inc. exhibits no corporate formalities that would indicate it is anything other than an alter ego of Portofino Technologies AG.

31. Pursuant to New York's long-arm statute, CPLR 302(a)(1), this Court has personal jurisdiction over both Portofino entities, which publicly claim to have a New York office, have posted job openings and recruited for multiple roles based in New York, have successfully solicited funding from venture capital investment firms based in New York, and have, on information and belief, New York-based clients.

32. This Court also has personal jurisdiction over the Portofino entities pursuant to CPLR 302(a)(2) because this action arises in part out of Portofino's tortious conduct within New York. First, as set forth in detail below, Portofino has solicited New York-based employees of Citadel Securities, tortiously interfering with their employment agreements by inducing some of them to leave Citadel Securities and instead secretly become employees of Portofino, while the solicited employees were being well compensated by Citadel Securities to sit out from competitive employment and to notify Citadel Securities promptly if they took a new opportunity, resulting in harm to Citadel Securities. Second, through its poaching of Citadel Securities' New York-based employees and by other means described below, Portofino has misappropriated from Citadel Securities' New York, U.S., and global operations confidential and proprietary trade secrets relating to Citadel Securities' research methodology used to develop and deploy its market making and high-frequency trading strategies using algorithmic, systematic, and automated trading

systems, as well as confidential information about Citadel Securities' business strategies and planning, including in the crypto space, to Citadel Securities' significant detriment.

33.    Personal jurisdiction over the Portofino entities is also proper pursuant to CPLR 302(a)(3) because Portofino's tortious acts committed outside of New York have caused injury to Citadel Securities in New York for the reasons cited above.

34.    This Court has personal jurisdiction over Canzoneri and any non-domiciliary Doe Investor Defendants pursuant to CPLR 302(a)(3) because Canzoneri and the Doe Investor Defendants committed tortious acts outside of New York that caused injury to Citadel Securities in New York.  Specifically, Canzoneri and the Doe Investor Defendants aided and abetted the misconduct through which Portofino misappropriated Citadel Securities' trade secrets and other confidential information developed and applied by Citadel Securities' operations in New York.

35.    Personal jurisdiction may also be proper over non-domiciliary Doe Investor Defendants who engaged in tortious conduct within New York pursuant to CPLR 302(a)(1)-(2).

36.    Pursuant to CPLR 301, personal jurisdiction is also proper over any Doe Investor Defendants who reside in New York, are incorporated in New York, and/or whose principal place of business is in New York.

37.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to Citadel Securities' claims occurred in the Southern District of New York.  Portofino tortiously interfered with the employment agreements of Citadel Securities employees based in Citadel Securities' New York office through solicitations made in this district, and misappropriated Citadel Securities' trade secrets and confidential information that were developed, used, and maintained in part at Citadel Securities' New York office, which is located within this district at 350 Park Avenue, New York, New York.

## JURY DEMAND

38.     Plaintiffs hereby demand a trial by jury.

## FACTUAL ALLEGATIONS

### I.   CITADEL SECURITIES' SUCCESS IS BASED ON ITS TRADE SECRETS AND CONFIDENTIAL INFORMATION

#### A.  Citadel Securities Is a Successful Market Maker

39.     Citadel Securities acts as a market maker for trading in a number of assets and securities, including equities, options, derivatives, fixed income products, and digital assets, including crypto.

40.     A "market maker" is a participant in the financial markets that stands ready to buy or sell a particular asset or security for itself or investors from available inventory or by sourcing it from an exchange or other market venue.

41.     As a market maker in each of the assets or securities it trades, Citadel Securities provides much needed market liquidity and efficient pricing to market participants and retail and institutional investors around the world, including major asset managers, banks, broker-dealers, hedge funds, public pension programs, and government entities.

42.     Citadel Securities' many competitive advantages as a market maker include its proprietary technology, systems, and methods for market making and high-frequency trading using algorithmic, systematic, and automated trading.

43.     High-frequency trading relies on complex algorithms, powerful specialized computers and servers, and customized technology to execute large numbers of trades in fractions of a second.   Algorithmic trading relies on automated, pre-programmed sets of rules and instructions based on complex formulas and mathematical and other models that are used to determine when to buy or sell.  Systematic trading relies on a defined set of rules—*e.g.*, sell a

particular stock at a particular price—to make trading decisions triggered by certain market conditions and to manage market risk. Automated trading relies on computers to execute trades according to programmed instructions. These trading methods are not mutually exclusive; automated systematic trading, for example, relies on computers programmed to execute trades based on pre-determined market conditions.

44.     Citadel Securities is renowned for its technology-driven trading expertise and success. Using its proprietary research methodology and market analysis, Citadel Securities' high-frequency trading using algorithmic, systematic, and automated trading systems allows it to trade smarter, at faster speeds, and at greater volumes. As a result of the sophisticated technology, proprietary systems, and in-house expertise Citadel Securities has developed and refined over more than two decades, Citadel Securities is the largest market maker in options in the United States and handles a substantial percentage of all stock orders traded by retail and institutional investors.[4] Over the years, this suite of trading technology has been leveraged to expand into a variety of asset classes and markets.

### B. Citadel Securities' Success Is Based on Its Trade Secrets and Other Confidential Information

45.     The commercially valuable trade secrets that Portofino, on information and belief, has misappropriated include: (1) Citadel Securities' confidential and proprietary research methodology ("Research Methodology"); (2) the bespoke set of trading techniques and technologies, or confidential and proprietary trading strategies ("Trading Strategies"), developed by Citadel Securities (using its Research Methodology) for trading in any asset that trades on electronic markets; (3) Citadel Securities' confidential and proprietary simulations, used for testing, validating, and refining its Trading Strategies ("Simulations"); and (4) Citadel Securities'

---

[4] *Options*, Citadel Securities, https://www.citadelsecurities.com/what-we-do/options/ (last visited May 16, 2023).

confidential and proprietary business plans and business strategies ("Business Plans and Strategies"), including for high-frequency trading across asset classes, including crypto (together, with the Research Methodology, Trading Strategies, and Simulations, the "Trade Secrets").

46.     Citadel Securities has invested substantial time, as well as financial and other resources, in developing these Trade Secrets, which enable Citadel Securities to provide optimal liquidity and pricing for its clients, while also maximizing its per-trade revenue.  They are its competitive advantage.  Indeed, Citadel Securities is believed to be unique among large-scale market makers for the complexity of its Research Methodology, Trading Strategies, and Simulations.

47.     Citadel Securities' confidential and proprietary Research Methodology includes Citadel Securities' know-how and processes, quantitative analysis, strategies, and automated and high-frequency trading algorithms and implementing code, as well as its valuation, pricing, forecasting, volatility, and other risk models.

48.     Using its confidential and proprietary Research Methodology, Citadel Securities develops confidential and proprietary Trading Strategies for buying and selling particular assets and securities.

49.     Citadel Securities' confidential and proprietary Trading Strategies are in turn tested and refined using confidential and proprietary Simulations.  These Simulations are built using historical market and institutional data, and then adjusted with proprietary statistical information and analysis to accurately reflect real-world market behavior with enhanced precision.  These Simulations are used to fine tune and calibrate Citadel Securities' Trading Strategies, thereby further improving performance.

50.     The employee know-how necessary to develop, refine, and deploy Citadel Securities' confidential and proprietary Research Methodology, Trading Strategies, and

Simulations is an essential part of its Trade Secrets.  Citadel Securities invests significant time, as well as financial and other resources, in training its employees to develop and implement its Trade Secrets.

51.     Significantly, many of Citadel Securities' Trade Secrets are asset neutral, which means that they are broadly applicable to all of the assets in which Citadel Securities trades, whether those assets are equities, European options, or, for example, crypto.

52.     Citadel Securities' Research Methodology, Trading Strategies, and Simulations are fundamental components of its confidential and proprietary Business Plans and Strategies for the various assets it trades.  Those Business Plans and Strategies also include confidential and proprietary product and market research and analysis, evaluations of competitors, and operational considerations like resource allocation, the design and staffing of the business, and recruiting and hiring efforts and objectives, among other things.

### C. Citadel Securities Goes to Great Lengths to Protect Its Trade Secrets and Other Confidential Information

53.     To protect its Trade Secrets and other commercially sensitive confidential information, Citadel Securities has implemented robust security measures across its operations. Those security measures include, among other things: (1) requiring all employees to have an electronic access card; (2) restricting physical access to the office environment generally and to certain areas of the office based on individual employees' job functions; (3) strictly limiting visitor access; (4) 24-hour monitoring of its premises using security cameras, security staff, and other measures; (5) protecting computer access by stringent information security measures that include, but are not limited to, password protection and two-factor authentication, as well as granting each user only the level of access to Citadel Securities' computer network that is absolutely necessary for them to perform their job functions; (6) limiting access to and knowledge of Citadel Securities'

confidential and proprietary Research Methodology and other Trade Secrets to senior business unit leaders and other key employees responsible for developing and implementing the Trade Secrets; (7) having and enforcing policies that require employees to maintain confidential information and work product exclusively within Citadel Securities' secure environment; and (8) providing regular training to employees about their obligations to comply with confidentiality obligations and information security measures.

54.     To further protect Citadel Securities' confidential and proprietary information from disclosure and theft, employees with access to its Trade Secrets and other confidential information are required to sign non-disclosure agreements.  These non-disclosure agreements recognize that employees will have "access and exposure to Citadel's Confidential Information"; "Citadel's Confidential Information will retain continuing vitality throughout and well beyond the period of [the employee's] employment"; and "any loss or erosion of Citadel's competitive advantage through the disclosure or improper use of [Citadel's] Confidential Information could have severe and irreparable repercussions on Citadel's business."

55.     Because Citadel Securities employees necessarily have access to and use the Trade Secrets to perform their jobs, because those Trade Secrets could contribute to and inform any new works that an employee may create even on their own time, and because employees have committed to give their full efforts to Citadel Securities and to not engage in outside business activities without notice and consent, employees agree in advance to assign any work product they develop to Citadel Securities.  They agree that "all information, ideas, concepts, improvements, discoveries and inventions . . . , and all other works of a creative, technical or professional nature . . . that are conceived, made, developed or acquired by me during my employment with Citadel that relate in any way to Citadel's current, proposed or planned research, developments, operations, business, strategies, products or services" are "*the exclusive property of Citadel and shall be owned*

*by Citadel*" (emphasis added). Citadel Securities employees "further agree to assign . . . to Citadel all rights that [they] may acquire regarding any" such work product. "Citadel" under the non-disclosure agreement is defined to include Citadel Group, which includes all Citadel Securities affiliates.

