**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITADEL SECURITIES AMERICAS LLC, CITADEL SECURITIES AMERICAS SERVICES LLC, CITADEL SECURITIES (EUROPE) LIMITED, and CITADEL MANAGEMENT (EUROPE) II LIMITED, | Case No.: 1:23-cv-05222 (GHW) |
| Plaintiffs, | |
| v. | |
| PORTOFINO TECHNOLOGIES AG, PORTOFINO TECHNOLOGIES USA, INC., JEAN CANZONERI, and JOHN DOES 1-10, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PORTOFINO TECHNOLOGIES AG AND PORTOFINO TECHNOLOGIES USA, INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

Introduction ....................................................................................................................1

Background ......................................................................................................................3

    A.    Lancia and Casimo Worked for Citadel Europe, One of Many High-Frequency Trading Firms. ............................................................................3

    B.    Lancia and Casimo Leave Citadel Europe and Pursue Business Citadel Securities Publicly and Repeatedly Rejected. ..........................................5

    C.    Citadel Securities Changes its Mind About Crypto and Tries to Squash Portofino. .........................................................................................6

    D.    Plaintiffs File this US Lawsuit Nearly a Year After the LCIA Arbitration. ......................................................................................9

Procedural History ........................................................................................................11

Argument .....................................................................................................................12

    A.    The Court Should Dismiss the Case in Favor of the More Convenient Forum of London, England. ..................................................................12

        1.    England is an adequate forum. ................................................13

        2.    The convenience of the parties decidedly weighs in favor of England. ...............................................................................14

        3.    The interests of England and the United States also favor dismissal. ............................................................................15

        4.    Plaintiffs' choice of forum is entitled to little weight. ...............16

    B.    The Court Lacks Personal Jurisdiction Over All But One Claim Against Portofino. ......................................................................................18

        1.    The Court lacks personal jurisdiction over the trade secret claims. .............................................................................19

        2.    The Court lacks personal jurisdiction over the claim for tortious interference with Moustapha's employment agreement. .........................22

        3.    The Court lacks personal jurisdiction over the claims for unfair competition and for unjust enrichment. ..................................23

C. Every Count in the Amended Complaint Fails to State a Claim Upon Which Relief Can be Granted. ..................................................................23

  1. English law governs most of the claims in the Amended Complaint..................................................................................23

  2. The Amended Complaint does not come close to pleading a trade secret claim. ...............................................................24

  3. Plaintiffs' unfair competition and unjust enrichment claims are derivative of their trade secret claims and fail for the same reasons...........................................................................................28

  4. The DTSA does not apply extraterritorially. ...............................28

  5. Plaintiffs' tortious interference count fails to plead a claim because Portofino did not knowingly induce a breach. ...........29

D. This Court Should Stay Any Claims It Does Not Dismiss Pending Resolution of the LCIA Arbitration. .......................................................32

Conclusion .........................................................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2008 WL 5958061 (E.D.N.Y. Sept. 26, 2008) ........................................................25

*In re Air Crash Near Clarence Ctr., N.Y.*,
983 F. Supp. 2d 249 (W.D.N.Y. 2013)..................................................................24

*Am. Recycling & Mfg. Co. v. Kemp*,
85 N.Y.S.3d 651 (2018)..........................................................................................30

*AVRA Surgical Robotics, Inc. v. Gombert*,
41 F. Supp. 3d 350 (S.D.N.Y. 2014)..............................................................20, 21

*Beijing Neu Cloud Oriental Sys. Tech. v. Int'l Bus. Machines*,
2022 WL 889145 (S.D.N.Y. Mar. 25, 2022) .........................................................29

*Bensusan Rest. Corp. v. King*,
126 F.3d 25 (2d Cir. 1997)......................................................................................20

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
2023 WL 2711417 (S.D.N.Y. Mar. 30, 2023) .......................................................24

*Bus. Networks of New York Inc. v. Complete Network Sols. Inc.*,
1999 WL 126088 (N.Y. Sup. Ct. Feb. 19, 1999), *aff'd in part as modified*, 696
N.Y.S.2d 433 (1999)................................................................................................28

*Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
155 F.3d 603 (2d Cir. 1998).............................................................................14, 17

*Chirag v. MT Marida Marguerite Schiffahrts*,
604 F. App'x 16 (2d Cir. 2015) ...................................................................19, 21, 22

*Coco v. AN Clark (Engineers) Ltd*,
[1969] RPC 41 ........................................................................................................24

*Credit Lyonnais Sec. (USA), Inc. v. Alcantara*,
183 F.3d 151 (2d Cir. 1999)..............................................................................19, 20

*Demag Cranes & Components Corp. v. Pinnacle Indus. Servs.*,
2021 WL 1525427 (N.D. Ohio Apr. 19, 2021).....................................................19

*Do Rosario Veiga v. World Meteorological Org.*,
486 F. Supp. 2d 297 (S.D.N.Y. 2007).....................................................................14

*Empire State Ethanol & Energy, LLC v. BBI Int'l*,
   2009 WL 1813205 (N.D.N.Y. June 25, 2009) ....................................................32, 33, 34, 35

*Faccenda Chicken v. Fowler*
   [1987] 1 Ch 117 ............................................................................................................24

*Falconwood Corp. v. In-Touch Techs., Ltd.*,
   642 N.Y.S.2d 869 (1996) ............................................................................................28

*Fintech Fund, F.L.P. v. Horne*,
   836 F. App'x 215 (5th Cir. 2020) ..............................................................................14

*First Union Nat. Bank v. Paribas*,
   135 F. Supp. 2d 443 (S.D.N.Y. 2001), *aff'd sub nom. FUNB v. Arab Afr. Int'l*
   *Bank*, 48 F. App'x 801 (2d Cir. 2002) ......................................................................17

*Gilstrap v. Radianz Ltd.*,
   443 F. Supp. 2d 474 (S.D.N.Y. 2006) ........................................................................13

*Gulf Oil Corp. v. Gilbert*,
   330 U.S. 501 (1947) ........................................................................................13, 14, 16

*Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*,
   600 F. Supp. 731 (E.D.N.Y. 1985) ............................................................................22

*Iragorri v. United Techs. Corp.*,
   274 F.3d 65 (2d Cir. 2001) ..........................................................................................14

*Jack L. Inselman & Co. v. FNB Fin. Co.*,
   41 N.Y.2d 1078 (1977) ................................................................................................30

*Kumaran v. Nat'l Futures Ass'n, LLC*,
   2022 WL 1805936 (S.D.N.Y. June 2, 2022), *reconsideration denied sub nom.*
   *Kumaran v. Nat'l Futures Ass'n*, 2023 WL 3160116 (S.D.N.Y. Apr. 28, 2023) ..................26

*L. Offs. of Ira H. Leibowitz v. Landmark Ventures, Inc.*,
   15 N.Y.S.3d 814 (2015) ..............................................................................................30

*LaSala v. Bank of Cyprus Pub. Co.*,
   510 F. Supp. 2d 246 (S.D.N.Y. 2007) ........................................................................16

*Lawrence v. NYC Med. Prac., P.C.*,
   2019 WL 4194576 (S.D.N.Y. Sept. 3, 2019) ........................................................25, 26

*Lear v. Royal Caribbean Cruises Ltd.*,
   2021 WL 1299489 (S.D.N.Y. Apr. 7, 2021) ..........................................................21, 22

*Lipin v. Bergquist*,
    574 F. Supp. 2d 423 (S.D.N.Y. 2008).............................................................................20

*Marks v. Energy Materials Corp.*,
    2015 WL 3616973 (S.D.N.Y. June 9, 2015) ..................................................................26

*Mujica v. AirScan*,
    771 F.3d 580 (9th Cir. 2014) ........................................................................................29

*OBG Ltd v. Allan*,
    [2007] UKHL 21, [2008] 1 AC 1 (House of Lords)................................................29, 30

*Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc.*,
    2013 WL 2531277 (S.D.N.Y. June 10, 2013) ...............................................................33

*Online Payment Sols. Inc. v. Svenska Handelsbanken AB*,
    638 F. Supp. 2d 375 (S.D.N.Y. 2009)............................................................................18

*Pellerin v. Honeywell Int'l, Inc.*,
    877 F. Supp. 2d 983 (S.D. Cal. 2012)............................................................................28

*Petersen Energia Inversora, S.A.U. v. Argentine Republic*,
    2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016).................................................................25

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981).................................................................................................13, 17

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003).............................................................................................16

*PT United Can Co. v. Crown Cork & Seal Co.*,
    138 F.3d 65 (2d Cir. 1998)................................................................................13, 14, 17

*Reid v. Ernst & Young Glob. Ltd.*,
    831 N.Y.S.2d 362 (Sup. Ct. 2006) .................................................................................24

*RLM Commc'ns, Inc. v. Tuschen*,
    831 F.3d 190 (4th Cir. 2016) .........................................................................................28

*SAS Group, Inc. v. Worldwide Inventions, Inc.*,
    245 F.Supp.2d 543 (S.D.N.Y. 2003)..............................................................................19

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007)........................................................................................................13

*Sunward Elecs., v. McDonald*,
    362 F.3d 17 (2d Cir. 2004).............................................................................................19

*Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*,
   68 F.4th 792 (2d Cir. 2023) .......................................................................................24

*Thornton Tomasetti, Inc. v. Anguillan Dev. Corp.*,
   2015 WL 7078656 (S.D.N.Y. Nov. 13, 2015) ........................................................32

*Vestergaard Frandsen A/S v Bestnet Europe Ltd*
   [2013] UKSC 31, [2013] 1 WLR 1556...................................................................24

*WorldCrisa Corp. v. Armstrong*,
   129 F.3d 71 (2d Cir. 1997)......................................................................................34

*Zirvi v. Flatley*,
   433 F. Supp. 3d 448 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020).............22