56.   Importantly, the assignment to Citadel Group expressly applies to any work product that is developed "entirely on [the employees'] own time" where such work product relates "to any aspect of Citadel's business" or "to Citadel's actual or demonstrably anticipated research or development."

57.   Employees with access to Citadel Securities' Trade Secrets and other confidential information also sign agreements that broadly prevent them from engaging in competitive activity during their employment with Citadel Securities and for a "Restricted Period" following termination of their employment. Among other things, employees in their Restricted Period cannot (i) "intentionally or inadvertently, use or rely upon Confidential Information" relating to Citadel Securities or its business activities, or (ii) "directly or indirectly . . . work[] on the development of or utilize[e] or oversee[] work on the development or utilization of . . . automated trading strategies . . . that are materially similar to" those of Citadel Securities.

58.   Certain employees, including Portofino's co-founder Lancia, are also subject to supplemental agreements, which extend the length of their non-compete term with respect to work similar to Citadel Securities' "high-frequency trading, algorithmic trading, systematic trading or automated trading businesses."

59.   As consideration for entering into these agreements and continuing to abide by them, Citadel Securities employees are paid significant sums—in Lancia's case, for example, hundreds of thousands of dollars—over the course of their Restricted Periods.

60.     Citadel Securities employees, including Portofino's founders and other Portofino employees, also sign non-solicitation agreements designed to further protect Citadel Securities from the disclosure or theft of its Trade Secrets and confidential information by preventing them from recruiting and hiring other Citadel Securities employees for a period of time.

### D. Citadel Securities Is and Has Been Using Its Trade Secrets and Confidential Information for High-Frequency Crypto Trading

61.     Citadel Securities has invested substantial amounts of money, as well as time and human resources, applying its asset-neutral Trade Secrets to high-frequency, algorithmic, systematic, and automated Trading Strategies for crypto.

62.     Portofino co-founder Casimo knew from his role as Business Manager that Citadel Securities was exploring the application of its business model to crypto and/or digital assets and that by 2019, Citadel Securities was already engaged in several forms of crypto trading.

63.     By way of example, on March 9, 2018 in a Slack conversation with his supervisor, Citadel Securities' Managing Director and COO for Global Derivatives, Casimo was sent information regarding "New businesses & M&A\Cryptocurrency."

64.     A month later, on April 9, 2018, Casimo's supervisor forwarded him an email entitled "Bitcoin Futures Update," describing a meeting about Bitcoin that the supervisor had participated in that morning with another Citadel Securities employee.  Casimo followed up by email to learn more about Citadel Securities' strategy at that time in connection with crypto assets, asking: "Is it simple arb between futures & actual cryptos on crypto-exchanges (Kraken, Poloniex, etc.)?  Or [are] we deploying anything smarter?"  Casimo's supervisor responded the same day with details of Citadel Securities' plans for crypto trading.

65.     On April 26, 2019, Casimo joined a closed Slack channel for Citadel Securities employees working on crypto initiatives and/or who had a personal interest in crypto, on which

employees exchanged information about Citadel Securities' Business Plans and Strategies for crypto trading.  In September 2019, messages on the Slack channel included a question about whether a Citadel Securities employee was looking at crypto "in the context of trading it yourself, or trading it as Citadel," to which another employee replied "Both." A third employee then stated that, "CS is not very active in crypto although we have capability, record market data and even fitted a couple of alpha [I] believe." A colleague responded to acknowledge the crypto business that Citadel Securities was already building, writing "just for interest, Systematic [Fixed Income, Currency, and Commodity unit] currently trades the bitcoin future.  Although not in very much size."

66.     These communications reflect how Citadel Securities was, during the course of the Portofino founders' employment with Citadel Securities, actively working on crypto-related Business Plans and Strategies.  And Citadel Securities has since been engaged in a variety of crypto-based activities, including high-frequency crypto trading.  Strategic hires to expand the crypto business started at Citadel Securities while Portofino's founders were still employed there.

67.     In spring 2021, Vincent Prieur, a former New York-based employee who has since been recruited to Portofino, along with other Citadel Securities employees, prepared and delivered an internal presentation on Citadel Securities' crypto-related business plan, strategies, and opportunities.  Prieur's presentation, as set forth in greater detail below, included proprietary and confidential information about Citadel Securities' plans for high-frequency crypto trading.

68.     Citadel Securities' asset-neutral Trade Secrets and other confidential information were an essential part of the various Business Plans and Strategies that Prieur and his team developed and assessed as part of their crypto work for Citadel Securities.

69.      In the months that followed, Citadel Securities implemented the Business Plans and Strategies that Prieur had presented in the spring of 2021, assembling teams of employees and

building the operational framework and technology platforms to engage in high-frequency crypto trading.

70.     Citadel Securities launched its internal algorithmic crypto trading business in early 2022, before Prieur left Citadel Securities to join Portofino.

71.     In addition to its internal crypto market-making trading, in January 2022, Citadel Securities announced a crypto-focused investment by Sequoia Capital and Paradigm.   The Managing Partner of Paradigm commented: "We look forward to partnering with the Citadel Securities team as they extend their technology and expertise to even more markets and asset classes, including crypto."5

72.     In June 2022, Citadel Securities announced it was entering into a joint venture with high-frequency trading firm Virtu Financial and crypto-focused venture capital firm Sequoia Capital to establish a liquidity-aggregating crypto trading platform that brings together market makers from across the industry who can provide liquidity to reduce spreads and improve market efficiencies on the platform.6

73.     This joint venture, EDX Markets, officially launched on September 13, 2022,7 with Citadel Securities' former New York-based Global Head of Business Development as its CEO. EDX Markets' CEO remains based in New York.  Citadel Securities' Trade Secrets and other

---

5  Press Release, Citadel Securities, Citadel Securities Announces $1.15 Billion Investment From Sequoia and Paradigm (Jan. 11, 2022), https://www.citadelsecurities.com/news-and-insights/citadel-securities-announces-1-15-billion-investment-from-sequoia-and-paradigm/.

6   Katherine Doherty, *Citadel Securities' Business Head Nazarali Leaves for Joint Crypto Venture With Virtu*, Bloomberg (June 28, 2022), https://www.bloomberg.com/news/articles/2022-06-28/citadel-securities-nazarali-leaves-to-run-firm-s-crypto-venture.

7  Press Release, EDX Markets, Digital Asset Exchange EDX Markets Launches with Backing from Leading Broker-Dealers, Global Market Makers and Venture Capital Firms (Sept. 13, 2022), https://www.businesswire.com/news/home/20220913005367/en/.

confidential information, designed, in part, from the work of Prieur and others, are an essential component of the technology and infrastructure used by EDX Markets.

74.     Just two days later, on September 15, 2022, Portofino emerged from "stealth mode."  Portofino announced that it, too, was a crypto market maker led by "leaders from Citadel Securities, the leading global market maker in traditional finance" and that it had market-leading high-frequency trading technology.[8]

## II.   PORTOFINO MISAPPROPRIATED CITADEL SECURITIES' TRADE SECRETS AND CONFIDENTIAL INFORMATION

### A.   Portofino's Founders Held Key Positions at Citadel Securities and Had Access to Citadel Securities' Trade Secrets and Confidential Information

#### 1.   Portofino Co-Founder Leonard Lancia

75.     From September 2018 to March 2021, Portofino co-founder Leonard Lancia was a senior Quantitative Researcher and ultimately Head of Systematic European Options Market Making, who had full access to Citadel Securities' Trade Secrets, including but not limited to its confidential and proprietary Research Methodology.

76.     Lancia's principal project during his tenure at Citadel Securities was to take and leverage Trade Secrets from across Citadel Securities' existing businesses in New York and elsewhere and use them to build, deploy, and oversee a new business line for Citadel Securities: Systematic European Options Trading.

77.     Because he was responsible for launching a new trading business that was based on other established Citadel Securities businesses—most notably, Citadel Securities' existing U.S.

---

[8] Press Release, Portofino Technologies, Portofino Technologies Announces $50 Million Investment to Build Financial Infrastructure Technology to Power Digital Asset Adoption (Sept. 15, 2022), https://www.businesswire.com/news/home/20220915005104/en/Portofino-Technologies-Announces-50-Million-Investment-to-Build-Financial-Infrastructure-Technology-to-Power-Digital-Asset-Adoption.

Options Trading business—Lancia necessarily had access to, and used, Citadel Securities' Trade Secrets in his work.

78.     Specifically, Lancia created a systematic trading platform for European options trading using Citadel Securities' Trade Secrets.  He analyzed and wrote code for that trading platform using Citadel Securities' Trade Secrets.  He determined pricing and forecasted risk for European options trading using Citadel Securities' Trade Secrets.  And he developed and tested Trading Strategies for European options trading, and made improvements to those Trading Strategies, using Citadel Securities' Trade Secrets.

79.     Throughout this process, Lancia worked collaboratively with Citadel Securities' Head of U.S. Options Trading, who is based in Citadel Securities' New York office and runs Citadel Securities' U.S. options trading desk also located in New York, as well as the Chicago-based Head of Derivatives and other colleagues across the U.S.  Lancia leveraged Citadel Securities' Trade Secrets that were developed and used by the New York U.S. Options team and other U.S.-based teams.

### 2.  Portofino Co-Founder Alex Casimo

80.     From January 2018 to March 2021, Portofino's co-founder Alex Casimo was a senior Business Manager in the Office of the COO, where he was the primary point of contact for the European options trading desk that Lancia built using Citadel Securities' Trade Secrets.

81.     During his tenure in Citadel Securities' Office of the COO, Casimo had broad visibility into Citadel Securities' Business Plans and Strategies with respect to high-frequency, algorithmic, systematic, and automated trading in different assets, including crypto.

82.     Casimo knew from his role as Business Manager that Citadel Securities was exploring the application of its Trade Secrets to crypto and/or digital assets.  As discussed above, as early as March 2018, Casimo was involved in internal discussions, including with other senior

Citadel Securities employees about the firm's plans to trade crypto and crypto-adjacent financial products.  And Casimo knew which employees at Citadel Securities had experience and interest working in crypto, which, on information and belief, Portofino would later use to tortiously interfere with Citadel Securities' relationships with its employees.