**Statutes**

18 U.S.C. § 1837.................................................................................................................29

**Rules**

N.Y. C.P.L.R. 302(a) ................................................................................... *passim*

**Other Authorities**

7percent Ventures (last visited Sept. 10, 2023), https://www.7pc.vc/. .........................15

Biz Carson, *These 13 Startups Have Raised Millions—But No One Knows What They Do*,
   Insider (Jan. 22, 2016), https://www.businessinsider.com/these-13-stealth-startups-
   have-raised-millions-2016-1?r=US&IR=T&IR=T...................................................8

Citadel, *Ken Griffin and David Rubenstein on Bloomberg TV*, YouTube (Apr. 11,
   2022), https://www.youtube.com/watch?v=CF_yiDKGY0M....................................7

Citadel Securities (Europe) Limited, *Pillar 3 Disclosures* at 2 (Dec. 31, 2021),
   https://www.citadelsecurities.com/wp-content/uploads/sites/2/2022/10/CSEL-
   Pillar-3-Report-2021-Final.pdf.................................................................................4

CNBC (@CNBC), X (July 18, 2018),
   https://twitter.com/CNBC/status/1019606181969584129......................................6

*Explore Our Roles*, Citadel (last accessed Sept. 10, 2023),
   https://www.citadel.com/careers/..............................................................................18

Greenfield Capital (last visited Sept. 10, 2023),
   https://greenfield.xyz/contact/imprint/....................................................................15

Jesse Pound, *Ken Griffin Says He Doesn't See the 'Economic Underpinning' of Cryptocurrencies*, CNBC (Feb. 19, 2021), https://www.cnbc.com/2021/02/19/ken-griffin-says-he-doesnt-see-economic-underpinning-of-cryptocurrencies.html ...................................................................6

Matt Villano, *Why Startups Launch in 'Stealth Mode' and Others Don't*, Entrepreneur (Oct. 17, 2013), https://www.entrepreneur.com/starting-a-business/why-startups-launch-in-stealth-mode-and-others-dont/229461 ................................8

New York Times Events, *Ken Griffin Talks Crypto, Digital Currency and The Future of the Economy*, YouTube (Nov. 10, 2021), https://www.youtube.com/watch?v=yF-WTRoSPhg ............................................................31

Nicolas Vega, *Billionaire Hedge Fund Founder Ken Griffin Softens His Anti-Crypto Stance: 'I Haven't Been Right on This Call'*, CNBC (Mar. 3, 2022), https://www.cnbc.com/2022/03/03/citadel-ceo-ken-griffin-changed-his-mind-about-cryptocurrencies.html. ..................................................................................5

The Economic Club of Chicago, *Kenneth C. Griffin, Founder & CEO, Citadel, 10/4/21*, YouTube (Oct. 5, 2023), https://youtu.be/dFE3X9qjWd0 ..................................6, 31

*Your Career. Accelerated.*, Citadel Securities (last accessed Sept. 10, 2023), https://www.citadelsecurities.com/careers/ ............................................................18

**INTRODUCTION**

In March 2021, Leonard Lancia and Alex Casimo left their jobs at Citadel Europe in London, where they made markets in European options. They were unhappy with the limited resources and the low priority Citadel Europe had given their business. At the time of their departure, Lancia and Casimo were considering starting a business that would use high-frequency trading (HFT) to make markets in cryptocurrency, something Citadel had repeatedly, publicly, and vehemently vowed it would not do.

After Lancia and Casimo left Citadel Europe, they founded Defendant Portofino Technologies AG ("Portofino") in Switzerland to focus on making markets in crypto. Almost a year later, Citadel Europe and its affiliates changed their mind about making markets in crypto and publicly acknowledged they had erred in rejecting the idea. To hamstring their upstart competitor, they immediately began harassing Portofino, Lancia, Casimo, and anyone who dealt with them. In June 2022, Citadel Europe eventually filed an arbitration against Lancia and Casimo in London. Citadel Europe alleged that Lancia, Casimo, and another former employee violated their employment contracts by soliciting employees and possibly misusing confidential information— but Citadel Europe acknowledged it had no idea if Portofino was using its trade secrets.

Eleven months later, apparently dissatisfied with the London arbitration proceedings, Citadel Europe and its American affiliates filed this lawsuit. It is full of baseless insinuations, calculated distortions, and outright falsehoods. It contains no factual allegations and seeks no relief beyond what Citadel Europe is already pursuing in the London arbitration. Aside from naming Portofino instead of its founders, the only discernable difference between the two proceedings is that while Citadel Europe's recent arbitration filing candidly admits that "it is not known, at this stage, whether the Respondents misused any confidential information," this lawsuit falsely

1

asserts—on information and belief—that Portofino *is* using Plaintiffs' trade secrets. This case does not belong here and lacks merit. The Court should dismiss this European dispute for three reasons.

*First*, the Court should dismiss this case in favor of the courts of England under the doctrine of forum non conveniens. All of the conduct alleged in the Amended Complaint (aside from the alleged poaching of a single New York employee, Vincent Prieur) took place in Europe. That is where Citadel Europe is located, where Lancia and Casimo worked for Citadel Europe, and where they formed and are operating Portofino. In fact, Citadel Europe's employment contracts with Lancia and Casimo *require* all disputes to be resolved in England, including those involving Citadel Europe's American affiliates.

*Second*, the Court lacks personal jurisdiction over Portofino with respect to all claims asserted in the Amended Complaint except the one that involves Prieur. All other conduct alleged in the Amended Complaint attributed to Casimo, Lancia, and Portofino took place in London or Switzerland. There are no well-pleaded allegations in the Amended Complaint that connect any of the other claims to anything Portofino allegedly did in New York.

*Third*, and alternatively, the Court should dismiss the Amended Complaint for failure to state a claim. There are simply no facts pleaded that suggest Portofino took or is using Plaintiffs' trade secrets. Citadel Europe acknowledged as much in the London arbitration earlier this year. The Amended Complaint doesn't even allege what those trade secrets might be, aside from general categories that cover everything Plaintiffs' business does.

Faced with a lack of facts supporting its trade secret claims, Plaintiffs say that Lancia and Casimo cannot engage in any HFT market-making, no matter what instrument they trade, without necessarily stealing their trade secrets. These allegations are clearly meant to intimidate other Citadel Securities employees who are thinking about jumping ship, but they are doomed to fail

2

under English and US law. No matter how much Plaintiffs may wish it otherwise, they do not own their employees and their employees' skills.

*Finally*, if the Court does not dismiss the case in its entirety, it should stay it pending the outcome of the London arbitration. The arbitration is scheduled for May 2024 and will potentially resolve many factual and legal issues raised by Plaintiffs' claims.

### BACKGROUND

**A.      Lancia and Casimo Worked for Citadel Europe, One of Many High-Frequency Trading Firms.**

High-frequency trading, or HFT, is now a common business model in market-making. HFT firms utilize computer algorithms to "make markets" by buying from market participants who want to sell securities and selling to market participants who want to buy securities. HFT firms improve the markets by "yield[ing] reduced spreads, faster execution times, a lower cost of liquidity, and lower trading costs." Donald C. Langevoort, *Sec. Law. Rev.*, § 1:3 The Securities Industry (2015).

Plaintiffs Citadel Securities (Europe) Limited and Citadel Management (Europe) II Limited (together "Citadel Europe") and Citadel Securities Americas LLC and Citadel Securities Americas Services LLC (together "Citadel America") are part of a global firm with offices and operations around the world ("Citadel Securities"). Citadel Securities is not the only HFT firm and far from the first; other prominent HFT market-makers include Jane Street, Virtu Financial, Hudson River Trading, IMC Trading, Jump Trading, and Susquehanna.

Defendant Portofino AG was founded by Leonard Lancia and Alex Casimo. Amended Complaint ("AC") ¶¶106, 109; Ex. 1 at ¶2 ("Casimo Dec."). Until March 2021, they worked for Citadel Europe in London. Citadel Europe publicly describes its "principal activity" as "technology-enabled liquidity provision and market making in equities, futures, options, interest

rate swaps and government securities."[1] Lancia, a French citizen, started working at Citadel Europe in London in September 2018. Casimo, a UK citizen, joined Citadel Europe in London in January 2018. There, Lancia focused on European equity options and Casimo on multiple asset classes. Mem. of Law in Support of Mot. to Seal, Ex. 1 at ¶18 ("Statement of Claim"); AC ¶¶75, 80. Before Citadel, Lancia worked at IMC Trading, where he honed his HFT skills. Mem. of Law in Support of Mot. to Seal, Ex. 2 at ¶40.1 ("Respondents' Statement"). Casimo honed his skills at Merrill Lynch's Global Markets team. *Id.* at ¶40.2. Citadel Europe actively recruited Lancia and Casimo for the skills they developed in their previous jobs.

Citadel Europe required Lancia and Casimo to sign employment agreements mandating that "all issues relating to [their] employment will be subject to the jurisdiction of and determined in accordance with the laws of England and Wales." Notice of Removal, Ex. 2 at 5, 9 (Dkt. No. 1-2) ("Casimo Agreement"); Ex. 3 at 5, 33 (Dkt. No. 1-3) ("Lancia Agreement"). The two employment agreements further required Lancia and Casimo to submit all disputes of any nature with Citadel Europe, any affiliate of Citadel Europe's, or any officer, director, employee, or agent of Citadel Securities, to mandatory arbitration in London.

The Employment Agreements contain several restrictive covenants, including non-solicits and non-competes. The non-competes only preclude Lancia and Casimo from participating in business activities "engaged in by Citadel at any time during [their] employment or that Citadel proposed or planned to engage in at any time in the twelve (12) month period prior to the termination of my employment." Casimo Agreement at 10; Lancia Agreement at 34.