### 3. Portofino's Founders Had Access to Citadel Securities' Trade Secrets and Other Confidential Information

83.    In their respective roles at Citadel Securities, Portofino's founders collectively covered the core and complementary functions needed to operate a market making and high-frequency trading business in any asset class, with Lancia providing quantitative research skills as part of the European Options Trading business, and Casimo aligned to the business in an operations capacity.  They facilitated market making and high-frequency trading in financial assets, which uses algorithmic, systematic, and automated trading.  Those skill sets were and are transferable across asset classes that are capable of trading on other exchanges, including digital assets and crypto.

84.    Portofino's founders also worked with other Citadel Securities colleagues who similarly had knowledge of an array of Citadel Securities' Trade Secrets—including proprietary systems and technologies, Trading Strategies, and plans for expanding its business—and who had deep expertise in the foundational systems, technologies, strategies, and ongoing improvements that underlie Citadel Securities' market making and high-frequency trading success (*i.e.*, its Research Methodology, Simulations, etc.). In the course of that work, they gained first-hand knowledge of the specific skills, expertise, and knowledge that these colleagues would bring to another firm and knew the harm that taking such colleagues could cause to Citadel Securities.

85.    Because they were senior Citadel Securities employees with access to Trade Secrets, Portofino's founders were subject to agreements that broadly prohibited them from

engaging in competitive activity during their employment with Citadel Securities and for an eight-month "Restricted Period" following termination of their employment, for which they were compensated hundreds of thousands of dollars.

86.     Lancia was also subject to an additional agreement that barred him from working in "high frequency trading, algorithmic trading, systematic trading or automated trading businesses" for another seven months after the end of his initial eight-month Restricted Period.

87.     In addition to their non-compete agreements, both Portofino founders were also subject to non-solicitation and non-disclosure agreements with Citadel Securities.

88.     They also agreed to assign all of their work product "that was conceived, made, developed, or acquired by [them] during any employment with Citadel that relate[s] in any way to Citadel's current, proposed or planned research, developments, operations, business strategies, products, or services."

### B.  Portofino Intentionally Hid Itself from Citadel Securities

#### 1.  Portofino Was Secretly Developed While Its Founders Were Still Employed by Citadel Securities and Had Access to Citadel Securities' Trade Secrets and Confidential Information

89.     Notwithstanding their express assignment to Citadel Securities of all rights in their work, Portofino's founders made the calculated decision to begin developing Portofino while they were still employed at Citadel Securities and had unfettered access to Citadel Securities' Trade Secrets and other confidential information.

90.     Casimo admitted as much.  As noted above, in an October 19, 2020 email to a partner at the venture capital firm 7percent, Casimo responded to a question about when he and Lancia would be free to "focus on" Portofino by assuring the 7percent partner that "we have (and are) putting in a LOT of focus into this project now."  As a result, Portofino itself is work product

that belongs to Citadel Securities because it was "conceived, made, developed or acquired" during its founders' employment with Citadel Securities.

91.     Some of the steps taken while Portofino's founders were still employed by Citadel Securities include the following:

92.     **August-October 2020: Casimo scrutinized his non-compete agreements with Citadel Securities**.  In August 2020, Casimo began raising questions about his non-compete agreement with Citadel Securities.

93.     As reflected in notes he emailed to himself on September 2, 2020, Casimo wanted to know if Citadel Securities would be the ultimate arbiter of any dispute over whether future employment was "competitive" with Citadel Securities.

94.     He also wanted to know whether he would still receive the Restricted Period payments if he engaged in employment during his non-compete period that was ultimately found to be non-competitive.

95.      On October 14, 2020, Casimo sent copies of both the renewed and prior versions of his non-compete agreement to his personal email.

96.     **Early Fall 2020: Portofino's pitch was circulating among the tech investor community.**  As described above, Portofino began to push its business case out to the early-stage tech investing community in the fall of 2020.  As early as September 22, 2020, Casimo was emailing with the 7percent partner after being introduced by a mutual friend who described Casimo as working on "a new opportunity to muscle in on this crypto game."  By that time, Portofino's "pitch document"—which Casimo himself later emailed directly to the 7percent partner—had already been sent by their mutual friend.  The pitch document asserted that Portofino's market-making business would generate $2.5 billion per year and touted its founders' experience as "senior leaders at a global High Frequency Trading firm," including their "track record of building

market making businesses."  This experience with Citadel Securities' Trade Secrets was, according to the pitch materials, "a crucial differentiating factor" for Portofino.

97.     Casimo met with the 7percent partner on September 25, 2020 and followed up with an email offering to introduce him to Lancia.  Casimo described Lancia as "far more technical" than Casimo, and said that he expected the 7percent partner and Lancia would have a "very good conversation on e.g. latency considerations for HFT trading."

98.     **October 2020: Portofino's founders solicited crypto-focused investors.**  The day after Casimo sent copies of his non-compete agreements to his personal email, on October 15, 2020, he sent an invitation for a video conference from his Citadel Securities email address to Lancia's personal email address and to the 7percent partner.  At the same time, Casimo sent the Portofino pitch document directly to 7percent from Casimo's personal email account.

99.     The following day, on October 16, 2020, Portofino's founders spoke with the 7percent partner and sought his financial support for Portofino.

100.    In an October 19, 2020 email to the 7percent partner, which copied Lancia, Casimo explained that he and Lancia were already "actively discussing" potential investments in Portofino with "a few VCs that have shown interest," and that "[i]ndicatively February 2021 would be our official start date."  Casimo also provided the 7percent partner with Portofino's new and expanded draft pitch deck for investors, in which the founders boasted about being "senior leaders" at "the world's largest HFT market maker" and made clear that they intended to "[r]eplicate the most successful trading business model in traditional financial markets in crypto-currency markets."

101.    These communications make clear that Portofino began discussing potential equity infusions with the Investor Defendants no later than the fall of 2020.  And they obtained financing from them in late 2020 and/or early 2021, while Portofino's founders were still working for Citadel Securities.

102.    **January 2021:   Portofino obtained seed funding.**   Indeed, by early 2021, Portofino's founders had secured at least one outside investor for Portofino.

103.    On his LinkedIn profile, French tech-industry investor and self-proclaimed "business angel" Jean Canzoneri identifies himself as a "Seed Investor" in Portofino starting in January 2021, right above a link to Bloomberg's September 2022 article about Portofino's emergence from "stealth mode:"[9]



[9] Until February 2023, Canzoneri's LinkedIn page indicated that he had provided Portofino with seed funding in January *2020*, a full fifteen months before Portofino's founders resigned their positions at Citadel Securities.

104.     In February 2021, the partner at 7percent introduced Portofino to a crypto-focused venture partner at Greenfield Capital.  The Portofino founders were still employed by Citadel Securities when the introduction to Greenfield Capital was made.

### 2.     Portofino Was Incorporated Immediately After Its Founders Left Citadel Securities

105.     Underscoring the fact that its founders had been developing Portofino for months before tendering their resignations from Citadel Securities in March 2021, Portofino's official company website was registered on March 13, 2021, less than two weeks after Lancia and Casimo gave notice and just one day after Lancia, and five days before Casimo, formally left Citadel Securities.

106.     Within a few weeks, on April 27, 2021, Portofino was incorporated in Zug, Switzerland.  Portofino's entry in the Commercial Register of the Zug Canton lists Lancia as the President of the Board of Directors since the date of Portofino's incorporation.  He is also Portofino's Chief Executive Officer.

107.     Portofino's other director at its founding was Martin Eisenring, a Zug attorney specializing in incorporation.  Eisenring is a serial advisor to crypto startups who provides advisory services for structuring, documenting, and regulating digital assets.  Eisenring has been affiliated with more than 120 different companies in Switzerland.  Since 2019, Eisenring has chaired the Investors' Working Group of the Crypto Valley Association, a trade association that supports the crypto industry in Zug.  He is a regular speaker on topics relevant to crypto startups.

108.     In August 2021, Hugues de Heinzelin de Braucourt joined Portofino's Board of Directors.  On information and belief, de Braucourt resides in New York and was formerly affiliated with the venture capital firm Global Founders Capital, which has publicly disclosed its investment in Portofino.

109.    After months of collaborating with Lancia to get Portofino off the ground, Casimo formally joined Portofino's Board on June 6, 2022.  Casimo is its Chief Operating Officer and describes himself as Portofino's Founder.

### 3.    Portofino Continued to Expand Its Operations in Secret

110.    Between its incorporation in April 2021 and its public exit from "stealth mode" in September 2022, Portofino traded billions of dollars' of crypto (based on its own public reporting) on behalf of clients all over the globe, including, on information and belief, clients in New York.

111.    During this time, Portofino also pursued both equity and debt financing from investors and lenders based in New York and elsewhere, and began recruiting employees around the world, including employees for Portofino's publicly announced New York office.  Portofino also began siphoning off employees from Citadel Securities' New York office, like Vincent Prieur.  Portofino concealed all of this from Citadel Securities.

112.    **Spring – Summer 2021:  Portofino began preparing to trade crypto products and started trading shortly thereafter.**  Mere weeks after its founders resigned from Citadel Securities, Portofino already employed at least two quantitative researchers, laying the groundwork for its plan to trade crypto products using Citadel Securities' Trade Secrets.  By May 2021, Portofino also employed at least two quantitative developers, a lead DevOps software engineer, a vice president of strategy and investments, a talent and acquisition partner, a chief financial officer, a vice president of strategy and operations, and an executive assistant/office manager.

113.    By the summer of 2021, Portofino had grown sufficiently large that, on information and belief, it threw itself a congratulatory, private party on a boat in Italy, attended by many of its employees.

114.     Portofino also purportedly began trading crypto products no later than September 2021.

115.     **July – August 2021:  Portofino sought additional funding.**  To finance Portofino's rapid growth and crypto trading, Lancia traveled to the United States including, on information and belief, to New York, in the summer of 2021 to meet with additional potential Portofino investors.  On information and belief, at least some of the additional funding provided by the Investor Defendants was secured in the summer and fall of 2021.

116.     **August – December 2021:  Portofino began clandestinely recruiting other Citadel Securities employees and continued raising funds from outside investors.**  At the outset of what ultimately became a widespread effort to recruit Citadel Securities employees to join Portofino, one U.S. Citadel Securities employee was asked by Portofino in August 2021 what his "hurdle number" would be to leave.  It is unknown to Citadel Securities when Portofino's outreach to that employee first began.