---

[1]   Citadel   Securities   (Europe)   Limited,   *Pillar   3   Disclosures*   at   2   (Dec.   31,   2021), https://www.citadelsecurities.com/wp-content/uploads/sites/2/2022/10/CSEL-Pillar-3-Report-2021-Final.pdf.

B.     **Lancia and Casimo Leave Citadel Europe and Pursue Business Citadel Securities Publicly and Repeatedly Rejected.**

On March 1 and 2, 2021, Lancia and Casimo advised Citadel Europe that they were resigning. Statement of Claim ¶9.2. Lancia and Casimo were unhappy at Citadel Europe because of, among other concerns, Citadel Europe's lack of investment in and focus on the European options business they ran. Respondents' Statement ¶77.

After departing Citadel Europe, Lancia and Casimo founded Defendant Portofino Technologies AG, a Swiss company based in Zug, Switzerland. AC ¶¶106, 109. Portofino planned to and did ultimately become a market-maker solely focused on crypto. AC ¶74. It has no offices or clients in New York. Casimo Dec. ¶¶5-6. Portofino formed a Delaware subsidiary in December 2021 with an eye toward a future expansion to the United States. AC ¶16. But that subsidiary, Defendant Portofino Technologies USA, Inc., has never been used for any purpose; it has no assets, no operations, and no employees. Casimo Dec. ¶7. All of Portofino's employees are located at its offices in Zug, London, and Amsterdam. Casimo Dec. ¶4.

Citadel Securities had absolutely no interest in making markets in crypto while Lancia and Casimo worked there. On the contrary, Citadel Securities' famous founder, Ken Griffin, garnered significant press attention as an outspoken critic of crypto. Griffin's stance was long-held and widely broadcast. For example in 2017, Griffin told CNBC that cryptocurrency had "many of the elements of the tulip bulb mania" of the 1630s, opined that crypto investors "don't really understand what they're participating in" and that "bubbles tend to end in tears."[2]

He added in July of 2018: "[I]n our market-making business we've debated whether or not to make markets in cryptocurrencies. And I have a hard time finding myself wanting to be in the

---

[2] Nicolas Vega, *Billionaire Hedge Fund Founder Ken Griffin Softens His Anti-Crypto Stance: 'I Haven't Been Right on This Call'*, CNBC (Mar. 3, 2022), https://www.cnbc.com/2022/03/03/citadel-ceo-ken-griffin-changed-his-mind-about-cryptocurrencies.html.

position of being a liquidity provider to a product that I don't believe in."[3] In February 2021, just days before Lancia and Casimo departed, Griffin went back on CNBC to, among other things, attack cryptocurrency: "I just don't spend much time thinking about cryptocurrencies . . . I don't see the economic underpinning of cryptocurrencies."[4]

Even well after Lancia and Casimo left, in October 2021, Griffin again confirmed crypto just wasn't something Citadel Securities did. In response to a question about crypto, Griffin stated that it is "a jihadist call" against the United States dollar.[5] He then added: "We don't trade crypto because of the regulatory uncertainty. . . . Because of the lack of regulatory certainty around cryptocurrency, we just aren't involved today. . . . I just don't want to take on the regulatory risk in this regulatory void that some of my contemporaries are willing to take on."[6]

### C. Citadel Securities Changes its Mind About Crypto and Tries to Squash Portofino.

At some point after Griffin's October 2021 comments, however, Citadel Securities apparently had a change of heart about crypto. Not coincidentally, in December 2021, Citadel Europe's outside counsel began demanding information from Portofino and its founders, AC ¶145, and soon after began shaking down Portofino's recruiters, investors, and potential investors for information about Portofino, including by threatening litigation.

Citadel Securities' about-face was only publicly disclosed a full year after Casimo and Lancia's departure. In March 2022, Griffin told investors he had been wrong about making markets in crypto and that despite his "skepticism," "we have to give serious consideration to being a

---

[3] CNBC (@CNBC), X (July 18, 2018), https://twitter.com/CNBC/status/1019606181969584129.
[4] Jesse Pound, *Ken Griffin Says He Doesn't See the 'Economic Underpinning' of Cryptocurrencies*, CNBC (Feb. 19, 2021), https://www.cnbc.com/2021/02/19/ken-griffin-says-he-doesnt-see-economic-underpinning-of-cryptocurrencies.html.
[5] The Economic Club of Chicago, *Kenneth C. Griffin, Founder & CEO, Citadel*, *10/4/21*, YouTube at 46:35 (Oct. 5, 2023), https://youtu.be/dFE3X9qjWd0.
[6] *Id.* at 47:56, 49:52.

market maker in crypto." Therefore, Griffin continued, it would be "fair to assume" that Citadel would begin to engage in crypto "over the months to come."[7]

A few months later, in June 2022, Citadel Europe filed an arbitration against Casimo and Lancia in the UK (the "LCIA Arbitration"). The arbitration also named as a defendant Taym Moustapha, a former Citadel Europe employee who had worked at the European equity options desk in London. Statement of Claim ¶18; Casimo Dec. ¶11. Moustapha chose to leave Citadel Europe on July 26, 2021. Statement of Claim ¶68. He did so because Citadel Europe shut down his desk, making his position redundant. Respondents' Statement ¶103. Instead of accepting a different job at Citadel Europe that was below his experience level, he decided to leave. *Id.* Moustapha's resignation was still months before Citadel Securities changed its mind about crypto, and even longer before Griffin publicly disclosed the about-face.

The Court is already familiar with the substance of the LCIA Arbitration because its allegations are the same as in the Amended Complaint. In the LCIA Arbitration, Citadel Europe alleges that Lancia, Casimo, and Moustapha breached their Employment Agreements and engaged in tortious conduct. It alleges, amongst other things, that they:

(1) conspired to form a competing business (Portofino);

(2) lied to Citadel Europe about it;

(3) breached their employment contracts by soliciting "each other" and other Citadel Securities employees and potentially by misusing Citadel Securities' confidential information; and

(4) "infring[ed]" Citadel Europe's "intellectual property rights" because Citadel Europe "infers" that Lancia and Casimo began creating Portofino while still at Citadel Europe, and that Citadel Europe therefore owns it.

Statement of Claim ¶¶107.1, 107.2, 108.2, 123.

---

[7] Vega, *supra* note 2; *see also* Citadel, *Ken Griffin and David Rubenstein on Bloomberg TV*, YouTube at 15:27 (Apr. 11, 2022), https://www.youtube.com/watch?v=CF_yiDKGY0M.

Just as with the Amended Complaint, Citadel Europe's Statement of Claim spends most of its pages accusing Lancia and Casimo of misleading their employer about the reasons for their departure, the formation of Portofino, and Portofino's business. *Compare*, *e.g.*, Statement of Claim ¶¶9-10, 58-67, 75-97, *with* AC ¶¶4-6, 138-151. In both the Statement of Claim and the Amended Complaint, Citadel Securities grasps at straws, hoping the reader accepts the notion that Portofino's operation in "stealth mode" means it was engaged in wrongdoing. *Compare* Statement of Claim ¶¶76-79, 95, *with* AC ¶¶110-129. Of course, the Court is well aware that it is common for tech startups to operate in stealth mode to avoid attracting competition and copycats until their product is developed.[8] But vilifying "stealth mode" is apparently the best Plaintiffs have got.

The arbitral Statement of Claim also alleges that Lancia, Casimo, and Moustapha recruited a number of Citadel Securities' employees, including "each other" and Vincent Prieur, which either resulted in their departure or in Citadel Securities increasing their pay. *Compare* Statement of Claim ¶¶100-104, 107.2, *with* AC ¶¶169-210, 250-256. It also alleges that Portofino or some unknown parts of it are Citadel Europe's "Work Product" because Portofino was "conceived, made, developed or acquired" while Lancia and Casimo were still at Citadel Europe. *Compare* Statement of Claim ¶67, *with* AC ¶164.

The Statement of Claim, filed just this past February, does differ in one significant way from the Amended Complaint. It is candid that there is no information suggesting that Portofino took or used Citadel Securities' trade secrets or confidential information:

> "[W]ithout prejudice to the foregoing, each of the Respondents owed contractual and equitable duties in respect of Citadel Securities' confidential information. Beyond their

---

[8] *See, e.g.*, Matt Villano, *Why Startups Launch in 'Stealth Mode' and Others Don't*, Entrepreneur (Oct. 17, 2013) (explaining the "pros and cons of operating under stealth mode before launching a company"), https://www.entrepreneur.com/starting-a-business/why-startups-launch-in-stealth-mode-and-others-dont/229461; *see also* Biz Carson, *These 13 Startups Have Raised Millions—But No One Knows What They Do*, Insider (Jan. 22, 2016) (listing stealth startups backed by Al Gore, Sheryl Sandberg, Ken Goldman, Andreessen Horowitz, and Sierra Ventures among others), https://www.businessinsider.com/these-13-stealth-startups-have-raised-millions-2016-1?r=US&IR=T&IR=T; Respondents' Statement ¶112.2.

actions in soliciting Citadel Securities' employees, ***it is not known, at this stage, whether the Respondents misused any such information*** . . . ."

Statement of Claim ¶11 (emphasis added). Nevertheless, it asserts a claim for misuse of confidential information based on tenuous inferences. *Id.* ¶113.6.