117.     While Portofino was not able to successfully recruit the employee it approached in August 2021, as discussed above, one of Portofino's pivotal successful recruits was Prieur, the "aggregator of all things crypto" in the U.S. for Citadel Securities.  Prieur was based in Citadel Securities' New York office.

118.     In October 2021, Casimo met Prieur in person to begin a concerted push to lure him from Citadel Securities.  Casimo told Prieur that Portofino had already raised funds from investors and had ambitious plans to grow into a crypto trading firm.

119.     Seriously considering Portofino's offer of employment, in November 2021, Prieur and his wife traveled to Zug, Switzerland, where Portofino is headquartered.  By this time, Portofino had at least ten employees and, on information and belief, had already begun to trade crypto.

120.     By November 2021, former Citadel Securities Systematic Options Trader Taym Moustapha had begun working at Portofino in violation of his non-compete agreement. Moustapha, who worked on the Citadel Securities European options trading desk that Lancia had established, had direct knowledge of the code base that is an essential component of Citadel Securities' Trade Secrets.[10]

121.     On information and belief, by December 2021, less than a year after its founders resigned from Citadel Securities, Portofino had already closed two rounds of fundraising and was actively trading on crypto exchanges, which it was only able to do by pitching and exploiting its many connections to Citadel Securities.  Indeed, so successful was Portofino's fundraising that, on information and belief, it threw itself an extravagant, private Christmas party to celebrate.

122.     Two months after visiting Portofino's offices in Switzerland, on January 10, 2022, Prieur contacted a senior Citadel Securities executive who was working on crypto projects to say that Prieur was "centralizing all our crypto efforts globally" and to ask for time with the senior executive to "align" on Citadel Securities' global crypto initiatives.  Later that month, Prieur informed Citadel Securities that he was leaving.

123.     Prieur—while still subject to a non-compete agreement with Citadel Securities— began working for Portofino in April 2022, bringing with him knowledge of Citadel Securities' crypto-related Business Plans and Strategies, as well as other of Citadel Securities' Trade Secrets and confidential information, much of which he had learned while working in Citadel Securities'

---

[10] Citadel Securities is engaged in ongoing arbitration proceedings in the United Kingdom involving former employees referred to in this Complaint.  Citadel Securities' claims against those individuals are separate and distinct from the claims brought against Portofino here.

New York office.  Indeed, that is precisely why Portofino hired Prieur: to make its own crypto trading business scalable. [11]

124.   **February 2022:  Portofino further expanded its recruiting efforts.**  In February 2022, Portofino's founders attended a recruiting event organized by the Oxford University Crypto Society on "High Frequency Trading in Crypto."   A Facebook post associated with the event described Portofino as being "backed by some big names, including Peter Thiel" and touted Portofino's connections to Citadel Securities.

125.   By February 2022, Portofino and its recruiters were also prolific posters on job boards, seeking additional employees for roles in multiple locations.

126.   **May 2022:  Portofino began obtaining debt financing.**  In May 2022, Portofino obtained debt financing from crypto lender BlockFi International Ltd.   Portofino obtained additional debt financing from crypto lender Celsius Network LLC in June 2022, and from crypto investment firm Maven 11 in September 2022.

127.   **May 2022:  Portofino recruited New York employees.**  In May 2022, Portofino recruiter Debolina Agarwal—who describes herself on LinkedIn as a "Global Acquisition Partner—Blockchain, Crypto, Market Making, High Frequency Trading"—began posting on LinkedIn about open roles at Portofino.

---

[11] After being actively recruited by Portofino, Prieur began working at the company more than a year before his non-compete period was set to expire on June 19, 2023.  Citadel Securities obtained a temporary restraining order preventing Prieur from continuing to violate his non-compete agreement pending resolution of the parties' dispute. *See Citadel Secs. Ams. Servs. LLC v. Prieur*, No. 1:22-cv-05185, ECF 16 (N.D. Ill. Sep. 28, 2022) (granting TRO). Citadel Securities' case against Prieur was subsequently voluntarily dismissed.  *Id.*, ECF 32, 33 (N.D. Ill. Oct. 26, 2022).  Prieur, on information and belief, honored the remainder of his non-compete period before returning to work for Portofino earlier this year.

128.    The open positions at Portofino that Agarwal posted were located in New York, among other locations:



129.   **May 2022:  Portofino hosted a one-year anniversary party.**  To celebrate the one-year anniversary of its operations, on information and belief, Portofino hosted a private party at a restaurant on the lake outside of Zug.

### 4.   Portofino Finally Emerged from "Stealth Mode"

130.   On September 15, 2022, Portofino came out of "stealth mode," announcing that it had raised $50 million from Valar Ventures, Global Founders Capital, and Coatue Management, and that it had thirty-five employees "dispersed between offices in Switzerland, London, New York, and Singapore."[12]  Valar Ventures and Coatue Management are both New York-based investors in technology and blockchain companies.

131.   According to Portofino, it was "ready for publicity," bragging that it had "handpicked a team of high frequency trading specialists from the best firms in traditional finance, [including] Citadel Securities."[13]

132.   Consistent with Portofino's eagerness for publicity and promoting its ties to Citadel Securities, Bloomberg ran the following story with "Citadel Securities" appearing in both the headline and the first few words of the opening sentence:[14]

---

[12]  Sarah Butcher, *Ex-Citadel Securities Staff Say New Venture Has Best Tech Jobs*, eFinancialCareers (Sept. 15, 2022) https://www.efinancialcareers.com/news/2022/09/portofino-technologies-crypto-jobs;  *see also*  Press Release, Portofino Technologies, *supra* n.8.

[13]  Butcher, supra n.11.

[14]  Yueqi Yang and Ivan Levingston, *Ex-Citadel Securities Duo Unveils Crypto High-Speed Trading Firm*, Bloomberg (Sept. 15, 2022), https://www.bloomberg.com/news/articles/2022-09-15/ex-citadel-securities-duo-unveils-crypto-high-speed-trading-firm.



Technology

**Ex-Citadel Securities Duo Unveils Crypto High-Speed Trading Firm**

■ Portofino emerges from 'stealth mode' with $50 million backing
■ Bets on providing liquidity across web3 services and sectors

A pair of former Citadel Securities employees are making public a market-making firm for cryptocurrencies they founded with the backing of $50 million from venture capitalists.

Leonard Lancia, Citadel Securities' former head of Europe systematic market making for derivatives, and Alex Casimo, who was with the firm's business-management team in Europe, founded Portofino Technologies in April 2021. Since then, the company has traded billions of dollars in so-called stealth mode, the executives said in an interview.

Alex Casimo, left, and Leonard Lancia. *Source: Portofino*

By Yueqi Yang and Ivan Levingston
September 15, 2022 at 2:00 AM EDT

133.    eFinancialCareers similarly emphasized Portofino's ties to Citadel Securities in its story about Portofino's emergence from "stealth mode":[15]

Fintech

## Ex-Citadel Securities staff say new venture has best tech jobs

by Sarah Butcher    15 September 2022    4 minute read

Portofino Technologies isn't new. Casimo founded it in April 2021 with the CEO Léonard Lancia. Both men came from Citadel Securities' London office, where Casimo was a COO and part of the business management team and Lancia was head of Europe systematic options market making. They already employ 35 people, and after raising $50m from VC firms, Casimo says they're out of "stealth mode" and ready for publicity.

134.    In its emergence from "stealth mode," Portofino leaned heavily into the halo effect that its founders' and other employees' connections to Citadel Securities—one of the world's most successful market makers—provided.   Their work at Citadel Securities conferred instant credibility on Portofino, serving as shorthand for Portofino's purported market-making and trading

---

[15]   Butcher, *supra* n.11.

acumen.  That is why the name "Citadel Securities" made up two of the very first few words in

Portofino's own September 15, 2022, press release, and why that same release acknowledged that

Citadel Securities was "the leading global market maker in traditional finance":[16]

```
ZUG, Switzerland -- September 15, 2022

Two former Citadel Securities leaders, Leonard Lancia and Alex Casimo, have
launched Portofino Technologies and have raised over US$50 million in equity
funding from Valar Ventures, Global Founders Capital and Coatue.
```

135.    To the public, the message was clear:  two former Citadel Securities employees

had taken what they learned at Citadel Securities—*i.e.*, Citadel Securities' Trade Secrets and

confidential information—to start a rival high-frequency crypto trading firm.

136.    As part of Portofino's emergence from "stealth mode," both of Portofino's founders

spoke at a conference hosted by the Crypto Valley Association in Zug held on September 14-15,

2022, during which they actively promoted Portofino as "high frequency trading specialists" who

"deploy [their] tech to market make on centralized and decentralized crypto exchanges."[17]

137.    Since exiting "stealth mode," Portofino has continued to play on its connections to

Citadel Securities.  On March 9, 2023, the Clearpool crypto lending exchange announced that

Portofino was added as a new borrower on its platform.  The Q&A-style press release opened by

saying that Portofino was founded by "two former leaders at Citadel Securities."  Later, in response

to a question about risk management strategies that Portofino had put in place to "ensure lenders'

funds are not misused," Portofino flashed its bona fides: "Furthermore, we have an experienced

---

[16] Press Release, Portofino Technologies, *supra* n.8.

[17] CV Labs, *CV Summit Day 2*, YouTube (Sept. 15, 2022), https://www.youtube.com/watch?v=YN13i3GSDq8, at 21:10-21:28.

Quantitative Trading team, led by Taym Moustapha (ex-Head of Trading for European Equities at Citadel Securities) that ensures our systems are operating as intended."[18]

### 5. Lies and Misrepresentations Prevented Citadel Securities from Discovering Portofino's Business

138.    At the time of their departure from Citadel Securities in March 2021 and for many months after, Portofino's founders intentionally hid the existence of Portofino and the nature of its business from Citadel Securities.

139.    Immediately after giving notice of his resignation, and again during communications with Citadel Securities' Human Resources team in early March and in an exit interview on March 16, 2021, Lancia claimed that he was leaving Citadel Securities because the company was not sufficiently focused on growing its business in Europe.  Based on Lancia's conversations with the Human Resources team and others, Citadel Securities understood that Lancia had "[n]o new role," did not have "any offers" of employment, and was "[s]till thinking about whether he want[ed] to stay in finance."  This was false.

140.    Casimo gave similar misrepresentations to his manager and false answers in his exit interview conducted a few days later in March 2021.  He said that he was leaving because Citadel Securities was not invested in Europe and that there was not enough consistency in the company's priorities.  Casimo told his manager and the HR interviewer that he did not have a new job and complained about Citadel Securities' non-compete policies.