Some of the relief sought in the LCIA Arbitration turns on whether Portofino was a "Competitive Enterprise" with respect to Citadel Securities, which requires that it do something Citadel Securities either (1) "engaged in" while Lancia and Casimo worked there or (2) "proposed or planned to engage in" within the twelve months prior to their departure. *See, e.g.*, Statement of Claim ¶¶108.12, 111-118; Casimo Agreement at 10; Lancia Agreement at 34. The problem for Citadel Europe in the LCIA Arbitration is that Portofino is simply not a "Competitive Enterprise." Both Citadel Europe's Statement of Claim and the Amended Complaint reveal that Citadel Securities never "proposed or planned to" make markets in crypto until after Lancia and Casimo left. Citadel Europe's Statement of Claim admits it never made systematic trades in crypto and it was an affiliate in Asia who first did so in March 2022, a full year after the duo left. Statement of Claim ¶24.2; *accord* AC ¶¶69-70 (alleging Plaintiffs did not begin, until the "months that followed" the "spring of 2021", to "assembl[e] teams of employees and building the operational framework and technology platforms to engage in high-frequency crypto trading" and didn't even trade until 2022). If Citadel Securities had been planning to start making markets in crypto before Lancia and Casimo left, Griffin would have been flat-out lying to the public, which the Court should assume he would not do.

The LCIA Arbitration is scheduled for a hearing in May 2024.

**D.    Plaintiffs File this US Lawsuit Nearly a Year After the LCIA Arbitration.**

Apparently unhappy with the LCIA Arbitration, Citadel Securities expanded its campaign to intimidate Portofino by filing this lawsuit in May 2023. The Amended Complaint repeats the

allegations made in the Statement of Claim, alleging that Lancia and Casimo conceived of Portofino while still at Citadel Europe, AC ¶164, lied to Citadel Europe about why they were leaving, AC ¶¶138-151, and misled Citadel Europe about the existence and nature of Portofino, AC ¶¶110-129.

The Amended Complaint seeks damages for the same conduct as the LCIA Arbitration. It seeks relief because Portofino allegedly solicited "more than a dozen Citadel Securities" employees, and successfully hired Moustapha and Prieur. AC ¶¶169-210, 250-256. Notably, the Amended Complaint does not allege that any of the Citadel Securities employees breached their employment agreements aside from Moustapha and Prieur.

The Amended Complaint likewise seeks damages for the alleged misuse of Citadel Securities' confidential information, asserting a claim for common-law misappropriation of trade secrets and violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*. As explained below, there isn't a single fact pleaded in the Amended Complaint that supports the inference that Portofino stole or is using Citadel Securities' trade secrets. The Amended Complaint boils down to a theory that any Citadel Securities employee who knows about HFT cannot work for any other HFT firm in any asset class without misappropriating Citadel Securities' trade secrets. According to Plaintiffs, their "Trade Secrets are asset neutral" so that employees who engage in any market-making *in any asset* for anyone other than Citadel Securities will necessarily steal them, even unknowingly. AC ¶51, 162. This theory is spelled out in paragraphs 162 and 165.

> 162. The asset-neutral nature of Citadel Securities' Trade Secrets and other confidential information—and Portofino's founders' and other employees' access to and familiarity with those Trade Secrets—makes it implausible that they and others at Portofino did not use—whether intentionally or unintentionally, directly or indirectly—Citadel Securities' Trade Secrets and other confidential information at Portofino. It would have been impossible for them not to since they are directly applicable to the business of Portofino.

165. On information and belief, Portofino has improperly used or relied upon, whether intentionally or inadvertently, directly or indirectly, Citadel Securities' Trade Secrets and other confidential information in its business and in providing services to its customers.

The Amended Complaint likewise alleges that merely by hiring Moustapha and Prieur, Portofino necessarily misappropriated Citadel Securities' trade secrets:

179. By hiring Moustapha in November 2021, not only did Portofino tortiously interfere with Citadel Securities' employment relationship with Moustapha and the obligations that Moustapha owed to Citadel Securities, but it also misappropriated Citadel Securities' Trade Secrets and other confidential information with which Moustapha was intimately familiar—specifically, the code base underlying Citadel Securities' confidential Research Methodology and Trading Strategies.

194. By inducing Prieur to leave Citadel Securities for Portofino, not only did Portofino tortiously interfere with Citadel Securities' employment agreement with Prieur, but it also misappropriated Citadel Securities' Trade Secrets and other confidential information relating to its Business Plans and Strategies for high-frequency crypto trading, which Prieur himself had developed.

The Amended Complaint also pleads claims for unfair competition and unjust enrichment that are derivative of the trade secret claims. AC ¶¶211-217, 257-265, 271-276.

Finally, "[o]n information and belief," Plaintiffs allege that a French angel investor named Jean Canzoneri, as well as other unnamed investors of Portofino, "aided and abetted" Portofino's "misappropriation of trade secrets." AC ¶¶266-270. While dragging an angel investor into this lawsuit may send a chilling message, there are absolutely no facts pleaded to support this allegation.

## PROCEDURAL HISTORY

On May 17, Plaintiffs filed this case in the Supreme Court of New York for the County of New York. On June 20, 2023, Defendants removed the case. Dkt. No. 1. Seven days later, Defendants filed letters outlining their arguments for dismissal of this action and requesting a pre-motion conference. Dkt. Nos. 19-20. In response, Plaintiffs amended their complaint to include vague allegations regarding Defendants' ties to New York and to plead a count under the Defend

Trade Secrets Act. Dkt. No. 25; Dkt. No. 26-1 (showing changes).

On July 28, 2023, Defendants filed a second round of pre-motion letters, to which Plaintiffs responded. Dkt. Nos. 27, 28, 30. On August 4, 2023, during the pre-motion conference, the Court granted defendants leave to file their motions to dismiss and to stay. Dkt. Nos. 31, 32.

ARGUMENT

The Court should dismiss Plaintiffs' complaint for three reasons. *First*, the Court should dismiss this case because the Southern District of New York is an inconvenient forum. With the limited exception of the conduct related to the Prieur claim, all conduct occurred in Europe.

*Second*, the Court lacks personal jurisdiction over Portofino for the claims unrelated to Prieur because the requirements of New York's long arm statute are not met.

*Third*, Plaintiffs fail to state their two claims for trade secret misappropriation because the Amended Complaint fails to specify the trade secrets and to allege facts showing misappropriation. The unjust enrichment and unfair competition claims are derivative of the trade secret claims and fail for the same reasons. Nor have Plaintiffs stated their claims for tortious interference because there is nothing pleaded from which it can be inferred that Portofino induced a breach of any contract knowingly.

If the Court does not dismiss all the claims, it should stay this case to allow the LCIA Arbitration to reach a resolution that will likely resolve many of the issues in this litigation.

### A. The Court Should Dismiss the Case in Favor of the More Convenient Forum of London, England.

The Court should dismiss all the claims against Portofino on grounds of forum non conveniens because this is a European dispute, with European parties' interests at stake, and with

12

nearly all the evidence and witnesses in Europe.[9] It was no accident that Citadel Europe, the Plaintiff with the real interest in this case, selected London as the forum for all disputes to be resolved with Lancia, Casimo, and Moustapha.

"The *forum non conveniens* inquiry has two steps." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998). First, the court needs to determine that an alternative forum is available. *Id.* If so, the court balances private and public interest factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947), to determine whether to dismiss the case. *Id.*

### 1.    England is an adequate forum.

The Court should dismiss the case in favor of the courts in London, England, which is unquestionably a suitable forum and to which Portofino consents.[10] For a foreign forum to be adequate, all that is needed is that Portofino be amenable or consent to jurisdiction. *Id.* at 75; *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 481 (S.D.N.Y. 2006).

The adequacy of a foreign forum does not depend on the existence of identical causes of action. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250 (1981). In any event, there is no jurisdiction with laws more like the United States than England. Courts routinely dismiss cases in favor of English courts for claims just like the Plaintiffs', including for unjust enrichment; for tortious interference with contractual relations, *Gilstrap*, 443 F. Supp. 2d at 475, 481-82; and under

---

[9] The Court may dismiss the case against Portofino on grounds of forum non conveniens before reaching any of the issues of personal jurisdiction. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 423 (2007) ("[A] court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is the more suitable arbiter of the merits of the case.").

[10] Mr. Canzoneri does not consent to the jurisdiction of the courts of England because the allegations against him are so frivolous that the Amended Complaint should be dismissed for lack of personal jurisdiction and for failure to state a claim. That is not an impediment to the Court dismissing the claims against Portofino on grounds of forum non conveniens. *PT United Can*, 138 F.3d at 74 (affirming the dismissal of some defendants on personal jurisdiction and of the remaining defendants on forum non conveniens and finding "unpersuasive" plaintiffs' argument "that the *forum non conveniens* analysis fails because the district court did not examine the adequacy of the alternate forum as to the individual defendants against whom it had dismissed all claims for lack of personal jurisdiction").

13

the Defend Trade Secrets Act, *Fintech Fund, F.L.P. v. Horne*, 836 F. App'x 215, 218, 227 (5th Cir. 2020). Moreover, courts routinely dismiss cases for forum non conveniens when plaintiffs assert federal claims. *See, e.g.*, *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 612 (2d Cir. 1998) (dismissing a case under the Sherman Act for forum non conveniens); *PT United Can*, 138 F.3d at 74 (finding that the nonexistence of a RICO statute in the alternative forum does not preclude dismissal in favor of that forum).

2.     *The convenience of the parties decidedly weighs in favor of England.*

In determining whether to dismiss a case in favor of an alternative forum, courts consider "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73-74 (2d Cir. 2001) (quoting *Gulf Oil*, 330 U.S. at 508). Those factors weigh in favor of England for several reasons.

*First*, most of the documentary evidence and witnesses, including Portofino[11] and Plaintiffs' employees, are in England or in Switzerland. *See Cap. Currency*, 155 F.3d at 611 ("As Judge Stanton found, most of the witnesses in this case reside in England, and the cost of transporting these witnesses to New York could be enormous. In addition, most of the documentary evidence in the case was created, and is stored, in England. Thus, conducting trial in the United States might impose significant burdens on the parties."); *Do Rosario Veiga v. World Meteorological Org.*, 486 F. Supp. 2d 297, 306 (S.D.N.Y. 2007) (documentary evidence being in Switzerland heavily favored dismissal where evidence was beyond the reach of court's power to compel production).