141.    As a result of their misrepresentations to Citadel Securities, Portofino's founders obtained more favorable departure terms than they would have otherwise received—namely, the reduction of their mandatory three-month notice periods—and their non-compete and non-

---

[18]    Press Release, Clearpool, Clearpool Announces New Borrower – Portofino (Mar. 9, 2023), https://medium.com/clearpool-finance/clearpool-announces-new-borrower-portofino-5df5e11155a1.

solicitation periods ended sooner than otherwise would have been the case.  During those periods, they had an obligation to notify Citadel Securities of new employment, and they were being paid significant sums each month by Citadel Securities.

142.    In November 2021, after Portofino had hired multiple employees and, on information and belief, built the infrastructure and systems on which Portofino now runs, Lancia finally told Citadel Securities that he was "Chairman of the Board for the company Portofino Technologies Ltd."  He identified the company's business as the "development, sale and licensing of software."   Lancia provided this information more than six months after Portofino was incorporated, rather than fourteen days prior to engaging in any business of any type during his Restricted Period, as he was obligated to do under his agreements with Citadel Securities.

143.    After Citadel Securities reminded Lancia that he was still in his Restricted Period and subject to his non-compete agreement, Lancia wrote in November 2021 that he "intend[ed] to fully comply with my obligations towards Citadel Securities" and that Portofino "is not in any way competing with Citadel Securities."  This was not true.  Portofino was already taking steps to establish itself as a market maker and liquidity provider in the crypto space that would compete with Citadel Securities by trading crypto.

144.    Following repeated requests from Citadel Securities for additional information, in November 2021, Lancia ultimately said only that he had "invested money in" Portofino and that as an "early stage investor[]" he "like[d] to sit on the board."  Lancia wrote that he did not have any "daily responsibilities" as chair, but that his general responsibilities were "[c]hairing the board," "[p]romoting high standards for corporate governance," and "[s]etting the board agenda, and making sure it's focused on strategic matters."  He conveniently omitted that, on information and belief, he was writing code and running a high-frequency trading operation.

145.    In response to a letter from Citadel Securities' outside counsel with detailed questions about Portofino, in December 2021, Lancia doubled down on his previous misrepresentations, stating that "Portofino does not compete in any way with Citadel Securities." Lancia described Portofino's business only as an "app that is a distributed ledger technology," the "scope of applications" of which "is not fully understood at this point"—failing entirely to note that its business was market making, not to mention its use of Trade Secrets and other confidential information belonging to Citadel Securities.

146.    When Casimo finally surfaced in spring 2022 and was expressly asked by Citadel Securities about his involvement with Portofino, he made similar misrepresentations about Portofino's business.  In April 2022, Casimo described the October 2020 investor call with the 7percent partner as a "phone call with an acquaintance" and said that he did not "recall the contents of the call."  In addition, he described Portofino only as a "technology / blockchain company" and said that "Citadel [Securities does] not participate in this sector."

147.    Casimo's statement to Citadel Securities was entirely untrue.  This would have been clear at the time to Casimo, who had been aware of Citadel Securities' crypto activities and plans as early as 2018, when, as a Citadel Securities employee, he started participating in Citadel Securities' internal communications about crypto and learned of some of the activities already underway.

148.    Portofino's efforts to hide its activities extended into its recruiting and employment practices.  On information and belief, Portofino employees were instructed not to disclose their employment publicly, a prohibition that was formally incorporated into Portofino's employee agreements; the founders' approval was required for employees to post about their positions at Portofino on social media.

149.     However, in its private recruiting efforts, and publicly when Portofino exited "stealth mode" in September 2022, Portofino self-identified as a market maker in high-frequency crypto trading that had been in existence for more than seventeen months, belying the misrepresentations its founders had repeatedly made to Citadel Securities.

150.     Portofino's duplicity was intentional and brazen.  As an example of this deceit, after noticing the Bloomberg article on Portofino in September 2022, a Citadel Securities employee pointed out in a message to Prieur that he had previously told her that Casimo was "just chilling in Sicily post-CitSec."  Prieur blithely responded: "Hehe[.] Welll[.] [sic] He wasnt[.]"



151.    Meanwhile, by this time, Prieur had been paid by Portofino for almost six months (unbeknownst to Citadel Securities, which was paying him thousands of dollars per month under his non-compete agreement) and had attended Portofino's May 2022 one-year anniversary party.

**C.    Portofino Misappropriated Citadel Securities' Trade Secrets and Confidential Information**

152.    Despite what its founders told Citadel Securities in late 2021 about Portofino's business, it turns out that Portofino is not a software company or an app.

153.    Rather, Portofino describes itself as a crypto market maker.  By its own public statements, Portofino "provide[s] liquidity on any one of thousands of trading pairs . . . across all of the main centralized and decentralized crypto markets," offers "execution services to institutional clients," and helps provide "advisory and market making services upon" the listing of new tokens on either centralized or decentralized exchanges.[19]  Its public press release upon exiting from "stealth mode" was explicit; Portofino "deploys its proprietary market-making technology to trade,"[20] leveraging the same technology that Citadel Securities is using to perform similar services in a variety of asset classes and markets.

154.    Portofino also claims that its "competitive advantage is its superior proprietary technology . . . to provide its clients and partners with the best pricing in the market"[21]— a description that could have been ripped directly from Citadel Securities' own marketing materials.[22]

---

[19]    *Id.* at 27:50.

[20]    Press Release, Portofino Technologies, *supra* n.8.

[21]    *Id.*

[22]    *See, e.g.*, *What We Do*, Citadel Securities, https://www.citadelsecurities.com/what-we-do/ ("We provide liquidity to ensure institutions and retail investors can trade what they want, when they want—in all market conditions around the world. . . . We meet clients' liquidity needs across a range of asset classes.") (last visited May 16, 2023); *Equities*, Citadel Securities, https://www.citadelsecurities.com/what-we-do/equities/ ("[W]e provide block-sized liquidity to help clients minimize the impact of large trades and get the best price for their order.") (last visited May 16, 2023).

155.    In fact, one business reporter observed in September 2022: "[G]iven that [Portofino's founders'] previous employer announced its own plans to build a crypto trading marketplace in June, it's worth questioning whether the two might have been better off hanging on and building under the Citadel Securities umbrella instead."[23]

156.    Portofino is leveraging its founders' and other employees' associations with Citadel Securities as selling points and shorthand for Portofino's supposed acumen and expertise.  The essence of Portofino's pitch is:  You should invest in, or work for, or use Portofino because our founders used to work for Citadel Securities, Portofino's other top employees used to work for Citadel Securities, and we operate in the same space as Citadel Securities, performing the same market-making role and engaging in high-tech high-frequency trading just like Citadel Securities.

157.    The clear implication of that pitch is:  We, too, have Citadel Securities' "secret sauce."  In other words, Portofino operates with the Trade Secrets and other confidential information it obtained from Citadel Securities.

158.    This, of course, is the same pitch that Portofino had been delivering to the venture capital community as early as the fall of 2020, while its founders were still employed at Citadel Securities.  Portofino's founders made this pitch explicit in the draft PowerPoint deck sent in October 2020 described above, in which they boasted about being "senior leaders" at Citadel Securities and made clear that Portofino intended to "replicate" Citadel Securities' business model.

159.    Portofino's pitch has been successful, based on public quotes from its investors.  Oliver Samwer, the founder of Global Founders Capital, said that his firm was "excited about the potential of Portofino" because "[y]ou rarely find a founding team with such fantastic expertise to

---

[23]  Butcher, *supra* n.11.

solve the problems that digital asset market participants face today."[24]  The "fantastic expertise" to which Samwer was referring was clearly a reference to Portofino's many connections to Citadel Securities, the "crucial differentiating factor" for Portofino, according to Portofino itself.

160.    Indeed, the timing of Portofino's launch would not have been possible without using Citadel Securities' Trade Secrets and confidential information.  Portofino would not otherwise have been able to ramp up as quickly as it did, raise as much money as it did, or purportedly trade in billions of dollars on crypto exchanges as it claims that it did while operating in "stealth mode."

161.    Portofino's founders used Citadel Securities' Trade Secrets and other confidential information to build and operate Citadel Securities' European options trading business. Portofino's founders then did for Portofino exactly what they had done for Citadel Securities.  Just as they had used the Trade Secrets and know-how of Citadel Securities' U.S. options trading business to build and operate Citadel Securities' European options trading business, this time, they used Citadel Securities' Trade Secrets and other confidential information and, on information and belief, applied that same know-how to build and operate another new business—this time a high-frequency crypto trading business called Portofino.

162.    The asset-neutral nature of Citadel Securities' Trade Secrets and other confidential information—and Portofino's founders' and other employees' access to and familiarity with those Trade Secrets—makes it implausible that they and others at Portofino did not use—whether intentionally or unintentionally, directly or indirectly—Citadel Securities' Trade Secrets and other

---

[24] Vignesh R, *With $50M, former Citadel Securities execs launch high-frequency crypto trading platform* (Sept. 15, 2022), https://techfundingnews.com/with-50m-former-citadel-securities-execs-launch-high-frequency-crypto-trading-platform/.

confidential information at Portofino.  It would have been impossible for them not to since they are directly applicable to the business of Portofino.

163.    Portofino was well aware that these former Citadel Securities employees had obligations not to use Citadel Securities' Trade Secrets and other confidential information.  As detailed above, Citadel Securities has maintained robust security measures and restricted access to its Trade Secrets and other confidential information, and its employees are bound by contractual obligations not to misuse those Trade Secrets.

164.    That is also why Citadel Securities' senior employees—including Portofino's founders—agreed to assign to Citadel Securities all of their work product "conceived, made, developed, or acquired" during their employment with Citadel Securities; the likelihood that any such work product would include Citadel Securities' Trade Secrets and other confidential information demands such protection.  As set forth above, Portofino's founders clearly "conceived" and "developed" Portofino during employment with Citadel Securities.  The founders therefore knew that Portofino itself constituted "work product" that belonged to Citadel under the terms of their employment, which further explains the extents to which they went to conceal their duplicitous activities.

165.    On information and belief, Portofino has improperly used or relied upon, whether intentionally or inadvertently, directly or indirectly, Citadel Securities' Trade Secrets and other confidential information in its business and in providing services to its customers.