---

[11] Portofino's Delaware entity was never made operational and has no employees. Casimo Dec. ¶7.

Both the real Plaintiffs in interest and Portofino are European entities—either English or Swiss. Citadel Europe is based in London, where it employed Lancia, Casimo, and Moustapha. Documents concerning their employment and their former Citadel Europe colleagues are in London. The Citadel Europe employees who were allegedly deceived about Lancia and Casimo's departure and Portofino are also in London. AC ¶¶139-40, 142-45; Casimo Dec. ¶10. The fact that Citadel Europe is based in London, and that is where its information, employees, and witnesses are, is likely the reason it *required* Lancia, Casimo, and Moustapha to commit to resolving all their disputes in London. Casimo Agreement at 9; Lancia Agreement at 33; Ex. 2 at 16 ("Moustapha Agreement"). Likewise, Portofino is European. It is based in and has its main office in Zug, Switzerland. Portofino's employees are split between Zug, London, and Amsterdam. Casimo Dec. ¶4.

*Second*, several third-party witnesses not subject to US service of process are based in England and may not willingly testify in the US. For example, Augmentti Search, the recruiting agency Portofino allegedly used to poach Citadel Securities' employees, is in London. Statement of Claim ¶117.3; Casimo Dec. ¶8. Similarly, 7percent Ventures, who Plaintiffs allege Lancia and Casimo solicited (but did not obtain) funding from while still at Citadel Europe, is located in London. *See* AC ¶9; 7percent Ventures (last visited Sept. 10, 2023), https://www.7pc.vc/; Casimo Dec. ¶8. And Greenfield Capital, another investment firm the duo allegedly spoke to, is based in Germany. *See* AC ¶104; Greenfield Capital (last visited Sept. 10, 2023), https://greenfield.xyz/contact/imprint/; Casimo Dec. ¶8.

3.    *The interests of England and the United States also favor dismissal.*

In deciding whether to grant a motion to dismiss for forum non conveniens, courts also weigh the "public interest" of the two potential forums. Public interest factors include court congestion, jury duty not being imposed on a community with no relation to the litigation, holding

trial in a community that has an interest in the case, local interest in having domestic controversies decided at home, and having cases decided in the forum that is the home of the law that will be applied. *Gulf Oil*, 330 U.S. at 508-09.

England has a greater interest in this dispute, given that it centers around the grievance of London-based Citadel Europe with its former London employees. In contrast, this dispute's only bona fide tie to New York is the allegation that Portofino poached a single Citadel Securities employee from there, providing this jurisdiction relatively little interest in the dispute compared to England's. *See Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 76 (2d Cir. 2003).

Moreover, English law applies to most of this case and governs many of the employment agreements. The "mere likelihood of the application of foreign law weighs in favor of dismissal." *LaSala v. Bank of Cyprus Pub. Co.*, 510 F. Supp. 2d 246, 263 (S.D.N.Y. 2007). As discussed in more detail below, under New York's choice of law principles, English law will apply to all of Plaintiffs' claims other than its new DTSA claim and a single claim of tortious interference. Plaintiffs' recent, strategic addition of a DTSA claim does not change the forum non conveniens analysis. *Pollux*, 329 F.3d at 76 ("[O]wing to the fact that the overwhelming majority of plaintiffs' claims necessitate the application of English law, the trial court concluded that choice of law considerations strongly tipped in favor of litigation in England."). Lancia, Casimo, and Moustapha's Employment Agreements are governed by English law. Casimo Agreement at 5, 9; Lancia Agreement at 5, 33; Moustapha Agreement at 5, 16. When interpreting them, this Court will have to apply that law.

### 4. Plaintiffs' choice of forum is entitled to little weight.

The only consideration that potentially weighs in favor of a New York forum is Plaintiffs' "choice of forum." But given the facts of this case, that choice should be given little, if any, weight. That is because the real Plaintiffs in interest are Citadel Europe, and this lawsuit was filed to forum

shop. It is difficult to even call this Court a valid "choice of forum" by Plaintiffs, given that they made clear in the Employment Agreements with Lancia, Casimo, and Moustapha that any disputes between any Citadel Securities entity and them should be resolved in England. *Id.*

*First,* Citadel Europe are the real parties in interest because it is those companies at which Lancia, Casimo, and Moustapha worked and whose confidential information was allegedly taken. As proof that those are the real parties in interest, the Court need look no further than Citadel Europe's LCIA Arbitration against Lancia, Casimo, and Moustapha. It sounds in both tort and contract, covers the same conduct, and seeks the same relief, and yet only Citadel Europe are the claimants. That is so even though the Employment Agreements explicitly allowed any member of Citadel Securities, including the US entities, to assert claims in the LCIA Arbitration. Casimo Agreement at 9; Lancia Agreement at 33. But the US entities did not do so, because the truth is that it is not their fight. Their presence here is only for purpose of obtaining an American forum.

Therefore, the real parties in interest in this case are foreign entities who lack a bona fide connection to this jurisdiction. *Piper Aircraft*, 454 U.S. at 261 ("[T]he presumption in favor of the respondent's forum choice applied with less than maximum force because the real parties in interest are foreign."); *Cap. Currency*, 155 F.3d at 612 ("Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of the plaintiffs' choice of forum."); *PT United Can*, 138 F.3d at 74 (noting that "a non-U.S. plaintiff's choice warrants less deference" than that of a US plaintiff); *First Union Nat. Bank v. Paribas*, 135 F. Supp. 2d 443, 453-54 (S.D.N.Y. 2001), *aff'd sub nom. FUNB v. Arab Afr. Int'l Bank*, 48 F. App'x 801 (2d Cir. 2002) (noting that it "would be wrong to overlook" the fact that a US plaintiff "is not in any practical sense seeking to litigate at home," because the lawsuit has "arisen out of the activities of its permanent branch in London").

17

*Second*, Plaintiffs are forum shopping, and their choice of forum should therefore be further discounted. *Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119, 129 (2d Cir. 2022) (noting that AE sought a tactical advantage in New York, as AE "first chose a different forum to litigate the termination of the AE-MINEA Contracts: Angola" and that "thus far, AE has not found success in those Angolan proceedings"). Plaintiffs filed this New York lawsuit nearly a year after Citadel Europe had commenced the LCIA Arbitration without providing any material additional facts and apparently only because of dissatisfaction with their prospects in arbitration. They are not entitled to a do-over here.

*Finally*, Citadel Securities' choice of forum is entitled to less weight because it does extensive foreign business and therefore can expect to be required to litigate its foreign disputes in foreign courts. Citadel Securities is a global firm with offices in 24 cities and operations in at least 12 countries.[12] *Online Payment Sols. Inc. v. Svenska Handelsbanken AB*, 638 F. Supp. 2d 375, 382 (S.D.N.Y. 2009) ("Field chose to establish and operate ECS in Sweden and England and he should therefore not be surprised that he would need to litigate his corporation's claims in those jurisdictions.") (citing cases).

## B.   The Court Lacks Personal Jurisdiction Over All But One Claim Against Portofino.

Portofino does not dispute that the Court has personal jurisdiction over Plaintiffs' single claim for tortious interference with the employment contract of one New York employee, Vincent Prieur. But Plaintiffs' vague and generalized personal jurisdiction allegations are not enough to allow it to require Portofino to defend their other quintessentially European claims in New York.

---

[12]   *Your Career. Accelerated.*, Citadel Securities (last accessed Sept. 10, 2023), https://www.citadelsecurities.com/careers/; *Explore Our Roles*, Citadel (last accessed Sept. 10, 2023), https://www.citadel.com/careers/.

"A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted." *Sunward Elecs., v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004); *SAS Group, Inc. v. Worldwide Inventions, Inc.*, 245 F.Supp.2d 543, 548 (S.D.N.Y. 2003) ("[A] plaintiff . . . must secure personal jurisdiction over a defendant with respect to each claim [he or] she asserts."). For example, for tortious interference claims, the analysis must be on a contract-by-contract basis. *Demag Cranes & Components Corp. v. Pinnacle Indus. Servs.*, 2021 WL 1525427, at *5 (N.D. Ohio Apr. 19, 2021) ("Personal jurisdiction is claim-specific. . . . Accordingly, the Court analyzes personal jurisdiction on a contract-by-contract basis.").

Plaintiffs allege that they have established personal jurisdiction under CPLR 302(a)(1), (a)(2), and (a)(3). Plaintiffs have not satisfied any of those provisions. Instead, they provide vague and claim-indiscriminate allegations in just three short paragraphs. AC ¶¶31-33. As explained in more detail below, to establish personal jurisdiction under CPLR 302(a), a plaintiff must establish that "the cause of action arises out of [defendants' New York] business activity, such that an 'articulable nexus' exists between them." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir. 1999). Moreover, a plaintiff must do more than speculate as to a nexus between its claims and a defendant's New York contacts. Even "[a] prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) (citing *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 186 (2d Cir. 1998)).

### 1. The Court lacks personal jurisdiction over the trade secret claims.

Plaintiffs have not and cannot establish personal jurisdiction for their common law and statutory trade secret claims. Portofino has no business, operations, or clients in New York. Casimo Dec. ¶¶5-7. Lancia, Casimo, and Moustapha worked for Citadel Europe in Europe before leaving to start Portofino in Switzerland. There are simply no New York connections to the trade secret

19

claims. Under CPLR 302(a), Plaintiffs have therefore failed to allege that Portofino "'transact[s] business' in New York" that has any "articulable nexus" to the trade secret claims. *Credit Lyonnais*, 183 F.3d at 153 (alterations in original).[13]

In addition, Plaintiffs suggest that having New York investors is enough to subject Portofino to jurisdiction here for all of their claims. But even if so, this Portofino contact with New York has no "nexus" to Citadel's claims, as CPLR requires, and does not help Citadel establish jurisdiction. *Id.*

Similarly, there is no jurisdiction as to the trade secret claims under CPLR 302(a)(2). Both the Second Circuit and the New York Court of Appeals have made it clear that "CPLR § 302(a)(2) reaches only tortious acts performed by a defendant who was ***physically*** present in New York when he performed the wrongful act." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 28 (2d Cir. 1997) (citing *Feathers v. McLucas*, 15 N.Y.2d 443 (1965)); *see also AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350, 360 (S.D.N.Y. 2014) ("The New York Court of Appeals has construed [CPLR 302(a)(2)] to require that the defendant was physically present in New York when he committed the tort."). That is not the case here because all the conduct occurred physically outside of New York.