166.    In addition, on information and belief, Portofino has misappropriated Citadel Securities' confidential Business Plans and Strategies for its high-frequency crypto trading business through its poaching of Vincent Prieur.  Prieur was Citadel Securities' New York-based "aggregator of all things crypto in the U.S" and described himself to colleagues as "centralizing

all [of Citadel Securities'] crypto efforts globally." The presentation he made to senior executives in Spring 2021 included:

- detailed data about crypto exchanges, including bid-ask spreads, volume, and geographic information;

- in-depth analysis of crypto products, including data on market trends and funding rates;

- evaluations of existing crypto market-makers, including likely competitors;

- key considerations for the trading entity's design and corporate organization;

- possible staffing proposals, including information on current Citadel Securities employees who had prior crypto-related experience before joining the company; and

- other confidential and proprietary information related to Citadel Securities' development of its crypto business.

167.    That is precisely why Portofino hired Prieur rather than someone else without Citadel Securities' crypto-related work experience.

168.    The Trade Secrets and other confidential information misappropriated by Portofino reside and are used by Citadel Securities in New York. The asset-neutral nature of these Trade Secrets means that they are developed and used by Citadel Securities' businesses around the world, including in New York. Moreover, in building and operating Citadel Securities' European options trading business, Lancia leveraged and adapted the Trade Secrets and other confidential information used by the company's U.S. options trading business, which was operated in part out of New York. And Prieur's work on Citadel Securities' Business Plans and Strategies for high-frequency crypto trading took place in New York.

## III.    PORTOFINO TORTIOUSLY INTERFERED WITH CITADEL SECURITIES' EMPLOYMENT CONTRACTS

169.    Portofino has attempted to recruit more than a dozen Citadel Securities employees. For example, Portofino has solicited several Citadel Securities employees in New York, including

a Business Manager in the Office of the COO covering certain algorithmically-traded assets, a Systematic Trader, and a Quantitative Researcher.

170.    Portofino is specifically targeting Citadel Securities' employees, aiming to lure those who would bring to Portofino their knowledge of Citadel Securities' Trade Secrets and other confidential information.

### A. Portofino Successfully Induced Taym Moustapha to Breach His Employment Agreements with Citadel Securities

171.    Portofino tortiously induced Taym Moustapha to breach his employment agreements with Citadel Securities and work for Portofino.

172.    A Systematic Options Trader who worked on Citadel Securities' European options trading desk that Lancia established, Moustapha had direct knowledge of the code base that comprises essential components of Citadel Securities' Trade Secrets, including its Research Methodology and Trading Strategies.

173.    Because of the nature of his work and the sensitivity of the Trade Secrets and confidential information to which he had access, Moustapha's employment with Citadel Securities was subject to the non-compete, non-solicitation, and non-disclosure agreements described above.

174.    Portofino knew that Moustapha's employment with Citadel Securities was subject to these agreements because Portofino's founders had signed the same agreements in connection with their employment with Citadel Securities.  Indeed, Portofino used nearly *identical* copies of some of these agreements for its own employees.

175.    Those agreements prevented Moustapha from leaving Citadel Securities for Portofino until the expiration of his mandatory Restricted Period.

176.     On July 26, 2021, Moustapha informed Citadel Securities of his resignation.  In connection with his resignation, Citadel Securities and Moustapha agreed to reduce his non-compete period from fifteen to eight months.

177.     On August 1, 2021, Moustapha signed a termination letter stating that his employment with Citadel Securities would continue through October 26, 2021, the end of his three-month notice period.  The letter informed Moustapha that his Restricted Period would not expire until March 25, 2022.

178.     Moustapha joined Portofino by November 2021, during his Restricted Period.  On information and belief, Portofino knowingly induced Moustapha to join Portofino before his Restricted Period expired in March 2022.

179.     By hiring Moustapha in November 2021, not only did Portofino tortiously interfere with Citadel Securities' employment relationship with Moustapha and the obligations that Moustapha owed to Citadel Securities, but it also misappropriated Citadel Securities' Trade Secrets and other confidential information with which Moustapha was intimately familiar—specifically, the code base underlying Citadel Securities' confidential Research Methodology and Trading Strategies.

### B.  Portofino Successfully Induced Vincent Prieur to Breach His Employment Agreements with Citadel Securities

180.     Portofino tortiously induced Vincent Prieur, a Business Manager in the Office of the COO based in Citadel Securities' New York office, to breach his employment agreements with Citadel Securities and work for Portofino.

181.     At Citadel Securities, Prieur had access to, acquired, and created valuable Trade Secrets that were, and still remain, critical to Citadel Securities' business.

182.    In particular, Prieur had access and visibility into Citadel Securities' crypto-related Business Plans and Strategies.  He was part of a small team of Citadel Securities employees who researched, analyzed, and evaluated opportunities and strategies for Citadel Securities to apply its asset-neutral market-making model to high-frequency crypto trading.  Throughout 2021 and 2022, Citadel Securities invested significant time and resources into entering the crypto space, and Prieur was integral to those efforts.

183.    In his 2021 year-end performance assessment, Prieur identified his "Accomplishment 1" as: "Lead[ing] CitSec's foray into crypto," which he noted included "deliver[ing] an initial plan and diagnostic for trading crypto for C-suite," and "review/initial interaction with 20+ vendors and exchanges."  Later in that same self-assessment, Prieur stated that he had "confirmed [his] ability to deliver on high-visibility items," and listed "Crypto strategy kick off" as an example.

184.    His manager wrote that Prieur had "excellent strategic perspective," and that he was "one of the strongest on the team when it comes to evaluating a new opportunity or challenge from a conceptual problem solving perspective," noting that a "[r]ecent example[] include[d] crypto."

185.    In early 2022, Prieur's manager told Prieur that he "need[ed] to be the aggregator of all things crypto in the US and [others at Citadel Securities] need[ed] to keep [him] fully in the loop."

186.    Through his work on Citadel Securities' crypto team, Prieur was intimately familiar with Citadel Securities' research and analysis of opportunities in the crypto space and how Citadel Securities' confidential and proprietary Trade Secrets could be leveraged in the crypto markets.

187.    Because of the nature of his work and the sensitivity of the Trade Secrets and other confidential information to which he had access, Prieur's employment with Citadel Securities was subject to the non-compete, non-solicitation, and non-disclosure agreements described above.

188.    Portofino knew that Prieur's employment with Citadel Securities was subject to these agreements because Portofino's founders had signed the same agreements in connection with their employment with Citadel Securities.  Indeed, Portofino used nearly *identical* copies of some of these agreements for its own employees.

189.    Prieur's employment agreements prevented him from leaving Citadel Securities to join Portofino until the expiration of his mandatory Restricted Period in June 2023.

190.    As detailed above, however, Portofino began recruiting Prieur in October 2021. And Prieur informed Citadel Securities of his resignation from Citadel Securities in January 2022, shortly after he contacted a Citadel Securities executive to ask about other ongoing crypto projects at Citadel Securities, describing himself as "centralizing all our crypto efforts globally."

191.    On March 7, 2022, Prieur signed a Transition Letter stating that his employment with Citadel Securities would continue through March 18, 2022.

192.    On March 18, 2022, Prieur signed a Cessation of Employment Agreement & General Release.  In that agreement, Citadel Securities provided formal notice that it had elected a Restricted Period of fifteen months as provided for and defined in Prieur's non-compete agreement, which would run until June 19, 2023.  The Agreement stated that Prieur would receive monthly Restricted Period payments as defined in the non-compete agreement, so long as he complied with the terms of the non-compete agreement.

193.    On September 9, 2022, Prieur informed Citadel Securities that he had joined Portofino during his Restricted Period.  On information and belief, Portofino knowingly induced Prieur to join Portofino before his Restricted Period expired in June 2023.

194.    By inducing Prieur to leave Citadel Securities for Portofino, not only did Portofino tortiously interfere with Citadel Securities' employment agreement with Prieur, but it also misappropriated Citadel Securities' Trade Secrets and other confidential information relating to its

Business Plans and Strategies for high-frequency crypto trading, which Prieur himself had developed.

### C. Portofino's Recruitment of Other Employees Caused Citadel Securities to Pay Substantial Retention Compensation

195.    In addition to losing valuable talent like Moustapha and Prieur, Citadel Securities has been forced to pay substantial amounts responding to Portofino's active recruitment of Citadel Securities employees and its push for them to breach their employment agreements with Citadel Securities.

196.    For example, in March 2022, while still in his mandatory non-solicitation period, Casimo met with Employee 1, a key member of Citadel Securities' Advanced Technology Team— the group that facilitates high-frequency trading—and a Citadel Securities employee since 2011, to try to recruit him as Portofino's Chief Technology Officer.

197.    Employee 1 soon received a formal job offer from Portofino.  That offer included a range of documents, such as non-competes and non-solicitation agreements.   Among those documents was a letter detailing the extraordinary efforts Portofino would go to in order to cover Employee 1's legal expenses should Citadel Securities challenge his employment by Portofino.

198.    Portofino met with Employee 1 again on May 5, 2022.  During that discussion, Portofino told Employee 1 that his non-compete with Citadel Securities would not apply if he came to work for Portofino.  This, of course, was a lie.  Portofino also offered Employee 1 his own portfolio and margin to manage.

199.    In light of these recruitment efforts, Citadel Securities was forced to make Employee 1 a counteroffer that included substantially increased compensation in order to keep him at Citadel Securities.

200.     As another example, on December 20, 2021, while he was still subject to his non-compete and non-solicitation agreements with Citadel Securities, Moustapha met with Employee 2, yet another senior member of Citadel Securities' Advanced Technology Team, and asked if he would be interested in a role at Portofino.  Moustapha told Employee 2 in writing that Portofino would cover the cost of a lawyer should Citadel Securities "go after you" for leaving to work for Portofino.

201.     A few weeks later, on February 10, 2022, Portofino sent employment documents to Employee 2, noting that they "may look familiar" since they were based on Citadel Securities' templates.  The next day, Portofino told Employee 2 that his non-compete with Citadel Securities would not apply if he came to work for Portofino.  Portofino later emphasized again that Employee 2 did not need to worry about Citadel Securities bringing claims against him.  Portofino even sent Employee 2 an Indemnity Letter on March 13, 2022.

202.     On April 27, 2022, Employee 2 resigned from Citadel Securities to work for Portofino.

203.     Once again, Citadel Securities was put in the position of having to convince Employee 2 to stay by agreeing to pay him additional compensation.