Finally, there is no jurisdiction under CPLR 302(a)(3) because the alleged theft of trade secrets did not cause "injury . . . within the state." CPLR 302(a)(3). "The only arguable basis for the existence of such an injury would be Plaintiff's residence in New York and Plaintiff's subsequent 'experience' of economic . . . injury in this state." *Lipin v. Bergquist*, 574 F. Supp. 2d 423, 432 (S.D.N.Y. 2008). Neither is enough. "[T]he suffering of economic damages in New York

---

[13] Even if Portofino had a client in New York, that would still not establish personal jurisdiction because the Amended Complaint lacks non-conclusory allegations that Portofino is using any of Plaintiffs' trade secrets in any way with respect to such clients.

is insufficient, alone, to establish a direct injury in New York for N.Y. C.P.L.R. § 302(a)(3)." *AVRA Surgical*, 41 F. Supp. 3d at 360 (quoting *Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 218 (2d Cir. 2013)). Indeed the "New York Court of Appeals instructs that § 302(a)(3) requires as a predicate for personal jurisdiction a closer expectation of consequences within the State than the indirect loss of profits." *Id.* (quotation marks omitted). "[T]he situs of the injury"— meaning "the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff"—must be New York. *Lear v. Royal Caribbean Cruises Ltd.*, 2021 WL 1299489, at *10 (S.D.N.Y. Apr. 7, 2021). And once again, the situs is London because that is where Lancia, Casimo, and Moustapha worked for Citadel Europe.

The Amended Complaint does try to establish jurisdiction over these claims by including conclusory allegations and speculation. But none establish even a prima facie case. *First*, in the recent amendment, Plaintiffs added a conclusory allegation that Portofino hired New York-based Prieur "in an effort to capitalize on his knowledge of Citadel Securities trade secrets and confidential business plans." Dkt. No. 26-1 at 8 (showing the amendments to AC ¶16). The Amended Complaint doesn't contain a single fact to support the speculation that hiring of an employee a year after Portofino's launch was part of some scheme to steal trade secrets. Parties cannot add made-up allegations to establish personal jurisdiction, or even to obtain jurisdictional discovery. "A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag*, 604 F. App'x at 19.[14]

---

[14] Even if the Court were to accept, for jurisdictional purposes, that Prieur's recruitment forms a part of Plaintiffs' trade secret claims, any trade secret claims (common law or statutory) arising out of Prieur's departure are separate from the claims arising out of Lancia, Casimo, and Moustapha's departures. Prieur left ten months after Lancia and Casimo. AC ¶122; Statement of Claim ¶¶9.2, 68. His departure is a separate claim because it starts a separate statute of limitations clock, running "from 'the date on which the misappropriation . . . is discovered or by the exercise of reasonable diligence should have been discovered.'" *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459 (S.D.N.Y.), *aff'd*, 838

*Second*, Plaintiffs allege that some or all the alleged trade secrets Lancia and Casimo learned while working for Citadel Europe in London were *also* used by Citadel Securities in the United States. *E.g.*, AC ¶37 (alleging that Citadel Securities "trade secrets and confidential information" "were developed, used, and maintained *in part* at Citadel Securities' New York office" (emphasis added)). Plaintiffs fail to offer any non-conclusory allegations showing trade secret misappropriation from London let alone that Defendants specifically reached into New York to steal trade secrets. Plaintiffs' effort to plead that their trade secrets are "in part" connected to their New York office would let any global firm establish jurisdiction anywhere it had an office simply by claiming its trade secrets were also used there.

In short, Plaintiffs cannot establish jurisdiction because they did not properly plead an injury to their New York subsidiary. *Chirag*, 604 F. App'x at 19. Moreover, "the New York State Court of Appeals has held that 'the residence or domicile of the injured party within the State is not a sufficient predicate for jurisdiction, which must be based upon a more direct injury within the State . . . .'" *Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*, 600 F. Supp. 731, 738 (E.D.N.Y. 1985). "An injury . . . does not occur within the state simply because the plaintiff is a resident." *Lear*, 2021 WL 1299489, at *10. "To hold to the contrary would allow courts to exercise jurisdiction over all out-of-state defendants provided that the plaintiff resides in New York and claims a loss . . . ." *Interface Biomedical*, 600 F. Supp. At 738. Thus, the fact that Citadel Securities has a New York office and that some of the allegedly misappropriated trade secrets could be accessed here is not enough to confer jurisdiction: the (ill-pleaded) injury occurred in London.

   2.   *The Court lacks personal jurisdiction over the claim for tortious interference with Moustapha's employment agreement.*

---

F. App'x 582 (2d Cir. 2020). Moreover, Prieur left from the New York office, not from the London office as the other three employees, even further distinguishing the facts underlying Plaintiffs' claims comingled in Counts 1 and 2.

Aside from Prieur's non-compete, the only other contract that Plaintiffs allege was tortiously interfered with is Moustapha's non-compete. Moustapha was a London-based Citadel Europe employee. AC ¶120. Plaintiffs have made no allegations to connect Portofino's alleged recruitment of him to the United States.[15]

       3.    *The Court lacks personal jurisdiction over the claims for unfair competition and for unjust enrichment.*

Plaintiffs' unfair competition and unjust enrichment claims are derivative of their trade secret claims, *see* AC ¶¶257-265, 271-276, and the Court lacks jurisdiction for the same reasons.

**C.    Every Count in the Amended Complaint Fails to State a Claim Upon Which Relief Can be Granted.**

Citadel Securities' core complaint is that Lancia and Casimo allegedly violated their Employment Agreements by soliciting Citadel Securities employees. Those claims are being litigated in the LCIA Arbitration. Apparently dissatisfied with its prospects there, Citadel Securities tries to manufacture claims against Portofino based on vague and conclusory allegations and speculations. Many of these claims simply do not constitute viable causes of action in tort, such as complaining that Portofino tried unsuccessfully to recruit its employees, or that Portofino operated in "stealth mode" while trying to do so. *See, e.g.*, AC ¶¶138-151, 164. Others, such as its trade secret claims, are far too vague and speculative to satisfy Rule 8.

       1.    *English law governs most of the claims in the Amended Complaint.*

English law applies to all of the claims in the Amended Complaint aside from the claim asserted under the DTSA and the claim that Portofino tortiously interfered with Prieur's non-compete. To resolve a conflict of laws in a tort action, "New York courts apply an 'interests analysis' to determine which jurisdiction has the greatest interest in the litigation" considering "the

---

[15] As explained below, there is no claim, under New York or English law, for tortious interference with contract without an allegation that a contractual breach was actually induced. *See infra* Section C.5.

locus of the tort and the domiciles of the parties." *In re Air Crash Near Clarence Ctr., N.Y.*, 983 F. Supp. 2d 249, 253 (W.D.N.Y. 2013).

"Where, as here, conduct regulating laws are implicated, the law of the locus jurisdiction where the tort occurred applies, because that jurisdiction has the most significant contacts with the claim." *Reid v. Ernst & Young Glob. Ltd.*, 831 N.Y.S.2d 362 (Table) (Sup. Ct. 2006) (applying New York choice of law to a tortious interference claim and concluding that Hong Kong law governs) (citations omitted) (citing cases). Other than Plaintiffs' claim arising out of Prieur's alleged inducement to join Portofino, all the relevant events occurred in London. That is where Moustapha, Lancia, and Casimo worked for Citadel Europe. In addition, their Employment Agreements select "the laws of England and Wales law," further raising the "interest" the United Kingdom has in regulating the conduct at issue in this case. Casimo Agreement at 5, 9; Lancia Agreement at 5, 44; Moustapha Agreement at 5, 16.

    2.    *The Amended Complaint does not come close to pleading a trade secret claim.*

Under US federal and common trade secret law and under the English analogue of breach of confidence, plaintiffs must establish (1) that they possess a trade secret and (2) that the defendants misappropriated it. Ex. 3 at ¶¶16-18 ("Brown Dec."); *Faccenda Chicken v. Fowler* [1987] 1 Ch 117; *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31, [2013] 1 WLR 1556 at [22]; *Coco v. AN Clark (Engineers) Ltd*, [1969] RPC 41 at p. 47 (requiring evidence of misappropriation); *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir. 2023) ("Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity."); *Better Holdco, Inc. v. Beeline Loans, Inc.*, 2023 WL 2711417, at *31 (S.D.N.Y. Mar. 30, 2023) ("To prevail on its claim for trade secret misappropriation under the DTSA, a plaintiff must prove that '(1) it possessed a trade

secret, and (2) the defendant misappropriated the trade secret.'"). Plaintiffs fail to sufficiently allege either of these elements under federal pleading standards.