### D.  Portofino Has Solicited Over a Dozen Other Citadel Securities Employees

204.     In addition to Moustapha, Prieur, Employee 1, and Employee 2, Portofino has solicited over a dozen other Citadel Securities employees from a variety of roles, including Citadel Securities' Head of Crypto Trading, Citadel Securities' Director of Systematic Options Trading, a member of the team that developed Citadel Securities' crypto trading operations, an options trader, and a software engineer.

205.    A consistent feature among all of the Citadel Securities employees whom Portofino has solicited is their common knowledge of Citadel Securities' Trade Secrets and other confidential information and, in many instances, its crypto-related Business Plans and Strategies.

### E.  Citadel Securities Has Been Damaged by Portofino's Recruitment Efforts

206.    Portofino's wrongful inducement of Prieur and Moustapha to breach their employment agreements with Citadel Securities damaged Citadel Securities by depriving the company of Prieur's and Moustapha's expertise and the benefits of its investment in their development.

207.    Citadel Securities also suffered millions of dollars in monetary damages as a direct result of Portofino's other recruiting efforts, including because it was forced to pay additional compensation to retain employees who Portofino attempted to hire.

208.    Moreover, in addition to its founders' use of Citadel Securities' Trade Secrets and other confidential information obtained from their time working at Citadel Securities, on information and belief, Portofino is actively exploiting and planning to exploit Citadel Securities' Trade Secrets and other confidential information obtained from other former Citadel Securities employees, including Prieur and Moustapha.  That is why Portofino is targeting Citadel Securities' employees in its inducement efforts.

209.    At the time of his resignation, Prieur was the "aggregator of all things crypto in the US" for Citadel Securities, and therefore was intimately familiar with how Citadel Securities' Trade Secrets and other confidential information can be applied to a high-frequency crypto trading business.  On information and belief, Portofino has used and will continue to use Prieur's personal knowledge of Citadel Securities' Trade Secrets and other confidential information to develop its own market making products.  That is precisely why Portofino took the risk of tortiously interfering with Prieur's employment agreement and hired him.

210.     The same goes for Moustapha.  As a Citadel Securities Quantitative Trader working in systematic equities trading and then systematic options trading, Moustapha was familiar with Citadel Securities' Trade Secrets and other confidential information, and can use his knowledge of those Trade Secrets and confidential information to help Portofino build its business, including through his direct exposure to the source code used for Citadel Securities' Research Methodology and Trading Strategies.

## IV.     PORTOFINO'S CONDUCT VIOLATES NEW YORK'S UNFAIR COMPETITION LAW

211.     Citadel Securities has invested substantial resources and time into developing its Trade Secrets and other confidential information, which are the source of its competitive advantage in developing and deploying high-frequency trading using algorithmic, systematic, and automated Trading Strategies across a wide range of assets.

212.     While employed by Citadel Securities, Portofino's founders secretly developed Portofino.  During that time, Portofino's founders had unfettered access to Citadel Securities' Trade Secrets and other confidential information which are carefully guarded to protect their confidentiality and cannot be easily replicated.  Portofino also knows about Citadel Securities' crypto-related Business Plans and Strategies.

213.     Citadel Securities went to great lengths to ensure the secrecy of its Trade Secrets and other confidential information, as described above.

214.     Still, on information and belief, Portofino used Citadel Securities' Trade Secrets and other confidential information in building its business, as described above.

215.     Because of this, Portofino has unfairly received the benefits of the short-cuts and accelerated timeline this misappropriation provided, as well as the ability to raise tens of millions of dollars from investors and recruit skilled employees.

54

216.    Through the course of conduct detailed in the preceding paragraphs, Portofino has engaged in unfair competition by, among other things: unlawfully misappropriating and using, on information and belief, Citadel Securities' Trade Secrets and other confidential information from New York and elsewhere; its founders making deliberate misrepresentations to Citadel Securities as a means to avoid detection of Portofino's competing business; trading on Citadel Securities' reputation as a market maker to gain legitimacy with clients based in New York and elsewhere and raise financing from investors in New York and elsewhere; and tortiously interfering with Citadel Securities' employment contracts.

217.    Portofino was able to build its business in reliance on Citadel Securities' Trade Secrets, know-how, expenditures, and reputation. Portofino then used these competitive advantages that it stole from Citadel Securities to solicit investors and poach additional Citadel Securities' employees, resulting in Portofino's accelerated entrance into the very market in which Citadel Securities operates.

## V.    THE INVESTOR DEFENDANTS AIDED AND ABETTED PORTOFINO'S MISCONDUCT

218.    Defendant Canzoneri, a self-proclaimed "business angel," and the Doe Investor Defendants funded Portofino's theft of Citadel Securities' Trade Secrets and other confidential information, on information and belief, knowing that at the time of their investments in 2020 or 2021, Portofino's founders were still employed by Citadel Securities or in their respective Restricted Periods and, because of the nature of their jobs, had unfettered access to its Trade Secrets and other confidential information, as well as obligations to safeguard and not steal those secrets.

219.    On information and belief, Portofino would not have obtained Citadel Securities' Trade Secrets and other confidential information absent early assistance from the Investor

Defendants as seed investors. Canzoneri invested in Portofino at least two months before its founders resigned from Citadel Securities and, on information and belief, the Doe Investor Defendants invested before or in the months immediately following the founders' resignations. The seed funding that Portofino received while its founders were still employed at Citadel Securities or in their Restricted Periods enabled Portofino's development, including, on information and belief, its misappropriation of Citadel Securities' Trade Secrets and other confidential information.

220.   But for the Investor Defendants' financial backing, Portofino would not have been developed when it was or as quickly as it was, and, critically, while its founders still had broad access to Citadel Securities' Trade Secrets and other confidential information.

221.   With funding from the Investor Defendants, Portofino's founders were able to develop Portofino while doing for Citadel Securities precisely what Portofino, under their leadership, would eventually be doing: using Citadel Securities' Trade Secrets and confidential information to build and operate a new high-frequency trading business. The fact that Portofino so benefitted from the Investor Defendants' early investments only underscores the asset-neutrality and commercial value of Citadel Securities' Trade Secrets and other confidential information.

## CAUSES OF ACTION

### Count 1: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836
### (Against the Portofino Defendants)

222.   Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

223.   Citadel Securities owns and possesses certain Trade Secrets and other confidential information, as alleged above. This includes (1) Citadel Securities' confidential and proprietary Research Methodology; (2) the bespoke set of trading techniques and technologies, or confidential

and proprietary Trading Strategies, developed by Citadel Securities (using its Research Methodology) for trading in any asset that trades on electronic markets; (3) Citadel Securities' confidential and proprietary Simulations, used for testing, validating, and refining its Trading Strategies; and (4) Citadel Securities' confidential and proprietary Business Plans and Strategies, including for crypto.

224.   None of these Trade Secrets are disclosed in any published Citadel Securities patents or patent applications.

225.   Citadel Securities' Trade Secrets and other confidential information relate to products and services, used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate or foreign commerce.

226.   Citadel Securities' Trade Secrets and other confidential information derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

227.   Citadel Securities has taken significant and reasonable measures to keep such information secret and confidential.  Citadel Securities has at all times maintained stringent security measures to preserve the secrecy of its Trade Secrets and other confidential information. Those security measures include, among other things: (1) requiring all employees to have an electronic access card; (2) restricting physical access to the office environment generally and to certain areas of the office based on individual employees' job functions; (3) strictly limiting visitor access; (4) 24-hour monitoring of its premises using security cameras, security staff, and other measures; (5) protecting computer access by stringent information security measures that include, but are not limited to, password protection and two-factor authentication, as well as granting each user only the level of access to Citadel Securities' computer network that is absolutely necessary

for them to perform their job functions; (6) limiting access to and knowledge of Citadel Securities'

confidential and proprietary Research Methodology and other Trade Secrets to senior business unit

leaders and other key employees responsible for developing and implementing the Trade Secrets;

(7) having and enforcing policies that require employees to maintain confidential information and

work product exclusively within Citadel Securities' secure environment; and (8) providing regular

training to employees about their obligations to comply with confidentiality obligations and

information security measures.

228.    Because of these security measures, Citadel Securities' Trade Secrets and other

confidential information are not available for others in any industry to use through any

legitimate means.

229.    In violation of Citadel Securities' rights and federal law, Portofino misappropriated

and is using Citadel Securities' Trade Secrets and other confidential information.

230.    The former Citadel Securities employees who now work at Portofino, including

Portofino's founders, possess highly confidential and technical knowledge concerning Citadel

Securities' Trade Secrets and confidential information.

231.    These former Citadel Securities employees' jobs at Portofino are, on information

and belief, nearly identical to their former jobs at Citadel Securities, so that the former employees

could not reasonably be expected to fulfil the responsibilities of their new positions without

directly or indirectly using Citadel Securities' Trade Secrets and confidential information. Given

that, on information and belief, Portofino built its business on the processes and methods created

by Citadel Securities, and is in direct competition with Citadel Securities, the Trade Secrets have

already been disclosed to Portofino.

232.    In using Citadel Securities' Trade Secrets and other confidential information to its

advantage, Portofino knew that the former employees owed duties to Citadel Securities to protect

and not use or otherwise disclose the Trade Secrets and other confidential information.  The former employees' disclosures of those Trade Secrets, on information and belief, constitute breaches of those obligations.

233.   Portofino's misappropriation of Citadel Securities' Trade Secrets and other confidential information, on information and belief, was intentional, knowing, willful, malicious, fraudulent, and oppressive.

234.   As a result of Portofino's misappropriation of Citadel Securities' Trade Secrets and other confidential information, Citadel Securities has suffered, and if Portofino's conduct is not stopped will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

235.   Citadel Securities has been damaged by all of the foregoing misconduct committed by Portofino and is entitled to an award of exemplary double damages and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(C)-(D).

236.   Because Citadel Securities' remedy at law is inadequate, Citadel Securities seeks— in addition to damages—permanent injunctive relief to recover and protect its Trade Secrets and other confidential information and to protect other legitimate business interests.  Citadel Securities is entitled to relief in the form of a permanent injunction requiring that Portofino:

a.   Cease and refrain from ever using Citadel Securities' Trade Secrets and other confidential information in any way, including in the development and/or operation of any business or enterprise that replicates, is based on, derives from, or otherwise incorporates in any way Citadel Securities' Trade Secrets and other confidential information;

b.   Return or destroy, as ordered by the Court, all copies of Citadel Securities' Trade Secrets and other confidential information that are in the possession or control of

Portofino, its employees, agents, or assigns, including all documents, records, processes, algorithms, implementing code, models, simulations, business plans, and / or strategies that replicate, are based on, derive from, or otherwise incorporate in any way Citadel Securities' Trade Secrets and other confidential information; and

c.   Identify all persons and entities to whom Citadel Securities' Trade Secrets and other confidential information have been disclosed and direct such parties to refrain from ever using or disclosing Citadel Securities' Trade Secrets and other confidential information in any manner.