*First*, Plaintiffs fail to plead the details of their trade secrets with the required level of specificity, offering only vague descriptions instead. As this Court explained, "district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated." *Lawrence v. NYC Med. Prac., P.C.*, 2019 WL 4194576, at *4 (S.D.N.Y. Sept. 3, 2019). Although a plaintiff need not disclose all the details of its trade secrets, "the pleading standard set forth in *Twombly* and *Iqbal* requires that the complaint allege facts sufficient to identify the information for which protection is claimed and sufficient information about its nature, value and measures taken to safeguard it to support an inference that the information qualifies as a trade secret." *Id.*[16]

Contrary to that legal standard, Plaintiffs "describe the alleged trade secrets at the highest level of abstraction." *Id.* at *5. The Amended Complaint alleges four non-descript sets of trade secrets: "(1) Citadel Securities' confidential and proprietary research methodology . . . ; (2) the bespoke set of trading techniques and technologies, or confidential and proprietary trading strategies, . . . developed by Citadel Securities (using its Research Methodology) for trading in any asset that trades on electronic markets; (3) Citadel Securities' confidential and proprietary Simulations, used for testing, validating, and refining its Trading Strategies . . .; and (4) Citadel Securities' confidential and proprietary business plans and business strategies . . . including [for] crypto." AC ¶223. These broad categories of purported trade secrets could be claimed by any trading firm or even any hedge fund.

---

[16] "It bears noting that *Twombly* applies with equal force to the plaintiffs' foreign law claims." *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2008 WL 5958061, at *9 n.9 (E.D.N.Y. Sept. 26, 2008); *see also Petersen Energia Inversora, S.A.U. v. Argentine Republic*, 2016 WL 4735367, at *14-15 (S.D.N.Y. Sept. 9, 2016) (applying federal pleading standards to plaintiffs' breach of contract claim governed by Argentine law).

These allegations are like the ones found insufficient in *Lawrence*: "trade secrets ... including the methods for advertising and communicating with prospective patients"; trade secrets pertaining to "patient coordination and signing up patients"; and trade secrets that "relate to services used, sold, and ordered in, or intended to be used, sold and/or ordered in interstate and/or foreign commerce." 2019 WL 4194576, at *5. "Listing general categories of information . . . does not adequately plead the existence of a trade secret." *Id.* For example, Plaintiffs "fail to include any allegations supporting the various factors that define the 'contours' of a trade secret: the information's value . . . the amount of effort or money spent to develop the information, and the ease with which the information could be acquired or developed by outsiders." *Id.* Therefore, Plaintiffs fail to specify their trade secrets with the required granularity.

*Second*, Plaintiffs failed to allege any facts showing that Defendants misappropriated the non-descript trade secrets. *Kumaran v. Nat'l Futures Ass'n, LLC*, 2022 WL 1805936, at *6 (S.D.N.Y. June 2, 2022), *reconsideration denied sub nom. Kumaran v. Nat'l Futures Ass'n*, 2023 WL 3160116 (S.D.N.Y. Apr. 28, 2023) ("FAC contains no facts as to how [defendants] improperly acquired, disseminated or used Plaintiffs' trade secrets."). Just as in *Kumaran*, "Plaintiffs' complaint relies solely on a number of threadbare and conclusory allegations." *Id.* This Court concluded that Plaintiffs' regurgitations of statutory language and statements "devoid of further factual enhancement to support Plaintiffs' allegations" were insufficient. *Id.*; *see also Marks v. Energy Materials Corp.*, 2015 WL 3616973, at *5 (S.D.N.Y. June 9, 2015) (finding that plaintiff's conclusory allegations of misappropriation were insufficient to plead a claim).

When pressed by the Court to point to the Amended Complaint's best allegation of misappropriation, Plaintiffs' counsel cited a slide that Portofino is alleged to have prepared for a prospective investor. Pre-Motion Telephone Conference, Tr. at 18:9-16 (August 8, 2023). Counsel

claimed "on information and belief" that the slide conveyed a "representation that Portofino had unique access to our trade secrets" and planned to "replicate" them. *Id.* at 8:2-4; 18:10-14 (August 8, 2023). Here is that slide, AC ¶7 (red box added):



Nowhere does it mention Citadel Securities. Instead, as the ***description of the business model makes clear***, "the most successful business model" refers to "HFT": "The business model: (1) An on exchange trading unit that connects to all major cryptocurrency cash and derivative exchanges. Using HFT trading strategies (2) a client facing unit that will offer bi-lateral 'OTC' liquidity to end customers (e.g retail brokers, Hedge Funds, etc.) using automated quoting strategies." (emphasis removed). This slide is apparently Plaintiffs' ***best*** support for their allegation of misappropriation.

Lacking any facts supporting misappropriation, Plaintiffs resort to asking the Court to draw inferences that have been uniformly rejected by courts. Plaintiffs allege that just because Lancia, Casimo, Prieur, and Moustapha had access to Citadel Securities' trade secrets when they were employed there, this means that they must be using those same trade secrets at Portofino. Courts have repeatedly rejected this theory: "[A] party cannot prove trade secret misappropriation by demonstrating that a former employee's new employment will inevitably lead the former employee

to rely on the former employer's trade secrets." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012); *see also Falconwood Corp. v. In-Touch Techs., Ltd.*, 642 N.Y.S.2d 869, 870 (1996) ("Plaintiffs' access to In–Touch's software is certainly not proof that they misappropriated it."); *Bus. Networks of New York Inc. v. Complete Network Sols. Inc.*, 1999 WL 126088, at *8 (N.Y. Sup. Ct. Feb. 19, 1999), *aff'd in part as modified*, 696 N.Y.S.2d 433 (1999) ("The mere access to such material and information, without more, does not constitute appropriation."); *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 200 (4th Cir. 2016) ("[C]ourts generally look for proof of more than a mere opportunity to misappropriate; they require evidence that the defendant actually acquired or used trade secrets.").

This Court should dismiss Citadel's common law and DTSA trade secret claims.

> 3.   *Plaintiffs' unfair competition and unjust enrichment claims are derivative of their trade secret claims and fail for the same reasons.*

Both the unfair competition and the unjust enrichment claims are premised on Portofino's alleged trade secret theft. For example, Plaintiffs allege that Portofino engaged in unfair competition because it "improperly accessed and misappropriated Citadel Securities' Trade Secrets and other confidential information from New York and elsewhere in bad faith, as alleged above." AC ¶261. And they repeat these allegations to substantiate their unjust enrichment claim. AC ¶275 ("Portofino's success comes on the shoulders of Citadel Securities' operations, employees, Trade Secrets, and work product located in New York and elsewhere, as discussed above."). Because these two counts are derivative of Plaintiffs' trade secrets claims, they fall for the same reasons as those claims.

> 4.   *The DTSA does not apply extraterritorially.*

Congress only permitted courts to apply the DTSA "to conduct occurring outside the United States if: (1) the offender is a natural person who is a citizen or permanent resident alien of

the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837.

The first subsection does not apply because Portofino Technologies USA, although incorporated in Delaware, was never made operational and has no office, assets, operations, or employees. Casimo Dec. ¶7.

The second subsection does not apply for the same reasons this Court lacks jurisdiction: "no act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837. As to the non-Prieur claims, "[n]owhere does the Complaint detail any act that occurred in the United States in furtherance of the misappropriation of trade secrets" in London. *Beijing Neu Cloud Oriental Sys. Tech. v. Int'l Bus. Machines*, 2022 WL 889145, at *4 (S.D.N.Y. Mar. 25, 2022). Citadel's conclusory allegations about connections to New York (and the United States) cannot support the extraterritorial application of the statute. *Mujica v. AirScan*, 771 F.3d 580, 592 (9th Cir. 2014) ("Plaintiffs have the burden of pleading sufficient *factual matter*, accepted as true, to state a claim to relief that is plausible on its face, and a mere conjecture that conduct may have occurred in the United States does not meet that burden.") (cleaned up).

5.    *Plaintiffs' tortious interference count fails to plead a claim because Portofino did not knowingly induce a breach.*

The Court should dismiss the tortious interference claims for several reasons. The relevant elements of tortious interference under English are (1) breach of contract and (2) intentional procurement of that breach. Brown Dec. ¶¶8-10, 11; *OBG Ltd v. Allan*, [2007] UKHL 21, [2008] 1 AC 1 (House of Lords) at [44] per Lord Hoffmann ("[O]ne cannot be liable for inducing a breach unless there has been a breach. No secondary liability without primary liability."). For Prieur's non-compete, New York law is similar. *See Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d

29

1078, 1080 (1977) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party, a situation not here present.") (citations omitted); *L. Offs. of Ira H. Leibowitz v. Landmark Ventures, Inc.,* 15 N.Y.S.3d 814, 817 (2015) ("A necessary element of such cause of action is the intentional and improper procurement of a breach and damages.") (citations omitted).

Plaintiffs do not allege that Employee 1 and Employee 2 left Citadel Securities, but only that Citadel Securities had to increase their compensation. AC ¶¶196-203. Since the two employees did not join Portofino, they could not have breached their non-competes and no tortious interference is possible. Brown Dec. ¶¶8-9; *OBG*, [2007] UKHL 21, [2008] 1 AC 1; *Inselman*, 41 N.Y.2d at 1080.[17] The Amended Complaint does allege that Moustapha and Prieur breached their non-competes by joining Portofino. AC ¶¶ 173, 178, 187, 193.[18]

As to Moustapha, Plaintiffs fail to allege that Portofino possessed the requisite intent to interfere with his non-compete. Citadel Europe's employment agreements (including Moustapha's) limit the non-compete's reach to business activities "engaged in by Citadel at any time during [their] employment or that Citadel proposed or planned to engage in at any time in the twelve (12) month period prior to the termination of my employment." Casimo Agreement at 10; Lancia Agreement at 34; Moustapha Agreement at 17.

There is no well-pleaded allegation that when Lancia and Casimo left Citadel Europe in March 2021, they would have known Citadel Securities was making markets in crypto or planning to do so. Likewise, the Amended Complaint doesn't offer anything aside from conclusory

---

[17] Neither is it possible to tortiously interfere with an at-will employment agreement. Brown Dec. ¶¶11-12; *Am. Recycling & Mfg. Co. v. Kemp*, 85 N.Y.S.3d 651, 653 (2018) ("The first contract, which was between plaintiff and a third-party contractor, was terminable at will, and thus it cannot give rise to a cause of action for tortious interference with contract.") (citations omitted).