**Count 2: Misappropriation of Trade Secrets and Confidential Information**
**(Against the Portofino Defendants)**

237.   Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

238.   Citadel Securities owns and possesses certain Trade Secrets and other confidential information, as alleged above.  This includes (1) Citadel Securities' confidential and proprietary Research Methodology; (2) the bespoke set of trading techniques and technologies, or confidential and proprietary Trading Strategies, developed by Citadel Securities (using its Research Methodology) for trading in any asset that trades on electronic markets; (3) Citadel Securities' confidential and proprietary Simulations, used for testing, validating, and refining its Trading Strategies; and (4) Citadel Securities' confidential and proprietary Business Plans and Strategies, including for crypto.

239.   None of these Trade Secrets are disclosed in any published Citadel Securities patents or patent applications.

240.   Citadel Securities' Trade Secrets and other confidential information derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

241.   Citadel Securities has taken significant and reasonable measures to keep such information secret and confidential.  Citadel Securities has at all times maintained stringent security measures to preserve the secrecy of its Trade Secrets and other confidential information. Those security measures include, among other things: (1) requiring all employees to have an electronic access card; (2) restricting physical access to the office environment generally and to certain areas of the office based on individual employees' job functions; (3) strictly limiting visitor access; (4) 24-hour monitoring of its premises using security cameras, security staff, and other measures; (5) protecting computer access by stringent information security measures that include, but are not limited to, password protection and two-factor authentication, as well as granting each user only the level of access to Citadel Securities' computer network that is absolutely necessary for them to perform their job functions; (6) limiting access to and knowledge of Citadel Securities' confidential and proprietary Research Methodology and other Trade Secrets to senior business unit leaders and other key employees responsible for developing and implementing the Trade Secrets; (7) having and enforcing policies that require employees to maintain confidential information and work product exclusively within Citadel Securities' secure environment; and (8) providing regular training to employees about their obligations to comply with confidentiality obligations and information security measures.

242.   Because of these security measures, Citadel Securities' Trade Secrets and other confidential information are not available for others in any industry to use through any legitimate means.

243.    In violation of Citadel Securities' rights at common law, Portofino misappropriated and is using Citadel Securities' Trade Secrets and other confidential information.

244.    The former Citadel Securities employees who now work at Portofino, including Portofino's founders, possess highly confidential and technical knowledge concerning Citadel Securities' Trade Secrets and confidential information.

245.    These former Citadel Securities employees' jobs at Portofino are, on information and belief, nearly identical to their former jobs at Citadel Securities, so that the former employees could not reasonably be expected to fulfil the responsibilities of their new positions without directly or indirectly using Citadel Securities' Trade Secrets and confidential information. Given that, on information and belief, Portofino built its business on the processes and methods created by Citadel Securities, and is in direct competition with Citadel Securities, the Trade Secrets have already been disclosed to Portofino.

246.    In using Citadel Securities' Trade Secrets and other confidential information to its advantage, Portofino knew that the former employees owed duties to Citadel Securities to protect and not use or otherwise disclose the Trade Secrets and other confidential information.  The former employees' disclosures of those Trade Secrets, on information and belief, constitute breaches of those obligations.

247.    Portofino's misappropriation of Citadel Securities' Trade Secrets and other confidential information, on information and belief, was intentional, knowing, willful, malicious, fraudulent, and oppressive.

248.    As a result of Portofino's misappropriation of Citadel Securities' Trade Secrets and other confidential information, Citadel Securities has suffered, and if Portofino's conduct is not stopped will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.

249.     Because Citadel Securities' remedy at law is inadequate, Citadel Securities seeks—in addition to damages—permanent injunctive relief to recover and protect its Trade Secrets and other confidential information and to protect other legitimate business interests.  Citadel Securities is entitled to relief in the form of a permanent injunction as set forth above in Paragraph 236.

### Count 3: Tortious Interference with Contractual Relationships
### (Against the Portofino Defendants)

250.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

251.     Citadel Securities and its employees executed employment contracts, and those employees were subject to such contracts when contacted by Portofino.

252.     Portofino had knowledge of Citadel Securities' employment contracts and the responsibilities contained therein.  Indeed, many of its agents identified above—Lancia, Casimo, and Moustapha—were previously subject to the very same contracts Portofino interfered with and even acknowledged those contractual obligations while engaging in a concerted scheme to induce Citadel Securities' employees to breach their employment contracts in order to work for Portofino.

253.     Portofino intentionally sought the breach of such contracts on numerous occasions, as alleged above.  And Portofino successfully induced the breach of contracts between Citadel Securities and Taym Moustapha, as well as between Citadel Securities and Vincent Prieur.  Portofino's inducement of Moustapha's and Prieur's breach of their employment contracts harmed Citadel Securities by opening up its Trade Secrets and other confidential information to a competitor, by depriving Citadel Securities of the expertise of Moustapha and Prieur, and by cheating Citadel Securities' out of its investment in Moustapha's and Prieur's development.

254.    Portofino's tortious efforts to induce other employees to breach their employment contracts also forced Citadel Securities to pay millions of dollars in additional retention compensation.

255.    Portofino solicited the above-identified breaches of contract without permissible justifications.

256.    As a result of Portofino's conduct, Citadel Securities sustained significant damages in an amount to be proven at trial.

### Count 4: Unfair Competition
### (Against the Portofino Defendants)

257.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

258.    Citadel Securities owns and possesses certain Trade Secrets and other confidential information, as alleged above.

259.    Citadel Securities' Trade Secrets and other confidential information derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

260.    Citadel Securities has taken reasonable measures to keep such information secret and confidential, as alleged above.

261.    On information and belief, Portofino improperly accessed and misappropriated Citadel Securities' Trade Secrets and other confidential information from New York and elsewhere in bad faith, as alleged above.

262.     Portofino's actions set forth above, including but not limited to the unauthorized misappropriation and use of Citadel Securities' Trade Secrets and other confidential information, constitutes unfair competition with Citadel Securities in New York and elsewhere.

263.     Portofino has unfairly received the benefit of this exploitation and appropriation to compete directly with Citadel Securities without expending the substantial time, as well as financial and other resources, that Citadel Securities put into developing these Trade Secrets and confidential information in New York and elsewhere.

264.     Portofino's acts of unfair competition, as described above, have damaged and will continue to cause irreparable harm to the business and goodwill of Citadel Securities unless restrained by this Court.

265.     Portofino's acts of unfair competition have caused harm and loss to Citadel Securities, thereby entitling Citadel Securities to the recovery of damages.

**Count 5: Aiding & Abetting Misappropriation of Trade Secrets and Confidential Information**
**(Against the Investor Defendants)**

266.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

267.     The Investor Defendants funded Portofino's theft of Citadel Securities' Trade Secrets and other confidential information from New York and elsewhere, on information and belief, knowing that at the time of their investment, Portofino's founders were still employed by Citadel Securities or in their respective Restricted Periods and because of the nature of their job functions, had unfettered access to Citadel Securities' Trade Secrets and confidential information, as well as obligations to safeguard and not steal those secrets.

268.     On information and belief, Portofino's founders would not have violated their obligations to Citadel Securities absent the Investor Defendants' early assistance as seed investors.

The seed funding that Portofino received while its founders were still employed at Citadel Securities or in their respective Restricted Periods enabled Portofino's misappropriation, on information and belief, of Citadel Securities' Trade Secrets and confidential information.

269.    The Investor Defendants' knowing participation in Portofino's development while Portofino's founders were still employed by Citadel Securities or in their respective Restricted Periods has caused harm and loss to Citadel Securities, from which the Investor Defendants have, on information and belief, reaped financial benefit and for which Citadel Securities is entitled to damages.

270.    Based on its investigative efforts to date, Citadel Securities has been able to identify Defendant Canzoneri as one of the Investor Defendants who aided and abetted Portofino's misconduct.  Citadel Securities expects to learn, through discovery obtained from Portofino and others, the identities of the Doe Investor Defendants, which information will allow Citadel Securities to amend this Complaint to name the Doe Investor Defendants.

### Count 6:  Unjust Enrichment
### (Against the Portofino Defendants)

271.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

272.    Plaintiffs and Portofino do not have a contractual relationship.

273.    Portofino has wrongfully obtained benefits, at the expense of the rightful owner of all aspects of Portofino's business, Citadel Securities.

274.    Through deceitful measures, Portofino has obtained immense financial support for a business created by two Citadel Securities employees during their employment with Citadel Securities.  Those same employees operated Portofino's business in "stealth" mode, including

solicitation of dozens of Citadel Securities employees, meetings with investors, and further development of Portofino's high-frequency trading platform.

275.   Portofino's success comes on the shoulders of Citadel Securities' operations, employees, Trade Secrets, and work product located in New York and elsewhere, as discussed above.

276.   In these circumstances, it would be unjust for Portofino to retain the proceeds of its wrongdoing.

## **PRAYER FOR RELIEF**

277.   WHEREFORE, Plaintiffs pray that this Court enter a final judgment awarding legal and equitable relief as follows:

A.   Judgment in Citadel Securities' favor and against Portofino and the Investor Defendants on all causes of action alleged here;

B.   Monetary damages in an amount to be determined at trial;

C.   Exemplary and punitive damages;

D.   Restitution;

E.   Permanent injunctive relief prohibiting Portofino from using Citadel Securities' Trade Secrets and other confidential information in any way and granting such other relief as set forth above;

F.   Pre-judgment and post-judgment interest;

G.   Attorney's fees and costs; and

H.   Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
July 21, 2023

Respectfully submitted,



_____
Timothy S. Martin
Gabrielle E. Tenzer
Michael Ferrara
Christopher R. Le Coney
Andrew L. Chesley
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
tmartin@kaplanhecker.com
gtenzer@kaplanhecker.com
mferrara@kaplanhecker.com
cleconey@kaplanhecker.com
achesley@kaplanhecker.com

*Counsel for Citadel Securities Americas LLC, Citadel Securities Americas Services LLC, Citadel Securities (Europe) Limited, and Citadel Management (Europe) II Limited*