[18] The Amended Complaint could also be read to suggest Portofino induced these two employees to breach their nondisclosure agreements, but for the reasons discussed throughout there are no facts pleaded to support this allegation.

allegations that such plans existed as of March 1 and 2, 2021, let alone that Lancia or Casimo knew about them. The Amended Complaint makes only vague references to a slack channel that described a small trade in Bitcoin *futures* by Citadel Securities nearly two years before Casimo left. AC ¶¶64-65. Tellingly, Plaintiffs have refused to allow Portofino's US counsel to see the communications that are cited in paragraphs 63 through 65 of the Amended Complaint, despite having already turned them over in the LCIA Arbitration. Elsewhere the Amended Complaint and Citadel Europe's arbitration pleadings acknowledge what Griffin stated publicly: Citadel Securities did not start planning to apply high-frequency trading in cryptocurrency until after Lancia and Casimo left. AC ¶¶72-73; Statement of Claim ¶24.2.

There are no allegations showing that when Moustapha left Citadel Europe in October 2021 Casimo and Lancia knew about Citadel Securities' change of heart (if it had even occurred at that point). Publicly, Citadel Securities maintained its negative attitude towards crypto. For example, in an interview with the Economic Club of Chicago on October 4, 2021, Griffin stated that crypto is "a jihadist call" against the dollar and that "[b]ecause of the lack of regulatory certainty around cryptocurrency, we just aren't involved today."[19] He then added: "I just don't want to take on the regulatory risk in this regulatory void that some of my contemporaries are willing to take on."[20] And in November, Griffin reiterated his negative views of the crypto industry during a New York Times event.[21]

Thus, as far as Portofino was aware, Citadel Securities' attitude towards crypto had not changed since the time Casimo and Lancia worked for Citadel Europe. Portofino had no way of knowing that Citadel Securities' "business activities" suddenly included making markets in crypto,

---

[19] *Kenneth C. Griffin*, *supra* note 5 at 46:35, 47:56.
[20] *Id.* at 49:52.
[21] New York Times Events, *Ken Griffin Talks Crypto, Digital Currency and The Future of the Economy*, YouTube at 18:35 (Nov. 10, 2021), https://www.youtube.com/watch?v=yF-WTRoSPhg.

if this is in fact true, contrary to Griffin's contemporaneous public statements. Even though Plaintiffs now allege that there has been a shift in direction in the interim, Portofino had no way of knowing that because the shift was not publicized. The Amended Complaint thus does not plausibly allege that Portofino possessed the requisite intent when allegedly interfering with Moustapha's non-compete.

The same is true with respect to the tortious interference claim for Prieur, who was allegedly induced to breach his contract by Portofino in October 2021 and left Citadel Securities by January 2022. AC ¶190. This too was before Plaintiffs allege they started making markets in crypto. *See, e.g.*, AC ¶¶72-73 (describing announcement of joint venture with Virtu Financial and Sequoia to establish a "liquidity-aggregating crypto trading platform" which actually launched in September 2022); Statement of Claim ¶24.2 (describing "first systematic crypto trade" taking place in March 2022). This Court should dismiss the tortious interference count.

### D. This Court Should Stay Any Claims It Does Not Dismiss Pending Resolution of the LCIA Arbitration.

If the Court does not dismiss all of Plaintiffs' claims, it should stay any that remain until resolution of the LCIA Arbitration. The Hearing in the LCIA Arbitration is set for May 2024.

Under the "prior pending action" doctrine, courts have "the inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Thornton Tomasetti, Inc. v. Anguillan Dev. Corp.*, 2015 WL 7078656, at *3 (S.D.N.Y. Nov. 13, 2015). Courts routinely apply this same principle to pending arbitrations. *See, e.g.*, *Empire State Ethanol & Energy, LLC v. BBI Int'l*, 2009 WL 1813205, at *1 (N.D.N.Y. June 25, 2009). Moreover, in addition to judicial economy, considerations of international comity between the United States and the United Kingdom counsel that this Court stay the action. *Ole Media Mgmt., L.P. v. EMI Apr. Music, Inc.*, 2013 WL 2531277, at *6 (S.D.N.Y. June 10, 2013).

When considering whether to stay a case due to a pending arbitration, courts consider four factors: "1) whether there are common issues between the arbitration and the litigation; 2) whether those issues are likely to be resolved in arbitration; 3) whether the failure to grant a stay will prejudice the defendant; and 4) whether the stay will prejudice the plaintiff." *Empire State*, 2009 WL 1813205, at *1.

*First,* both proceedings address the common issues of whether Lancia, Casimo, or Portofino poached or attempted to poach Citadel Securities employees, including by misusing its confidential information or misappropriating its trade secrets. In both proceedings, Citadel Europe and Plaintiffs accuse Lancia, Casimo, and Portofino of soliciting Citadel Securities' employees, including specifically Moustapha and Prieur, and causing them to breach their agreements with Citadel Securities. The LCIA Arbitration will therefore likely decide whether Lancia and Casimo are guilty of unlawfully "[s]oliciting Mr. Moustapha and Mr. Prieur" and will decide other aspects of the interference claim. Statement of Claim ¶117.2; *see also id.* at ¶107 (alleging that Lancia and Casimo conspired to "recruit Citadel Securities employees, including" Moustapha as part of the "Conspiracy" claim); ¶108.12 (referencing Prieur's departure as part of the same claim). Both proceedings will require careful analysis of the same employment contracts (including the enforceability of the same restrictive covenants) and close factual analysis of the events surrounding Lancia and Casimo's departure from Citadel Europe, the founding of Portofino, and the hiring of Moustapha and Prieur and alleged efforts to hire other Citadel Securities' employees. The LCIA Arbitration tribunal will hear these issues in May of 2024 and is expected to issue a decision promptly. *Empire State*, 2009 WL 1813205, at *1.

Counts 1, 2, 4, and 6 of the Amended Complaint concern allegations that Portofino misappropriated Plaintiffs' trade secrets. The LCIA Arbitration tribunal has already been asked to

decide if Lancia, Casimo, and Moustapha are "[m]isusing, misappropriating and reproducing Work Product that belonged to Citadel Securities." Statement of Claim ¶113.9; *see also id.* ¶110.3 (alleging "misuse of Work Product that belonged to Citadel Securities" under the "Deceit" count); ¶110.5 (same); ¶113.3 (alleging "using Work Product that belonged to Citadel Securities and/or Confidential Information" under the "Breaches of the Employment Agreements" count); ¶113.12.3 (same); ¶128 (alleging that the trio "copied the Copyright Works and/or has possessed copies of the Copyright Works" as part of the "Infringement of Citadel Securities' intellectual property rights" count).

Quoting Chief Judge Posner, the Second Circuit advised that "where a party to an arbitration agreement attempts to avoid that agreement by suing a related party with which it has no arbitration agreement in the hope that the claim will be adjudicated first and have preclusive effect in the arbitration, '[s]uch a maneuver should not be allowed to succeed, [and] . . . is blocked . . . by the principles of parallel-proceeding abstention, which . . . require the court to stay the proceedings before it and let the arbitration go forward unimpeded.'" *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) (all alterations in original) (quoting *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 530 (7th Cir. 1996)). This is exactly what Plaintiffs are attempting through this lawsuit. Although they initially opted to arbitrate the claims against Lancia and Casimo in England, they now apparently regret that choice. Citadel attempts to take a second bite at the apple by asserting the same claims in the United States against Portofino. Therefore, this factor indicates that this Court should stay the remaining case.

*Second*, failure to grant a stay will prejudice Portofino because otherwise the startup will be subjected to the expense and burden of duplicative discovery and litigation. The expenses will be significant because the evidence and witnesses are in Europe and Asia. Courts "strongly

34

prefer[]" stays where litigation parallel to arbitration "'would involve significant expense and inconvenience and might adversely affect the outcome' of the arbitration." *Empire State*, 2009 WL 1813205, at *2. This factor counsels a stay.

*Finally*, Plaintiffs will not be prejudiced. Portofino has "not taken nor will take any steps to hamper the progress of the arbitration proceeding." *Id.* at *3. To the contrary, it is interested in resolving the LCIA Arbitration as quickly and efficiently as possible so that it can proceed with its day-to-day business free of Citadel Securities' intimidation and interference. In addition, "the arbitration may be expected to conclude within a reasonable time, and . . . delay will not [cause] undue hardship." *Id.* (alterations in original). Moreover, Plaintiffs have asserted essentially the same claims and seek substantially the same relief in the UK, the forum they chose first. They then waited nearly a year to start this duplicative proceeding.

**CONCLUSION**

For the foregoing reasons, Portofino respectfully requests that the Court (1) dismiss this case on the grounds of forum non conveniens in favor of the Courts of England; or, alternatively, (2) dismiss most of Plaintiffs' claims for lack of personal jurisdiction; (3) dismiss any remaining claims for failure to state a claim; and, again alternatively, (4) stay any remaining claims pending resolution of the LCIA Arbitration.

Dated: September 19, 2023

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: */s/ Jacob W. Buchdahl*
    Jacob W. Buchdahl
    Cory S. Buland
    Dinis Cheian
    SUSMAN GODFREY L.L.P.
    1301 Avenue of the Americas, Floor 32
    New York City, NY 10019
    Telephone:  (212) 336-8330
    Facsimile:   (212)-336-8340
    jbuchdahl@susmangodfrey.com
    cbuland@susmangodfrey.com
    dcheian@susmangodfrey.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

On September 19, 2023, I hereby certify that I caused a true and correct copy of the foregoing document along with all its exhibits to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to the attorneys of record.

*/s/ Jacob W. Buchdahl*
Jacob W. Buchdahl
