# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITADEL SECURITIES AMERICAS LLC, CITADEL SECURITIES AMERICAS SERVICES LLC, CITADEL SECURITIES (EUROPE) LIMITED, and CITADEL MANAGEMENT (EUROPE) II LIMITED, <br><br> Plaintiffs, <br><br> v. <br><br> PORTOFINO TECHNOLOGIES AG, PORTOFINO TECHNOLOGIES USA, INC., JEAN CANZONERI, and JOHN DOES 1-10, <br><br> Defendants. | Case No.: 1:23-cv-05222-GHW |

<u>**DECLARATION OF EDWARD BROWN K.C. IN SUPPORT OF PORTOFINO TECHNOLOGIES AG AND PORTOFINO TECHNOLOGIES USA, INC.'S MOTION TO DISMISS AND IN SUPPORT OF MR. CANZONERI'S MOTION TO DISMISS**</u>

**I, EDWARD BROWN K.C., declare under penalty of perjury of the Law of the United States of America:**

1.      I am a barrister, and King's Counsel, practicing at Essex Court Chambers, 24 Lincoln's Inn Fields, London, WC2A 3EG.

2.      I have been instructed by Susman Godfrey LLP to provide an independent expert opinion regarding English law on behalf of Portofino Technologies AG and Portofino Technologies USA.

3.      I have read the Plaintiffs' Amended Complaint.  I have not read any other case papers in these proceedings or in the arbitration proceedings referred to at footnote 10 of page 32 of the Amended Complaint.

4.      I have a degree in Law (BA Hons) from the University of Cambridge. I also have Masters Degrees from the London School of Economics (LLM Labour Law) and the University of

Siena. I regularly publish on employment and company law. I have practiced from Essex Court Chambers since October 2004. I was appointed as Queen's Counsel (now King's Counsel) in 2022.

5.      I frequently represent businesses and individuals in the Courts of England and arbitrations administered under English law that involve business disputes and unlawful competition.

6.      In light of my education and experience, I am qualified to provide an opinion on English law as relevant to this claim. I am asked to explain the nature of English causes of action, at common law or in statute, that are analogous to the claims described in the Amended Complaint.

## **Inducing / Procuring Breach of Contract**

7.      In the Amended Complaint, Plaintiffs allege that what it calls the Portofino Defendants "induce[d] Citadel Securities' employees to breach their employment contracts in order to work for Portofino."

8.      The claim described is analogous to the tort of procuring breach of contract. This tort has the following elements:

        a.   There is a contract between the Claimant (C) and a third party counterparty (X).

        b.   The Defendant (D) knows about (or turns a blind eye to) the existence of the contract between C and X.

        c.   D intentionally induces or procures that X breaches his contract with C.

        d.   D's inducement in fact causes X to breach his contract with C.

        e.   Loss is thereby caused to C.

        f.   D has no justification for his actions.

9.      The tort is a form of 'secondary' liability, in that it is dependent upon the fact of a breach of contract between C and X. In the employment context, this will typically be a contract of

employment between the employer and employee. D can only be liable in tort if the primary contract has in fact been breached.  See **_OBG Ltd v Allan_** [2007] UKHL 21, [2008] 1 AC 1 (House of Lords) at [44] per Lord Hoffmann: "one cannot be liable for inducing a breach unless there has been a breach.  No secondary liability without primary liability." (Attached.)  See too at [189] per Lord Nicholls, [264] per Lord Walker, [302] per Baroness Hale and [319] per Lord Brown. (Attached.) (And see **Clerk & Lindsell on Torts**, 23rd edition, at [23-17]. (Attached.)).

10.    Consequently, there can be no tortious interference without a breach of the underlying contract.

11.    I am instructed that, in the present case, some of the relevant contracts that are alleged to have been breached contained a three-month notice period but otherwise did not prevent the employee from resigning. To the extent that the Amended Complaint is based on the decision of an individual to give the prescribed contractual notice and leave his or her existing employment, then the tort would not be established. This is for the following reasons:

a.    The third party cannot have intended to procure any breach (the element of the tort described at paragraph 8(c) above), as I am instructed that the facts would not amount to a breach of the underlying contracts as lawful notice would have been given.

b.    There is no breach of the underlying contracts in any event (the element of the tort described at paragraph 8(d) above).

12. As a result of either aspect, the tort would not therefore be established if based on the employee's decision to resign on notice.


**Misappropriating Trade Secrets / Confidential Information**

13.    The Amended Complaint asserts a claim for what it labels "misappropriation of trade secrets and confidential information" (Count 2, paragraphs 237-249 of the Amended Complaint, which I understand cross-refer to factual allegations at paragraphs 152-168 of the Amended Complaint).

14.    There are various potential analogues in English law, depending on the precise nature of the claim and the nature of the 'trade secrets and confidential information' and the remedies sought. Claims can be brought under various statutory provisions (for example under the Torts (Interference with Goods) Act 1977, the Trade Secrets (Enforcement, etc) Regulations 2018, or specific legislation in the context of copyright and/or intellectual property). There are also various common law causes of action that may arise, including, for example, dishonest assistance, knowing receipt and breach of confidence.

15.    The most appropriate analogue to Count 2 would be a common law claim for breach of confidence.

16.    The classic statement of the elements of a cause of action for breach of confidence is **Coco v AN Clark (Engineers) Ltd** [1969] RPC 41, where at p.47 Megarry J said: "*In my judgment, three elements are normally required if, apart from contract, a case of breach of confidence is to succeed.  First, the information itself (...) must "have the necessary quality of confidence about it".  Secondly, that information must have been imparted in circumstances importing an obligation of confidence.  Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it.*" (Attached.) That statement of principle was confirmed in **Wade v British Sky Broadcasting Ltd** [2016] EWCA Civ 1214 at [2]; and see **Clerk & Lindsell on Torts** (23rd ed) at [26-06]. (Attached.)

17.    In relation to the first and second elements, in the context of the employment relationship (and leaving aside any express contractual obligations that might be relevant), the law is that one can ordinarily identify three categories of information – (1) trivial information which does not have an element of confidentiality; (2) information which is confidential and which, during an employee's employment, may only be used for the benefit of the employer; and (3) trade secrets, the most significant category of confidential information, which the employee may not use even after the employment has terminated: ***Faccenda Chicken v Fowler*** [1987] 1 Ch 117. (Attached.)

18.    In relation to the third element, the claimant must demonstrate 'misuse'. The mere fact that an employee leaves for a similar position at a competitor will not itself found a claim. There has to be misuse: ***Vestergaard Frandsen A/S v Bestnet Europe Ltd*** [2013] UKSC 31, [2013] 1 WLR 1556 at [22]. (Attached.)

19.    The Amended Complaint also asserts a claim of "aiding and abetting misappropriation of trade secrets and confidential information." Under English law, the analogous claims in the employment context would be vicarious liability for breach of confidence or dishonest assistance of breach of confidence: ***Vestergaard Frandsen A/S v Bestnet Europe Ltd*** [2013] UKSC 31, [2013] 1 WLR 1556 at [26]-[27]. (Attached.) One requirement of this claim is that the underlying breach of confidence occur. In addition, the Amended Complaint at §247 relies on knowledge. Knowledge is also a component of the tort of dishonest assistance under English law.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in London, United Kingdom, on September 18, 2023.



_____
EDWARD BROWN K.C.

A

# The Law Reports

## Appeal Cases
## Volume 1

B

————————

C

House of Lords

### OBG Ltd and another *v* Allan and others

### Douglas and others *v* Hello! Ltd and others (No 3)

### Mainstream Properties Ltd *v* Young

D

### [2007] UKHL 21

2006   Nov 13–16, 20,   Lord Nicholls of Birkenhead, Lord Hoffmann,
       21–23, 27, 28;   Lord Walker of Gestingthorpe, Baroness Hale of
2007   May 2            Richmond and Lord Brown of Eaton-under-Heywood

E

*Confidential information — Breach of confidence — Damages — Celebrity couple granting magazine exclusive rights to publish selected photographs of wedding — Photography forbidden at wedding except by couple's official photographer — Publication by rival magazine of photographs taken surreptitiously — Whether authorised publisher having cause of action against rival publisher for economic torts of unlawful interference with business or conspiracy to injure*

*Tort — Cause of action — Inducing breach of contract — Claimant's employees acting in breach of employment contract by carrying out property development scheme for their own benefit — Scheme financed by defendant after being assured by employees that scheme not in conflict with employees' duties to claimant — Whether defendant liable to claimant for inducing breach of contract*

F

*Tort — Cause of action — Procuring breach of contract — Invalidly appointed receivers assuming control of company's contracts — Whether wrongful interference with contractual relations — Whether conversion of company's contracts*

G

In the first appeal, the claimants, a civil engineering company and its associated company, got into dire financial difficulties. The third defendant, an unsecured creditor of the claimants, acting on the advice of its solicitors, the fourth defendant, purported to appoint the first and second defendants as joint administrative receivers of the claimants. The receivers attended at the premises of the first claimant and took control of the business. Steps subsequently taken by them included terminating the contracts of the majority of the claimants' subcontractors and settling claims under the contracts which the first claimant had made. Shortly afterwards the claimants went into liquidation. They subsequently brought proceedings against the defendants claiming that the receivers had been invalidly appointed and that, inter alia, they had suffered loss as a result of the receivers' wrongful interference with their contractual relations and conversion of their contracts. The judge found that

H

A

the receivers' appointment had been invalid and that but for their appointment the claimants would, through their liquidators, have obtained a substantially better settlement of their outstanding contracts than the receivers had in fact achieved. The judge awarded the claimants damages for wrongful interference with contractual relations but dismissed the claim for conversion. The Court of Appeal, by a majority, allowed the defendants' appeal, and held that the receivers' actions lacked the intention to procure a breach of contract or the non-performance of a primary obligation of a contract, which was an essential ingredient of the tort of wrongful interference with contractual relations. The Court of Appeal also dismissed the claimants' cross-appeal on the ground that as a matter of law there could be no conversion of a chose in action.

B

In the second appeal, the first and second claimants were well-known film actors who entered into an agreement with the third claimant, the publisher of an English celebrity magazine, granting it exclusive rights for a period of nine months to publish photographs, approved by them, of their wedding in New York on 18 November 2000. The contract further provided that the first and second claimants retained any rights not expressly granted to the third claimant. The first and second claimants hired an official photographer, and jointly owned copyright in the photographs taken. It was a term of the contract that the first and second claimants would take all reasonable steps to restrict access to the wedding so that no photographs were made available to third party media. Guests were informed that no photographs were to be taken, and tight security measures were put in place. Despite those measures, the wedding reception was infiltrated by a freelance photographer who surreptitiously took photographs. He then sold the exclusive right to publish the unauthorised photographs to the first defendant, the publisher in England of a celebrity magazine in competition with the third claimant. On learning that the first defendant intended to publish unauthorised photographs, the claimants sought an interlocutory injunction restraining publication, which was granted without notice on 20 November 2000 and continued on notice the following day, but lifted by the Court of Appeal on 23 November 2000. The first defendant distributed copies of its issue containing the unauthorised photographs on 23 November for sale on 24 November. The third claimant brought forward its own publication, thereby incurring expenses. The first of its two issues featuring the authorised photographs also went on sale on November 24, with a second issue containing further photographs appearing a week later. The claimants sought damages as a result of the first defendant's unauthorised publication and further defendants were joined. The judge held, inter alia, that the third claimant was entitled to damages from the first defendant for loss of profit from the exploitation of the authorised photographs attributable to the publication of the unauthorised photographs but rejected the third claimant's claim against the first defendant based on the economic torts of deliberate interference with the third claimant's business or conspiracy to injure by lawful or unlawful means. The Court of Appeal allowed the first defendant's appeal and held that the third claimant had no right to commercial confidence enforceable against the first defendant in relation to the details of the wedding or the photographic images portraying them. The Court of Appeal also dismissed the third claimant's cross-appeal and held that the economic tort was not made out since, on the judge's findings, the first defendant had not aimed, directed or targeted its conduct at the third claimant, and therefore it did not have the subjective intention to cause harm to the third claimant.

C

D

E

F

G

In the third appeal, the claimant was a property development company which employed the first and second defendants to find suitable properties for development by the claimant. In breach of their contracts with the claimant, the two defendants diverted the purchase of development land to a joint venture consisting of themselves and the sixth defendant, who financed the project. The claimant brought proceedings against the first and second defendants for damages for loss of the

H

A  opportunity to develop the site, and against the sixth defendant for damages for inducing a breach of the first and second defendants' contracts of employment with the claimant. The judge upheld the claim against the first and second defendants but dismissed the claim against the sixth defendant on the ground that although the sixth defendant knew of the first and second defendants' duties towards the claimant he had sought and been given assurances by them that there was no conflict of interest with the claimant and therefore he did not intend to procure a breach of the first and

B  second defendants' contracts of employment or otherwise interfere with their performance. The Court of Appeal dismissed the claimant's appeal and held that the tort of interference with contractual rights required a specific subjective intention on the defendant's part to cause harm to the claimant and the sixth defendant had no such intention.

On appeals by the claimants in the first appeal, the third claimant in the second appeal and the claimant in the third appeal—

C  *Held*, (1) that the unified theory which treated causing loss by unlawful means as an extension of the tort of inducing a breach of contract was confusing and misleading and should be abandoned; and that, accordingly, inducing breach of contract and causing loss by unlawful means were two separate torts, each with its own conditions for liability ( post, paras 33, 38, 188–189, 264, 303, 306, 319).

*Lumley v Gye* (1853) 2 E & B 216, *Allen v Flood* [1898] AC 1, HL(E), *Quinn v*

D  *Leathem* [1901] AC 495, HL(I), *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376 and *D C Thomson & Co Ltd v Deakin* [1952] Ch 646, CA considered.

(2) That inducing a breach of contract was a tort of accessory liability, and an intention to cause a breach of contract was a necessary and sufficient requirement for liability; that in order to be liable a person had to know that he was inducing a breach of contract and to intend to do so with knowledge of the consequences; that a conscious decision not to inquire into the existence of a fact could be treated as knowledge for the purposes of the tort; that a person who knowingly induced a breach of contract as a means to an end had the necessary intent even if he was not

E  motivated by malice but had acted with the motive of securing an economic advantage for himself; that, however, a breach of contract which was neither an end in itself nor a means to an end but was merely a foreseeable consequence of a person's acts did not give rise to liability; and that there could be no secondary liability without primary liability, and therefore a person could not be liable for inducing a breach of contract unless there had in fact been a breach by the contracting party ( post, paras 8, 39–44, 172, 173, 191, 192, 264, 302, 303, 319).

F  *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691, CA and *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, CA considered.

*Millar v Bassey* [1994] EMLR 44, CA disapproved.

*Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, HL(E) not followed.

(3) That causing loss by unlawful means was a tort of primary liability, and acts against a third party counted as unlawful means only if they were actionable by that third party if he had suffered loss; that (per Lord Hoffmann, Lord Walker of

G  Gestingthorpe, Baroness Hale of Richmond and Lord Brown of Eaton-under-Heywood) unlawful means consisted of acts intended to cause loss to the claimant by interfering with the freedom of a third party in a way which was unlawful as against that third party and which was intended to cause loss to the claimant, but did not include acts which might be unlawful against a third party but which did not affect his freedom to deal with the claimant ( post, paras 8, 45–64, 270, 302, 320).

*Allen v Flood* [1898] AC 1, HL(E), *Quinn v Leathem* [1901] AC 495, HL(I),

H  *J T Stratford & Son Ltd v Lindley* [1965] AC 269, HL(E), *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, HL(E) and *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785 considered.

(4) That in the first appeal, the only possible causes of action which could arise out of the alleged interference with contractual relations were the tort of procuring a breach of contract or the tort of causing loss by unlawful means; that none of the

A

requirements of either of those torts could be established; that there had been no breach or non-performance of any contract, and therefore there was no wrong to which accessory liability for procuring a breach of contract could attach; that the receivers had acted in good faith and had neither employed unlawful means nor intended to cause any loss to the claimant; and that, accordingly, there was no primary liability for causing loss by unlawful means (post, paras 86, 218, 264, 301–303, 319, 330).

B

(5) Dismissing the first appeal, (Lord Nicholls of Birkenhead and Baroness Hale of Richmond dissenting) that strict liability for conversion applied only to an interest in chattels and not to choses in action; that it would be too drastic a reshaping of the law to extend the tort of conversion to apply also to choses in action and thereby impose strict liability for pure economic loss on receivers who had been appointed and had acted in good faith for conversion of the claimants' contracts; and that, accordingly, the claim against the receivers failed (post, paras 95–100, 105, 106, 271, 319, 321, 322, 330).

C

(6) Allowing the second appeal (Lord Nicholls of Birkenhead and Lord Walker of Gestingthorpe dissenting) that although information about the wedding generally was information that anyone was free to communicate, the photographic images of the wedding were not publicly available and were therefore confidential information; that there was no conceptual reason why the obligation of confidence should not be imposed only in respect of the photographs if the third claimants were willing to pay for the right to be the only source of that particular form of information and did not mind that others were free to communicate other information about the wedding;

D

that the photographs of the wedding constituted information of commercial value over which the first and second claimants had sufficient control to enable them to impose an obligation of confidence and there was no public policy reason why the law of confidence should not protect that obligation; that the third claimant, having bought the benefit of the obligation of confidence imposed by the first and second claimants on those present at the wedding, was entitled to protect the right to that benefit against any third party who intentionally destroyed it; that the duty of

E

confidence imposed by the first and second claimants was binding upon the unauthorised photographer, and, by reason of the circumstances in which the first defendant had acquired the photographs, the duty of confidentiality had also been binding upon the first defendant when it had published the photographs to the detriment of the third claimants; that the fact that the third claimant had published its authorised photographs before the defendants had published the unauthorised photographs did not necessarily mean that the photographic images were by then in

F

the public domain so that they could no longer be the subject of confidence; that whether information was in the public domain and whether there was still any point in enforcing the obligation of confidence thereafter depended on the nature of the information and the facts of the case; that the purpose of publishing the photographs had not merely been to convey the information that the first and second claimants had got married, but to convey the visual information of their wedding, and the transaction entered into between the claimants was that each picture would be

G

treated as a separate piece of information which the third claimant would have the exclusive right to publish; that, therefore, publication of the authorised pictures had not put all the pictures in the public domain, and the duty of confidentiality continued in respect of any pictures of the wedding; and that, accordingly, the third claimants were entitled to damages against the first defendant for breach of confidence (post, paras 113–117, 119, 122–124, 127–136, 302, 325–330).

H

(7) That, in the second appeal (per Lord Hoffmann, Baroness Hale of Richmond and Lord Brown of Eaton-under-Heywood), although the defendants had made the third claimant's contractual rights less profitable than they would otherwise have been, they had done nothing to interfere with the first and second claimants' ability to deal with the third claimant or to perform their contractual obligations to the third claimant; that, however, the Court of Appeal had erred in holding that the defendants

A had no intention to cause loss to the third claimant and had only intended to maintain their own sales; that causing loss to the third claimant was the means whereby the defendants had intended to attain their desired end and the loss was not merely a foreseeable consequence of attaining that end; and that, accordingly, the defendants had the necessary intention to cause loss but they were not liable in tort because they had not interfered by unlawful means with the actions of the first and second claimants (post, paras 129–136, 302, 303, 319, 329).

B (8) Dismissing the third appeal, that, on the judge's unchallenged findings, the sixth defendant had honestly believed that assisting the first and second defendants with the joint venture would not involve them in breaches of their contractual obligations; that the sixth defendant had not been indifferent as to whether there was a breach of contract or not, nor had he made a conscious decision not to inquire in case he discovered a disagreeable truth; and that, accordingly, he had not intended to cause a breach of contract nor had he caused loss by unlawful means (post, paras 67–69, 199, 200, 202, 203, 301, 318, 330).

C Decision of the Court of Appeal in *OBG Ltd v Allan* [2005] EWCA Civ 106; [2005] QB 762; [2005] 2 WLR 1174; [2005] 2 All ER 602 affirmed.

Decision of the Court of Appeal in *Douglas v Hello! Ltd (No 3)* [2005] EWCA Civ 595; [2006] QB 125; [2005] 3 WLR 881; [2005] 4 All ER 128 reversed.

Decision of the Court of Appeal in *Mainstream Properties Ltd v Young* [2005] EWCA Civ 861; [2005] IRLR 964 affirmed.

D The following cases are referred to in the opinions of their Lordships:

*A v B plc* [2002] EWCA Civ 337; [2003] QB 195; [2002] 3 WLR 542; [2002] 2 All ER 545, CA
*Albert (Prince) v Strange* (1849) 2 De G & S 652
*Allen v Flood* [1895] 2 QB 21, CA; [1898] AC 1, HL(E)
*Anns v Merton London Borough Council* [1978] AC 728; [1977] 2 WLR 1024; [1977] 2 All ER 492, HL(E)

E *Argyll (Duchess) v Argyll (Duke)* [1967] Ch 302; [1965] 2 WLR 790; [1965] 1 All ER 611
*Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109; [1988] 3 WLR 776; [1988] 3 All ER 545, HL(E)
*Australian Broadcasting Corpn v Lenah Game Meats Pty Ltd* (2001) 208 CLR 199
*Ayres v French* (1874) 41 Conn 142
*Bakewell Management Ltd v Brandwood* [2004] UKHL 14; [2004] 2 AC 519; [2004] 2 WLR 955; [2004] 2 All ER 305, HL(E)

F *Barretts & Baird (Wholesale) Ltd v Institution of Professional Civil Servants* [1987] IRLR 3
*Bradshaw Construction Ltd v Bank of Nova Scotia* [1993] 1 WWR 596
*British Industrial Plastics Ltd v Ferguson* [1938] 4 All ER 504, CA; [1940] 1 All ER 479, HL(E)
*CBS Songs Ltd v Amstrad Consumer Electronics plc* [1988] AC 1013; [1988] 2 WLR 1191; [1988] 2 All ER 484, HL(E)

G *Campbell v MGN Ltd* [2004] UKHL 22; [2004] 2 AC 457; [2004] 2 WLR 1232; [2004] 2 All ER 995, HL(E)
*Coco v A N Clark (Engineers) Ltd* [1969] RPC 41
*Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444
*D v L* [2003] EWCA Civ 1169; [2004] EMLR 1, CA
*Daily Mirror Newspapers Ltd v Gardner* [1968] 2 QB 762; [1968] 2 WLR 1239; [1968] 2 All ER 163, CA

H *Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 67; [1984] 1 All ER 117, CA; [1984] 1 WLR 427; [1984] 1 All ER 751, HL(E)
*Donoghue v Stevenson* [1932] AC 562, HL(Sc)
*Douglas v Hello! Ltd* [2001] QB 967; [2001] 2 WLR 992; [2001] 2 All ER 289, CA
*Ellerman Lines Ltd v Read* [1928] 2 KB 144, CA

6

OBG Ltd v Allan (HL(E))                                                    [2008] 1 AC

*Elvis Presley Trade Marks* [1999] RPC 567, CA                                   A

*Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691; [1966] 1 All ER 1013,
    CA

*Fowler v Hollins* (1872) LR 7 QB 616, CA; sub nom *Hollins v Fowler* (1875)
    LR 7 HL 757, HL(E)

*Fraser v Evans* [1969] 1 QB 349; [1968] 3 WLR 1172; [1969] 1 All ER 8, CA

*GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376

*Garret v Taylor* (1620) Cro Jac 567                                              B

*Gilbert v Star Newspaper Co Ltd* (1894) 11 TLR 4

*Greig v Insole* [1978] 1 WLR 302; [1978] 3 All ER 449

*Hargreaves v Bretherton* [1959] 1 QB 45; [1958] 3 WLR 463; [1958] 3 All ER 122

*Hellewell v Chief Constable of Derbyshire* [1995] 1 WLR 804; [1995] 4 All ER 473

*Hill (Edwin) & Partners v First National Finance Corpn plc* [1989] 1 WLR 225;
    [1988] 3 All ER 801, CA

*Hoath v Connect Internet Services Pty Ltd* [2006] NSWSC 158                      C

*Hollywood Silver Fox Farm Ltd v Emmett* [1936] 2 KB 468; [1936] 1 All ER 825

*Hunter v Canary Wharf Ltd* [1997] AC 655; [1997] 2 WLR 684; [1997] 2 All
    ER 426, HL(E)

*Irvine v Talksport Ltd* [2002] EWHC 367 (Ch); [2002] 1 WLR 2355; [2002] 2 All
    ER 414

*Kaye v Robertson* [1991] FSR 62, CA

*Kremen v Online Classifieds Inc* (2003) 337 F 3d 1024                            D

*Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] UKHL 19; [2002]
    2 AC 883; [2002] 2 WLR 1353; [2002] 3 All ER 209; [2002] 1 All ER (Comm)
    843, HL(E)

*Lloyds Bank Ltd v Chartered Bank of India, Australia and China* [1929] 1 KB 40, CA

*Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173; [1981] 3 WLR 33;
    [1981] 2 All ER 456, HL(E)

*Lonrho plc v Fayed* [1990] 2 QB 479; [1989] 3 WLR 631; [1989] 2 All ER 65, CA;    E
    [1992] 1 AC 448; [1991] 3 WLR 188; [1991] 3 All ER 303, HL(E)

*Lumley v Gye* (1853) 2 E & B 216

*McKennitt v Ash* [2005] EWHC 3003 (QB); [2006] EMLR 178

*McLachlan v Canadian Imperial Bank of Commerce* (1987) 13 BCLR (2d) 300;
    (1989) 57 DLR (4th) 687

*Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2001] UKHL 1; [2003]
    1 AC 469; [2001] 2 WLR 170; [2001] 1 All ER 743, HL(E)                        F

*Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; [1983] 2 WLR 778;
    [1983] 2 All ER 189, HL(E)

*Millar v Bassey* [1994] EMLR 44, CA

*Millar v Taylor* (1769) 4 Burr 2303

*Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, CA; [1892]
    AC 25, HL(E)

*Morison v London County and Westminster Bank Ltd* [1914] 3 KB 356, CA           G

*Morris v Kanssen* [1946] AC 459; [1946] 1 All ER 586, HL(E)

*National Phonograph Co Ltd v Edison-Bell Consolidated Phonograph Co Ltd*
    [1908] 1 Ch 335, CA

*Oren (Isaac) v Red Box Toy Factory Ltd* [1999] FSR 785

*Philip v Pennell* [1907] 2 Ch 577

*Phipps v Boardman* [1967] 2 AC 46; [1966] 3 WLR 1009; [1966] 3 All ER 721,
    HL(E)                                                                         H

*Pollard v Photographic Co* (1888) 40 Ch D 345

*Quinn v Leathem* [1901] AC 495, HL(I)

*RCA Corpn v Pollard* [1983] Ch 135; [1982] 3 WLR 1007; [1982] 3 All ER 771, CA

*Rogers v Kelly* (1809) 2 Camp 123

*Rookes v Barnard* [1964] AC 1129; [1964] 2 WLR 269; [1964] 1 All ER 367, HL(E)

A    *Royal Bank of Canada v W Got & Associates Electric Ltd* (1994) 150 AR 93; (1997)
196 AR 241; [1999] 3 SCR 408

*Royal British Bank v Turquand* (1856) 6 E & B 327

*Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134

*Smith v Lloyds TSB Group plc* [2001] QB 541; [2000] 3 WLR 1725; [2001] 1 All
ER 424, CA

*Smithies v National Association of Operative Plasterers* [1909] 1 KB 310, CA

B    *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211

*Sorrell v Smith* [1925] AC 700, HL(E)

*South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239, HL(E)

*Stratford (JT) & Son Ltd v Lindley* [1965] AC 269; [1964] 3 WLR 541; [1964] 3 All
ER 102, HL(E)

*Tarleton v M'Gawley* (1794) Peake 270

*Telecom Vanuatu Ltd v Optus Networks Pty Ltd* [2005] NSWSC 951

C    *Theakston v MGN Ltd* [2002] EWHC 137 (QB); [2002] EMLR 398

*Thomson (DC) & Co Ltd v Deakin* [1952] Ch 646; [1952] 2 All ER 361, CA

*Thyroff v Nationwide Mutual Insurance Co* (unreported) 21 August 2006, US Court
of Appeals Second Circuit; (2007) 832 NYS 2d 873

*Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; [1969] 2 WLR 289; [1969] 1 All
ER 522, CA

*Tuttle v Buck* (1909) 119 NW 946

D    *Unilever plc v Chefaro Proprietaries Ltd* [1994] FSR 135, CA

*Van Camp Chocolates Ltd v Aulsebrooks Ltd* [1984] 1 NZLR 354

*Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* (1937) 58 CLR 479

*Wainwright v Home Office* [2003] UKHL 53; [2004] 2 AC 406; [2003] 3 WLR 1137;
[2003] 4 All ER 969, HL(E)

*Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, CA

The following additional cases were cited in argument in *OBG Ltd v Allan*:

E    *Bank of Montreal v Tourangeau* (1980) 118 DLR (3d) 293

*Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393,
CA

*Concord Trust v The Law Debenture Trust Corpn plc* [2005] UKHL 27; [2005]
1 WLR 1591; [2005] 1 All ER (Comm) 699, HL(E)

*Corbin, decd, In re Estate of* (1980) 391 So 2d 731

*Cruikshank (R) Ltd v Chief Constable of Kent County Constabulary* [2002]
F    EWCA Civ 1840; The Times, 27 December 2002, CA

*Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2006] UKHL 49;
[2007] 1 AC 558; [2006] 3 WLR 781; [2007] 1 All ER 449, HL(E)

*Gainers Inc v Pocklington Holdings Inc* (2000) 194 DLR (4th) 109

*Goldburg, In re (No 2); Ex p Page* [1912] 1 KB 606

*Granby Marketing Services Ltd v Interlego AG* [1984] RPC 209

*Gulf Insurance Ltd v Central Bank of Trinidad and Tobago* [2005] UKPC 10;
G    66 WIR 297, PC

*Lubenham Fidelities and Investments Co Ltd v South Pembrokeshire District
Council* (1986) 33 BLR 39, CA

*MCC Proceeds Inc v Lehman Bros International (Europe)* [1998] 4 All ER 675, CA

*Middlebrook Mushrooms Ltd v Transport and General Workers' Union* [1993]
ICR 612, CA

*Payne v Elliott* (1880) 54 Cal 339

H    *Pritchard v Briggs* [1980] Ch 338; [1979] 3 WLR 868; [1980] 1 All ER 294, CA

*Simms, In re; Ex p Trustee* [1934] Ch 1, CA

*Smith v Morrison* [1974] 1 WLR 659; [1974] 1 All ER 957

*Stocznia Gdanska SA v Latvian Shipping Co* [2002] EWCA Civ 889; [2002] 2 Lloyd's
Rep 436, CA

*Vaughan, Ex p; In re Riddeough* (1884) 14 QBD 25, DC

The following additional cases were cited in argument in *Douglas v Hello! Ltd*:

*Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 WLR 1676; [1971] 3 All
  ER 1175, CA
*Associated British Ports v Transport and General Workers' Union* [1989] 1 WLR
  939; [1989] 3 All ER 822, HL(E)
*Beaudesert Shire Council v Smith* (1966) 120 CLR 145
*Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435; [1942] 1 All
  ER 142, HL(Sc)
*Indata Equipment Supplies Ltd v ACL Ltd* [1998] FSR 248, CA
*Mustad & Son v Dosen* [1964] 1 WLR 109; [1963] 3 All ER 416, HL(E)
*Northern Territory of Australia v Mengel* (1995) 185 CLR 307
*Venables v News Group Newspapers Ltd* [2001] Fam 430; [2001] 2 WLR 1038;
  [2001] 1 All ER 908

The following additional cases were cited in argument in *Mainstream Properties Ltd
v Young*:

*Lubenham Fidelities & Investments Co Ltd v South Pembrokeshire District Council*
  (1986) 33 BLR 39, CA
*Twinsectra Ltd v Yardley* [2002] UKHL 12; [2002] 2 AC 164; [2002] 2 WLR 802;
  [2002] 2 All ER 377, HL(E)
*White v Riley* [1921] 1 Ch 1, CA

**APPEALS** from the Court of Appeal

### OBG Ltd v Allan

By leave of the House of Lords (Lord Nicholls of Birkenhead, Lord Hope
of Craighead and Lord Brown of Eaton-under-Heywood) granted on 28 July
2005, the claimants, OBG Ltd and OBG (Plant and Transport Hire) Ltd,
appealed from a decision of the Court of Appeal (Peter Gibson, Mance and
Carnwath LJJ) on 9 February 2005 allowing an appeal by the defendants,
Iain John Allan, Michael Francis Stevenson, Raymond International Ltd
(formerly Raymond Centriline Ltd) and Penningtons, and dismissing the
claimants' cross-appeal from a decision of Judge Maddocks who, sitting as a
judge of the Chancery Division in Manchester on 24 February 2004, had
given judgment for the claimants in the sum of £1,854,000 plus interest in
their claim against the defendants for wrongful interference with contractual
relations, but had dismissed the claim for conversion.

The facts are stated in the speech of Lord Hoffmann.

### Douglas v Hello! Ltd (No 3)

By leave of the House of Lords (Lord Nicholls of Birkenhead, Lord Hope
of Craighead and Lord Brown of Eaton-under-Heywood) granted on 28 July
2005, the third claimant, Northern & Shell plc, publishers of "OK!"
magazine, appealed from a decision of the Court of Appeal (Lord Phillips of
Worth Matravers MR, Clarke and Neuberger LJJ) on 18 May 2005,
allowing an appeal by the first defendant, Hello! Ltd, from decisions of
Lindsay J who on 11 April 2003 and 7 November 2003 had held the first
defendant liable in damages to the third claimant for breach of confidence,
and assessed the damages at £1,026,706 for loss of profit from the
exploitation of unauthorised photographs.

The facts are stated in the speech of Lord Hoffmann.

A

*Mainstream Properties Ltd v Young*

By leave of the House of Lords (Lord Nicholls of Birkenhead, Lord Hope of Craighead and Baroness Hale of Richmond) granted on 9 November 2005, the claimant, Mainstream Properties Ltd, appealed from a decision of the Court of Appeal (Sedley and Arden LJJ and Aikens J) on 13 July 2005 dismissing the claimant's appeal from a decision of Judge Norris QC who,

B
sitting as a judge of the Chancery Division in the Birmingham District Registry on 10 September 2004, had dismissed the claimant's claim against the sixth defendant, Joseph De Winter, for damages for inducing a breach by the first defendant, Paul Colin Young, and the second defendant, Jeffrey William Broad, of their contracts with the claimant.

The facts are stated in the speech of Lord Hoffmann.

C
*John Randall QC, Alistair Wyvill* and *Marc Brown* for the claimants in *OBG Ltd v Allan*. The claim is for interference by what has been termed prevention rather than procurement. A's interference has taken the form of non-consensual action affecting B, rather than persuading B to act in accordance with A's suggestion. [Reference was made to Simester and Chan: "Inducing Breach of Contract: One Tort or Two?" [2004] CLJ 132

D
and *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376.]

Although actionable interference often takes the form of inducing or procuring voluntary action on the part of one of the parties to a contract, it need not necessarily do so. A party who permanently takes full control and benefit of a contract away from a contracting party commits the most serious and extensive interference possible with that party's contractual rights. [Reference was made to *Dimbleby & Sons v Ltd v National Union of*

E
*Journalists* [1984] 1 WLR 67; *Lumley v Gye* (1853) 2 E & B 216; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; *Quinn v Leathem* [1901] AC 495 and *Allen v Flood* [1898] AC 1.]

Since the receivers' appointment was unlawful all their actions were taken without lawful authority and that is a critical element for their liability. The interference was on any view direct, committed with knowledge of the

F
contracts and without justification. The receivers' intention was to discharge their duties as administrative receivers, which necessarily required them to exclude the directors from control over the claimants' valuable assets and then to realise those assets for the benefit of their appointor and, through their fees, themselves. Their taking control of the claimants' contracts was deliberate rather than accidental.

G
The receivers' honest belief in the lawfulness of their appointment affords them no defence. Provided there is the requisite knowledge of the contract or other source of the protected right that has been interfered with, the intention for the tort has been established. Alternatively, if any greater intention is required, a defendant's intention to bring about the reasonable and probable consequences or the necessary or inevitable consequences of

H
his action will suffice. There is no separate requirement that the acts should be aimed or directed against the claimants. Neither malice nor an intention to injure is required for the *Lumley v Gye* tort. [Reference was made to *Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883; *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239;

*Smithies v National Association of Operative Plasterers* [1909] KB 310; *Edwin Hill & Partners v First National Finance Corpn plc* [1989] 1 WLR 225; *Douglas v Hello! Ltd* [2001] QB 967; *Lonrho plc v Fayed* [1990] 2 QB 479; *Greig v Insole* [1978] 1 WLR 302; *Belmont Finance Corpn Ltd v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393 and *Pritchard v Briggs* [1980] Ch 338.]

There are no compelling policy reasons why interference by the receivers in the present circumstances should not be held to be within the scope of protection under the law of tort. There are clear and compelling reasons why interference in such circumstances as the present should be held to be within the scope of legal protection. It is wrong in principle for the victim of unauthorised interference with his contractual rights to be forced by the law to adopt as his agents those who interfered or to waive the tort. [Reference was made to *Deutsche Morgan Grenfell Group plc v Inland Revenue Comrs* [2007] 1 AC 558.]

An invalidly appointed administrative receiver who, by asserting the validity of his appointment, takes or obtains exclusive possession of, control over, or enjoyment of a company's assets, and then realises those assets for the benefit of the appointor thereby permanently depriving the company of them, commits the tort of conversion in relation to all of those assets, including intangible property. The tort of conversion committed in relation to intangible property is a freestanding tort which is not dependent upon the commission of any tort in relation to tangible property. Alternatively, the intangible property is sufficiently associated with the tangible property such that, when assessing damages for the wrong committed to the latter, the value of the former is treated as included within it. The nature of the wrong does not vary according to whether or not, but for the receivers' interference, the company would have survived.

There is no absolute rule in English law that there can be no conversion of a chose in action. Choses in action are part of modern life and must be protected from unlawful and damaging acts. Choses in action should be treated as on the same side of the line as tangible assets when, in a case with the features of the present case, the claimant has legal title to the contractual rights in question and they have been dealt with by a third party in a manner sufficient to satisfy the test for conversion. That would amount to a modest incremental development of the law. [Reference was made to *Ex p Vaughan; In re Riddeough* (1884) 14 QBD 25; *In re Simms; Ex p Trustee* [1934] Ch 1; *In re Goldburg (No 2); Ex p Page* [1912] 1 KB 606; *Payne v Elliott* (1880) 54 Cal 339; *Kremen v Online Classifieds Inc* (2003) 337 F 3d 1024; *Ayres v French* (1874) 41 Conn 142; *In re Estate of Corbin, decd* (1980) 391 So 2d 731; *Telecom Vanuatu Ltd v Optus Networks Pty Ltd* [2005] NSWSC 951; *Hoath v Connect Internet Services Pty Ltd* [2006] NSWSC 158; *Thyroff v Nationwide Mutual Insurance Co* (unreported) 21 August 2006 and *Gulf Insurance Ltd v Central Bank of Trinidad and Tobago* (2005) 66 WIR 297.]

The Human Rights Act 1998 does not apply since the unlawful taking of the claimants' property occurred before 2 October 2000 when the Act came into force. However the jurisprudence of the European Court of Human Rights illustrates that it is important that domestic courts develop the common law in the context of rights to property derived from article 1 of the First Protocol to the Convention for the Protection of Human Rights and

A    Fundamental Freedoms. Under article 13 the United Kingdom has a positive duty to ensure that the claimants have an effective remedy for any violation of Convention rights. If it is held that the common law of England and Wales does not afford the claimants any effective remedy for the loss of the value of their intangible property, their remedy would then have to be in proceedings against the United Kingdom in the European Court of Human Rights for violation of their Convention rights.

B

*Gregory Mitchell* QC and *Paul Greenwood* for the defendants. The conventional requirements for inducing breach of contract are that (1) there is a breach of contract, (2) causing loss to the claimant, and (3) which has been induced or procured by the defendant. That is the classic *Lumley v Gye* case. The concept of inducing or procuring carries with it the intention to bring about a breach of contract. That intention necessarily involves an intention to cause loss, in the sense of depriving the claimant of the benefit of the contract. The requirements of the tort of wrongful interference with trade are that there has been a use of unlawful means, which may involve breach of contract, breach of statutory duty or some other wrongful conduct including, but not limited to deceit. The two economic torts of inducing breach of contract and wrongful interference with trade will overlap in many cases: see *J T Stratford & Son Ltd v Lindley* [1965] AC 269; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106 and *Dimbleby & Sons Ltd v National Union of Journalists* [1984] 1 WLR 67.

C

D

There is a fault condition for liability in economic tort which requires proof against the defendant of a violation of the claimant's legal rights. Unlawful interference with trade also requires proof of the intentional infliction of harm by the use of unlawful means. The trial judge needs to investigate and decide as a fact the actual and subjective intention with which the defendant acted. In the present case it was not alleged that the receivers acted other than in the mistaken but genuine belief that they were lawfully appointed as administrative receivers and entitled to act. They did not procure or induce any breaches of contract which caused the claimants any harm or damage.

E

F

The receivers mistakenly believed they were lawfully appointed because they had been so advised by solicitors. There was no analysis whatsoever of the content or nature of their mistake and of whether it was properly classifiable as one of fact or law. They acted in good faith in the belief that they were legally entitled so to act. Thus, they cannot have had an intention to use unlawful means or an intention to cause harm thereby.

G

Genuine mistake, whether of fact or of law, is a complete defence to a claim in economic tort, where its effect is to negative the requisite intention. Whether or not a mistake does negative intention in a particular case is a matter for the judge to find as a fact when deciding a defendant's state of mind. Economic tort can be reconciled with principles of equity. A fault condition of intention to use unlawful means will come as close as possible to that reconciliation. If a fault condition is required then the claimants' case will fail.

H

Liability in economic tort can only arise in exceptional circumstances for good policy reasons. There are powerful remedies provided by the law, both in equity and by the insolvency legislation, against invalidly appointed

receivers.  The claimants have not pleaded those remedies.  English law does *A* not need to be extended to provide a remedy to the claimants.  [Reference was made to *J T Stratford & Son Ltd v Lindley* [1965] AC 269; *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106; *Dimbleby & Sons v Ltd v National Union of Journalists* [1984] 1 WLR 67; *Smith v Morrison* [1974] 1 WLR 659; *Granby Marketing Services Ltd v Interlego AG* [1984] RPC 209; *Lubenham* *B* *Fidelities and Investments Co Ltd v South Pembrokeshire District Council* (1986) 33 BLR 39; *Edwin Hill & Partners v First National Finance Corpn plc* [1989] 1 WLR 225; *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148; *Middlebrook Mushrooms Ltd v Transport and General Workers' Union* [1993] ICR 612; *Stocznia Gdanska SA v Latvian Shipping Co* [2002] 2 Lloyd's Rep 436; *R Cruikshank Ltd v Chief Constable* *C* *of Kent County Constabulary* [2002] EWCA Civ 1840; The Times, 27 December 2002; *Concord Trust v The Law Debenture Trust Corpn plc* [2005] 1 WLR 1591 and *Gainers Inc v Pocklington Holdings Inc* (2000) 194 DLR (4th) 109.]

   Conversion is a tort of strict liability designed to protect a person who owns, or is in, or is entitled to, possession of tangible goods against all (other than purely involuntary) acts, which in fact exclude or usurp his *D* proprietary or possessory rights to those goods.  Conversion is therefore replete with features inconsistent with the notion of its application to choses in action.

   The central issue of principle is whether on their appointment, by virtue of accepting their appointment and without more, the receivers ought to be held strictly liable in tort for the entire value of the business and undertaking in respect of which they were appointed.  A tort of strict liability is *E* exceptional and requires sound justification and a nexus between the tortfeasor, his conduct and the claimant.  In the context of conversion that nexus is provided by the requirement of a tangible thing, the existence of which is or ought to be obvious to the tortfeasor, and in respect of each such thing there is a limited class of potential claimants, defined by reference to the requirement of a possessory or proprietary right.  By contrast, in the context of interference in economic interests, the touchstone of tortious *F* liability is fault, and the requisite nexus is provided by reference to the defendant's intention and his deliberate use of unlawful means.

   It is not generally the policy of English law to impose strict liability in tort in respect of the violation of economic or intangible interests.  There is no reason to impose on innocent administrative receivers or other similar office holders, whether or not validly appointed, strict liability in respect of the *G* entire value of the whole business and undertaking of a company.  Neither is that the scheme anticipated by the insolvency legislation.

   The claimants are wrong to say that there is no absolute rule that a chose in action cannot be converted and that there are significant exceptions into which this case falls.  Under English law, the only exception to the requirement of corporeal personal property comprises documents such as *H* title deeds, cheques, negotiable instruments and other securities with a value greater than that of a mere piece of paper.  However, in none of those cases have the courts awarded damages for conversion of a cause of action.  None of the cases cited by the claimants provide true exceptions to the rules of conversion.  [Reference was made to *MCC Proceeds Inc v Lehman Bros*

A  *International (Europe)* [1998] 4 All ER 675; *In re Simms; Ex p Trustee* [1934] Ch 1; *Morison v London County and Westminster Bank Ltd* [1914] 3 KB 356; *Bank of Montreal v Tourangeau* (1980) 118 DLR (3d) 293 and *Gulf Insurance Ltd v Central Bank of Trinidad and Tobago* 66 WIR 297.]

   *Randall QC* replied.

B  *Richard Millett QC, Richard Slowe*, solicitor, and *Paul Stanley* for the third claimant in *Douglas v Hello! Ltd.* The publication of the unauthorised photographs constituted a breach of confidence vis-à-vis the third claimant for which they are entitled to recover damages. In order to award them damages it is not necessary to develop the law or to overrule previous authority. It is simply a case of establishing well established principles correctly to the facts as the judge did and the Court of Appeal did not.

C  A duty of confidence arises whenever information comes to the knowledge of a person who knows, or is on notice of or who has agreed the fact that it is confidential, such that it would be just in all the circumstances that he should be precluded from disclosing it to others. Whether information has the quality of confidence is a question of fact which depends on all the circumstances. The duty is owed to all those persons whom the defendant knows, or reasonably ought to know, have a reasonable expectation that the information will remain inaccessible to the public. Thus the information need not be available to, accessible to or owned by claimant A in order for the duty of confidence to be owed to him by defendant B, provided (1) that there is another person to whom the duty is also owed and to whom that information is available (in the present case the Douglases) and (2) that the claimant has a reasonable expectation, based on a legitimate interest, of the defendant's knowledge of that confidence being maintained. [Reference was made to *Phipps v Boardman* [1967] 2 AC 46; *Coco v A N Clark (Engineers) Ltd* [1969] RPC 41; *Fraser v Evans* [1969] 1 QB 349; *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109; *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134; *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444; *Venables v News Group Newspapers Ltd* [2001] Fam 430; *A v B plc* [2003] QB 195 and *Campbell v MGN Ltd* [2004] 2 AC 457.] The question that arises from the authorities is: is it just, in all the circumstances, to make the person who put the information in the public domain legally responsible to those who have a legitimate interest and a reasonable expectation of it being kept secret?

G  It would be wrong and unjustified to adopt an overfine approach to what is always a highly fact-sensitive and conscience based cause of action, whether it is called a tort or whether it is called an invocation of equitable relief. It would narrow the class of persons who could sue for breach of confidence to require them to show not only that they had a legitimate interest in the maintenance of confidentiality but also a right to the information itself. That would be an unjustified and retrograde development of the law of confidentiality and not an application of it. The law of confidence is not about having information. It is about keeping secrets. The defendants knew that although the unauthorised photographs they intended to publish were not chosen by the Douglases, the third claimant had an interest in maintaining their secrecy.

If the defendants' conduct was not directly a breach of the duty of
confidence owed by the defendants to the third claimant, the tort of unlawful
interference becomes important.  The Court of Appeal was right in
concluding that the actions of the defendants in publishing the unauthorised
photographs was an unlawful act for the purposes of the tort of unlawful
interference at the suit of the third claimant.  The unlawful act was the
commission of the tort of breach of confidence vis-à-vis the Douglases.  They
Court of Appeal was also right to say that for the purposes of the tort of
unlawful interference there was sufficient nexus between the unlawful act
and the injury to the third claimant, and that it was not necessary for the
unlawful means to amount to an actionable infringement of the claimant's
own rights.  Those conclusions mean that the issue is a narrow one, namely,
whether the Court of Appeal was right to say that there was a high test of
intention: see [2006] QB 125, paras 221–223.  The Court of Appeal failed to
distinguish between an intention to harm and a desire to harm and applied
far too high a test.

Conduct may be aimed at a claimant even though a defendant's
predominant purpose or motive is to advance the defendant's own personal
or commercial interests, even though it prejudices or harms the claimant
and even though it is not part of his actuating motive.  Conduct can be
aimed at a claimant even though the principal target of the defendant's
action is a third party and not the claimant himself.  Conduct can be aimed
at a claimant even though the defendant derives no satisfaction from the
position that he is placed in and even if he regrets it.  Conduct can be aimed
at a claimant even though the defendant hopes that the claimant will
actually avoid any economic loss.   [Reference was made to *Mogul
Steamship Co Ltd v McGregor Gow & Co (1889) 23 QBD 598; Allen v
Flood* [1898] AC 1; *Quinn v Leathem* [1901] AC 495; *Sorrell v Smith*
[1925] AC 700; *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942]
AC 435; *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173;
*Lonrho plc v Fayed* [1990] 2 QB 479; *D C Thomson & Co Ltd v Deakin*
[1952] Ch 646; *Rookes v Barnard* [1964] AC 1129; *J T Stratford & Son Ltd
v Lindley* [1965] AC 269; *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch
106; *Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 WLR 1676;
*Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570; *Dimbleby &
Sons Ltd v National Union of Journalists* [1984] 1 WLR 67; *Associated
British Ports v Transport and General Workers' Union* [1989] 1 WLR 939;
*Barretts & Baird (Wholesale) Ltd v Institution of Professional Civil
Servants* [1987] IRLR 3; *Van Camp Chocolates Ltd v Aulsebrooks* [1984]
1 NZLR 354; *Millar v Bassey* [1994] EMLR 44; *Isaac Oren v Red Box Toy
Factory Ltd* [1999] FSR 785 and *RCA Corpn v Pollard* [1983] Ch 135.]
The defendants cannot say that although they knew the consequences
of the unlawful act, they did not intend it.  Knowledge should be enough for
the commission of the tort.

*Stanley* followed.

*James Price QC* and *Giles Fernando* for the defendants.  The information
was not confidential.  What a bride and bridegroom look like at their
wedding is not a trade secret for the purposes of being exploited
commercially.  It is private and it is the subject of rights of human dignity

A    and autonomy but it is not a trade secret.  Alternatively, if it is a trade secret, it is not one which the third claimant shared in.

The well established law of confidence requires one to start by asking whether the confidant owed an obligation of confidence, the confidant being the person either to whom the information has been confided or who has obtained the information in some improper way.  Anyone else becomes liable because of his knowledge of the obligation of confidence owed by the

B    confidant.  In the present case the confidant, namely, the intruder at the wedding, owed no such obligation.

At the time of the defendants' publication, which took place simultaneously with the third claimant's publication, the information had been put in the public domain by the confider, the third claimant.  The third claimant must establish that the trade secret remained a secret throughout

C    the period of a fortnight in which the claimants' publication was being marketed.  Where an obligation is based on confidence, that confidence cannot survive the allegedly confidential information being put into the public domain by the confider.

The images have to be divided into two categories: those the Douglases wanted published and those that they did not want published.  The third claimant did not share any rights in the later category of images.  Persons

D    from whom confidential information is withheld cannot claim to be owed a duty of confidence.  [Reference was made to *Gilbert v Star Newspaper Co Ltd* (1894) 11 TLR 4; *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134; *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444 and *Mustad & Son v Dosen* [1964] 1 WLR 109.]

The Douglases' rights derived from the Human Rights Convention and

E    relate to privacy.  There must be a distinction between privacy and confidentiality.  Privacy responds to human autonomy and dignity.  What happens at a wedding is private but not confidential.  Privacy is not a tradeable right.  Confidence does not protect trivia although privacy might do.

The right asserted by the third claimant is neither a right of privacy nor a right to confidentiality, but a quasi proprietary image right which is

F    unaffected by the publication of the pictorial information by or with the consent of the subject, and which is not recognised in English law.  A bride and groom have a reasonable expectation of privacy with respect to their wedding, but information about events at a wedding, including photographic images of the wedding are not confidential.

The photographs which the third claimant claims were the subject of an

G    obligation of confidentiality were never disclosed to it by the Douglases, but were kept private to themselves, and all rights to them were retained by the Douglases.  The intruder who took the unauthorised photographs came under no obligation to keep them confidential, and accordingly there is no basis on which a person who obtained the photographs from him can come under any obligation of confidentiality.  Confidentiality in the images which the third claimant seeks to protect was lost on publication to the world by

H    the third claimant.

The tort of unlawful interference with trade or business is typically concerned with unlawful actions in the course of trade or business competition.  It is a natural and probable consequence of competing that some competitors will suffer.  The mental element suggested by the third

16

OBG Ltd v Allan (HL(E))                                                    [2008] 1 AC

claimant would come close to reducing the tort to one of acting unlawfully in a competitive situation.  The mental element required for the tort of unlawful interference with business is a specific intent to cause economic harm to the claimant, and the trial judge found as a fact that the defendants did not have such an intent.  Respect for the value which underlies the right of privacy and the coherent development of intellectual property and related rights require that neither misuse of private information nor breach of confidence should be capable of constituting unlawful means for the purpose of the tort of unlawful interference with business.  It is clearly established that trespass abroad is not actionable in this country.  Therefore trespass by the intruder in New York cannot serve as an unlawful act for the purposes of the economic tort.  [Reference was made to *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785; *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173; *Lonrho plc v Fayed* [1992] 1 AC 448; *Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 WLR 1676; *Beaudesert Shire Council v Smith* (1966) 120 CLR 145; *Indata Equipment Supplies Ltd v ACL Ltd* [1998] FSR 248; *Northern Territory of Australia v Mengel* (1995) 185 CLR 307 and *RCA Corpn v Pollard* [1983] Ch 135.]

Depriving a claimant of exclusivity of a publication cannot be regarded as an intention to harm.  Exclusivity can have no special status.

At the time of the defendants' decision to publish the Human Rights Act 1998 had not come into effect and the whole topic of privacy in English law was subject to uncertainty because of the absence of a an effective law of privacy.  The defendants could not have foreseen the subsequent developments in the law which have made them liable to the third claimant if such liability is established.  The information was in the public domain by the time the defendants published.

*Millett QC* replied.

*John Randall QC* and *John de Waal* for the claimant in *Mainstream Properties Ltd v Young*.  The single issue is whether it is an essential element of the tort of inducing a breach of contract that the alleged tortfeasor had the subjective belief that his actions would bring about a breach of contract.

Provided the requisite knowledge of the contract has been established, the requirement for intention should be the same as that for the intentional torts of conversion and trespass, namely, that the defendant's actions were deliberate and not accidental.  If any greater intention is required, a defendant's intention to bring about the reasonable and probable consequences, or alternatively, at least the necessary or inevitable consequences, of his actions will be judged objectively and/or imputed to him by presumption or inference.  [Reference was made to *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148; *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211; *Lubenham Fidelities and Investments Co Ltd v South Pembrokeshire District Council* 33 BLR 39; *White v Riley* [1921] 1 Ch 1; *Greig v Insole* [1978] 1 WLR 302; *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479; *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239 and *Twinsectra Ltd v Yardley* [2002] 2 AC 164.]

The law will infer the necessary intention from the actions of a defendant who knew of the existence of the contract.  The requisite intention is to be

[2008] 1 AC                                    OBG Ltd v Allan (HL(E))

A    inferred at least in respect of consequences which will necessarily result from achieving the object of a defendant's conduct. At least in cases of direct interference the requisite intention is also to be inferred in respect of consequences which will naturally and probably result from achieving the object of the defendant's conduct.

Provided the requisite knowledge of the contract has been established, any requirement of subjective intention is limited to intention to commit the
B    act which results in interference with the contract in question, and does not have to extend to an intention that such act should bring about a contractual interference or injury to the claimant. In the present case the sixth defendant acted deliberately with knowledge of the contract, including the general nature of the relevant terms. He therefore necessarily appreciated and intended the consequences. That satisfies the requirement for limited
C    subjective intention in the sense of voluntary or deliberate conduct coupled with the requisite knowledge. Further, even on the facts as told to and believed by the sixth defendant, as a matter of law the first and second defendants' actions were breaches of their duty towards the claimant.

Ignorantia juris non excusat is an accepted maxim of the law. The principle is well recognised in the criminal law, but is equally applicable to
D    the civil law, and in particular the law of tort. It applies even if legal advice has been sought, obtained and relied upon.

Recklessness should be a recognised equivalent to intention. The sixth defendant was reckless in that he failed to make any reasonable inquiry about the obvious risk that he was being invited to provide funding which would enable the commission of serious breaches of duty towards the claimant.

E    A person who directly interferes with another's contract, knowing of its existence and without justification, should be liable for the reasonable and probable, or alternatively, at least the necessary or inevitable consequences of his actions in accordance with the principle in *Lumley v Gye* 2 E & B 216.

*Gordon Pollock QC* and *Barry Isaacs* for the sixth defendant. The tort of interference with contractual relations or inducing breach of contract is a
F    tort of subjective and specific intent. The abandonment of the requirement of a specific subjective intent and a substitution of a test based on the reasonableness of the defendant's beliefs leads inevitably to the position that before acting every individual owed a duty of care to the world to ascertain the existence and terms of any contract on which his actions may impinge, and to ascertain whether his actions may bring about or assist in the breach
G    of that contract by one of those who is a party to it. Such a wide and uncontrolled duty of care is wholly inconsistent with the policy of English law. [Reference was made to *D C Thomson & Co Ltd v Deakin* [1952] Ch 646; *British Industrial Plastics Ltd v Ferguson* [1938] 4 All ER 504; *Solihull Metropolitan Borough v National Union of Teachers* [1985] IRLR 211; *Pritchard v Briggs* [1980] Ch 338 and *Greig v Insole* [1978] 1 WLR 302.]

The tort of inducing a breach of contract requires proof of a subjective
H    state of mind on the part of the alleged tortfeasor. His honest belief that no breach of contract will be committed is sufficient. The tort cannot be committed negligently or on the basis of a presumed state of mind.

The trial judge's finding of fact was that the sixth defendant genuinely believed that no breach of contract would occur. That finding is necessarily

18
OBG Ltd v Allan (HL(E))                                                     [2008] 1 AC
Lord Hoffmann

inconsistent with an allegation of recklessness. The claimant cannot now attack that finding of fact. <span>A</span>

*Randall QC* replied

Their Lordships took time for consideration.

2 May 2007. **LORD HOFFMANN** <span>B</span>

*The three appeals*

1   My Lords, these three appeals are principally concerned with claims in tort for economic loss caused by intentional acts.

(a) In *OBG Ltd v Allan* [2005] QB 762 the defendants were receivers purportedly appointed under a floating charge which is admitted to have been invalid. Acting in good faith, they took control of the claimant company's assets and undertaking. The claimant says that this was not only a trespass to its land and a conversion of its chattels but also the tort of unlawful interference with its contractual relations. It claims that the defendants are liable in damages for the value of the assets and undertaking, including the value of the contractual claims, as at the date of their appointment. Alternatively, it says the defendants are liable for the same damages in conversion. <span>C</span><span>D</span>

(b) In *Douglas v Hello! Ltd (No 3)* [2006] QB 125 the magazine "OK!" contracted for the exclusive right to publish photographs of a celebrity wedding at which all other photography would be forbidden. The rival magazine "Hello!" published photographs which it knew to have been surreptitiously taken by an unauthorised photographer pretending to be a waiter or guest. "OK!" says that this was interference by unlawful means with its contractual or business relations or a breach of its equitable right to confidentiality in photographic images of the wedding. <span>E</span>

(c) In *Mainstream Properties Ltd v Young* [2005] IRLR 964 two employees of a property company, in breach of their contracts, diverted a development opportunity to a joint venture in which they were interested. The defendant, knowing of their duties but wrongly thinking that they would not be in breach, facilitated the acquisition by providing finance. The company says that he is liable for the tort of wrongfully inducing breach of contract. <span>F</span>

2   It will therefore be seen that the claimants in these three appeals rely upon at least five different wrongs, or alleged wrongs, which they say provide them with causes of action for economic loss: inducing breach of contract (*Mainstream*), causing loss by unlawful means (*Hello!*) interference with contractual relations (*OBG*); breach of confidence (*Hello!*) and conversion (*OBG*). I shall put aside the last two until I come to deal with the facts of the cases in which they arise. But I propose to start with some general observations on the first three torts. <span>G</span>

*Inducing breach of contract* <span>H</span>

3   Liability for inducing breach of contract was established by the famous case of *Lumley v Gye* (1853) 2 E & B 216. The court based its decision on the general principle that a person who procures another to commit a wrong incurs liability as an accessory. As Erle J put it, at p 232:

A      "It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: he who procures the wrong is a joint wrongdoer, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of."

B    4   For a court in 1853, the difficulty about applying this principle to procuring a breach of contract was that the appropriate action for the wrong committed by the contracting party lay in contract but no such action would lie against the procurer. Only a party to the contract could be sued for breach of contract. The answer, said the court, was to allow the procurer to be sued in tort, by an action on the case. There was a precedent for this mixing and matching of the forms of action in the old action on the case for C enticing away someone else's servant: see Gareth Jones "Per Quod Servitium Amisit" (1958) 74 LQR 39. Some lawyers regarded that action as a quaint anomaly, but the court in *Lumley v Gye* treated it as a remedy of general application.

   5   The forms of action no longer trouble us. But the important point to bear in mind about *Lumley v Gye* is that the person procuring the breach of contract was held liable as accessory to the liability of the contracting party.
D   Liability depended upon the contracting party having committed an actionable wrong. Wightman J made this clear when he said, at p 238:

     "It was undoubtedly prima facie an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant maliciously to procure her to do so . . ."

E

*Causing loss by unlawful means*

   6   The tort of causing loss by unlawful means has a different history. It starts with cases like *Garret v Taylor* (1620) Cro Jac 567, in which the defendant was held liable because he drove away customers of Headington Quarry by threatening them with mayhem and vexatious suits. Likewise, in
F *Tarleton v M'Gawley* (1794) Peake 270 Lord Kenyon held the master of the *Othello*, anchored off the coast of West Africa, liable in tort for depriving a rival British ship of trade by the expedient of using his cannon to drive away a canoe which was approaching from the shore. In such cases, there is no other wrong for which the defendant is liable as accessory. Although the immediate cause of the loss is the decision of the potential customer or trader
G to submit to the threat and not buy stones or sell palm oil, he thereby commits no wrong. The defendant's liability is primary, for intentionally causing the plaintiff loss by unlawfully interfering with the liberty of others.

   7   These old cases were examined at some length by the House of Lords in *Allen v Flood* [1898] AC 1 and their general principle approved. Because they all involved the use of unlawful threats to intimidate potential customers, *Salmond on Torts*, 1st ed (1907) classified them under the
H heading of "Intimidation" and the existence of a tort of this name was confirmed by the House of Lords in *Rookes v Barnard* [1964] AC 1129. But an interference with the liberty of others by unlawful means does not require threats. If, for example, the master of the *Othello* in *Tarleton v M'Gawley* Peake 270 had deprived the plaintiff of trade by simply sinking the

20
OBG Ltd v Allan (HL(E))                                                    [2008] 1 AC
Lord Hoffmann

approaching vessel with its cargo of palm oil, it is unlikely that Lord Kenyon    A
would have regarded this as making any difference.  Salmond's tort of
intimidation is therefore only one variant of a broader tort, usually called for
short "causing loss by unlawful means", which was recognised by Lord Reid
in *J T Stratford & Son Ltd v Lindley* [1965] AC 269, 324:

> "the respondents' action [in calling a strike] made it practically    B
> impossible for the appellants to do any new business with the barge
> hirers.  It was not disputed that such interference with business is tortious
> if any unlawful means are employed."

8    The tort of causing loss by unlawful means differs from the *Lumley v
Gye* principle, as originally formulated, in at least four respects.  First,
unlawful means is a tort of primary liability, not requiring a wrongful act by
anyone else, while *Lumley v Gye* created accessory liability, dependent upon    C
the primary wrongful act of the contracting party.  Secondly, unlawful
means requires the use of means which are unlawful under some other rule
("independently unlawful") whereas liability under *Lumley v Gye* 2 E & B
216 requires only the degree of participation in the breach of contract which
satisfies the general requirements of accessory liability for the wrongful act
of another person: for the relevant principles see *CBS Songs Ltd v Amstrad    D
Consumer Electronics plc* [1988] AC 1013 and *Unilever plc v Chefaro
Proprietaries Ltd* [1994] FSR 135.  Thirdly, liability for unlawful means
does not depend upon the existence of contractual relations.  It is sufficient
that the intended consequence of the wrongful act is damage in any form; for
example, to the claimant's economic expectations.  If the African canoeists
had been delivering palm oil under a concluded contract of which notice had
been given to the master of the *Othello*, Lord Kenyon would no doubt have    E
considered that an a fortiori reason for granting relief but not as making a
difference of principle.  Under *Lumley v Gye*, on the other hand, the breach
of contract is of the essence.  If there is no primary liability, there can be no
accessory liability.    Fourthly, although both are described as torts of
intention (the pleader in *Lumley v Gye* used the word "maliciously", but the
court construed this as meaning only that the defendant intended to procure    F
a breach of contract), the *results* which the defendant must have intended are
different.  In unlawful means the defendant must have intended to cause
damage to the claimant (although usually this will be, as in *Tarleton v
M'Gawley* Peake 270, a means of enhancing his own economic position).
Because damage to economic expectations is sufficient to found a claim,
there need not have been any intention to cause a breach of contract or
interfere with contractual rights.  Under *Lumley v Gye*, on the other hand,    G
an intention to cause a breach of contract is both necessary and sufficient.
Necessary, because this is essential for liability as accessory to the breach.
Sufficient, because the fact that the defendant did not intend to cause
damage, or even thought that the breach of contract would make the
claimant better off, is irrelevant.  In *South Wales Miners' Federation v
Glamorgan Coal Co Ltd* [1905] AC 239 the miners' union said that their    H
intention in calling a strike (inducing miners to break their contracts of
employment) was, OPEC-like, to restrict production of coal and thereby
raise its price.  So far from wishing to cause the mine owners loss, they
intended to make both owners and miners better off.  The House of Lords
said that this made no difference.  It was sufficient that the union intended

A  the employment contracts to be broken.  It was no defence, as Lord
Macnaghten put it, at p 246, that "if the masters had only known their own
interest they would have welcomed the interference of the federation".

*Allen v Flood: the torts kept separate*

B  9   The Law Lords who formed the majority in *Allen v Flood* [1898]
AC 1 showed a clear recognition that *Lumley v Gye* 2 E & B 216 and causing
loss by unlawful means are separate torts, each with its own conditions for
liability.  The difficulty for the plaintiffs in *Allen v Flood* was that, although
the jury found that the defendants had acted "maliciously" in procuring the
shipyard not to employ them, the defendants had neither used unlawful
means nor procured any breach of contract.  In the Court of Appeal [1895]
C  2 QB 21 the plaintiffs had argued successfully that the essence of *Lumley v
Gye* was that the defendant had acted maliciously.  A breach of contract was
not essential.  But the majority in the House of Lords said that liability had
been as accessory to the breach of contract.  Lord Watson quoted from the
judgments in the Court of Queen's Bench and said, at p 106, that they
embodied "an intelligible and a salutary principle":

D      "He who wilfully induces another to do an unlawful act which, but for
       his persuasion, would or might never have been committed, is rightly held
       to be responsible for the wrong he has procured" (p 107).

10   Likewise Lord Herschell said, at p 123, that he was satisfied that "the
procuring what was described as an unlawful act—namely, a breach of
contract, was regarded as the gist of the action".

E  11   Lord Macnaghten reserved his opinion on whether *Lumley v Gye*
had been rightly decided but there can be no doubt about what principle he
thought it laid down, see pp 151–152:

       "where the act itself to which the loss is traceable involves some breach
       of contract or some breach of duty, and amounts to an interference with
       legal rights . . . the immediate agent is liable, and it may well be that the
       person in the background who pulls the strings is liable too, though it is
F      not necessary in the present case to express any opinion on that point."

12   When the case was argued before the House of Lords (see Lord
Herschell, at p 132), the weight of the plaintiffs' argument was shifted to the
*Garret v Taylor* Cro Jac 567 and *Tarleton v M'Gawley* Peake 270 line of
authority, which were said to support the proposition that any unjustified
interference with trade or employment was actionable.  But the majority said
G  that it was essential to liability in those cases that the defendant had injured
the plaintiff by using unlawful means against a third party.  Lord Watson, at
p 104, described them as "cases in which an act detrimental to others, but
affording no remedy against the immediate actor, had been procured by
illegal means".  Lord Herschell said, at p 137: "In all of them the act
complained of was in its nature wrongful; violence, menaces of violence,
H  false statements."

13   Thus the facts of *Allen v Flood* did not fall within *Lumley v Gye*
because no breach of contract or other unlawful act had been procured and
did not fall within the unlawful means tort because no unlawful means had
been used.  The majority did not accept that there was any other basis for

liability. In particular, the fact that the defendant deliberately caused damage "maliciously" in the sense of having a bad or improper motive was rejected as a ground for imposing liability. As Lord Watson (whose, views, said Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 509 "represent the views of the majority better far than any other single judgment delivered in the case") summed up [1898] AC 1, 96:

> "There are, in my opinion, two grounds only upon which a person who procures the act of another can be made legally responsible for its consequences. In the first place, he will incur liability if he knowingly and for his own ends induces that other person to commit an actionable wrong. In the second place, when the act induced is within the right of the immediate actor, and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment of a third party; and in that case according to the law laid down by the majority in *Lumley v Gye* 2 E & B 216, 232, the inducer may be held liable if he can be shewn to have procured his object by the use of illegal means directed against that third party."

(Like Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 510, I think that the reference to *Lumley v Gye* in support of the second cause of action is a slip—"a rare occurrence in a judgment of Lord Watson's"—because it obviously applies to the first cause of action).

14    Some writers regret the failure of English law to accept bad motive as a ground for liability, as it is in the United States and Germany: see for example *Heydon*, *Economic Torts*, 2nd ed (1978), p 28. But I agree with Tony Weir's opinion, forcibly expressed in his Clarendon Law Lectures on *Economic Torts* (1997), that we are better off without it. It seems to have created a good deal of uncertainty in the countries which have adopted such a principle. Furthermore, the rarity of actions for conspiracy (in which a bad motive can, exceptionally, found liability) suggests that it would not have made much practical difference.

*Quinn v Leathem: the seeds of confusion*

15    *Quinn v Leathem* [1901] AC 495 is nowadays regarded as a case on lawful means conspiracy, which established that an improper motive can anomalously found a cause of action which, under the principle in *Allen v Flood* [1898] AC 1, would not lie against an individual. But this was by no means clear at the time and the case contains some discussion of both *Lumley v Gye* 2 E & B 216 and causing loss by unlawful means. Lord Macnaghten, in a well-known passage, at p 510, considered the basis of *Lumley v Gye*:

> "I have no hesitation in saying that I think the decision was right, not on the ground of malicious intention—that was not, I think, the gist of the action—but on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right to interfere with contractual relations recognised by law if there be no sufficient justification for the interference."

16    I rather doubt whether Lord Macnaghten's view of what *Lumley v Gye* 2 E & B 216 decided had altered since his opinion in *Allen v Flood* three

A    years earlier. But the *Quinn v Leathem* formulation is open to the construction that there can be liability for "interfering" with contractual relations without being accessory to any breach of contract. Of course if this is done by unlawful means with the intention of causing damage, it will fall within the unlawful means tort. But Lord Macnaghten made no mention of unlawful means and in any case, under that tort, interference with contractual relations is not a necessary part of the cause of action. Any

B    intentionally inflicted damage will do. The dictum was therefore capable of giving rise to confusion.

   17    Lord Lindley went even further and said, at p 535, that the *Lumley v Gye* tort was an example of causing loss by unlawful means:

C    "If the above reasoning is correct, *Lumley v Gye* was rightly decided, as I am of opinion it clearly was. Further, the principle involved in it cannot be confined to inducements to break contracts of service, nor indeed to inducements to break any contracts. The principle which underlies the decision reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him."

D    18    There are two objections to this analysis. First, it reflects neither the reasoning of the court in *Lumley v Gye* nor the analysis of the case in *Allen v Flood*. Secondly, to say that the defendant in *Lumley v Gye* did a wrongful act is circular. It was only wrongful because the court in *Lumley v Gye* said that inducing a breach of contract was tortious. It is circular then to say that it was tortious because it involved a wrongful act.

E    19    One reason, I think, why it seemed to Lord Lindley and others that *Lumley v Gye* and the unlawful means tort were illustrations of the same principle was that quite often, particularly in cases of torts committed in the course of commercial competition or industrial disputes, both could be regarded as unlawful ways of carrying on the competition or the dispute. That was how it appeared to Bowen LJ in *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, 614:

F    "No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it. The intentional driving away of customers by shew of violence: *Tarleton v M'Gawley* Peake 270; the obstruction of actors on the stage by preconcerted hissing: *Clifford v Brandon* 2 Camp 358; *Gregory v Brunswick* 6 Man & G 205;

G    the disturbance of wild fowl in decoys by the firing of guns: *Carrington v Taylor* 11 East 571, and *Keeble v Hickeringill* 11 East 574n; the impeding or threatening servants or workmen: *Garret v Taylor* Cro Jac 567; the inducing persons under personal contracts to break their contracts: *Bowen v Hall* 6 QBD 333; *Lumley v Gye* 2 E & B 216; all are instances of such forbidden acts."

H    20    These are, it is true, all instances of unlawful ways of causing economic damage. But that does not mean (and I do not think that Bowen LJ meant) that there is a single principle which makes them all unlawful. Disturbing the wild fowl may have been unlawful because it constituted a nuisance (compare *Hollywood Silver Fox Farm Ltd v Emmett*

[1936] 2 KB 468); the people who hissed in the theatre may have been liable
for malicious *Quinn v Leathem* conspiracy; *Lumley v Gye* 2 E & B 216 was
accessory liability and *Tarleton v M'Gawley* Peake 270 was true primary
unlawful means liability.

21    Furthermore, there is no reason why the same facts should not give
rise to both accessory liability under *Lumley v Gye* and primary liability for
using unlawful means.  If A, intending to cause loss to B, threatens C with
assault unless he breaks his contract with B, he is liable as accessory to C's
breach of contract under *Lumley v Gye* and he commits the tort of causing
loss to B by unlawful means.  The areas of liability under the two torts may
be intersecting circles which cover common ground.  This often happened in
20th century industrial disputes, where, for example, a union would use
unlawful means (inducing members to break their contracts of employment)
to put pressure upon the employer to break his contract with someone else
who was the union's real target.  Leaving aside statutory defences, this
would make the union liable both under *Lumley v Gye* as accessory to the
employer's breach of contract and for causing loss to the target by unlawful
means.  That does not make *Lumley v Gye* and unlawful means the same
tort.  But the close proximity of the circumstances in which they could be
committed, particularly in industrial disputes, may explain why they were
often thought to be manifestations of the same principle.

*Muddle: GWK Ltd v Dunlop Rubber Co Ltd*

22    Muddle set in with the influential case *GWK Ltd v Dunlop Rubber
Co Ltd* (1926) 42 TLR 376.  The GWK company made motor cars and
the ARM company made tyres.  GWK contracted to fit all their new cars
with ARM tyres and to show them with ARM tyres at trade exhibitions.  On
the night before a motor show in Glasgow, Dunlop employees removed the
ARM tyres from two GWK cars on the exhibition and substituted Dunlop
tyres.  The evidence showed that Dunlop knew of ARM's contractual right
to have their tyres displayed.

23    Lord Hewart CJ held Dunlop liable.  He referred to the dicta of Lord
Macnaghten and Lord Lindley in *Quinn v Leathem* [1901] AC 495, which
I have already cited, and said 42 TLR 376, 377:

"In [my] opinion the defendants . . . knowingly committed a violation
of the ARM company's legal rights by interfering, without any
justification whatever, with the contractual relations existing between
them and the GWK company, and [I think] that the defendants so
interfered with the intention of damaging the ARM company, and that
that company has been thereby damnified."

24    The case is a good example of intentionally causing loss by unlawful
means.  There was a finding of an intention to damage the ARM company
(as a means of advancing the interests of the Dunlop company, but more of
that later) and although there is no express reference to unlawful means in
the passage I have cited, it is implied both by the reference to Lord Lindley's
statement of principle and the separate finding of trespass to the goods of the
GWK company.

25    Lord Hewart, however, made no reference to the tort of causing loss
by unlawful means, possibly because the only form in which it was then

[2008] 1 AC                                    OBG Ltd v Allan (HL(E))
                                                          Lord Hoffmann

A    recognised in the textbooks was *Salmond's* tort of intimidation.  *GWK Ltd v Dunlop Rubber Co Ltd* was clearly not a case of intimidation.  Dunlop had not threatened anyone but had achieved its ends more directly by a trespass against the property of the GWK company.  It had nevertheless interfered with the freedom of the ARM company to fit its vehicles with tyres in accordance with its agreement with GWK.  Nowadays we would not regard the fact that this was achieved by direct action rather than threats as making

B    any difference: in both cases, intended loss is caused by unlawful means used against a third party.  But Lord Hewart looked for a different pigeonhole and the way he formulated his reasons ("committed a violation of the ARM company's legal rights by interfering . . . with the contractual relations existing between them and the GWK company") shows that he found it in Lord Lindley's extended definition of the *Lumley v Gye* tort.  As

C    Sir Jeremy Lever QC pointed out in an elegant essay written nearly 50 years ago, before *Rookes v Barnard* [1964] AC 1129 and *J T Stratford & Son Ltd v Lindley* [1965] AC 269, this analysis is unsatisfactory because it "ignores the importance of the means employed and over-emphasises the interest of the victim which is affected": see "Means, Motives and Interests in the Law of Torts", in *Oxford Essays in Jurisprudence* (1961), p 53.

D    *Adoption of the unified theory: DC Thomson & Co Ltd v Deakin*

      26   The law was analysed in great depth by the Court of Appeal in *DC Thomson & Co Ltd v Deakin* [1952] Ch 646, in which argument by eminent counsel extended over nine days.  The judgment of Jenkins LJ in particular has directed the course of the law ever since.  He fully adopted the theory, originating with Lord Lindley in *Quinn v Leathem* and supported (possibly

E    unintentionally) by Lord Macnaghten's dictum in the same case, that the principle of *Lumley v Gye* extended to all interference with contractual relations by unlawful means.  "Direct persuasion or procurement or inducement applied by the third party to the contract breaker" was "regarded as a wrongful act in itself" and constituted the "primary form" of the tort: see p 694.  But other forms of interference with contracts by

F    unlawful means, such as *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376 ("a striking example") came within the same tort.  From the dicta of Lord Macnaghten and Lord Lindley in *Quinn v Leathem* [1901] AC 495, Jenkins LJ, at p 693, deduced two propositions:

            "First . . . there may . . . be an actionable interference with contractual rights where other means of interference than persuasion or procurement

G    or inducement, in the sense of influence of one kind or another brought to bear on the mind of the contract breaker to cause him to break his contract, are used by the interferer; but, secondly, that (apart from conspiracy to injure, which, as I have said, is not in question so far as this motion is concerned) acts of a third party lawful in themselves do not constitute an actionable interference with contractual rights merely

H    because they bring about a breach of contract, even if they were done with the object and intention of bringing about such breach."

      27   The unified theory thus treated procuring breach of contract, the old *Lumley v Gye* tort, as one species of a more general tort of actionable interference with contractual rights.

28   My Lords, I think that one reason why the Court of Appeal in *DC*   A
*Thomson & Co Ltd v Deakin* [1952] Ch 646 adopted the unified theory was
that there was an inadequate appreciation at that time of the scope, possibly
even the existence, of the tort of causing loss by unlawful means.   The
reasoning of the Court of Appeal proceeded on the footing that no such tort
existed.   On that assumption, there was clearly a compelling case for
creating a cause of action to cover cases in which the defendant used    B
unlawful means to cause damage by interfering with the performance of a
contract without any voluntary or even compelled participation on the
part of the contracting party.   As Sir Raymond Evershed MR put it, at
pp 677–678:

"It was suggested in the course of argument by Sir Frank Soskice and
by Mr Lindner, that the tort must still be properly confined to such direct
intervention, that is, to cases where the intervener or persuader uses by   C
personal intervention persuasion on the mind of one of the parties to the
contract so as to procure that party to break it.   I am unable to agree that
any such limitation is logical, rational or part of our law.   In such cases
where the intervener (if I may call him such) does so directly act upon the
mind of a party to the contract as to cause him to break it, the result is, for
practical purposes, as though in substance he, the intervener, is breaking   D
the contract, although he is not a party to it . . .   At any rate, it is clear
that, when there is such a direct intervention by the intervener, the
intervention itself is thereby considered wrongful.   I cannot think that the
result is any different if the intervener, instead of so acting upon the mind
of the contracting party himself, by some other act, tortious in itself,
prevents the contracting party from performing the bargain.   A simple   E
case is where the intervener, for example, physically detains the
contracting party so that the contracting party is rendered unable by the
detention to perform the contract."

29   The Court of Appeal thought that the only way to give a remedy in
such cases was by an extension of *Lumley v Gye* along the lines proposed by
Lord Lindley.   Today one can see that an alternative analysis was available:   F
that the person who physically detained the contracting party would indeed
incur liability, but not accessory liability under the principle in *Lumley v
Gye*.   It would be primary liability for intentionally causing loss by
unlawfully interfering with the liberty of a third party, under the principle
derived from *Garret v Taylor* Cro Jac 567 and *Tarleton v M'Gawley*
Peake 270.

30   My Lords, I do not wish to exaggerate the difficulties which have   G
arisen from the adoption of the unified theory.   To some extent it is a matter
of nomenclature.   If, as Jenkins LJ made clear, liability outside the primary
form of the tort requires the use of unlawful means, does it matter whether
the tort is classified as causing loss by unlawful means or an extension of
*Lumley v Gye*?   In most cases, the question of taxonomy will make no
difference.   It is not easy to point to cases which were wrongly decided
because the court had adopted the unified theory rather than the two-tort   H
analysis of *Allen v Flood*.

31   Is there something to be said in principle for a unified theory?   Tony
Weir, in the Clarendon Law Lectures to which I have referred, makes a
bravura case for one.   Not, it is true, the version adopted in *DC Thomson v*

A  *Deakin*, which he thinks paid too much attention to the contractual nature of the claimant's rights. Weir would prefer *Lumley v Gye* to be swallowed up by the tort of intentionally causing loss by unlawful means, treating the "seduction" of the contracting party as a species of unlawful means and not distinguishing between interference with contractual rights and damage to economic expectations. The example of what Lord Atkin achieved for negligence in *Donogue v Stevenson* [1932] AC 562 always beckons: see

B  Weir, at p 25. But this too is a form of seduction which may lure writers onto the rocks.

32  In my opinion the principle of accessory liability for breach of contract, the first of Lord Watson's principles of liability for the act of another in *Allen v Flood*, cannot be subsumed in the tort of causing loss by unlawful means (the second of Lord Watson's principles in *Allen v Flood*)

C  simply by classifying "seduction" as unlawful means. That only adds a pejorative description to a circular argument: see para 18 above. To induce a breach of contract is unlawful means when the breach is used to cause loss to a third party, as in *J T Stratford & Son Ltd v Lindley* [1965] AC 269, but it makes no sense to say that the breach of contract itself has been caused by unlawful means. Philip Sales and Daniel Stilitz, in their illuminating article

D  "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411, 433, make it clear that *Lumley v Gye* was "founded on a different principle of liability than the intentional harm tort". It treats contractual rights as a species of property which deserve special protection, not only by giving a right of action against the party who breaks his contract but by imposing secondary liability on a person who procures him to do so. In this respect it

E  is quite distinct from the unlawful means principle, which is concerned only with intention and wrongfulness and is indifferent as to the nature of the interest which is damaged. I therefore do not think that the two causes of action can be brought within a unified theory and agree with Professor Peter Cane, "Mens Rea in Tort Law" (2000) 20 Oxford JLS 533, 552, that

F  "The search for 'general principles of liability' based on types of conduct is at best a waste of time, and at worst a potential source of serious confusion; and the broader the principle, the more is this so. Tort law is a complex interaction between protected interests, sanctioned conduct, and sanctions; and although there *are* what might be called 'principles of tort liability', by and large, they are not very 'general'. More importantly, they cannot be stated solely in terms of the sorts of conduct which will attract tort liability. Each principle must refer, as

G  well, to some interest protected by tort law and some sanction provided by tort law."

33  That said, I would not expect your Lordships to reject the unified theory adopted in *DC Thomson & Co Ltd v Deakin* [1952] Ch 646 unless it had serious practical disadvantages. After all, in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 607, Lord Diplock said that for

H  30 years the judgment of Jenkins LJ had been regarded as authoritative and that no benefit was gained by "raking over once again the previous decisions", as I must confess to have done. But I do think that it has been a source of confusion in more than one respect and that it would therefore be better to abandon it and return to the two torts identified by Lord Watson in

*Allen v Flood* [1898] AC 1.  To these problems created by the unified theory   A
I now turn.

*Direct and indirect interference*

34   The distinction between the original *Lumley v Gye* tort and its
extension in *DC Thomson & Co Ltd v Deakin* has been described in later
cases as a distinction between "direct" and "indirect" interference.  The   B
latter species requires the use of independently unlawful means while the
former requires no more than inducement or persuasion.  But the use of these
terms seems to me to distract attention from the true questions which have to
be asked in each case.  For example, in *Daily Mirror Newspapers Ltd v
Gardner* [1968] 2 QB 762 the Federation of Retail Newsagents resolved to
boycott the "Daily Mirror" for a week to put pressure on the publishers to   C
allow its members higher margins.  The federation advised their members
to stop buying the paper from wholesalers.  The publishers claimed an
injunction on the ground that the federation was procuring a breach of the
wholesalers' running contracts with the publishers to take a given number of
copies each day.  Counsel for the federation (see the judgment of Lord
Denning MR, at p 781) said that it was a case of indirect inducement because   D
the federation "did not exert directly any pressure or inducement on the
wholesalers: but at most they only did it indirectly by recommending the
retailers to give stop orders".  Lord Denning said that it did not matter
whether one procured a breach of contract "by direct approach to the one
who breaks the contract or by indirect influence through others".  There
seems to me much sense in this observation, although whether it leads to the   E
conclusion that the defendant should be liable in both cases or neither is
another matter.

35   In *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, 138–139, Lord
Denning changed his mind.  He said that there was a distinction between
"direct persuasion", which was "unlawful in itself", and bringing about a
breach by indirect methods, which had to involve independently unlawful
means.  On reconsideration of the *Daily Mirror* case he thought the   F
federation had "interfered directly by getting the retailers as their agents to
approach the wholesalers".

36   This treats the distinction as turning simply upon whether there was
communication, directly or through an agent, between the defendant and
the contract-breaker.  But, like Lord Denning in the *Daily Mirror* case,
I cannot see why this should make a difference.  If that is what the distinction
between "direct" and "indirect" means, it conceals the real question which   G
has to be asked in relation to *Lumley v Gye* 2 E & B 216: did the defendant's
acts of encouragement, threat, persuasion and so forth have a sufficient
causal connection with the breach by the contracting party to attract
accessory liability?  The court in *Lumley v Gye* made it clear that the
principle upon which a person is liable for the act of another in breaking his
contract is the same as that on which he is liable for the act of another in
committing a tort.  It follows, as I have said, that the relevant principles are   H
to be found in cases such as *CBS Songs Ltd v Amstrad Consumer Electronics
plc* [1988] AC 1013 and *Unilever plc v Chefaro Proprietaries Ltd* [1994]
FSR 135.  By the test laid down in these cases, the federation could not have
incurred any liability.  They were not encouraging or assisting the

A wholesalers in breaking their contracts. They were simply advising their members to exercise their own freedom to buy whatever newspapers they liked. The wholesalers had no right to the co-operation of the retailers in enabling them to perform their contracts. Liability could not depend upon the accident of whether the federation had communicated (directly or through an intermediary) with the wholesalers. The distinction between B direct and indirect interference was therefore irrelevant and misleading.

37   The distinction between direct and indirect interference has the further disadvantage that it suggests that the "primary form" of the *Lumley v Gye* tort and the extension of the tort are mutually exclusive. Interference cannot be both direct and indirect. But, as I have said earlier, there is no reason why the same act should not create both accessory liability for procuring a breach of contract and primary liability for causing loss by C unlawful means.

38   In my opinion, therefore, the distinction between direct and indirect interference is unsatisfactory and it is time for the unnatural union between the *Lumley v Gye* tort and the tort of causing loss by unlawful means to be dissolved. They should be restored to the independence which they enjoyed at the time of *Allen v Flood*. I shall therefore proceed to discuss separately D the essential elements of each.

*Inducing breach of contract: elements of the Lumley v Gye tort*

39   To be liable for inducing breach of contract, you must know that you are inducing a breach of contract. It is not enough that you know that you are procuring an act which, as a matter of law or construction of the E contract, is a breach. You must actually realize that it will have this effect. Nor does it matter that you ought reasonably to have done so. This proposition is most strikingly illustrated by the decision of this House in *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479, in which the plaintiff's former employee offered the defendant information about one of the plaintiff's secret processes which he, as an employee, had invented. The F defendant knew that the employee had a contractual obligation not to reveal trade secrets but held the eccentric opinion that if the process was patentable, it would be the exclusive property of the employee. He took the information in the honest belief that the employee would not be in breach of contract. In the Court of Appeal [1938] 4 All ER 504, 513, MacKinnon LJ observed tartly that in accepting this evidence the judge had "vindicated G his honesty . . . at the expense of his intelligence" but he and the House of Lords agreed that he could not be held liable for inducing a breach of contract.

40   The question of what counts as knowledge for the purposes of liability for inducing a breach of contract has also been the subject of a consistent line of decisions. In *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691 union officials threatened a building contractor with a H strike unless he terminated a subcontract for the supply of labour. The defendants obviously knew that there was a contract—they wanted it terminated—but the court found that they did not know its terms and, in particular, how soon it could be terminated. Lord Denning MR said, at pp 700–701:

"Even if they did not know the actual terms of the contract, but had the means of knowledge—which they deliberately disregarded—that would be enough. Like the man who turns a blind eye. So here, if the officers deliberately sought to get this contract terminated, heedless of its terms, regardless whether it was terminated by breach or not, they would do wrong. For it is unlawful for a third person to procure a breach of contract knowingly, or recklessly, indifferent whether it is a breach or not."

41   This statement of the law has since been followed in many cases and, so far as I am aware, has not given rise to any difficulty. It is in accordance with the general principle of law that a conscious decision not to inquire into the existence of a fact is in many cases treated as equivalent to knowledge of that fact: see *Manifest Shipping Co Ltd v Uni-Polaris Insurance Co Ltd* [2003] 1 AC 469. It is not the same as negligence or even gross negligence: in *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479, for example, Mr Ferguson did not deliberately abstain from inquiry into whether disclosure of the secret process would be a breach of contract. He negligently made the wrong inquiry, but that is an altogether different state of mind.

42   The next question is what counts as an intention to procure a breach of contract. It is necessary for this purpose to distinguish between ends, means and consequences. If someone knowingly causes a breach of contract, it does not normally matter that it is the means by which he intends to achieve some further end or even that he would rather have been able to achieve that end without causing a breach. Mr Gye would very likely have preferred to be able to obtain Miss Wagner's services without her having to break her contract. But that did not matter. Again, people seldom knowingly cause loss by unlawful means out of simple disinterested malice. It is usually to achieve the further end of securing an economic advantage to themselves. As I said earlier, the Dunlop employees who took off the tyres in *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376 intended to advance the interests of the Dunlop company.

43   On the other hand, if the breach of contract is neither an end in itself nor a means to an end, but merely a foreseeable consequence, then in my opinion it cannot for this purpose be said to have been intended. That, I think, is what judges and writers mean when they say that the claimant must have been "targeted" or "aimed at". In my opinion the majority of the Court of Appeal was wrong to have allowed the action in *Millar v Bassey* [1994] EMLR 44 to proceed. Miss Bassey had broken her contract to perform for the recording company and it was a foreseeable consequence that the recording company would have to break its contracts with the accompanying musicians, but those breaches of contract were neither an end desired by Miss Bassey nor a means of achieving that end.

44   Finally, what counts as a breach of contract? In *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106, 138 Lord Denning said that there could be liability for preventing or hindering performance of the contract on the same principle as liability for procuring a breach. This dictum was approved by Lord Diplock in *Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570, 607–608. One could therefore have liability for interference with contractual relations even though the contracting party committed no

[2008] 1 AC                                        OBG Ltd v Allan (HL(E))
                                                           Lord Hoffmann

A    breach.  But these remarks were made in the context of the unified theory
     which treated procuring a breach as part of the same tort as causing loss by
     unlawful means.  If the torts are to be separated, then I think that one cannot
     be liable for inducing a breach unless there has been a breach.  No secondary
     liability without primary liability.    Cases in which interference with
     contractual relations has been treated as coming within the *Lumley v Gye*
     tort (like *Dimbleby & Sons Ltd v National Union of Journalists* [1984]
B    1 WLR 67 and [1984] 1 WLR 427) are really cases of causing loss by
     unlawful means.

     *Causing loss by unlawful means: elements of the tort*

     45    The most important question concerning this tort is what should
C    count as unlawful means.  It will be recalled that in *Allen v Flood* [1898]
     AC 1, 96, Lord Watson described the tort thus:

         "when the act induced is within the right of the immediate actor, and is
         therefore not wrongful in so far as he is concerned, it may yet be to the
         detriment of a third party; and in that case . . . the inducer may be held
         liable if he can be shewn to have procured his object by the use of illegal
D        means directed against that third party."

     46    The rationale of the tort was described by Lord Lindley in *Quinn v
     Leathem* [1901] AC 495, 534–535:

         "a person's liberty or right to deal with others is nugatory, unless they
         are at liberty to deal with him if they choose to do so.  Any interference
         with their liberty to deal with him affects him.  If such interference is
E        justifiable in point of law, he has no redress.  Again, if such interference is
         wrongful, the only person who can sue in respect of it is, as a rule, the
         person immediately affected by it; another who suffers by it has usually no
         redress; the damage to him is too remote, and it would be obviously
         practically impossible and highly inconvenient to give legal redress to all
         who suffer from such wrongs.  But if the interference is wrongful and is
         intended to damage a third person, and he is damaged in fact—in other
F        words, if he is wrongfully and intentionally struck at through others, and
         is thereby damnified—the whole aspect of the case is changed: the wrong
         done to others reaches him, his rights are infringed although indirectly,
         and damage to him is not remote or unforeseen, but is the direct
         consequence of what has been done."

G    47    The essence of the tort therefore appears to be (a) a wrongful
     interference with the actions of a third party in which the claimant has an
     economic interest and (b) an intention thereby to cause loss to the claimant.
     The old cases of interference with potential customers by threats of unlawful
     acts clearly fell within this description.  So, for the reasons I have given, did
     *GWK Ltd v Dunlop Rubber Co Ltd* 42 TLR 376.  Recent cases in which the
     tort has been discussed have also concerned wrongful threats or actions
H    against employers with the intention of causing loss to an employee (as in
     *Rookes v Barnard* [1964] AC 1129) or another employer (as in *J T Stratford
     & Son Ltd v Lindley* [1965] AC 269).  In the former case, the defendants
     conspired to threaten the employer that unless the employee was dismissed,
     there would be an unlawful strike.  In the latter, the union committed the

32
OBG Ltd v Allan (HL(E))                                    [2008] 1 AC
Lord Hoffmann

*Lumley v Gye* tort of inducing breaches of the contracts of the employees of    A
barge hirers to prevent them from hiring the plaintiff's barges.

48    In the *Stratford* case, at pp 329–330, Viscount Radcliffe expressed
some disquiet about using the question of whether the actual or threatened
strike was or would have been in breach of contract as the touchstone of
whether the union or its officers were liable for causing loss by secondary
action.  These remarks were made in the context of industrial relations,    B
where the use of secondary action has since been comprehensively regulated
by statute.  In principle, the cases establish that intentionally causing
someone loss by interfering with the liberty of action of a third party in
breach of a contract with him is unlawful.

49    In my opinion, and subject to one qualification, acts against a third
party count as unlawful means only if they are actionable by that third party.
The qualification is that they will also be unlawful means if the only reason    C
why they are not actionable is because the third party has suffered no loss.  In
the case of intimidation, for example, the threat will usually give rise to no
cause of action by the third party because he will have suffered no loss.  If he
submits to the threat, then, as the defendant intended, the claimant will have
suffered loss instead.  It is nevertheless unlawful means.  But the threat must
be to do something which *would* have been actionable if the third party had    D
suffered loss.  Likewise, in *National Phonograph Co Ltd v Edison-Bell
Consolidated Phonograph Co Ltd* [1908] 1 Ch 335 the defendant
intentionally caused loss to the plaintiff by fraudulently inducing a third
party to act to the plaintiff's detriment.  The fraud was unlawful means
because it would have been actionable if the third party had suffered any
loss, even though in the event it was the plaintiff who suffered.  In this    E
respect, procuring the actions of a third party by fraud (dolus) is obviously
very similar to procuring them by intimidation (metus).

50    *Lonrho plc v Fayed* [1990] 2 QB 479 was arguably within the same
principle as the *National Phonograph Co* case.  The plaintiff said that the
defendant had intentionally caused it loss by making fraudulent statements
to the directors of the company which owned Harrods, and to the Secretary    F
of State for Trade and Industry, which induced the directors to accept his bid
for Harrods and the Secretary of State not to refer the bid to the Monopolies
Commission.  The defendant was thereby able to gain control of Harrods to
the detriment of the plaintiff, who wanted to buy it instead.  In the Court of
Appeal, Dillon LJ, at p 489, referred to the *National Phonograph* case as
authority for rejecting an argument that the means used to cause loss to    G
the plaintiff could not be unlawful because neither the directors nor the
Secretary of State had suffered any loss.  That seems to me correct.  The
allegations were of fraudulent representations made to third parties, which
would have been actionable by them if they had suffered loss, but which
were intended to induce the third parties to act in a way which caused loss to
the plaintiff.  The Court of Appeal therefore refused to strike out the claim as
unarguable and their decision was upheld by the House of Lords: see [1992]    H
1 AC 448.

51    Unlawful means therefore consists of acts intended to cause loss to
the claimant by interfering with the freedom of a third party in a way which
is unlawful as against that third party and which is intended to cause loss to
the claimant.  It does not in my opinion include acts which may be unlawful

A  against a third party but which do not affect his freedom to deal with the claimant.

52  Thus in *RCA Corpn v Pollard* [1983] Ch 135 the plaintiff had the exclusive right to exploit records made by Elvis Presley. The defendant was selling bootleg records made at Elvis Presley concerts without his consent. This was an infringement of section 1 of the Dramatic and Musical Performers' Protection Act 1958, which made bootlegging a criminal offence

B  and, being enacted for the protection of performers, would have given Elvis Presley a cause of action: see Lord Diplock in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 187. The Court of Appeal held that the infringement of the Act did not give RCA a cause of action. The defendant was not interfering with the liberty of the Presley estate to perform the exclusive recording contract which, as Oliver LJ noted, at p 149, was "no

C  more than an undertaking that he will not give consent to a recording by anybody else". Nor did it prevent the Presley estate from doing any other act affecting the plaintiffs. The bootlegger's conduct, said Oliver LJ, at p 153: "merely potentially reduces the profits which [the plaintiffs] make as the result of the performance by Mr Presley's executors of their contractual obligations."

D  53  It is true that there was no allegation that the defendant intended to cause loss to the plaintiff, although, given that the defendant was selling records in competition with the plaintiff, such an allegation would have been easy to make. But I do not think that it would have made any difference. The wrongful act did not interfere with the estate's liberty of action in relation to the plaintiff.

E  54  Likewise in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, one of the claimants was the exclusive licensee of a registered design. The defendant sold articles alleged to infringe the design right. The registered owner had a statutory right to sue for infringement. But the question was whether the licensee could sue. In the case of some intellectual property rights, an exclusive licensee has a statutory right of action: see, for example, section 67(1) of the Patents Act 1977. But the exclusive licensee of a registered design has no such right. So the licensee claimed that the

F  defendant was intentionally causing him loss by the unlawful means of infringing the rights of the registered owner. Jacob J rejected the claim on the principle of *RCA Corpn v Pollard*. The defendant was doing nothing which affected the relations between the owner and licensee. The exclusive licence meant that the licensee was entitled to exploit the design and that the owner contracted not to authorise anyone else to do so. As Jacob J said,

G  at p 798, para 33: "It is true that the exploitation of the licence may not have been so successful commercially by reason of the infringement, but the contractual relations and their performance remain completely unaffected."

55  *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173 was an attempt to found a cause of action simply on the fact that the conduct alleged to have caused loss was contrary to law. The defendant's conduct was alleged to be a criminal offence but not actionable by anyone. In this respect

H  it was unlike *RCA v Pollard* and *Isaac Oren v Red Box Toy Factory Ltd*, in which it could at least be said that the conduct was a wrong against someone in contractual relations with the claimant. Lonrho owned and operated a refinery in Rhodesia supplied by a pipeline from the port of Beira. When Rhodesia declared independence in 1965, the UK imposed sanctions which

34
OBG Ltd v Allan (HL(E))                                                    [2008] 1 AC
Lord Hoffmann

made it unlawful for anyone to supply the country with oil.  As a result, the    A
refinery and pipeline stood idle until the independence regime came to an
end.  Lonrho alleged that Shell had prolonged the regime by unlawfully
supplying Rhodesia with oil through other routes and thereby caused it loss.
The House of Lords decided that the alleged illegality gave rise to no cause of
action on which Lonrho could rely.  Again, there was no allegation that Shell
had intended to cause loss to Lonrho, but I cannot see how that would have    B
made any difference.  Shell did not interfere with any third party's dealings
with Lonrho and even if it had done so, its acts were not wrongful in the
sense of being actionable by such third party.

56   Your Lordships were not referred to any authority in which the tort
of causing loss by unlawful means has been extended beyond the description
given by Lord Watson in *Allen v Flood* [1898] AC 1, 96 and Lord Lindley in
*Quinn v Leathem* [1901] AC 495, 535.  Nor do I think it should be.  The    C
common law has traditionally been reluctant to become involved in devising
rules of fair competition, as is vividly illustrated by *Mogul Steamship Co Ltd
v McGregor Gow & Co* [1892] AC 25.  It has largely left such rules to be laid
down by Parliament.  In my opinion the courts should be similarly cautious
in extending a tort which was designed only to enforce basic standards of
civilised behaviour in economic competition, between traders or between    D
employers and labour.  Otherwise there is a danger that it will provide a
cause of action based on acts which are wrongful only in the irrelevant sense
that a third party has a right to complain if he chooses to do so.  As
Jacob J said in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, 800,
para 42:

 "the right to sue under intellectual property rights created and    E
 governed by statute are inherently governed by the statute concerned.
 Parliament in various intellectual property statutes has, in some cases,
 created a right to sue, and in others not.  In the case of the 1988 Act it
 expressly re-conferred the right on a copyright exclusive licensee,
 conferred the right on an exclusive licensee under the new form of
 property called an unregistered design right (see section 234) but did not    F
 create an independent right to sue on a registered design exclusive
 licensee.  It is not for the courts to invent that which Parliament did not
 create."

57   Likewise, as it seems to me, in a case like *Lonrho Ltd v Shell
Petroleum Co Ltd (No 2)* [1982] AC 173, it is not for the courts to create a
cause of action out of a regulatory or criminal statute which Parliament did
not intend to be actionable in private law.    G

58   It is not, I think, sufficient to say that there must be a causal
connection between the wrongful nature of the conduct and the loss which
has been caused.  If a trader secures a competitive advantage over another
trader by marketing a product which infringes someone else's patent, there is
a causal relationship between the wrongful act and the loss which the rival
has suffered.  But there is surely no doubt that such conduct is actionable
only by the patentee.    H

59   Philip Sales and Daniel Stilitz, "Intentional Infliction of Harm by
Unlawful Means" (1999) 115 LQR 411–437, take a very wide view of what
can count as unlawful means, arguing that any action which involves a civil
wrong against another person or breach of a criminal statute ("any act that

A the defendant is not at liberty to commit") should be sufficient. In their opinion, a requirement of a specific intention to "target" the claimant should keep the tort within reasonable bounds. Tony Weir in the Clarendon Law Lectures "Economic Torts" is of much the same opinion. But other writers consider that it would be arbitrary and illogical to make liability depend upon whether the defendant has done something which is wrongful for reasons which have nothing to do with the damage inflicted on the claimant:

B see Roderick Bagshaw's review of Weir in "Can the Economic Torts be Unified" (1998) 18 Oxford JLS 729–739, at p 732. I agree.

60   I do not think that the width of the concept of "unlawful means" can be counteracted by insisting upon a highly specific intention, which "targets" the plaintiff. That, as it seems to me, places too much of a strain on the concept of intention. In cases in which there is obviously no reason why a

C claimant should be entitled to rely on the infringement of a third party's rights, courts are driven to refusing relief on the basis of an artificially narrow meaning of intention which causes trouble in later cases in which the defendant really has used unlawful means. This, as I shall in due course explain, is what may have happened in the *Hello!* case.

61   I would only add one footnote to this discussion of unlawful means.

D In defining the tort of causing loss by unlawful means as a tort which requires interference with the actions of a third party in relation to the plaintiff, I do not intend to say anything about the question of whether a claimant who has been compelled by unlawful intimidation to act to his own detriment, can sue for his loss. Such a case of "two party intimidation" raises altogether different issues.

E 62   Finally, there is the question of intention. In the *Lumley v Gye* tort, there must be an intention to procure a breach of contract. In the unlawful means tort, there must be an intention to cause loss. The ends which must have been intended are different. *South Wales Miners' Federation v Glamorgan Coal Co Ltd* [1905] AC 239 shows that one may intend to procure a breach of contract without intending to cause loss. Likewise, one may intend to cause loss without intending to procure a breach of contract.

F But the concept of intention is in both cases the same. In both cases it is necessary to distinguish between ends, means and consequences. One intends to cause loss even though it is the means by which one achieved the end of enriching oneself. On the other hand, one is not liable for loss which is neither a desired end nor a means of attaining it but merely a foreseeable consequence of one's actions.

G 63   The master of the *Othello* in *Tarleton v M'Gawley* Peake 270 may have had nothing against the other trader. If he had gone off to make his fortune in other waters, he would have wished him well. He simply wanted a monopoly of the local trade for himself. But he nevertheless intended to cause him loss. This, I think, is all that Woolf LJ was intending to say in a passage in *Lonrho plc v Fayed* [1990] 2 QB 479, 494 which has proved

H controversial:

> "Albeit that he may have no desire to bring about that consequence in order to achieve what he regards as his ultimate ends, from the point of view of the plaintiff, whatever the motive of the defendant, the damage which he suffers will be the same."

36
OBG Ltd v Allan (HL(E))                                              [2008] 1 AC
Lord Hoffmann

64    On the other hand, I think that Henry J was right in *Barretts & Baird
(Wholesale) Ltd v Institution of Professional Civil Servants* [1987]
IRLR 3 when he decided a strike by civil servants in the Ministry of
Agriculture in support of a pay claim was not intended to cause damage to
an abattoir which was unable to obtain the certificates necessary for
exporting meat and claiming subsidies.  The damage to the abattoir was
neither the purpose of the strike nor the means of achieving that purpose,
which was to put pressure on the government.

### Back to the three appeals

65    My Lords, after this somewhat lengthy clearing of the ground I can
come to the three appeals before the House.  In arriving at these statements
of general principle, I have derived great assistance from many who have
written on the subject in addition to those whom I have specifically cited and
in particular, if what I have said does anything to clarify what has been
described as an extremely obscure branch of the law, much is owing to Hazel
Carty's book *An Analysis of the Economic Torts* (2001).

### Mainstream Properties Ltd v Young

66    I shall start with the *Mainstream* case, because it is the easiest and
provides a useful stepping stone to the other two.  Mainstream was a
development company owned and controlled by Mr Moriarty.  He engaged
Mr Young as a working director and Mr Broad as a manager and left the
business to them.  In 2000 they diverted the purchase of development land at
Findern in Derbyshire to a joint venture consisting of themselves and the
respondent Mr De Winter, who financed the project.  Judge Norris QC, in a
detailed and lucid judgment, found that this was a breach of their
contractual and fiduciary duties to obtain the property for Mainstream.

67    There is no challenge to these findings but the question in this appeal
is whether Mr De Winter is liable in tort for inducing Mr Young and
Mr Broad to break their contracts.  The cause of action is therefore the
original *Lumley v Gye* tort, based on accessory liability.  The judge found
that Mr Young and Mr Broad could not have acquired the property without
Mr De Winter's financial assistance.  His participation was therefore
causative.  He also knew that they were employed by Mainstream and that
there was an obvious potential conflict between their duties to Mainstream
and their participation in the joint venture.  But the judge found that Mr De
Winter was a cautious man who had raised the question of conflict of interest
with Mr Young and Mr Broad and had received an assurance that there was
no conflict because Mainstream had been offered the site but refused it.  This
was untrue but Mr Winter genuinely believed it.  He had been given a similar
(and more truthful) assurance concerning another project which Mr Young
and Mr Broad had brought to him in the previous year and that, said the
judge, "was now proceeding smoothly without objection".

68    On these findings of fact the judge found that Mr Winter did not
intend to procure a breach of the contracts of employment or otherwise
interfere with their performance.  The claim against him was therefore
dismissed.  This finding was upheld [2005] IRLR 964 by the Court of Appeal
(Sedley, Arden LJJ and Aikens J).

[2008] 1 AC                                             OBG Ltd v Allan (HL(E))
                                                                       Lord Hoffmann

A     **69** In my opinion this case comes squarely within *British Industrial Plastics Ltd v Ferguson* [1940] 1 All ER 479. On the finding of the judge, Mr De Winter honestly believed that assisting Mr Young and Mr Broad with the joint venture would not involve them in the commission of breaches of contract. Nor can Mr De Winter be said to have been indifferent to whether there was a breach of contract or not, as in *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691, or made a conscious decision not to inquire in case he discovered a disagreeable truth. He therefore did not intend to cause a breach of contract and the conditions for accessory liability under the *Lumley v Gye* tort are not satisfied. Nor is there any question of his having caused loss by unlawful means. He neither intended to cause loss to Mainstream nor used any unlawful means.

C     **70** Your Lordships were referred by Mr Randall, who appeared for Mainstream, to a number of authorities. But they concerned different questions and none of them cast any doubt upon the proposition that one cannot be liable for inducing a breach of contract unless one intended to cause a breach. For example, in *Smithies v National Association of Operative Plasterers* [1909] 1 KB 310 the union undoubtedly intended to cause a breach of the workmen's contracts of service. But they claimed to be entitled to do so because the employer had not adhered to a collective agreement. The Court of Appeal rejected this defence but the case has nothing to do with the requirements of knowledge and intention. In *Greig v Insole* [1978] 1 WLR 302 the International Cricket Conference knew that the cricketers were contracted to play for Mr Kerry Packer's company but put pressure upon them to withdraw, indifferent as to whether this would cause breaches of contract or not. As Slade J observed, the case fell within the principle of *Emerald Construction Co Ltd v Lowthian* [1966] 1 WLR 691. This case clearly does not. The other cases cited by Mr Randall were similarly concerned with indifference, conscious decision not to inquire or different torts.

F     **71** Finally, Mr Randall said that even if the judge's findings exonerated Mr De Winter from the charge of inducing a breach of the obligation of good faith which required Mr Young and Mr Broad to make the Findern property available to Mainstream, it did not provide any answer to a claim that he had induced a breach of their obligation to give their full time and attention to Mainstream's business. Mr De Winter did not say he had inquired into whether they had asked Mr Moriarty for permission to participate in the joint venture; the evidence was that they had not asked and that if they had, permission would not have been given.

    **72** This is a point which appeared for the first time in supplemental submissions to the Court of Appeal. The Court of Appeal did not deal with it. There had been no suggestion at the trial that Mainstream was making a separate claim for loss of the services of Mr Young and Mr Broad while they were working for the joint venture. Nothing was put to Mr De Winter about whether he thought they were free to do so. No attempt was made to assess what might have been the damage flowing from such a breach. In my opinion it is not open to Mainstream now to reformulate its case in this way. I would dismiss the Mainstream appeal.

38
OBG Ltd v Allan (HL(E))                                        [2008] 1 AC
Lord Hoffmann

*OBG Ltd v Allan*                                                     A

   73   OBG Ltd and OBG (Plant and Transport Hire) Ltd (which I shall
refer to together as OBG as if they were one company, which for practical
purposes they were) carried on business laying and maintaining
underground pipes.  OBG's main customer was North West Water Ltd
("NWW"), with whom it had a profitable running contract in Civil
Engineers Conditions of Contract form for laying and maintaining water      B
pipes, under which it was paid monthly against engineer's certificates.  There
were also other customers.  OBG employed a specialist subcontractor called
Raymond Centriline Ltd ("Centriline") to line pipes with mortar mix or
epoxy resin.

   74   In the spring of 1992 OBG had the misfortune to fall out with
NWW, which took the view that recent work had been substandard and that    C
it had been overcharged.  There was an investigation as a result of which the
engineer "decertified" substantial past payments.   NWW set off the
decertified sums against money due on current certificates and withheld
further orders.  The result was that OBG's cash flow dried up and it became
insolvent in the sense of being unable to pay its debts as they fell due.

   75   OBG attempted to obtain financial support from Centriline, which
had an interest in its future not only as a subcontractor but also as a creditor   D
to the tune of over £1m.  In the course of these negotiations Centriline took
an assignment from Royal Bank of Scotland of an all-moneys debenture
secured by the floating charge over OBG's assets and undertaking.   The
negotiations fell through and on 9 June 1992 Centriline appointed the
defendants, Mr Allan and Mr Stevenson, as administrative receivers under
the floating charge.                                                        E

   76   Unfortunately OBG had owed nothing to the bank and no secured
debt was assigned with the debenture.   Centriline was advised by its
solicitors that it could tack its own unsecured debt onto the empty
debenture.  This advice is admitted to have been wrong; indeed, negligent.
Centriline was therefore not entitled to appoint receivers.  But it and the
receivers believed in good faith that the appointment was valid.            F

   77   The receivers went into possession of the premises and chattels
owned by OBG and took control of its affairs.  NWW elected to treat the
insolvency of OBG as an event of default and terminated its contracts.  The
receivers arranged for the completion of the contracts with other customers.
There followed lengthy negotiations with NWW, with the receivers claiming
that OBG was owed money under the contracts and NWW asserting cross-
claims.  Eventually, in November 1993, the receivers agreed in principle to   G
accept £400,000 in full and final settlement.

   78   By this time it was clear that OBG was challenging the validity of
the appointment of the receivers.  The company had gone into creditors'
voluntary liquidation on 19 June 1992, ten days after the appointment
of the receivers.   The liquidator had taken advice on the validity of the
appointment.  NWW was reluctant to conclude a settlement with the
receivers unless the liquidator also became a party.  On 19 October 1995    H
OBG, acting by the liquidator, issued these proceedings, claiming a
declaration that the appointment had been invalid and damages.   On
15 August 1997 the settlement with NWW was finally executed, with the
liquidator concurring.

A    79   Judge Maddocks QC tried the case in stages.   After hearing argument on the validity of the appointment, he made a declaration on 31 January 2001 that it had been invalid.   There is no challenge to this ruling.   He adjourned the question of what damages, if any, OBG could in consequence claim.

80   There followed some interlocutory hearings and pleadings in which OBG was asked to state the basis on which it made its claim.   This was put in various ways, but I need not concern myself with the claims that it would

B   have survived to become profitable or that its assets would have been realised more advantageously in administration, because the judge found on the facts that neither of these things would have happened.   Insolvent liquidation was inevitable.

C   81   OBG's case, as it emerged, was that by taking control of OBG's assets and undertaking on 9 June 1992, the receivers became liable in damages for their value on that date.   Liability was alleged to be strict.   The cause of action giving rise to this liability was, as to the land and chattels, trespass and conversion, and as to the contractual claims, wrongful interference with contractual relations.   The defendants admitted liability for trespass to the land and conversion of the chattels, but denied that they had unlawfully interfered with the contractual rights.   OBG's alternative

D   case was that the receivers had converted the entire assets and undertaking, including the contractual claims.   The answer of the receivers was that conversion is a tort against chattels and not against contractual claims.

82   The judge dealt with the case on the basis that if he found that either of these causes of action was well founded, he was concerned only to value the company's assets and undertaking on 9 June 1992 and then to give credit

E   for the sums for which the receivers had accounted to the liquidator.   The rest was damages.   He assessed this figure at £1,854,000, most of which was attributable to the difference between the value which he put on the claims against NWW as at 9 June 1992 and the £400,000 for which the company had agreed to settle them five years later.

83   There was no allegation that the receivers had been negligent.   Nor was it regarded as necessary to ask whether the assumption of control by the

F   receivers had caused the disparity between the value at that date and the amount subsequently realised—whether, for example, the value of the assets had fallen for a reason which had nothing to do with who was in control of them.   The receivers were alleged to be strictly liable, on one basis or the other, for the value of the assets on the day they were appointed.   Nothing that happened after that date, or would have happened if they had not been

G   appointed, was regarded as relevant.

84   The judge found that OBG had a cause of action for interference with contractual relations.   He referred to Lord Macnaghten's dictum in *Quinn v Leathem* [1901] AC 495 and to *Greig v Insole* [1978] 1 WLR 302.   It was true that the receivers had not interfered with performance of the contracts, still less caused them to be breached.   They had conducted negotiations in the bona fide belief that they were entitled to act on behalf of

H   OBG.   But, he said, "that factor serves only to create the interference more directly".   He rejected the alternative claim for conversion of contractual rights.

85   The Court of Appeal (Peter Gibson, Mance and Carnwath LJJ) [2005] QB 762 unanimously upheld the judge's rejection of the conversion

claim but by a majority (Mance LJ dissenting) allowed the appeal against the A
finding of wrongful interference with contractual rights. OBG pursued both
causes of action in the appeal to your Lordships' House and I shall deal with
them in turn.

*Interference with contractual relations*

86    The present case amply illustrates the dangers of a broad reading B
of Lord Macnaghten's reference to "interference" in *Lumley v Gye* (1853)
2 E & B 216 and the promiscuous application of cases on accessory liability
(such as *Greig v Insole* [1978] 1 WLR 302) to a case which, on any view,
can only be a case of primary liability. There are only two possible causes
of action: procuring a breach of contract in a way which creates accessory
liability under *Lumley v Gye* or causing loss by unlawful means. It is,
I think, plain and obvious that the requirements for liability under neither of C
these torts were satisfied. There was no breach or non-performance of any
contract and therefore no wrong to which accessory liability could attach.
And the receivers neither employed unlawful means nor intended to cause
OBG any loss.

87    I must, however, advert to the grounds upon which Mance LJ
dissented on this point. He said, at para 86, that a "central question" was D

"whether the tort of interference in the execution of a contract is
capable of covering the situation of an unauthorised agent, who takes
over the handling of a contract with a view to its performance by
settlement of mutual contractual rights and obligations but with the result
that the 'principal' suffers a loss which he would not otherwise have
suffered. The generality of the phrase 'interference in the execution of a E
contract' has so far only been held to extend to the 'procurement of a
breach' or the 'prevention' or 'hindrance' of 'performance'. The tort is
not, however, limited to protecting contractual interests, and it must in
my view extend to some situations where a person's pre-existing legal
position is adversely affected in a more general manner than falls directly
within any of the latter phrases." F

88    I would first observe that there was no finding that as a *result* of the
unauthorised taking over of the handling of the contracts by the receivers,
OBG suffered a loss which it would not otherwise have suffered. As the
claim was formulated by OBG, this question of causation was treated as
irrelevant. The judge simply held the receivers liable for the value of the
contracts on 9 June 1992. G

89    Secondly, if there had been an investigation of this question, it is
doubtful whether a causal connection between the assumption of control
and the putative loss could have been established. Mance LJ suggested that
the acts of the receivers might have been binding upon OBG, and thereby
committed it to a disadvantageous settlement, by virtue of section 232 of the
Insolvency Act 1986: H

"The acts of an individual as administrator, administrative receiver,
liquidator or provisional liquidator of a company are valid
notwithstanding any defect in his appointment, nomination or
qualifications."

A     90   For my part, I rather doubt, as the judge did, whether this section would have applied to the administrative receivers in this case. In *Morris v Kanssen* [1946] AC 459, 471 this House considered the effect of a similar provision relating to the acts of directors, which was then contained in section 143 of the Companies Act 1929. Lord Simonds said:

B     "There is, as it appears to me, a vital distinction between (a) an appointment in which there is a defect or, in other words, a defective appointment, and (b) no appointment at all. In the first case it is implied that some act is done which purports to be an appointment but is by reason of some defect inadequate for the purpose; in the second case there is not a defect, there is no act at all. The section does not say that the acts of a person acting as director shall be valid notwithstanding that it is afterwards discovered that he was not appointed a director. Even if it did,

C     it might well be contended that at least a purported appointment was postulated. But it does not do so, and it would, I think, be doing violence to plain language to construe the section as covering a case in which there has been no genuine attempt to appoint at all. These observations apply equally where the term of office of a director has expired, but he nevertheless continues to act as a director, and where the office has been

D     from the outset usurped without the colour of authority."

    91   In this case there was no colour of authority for the appointment of the receivers. Although it is unnecessary to express a concluded view, I think that it follows from *Morris v Kanssen* that section 232 would have had no application. If it had, it would have operated for the benefit of the receivers as well as anyone who dealt with them. There is nothing in its language to

E     suggest that its application is in any way restricted. (One may compare the explicit language of many other provisions for the protection of outside parties, such as section 14(6) of the Insolvency Act 1986.)

    92   That does not mean that a contract made by a person dealing in good faith with someone purporting to be a receiver, as in this case, can be repudiated by the company. As Lord Simonds went on to point out in *Morris v Kanssen* [1946] AC 460, such a person can rely on the principle of

F     ostensible authority which in company law goes under the name of the rule in *Royal British Bank v Turquand* (1856) 6 E & B 327. In this case, however, it was unnecessary to invoke either that rule or section 232, because NWW refused to rely upon the ostensible authority of the receivers. They insisted upon the liquidator joining in the settlement. The liquidator was at liberty to refuse, but he did so. In order to establish a causal

G     connection between the conduct of negotiations by the receivers and a loss which the company would not otherwise have suffered, it would be necessary to show that those negotiations somehow prejudiced the position of the company in a way which the liquidator could not repair by insisting that the deal be renegotiated.

    93   Be all that as it may, the question remains as to whether there is a tort of the breadth contemplated by Mance LJ, by which a purported agent can

H     be strictly liable for causing the principal loss by making him liable, by virtue of ostensible authority, under a disadvantageous contract. In my opinion, there is not the slightest authority for such a tort. It may be that, in some of the examples of unauthorised agency postulated by Mance LJ, there will be an implied contract which makes him liable for exceeding his actual

42

OBG Ltd v Allan (HL(E))                                          [2008] 1 AC
Lord Hoffmann

authority, just as the agent gives an implied warranty of authority to the third party with whom he deals. But there is, in my opinion, no such liability outside contract. Mance LJ said [2005] QB 762, 789, para 90, "the tort protects from interference legal interests beyond the merely contractual". If that is a reference to the tort of causing loss by unlawful means, then so it does. But it requires unlawful means and an intention to cause loss, neither of which were present in this case.

*Conversion*

94    The case in conversion was unanimously rejected by all the judges who heard the *OBG* case and it might therefore be sufficient to say that I agree with them. But the claim was given considerable prominence in argument, with a good deal of reference to North American authorities, and I shall therefore deal with it at greater length.

95    Everyone agrees that conversion is historically a tort against a person's interest in a chattel, being derived from the action for trover, which included a fictitious allegation that the plaintiff had lost the chattel and that the defendant had found it. Secondly, and consistently with its ancient origin, conversion is a tort of strict liability. Anyone who converts a chattel, that is to say, does an act inconsistent with the rights of the owner, however innocent he may be, is liable for the loss caused which, if the chattel has not been recovered by the owner, will usually be the value of the goods. *Fowler v Hollins* (1872) LR 7 QB 616 was a claim for conversion of bales of cotton bought in good faith through a broker in Liverpool. The purchasers were nevertheless held strictly liable. Cleasby B said robustly, at p 639, that:

"the liability under it is founded upon what has been regarded as a salutary rule for the protection of property, namely, that persons deal with the property in chattels or exercise acts of ownership over them at their peril."

96    Advising the House of Lords on appeal from this decision, Blackburn J was more sympathetic. He said, *Hollins v Fowler* (1875) LR 7 HL 757, 765 that the result was hard on the innocent purchasers but added:

"If, as is quite possible, the changes in the course of business since the principles of law were established make them cause great hardships or inconvenience, it is the province of the legislature to alter the law."

97    Parliament has responded with legislation such as the Factors Act 1889 (52 & 53 Vict c 45), section 4 of the Cheques Act 1957 (which protects a collecting bank against liability for conversion of a cheque to which its customer had no title) and section 234(3) of the Insolvency Act 1986, which, in the absence of negligence, protects an administrative receiver who "seizes or disposes of any property which is not property of the company" against liability. But there are no such protective provisions in relation to anything other than chattels. Why not? Obviously because Parliament thought them to be unnecessary. It would never have occurred to Parliament that strict liability for conversion could exist for anything other than chattels. The whole of the statutory modification of the law of conversion has been on the assumption that it applies only to chattels. There has been no discussion of

A   the question of whether an extension of conversion to choses in action would require a corresponding or even greater degree of protection for people acting in good faith.

98  Mr Randall, who appeared for OBG, drew attention to paras 829 and 830 of the Report of the Review Committee on Insolvency Law and Practice (the Cork Committee) (1982) (Cmnd 8558), which endorsed a recommendation of the Jenkins Committee (Cmnd 1749) (1962) that the

B   court should be given power to relieve an invalidly appointed receiver from liability for acts which would have been lawful if the appointment had been valid. Parliament has not given effect to this recommendation. He suggested that this omission should be regarded as somehow justifying a drastic *extension* of the liability of such receivers for conversion. The fallacy in this reasoning does not need to be underlined.

C   99  By contrast with the approving attitude of Cleasby B to the protection of rights of property in chattels, it is a commonplace that the law has always been very wary of imposing any kind of liability for purely economic loss. The economic torts which I have discussed at length are highly restricted in their application by the requirement of an intention to procure a breach of contract or to cause loss by unlawful means. Even

D   liability for causing economic loss by negligence is very limited. Against this background, I suggest to your Lordships that it would be an extraordinary step suddenly to extend the old tort of conversion to impose strict liability for pure economic loss on receivers who were appointed and acted in good faith. Furthermore, the effects of such a change in the law would of course not stop there. *Hunter v Canary Wharf Ltd* [1997] AC 655, 694 contains a warning from Lord Goff of Chieveley (and other of their Lordships) against

E   making fundamental changes to the law of tort in order to provide remedies which, if they are to exist at all, are properly the function of other parts of the law.

100  As to authority for such a change, it hardly needs to be said that in English law there is none. I need go no further than *Halsbury's Laws of England*, 4th ed reissue vol 45(2) (1999), para 547, which says "The subject matter of conversion or trover must be specific personal property, whether

F   goods or chattels". The Law Revision Committee was invited, in 1967, to consider "whether any changes are desirable in the law relating to conversion and detinue". In its 18th Report (Conversion and Detinue) in 1971 (Cmnd 4774) the committee treated them both as confined to wrongful interference with chattels. They made various recommendations for changes in the law but none for the extension of conversion to intangible

G   choses in action. On the contrary, the Torts (Interference with Goods) Act 1977, which was passed as a result of their recommendations, defined "wrongful interference with goods" to include "conversion of goods" (section 1) and defined "goods" in section 14(1) to include "all chattels personal other than things in action and money".

101  Mr Randall relied upon authorities in Canada and the United States. I can find no discussion in the Canadian cases of whether a claim for

H   conversion can be made in respect of a chose in action. These cases are analysed by Peter Gibson LJ in his judgment in the Court of Appeal [2005] QB 762, 777–778 and I do not think that I should lengthen this judgment by adding to his comments. For the reasons which he gives, I derive no assistance from them. There are certainly cases in the United States which

44
OBG Ltd v Allan (HL(E))                                          [2008] 1 AC
Lord Hoffmann

support Mr Randall's submission and which form part of the profligate         A
extension of tort law which has occurred in that country. Perhaps the most
remarkable is the decision of the Federal Court of Appeals (9th Circuit) in
*Kremen v Online Classifieds Inc* (2003) 337 F 3d 1024, in which it was held
that a publicly-funded company which provided gratuitous registration of
internet domain names could be liable in conversion, on a footing of strict     B
liability, for transferring a registered name to a third party, having acted in
good faith on the authority of a forged letter. The court held that the
domain name was intangible property which could be converted in the same
way as a chattel and that the registration company could be liable for its
value. I have no difficulty with the proposition that a domain name may be
intangible property, like a copyright or trade mark, but the notion that a
registrar of such property can be strictly liable for the common law tort of
conversion is, I think, foreign to English law.                                 C

102   The American cases make a good deal of the line of authority,
which in England goes back to the beginning of the 19th century or earlier,
by which a person who misappropriates a document which constitutes or
evidences title to a debt can be liable in conversion for the face value of the
document. Surely, it was said, in such cases the action is in substance for
conversion of the debt, a chose in action, and if that is right, then why not     D
have conversion of any chose in action?

103   But the document cases have been recognised to be an anomaly
created by the judges to solve a particular problem, namely that a person
who wrongfully secures payment of money due to another cannot be sued by
the true creditor for money had and received to his use. That is because the
creditor is not the owner of the money. The wrongful payment was treated       E
as a matter between the paying party and the recipient which did not affect
the creditor's position. Thus in *Rogers v Kelly* (1809) 2 Camp 123 a bank
had mistakenly paid the defendant some money which the plaintiff had
deposited. Lord Ellenborough said: "There is no privity between the parties
to this suit. The plaintiff's claim is on the bankers, and they must seek their
remedy against the defendant the best way they can."

104   But in cases in which the title to the debt was evidenced by a          F
negotiable instrument, or even in some cases where it was not negotiable, the
wrongful misappropriation of the document could cause actual loss to the
true creditor, who might not be able to recover the debt. That left a gap in
the law. The judges filled it by treating the misappropriation as a conversion
of a chattel equal in value to the debt which it evidenced. In *Morison v
London County and Westminster Bank Ltd* [1914] 3 KB 356, 379
Phillimore LJ was not altogether confident about explaining the basis of the     G
rule:

    "The defendant bank was the holder of the cheques . . . and . . .
    collected the proceeds in its own right . . . Therefore, the defendant bank
    converted the cheques. That the damages for such conversion are (at any
    rate where the drawer has sufficient funds to his credit and the drawee
    bank is solvent) the face value of the cheques is established in a series of    H
    cases . . . so well established that it is not necessary to inquire into the
    principle which may underlie the authority. But the principle probably is
    that, though the plaintiff might at any moment destroy the cheques while
    they remained in his possession, they are potential instruments whereby

A  the sums they represent may be drawn from his bankers, and, if they get into other hands than his, he will be the loser to the extent of the sums which they represent.  It may be also that anyone who has obtained its value by presenting a cheque is estopped from asserting that it has only a nominal value."

B  105   In *Lloyds Bank Ltd v Chartered Bank of India, Australia and China* [1929] 1 KB 40, 55–56, Scrutton LJ recognised the anomalous and limited nature of the principle:

C  "Conversion primarily is conversion of chattels, and the relation of bank to customer is that of debtor and creditor.  As no specific coins in a bank are the property of any specific customer there might appear to be some difficulty in holding that a bank, which paid part of what it owed its customer to some other person not authorised to receive it, had converted its customer's chattels; but a series of decisions binding on this court, culminating in *Morison's* case [1914] 3 KB 356 and *Underwood's* case [1924] 1 KB 775 have surmounted the difficulty by treating the conversion as of the chattel, the piece of paper, the cheque under which the money was collected, and the value of the chattel converted as the money received under it: see the explanation of Phillimore LJ in *Morison's* case, at p 378."

D  106   There do not appear to be any judicial statements offering a better explanation.  It is in my opinion an insecure base on which to erect a comprehensive system of strict liability for interference with choses in action.

E  107   The only point on which I would differ from Peter Gibson LJ in his admirable judgment in the Court of Appeal is in his expression of regret (in para 58) that the liquidator had no cause of action.  This is not a case in which a wrongful appointment of receivers caused damage to a solvent company.  The judge found that the company was inevitably headed for insolvent liquidation.  The liquidator sought immediate advice on the legality of the appointment of the receivers and then stood back for over three years, leaving the receivers to negotiate with NWW.  The receivers acted in good faith throughout and the liquidator concurred in the settlement they reached.  The liquidator then put his case on the basis of an allegation of strict liability which precluded any investigation into his own conduct or whether he could have produced a better result.  I can see no reason why such a claim should have succeeded.  I would therefore dismiss the liquidator's appeal.

F

G

*Douglas v Hello! Ltd*

108   Northern & Shell plc publishes "OK!" magazine and I shall refer to it as "OK!".  In November 2000 "OK!" entered into a contract with Michael Douglas and Catherine Zeta-Jones, whom I shall call "the Douglases", for the exclusive right to publish photographs of their forthcoming wedding on 18 November 2000 at the Plaza Hotel, New York.  The Douglases dealt with "OK!", who paid them £1m for the rights, in preference to the rival magazine "Hello!", published by the respondent.  The Douglases agreed to engage a photographer and to supply "OK!" with pictures they had chosen.

H

A

By clause 6 of the agreement they agreed to use their best efforts to ensure that no one else would take any photographs.

109   The Douglases went to some lengths to comply with this obligation and no criticism is made of their security precautions, but a freelance photographer named Rupert Thorpe infiltrated the wedding and took photographs which he sold to "Hello!".  "OK!" obtained an ex parte injunction restraining publication by "Hello!" but on 23 November 2000 the injunction was discharged by the Court of Appeal and the photographs were published on the following day.  A few hours earlier on the same day "OK!" published its own photographs, having brought forward its date of publication on account of what it knew to be the imminent publication by "Hello!"  Also on the same day, some of the unauthorised pictures were, without objection by "Hello!", published in national daily newspapers.

110   "OK!" sued "Hello!" for breach of confidence and the tort of causing loss by unlawful means.  (The Douglases brought separate proceedings against "Hello!" and recovered modest damages, but these are not in issue in this appeal, to which the Douglases are not parties.)

111   Lindsay J [2003] 3 All ER 996 held "Hello!" liable for breach of confidence.  He applied the well-known criteria summarised by Megarry J in *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41, 47:

"First, the information itself . . . must have the necessary quality of confidence about it.  Secondly, that information must have been imparted in circumstances importing an obligation of confidence.  Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it."

112   For this purpose the judge identified the information as being photographic images of the wedding.  Not information about the wedding generally; anyone was free to communicate the information that the Douglases had been married, describe what the bride wore and so forth.  The claim was only that there had been a breach of an obligation of confidence in respect of photographic images.

113   Lindsay J held that the three conditions were satisfied.  As for the first, photographs of the wedding were confidential information in the sense that none were publicly available.  As to the second, the Douglases had made it clear that anyone admitted to the wedding was not to make or communicate photographic images.  They allowed people to witness their marriage, but only on the basis that the information which the spectators thereby obtained was not communicated in the form of a photographic image.  The judge said, at para 197:

"the very facts that 'Hello!' and 'OK!' competed for exclusivity as they did and that each was ready to pay so much for it points to the commercial confidentiality of coverage of the event.  The event was private in character and the elaborate steps to exclude the uninvited, to include only the invited, to preclude unauthorised photography, to control the authorised photography and to have had the claimants' intentions in that regard made clear all conduce to that conclusion.  Such images as were, so to speak, radiated by the event were imparted to those present, including Mr Thorpe and his camera, in circumstances importing an obligation of confidence.  Everyone there knew that was so."

B

C

D

E

F

G

H

[2008] 1 AC

A    114   Furthermore, everyone knew that the obligation of confidence was imposed for the benefit of "OK!" as well as the Douglases. To no one could this have been clearer than to Mr Thorpe. The judge then went on to make findings about the circumstances in which "Hello!" had acquired his photographs:

B    "198. As for the 'Hello!' defendants, their consciences were, in my view, tainted; they were not acting in good faith nor by way of fair dealing. Whilst their position might have been worse had I held that the taking of unauthorised pictures for use by them had been truly commissioned in advance, even without that there is in my view enough to afflict their conscience. They knew that 'OK!' had an exclusive contract; as persons long engaged in the relevant trade, they knew what sort of provisions any such contract would include and that it would C    include provisions intended to preclude intrusion and unauthorised photography. Particularly would that be so where, as they knew, a very considerable sum would have had to have been paid for the exclusive rights which had been obtained . . . The surrounding facts were such that a duty of confidence should be inferred from them. The 'Hello!' defendants had indicated to paparazzi in advance that they would pay D    well for photographs and they knew the reputation of the paparazzi for being able to intrude. The unauthorised pictures themselves plainly indicated they were taken surreptitiously. Yet these defendants firmly kept their eyes shut lest they might see what they undeniably knew would have become apparent to them."

E    115   The obligation of confidence was therefore binding upon "Hello!" and the third *Coco* requirement of use to the detriment of "OK!" was plainly satisfied. Lindsay J therefore decided that "Hello!" was liable to "OK!" for the loss caused by the publication, which he later assessed at £1,033,156.

116   The Court of Appeal [2006] QB 125 (Lord Phillips of Worth Matravers MR, Clarke and Neuberger LJJ) reversed the judge's decision on the ground that the obligation of confidence for the benefit of "OK!" attached only to the photographs which the Douglases authorised them to F    publish. They did not have the benefit of an obligation of confidence in respect of any other photographs. Their publication may have invaded a residual right of privacy retained by the Douglases but did not infringe any right of "OK!".

117   In my opinion Lindsay J was right. The point of which one should never lose sight is that "OK!" had paid £1m for the benefit of the obligation G    of confidence imposed upon all those present at the wedding in respect of *any* photographs of the wedding. That was quite clear. Unless there is some conceptual or policy reason why they should not have the benefit of that obligation, I cannot see why they were not entitled to enforce it. And in my opinion there are no such reasons. Provided that one keeps one's eye firmly on the money and why it was paid, the case is, as Lindsay J held, quite straightforward.

H    118   It is first necessary to avoid being distracted by the concepts of privacy and personal information. In recent years, English law has adapted the action for breach of confidence to provide a remedy for the unauthorised disclosure of personal information: see *Campbell v MGN Ltd* [2004] 2 AC 457. This development has been mediated by the analogy of the right to

48
OBG Ltd v Allan (HL(E))                                    [2008] 1 AC
Lord Hoffmann

privacy conferred by article 8 of the European Convention on Human Rights
and has required a balancing of that right against the right to freedom of
expression conferred by article 10.  But this appeal is not concerned with the
protection of privacy.  Whatever may have been the position of the
Douglases, who, as I mentioned, recovered damages for an invasion of their
privacy, "OK!'s" claim is to protect commercially confidential information
and nothing more.  So your Lordships need not be concerned with
Convention rights.  "OK!" has no claim to privacy under article 8 nor can it
make a claim which is parasitic upon the Douglases' right to privacy.  The
fact that the information happens to have been about the personal life of the
Douglases is irrelevant.  It could have been information about anything that
a newspaper was willing to pay for.  What matters is that the Douglases,
by the way they arranged their wedding, were in a position to impose an
obligation of confidence.  They were in control of the information.

119   Is there any conceptual problem about the fact that the obligation
of confidence was imposed only in respect of a particular form of
information, namely, photographic images?  I do not see why there should
be.  If "OK!" was willing to pay for the right to be the only source of that
particular form of information and did not mind that others were free to
communicate other forms of information about the wedding, then I think
the Douglases should be able to impose a suitably limited obligation of
confidence.

120   Lord Nicholls of Birkenhead and Lord Walker of Gestingthorpe,
are troubled by the fact that the information in the photographic images was
not intended to be kept secret but to be published to the world by "OK!" and
was so published at much the same time as the unauthorised photographs in
"Hello!".  But I see no reason why there should not be an obligation of
confidence for the purpose of enabling someone to be the only source of
publication if that is something worth paying for.  Why should a newspaper
not be entitled to impose confidentiality on its journalists, sub-editors and so
forth to whom it communicates information about some scoop which it
intends to publish next day?  That does not of course prevent publication by
someone who receives the information otherwise than under an obligation
of confidence.  And I say nothing about cases in which there is a public
interest in communicating the information to others or the public at large.
But otherwise it is simply information of commercial value.

121   Lord Nicholls, is also of opinion that once the approved
photographs were published, the publication of the unauthorised
photographs was not a breach of confidence.  I cannot understand this.
Mr Thorpe was subject to an obligation of confidence in respect of the
pictures which he took.  "Hello!", by reason of the circumstances in which
they acquired the pictures, were subject to the same obligation.  How could
it be destroyed by "OK!'s" publication of other photographs a few hours
earlier?  He says that the differences between the photographs were
"insufficiently significant to call for legal protection"; "the unapproved
pictures contained nothing not included in the approved pictures".

122   My Lords, it is certainly the case that once information gets into
the public domain, it can no longer be the subject of confidence.  Whatever
the circumstances in which it was obtained, there is no point in the law
providing protection.  But whether this is the case or not depends on the
nature of the information.  Whether there is still a point in enforcing the

A    obligation of confidence depends on the facts. If the purpose of publishing the pictures was simply to convey the information that the Douglases had married, the bride wore a wedding dress and so forth, then the publication of any photographs would have put that information in the public domain. So would a description of the event. In this case, however, the point of the transaction was that each picture would be treated as a separate piece of information which "OK!" would have the exclusive right to publish. The

B    pictures published by "OK!" were put into the public domain and it would have had to rely on the law of copyright, not the law of confidence, to prevent their reproduction. But no other pictures were in the public domain and they did not enter the public domain merely because they resembled other pictures which had. Why was "Hello!" willing to pay Mr Thorpe so much money for information which was already in the public domain? Why

C    did the judge find that the publication of information which did not, in Lord Nicholls's words, "call for legal protection", had caused substantial financial loss to "OK!"? My Lords, this seems to me a point on which theory is in danger of losing touch with reality.

   123   The Court of Appeal's analysis, which treats the obligation of confidence as having been imposed in favour of "OK!" only in respect of the photographs with which it was supplied by the Douglases, also seems to me

D    to make no commercial sense. The essential purpose of the security arrangements and the prohibition of unauthorised photography were to impose an obligation of confidence in respect of *any* pictures of the wedding. Only in that way could the commercial interests of "OK!" be protected. And it was clear to everyone, Mr Thorpe and Señor Sanchez Junco in particular, that this obligation was imposed for the benefit of "OK!" as well as the

E    Douglases. As the Court of Appeal put it when stating "OK!'s" argument, [2006] QB 125, para 138 "the photographs published by "Hello!" fell within a generic class of commercially confidential information . . . which "OK!" were entitled to protect".

   124   Is there any reason of public policy why the law of confidence should not protect information of this form and subject matter? There is in my opinion no question of creating an "image right" or any other

F    unorthodox form of intellectual property. The information in this case was capable of being protected, not because it concerned the Douglases' image any more than because it concerned their private life, but simply because it was information of commercial value over which the Douglases had sufficient control to enable them to impose an obligation of confidence. Some may view with distaste a world in which information about the events

G    of a wedding, which Warren and Brandeis in their famous article on privacy "The Right to Privacy" (1890) 4 Harvard LR 193 regarded as a paradigm private occasion, should be sold in the market in the same way as information about how to make a better mousetrap. But being a celebrity or publishing a celebrity magazine are lawful trades and I see no reason why they should be outlawed from such protection as the law of confidence may offer.

H    125   I therefore think that the Court of Appeal was wrong to reverse the judge on this point. Mr Price, who appeared for "Hello!", also relied upon two other arguments. First, he said that to hold that participants in a "celebrity event" can impose a duty of confidence upon those who attend would give rise to inconsistency with the "carefully constructed" scheme of

50
OBG Ltd v Allan (HL(E))                                            [2008] 1 AC
Lord Hoffmann

statutory performing rights in Part II of the Copyright, Designs and Patents    A
Act 1988. I cannot see how there can be a conflict between such statutory
rights and any additional rights which may exist under the common law.
One might as well say that the law of contract is inconsistent because it
allows for the possibility of a performer bargaining for greater rights than he
would have under the statute.

126   Secondly, Mr Price submitted that under the law of New York    B
Mr Thorpe owed no obligation to keep the information confidential. The
statement of facts and issues records that under New York law "there would
have been no inhibition upon Mr Thorpe publishing the photographs which
he had taken". We are not told the basis of this statement. The judge found
that Mr Thorpe must have been "at least a trespasser" by the law of New
York. It may be that, under the First Amendment, he was entitled to publish
in New York notwithstanding the circumstances in which the photographs    C
were obtained. But that does not mean that he or anyone deriving title from
him is entitled to publish in England. There is nothing to suggest that an
obligation of confidence cannot be imposed in New York, even though it
may be overridden by a constitutional right to freedom of expression. But
the question of whether that obligation of confidence can entitle the
beneficiary to restrain publication in England is a matter of English law.

127   I would therefore allow the appeal of "OK!" and restore the order    D
of the judge. Mr Price submitted that the award of damages should not be
allowed in full because, on the evidence, a substantial part of the loss was
caused by the publication of the unauthorised photographs in national daily
newspapers rather than in "Hello!" But the judge considered this point in
his supplemental judgment on damages [2004] EMLR 13 and came to the
conclusion that the full losses were "sufficiently consequential upon the    E
breach and sufficiently foreseeable as to make 'Hello!' liable for them in
the ordinary way": para 48. Further, in para 53, he said:

    "I do not regard the newspaper publications of the pictures as so
    remote a consequence of Hello!'s publication as not to be laid at Hello!'s
    door and plainly the newspaper publications would not have occurred as
    they did but for Hello!'s publication of the unauthorised photographs."    F

128   In the light of these findings of fact I would not disturb the judge's
award.

129   In view of my conclusion that "OK!" was entitled to sue for breach
of an obligation of confidentiality to itself, it is a little artificial to discuss the
alternative claim on the footing that the obligation was owed solely to the
Douglases. I would have considerable difficulty in reconciling such a
hypothetical claim with *RCA Corpn v Pollard* [1983] Ch 135 and *Isaac Oren*    G
*v Red Box Toy Factory Ltd* [1999] FSR 785. Neither Mr Thorpe nor
"Hello!" did anything to interfere with the liberty of the Douglases to deal
with "OK!" or perform their obligations under their contract. All they did
was to make "OK!'s" contractual rights less profitable than they would
otherwise have been.

130   On the other hand, I should make it clear that in my opinion such a    H
claim should not have failed for the reasons given by the judge and the Court
of Appeal, namely that "Hello!" did not intend to cause loss to "OK!".

131   Their conclusion was based upon the evidence of Señor Sanchez
Junco, the controlling shareholder of "Hello!'s" Spanish holding company,

A  who had made the decision to publish.  The judge set out this evidence
[2003] 3 All ER 996, paras 245–249, from which I shall quote extracts.
First, there was his written evidence:

>    "I want to state categorically that there was never an intention to cause
>    damage to any of the claimants . . . because we have always treated them
>    in 'Hello!' with deference and sympathy, in accordance with the magazine
B  >    style.  In our 60-year history we have never tried to damage anyone.
>    Therefore, we would not want to do it to people whom we have always
>    treated fairly and objectively in our reports portraying them in the best
>    possible light.  With respect to 'OK!' we took it for granted that, without a
>    doubt, they would have a great editorial success, as they had a great
>    exclusive and consequently, the magazine would be sold under excellent
C  >    conditions as was the case.  Our main purpose was to inform our readers
>    about an event which had been publicised all over the media for weeks
>    before the wedding, which shows that this wedding was of interest for the
>    United Kingdom.  We did not wish to disappoint our readers.  It was never
>    our aim or intention to damage the third claimant, our prime motivation
>    was only to give our readers information on the wedding of two celebrities,
>    about whom, without doubt, our readers expected to read in 'Hello!' . . ."

D  132  Then there was his oral evidence, summarised by the judge, at
para 246:

>    "Señor Sanchez Junco disavowed having acted in revenge against the
>    Douglases for his not getting the exclusive he so wished; rather he
>    wanted, despite losing the exclusive, to publish an edition that would
>    interest his readers, the event being one which had captured the
E  >    imagination of the public.  His act, he said, was not of revenge but
>    of salvage.  He denied having the intention of spoiling 'OK!'s' sales
>    adding . . . 'my motive was never to spoil the exclusive of 'OK!'.  I repeat,
>    I wanted to defend as far as I could my publication . . .  My priority was
>    to save my publication after having, in the light of a very important big
>    loss, and that is that of the exclusive, and I didn't think of the possible
F  >    damage that I could inflict on 'OK!' or the Douglases . . .'"

133  The judge concluded, at para 249:

>    "I . . . accept the evidence Señor Sanchez Junco gave on this subject.
>    Whilst I recognise that for a defendant to act out of self-interest does not,
>    of itself, disprove that he had no intent to injure another, here I find on the
>    evidence that there was no intent to injure by unlawful means because
G  >    there was no intent to injure at all."

134  Thus the position of Señor Sanchez Junco was that he wished to
defend his publication against the damage it might suffer on account of
having lost the exclusive.  But that, it seems to me, is precisely the position of
every competitor who steps over the line and uses unlawful means.  The
injury which he inflicted on "OK!" in order to achieve the end of keeping up
H  his sales was simply the other side of the same coin.  His position was no
different from Mr Gye saying that he had no wish to injure Mr Lumley and
had the greatest respect for Her Majesty's Theatre but his intention was to
improve attendance at his own theatre, or the master of the *Othello* saying
that his intention was to buy more palm oil: *Tarleton v M'Gawley* 1 Peake

52

OBG Ltd v Allan (HL(E))                                    [2008] 1 AC
Lord Hoffmann

NPC 270. Lord Sumner made this point pungently in *Sorrell v Smith* [1925]    A
AC 700, 742:

> "How any definite line is to be drawn between acts, whose real purpose
> is to advance the defendants' interests, and acts, whose real purpose is
> to injure the plaintiff in his trade, is a thing which I feel at present beyond my
> power. When the whole object of the defendants' action is to capture the    B
> plaintiff's business, their gain must be his loss. How stands the matter
> then? The difference disappears."

The injury to "OK!" was the means of attaining Señor Sanchez Junco's
desired end and not merely a foreseeable consequence of having done so.

135   The analysis of intention by the Court of Appeal in my opinion
illustrates the danger of giving a wide meaning to the concept of unlawful    C
means and then attempting to restrict the ambit of the tort by giving a
narrow meaning to the concept of intention. The effect is to enable virtually
anyone who really has used unlawful means against a third party in order to
injure the plaintiff to say that he intended only to enrich himself, or protect
himself from loss. The way to keep the tort within reasonable bounds is to
restrict the concept of unlawful means to what was contemplated in *Allen v
Flood*; not to give an artificially narrow meaning to the concept of intention.    D

136   I would therefore have held that "Hello!" had the necessary
intention to cause loss but not that they interfered by unlawful means with
the actions of the Douglases.

**LORD NICHOLLS OF BIRKENHEAD**

137   My Lords, before your Lordships' House are three appeals. They    E
were heard consecutively because the legal issues overlap. The first appeal,
*OBG Ltd v Allan* [2005] QB 762, concerns a claim by a company in
liquidation for damages in respect of losses sustained by the company
through acts done by administrative receivers whose appointment was later
held to be invalid. The causes of action relied upon are conversion and
wrongful interference with contractual relations.    F

138   The second appeal, *Douglas v Hello! Ltd (No 3)* [2006] QB 125,
concerns the publication of photographs taken surreptitiously at a celebrity
wedding held in private. The causes of action relied upon are breach of
confidence and unlawful interference with economic interests. In the third
appeal, *Mainstream Properties Ltd v Young* [2005] IRLR 964, the cause of
action is wrongful interference with contractual relations. The context is    G
breaches by directors of their obligations to their company.

139   Counsel's submissions were wide-ranging. In particular the House
is called upon to consider the ingredients of the tort of interference with a
business by unlawful means and the tort of inducing breach of contract.
These are much vexed subjects. Nearly 350 reported decisions and
academic writings were placed before the House. There are many areas of
uncertainty. Judicial observations are not always consistent, and academic    H
consensus is noticeably absent. In the words of one commentator, the law is
in a "terrible mess". So the House faces a daunting task. For good measure
your Lordships have also to review the scope of the tort of conversion.

140   I shall consider first the ingredients of the relevant economic torts.

A    *Interference with the claimant's business by unlawful means*

**141**    I start with the tort comprising interference with a trade or business by unlawful means or, more shortly, the tort of unlawful interference. The gist of this tort is intentionally damaging another's business by unlawful means. Intention is an essential ingredient. The tort is not one of strict liability for harm inflicted on another's business, nor is it a tort based on

B    negligence. The defendant must have intended to inflict the harm of which complaint is made. That is the starting point. I shall have to return to this point later.

**142**    But intent to harm is not enough. Intentional harm of another's business is not of itself tortious. Competition between businesses regularly involves each business taking steps to promote itself at the expense of the other. One retail business may reduce its prices to customers with a view to

C    diverting trade to itself and away from a competitor shop. Far from prohibiting such conduct, the common law seeks to encourage and protect it. The common law recognises the economic advantages of competition.

*Unlawful means*

**143**    This is not to say that in this field of economic rivalry anything

D    goes. Business people are not free to promote their own businesses at the expense of others by whatever means they may choose. There are limits. The common law has long recognised that some forms of conduct, intentionally damaging other traders, are not acceptable. A well-known passage from the judgment of Bowen LJ in the Court of Appeal in *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, 614, merits

E    repetition:

"What, then, are the limitations which the law imposes on a trader in the conduct of his business as between himself and other traders? There seem to be no burdens or restrictions in law upon a trader which arise merely from the fact that he is a trader, and which are not equally laid on all other subjects of the Crown. His right to trade freely is a right which

F    the law recognises and encourages, but it is one which places him at no special disadvantage as compared with others. No man, whether trader or not, can, however, justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction, and molestation are forbidden; so is the intentional procurement of a violation of individual rights, contractual or other, assuming always that there is no just cause for it . . . But the defendants have been guilty of

G    none of these acts. They have done nothing more against the plaintiffs than pursue to the bitter end a war of competition waged in the interest of their own trade. To the argument that a competition so pursued ceases to have a just cause or excuse when there is ill-will or a personal intention to harm, it is sufficient to reply . . . that there was here no personal intention to do any other or greater harm to the plaintiffs than such as was

H    necessarily involved in the desire to attract to the defendants' ships the entire tea freights of the ports, a portion of which would otherwise have fallen to the plaintiffs' share."

**144**    A similar approach has been adopted in cases involving labour disputes. In *Allen v Flood* [1898] AC 1, 164, Lord Shand likened the labour

dispute in that case to one of "competition in labour", which he said "is in all essentials analogous to competition in trade, and to which the same principles must apply". Lord Lindley adopted the same stance in another trade union case, *Quinn v Leathem* [1901] AC 495, 532–535. Lord Lindley approved Bowen LJ's observations quoted above. He said the underlying principles are that an act "otherwise lawful", although harmful, does not become actionable because it is done simply with intent to annoy or harm. But "all wrongful acts" done intentionally to damage a particular individual and actually damaging him are remediable.

145   Since then the common law of England has adhered to the view that "unlawful" conduct is a prerequisite of liability under the tort of unlawful interference with trade. In the American case of *Tuttle v Buck* (1909) 119 NW 946 the court held a rich banker liable for spitefully driving the claimant barber out of business by opening a rival barber's shop and undercutting him. That is not the law in England. In this country intentionally causing damage without using unlawful means is not of itself actionable.

146   The English approach has not lacked critics. On the "unlawful conduct" approach the tort is parasitic on conduct defined as unlawful otherwise than because it amounts to a wrong to the claimant. This, it is said, is inherently unsatisfactory. It is inherently unsatisfactory because it means that a tort concerned with the regulation of trade is geared to commission of illegalities which were created for altogether different reasons: see *Heydon, Economic Torts*, 2nd ed (1978), p 124. A wrong designed for some other purpose is being used as the criterion for deciding whether an act done with an intention to harm is acceptable. This ingredient "imposes an arbitrary and illogical limit on the development of a rational general principle to explain this part of the law": *Salmond & Heuston, Law of Torts*, 21st ed (1996), p 346. It "can produce capricious results in which the distinction between permissible and impermissible . . . comes to turn on fictitious and, from a practical viewpoint, even irrelevant factors": *Fleming, The Law of Torts*, 9th ed (1998), p 761. In *J T Stratford & Son Ltd v Lindley* [1965] AC 269, 330, Viscount Radcliffe expressed unhappiness about this aspect of English law. He said the trade dispute in that case should be resolved "according to its substance, without the comparatively accidental issue whether breaches of contract are looked for and involved".

147   These criticisms have force. The contrary, pragmatic view is that in this difficult and uncertain area of the law there is perhaps something to be said for having an objective element of unlawfulness as the boundary of liability. A defendant is not liable under this tort unless he has resorted to "unlawful" means to achieve his end. Tony Weir, a staunch supporter of this approach, says this requirement is "entirely correct, sensible and practical": *Weir, Economic Torts* (1997), p 3.

148   I do not propose to enter upon the pros and cons of this particular debate. Your Lordships are not writing on a clean slate. English courts have long recognised they are not best equipped to regulate competitive practices at large. Parliament is better placed to decide what interests need protection and by what means. Fry LJ said that "To draw a line between fair and unfair competition, between what is reasonable and unreasonable, passes the power of the courts": *Mogul Steamship Co Ltd v McGregor Gow & Co* (1889) 23 QBD 598, 625–626. Since then Parliament has intervened on

A many occasions.  The courts have taken, as their foothold, conduct which is unlawful.  In English law it is now well established that "unlawful means" is an essential ingredient of this tort.  This goes back to the decision in *Allen v Flood* [1898] AC 1.  I shall proceed on this footing.

  149 Although the need for "unlawful means" is well established, the same cannot be said about the content of this expression.  There is some controversy about the scope of this expression in this context.

B  150 One view is that this concept comprises, quite simply, all acts which a person is not permitted to do.  The distinction is between "doing what you have a legal right to do and doing what you have no legal right to do": Lord Reid in *Rookes v Barnard* [1964] AC 1129, 1168–1169.  So understood, the concept of "unlawful means" stretches far and wide.  It covers common law torts, statutory torts, crimes, breaches of contract, breaches of trust and equitable obligations, breaches of confidence, and so on.

C  151 Another view is that in this context "unlawful means" comprise only civil wrongs.  Thus in *Allen v Flood* itself Lord Watson described illegal means as "means which in themselves are in the nature of civil wrongs": [1898] AC 1, 97–98.  A variant on this view is even more restricted in its scope: "unlawful means" are limited to torts and breaches of contract.

D  152 The principal criticism of the first, wider view is that it "tortifies" criminal conduct.  The principal criticism of the second, narrower view is that it would be surprising if criminal conduct were excluded from the category of "unlawful" means in this context.  In the classical "three-party" form of this tort the defendant seeks to injure the claimant's business through the instrumentality of a third party.  By this means, as Lord Lindley said, the claimant is "wrongfully and intentionally struck at through others,
E and is thereby damnified": *Quinn v Leathem* [1901] AC 495, 535.  It would be very odd if in such a case the law were to afford the claimant a remedy where the defendant committed or threatened to commit a tort or breach of contract against the third party but not if he committed or threatened to commit a crime against him.  In seeking to distinguish between acceptable and unacceptable conduct it would be passing strange that a breach of contract should be proscribed but not a crime.  In *Rookes v Barnard* [1964]
F AC 1129, 1206–1207, Lord Devlin noted it was "of course" accepted that a threat to commit a crime was an unlawful threat and continued:

> "It cannot be said that every form of coercion is wrong.  A dividing line must be drawn and the natural line runs between what is lawful and unlawful as against the party threatened."

G  153 These different views are founded on different perceptions of the rationale underlying the unlawful interference tort.  On the wider interpretation of "unlawful means" the rationale is that by this tort the law seeks to curb clearly excessive conduct.  The law seeks to provide a remedy for intentional economic harm caused by unacceptable means.  The law regards all unlawful means as unacceptable in this context.

H  154 On the narrower interpretation this tort has a much more limited role.  On this interpretation the function of the tort of unlawful interference is a modest one.  Its function is to provide a claimant with a remedy where intentional harm is inflicted indirectly as distinct from directly.  If a defendant intentionally harms a claimant directly by committing an actionable wrong against him, the usual remedies are

56
OBG Ltd v Allan (HL(E))                                      [2008] 1 AC
Lord Nicholls of Birkenhead

available to the claimant.  The unlawful interference tort affords a claimant       A
a like remedy if the defendant intentionally damages him by committing an
actionable wrong against a third party.  The defendant's civil liability is
expanded thus far, but no further, in respect of damage intentionally
caused by his conduct.

155   In my view the former is the true rationale of this tort.  The second
interpretation represents a radical departure from the purpose for which this      B
tort has been developed.  If adopted, this interpretation would bring about
an unjustified and unfortunate curtailment of the scope of this tort.

156   On either interpretation complications may arise in the application
of this tort in certain types of cases, notably where the civil rights of a third
party infringed by the defendant are statute-based.  The existence of these
perceived complications is not a pointer in favour of either interpretation.

157   Take the case of a patent.  A manufacturer seeks to steal a march on     C
his rival by employing a novel, patented process.  In order to sell his product
more cheaply, he does so without paying any licence fee to the owner of the
patent.  By means of this patent infringement he undercuts his law-abiding
rival.  He has damaged his rival's business by an unlawful means.  But this
conduct, however reprehensible, cannot afford the rival manufacturer a
cause of action for damages for interference with trade by unlawful means.     D
Parliament has specified the nature and extent of the remedies available for
infringement of patents.  Remedial relief for infringement of a patent is
available to patentees and exclusive licensees.  It would be inconsistent with
the statutory scheme if the common law tort were to afford a remedy more
widely.

158   Thus in *Oren v Red Box Toy Factory Ltd* [1999] FSR 785, 800,
para 42, Jacob J said in the context of a claim for unlawful interference with     E
contractual relations:

> "the right to sue under intellectual property rights created and
> governed by statute are inherently governed by the statute concerned.
> Parliament in various intellectual property statutes has, in some cases,
> created a right to sue, and in others not.  In the case of the [Copyright,
> Designs and Patents Act 1988] it expressly re-conferred the right on a
> copyright exclusive licensee, conferred the right on an exclusive licensee     F
> under the new form of property called an unregistered design right . . .
> but did not create an independent right to sue on a registered design
> exclusive licensee.  It is not for the courts to invent that which Parliament
> did not create."

159   The difficulties here are more apparent than real.  The answer lies in     G
keeping firmly in mind that, in these three-party situations, the function of
the tort is to provide a remedy where the claimant is harmed through the
*instrumentality* of a third party.  That would not be so in the patent example.

160   Similarly with the oft-quoted instance of a courier service gaining
an unfair and illicit advantage over its rival by offering a speedier service
because its motorcyclists frequently exceed speed limits and ignore traffic
lights.  The unlawful interference tort would not apply in such a case.  The     H
couriers' criminal conduct is not an offence committed against the rival
company in any realistic sense of that expression.

161   Nor am I persuaded that the effect of the broader interpretation of
"unlawful means" is to impose civil liability on a defendant simply because

[2008] 1 AC

OBG Ltd v Allan (HL(E))
Lord Nicholls of Birkenhead

A he reached his victim through an agent rather than directly. I am far from satisfied that, in a two-party situation, the courts would decline to give relief to a claimant whose economic interests had been deliberately injured by a crime committed against him by the defendant.

162 For these reasons I accept the approach of Lord Reid and Lord Devlin and prefer the wider interpretation of "unlawful means". In this context the expression "unlawful means" embraces all acts a defendant is

B not permitted to do, whether by the civil law or the criminal law.

163 I add a brief observation on the decision of the House in *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173. There the House held that Shell and BP's alleged criminal breaches of the sanctions orders against Southern Rhodesia did not afford a civil remedy to Lonrho. That decision does not assist either way on the point now under consideration. The House

C was not considering the scope of the unlawful interference tort. In that case there was no allegation that Shell and BP's alleged acts in contravention of the sanctions orders were done to injure Lonrho. The case proceeded on the footing that this essential ingredient of the unlawful interference tort was not present.

D *Intent to injure*

164 I turn next, and more shortly, to the other key ingredient of this tort: the defendant's intention to harm the claimant. A defendant may intend to harm the claimant's business either as an end in itself or as a means to an end. A defendant may intend to harm the claimant as an end in itself where, for instance, he has a grudge against the claimant. More usually a defendant intentionally inflicts harm on a claimant's business as a means to

E an end. He inflicts damage as the means whereby to protect or promote his own economic interests.

165 Intentional harm inflicted against a claimant in either of these circumstances satisfies the mental ingredient of this tort. This is so even if the defendant does not wish to harm the claimant, in the sense that he would prefer that the claimant were not standing in his way.

F 166 Lesser states of mind do not suffice. A high degree of blameworthiness is called for, because intention serves as the factor which justifies imposing liability on the defendant for loss caused by a wrong otherwise not actionable by the claimant against the defendant. The defendant's conduct in relation to the loss must be deliberate. In particular, a defendant's foresight that his unlawful conduct may or will probably

G damage the claimant cannot be equated with intention for this purpose. The defendant must *intend* to injure *the claimant*. This intent must be a cause of the defendant's conduct, in the words of Cooke J in *Van Camp Chocolates Ltd v Aulsebrooks Ltd* [1984] 1 NZLR 354, 360. The majority of the Court of Appeal fell into error on this point in the interlocutory case of *Miller v Bassey* [1994] EMLR 44. Miss Bassey did not breach her recording contract with the intention of thereby injuring any of the plaintiffs.

H 167 I add one explanatory gloss to the above. Take a case where a defendant seeks to advance his own business by pursuing a course of conduct which he knows will, in the very nature of things, necessarily be injurious to the claimant. In other words, a case where loss to the claimant is the obverse side of the coin from gain to the defendant. The defendant's

A

gain and the claimant's loss are, to the defendant's knowledge, inseparably linked. The defendant cannot obtain the one without bringing about the other. If the defendant goes ahead in such a case in order to obtain the gain he seeks, his state of mind will satisfy the mental ingredient of the unlawful interference tort. This accords with the approach adopted by Lord Sumner in *Sorrell v Smith* [1925] AC 700, 742:

B

> "When the whole object of the defendants' action is to capture the plaintiff's business, their gain must be his loss. How stands the matter then? The difference disappears. The defendants' success is the plaintiff's extinction, and they cannot seek the one without ensuing the other."

### The tort of inducing a breach of contract

C

168    The other tort requiring consideration is the tort of inducing a breach of contract. This tort is known by various names, reflecting differing views about its scope. At its inception in 1853 this tort was concerned with a simple tripartite situation of a non-party to a contract inducing a contracting party to break her contract. Did the other party to the contract have a cause of action against the non-party?

D

169    The facts in *Lumley v Gye* 2 E & B 216 are familiar to every law student. The well-known opera singer Johanna Wagner had contracted with Mr Lumley to perform exclusively at the Queen's Theatre. Mr Gye, the owner of Her Majesty's Theatre, "enticed and procured" Miss Wagner to break her contract. The action came before the court on a plea of demurrer. The question was whether the counts disclosed a cause of action against Mr Gye. The court, by a majority, held they did.

E

170    The reasoning of the judges differed in its generality. It was established law that a person who knowingly procured a servant to leave his master's service committed an actionable wrong. Crompton J saw no reason to confine this principle to contracts for services of any particular description. Erle J reasoned more widely. He said, at p 232, that the principle underlying the master and servant cases is that procurement of the violation of a right is a cause of action:

F

> "It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: *he who procures the wrong is a joint wrongdoer*, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of." (Emphasis added.)

G

This principle, of liability for procurement of a wrong, applies to a breach of contract as well as an actionable wrong: p 233. Wightman J expressed himself similarly, at p 238: "It was undoubtedly prima facie an unlawful act on the part of Miss Wagner to break her contract, and therefore a tortious act of the defendant knowingly *to procure her to do so*." (Emphasis added.)

171    This "procurement" analysis commended itself to Lord Watson in *Allen v Flood* [1898] AC 1. Lord Watson approved Erle J's reasoning as quoted above, and continued, at pp 106–107:

H

> "These statements embody an intelligible and a salutary principle, and they contain a full explanation of the law upon which the case was

A decided. He who wilfully induces another to do an unlawful act which, but for his persuasion, would or might never have been committed, is rightly held responsible for the wrong which he procured."

172 Thus understood, the rationale and the ingredients of the "inducement" tort differ from those of the "unlawful interference" tort. With the inducement tort the defendant is responsible for the third party's

B breach of contract which he procured. In that circumstance this tort provides a claimant with an additional cause of action. The third party who breached his contract is liable for breach of contract. The person who persuaded him to break his contract is also liable, in his case in tort. Hence this tort is an example of civil liability which is secondary in the sense that it is secondary, or supplemental, to that of the third party who committed a breach of his contract. It is a form of accessory liability.

C 173 This form of liability is to be contrasted with the tort of unlawful interference. This is a "stand-alone" tort of wide scope, imposing primary liability on a defendant for his own conduct, irrespective of whether on the facts anyone else may also be liable, either in contract or in tort. On this I agree with Philip Sales and Daniel Stilitz in their stimulating article "Intentional Infliction of Harm by Unlawful Means" (1999) 115 LQR 411,

D 433.

*Preventing performance of a contract: "interfering with contractual relations"*

174 I must move now to more troubled waters. In *Quinn v Leathem*
[1901] AC 495 the House upheld the decision in *Lumley v Gye* 2 E & B 216.

E In doing so their Lordships expressed the principle underlying that decision in broad terms. Lord Macnaghten, at p 510, said that *Lumley v Gye* was rightly decided, not on the ground of malicious intention, but

"on the ground that a violation of legal right committed knowingly is a cause of action, and that it is a violation of legal right *to interfere with contractual relations* recognised by law if there be no sufficient

F justification for the interference." (Emphasis added.)

Lord Lindley said the "principle which underlies the decision [in *Lumley v Gye*] reaches all wrongful acts done intentionally to damage a particular individual and actually damaging him": p 535.

175 These broad, indeed, sweeping affirmations made no mention of the need for inducement of breach of contract in *Lumley v Gye* cases. Lord

G Macnaghten spoke quite generally of "interfering with contractual relations" as a violation of legal right. Lord Lindley expressed the underlying rationale in even wider terms. On the face of these observations the *Lumley v Gye* tort is not confined to cases where the defendant *induced* a contracting party to break his contract. These observations could be taken to suggest that the *Lumley v Gye* tort covers also cases where the defendant with intent to damage the claimant *prevented* a party to a contract from

H performing his contractual obligations.

176 In *GWK Ltd v Dunlop Rubber Co Ltd* (1926) 42 TLR 376 Lord Hewart CJ applied these statements in a "prevention" case. GWK, a car manufacturer, agreed with a tyre manufacturer Associated Rubber Manufacturers ("ARM"), that the latter's tyres would be fitted on all

GWK cars exhibited for sale. Two of GWK's cars were exhibited at the    A
Glasgow motor show. On the eve of the show Dunlop wrongfully
removed ARM's tyres from the cars and replaced them with its own
Dunlop tyres.

177   Clearly, Dunlop did not induce GWK to break its contract with
ARM. Equally plainly, Dunlop was liable to ARM for unlawful interference    B
with its business. Dunlop intended to damage ARM by unlawful means,
namely, by trespass to the goods of GWK. But Lord Hewart followed a
different route. He gave effect to the broad observations of Lord
Macnaghten and Lord Lindley in *Quinn v Leatham* [1901] AC 495. Dunlop
had knowingly committed a violation of ARM's legal rights by interfering
without justification with the contractual relations existing between ARM
and GWK and had done so with intent to damage ARM.                            C

178   With hindsight it is evident that application of the *Lumley v Gye*
tort to a "prevention" case was unfortunate. There is a crucial difference
between cases where the defendant induces a contracting party not to
perform his contractual obligations and cases where the defendant prevents
a contracting party from carrying out his contractual obligations. In
inducement cases the very act of joining with the contracting party and    D
inducing him to break his contract is sufficient to found liability as an
accessory. In prevention cases the defendant does not join with the
contracting party in a wrong (breach of contract) committed by the latter.
There is no question of accessory liability. In prevention cases the defendant
acts independently of the contracting party. The defendant's liability is a
"stand-alone" liability. Consistently with this, tortious liability does not
arise in prevention cases unless, as was the position in *GWK*, the           E
preventative means used were independently unlawful.

179   Jenkins LJ made this point in *D C Thomson & Co Ltd v Deakin*
[1952] Ch 646, 693:

> "acts of a third party *lawful in themselves* do not constitute an
> actionable interference with contractual rights merely because they bring    F
> about a breach of contract, even if they were done with the object and
> intention of bringing about such breach." (Emphasis added.)

Evershed MR was of the same view. Suppose, he said, a defendant buys up
all the commodities of a particular character with the object of preventing
performance of a contract whereby the claimant would receive a supply of
those commodities. The defendant would not act tortiously in such a case:    G
p 680.

180   Given this difference between prevention and inducement, it is
confusing and misleading to treat prevention cases as part and parcel of
the same tort as inducement cases. The rationale is not the same, nor are the
ingredients. But the rationale and ingredients of liability in prevention cases
are the same as those of the tort of interference with a business by unlawful    H
means. Prevention cases should be recognised for what they are:
straightforward examples of the latter tort, rather than as exemplifying a
wider version of *Lumley v Gye* labelled "interference with contractual
relations".

A    *A step too far*

181    A regrettable consequence of treating "preventing performance" as an extension of the *Lumley v Gye* tort has been to widen the ambit of this tort in an unprincipled fashion. It has meant that a defendant who intentionally harmed a plaintiff may be liable even though he did *not* use unlawful means *nor* did he induce a party to break his contract. A defendant

B    may be held liable for intentional harm even though he did not cross the Rubicon by doing something he had no legal right to do. He is liable for intentional harm effected by lawful means.

182    This step was taken by the Court of Appeal in the well known case of *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch 106. A trade union and its officials blacked supplies of oil to the Imperial Hotel in Torquay. This

C    prevented the oil company Esso from performing its contractual obligation to supply oil to the hotel. The Court of Appeal held this was actionable at the suit of the hotel.

183    In reaching this conclusion Lord Denning MR said Lord Macnaghten, in the passage quoted above from *Quinn v Leathem* [1901] AC 495, 510, extended the principle of *Lumley v Gye*. The time has come, Lord Denning stated, to extend the principle further, to cover deliberate and

D    direct interference with the performance of a contract without causing any breach. The interference must be "direct". Unlawful means was an ingredient of liability if, but only if, the interference was "indirect", as in Evershed MR's example of cornering the market in a commodity. In the instant case the interference was direct. So liability arose irrespective of whether the means used by the defendants to prevent performance of Esso's supply contract was lawful or not.

E    184    The court went further in another respect. The court held that the tort applied even though the interference did not give rise to a breach of contract. Esso's supply contract included a force majeure clause. This mattered not. What mattered was that Esso was prevented or hindered from performing its contractual obligations. This view of the law was approved by your Lordships' House in *Merkur Island Shipping Corpn v Laughton*

F    [1983] 2 AC 570, 608, per Lord Diplock.

185    With the very greatest respect I have difficulty with Lord Denning's extension of *Lumley v Gye* 2 E & B 216. The effect of this extension is that a person who directly prevents performance of a contract by wholly lawful means, and thereby intentionally inflicts damage on the claimant, is liable to the claimant. No reason was given, and none is

G    discernible, for this fundamental extension of the law. Why should a defendant, acting wholly *lawfully*, be liable in such a case, although the use of *unlawful* means is a prerequisite of liability if he intentionally inflicts damage in any other way?

186    Nor is the basis of the distinction between direct and indirect interference apparent. One would suppose the outcome on liability would be the same whether a person sought to achieve his end by direct or indirect

H    means. It would be remarkable if this were not so.

187    This extension of the *Lumley v Gye* tort must be going too far. To hold a defendant liable where the intentional harm is inflicted by lawful means runs counter to the limit on liability long established in English law. So long as this general limit is maintained in respect of other forms of

62
OBG Ltd v Allan (HL(E))                                            [2008] 1 AC
Lord Nicholls of Birkenhead

interference with a claimant's business, and Lord Denning did not suggest    A
this should be changed, the extension in liability proposed by him and
seemingly approved by Lord Diplock is irrational.  Despite the high
authority of these cases, I have to say that on this occasion these
distinguished judges fell into error.  They were led astray by the width of
Lord Macnaghten's observations made in 1901, long before the unlawful
interference tort became shaped.  The jurisprudence of the economic torts    B
had not then been thought through.

188    For these reasons this extension of the inducement tort of *Lumley v
Gye* cannot stand consistently with the economic torts having a coherent
framework.  This extension is productive of obscurity and, hence,
uncertainty.  This, in turn, as Lord Diplock himself once said, is destructive
of the rule of law: see *Merkur Island Shipping Corpn v Laughton* [1983]    C
2 AC 570, 612.

189    I feel bound to say therefore that the ambit of the *Lumley v Gye*
tort should properly be confined to inducing a breach of contract.  The
unlawful interference tort requires intentional harm effected by unlawful
means, and there is no in-between hybrid tort of "interfering with
contractual relations".  In so far as authorities suggest or decide otherwise    D
they should not now be followed.  I leave open the question of how far the
*Lumley v Gye* principle applies equally to inducing a breach of other
actionable obligations such as statutory duties or equitable or fiduciary
obligations.

190    On this footing the "force majeure" point seems largely to
disappear.  It can hardly arise in inducement cases.  An exemption clause can
scarcely apply to a contracting party who chooses to default.  Nor would the
existence of an exemption clause have any obvious relevance in unlawful    E
interference cases.  If a defendant prevents performance of a contract by
unlawful means, the existence of an exemption clause will be neither here
nor there.  The question will always be: how much loss did this interference
cause to the claimant?

*Inducing a breach of contract: the mental element*    F

191    I turn next to the mental ingredient of the *Lumley v Gye* tort.  The
mental ingredient is an intention by the defendant to procure or persuade
("induce") the third party to break his contract with the claimant.  The
defendant is made responsible for the third party's breach because of his
intentional causative participation in that breach.  Causative participation is
not enough.  A stranger to a contract may know nothing of the contract.    G
Quite unknowingly and unintentionally he may procure a breach of the
contract by offering an inconsistent deal to a contracting party which
persuades the latter to default on his contractual obligations.  The stranger is
not liable in such a case.  Nor is he liable if he acts carelessly.  He owes no
duty of care to the victim of the breach of contract.  Negligent interference is
not actionable.

192    The additional, necessary factor is the defendant's intent.  He is    H
liable if he intended to persuade the contracting party to breach the contract.
Intentional interference presupposes knowledge of the contract.  With that
knowledge the defendant proceeded to induce the other contracting party to
act in a way the defendant knew was a breach of that party's obligations

A   under the contract.  If the defendant deliberately turned a blind eye and proceeded regardless he may be treated as having intended the consequence he brought about.  A desire to injure the claimant is not an essential ingredient of this tort.

193   For completeness I mention, but without elaboration, that a defence of justification may be available to a defendant in inducement tort cases.  A defendant may, for instance, interfere with another's contract in B   order to protect an equal or superior right of his own, as in *Edwin Hill & Partners v First National Finance Corpn plc* [1989] 1 WLR 225.

*A bird's-eye view*

194   It may be helpful to pause and take on overall look at where this leaves the law.  The effect of the views expressed above is to draw a sharp C   distinction between two economic torts.  One tort imposes primary liability for intentional and unlawful interference with economic interests.  The other tort imposes accessory liability for inducing a third party to commit an actionable wrong, notably a breach of contract, but possibly some other actionable civil wrongs as well.

195   This overall framework, it is to be hoped, should assist in the more D   coherent development of the economic torts.  On this I am comforted by noting that this twofold structure substantially accords with the views of at least some commentators, including *Hazel Carty, An Analysis of the Economic Torts*, (2001), pp 271–276, and Ken Oliphant (1999) 62 MLR 320, 322.

E   *Mainstream Properties Ltd v Young*

196   Against that legal background I turn at last to the three appeals, starting with *Mainstream Properties Ltd v Young*.

197   Mainstream was a residential property development company concentrating on the Derbyshire area.  The defendant Mr Young was a director of the company and the defendant Mr Broad a manager.  They were the company's two most senior employees.  In late 2000 and early 2001 F   Mr Young and Mr Broad appropriated to themselves the opportunity to develop a site at Findern.  This was in breach of the contractual and fiduciary duties they owed to Mainstream.  They developed the site as a joint venture with the defendant Mr De Winter.  Mr De Winter provided the necessary finance.  Without his assistance the other two could not have proceeded with the development.

G   198   Mainstream sued all three of them.  The claims against Mr Young and Mr Broad succeeded.  The company's claim against Mr De Winter was that he induced the other two to break their contracts of employment; in other words, a straightforward *Lumley v Gye* claim.  The judge, Judge Norris QC, dismissed this claim.  Mainstream appealed, and the Court of Appeal, comprising Sedley, Arden LJJ and Aikens J, dismissed Mainstream's appeal [2005] IRLR 964.  Before the House is a further appeal H   by Mainstream.

199   The relevant findings of the trial judge were these.  Mr De Winter knew Mr Young and Mr Broad had contracts of employment, although not their precise terms.  He knew sufficient to spot the conflict problem.  He raised this issue with the others.  In the light of what they told him Mr De

64
OBG Ltd v Allan (HL(E))                                              [2008] 1 AC
Lord Nicholls of Birkenhead

Winter genuinely believed their participation in the Findern venture would
not occasion a conflict between their duty and their interest. Accordingly
Mainstream failed to establish that Mr De Winter intended to procure a
breach of the others' employment contracts.

200    These are factual findings, which were not disturbed by the Court
of Appeal. On these findings the appeal must fail. The burden of proving
Mr De Winter intended to persuade Mr Young and Mr Broad to break their
contracts lay on Mainstream. Mainstream failed to discharge this onus.

201    Mr Randall sought to avoid the difficulty posed by the judge's
findings by drawing attention to Mr De Winter's written statements. These
showed that Mr Broad told Mr De Winter that Mainstream was not
interested in buying the land at Findern. Mr De Winter believed what he
was told. On this basis he believed the joint venture would not entail a
breach by the others of their contracts with Mainstream. This, submitted
counsel, was not good enough. The matters on which Mr De Winter relied
did not, as a matter of law, leave Mr Broad and Mr Young free to compete
with Mainstream over the development of the Findern land while still
working as full-time executives of the company in that area. Mr De Winter
was relying on his own, erroneous, legal conclusion. He was not entitled
to escape liability by relying on his own mistaken assessment of the legal
position.

202    I cannot accept this. An honest belief by the defendant that the
outcome sought by him will not involve a breach of contract is inconsistent
with him intending to induce a breach of contract. He is not to be held
responsible for the third party's breach of contract in such a case. It matters
not that his belief is mistaken in law. Nor does it matter that his belief is
muddle-headed and illogical, as was the position in *British Industrial
Plastics Ltd v Ferguson* [1940] 1 All ER 479. As Lord Devlin said in *Rookes
v Barnard* [1964] 1129, 1212, the defendant must know of the contract "and
of the fact that the act induced will be a breach of it". Counsel referred the
House to several authorities where a contrary view seems to have been
expressed; for instance, *Solihull Metropolitan Borough v National Union
of Teachers* [1985] IRLR 211, 213, paras 7–10, and *Welsh Development
Agency v Export Finance Co Ltd* [1992] BCLC 148, 179. If and in so far as
observations in those cases depart from the principle outlined above they
were wrong.

203    I would dismiss Mainstream's appeal.

*OBG Ltd v Allan*

204    OBG Ltd carried on a substantial business as a civil engineering
contractor, specialising in laying and maintaining underground pipes. An
associated company provided plant and transport. For present purposes
they can be treated as a single entity.

205    In 1992 OBG had the misfortune to fall out with its main customer
North West Water Ltd. OBG's cash flow dried up and it became unable to
pay its debts. In June 1992 one of its subcontractors, Raymond Centriline
Ltd, appointed joint administrative receivers under a floating charge
assigned to Centriline by OBG's bankers. It later turned out that this
appointment was invalid because at the date of the assignment OBG did not

A    owe any money to the bank under the charge. But at the time Centriline and the receivers, acting in good faith, believed the appointment was valid.

206   The receivers went into possession of OBG's property and took control of its business on 9 June 1992. They did what receivers do in these circumstances. They dismissed employees, terminated contracts, disposed of assets and settled claims. Work ceased on the sites on 12 June. One week later OBG went into creditors' voluntary liquidation.

B

207   North West Water treated the appointment of the receivers as an event of default, entitling it to determine its contracts with OBG. Disputes arose. In November 1992 the receivers agreed to accept £400,000 in settlement. OBG's contracts with other customers were completed on the instructions of the receivers.

C    208   Meanwhile the liquidators were questioning the validity of the receivers' appointment. In October 1995 OBG, acting by its liquidators, started these proceedings claiming a declaration that the appointment was invalid and consequential relief including damages. In August 1997 the settlement negotiated by the receivers with North West Water was finally signed, with the concurrence of the liquidators.

209   In January 2001 Judge Maddocks held that the receivers' appointment was invalid. He directed an assessment of damages. OBG D    advanced claims for damages for trespass over and conversion of its land and chattels and all its other assets; alternatively, unlawful interference with contractual relations in respect of its contracts. OBG based its damages claims on the value of these assets on the date they were wrongfully taken over by the receivers, that is, 9 June 1992.

210   The judge rejected OBG's claim for conversion of its contractual E    rights. The tort of conversion is confined to tangible property. The judge upheld the claim based on interference with contractual relations. In reaching the latter conclusion the judge relied upon the passage from the speech of Lord Macnaghten in *Quinn v Leathem* [1901] AC 495, 510, which I set out above when considering the "prevention of performance" aberration.

F    211   As to quantum, there was no difficulty in assessing the value of the land or the value of the plant and equipment. Before the judge the factual dispute centred on the value of OBG's contracts with North West Water ("the NWW contracts") and its contracts with other customers ("the non-NWW contracts"). Valuation of these contracts called for an assessment, as at 9 June 1992, of the amount these contracts could reasonably have been expected to yield to OBG had the receivers not been appointed. The judge G    assessed this amount at £1,400,000 for the NWW contracts and £420,000 for the non-NWW contracts.

212   This amount contrasted with the sums realised by the receivers for these items: £400,000 paid to the receivers pursuant to the settlement they negotiated with North West Water, and £353,000 in respect of the non-NWW contracts. The judge gave reasons why the values he attributed to the contracts could not be equated with the amounts actually realised by the H    receivers. He also held that, although the liquidators joined in the North West Water settlement document, there was no question of estoppel, acquiescence or ratification. This was throughout a hostile receivership. The receivers were not affected in their conduct of the receivership by anything done or not done by the liquidators. The liquidators never

66
OBG Ltd v Allan (HL(E))                                    [2008] 1 AC
Lord Nicholls of Birkenhead

accepted the validity of the receivers' appointment, nor were the liquidators in a position to renegotiate the settlement reached by the receivers with North West Water. None of these matters was in issue before your Lordships.

213  The outcome was that Judge Maddocks ordered the receivers to pay £1,854,000 to OBG plus interest. This amount comprised £244,000 in respect of the land, plant and equipment, and £1,910,000 in respect of OBG's contracts and other debtors and cash at bank. The judge deducted £300,000 in respect of estimated liquidation costs OBG would have incurred in any event.

214  The Court of Appeal, comprising Peter Gibson, Mance and Carnwath LJJ, allowed [2005] QB 762 an appeal by the receivers on the interference with contractual relations claim and dismissed a cross-appeal by OBG on the conversion claim. The Court of Appeal deleted from the judge's order all the amounts awarded by him save those for land, plant and equipment. This reduced the amount of the damages from £1,854,000 to £244,000.

215  The effect of the Court of Appeal's order was that OBG received nothing for the loss of its debts and other contractual rights. Valued altogether at nearly £2m, these disallowed items represented almost 90% of OBG's assets. But in respect of the receivers' misappropriation of these substantial items OBG received no recompense at all.

216  That was the effect of the order of the Court of Appeal. But I should note that the receivers have not sought to leave OBG in this position. They accept they are liable to account for their net realisations. This means, in financial terms, that the continuing dispute concerns the difference of £1,067,000 between the judge's assessment of the value of the NWW and non-NWW contracts and the amounts actually realised by the receivers for these assets.

217  Peter Gibson LJ said he reached his conclusion on the legal issues with regret. The wrongful taking of control of intangible assets by an invalidly appointed receiver leading to loss which but for the receivership would have been avoided ought to have consequences in law. Carnwath LJ's "initial instinct" was that the receivers should be strictly liable for all the consequences of their unlawful misappropriation of OBG's business, by analogy with the long-established principles applied to unlawful receiverships under the law of trespass and conversion. But he agreed that course was not open to the Court of Appeal. Mance LJ dissented on the interference with contractual relations claim. On this ground he would have upheld the judge's order.

*The economic torts*

218  I agree with the majority in the Court of Appeal that OBG's claim based on the economic torts fails. I can state my reasons very shortly, because they will be apparent from the views I have already expressed on the ingredients of these torts. The receivers did not intend to "induce" OBG to breach of any of its contracts. The receivers honestly believed they were entitled to act on behalf of OBG in exercise of their powers as administrative receivers. So the tort of inducing a breach of contract does not avail OBG. Nor does the tort of interference with a business by

[2008] 1 AC                                      OBG Ltd v Allan (HL(E))
                                                 Lord Nicholls of Birkenhead

A   unlawful means assist OBG.  The receivers did not have any intent to
    injure OBG.

        **219**  OBG's claim based on the tort of conversion, a tort of strict
    liability, is an altogether different matter.  To that I now turn.

    *Conversion*

B       **220**  In this case the receivers, acting in good faith but without any
    lawful right, took over OBG's business and assets.  They sold the company's
    land, its plant and its equipment.  They wound down its outstanding
    contracts and negotiated a deal with its biggest customer.  The receivers are
    liable for their unauthorised dealings with the company's land and chattels.
    That is not in dispute.  But, it is said, they are not liable for their
    unauthorised dealings with the company's debts and other contractual
C   rights.

        **221**  This prompts the question: why not?  The receivers took over the
    entirety of the company's business and assets.  Why should they be liable
    strictly in respect of their unauthorised dealings with some parts of the
    company's property but not others?  This distinction makes no sense.  It
    lacks any rhyme or reason.

D       **222**  The distinction, it is said, follows from the limited scope of the tort
    of conversion.  The tort of conversion provides a remedy in damages for the
    misappropriation of chattels, but not for the misappropriation of
    intangibles.  Conversion applies to choses in possession, not choses in action,
    to use the historic labels.

        **223**  There can be no better place to start consideration of this subject
    than to remember Sir John Salmond's famous words:

E
        "Forms of action are dead, but their ghosts still haunt the precincts of
        the law.  In their life they were powers of evil, and even in death they have
        not wholly ceased from troubling.  In earlier days they filled the law with
        formalism and fiction, confusion and complexity, and though most of the
        mischief which they did has been buried with them, some portion of it
        remains inherent in the law of the present day.  Thus if we open a book on
F       the law of torts, howsoever modern and rationalised, we can still hear the
        echoes of the old controversies . . . and we are still called upon to observe
        distinctions and subtleties that have no substance or justification in them,
        but are nothing more than an evil inheritance from the days when forms
        of action and of pleading held the legal system in their clutches.  In no
        branch of the law is this more obvious than in that which relates to the
G       different classes of wrongs which may be committed with respect to
        chattels.  In particular the law of trover and conversion is a region still
        darkened with the mists of legal formalism, through which no man will
        find his way by the light of nature . . ."

    Salmond was writing in the Law Quarterly Review at the beginning of the
    last century: "Observations on Trover and Conversion" (1905) 21 LQR 43.
H   But his observations still have a ring of truth in this area of the law.

        **224**  The cause of action, formerly known as trover but now known as
    conversion, was founded on a fiction.  The standardised plea was that the
    plaintiff possessed certain goods, that he casually lost them, that the
    defendant found them, and that the defendant did not return them but

68
OBG Ltd v Allan (HL(E))                                                    [2008] 1 AC
Lord Nicholls of Birkenhead

instead "converted them to his own use". The defendant was not permitted    A
to deny the losing and finding, and so the only issues were the plaintiff's right
to possession and the conversion itself. In due course this became the
standard remedy for the unauthorised assumption of the powers of the true
owner. Any chattel could be lost and found, and so it could be converted.
But land could not be lost and found, nor could intangible property. And so
originally the rule was that intangibles could not be converted.               B

225  With the expansion of commerce and the increase in dealings with
intangible property this rule, described by Professor Prosser as a "hoary
limitation", had to be relaxed. The law provided, in respect of the
misappropriation of intangibles, no remedy equivalent to that provided by
conversion for the misappropriation of tangibles. So the courts resorted to
another legal fiction. They held that in appropriate cases a document
embodying or recording a debt or obligation should be treated as having the    C
same value as the debt or obligation.

226  As would be expected, the reach of this useful tool gradually
expanded. Now it is not confined to documents of title and negotiable
instruments. It includes insurance policies, guarantees, share certificates and
much else. In *Clerk & Lindsell* the principle is said to extend to "any
document which is specially prepared in the ordinary course of business as     D
evidence of a debt or obligation": *Clerk & Lindsell on Torts*, 19th ed (2006),
para 17-35.

227  In the past some unconvincing efforts were made to justify this
extension as a particular application of the ordinary principles of damages.
Now it is openly recognised that this extension involves a legal fiction: see,
for instance, Pill and Potter LJJ in *Smith v Lloyds TSB Group plc* [2001]
QB 541, 551, 557, and Mance LJ in the present case [2005] QB 762, 784,         E
para 76.

228  Legal fictions, of their nature, conceal what is going on. They are a
pretence. They represent an unacknowledged departure from existing
principle. By resorting to the fiction of equating the value of a document as a
chattel or piece of paper with the value of the rights embodied or recorded
on it the courts concealed the reality. The reality is that English law does     F
sometimes provide a remedy for the misappropriation, or conversion, of
intangible rights. To that extent the tort of conversion has already jumped
the gap between tangibles and intangibles. It did so a long time ago.

229  This prompts a further question: why should this extension of the
tort of conversion be confined to cases where the intangible rights are
specially recorded in a document? I would like to think that, as a mature
legal system, English law has outgrown the need for legal fictions. There was   G
a time when John Doe and Richard Roe were popular characters. They had
to be parties to some forms of action. When they were in their prime their
names appeared again and again in the law reports. English law has moved
on. John Doe and Richard Roe are no more. So here, if there is to be a limit
to the types of intangibles which attract a remedy in conversion, this limit
should be capable of being articulated and justified openly, not by reference    H
to fiction piled upon fiction.

230  Rationally the dividing line cannot be the existence or not of a piece
of paper. The existence of a document is essentially irrelevant. Intangible
rights can be misappropriated even if they are not recorded in a document.

A  In principle an intangible right not recorded in writing may merit protection just as much as a right which is recorded in this way.

231  In practice misappropriation is more likely to occur with a right embodied in a document such as a cheque which passes through several hands in the ordinary course of business. But that is no reason for withholding protection in other cases. This is especially so today when information is increasingly stored and communicated, and transactions are B effected, by electronic means.

232  The better approach today is to discard the fictional significance of a piece of paper. Instead one should seek to identify the common characteristic of the intangible rights in respect of whose misappropriation English law, as a matter of reality, already provides the remedy of conversion. The common characteristic, it seems to me, is that the rights C protected in this way are contractual rights. No principled reason is apparent for attempting, for this purpose, to distinguish between different kinds of contractual rights.

233  The time has surely come to recognise this and, additionally, to recognise that the tort of conversion applies to contractual rights irrespective of whether they are embodied or recorded in writing. I would so hold. This would be a modest but principled extension of the scope of the tort of D conversion. It would rid the law of an artificial limitation derived from the limited scope of an enabling legal fiction.

234  This step would not run counter to any legislation. Parliament has not enacted any general relieving provision from strict liability for conversion. Parliament has enacted specific relieving provision in respect of particular types of dealings with goods, for instance, the Factors Acts, and E particular types of dealings with intangibles, for instance, the Cheques Act 1957. Abolishing the need for a piece of paper would not cut across any legislative scheme.

235  The receivers placed reliance on the Torts (Interference with Goods) Act 1977. This Act excludes "things in action" from the scope of "conversion of goods" as defined in that Act. This definition accords with the existing law by seemingly embracing the fiction that pieces of paper are F deemed to be worth the value of the rights embodied or recorded in them. But Parliament cannot be taken to have intended to preclude the courts from developing the common law tort of conversion if this becomes necessary to achieve justice.

236  The receivers also drew attention to section 234(3) of the Insolvency Act 1986. This provision protects administrative receivers and G liquidators, in the absence of negligence, from liability if they seize or dispose of property which is not the property of the company. "Property" includes things in action: section 436. In *Welsh Development Agency v Export Finance Co Ltd* [1992] BCLC 148, the Court of Appeal held that "property" in section 234(3) does not include intangibles because they cannot be "seized". So, the argument runs, this is a legislative recognition that protection was not needed in respect of intangibles. I do not agree. The H difficulty I have with this submission lies in the Court of Appeal's restrictive interpretation of "property". Contrary to the decision of the Court of Appeal, I see no reason to suppose Parliament intended to exclude the wrongful disposal of contractual rights from the scope of this relieving provision.

70

OBG Ltd v Allan (HL(E))                                    [2008] 1 AC
Lord Nicholls of Birkenhead

A

**237**  Whether the law on conversion should extend beyond contractual rights and embrace other forms of intangibles is not a matter to be pursued on this occasion.  This further step has been taken elsewhere in some parts of the common law world.   But other forms of intangible rights, such as intellectual property, raise problems of their own.  These problems are best considered when they arise.

B

**238**  Accordingly I would hold that in the present case the receivers committed the tort of conversion by their wrongful misappropriation of OBG's debts and OBG's contractual rights against North West Water and other contractors.

**239**  Mr Mitchell submitted that the tort of conversion should not be extended.  OBG has a good remedy, which it has chosen not to pursue, against the other parties to OBG's contracts.  By accepting that the receivers gave a good discharge to OBG's debtors and contractors despite the invalidity of the receivers' appointment, OBG accepted that the receivers acted as OBG's agents.  OBG's remedy against the receivers lay, not in conversion, but in suing the receivers for breach of their fiduciary duties.

C

**240**  I cannot accept this.  OBG acting by its liquidators could hardly be expected to pursue the company's debtors and contractors for non-payment, on the ground that the receivers were not able to give them a good receipt.  That would be utterly unreasonable.  OBG's failure to take this course cannot be treated as a waiver of the receivers' torts.  OBG cannot thereby be taken to have accepted that the receivers were acting as agents of the company.  In the case of North West Water, OBG joined in the settlement document.  But, here again, as already noted, the judge rejected the suggested defences of estoppel, acquiescence and waiver.

D

**241**  I would allow this appeal and restore the order of Judge Maddocks.

E

*Douglas v Hello! Ltd*

**242**  In the third appeal the dispute is between two magazines, "OK!" and "Hello!".  "OK!" and "Hello!" are keen rivals in the celebrity magazine market.  On 18 November 2000 Mr Michael Douglas and Miss Catherine Zeta-Jones, well known film stars, were married at the Plaza Hotel, New York.  The Douglases exercised tight control over their wedding photographs.  They took steps to ensure no one was present except for 350 invited guests, authorised photographers, authorised hotel staff, security personnel and the like.  They also made arrangements to see that, apart from the authorised photographers, nobody took any photographs.  Despite the enormous media interest, this was, as the judge put it, a private wedding.

F

G

**243**  In order to satisfy the media demand for photographs and reduce the risk of unauthorised and intrusive photographs the Douglases entered into an agreement with "OK!" on 10 November 2000.  In outline the agreement provided that the Douglases transferred to "OK!" the world wide exclusive right to publish, and authorise others to publish, wedding photographs approved by the Douglases.  In return "OK!" paid the Douglases £1m.  The Douglases were to hire photographers, and do their best to ensure no other photographers or media had access to the wedding and that no guests or anyone else took photographs.  Any rights not specifically granted to "OK!" were reserved to the Douglases.

H

A  **244**  So this was a private wedding, subject to this: many photographs, approved by the Douglases, were to be made publicly available at once.

**245**  The best laid plans can go astray.  A photographer called Rupert Thorpe somehow, by deceit or subterfuge, infiltrated the wedding and the reception.  Surreptitiously he took some indifferent photographs.  Early the next day these photographs were offered on the market and sent electronically to "Hello!'s" picture editor Ms Neal in London.  They were

B  then sent on from London to Madrid for Señor Sanchez Junco, "Hello!'s" editor-in-chief, to decide whether to buy them.  The upshot was that "Hello!" agreed to pay £125,000 for the exclusive right to publish six photographs in the United Kingdom, France and Spain.

**246**  "Hello!" then prepared the photographs and accompanying text for publication in issue 639.  On Monday, 20 November the Douglases

C  obtained an ex parte injunction restraining publication.  This was discharged by the Court of Appeal on Thursday, 23 November.  Edition 639 of "Hello!" containing the six unauthorised photographs went on sale on the following day, Friday, 24 November, on the same day as issue 241 of "OK!" which included "OK!'s" coverage of the wedding.  "OK!" had hurriedly brought forward this publication.  "Hello!'s" sales figures for issue 639,

D  about 523,000, were some 150,000 above average.

*The proceedings*

**247**  In the proceedings the Douglases and Northern and Shell plc, the publisher of "OK!", claimed damages for breach of confidence.  "OK!" also claimed damages for interference with its business by unlawful means.

E  **248**  In a comprehensive judgment Lindsay J held that "Hello!" did not, by its publication of the unauthorised pictures, commit the tort of inducing a breach of contract.  The Douglases did not break their contract.  They fulfilled their contractual obligation to do the best they could to exclude the media and the public from the wedding.  Nor did "Hello!" commit the tort of interfering with "OK!'s" business by unlawful means.  "Hello!" did not intend to injure "OK!".  But "Hello!" was liable to the Douglases and "OK!"

F  for breach of confidence [2003] All ER 996.  In a supplemental judgment the judge [2004] EMLR 2 awarded damages of £1,047,756, divisible as to £14,600 to the Douglases and the balance to "OK!".

**249**  The Court of Appeal, comprising Lord Phillips of Worth Matravers MR, and Clarke and Neuberger LJJ, upheld the judge's decision on the Douglases' breach of confidence claim and on "OK!'s" claims based on economic torts.  The court [2006] QB 125 reversed the judge's decision

G  on "OK!'s" breach of confidence claim.  The overall outcome was that the Douglases' breach of confidence claim succeeded but "OK!'s" claims wholly failed.

**250**  "OK!" appealed to your Lordships' House.  "Hello!" did not appeal against the decision in favour of the Douglases.

H  *Misuse of private information*

**251**  Photographs are much the best way of conveying an impression of how everybody looked at a wedding.  Photographs make one a spectator at the wedding.  Information communicated in other ways, in sketches or descriptive writing or by word of mouth, cannot be so complete or accurate.

72
OBG Ltd v Allan (HL(E))                                                    [2008] 1 AC
Lord Nicholls of Birkenhead

The Douglases and "OK!" claim that, save to the extent "OK!" published    A
authorised photographs, photographic information about their wedding
was private. Publication of this information without the Douglases'
approval was misuse of this information.

252  Mr and Mrs Douglas sought to keep this information private
primarily to protect their "image". Film directors take into account
the public perception of actors and actresses when casting for films.    B
Miss Zeta-Jones said the "hard reality of the film industry is that preserving
my image, particularly as a woman, is vital to my career". Mr Douglas said
his name and likeness are valuable assets to him. It is important for him, for
professional reasons, to protect his name and likeness and prevent
unauthorised use of either.

253  Given the understandable importance to Mr and Mrs Douglas of    C
their public image, it is necessary first to mention and put on one side
certain points in this regard. The identity of this couple made their
wedding an eminently newsworthy event. By publishing pictures of the
wedding "Hello!" was exploiting that fact. In principle that was
unexceptionable. Publication of wedding photographs in "Hello!" was not,
*of itself,* improper exploitation of the reputation, name or likeness of the
Douglases such as may be protected in some circumstances in the United    D
States of America: see *Corpus Juris Secundum*, vol 77, pp 591–592,
para 51. Nor did "Hello!'s" publication of pictures of this event constitute
"character merchandising" or, still less, a case of "false endorsement" as
discussed by Laddie J in *Irvine v Talksport Ltd* [2001] 1 WLR 2355. Thus
it is unnecessary to consider how far English law has developed, or should
develop, in these fields.    E

254  Nor is it necessary to consider further the legal foundation for the
Douglases' claim. This is not an issue on this appeal. Your Lordships are
concerned only with "OK!'s" claim. "OK!'s" claim is based solely on breach
of confidence.

*Confidential information*    F

255  As the law has developed breach of confidence, or misuse of
confidential information, now covers two distinct causes of action,
protecting two different interests: privacy, and secret ("confidential")
information. It is important to keep these two distinct. In some instances
information may qualify for protection both on grounds of privacy and
confidentiality. In other instances information may be in the public domain,
and not qualify for protection as confidential, and yet qualify for protection    G
on the grounds of privacy. Privacy can be invaded by further publication of
information or photographs already disclosed to the public. Conversely, and
obviously, a trade secret may be protected as confidential information even
though no question of personal privacy is involved. This distinction was
recognised by the Law Commission in its report on Breach of Confidence
(1981) (Cmnd 8388), pp 5–6.    H

256  "OK!'s" claim is that "Hello!" committed a breach of confidence by
publishing a confidential secret. "OK!'s" interest was wholly commercial, in
maximising the financial advantage flowing from having an exclusive right
to publish the authorised pictures. Accordingly, as my noble and learned

[2008] 1 AC                                          OBG Ltd v Allan (HL(E))
                                              Lord Nicholls of Birkenhead

A  friend, Lord Walker of Gestingthorpe, says, "OK!'s" claim has to be based
on a right to short-term confidentiality for a commercial secret.

257   So the first step is to identify the "secret". The secret information
cannot lie in the differences between the unapproved photographs and the
approved photographs. The secret cannot lie there, because the six
unapproved photographs contained nothing not included in the approved

B  photographs. That is common ground. This being so, the inevitable
differences, in expression and posture and so on, cannot constitute
"confidential" information for the purposes of this equitable principle. The
expression of the bride in one wedding photograph compared with her
expression in another is insufficiently significant to call for legal protection.
It has not been suggested that the unapproved photographs were
embarrassing in any way, or that they were detrimental to the Douglases'

C  image. Accordingly, once the approved pictures were published, albeit
simultaneously, publication of the unapproved pictures was not a breach of
confidence.

258   "OK!" sought to avoid this difficulty by defining the commercial
secret in wider terms. The secret comprised photographic information
about the entire wedding as an event, and not just the particular wedding

D  photographs "OK!" was permitted to publish. Publication of the approved
photographs did not destroy the confidentiality of the remainder of the
information.

259   Let me assume, without deciding, that this generic class of
information was confidential at the outset. Even so, this formulation of the
commercial secret leads nowhere, for the same reason as applies to the

E  narrower formulation of the secret: the unapproved pictures contained
nothing not included in the approved pictures, and the approved
photographs were published at much the same time as the unapproved
photographs.

260   For these reasons I am unable to accept "OK!'s" claim based on
confidentiality.

F  *Unlawful interference with business*

261   I turn finally to "OK!'s" claim based on the tort of intentionally
causing loss by unlawful means. This is a "two party" situation. There is no
question of Hello! injuring "OK!" through an intermediary. Thus the first
question is whether the harm caused to "OK!" by "Hello!'s" publication of
the unapproved photographs was effected by unlawful means. In my view

G  this claim fails at this point. I have rejected "OK!'s" claim based on breach
of confidence. The only other conduct which may constitute unlawful
means is Rupert Thorpe's trespass at the wedding. But he was not "Hello's"
agent. The background was that "Hello!'s" bid of £1m for the exclusive
right to the wedding photographs was rejected by the Douglases.
Thereafter, before the wedding, "Hello!" indicated to paparazzi that it
would pay well for photographs. "Hello!" knew the reputation of the

H  paparazzi for being able to intrude. By its actions "Hello!" was encouraging
the paparazzi to do just that. The six photographs themselves plainly
indicated they were taken covertly. "Yet", the judge said, "these defendants
firmly kept their eyes shut lest they might see what they undeniably knew

74

OBG Ltd v Allan (HL(E))                                                [2008] 1 AC
Lord Nicholls of Birkenhead

would have become apparent to them." Even so, I do not see how "Hello!"    A
can be held liable for the photographer's trespass.

262   This being so, "OK!'s" case does not get off the ground. "Hello!"
did not use unlawful means. I would dismiss this appeal.

## LORD WALKER OF GESTINGTHORPE

*The economic torts*                                                       B

263   My Lords, I have had the privilege of reading in draft the opinions
of my noble and learned friends, Lord Nicholls of Birkenhead and Lord
Hoffmann, both of which cast welcome light on the obscurities of the
so-called economic torts. In relation to these torts there is (as I see it) a large
measure of agreement between my noble and learned friends, though with
some differences in emphasis, and some more substantial differences.          C

264   Both my noble and learned friends agree that the "unified theory"
of the economic torts, attractive though it is, must be rejected. The tort of
intentionally inducing a breach of contract is essentially different from
inflicting harm by unlawful means, although in some factual situations they
may overlap. The majority decision of the Court of Appeal in *Millar v
Bassey* [1994] EMLR 44 was mistaken. The decision of this House in         D
*Merkur Island Shipping Corpn v Laughton* [1983] 2 AC 570 should not be
followed, so far as it holds that inducing an actual breach of contract is not a
necessary ingredient of the *Lumley v Gye* tort. On these points Lord
Nicholls and Lord Hoffmann are at one, and I respectfully concur in their
reasoning and conclusions.

265   I must however set out briefly my views on those points on the
economic torts on which my noble and learned friends seem to differ; and on    E
the tort of conversion, on which they certainly differ. I must also set out the
reasons why, in respectful disagreement with the majority, I would for my
part dismiss the appeal in *Douglas v Hello! Ltd*.

266   On the economic torts, the most important difference is in the
identification of the control mechanism needed in order to stop the notion
of unlawful means getting out of hand—for example, a pizza delivery business
which obtains more business, to the detriment of its competitors, because its     F
drivers regularly exceed the speed limit and jump red lights. Lord Hoffmann
sees the rationale of the unlawful means tort as encapsulated in Lord
Lindley's reference (in *Quinn v Leatham* [1901] AC 495, 534) to interference
with "a person's liberty or right to deal with others." In his view acts against
a third party count as unlawful means only if they are (or would be if they
caused loss) actionable at the suit of the third party.                          G

267   Lord Hoffmann does not question the correctness of the decisions
of the Court of Appeal in *RCA Corpn v Pollard* [1983] Ch 135 or of
Jacob J in *Isaac Oren v Red Box Toy Factory Ltd* [1999] FSR 785, which
show that a bootlegger's activities, although actionable by the owner of the
intellectual property rights in question, are not actionable (by statute or at
common law) by a contractual licensee entitled to exploit those rights, even    H
if the licensee's profits are demonstrably reduced by the unlawful activities.
As Oliver LJ said in *RCA Corpn v Pollard* [1983] Ch 135, 153,

> "the defendant's conduct involves no interference with the contractual
> relationships of the plaintiffs but merely potentially reduces the profits

A which they make as the result of the performance by Mr Presley's executors of their contractual obligations."

268 Lord Nicholls also accepts the correctness of *Isaac Oren v Red Box Toy Factory Ltd* (and also, I infer, the correctness of *RCA Corpn v Pollard*). He proposes a wider test of unlawful means relying on the notion of instrumentality as the appropriate control mechanism.

B 269 Faced with these alternative views I am naturally hesitant. I would respectfully suggest that neither is likely to be the last word on this difficult and important area of the law. The test of instrumentality does not fit happily with cases like *RCA Corpn v Pollard,* since there is no doubt that the bootlegger's acts were the direct cause of the plaintiff's economic loss. The control mechanism must be found, it seems to me, in the nature of the disruption caused, as between the third party and the claimant, by the

C defendant's wrong (and not in the closeness of the causal connection between the defendant's wrong and the claimant's loss).

270 I do not, for my part, see Lord Hoffmann's proposed test as a narrow or rigid one. On the contrary, that test (set out in para 51 of his opinion) of whether the defendant's wrong interferes with the freedom of a third party to deal with the claimant, if taken out of context, might be

D regarded as so flexible as to be of limited utility. But in practice it does not lack context. The authorities demonstrate its application in relation to a wide variety of economic relationships. I would favour a fairly cautious incremental approach to its extension to any category not found in the existing authorities.

E *Conversion*

271 Lord Nicholls makes a powerful case for extending the tort of conversion so as to cover the appropriation of choses in action. But in my opinion his proposals would involve too drastic a reshaping of this area of the law of tort. The reshaping would be inconsistent with the basis on which Parliament enacted the Torts (Interference with Goods) Act 1977, after long consideration by the Law Revision Committee. It would have far-reaching

F consequences which this House is not in a position to explore or assess fully. This is an area in which reform must come from Parliament, after further consideration by the Law Commission. In any case the confused facts of the *OBG* appeal (in which the liquidators eventually concurred in the settlement with NWW) makes it a singularly unsuitable case for a major change in the law.

G *Privacy and confidence: introduction*

272 I now turn to breach of confidence. This House has quite recently reaffirmed that English law knows no common law tort of invasion of privacy: *Wainwright v Home Office* [2004] 2 AC 406. But the law of confidentiality has been, and is being developed in such a way as to protect private information. The process of development is referred to in the speech

H of my noble and learned friend, Lord Hoffmann, in *Wainwright v Home Office* [2004] 2 AC 406, paras 28–30 and in all the speeches in *Campbell v MGN Ltd* [2004] 2 AC 457 (Lord Nicholls of Birkenhead at paras 11–22, Lord Hoffmann at paras 43–52, Lord Hope of Craighead at paras 85–86 and 105–113, Baroness Hale of Richmond at paras 132–141 and Lord

Carswell at paras 166–167). The most important single step in the course of    A
the law's recent development has been the speech of Lord Goff of Chieveley
in *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109,
280 (his speech was not in terms concurred in by the other members of the
appellate committee but Lord Goff's exposition of the law has commanded
general acceptance). In an important passage, at pp 281–282, Lord Goff
stated a broad general principle of confidence subject to three limiting        B
principles: (1) "the principle of confidentiality only applies to information
to the extent that it is confidential"; (2) it "applies neither to useless
information, nor to trivia"; and (3) the public interest protecting confidence
"may be outweighed by some other countervailing public interest which
favours disclosure". (It was on the application of this third principle to a
borderline factual situation that this House was divided in *Campbell v
MGN Ltd.*)                                                                      C

273    The first issue in this appeal raises questions as to whether and how
far the law of confidence should be developed further. The most important
of these questions, to my mind, are (i) whether claimants can simultaneously
assert rights of confidence for the protection of both personal privacy and
short-term commercial secrecy (until profitable publication in the mass
media of an "exclusive" which waives personal privacy on a selective basis);    D
and (ii) what special rules apply to the publication of photographs of
individual claimants.

274    It is unnecessary, by way of introduction, to go again over the
ground covered in *Wainwright v Home Office* and *Campbell v MGN Ltd*.
But it is perhaps worth noting that there is not a complete jurisprudential
void between *Prince Albert v Strange* (1849) 2 De G & Sm 652 and the cases
which can be seen as the beginning of the modern line of authority (*Duchess    E
of Argyll v Duke of Argyll* [1967] Ch 302, *Coco v AN Clark (Engineers) Ltd*
[1969] RPC 41 and *Fraser v Evans* [1969] 1 QB 349). The cases cited in the
three last-mentioned decisions show a continuous, if hardly abundant,
stream of authority. *Philip v Pennell* [1907] 2 Ch 577 is of some interest as it
shows the court addressing the distinction between intellectual property
rights in the form of a communication and confidentiality in its substance. It
was concerned with letters written by James M'Neill Whistler (who had died   F
in 1903). The letters were lawfully in the hands of two authors who had
been commissioned to write a biography of Whistler, but his executrix
applied for an injunction to restrain both publication of the letters and
dissemination of information contained in them. The judgment of
Kekewich J harked back to the great controversy as to whether at common
law there was any copyright in published works: see *Millar v Taylor* (1769)    G
4 Burr 2303, which, with its background and sequels, is well described in
*Laddie, Prescott and Vitoria, The Modern Law of Copyright and Designs*,
3rd ed (2000) paras 3.2–3.7. Kekewich J rightly distinguished between
property in the letters as tangible property; copyright in the linguistic
contents of the letters as literary compositions; and the more debatable right
to restrain misuse of confidential information contained in the letters. On
the last point he remarked, at p 587: "It cannot be said that the confidence   H
runs with the letters."

275    That observation still holds good in that information, even if it
is confidential, cannot properly be regarded as a form of property. Its
practical significance has been overtaken by *Attorney General v Guardian*

A    *Newspapers Ltd (No 2)* [1990] 1 AC 109. Kekewich J's judgment is also of interest as an early recognition, or at least a hint, that a celebrity's private life may be a saleable commodity, at p 589:

"It is a recognised duty of every man, and more especially of a successful man in any profession, to make his life and experience useful to others, and it would be inconsistent with this to hold that a writer of
B    letters must be presumed to have intended that those letters should not be used at some time or other, on a proper occasion and in a proper manner, towards that end."

This may be compared with Sedley LJ's view (expressed in the present case when the Court of Appeal gave its reasons for discharging the injunction
C    [2001] QB 967, para 140) that Mr Douglas and his bride "had sold most of the privacy which they now seek to protect to ['OK!'] for a handsome sum". I start with some sympathy for what I take to be Sedley LJ's instinctive feeling that it is not obvious why a claimant should be able to invoke the law's protection for the confidentiality of his or her private life (this claim being based on the high principle of respect for human autonomy and dignity) and also to invoke its protection for the commercial confidentiality of the same or similar material, as a trade secret, until it is to be disclosed for
D    profit at a time of his or her own choosing.

   276   In order to investigate that problem it is necessary to enquire more closely into what is happening, in legal terms, when a court makes an order for the protection of confidential information. If the person disclosing the information is in contractual relations with the claimant, the most natural claim will be for breach of an express or implied term in the contract. That
E    was the basis for the decision in *Pollard v Photographic Co* (1888) 40 Ch D 345 (the case of the commercial photographer who was commissioned to take photographs of the Pollard family, and started selling prints of Mrs Pollard as a Christmas card). Where there is no contractual tie the cause of action is the equitable jurisdiction to restrain (or if it cannot be restrained, to award compensation or an account of profits for) breach of confidence. This jurisdiction does not depend on treating confidential information as
F    property, although it is often referred to, loosely or metaphorically, in those terms. Professor Finn has written in *Fiduciary Obligations* (1977), para 293: "Perhaps the most sterile of the debates which have arisen around the subject of information received in confidence is whether or not such information should be classified as property." There is also a valuable discussion of the whole topic in *Toulson & Phipps, Confidentiality* (1996),
G    paras 2-12 to 2-18.

   277   Before your Lordships, Mr Millett (for the appellant "OK!") strongly disclaimed any reliance on confidential information as property, referring to the speech of Lord Upjohn in *Phipps v Boardman* [1967] 2 AC 46, 127–128, as well as to *Toulson & Phipps*. He did so advisedly, since although clause 2 of the contract between the Douglases and "OK!" was expressed as a transfer of exclusive rights to publish (and licence
H    republication of) approved photographs, that way of putting his case (if otherwise sound) would not catch the publication of different, pirated photographs. Mr Millett relied instead on pictorial information about the wedding as an abstract, generic concept in which the Douglases enjoyed rights of confidentiality, and in which "OK!" became entitled, by contract

rather than by assignment, to concurrent rights of confidentiality. This approach was noted (but not accepted) by the Court of Appeal in this case [2006] QB 125, para 138:

> "If we are wrong in our conclusions that OK! had no right of commercial confidence in the information portrayed by Hello!'s photographs, this can only be on the basis that the photographs published by Hello! fell within the generic class of commercially confidential information to which OK! were party and which OK! were entitled to protect."

278   The authorised photographs taken at the wedding (and later selected and approved by Mr and Mrs Douglas) gave a lot of information, so far as still photographs could, about the event: what the bride wore, how she and the groom conducted themselves towards each other, what the wedding cake looked like, and so on.  The unauthorised photographs disclosed the same sort of information (aptly summed up by Sedley LJ [2001] QB 967, para 138, as "the simple information: 'This is what the wedding and the happy couple looked like'").  They disclosed it in a different and by most standards obviously inferior manner (though the informality of the unposed and sometimes unfocused images has a certain appeal).  Mr and Mrs Douglas would have been most unlikely to have selected any of the unauthorised pictures for publication, but it has not been suggested that they disclosed anything embarrassing (such as a fleeting moment of disharmony between the happy couple).  The information which they impart is, on the way Mr Millett put his case, essentially the same, and entitled to protection as confidential information.

*The judgments below*

279   There are four sets of reported judgments in the case: the reasons of the Court of Appeal (Brooke, Sedley and Keene LJJ) [2001] QB 967, given on 21 December 2000, for lifting the injunction by its order of 23 November 2000; the judgment of Lindsay J on liability given on 11 April 2003 and reported as *Douglas v Hello! Ltd (No 3)* [2003] 3 All ER 996; the judgment of Lindsay J on quantum, given on 31 July 2003 and reported as *Douglas v Hello! Ltd (No 6)* [2004] EMLR 13; and the judgment of the Court of Appeal (Lord Phillips of Worth Matravers MR, Clarke and Neuberger LJJ) now under appeal, given on 18 May 2005 and reported as *Douglas v Hello! Ltd (No 3)* [2006] QB 125.  I need not comment on Lindsay J's judgment on quantum, but the other judgments call for mention.

280   The first decision of the Court of Appeal was interlocutory in nature and (as Brooke LJ noted in para 62 of his judgment) it was reached after oral submissions prepared and made under severe time constraints.  It is therefore not surprising that this Court of Appeal decision concentrated on the alleged invasion of the privacy of the individual claimants as the claim for which an award of damages was least likely to be an adequate remedy.  Nevertheless all three members of the court noted that the wedding was not an ordinary private occasion.  Brooke LJ stated, at para 95:

> "So far as privacy is concerned, the case of the first and second claimants is not a particularly strong one.  They did not choose to have a private wedding, attended by a few members of their family and a few

A    friends, in the normal sense of the words 'private wedding'.  There is
     nothing in the court's papers to belie the suggestion, at p 88 of the
     disputed issue 639 of 'Hello!' that they invited 250 guests, and the
     trappings of privacy in this context are identical with the trappings of
     confidentiality to which I have alluded earlier in this judgment."

     I have already set out what Sedley LJ said, at para 140 (he developed the
B    point in paras 141 and 142).  Keene LJ observed, at para 169:

         "In the present case, it is of considerable relevance that very
         widespread publicity was to be given in any event to the wedding very
         soon afterwards by way of photographs in 'OK!' magazine.  The occasion
         thereby lost much of its private nature.  The claimants were by their
         security measures and by their agreements with the service companies
C        seeking not so much to protect the privacy of the first two claimants but
         rather to control the form of publicity which ensued."

     281    Lindsay J [2003] 3 All ER 996 made a thorough survey of the
     developing law of confidentiality.  He noted, at para 186, the effect of the
     Human Rights Act 1998 and referred to Council of Europe Resolution 1165
     of 1998, para 6 quoted by the Court of Appeal in *A v B plc* [2003] QB 195,
D    para 11(xii) that, "people's private lives have become a highly lucrative
     commodity for certain sectors of the media.  The victims are essentially
     public figures, since details of their private lives serve as a stimulus to sales."
     Lindsay J went on to hold, at paras 196 and 197:

         "that the claimants had here a valuable trade asset, a commodity the
         value of which depended, in part at least, upon its content at first being
E        kept secret and then of its being made public in ways controlled by
         Miss Zeta-Jones and Mr Douglas for the benefit of them and of the third
         claimant.  I quite see that such an approach may lead to a distinction
         between the circumstances in which equity affords protection to those
         who seek to manage their publicity as part of their trade or profession and
         whose private life is a valuable commodity and those whose is not but
F        I am untroubled by that; the law which protects individual confidences
         and a law of privacy may protect the latter class and provide no reason to
         diminish protection for the former.  So far as concerns 'OK!', the right to
         exclusivity of photographic coverage of the wedding was, in contrast with
         the nature of the confidence as to the first and second claimants, even
         more plainly a right in the nature of a trade secret.  I thus regard
         photographic representation of the wedding reception as having had the
G        quality of confidence about it.  Of course, the general appearance of both
         Mr Douglas and Miss Zeta-Jones was no secret; what they looked like
         was well known to the public.  But that does not deny the quality of
         commercial confidentiality to what they looked like on the exceptional
         occasion of their wedding."

     The judge did not to my mind fully explain why he was not troubled by the
H    thought that the persons whom the Council of Europe termed "the victims"
     were themselves cashing in their "valuable trade asset" in a manner and at a
     time of their own choosing.
     282    The Court of Appeal dealt with this part of the case in a judgment
     of the court [2006] QB 125, paras 122–137.  It observed, at para 128, that

Lindsay J treated information about the wedding "rather as if it were property" when he referred to its being shared between co-owners. Whether or not there is force in that observation (it is in practice quite difficult to address the subject of confidential information without slipping into metaphorical language literally appropriate only to property rights) it is clear that that is not how "OK!'s" case is now put. In fact much of Mr Millett's criticism of the Court of Appeal was for having fallen into precisely the same error—treating confidential information as an item of property—as that for which the Court of Appeal had criticised the judge.

**283**   The heart of the Court of Appeal's reasoning on this part of the case is in para 136:

> "On analysis, OK!'s complaint is not that Hello! published images which they had been given the exclusive right to publish, but that Hello! published other images, which no one with knowledge of their confidentiality had any right to publish. The claimants themselves argued that 'the unauthorised photographs were taken at different moments to the authorised ones, showed different and informal incidents at the reception, and were naturally much less posed.' These photographs invaded the area of privacy which the Douglases had chosen to retain. It was the Douglases, not OK!, who had the right to protect this area of privacy or confidentiality. Clause 10 of the OK! contract expressly provided that any rights not expressly granted to OK! were retained by the Douglases."

Whereas the judge saw the arrangement as a sharing of confidentiality in photographic information about the wedding, the Court of Appeal analysed it as the retention (by Mr and Mrs Douglas alone) of part of that information (that is, all except the information in the authorised photographs published by OK!).

### The scope of breach of confidence

**284**   Expressed in these terms, both competing submissions seem to me to be on the way to becoming so abstract as to risk losing touch with reality. Reality was, if I may respectfully say so, restored when on the third day of the hearing my noble and learned friend, Lord Nicholls of Birkenhead observed, "It is not the same, is it, because obviously a picture of the bride looking nice is different from a picture of the bride caught at an unfortunate moment". The Douglases were content to have wedding photos published, for a handsome fee, so long as they had strict control over the selection of the pictures. This was reflected in the evidence of Miss Zeta-Jones herself, quoted by Lindsay J [2003] 3 All ER 996, para 195:

> "Both Michael and I are in the business of 'name and likeness.' Any photographs of us that are published are important to us, not just personally but professionally as well. People go to see movies specifically because either Michael or I are in them and they have expectations, among other things, of the way we will look. Those expectations are created to a significant degree by the images they see of us in the media. Directors take into account the public's perception of actors and actresses when casting for films. The hard reality of the film industry is that preserving my image, particularly as a woman, is vital to my career."

A      **285**   In short, the confidentiality which the Douglases claimed, and which OK! also claims, is of a specialised commercial character, far removed from the sort of intrusion on the privacy of a seriously ill patient which the Court of Appeal considered (but felt unable to remedy) in *Kaye v Robertson* [1991] FSR 62. Their claims come close to claims to a "character right" protecting a celebrity's name and image such as has consistently been rejected in English law: see *Elvis Presley Trademarks* [1999] RPC 567, 580–582, 597–598, and also Brooke LJ in the interlocutory appeal in this case [2001] QB 967, paras 74 and 75. The present limits of the law of passing off as a protection of a celebrity complaining of "false endorsement" were thoroughly reviewed by Laddie J in *Irvine v Talksport Ltd* [2002] 1 WLR 2355.

**286**   Both Lindsay J and the Court of Appeal referred to the decision of the High Court of Australia in *Australian Broadcasting Corpn v Lenah Game Meats Pty Ltd* (2001) 208 CLR 199, a case concerned with the public interest defence to unauthorised and clandestine filming in an abattoir. Your Lordships were not referred to the earlier case in the High Court, discussed in the *Australian Broadcasting Corpn* case, of *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* (1937) 58 CLR 479. In that case the defendant built a platform on his land, which bordered the plaintiff's racecourse, and allowed race commentaries to be broadcast from it. The plaintiff failed in a claim for an injunction. The claim was put primarily in the law of nuisance, but confidence and copyright (in the board displaying the numbers of starters and winners) was also relied on. Latham CJ said, at pp 496–497:

"I find difficulty in attaching any precise meaning to the phrase 'property in a spectacle.' A 'spectacle' cannot be 'owned' in any ordinary sense of that word. Even if there were any legal principle which prevented one person from gaining an advantage for himself or causing damage to another by describing a spectacle produced by that other person, the rights of the latter person could be described as property only in an metaphorical sense. Any appropriateness in the metaphor would depend upon the existence of the legal principle. The principle cannot itself be based upon such a metaphor."

**287**   In this case the claimants did not claim any quasi-proprietorial rights in the spectacle of the wedding. They claimed non-proprietorial rights of confidence in wedding photographs as a generic class, regardless of who owned the copyright in those photographs. English law has (especially in the decision of this House in *Campbell v MGN Ltd* [2004] 2 AC 457) recognised that there may be something special about photographs, but I think that it is necessary to see how far this approach has gone.

**288**   In *Campbell* some of your Lordships mentioned the familiar saying that "a picture is worth a thousand words." My noble and learned friend, Lord Hoffmann, was rather less enthusiastic about the saying, observing, at para 72:

"In my opinion a photograph is in principle information no different from any other information. It *may* be a more vivid form of information than the written word ('a picture is worth a thousand words')." (Emphasis supplied.)

Photographs are in a special position in that if a photograph is a blatant and obviously unjustifiable invasion of personal privacy, its publication by the perpetrator will not give him a "public domain" defence for further publication: see the Court of Appeal's judgment [2006] QB 125, paras 84–90, citing *Theakston v MGN Ltd* [2002] EMLR 398, para 78 (Ouseley J) and *D v L* [2004] EMLR 1, para 23 (Waller LJ). Photographs are also regarded (despite the ample opportunities for manipulation which modern technology affords) as providing powerful corroboration of written reports of conduct which the person photographed might wish to deny. But this is not that sort of case. The world was not in doubt that the Douglases did get married at the Plaza Hotel in New York on 18 November 2000; and the photographs published by "Hello!" may have been un-posed and un-focused, but none of them was even faintly embarrassing.

289    Your Lordships were referred to two interlocutory decisions at first instance in which injunctions were granted to restrain publication of unauthorised photographs of scenes which were claimed to be entitled to commercial confidentiality. In *Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134, a photographer had found his way onto a film set where "Mary Shelley's Frankenstein" was being filmed. It was a high-budget film with several big stars. There was a conflict of evidence as to whether the photographer evaded security guards and ignored notices forbidding photography. The claim was put primarily as a breach of copyright in costumes and prosthetic features (especially those of Robert de Niro, the "sharp featured man" who was to be hanged and brought back to life by Frankenstein). The judge accepted that there was an arguable case on copyright infringement but also considered breach of confidence, and found that the claimant had an arguable case there also. He seems to have accepted counsel's submission that there was a legitimate interest in the confidentiality of making this film of Mary Shelley's gothic tale, especially, at p 139:

    "that Robert de Niro's appearance, mainly as 'the creature' but also as 'the sharp featured man' should be kept secret so as to maintain the interest of the public in one of the essential elements of the film, namely, the appearance of Dr Frankenstein's creation."

That was, in the context of a serious film with a $40m budget, not a trivial matter.

290    The other case is *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444, in which a photographer had taken pictures (again, with a conflict of evidence as to the circumstances) of a photo shoot for a poster for a forthcoming Oasis album. The poster was to show a white Rolls Royce apparently emerging from a swimming pool, with the members of the group and various other unrelated objects also in the picture. The most striking feature of the case, to my mind, is the lengths to which the record company's counsel went in seeking to establish an arguable case as to the infringement of some recognised intellectual property right. He argued that the Rolls Royce, the group members and the other objects were (i) a dramatic work or (ii) a sculpture or (iii) a collage or (iv) a work of artistic craftsmanship. So the barrel of intellectual property rights was thoroughly scraped before the judge came to the claim for breach of confidence, which he regarded as arguable. Lloyd J said, at pp 454–455,

A    "Mr Garnett argues that, despite all of that, no arguable case is made out for breach of confidence, or indeed for the existence of confidentiality, and says correctly that merely because a well-known person tries to stop people taking photographs of him or her it does not follow that any picture taken in evasion or defiance of those attempts is in breach of confidentiality. That seems to me to be a perfectly sound proposition but very far from this case."

B    Lloyd J went on to stress the evidence as to restrictions on intrusion.

291   In the Oasis case the defendants seem not to have relied on Lord Goff's second limiting principle (in *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109, 282), that the law of confidence does not protect trivia. Photographs of a white Rolls Royce in a swimming pool may be thought to be a fairly trivial trade secret. The argument that
C    information is trivial or anodyne carries much less weight in a case concerned with facts about an individual's private life which he or she reasonably expects to be kept confidential: *McKennitt v Ash* [2006] EMLR 178, para 58 (Eady J).

*Conclusions on breach of confidence*

D    292   In *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109 the law took an important step forward with the holding that an actual, deliberate confiding of private information is not necessary to establishing a cause of action for breach of confidence. But there would be some danger of that principled and progressive step turning into an uncontrolled and unprincipled explosion if we were to disregard Lord Goff's
E    three limiting factors, of which the first ("the principle of confidentiality only applies to information to the extent that it is confidential") and the second ("it applies neither to useless information, nor to trivia") are potentially relevant to this appeal. Uncontrolled growth of the law of confidence would also tend to bring incoherence into the law of intellectual property.

293   Although the position is different in other jurisdictions, under English law it is not possible for a celebrity to claim a monopoly in his or her
F    image, as if it were a trademark or brand. Nor can anyone (whether celebrity or nonentity) complain simply of being photographed. There must be something more: either that the photographs are genuinely embarrassing (*Theakston v MGN Ltd* [2002] EMLR 398) or that their publication involves a misuse of official powers (*Hellewell v Chief Constable of Derbyshire* [1995] 1 WLR 804) or that they disclose something which merits
G    temporary protection as a commercial secret (*Shelley Films Ltd v Rex Features Ltd* [1994] EMLR 134, in which a photograph of Robert De Niro in the guise of Frankenstein's creature would no doubt have been worth a thousand words of description).

294   There was nothing embarrassing or offensive about the "Hello!" photographs of the wedding, apart from the fact that Mr and Mrs Douglas did not want them to be taken, and indeed were contractually bound to do
H    their best to see that they were not taken. The fact that stringent security arrangements were in place cannot by itself invest the wedding reception with the quality of confidentiality, if it did not otherwise attract it: see the observations of Lloyd J in *Creation Records Ltd v News Group Newspapers Ltd* [1997] EMLR 444, 454–455, which I have already quoted.

295   There is no cross-appeal by "Hello!" against the Court of Appeal's   A
dismissal of its appeal challenging the judge's award to the individual
claimants, Mr and Mrs Douglas.  That issue is not therefore before your
Lordships, and I should not be taken as expressing the view that the judge
and the Court of Appeal were wrong about the modest awards of damages
made in their favour.  Mr and Mrs Douglas had both a personal and a
commercial interest in the matter, even if the two sat uneasily together.  But   B
the interest of "OK!" was wholly commercial, and its case on breach of
confidence must stand or fall on the ground of a right to short-term
confidentiality for a trade secret.

296   In *Gilbert v Star Newspaper Co Ltd* (1894) 11 TLR 4, W S Gilbert
obtained protection for the plot of his forthcoming comic opera, but only
until its first night, and in the *Shelley Films* case [1994] EMLR 134 it was   C
recognised that the injunction could not continue after the film was released.
In this case [1994] EMLR 134, by contrast, the wedding was over before any
photographs were published, and the "Hello!" photographs and the first
batch of "OK!" photographs were published almost simultaneously.  "OK!"
had no intellectual property rights in the "Hello!" photographs, or in the
"spectacle" of the wedding (compare the Australian *Victoria Park* case
58 CLR 479 and the risible arguments advanced in *Creation Records Ltd v   D
News Group Newspapers Ltd*).  The appellant's reliance on a generic class
of photographic information about the wedding is ingenious, but I share the
view of the Court of Appeal that it is unsound.   "OK!" no more had a
monopoly in any possible photograph of the spectacle than it had in the
spectacle itself, or in any other event of which it hoped to carry exclusive
coverage.

297   I have already noted that neither Lord Nicholls nor Lord Hoffmann   E
regards *RCA Corpn v Pollard* [1983] Ch 135 and *Isaac Oren v Red Box Toy
Factory Ltd* [1999] FSR 785 (both unsuccessful claims by exclusive
licensees) as having been wrongly decided.  It would in my opinion be
anomalous if the principle in *RCA Corpn v Pollard* and *Isaac Oren v Red
Box Toy Factory Ltd* were limited to exclusive licences of copyright or other
intellectual property rights protected by an exhaustive statutory code, and
were not applied to the analogous case of "OK!'s" exclusive contractual   F
licence in respect of what might loosely be called quasi-copyright (not
protected by statute).  In respectful disagreement with Lord Hoffmann
I think it would go some way to creating an unorthodox and exorbitant form
of intellectual property.

298   My Lords, my respectful dissent from the views of the majority
arises not from any distaste for the modern celebrity world but from my   G
perception (shared, no doubt, by all of us) of the need for consistent and
rational development of the law of confidentiality.  My initial inclination
was to conclude that "Hello!" was liable to pay damages to "OK!" under
the "unlawful means" tort.  But in my opinion it would be impossible to
reach that conclusion without either overturning *RCA Corpn v Pollard* or
distinguishing it on unsatisfactory grounds.  An exclusive licensee of real
intellectual property rights suffers economic loss as a direct result of a   H
bootlegger's activities, but has no cause of action against him because his
exclusive licence remains intact as a matter of law.  One reason for the
decision was the Court of Appeal's conclusion that there was an exhaustive
statutory code.  But another, simpler reason was that the exclusive licence

[2008] 1 AC                                    OBG Ltd v Allan (HL(E))
                                               Lord Walker of Gestingthorpe

A    was not destroyed; it was simply made less valuable. The fact that it was no
     longer truly exclusive did not alter that conclusion.

     299    Can the licensee's lack of a remedy under the "unlawful means"
     tort be made good by relying on the law of confidence, even in a case where
     there is no separate element of unlawful means?  The answer must be (in a
     case where personal privacy is not an issue) that the law of confidence can
B    be invoked only if the information in question meets the law's requirements for
     the protection of information that is, in the eyes of the law, confidential.
     Lord Hoffmann suggests, in an appeal to economic realities, that if "OK!"
     thought that it was worth paying £1m for its "exclusive" contractual right
     (and "Hello!" was willing to pay the same price) then there is no reason why
     there should not be an obligation of confidentiality.  But the confidentiality
     of any information must depend on its nature, not on its market value.

C    300    For instance, a newspaper or television company might be willing
     to pay a large sum to the promoter of some important sporting event for the
     "exclusive" right to all motion pictures and photographs of the event, and it
     might go to great lengths to publicise its exclusive right (partly to attract
     custom, and partly in the hope of engaging the law of confidence).  If the
     event (for instance, figure-skating or show-jumping) was held in a relatively
D    small indoor venue, with tight security, the hoped-for exclusivity might
     actually be achieved.  If the event was a motor rally or a marathon foot-race
     held on public roads it would be unachievable (although the newspaper or
     television company might still make a worthwhile profit).  But in neither
     case, in my opinion, should the law of confidentiality afford the protection of
     exclusivity in a spectacle (the term used by the High Court of Australia in
E    *Victoria Park Racing and Recreation Grounds Co Ltd v Taylor* 58 CLR
     479).  That would stretch the law of confidence from its proper function (in
     this commercial context, the protection of trade secrets) and would in effect
     confer on the exclusive licensee a form of property right which the courts
     have (in cases like *RCA Corpn v Pollard* [1983] Ch 135) rightly withheld
     from exclusive licensees of established intellectual property rights.

     301    I would therefore dismiss all three appeals.

F    **BARONESS HALE OF RICHMOND**

     302    My Lords, I have read your Lordships' opinions with admiration.
     On many issues, in particular the general shape of the economic torts, there
     is complete agreement.  On three issues, there is disagreement.  On two of
     these, I agree with the conclusions and reasoning of my noble and learned
     friend, Lord Hoffmann: these are "what should count as unlawful means" in
G    the tort of causing economic loss by unlawful means and "what should count
     as a secret" in the law of breach of confidence.  On the third issue, the
     application of the tort of conversion to contractual rights of action, I agree
     with the conclusions and reasoning of Lord Nicholls of Birkenhead.

     303    On the first two issues, Lord Hoffmann's view is shared by a
     majority.  The least said by the rest of us who take the same view, therefore,
     the better.  There should be no doubt, and no room for argument, about
H    what has been decided and why.  Any perceived inconsistency between what
     I say and what he says is to be resolved in favour of the latter.  Indeed, there
     would be much to be said for our adopting the practice of other supreme
     courts in having a single majority opinion to which all have contributed and
     all can subscribe without further qualification or explanation.  There would

be less grist to the advocates' and academics' mills, but future litigants might    A
thank us for that.

304   On the third issue, on the other hand, Lord Nicholls and I are in
the minority.   I can do less harm, therefore, by contributing my own
twopenn'orth to the debate.   Once again, however, any perceived
inconsistency between what I say and what he says is to be resolved in his
favour.   As my noble and learned friend, Lord Walker of Gestingthorpe,    B
acknowledges, Lord Nicholls makes a powerful case.   Peter Gibson LJ
reached the conclusion that such a development was not open to the Court
of Appeal "with regret" [2005] QB 762, para 58.   Carnwath LJ's "initial
instinct" was also

"that the receivers should be strictly liable for all the consequences of
their unlawful appropriation of the business, by analogy with the long-
established principles applied to unlawful receiverships under the law of    C
trespass and conversion": para 115.

305   For those of us who share that general view, the question is whether    D
this is simply the development of established principles of the common law
to meet the demands of the modern world or whether it is a more radical step
which should be left to Parliament.   The great strength of the common law is
that the judges are free to develop it on a case by case basis as new factual
situations arise.   There comes a point when, as Scrutton LJ once said, "If
there is no authority for this it is time that we made one": see *Ellerman Lines*
*Ltd v Read* [1928] 2 KB 144, 152.   But on what basis do the judges decide to
make authority where there was none before?   Or to modify or adapt such
authority as there is?   There is no easy answer to this.   Whatever we do must
be consistent with the underlying principles and policy of the law.   It must    E
not overstep that indefinable line between the development and elaboration
of existing principles and the making of brand new law which is
unquestionably the province of Parliament.   It must work with, rather than
against, the grain of legal policy.   It must go forward when the law is going
forward and draw back when the law is drawing back.

306   That is why I have no difficulty with the first two issues.   The    F
underlying rationale of both the *Lumley v Gye* (1853) 2 E & B 216 and the
unlawful means torts is the same: the defendant is deliberately striking at his
target through a third party.   But the means used to strike must be unlawful:
see *Allen v Flood* [1898] AC 1.   They may either be a wrong committed by
the third party against the target or be a wrong committed by the defendant
against the third party.   But the rules governing each are different: in
particular, the intention is different and the damage procured is different.    G
Nevertheless, the common thread is striking through a third party who
might otherwise be doing business with your target, whether by buying his
goods, hiring his barges or working for him or whatever.   The refinement
proposed by my noble and learned friend, Lord Hoffmann, is entirely
consistent with the underlying principles to be deduced from the decided
cases.   It is also consistent with legal policy to limit rather than to encourage
the expansion of liability in this area.   In the modern age, Parliament has
shown itself more than ready to legislate to draw the line between fair and    H
unfair trade competition or between fair and unfair trade union activity.
This can involve major economic and social questions which are often
politically sensitive and require more complicated answers than the courts

A   can devise. Such things are better left to Parliament. The common law need do no more than draw the lines that it might be expected to draw: procuring an actionable wrong between the third party and the target or committing an actionable (in the sense explained by Lord Hoffmann at para 49 above) wrong against the third party inhibiting his freedom to trade with the target. I too have found the discussion by my former colleague, Hazel Carty, in *An Analysis of the Economic Torts* (2001), ch 5, most helpful.

B   307  Commercial confidentiality is a different matter. It is moving forward rather than drawing back. The law took a big leap forward with the *Spycatcher* case (*Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109). It was, incidentally, a leap which would have been impossible had the Law Commission's Report on Breach of Confidence (1981) (Law Com No 110) (Cmnd 8558) been implemented by statute.

C   Rather as *Lumley v Gye* had expanded liability for breach of contract beyond the contract breaker to the person who persuaded him to break his contract, *Spycatcher* expanded liability for failing to keep a secret beyond the person to whom it had originally been confided to the person who knowingly took advantage of the secret. There are some secrets which the law will not protect. They may be so trivial or useless that the law should not concern itself with them. There may be a public interest in disclosure

D   greater than the private interest in secrecy. But we have not been given any principled reason why photographic images of this wedding should not be protected. They were undoubtedly a secret unless and until "OK!" chose to publish the images authorised by the Douglases. "Hello!" did its best to break what it knew was a secret. There may not have been an entirely identical case before but it is consistent with existing principles to apply

E   them to this case, as the judge did. I confess to having some difficulty in understanding what this has to do with the law of intellectual property. Parliament has devised ways in which an author, inventor or creator can continue to profit from his creativity long after the product has passed into the public domain. Although in both cases the subject matter can be called information, one set of remedies is about rewarding its creator, the other about keeping it quiet. Parliament has intervened in the former but not the

F   latter.

   308  Conversion is another area of judge made law, of much greater antiquity than the other two, and hence it has undergone even more momentous developments than they have done. The common law, as is well known, lacked any general proprietary remedy equivalent to the Roman law vindicatio. It provided three separate remedies for wrongfully taking away,

G   keeping, or disposing of another's goods: trespass, detinue and trover or conversion. Conversion had distinct procedural advantages over the other two and rapidly extended its boundaries to cover much the same ground as they did: see John W Salmond, "Observations on Trover and Conversion" (1905) 21 LQR 43, 47. The contrivances used to achieve this desirable end led to many technicalities and controversies which continued to plague the law long after the reason for them had gone: ibid, at p 43. But of one thing

H   there could be no doubt: although nominally tortious, conversion had become the remedy to protect the ownership of goods: see *Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, per Lord Nicholls of Birkenhead at para 77. It follows that fault is irrelevant: "An honest but mistaken claim of right on the part of the defendant is just as much a

conversion as a fraudulent purpose to retain another's property is":    A
Salmond, loc cit, at p 49. The remedy is either the value of what has been
lost or (following the Torts (Interference with Goods) Act 1977) the return
of the goods.

309   In a logical world, there would be such a proprietary remedy for the
usurpation of all forms of property. The relevant question should be, not "is
there a proprietary remedy?", but "is what has been usurped property?"    B
Rights of action were not seen as property in the 15th and 16th centuries
when the tort of conversion was first developing. The essential feature of
property is that it has an existence independent of a particular person: it can
be bought and sold, given and received, bequeathed and inherited, pledged
or seized to secure debts, acquired (in the olden days) by a husband on
marrying its owner. So great was the medieval fear of maintenance that the
law took a very long time to recognise any right of action (even a    C
reversionary right to tangible property) as having this quality: see
W S Holdsworth, "The History of the Treatment of Choses in Action by the
Common Law" (1920) 33 Harvard Law Review 997. But it is noteworthy
that, when new forms of chose in action which could be assigned were
developed during the 17th and 18th centuries, the remedy of conversion was
adapted to accommodate them: it did so by pretending that the document or    D
other token representing or evidencing the obligation had the same value as
the obligation itself.

310   The point was well made by Park CJ, in the Supreme Court of
Errors in the State of Connecticut, in *Ayres v French* (1874) 41 Conn R 142,
150:

> "There is really no difference in any important respect between [a share    E
> of stock] and other kinds of personal property. A man purchases a share
> of stock and pays one hundred dollars for it. He afterwards purchases a
> horse, and pays the same price. The one was bought in the market as
> readily as the other and can be sold and delivered as readily. The one can
> be pledged as collateral security as easily as the other; as easily attached to
> secure a debt; and its value as easily estimated. The one enriches a man as
> much as the other, and fills as important a place in the inventory of his    F
> estate."

Once the law recognises something as property, the law should extend a
proprietary remedy to protect it. Our law is prepared, according to *Clerk &
Lindsell*, to apply the remedy of conversion to "any document which is
specially prepared in the ordinary course of business as evidence of a debt
or obligation": see *Clerk & Lindsell on Torts*, 19th ed (2006), para 17-35.    G
The reliance on a document or some other tangible token of the existence of
the obligation may be understandable as a relic of the history, but it is not
principled. It is at once too wide and too narrow. There may be a document
evidencing an obligation of a purely personal kind, which ought not to
attract a proprietary remedy. On the other hand, there are many debts and
some other obligations which can now be readily assigned, attached, form
part of an insolvent estate, and enjoy all the other characteristics of property,    H
but which are not represented by a specific document. It is not surprising
that the law has not yet taken the logical step of applying the same principle
to them, because it is much more difficult wrongly to deprive someone of his
rights of action than it is to deprive him of his wallet or his coat. But, to my

A   mind, it is no greater step for the law to do this than it is for the law to recognise that photographs of the Douglas wedding enjoy the same protection as more conventional trade secrets. It is not only entirely consistent with principle. It is inconsistent with principle not to do so.

     311   The facts of the *OBG* case make the point more clearly than I could ever do. The defendants took control over all the company's assets. They entered the company's premises and changed the locks. They took charge of

B   all its plant and machinery and other chattels. They had no right to do so. No one disputes that they are strictly liable in trespass to land and conversion no matter how bona fide their belief that they were entitled to do this. They also took charge of the company's business and closed it down. The judge found that the company was doomed, so that there was no goodwill to be attached to disposing of it as a going concern. But among the

C   company's assets were the debts and other contractual liabilities it was owed. The judge found that the defendants obtained less for these assets than would have been obtained in an orderly winding up. This is not improbable. The receivers' obligations and priorities were different from those of the company, its other creditors and shareholders. They might well result in lower realisations than the company might have achieved for itself. Accepting, as we must, the judge's findings on this, it makes no sense that the

D   defendants should be strictly liable for what was lost on the tangible assets but not for what was lost on the intangibles.

     312   There could, of course, be an objection to extending the scope of an invalidly appointed receiver's liability if Parliament had considered that receivers should be granted relief from liability in trespass to land or conversion of goods and had enacted that relief in terms which could not be

E   applied to the conversion of contractual rights. But Parliament has not done so. Parliament's failure to act is not a reason to make the extension proposed: it merely negates a possible objection to doing so.

     313   Nor do I see the Torts (Interference with Goods) Act 1977 as an obstacle. The Law Reform Committee, whose 18th Report (Conversion and Detinue) (1971) (Cmnd 4774) preceded the 1977 Act, were specifically asked to consider the torts relating to interference with chattels. It was in

F   that context that they recommended a new tort of wrongful interference with chattels from which other forms of property, including land, money and choses in action would expressly be excluded, at para 29. They were not asked to consider, and did not consider, whether the tort of conversion should be applied to intangible property. Indeed, they excluded from their consideration its application to the infringement of copyright by the

G   Copyright Act 1956, at para 4. Furthermore, while recommending a new tort, the committee deliberately did not recommend a complete codification of the common law of conversion; rather, they recommended that it should be retained save in so far as modified by their proposals, at para 32. In the event, Parliament did not even enact a new tort. It merely enacted a new label identifying the torts, including "conversion of goods", to which the new rules would apply. Those new rules were of very limited scope. None of

H   them is inconsistent with applying the common law tort to contractual choses in action (or indeed to other forms of intangible property, but we are not concerned with these).

     314   The committee did consider the measure of damages applicable to the conversion of "tokens". By this they meant "any article (usually, but not

A

necessarily, a document) of small inherent value which constitutes or evidences some right in its possessor as respects property or other benefits", at para 90. There was some doubt about whether the rule applicable to negotiable and quasi-negotiable instruments applied to such things and the committee were of the view that arguably it already did and certainly it should (consistently with the view now taken by *Clerk & Lindsell*, para 17-35). They recommended that the measure of damages in conversion should always be the true loss suffered by reason of the defendant's acts, at para 91. That view was adopted in the decision of this House in *Kuwait Airways Corpn v Iraqi Airways Co (Nos 4 and 5)* [2002] 2 AC 883, para 68. In that case, the effect was to limit the damages which would otherwise be payable but the principle is the same. It means that the law of conversion has already been adapted by the courts in a significant respect which is consistent with its application to contractual rights of action: cf Val D Ricks, "The Conversion of Intangible Property: Bursting the Ancient Trover Bottle with New Wine" (1991) 4 Brigham Young University Law Review 1681, where this was seen as the major problem in the current US developments.

B

C

315   Reforming the common law by statute is not an easy task (the difficulties are vividly described in *R Oerton, A Lament for the Law Commission* (1987)). One of the difficulties is that the common law is constantly developing. The state of the law when the reforms are originally proposed may be different from the state of the law if and when they are eventually enacted. Indeed, the law may continue to move on even after the reforms have been enacted. The law reformer will rarely wish to preclude such organic development unless (unlike the 1977 Act) the reform is intended to be a complete codification. It is quite possible that a later development in the common law will take away the case for a reform which has been enacted on the basis of what the law was previously thought to be. A recent example of this is *Bakewell Management Ltd v Brandwood* [2004] 2 AC 519. But that will not deter the courts from developing the law unless it is clearly inconsistent with what Parliament has enacted, which this is not. I do not, therefore, see the 1977 Act as any obstacle to the incremental development of the common law of conversion.

D

E

F

316   If, however, a majority of your lordships would prefer to leave the matter to Parliament, then I very much hope that the Law Commission can be persuaded to include it in their tenth programme of law reform. The commission would be bound to consider developments in other common law jurisdictions. There are Canadian authorities which look at it from the point of view of invalid receivership. They establish, at the very least, that where a receiver wrongly takes control and a business fails as a result, then the value of the company's intangible assets is included in the measure of damages: *McLachlan v Canadian Imperial Bank of Commerce* (1987) 13 BCLR (2d) 300; approved on appeal (1989) 57 DLR (4th) 687; *Bradshaw Construction Ltd v Bank of Nova Scotia* [1993] 1 WWR 596; and *Royal Bank of Canada v W Got & Associates Electric Ltd* (1994) 150 AR 93, confirmed on appeal by the Alberta Court of Appeal (1997) 196 AR 241 and by the Supreme Court of Canada [1999] 3 SCR 408.

G

H

317   In the United States, the *American Law Institute, Restatement of the Law, Torts,* 2d (1965) merely refers to "documents in which intangible rights are merged", but the commentary, at p 242, observes:

[2008] 1 AC                                      OBG Ltd v Allan (HL(E))
                                                 Baroness Hale of Richmond

A    "It is at present the prevailing view that there can be no conversion of
an ordinary debt not represented by a document, or of such intangible
rights as the goodwill of a business or the names of customers. The
process of extension has not, however, necessarily terminated; and
nothing that is said in this section is intended to indicate that in a proper
case liability for intentional interference with some other kind of
intangible rights may not be found."

B    Even before then, some seeds of such a development had been sown: see
"Conversion of Choses in Action" (1941) 10 Fordham Law Review 415.
Since then a few states have extended the tort beyond contractual
obligations to intangibles such as computer records and data: see most
recently, *Thyroff v Nationwide Mutual Insurance Co* (2007) 832 NYS 2d
C    873. These raise far more formidable questions than the one with which we
are concerned: it is questionable whether the subject matter has sufficient
proprietary quality to attract a proprietary remedy. But they certainly point
to a problem with our present reliance on tangible tokens: the reason why (if
it be the case) an e-ticket cannot be converted is that it is non-assignable, not
that it exists in cyber-space rather than on paper. We do not have to venture
into these difficult issues to resolve the present case in favour of OBG. The
D    Law Commission, however, would almost certainly have to do so. Such
questions are already rearing their heads in Australia as well as the
United States: see *Telecom Vanuatu Ltd v Optus Networks Pty Ltd*
[2005] NSWSC 951; *Hoath v Connect Internet Services Pty Ltd* [2006]
NSWSC 158. I would quite understand it if the commission were to consider
this a more suitable topic for the case by case development of the common
E    law than for comprehensive statutory reform. I regret that by this decision
we appear to be ruling that out.

318    For these reasons, I would allow the appeals in the cases of
OBG and "OK!" but, in agreement with all your Lordships, I would dismiss
the appeal in the Mainstream case.

**LORD BROWN OF EATON-UNDER-HEYWOOD**

F    319    My Lords, I have had the privilege of reading in draft the opinions
of my noble and learned friends, Lord Nicholls of Birkenhead, Lord
Hoffmann and Lord Walker of Gestingthorpe. All three agree on many of
the issues arising in these appeals and where that is so I too agree. Where,
however, they disagree—notably with regard to (i) the precise nature and
ambit of the economic tort of causing loss by unlawful means, (ii) whether
the tort of conversion should be extended to cover the appropriation of
G    choses in action, and (iii) "OK's" claim based on confidentiality—I have
come in the end to accept in each instance the reasoning and conclusions of
Lord Hoffmann. I add only the following brief observations.

*Causing loss by unlawful means*

H    320    As Lord Hoffmann explains, any liability for this tort is primary
(unlike the accessory liability which arises under the principle in *Lumley v
Gye* (1853) 2 E & B 216 where the defendant induces a contracting party to
commit an actionable wrong against the claimant) and it arises where the
defendant, generally to advance his own purposes, intentionally injures the
claimant's economic interests by unlawfully interfering with a third party's

A

freedom to deal with him.  In this tort there is no question of the third party's conduct (which ex hypothesi will have been inhibited or obstructed by the defendant's actions) being unlawful vis-à-vis the claimant; if it were, the case would be one of *Lumley v Gye* secondary liability.  Rather the unlawfulness is that of the defendant towards the third party and the defendant's conduct must be such as would be actionable at the suit of the third party had he suffered loss.  To define and circumscribe the tort in this way seems to be not only faithful to its origins as described by Lord Lindley in *Quinn v Leatham* [1901] AC 495, 535, and consistent with the great bulk of authority which has considered the tort over the ensuing century, but also to confine it to manageable and readily comprehensible limits.  This whole area of economic tort has been plagued by uncertainty for far too long.  Your Lordships now have the opportunity to give it a coherent shape.  This surely is an opportunity to be taken.

B

C

### Conversion

**321**  In common with Lord Hoffmann and Lord Walker I too would regard the expansion of the tort of conversion to cover the appropriation of things in action, as proposed by Lord Nicholls, to involve too radical and fundamental a change in the hitherto accepted nature of this tort (see particularly the Torts (Interference with Goods) Act 1977) to be properly capable of achievement under the guise of a development of the common law.  Lord Nicholls suggests that this would represent merely "a modest but principled extension of the scope of the tort".  I see it rather differently—as no less than the proposed severance of any link whatever between the tort of conversion and the wrongful taking of physical possession of property (whether a chattel or document) having a real and ascertainable value. Indeed, I respectfully question whether such a proposed development in the law ought in any event to be welcomed.  I recognise, of course, that the tort has long since been extended to encompass a variety of documents, not merely documents of title and negotiable instruments but also any business document which in fact evidences some debt or obligation.  But to my mind there remains a logical distinction between the wrongful taking of a document of this character and the wrongful assertion of a right to a chose in action which properly belongs to someone else.  One (the document) has a determinable value as at the date of its seizure.  The other, as so clearly demonstrated by this very case (OBG), does not.  It is one thing for the law to impose strict liability for the wrongful taking of a valuable document; quite a different thing now to create strict liability for, as here, wrongly (though not knowingly so) assuming the right to advance someone else's claim.

D

E

F

G

**322**  As Lord Hoffmann points out, there is really no explanation in OBG's case for the trial judge's conclusion that causes of action in respect of the terminated North West Water contracts which were finally settled in November 1993 for £400,000 had in June 1992 been worth three and a half times that sum: £1,400,000.  Certainly there is no suggestion that the receivers here acted incompetently in negotiating the settlement, still less that the supposed value of these contracts in June 1992 was in fact then realisable in that sum.  As Lord Walker observes, this is "a singularly unsuitable case for a major change in the law".

H

[2008] 1 AC

A   *Confidentiality*

323   The facts giving rise to the claim by "OK!" against "Hello!" are sufficiently summarised by Lord Hoffmann, at paras 108–109, and by Lord Nicholls, at paras 242–246 (and are to be found in altogether greater detail in the judgments below). Nobody disputes that the Douglases were perfectly entitled, quite irrespective of any right of privacy, to sell the exclusive right to publish photographs of their wedding, and nobody doubts that the right was worth the £1m which "OK!" paid for it. Indeed "Hello!" had earlier made an unsuccessful bid for the same right in the same sum. It is no less plain than in publishing as they did the rogue photographs deceitfully taken by an infiltrator at the wedding, "Hello!" not only lent themselves to this outwitting of the strenuous efforts made by the Douglases to safeguard "OK!'s" exclusive but intentionally destroyed the very right itself.

324   The loss of their exclusive right cost "OK!" £1m; that was the judge's assessment of damages here and there are no good grounds for impugning it. "Hello!", however, contend that vis-à-vis "OK!" they committed no actionable wrong: all is fair in love and war and so too, they submit, between publishers of celebrity magazines. Spike your competitor's exclusive if you can and use whatever means you must.

325   If the law were indeed to sanction such an approach I for my part would regret it. Having paid £1m for an exclusive right it seems to me that "OK!" ought to be in a position to protect that right and to look to the law for redress were a third party intentionally to destroy it. Like Lord Hoffmann, I would uphold "OK!'s" claim, as Lindsay J did at first instance, on the ground of breach of confidence.

326   What is the information to which the confidence here attached? Plainly the information as to how the wedding looked—the photographic images which bring the event to life and make the viewer a virtual spectator at it. How can one doubt that this was commercially confidential information or, if one prefers, a trade secret? It was, after all, secret information for which "OK!" had been prepared to pay £1m, in the expectation, obviously, that it was to remain secret until they chose to make use of it. And that is certainly how it would also have been perceived by "Hello!" (who had themselves hoped to acquire and exploit the secret in the same way).

327   Like Lord Hoffmann I find the Court of Appeal's criticism of the judge, at para 136 of their judgment, unpersuasive. I cannot agree that "OK!'s" complaint, properly analysed, is not about "Hello!'s" breach of their exclusive right to publish authorised photographs but rather that "Hello!" published images which no one had a right to publish and about which only the Douglases had a right to complain. This to my mind entirely overlooks that the Douglases had granted "OK!" the exclusive right to publish any photographic images of the wedding and had undertaken to do their best to ensure that no photographs were taken by anyone else so that nobody else would be in a position to defeat their exclusive right.

328   Assume, for example, that the Douglases were themselves magazine publishers and had wished to market the visual images of their wedding as an exclusive in their own magazine. Could it then be suggested that they had no right to complain against "Hello!" for behaving as they did here? Surely not. Or assume that the contract had stipulated that if other

94
OBG Ltd v Allan (HL(E))                                    [2008] 1 AC
Lord Brown of Eaton-under-Heywood

photographs of the wedding came to be published, the £1m paid by "OK!"                    A
(or, say, £½m) would be repayable.  Would not the Douglases have been
entitled to claim that loss against "Hello!" on the ground of breach of
confidence?  Why then not "OK!" too?

329  The one hesitation I must own to having had with regard to the
claim for breach of confidence concerns the situation which arises upon
publication by "OK!" of the authorised photographs in pursuance of their           B
exclusive right.  At that moment, it may be suggested, the secret is out, the
world now knows what the wedding looks like, and no commercial
confidence remains to be protected.  The answer, however, I am persuaded is
this.  The secret consists no less of each and every visual image of the
wedding than of the wedding as a whole.  Assume, for example, that "OK!"
had chosen to publish photographs of the bride and groom in one issue, the
guests in the next, and the presents later still.  The confidence would, I think,           C
continue throughout and I see no reason why at some point bootlegged
photographs should suddenly become acceptable on the grounds that the
look of the wedding was now in the public domain so that no confidentiality
in its photographic image remained to be protected.

*Conclusion*                                                                             D

330  It follows from all this that I too would dismiss the appeals
respectively by OBG and by Mainstream Properties but allow the appeal
by "OK!" on the ground of breach of confidence, reinstating Lindsay J's
damages award accordingly.

*Appeal in OBG Ltd v Allan dismissed.*
*Appeal in Douglas v Hello! Ltd*                                                         E
*    allowed.*
*Appeal in Mainstream Properties Ltd*
*    v Young dismissed.*

    Solicitors: Hammonds, Leeds; Reynolds Porter Chamberlain; S J Berwin;
M Law; Smith Partnership, Derby; Leigh Davis.                                             F

                                                        S H

                                        ———                                              G

                                                                                        H

Chapter 23

# ECONOMIC TORTS

Table of Contents

| | | |
|---|---|---|
| 1. | General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-01 |
| 2. | Procuring a Breach of Contract . . . . . . . . . . . . . . . . . . . . . . | 23-16 |
| (a) | Breach . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-17 |
| (i) | Breach of a valid and subsisting contract . . . . . . . . . . | 23-17 |
| (ii) | Bare interference without breach . . . . . . . . . . . . . . . . . | 23-20 |
| (iii) | Breach of other obligations . . . . . . . . . . . . . . . . . . . . . | 23-21 |
| (b) | Knowledge and intention . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-28 |
| (c) | The wrongful procurement . . . . . . . . . . . . . . . . . . . . . . . . . | 23-36 |
| (i) | Direct inducement . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-38 |
| (ii) | Indirect procurement . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-48 |
| (d) | Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-53 |
| (e) | Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-54 |
| (f) | Defence of justification . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-57 |
| 3. | Intimidation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-62 |
| (a) | The threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-64 |
| (b) | Unlawful act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-66 |
| (c) | Submission to threat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-74 |
| (d) | Two party intimidation . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-75 |
| (e) | Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-76 |
| (f) | Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-77 |
| 4. | Causing Loss by Unlawful Means . . . . . . . . . . . . . . . . . . . . | 23-78 |
| (a) | Intention to cause loss . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-79 |
| (b) | Unlawful means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-82 |
| (c) | Interference with a third party's freedom . . . . . . . . . . . . | 23-90 |
| (d) | Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-93 |
| (e) | Two-party causing loss by unlawful means . . . . . . . . . . | 23-94 |
| (f) | Related statutory torts . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-97 |
| 5. | Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-98 |
| (a) | General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-98 |
| (b) | Unlawful means conspiracy . . . . . . . . . . . . . . . . . . . . . . . | 23-105 |
| (i) | Intention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-106 |
| (ii) | Unlawful means . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-108 |
| (iii) | "Indeed the means" . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-119 |
| (iv) | Knowledge of the unlawfulness of the means . . . . . . . | 23-120 |
| (c) | Lawful means conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . | 23-122 |
| (d) | Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-129 |
| 6. | Trade Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-130 |
| (a) | General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 23-130 |
| (b) | Trade disputes and procuring breach of contract . . . . . . | 23-136 |
| (c) | Trade disputes and intimidation . . . . . . . . . . . . . . . . . . . | 23-140 |

[1713]

(d)    Specific limitations on the protection against liability    . . .    23-142
(e)    Dismissals and immunities    . . . . . . . . . . . . . . . . . . . . . . .    23-150
(f)    Trade disputes and conspiracy    . . . . . . . . . . . . . . . . . . . .    23-154
(g)    Trade disputes and causing loss by unlawful means    . . . .    23-157
(h)    Trade disputes and ballots    . . . . . . . . . . . . . . . . . . . . . . .    23-162
(i)    The statutory right of action    . . . . . . . . . . . . . . . . . . . . .    23-173
(j)    Picketing and trade disputes    . . . . . . . . . . . . . . . . . . . . . .    23-174
(k)    Contemplation or furtherance of a trade dispute    . . . . . . .    23-180
  (i)    The dispute    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23-185
  (ii)    Parties    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23-186
  (iii)    The content    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23-188
  (iv)    Contemplation or furtherance    . . . . . . . . . . . . . . . . . . .    23-195

## 1. General

**23-01**    **The core economic torts**    The torts of procuring a breach of contract, intimidation, causing loss by unlawful means and the two forms of conspiracy are generally described today as "the economic torts".[1] They form the core of the tort liabilities for intentional disruption of economic interests and the principles governing them are interrelated. The description "the economic torts" is useful, even if not strictly accurate when the liabilities involved can extend more widely than damage to "economic" interests.[2] The general patterns of liability contain "ramshackle" elements (for they have "lacked their Atkin"),[3] though it has also been suggested

---

[1]    cf. Lord Neuberger in *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [216]: "Unlawful means conspiracy is one of the so-called economic torts, which include procuring a breach of contract, unlawful interference, causing loss by unlawful means, intimidation and conspiracy to injure (or lawful means conspiracy). These torts present problems even if they are considered individually (and yet more problems if they are treated as a genus)." For a valuable critical analysis see H. Carty, *An Analysis of the Economic Torts*, 2nd edn (Oxford: OUP, 2010); see too S. Deakin, "Economic Relations" Ch.30 in Sappideen and Vines (eds), *Fleming's The Law of Torts*, 10th edn (Thomson Reuters: Australia, 2011) updating Fleming's own Ch.30 in the 9th edn (Thomson Reuters: Australia, 1998). Older but still valuable specialist texts are J. Heydon *Economic Torts*, 2nd edn (London: Sweet & Maxwell, 1978), P. Cane, *Tort Law and Economic Interests*, 2nd edn (Oxford: OUP, 1996); and T. Weir, *Economic Torts* (1997). In general tort texts see D. Howarth, M. Matthews, J. Morgan, J. O'Sullivan and S. Tofaris, *Hepple & Matthews Tort: Cases and Materials*, 7th edn (Oxford: OUP, 2015), Ch.15; S. Deakin and Z. Adams, *Markesinis and Deakin's Tort Law* 8th edn (Oxford: OUP, 2019), Ch.15; E. Peel and J. Goudkamp (eds), *Winfield and Jolowicz on Tort*, 19th edn (London: Sweet & Maxwell, 2014), Ch.19; C. Witting, *Street on Torts*, 15th edn (Oxford: OUP, 2018), Ch.15. See too R. Smith, "The Economic Torts: Their Impact on Real Property" (1977) 41 Conv. (N.S.) 318; R. Heuston and R. Buckley (eds), *Salmond and Heuston on the Law of Torts*, 21st edn (1996), Ch.16. For Commonwealth developments: on Australia: Barker et al, *The Law of Torts in Australia*, 5th edn (2012), Ch.6; on New Zealand: S. Todd et al, *Todd on Torts* (formerly, *Law of Torts in New Zealand*), 8th edn (2019), Ch.13; on Canada: Klar, *Tort Law*, 6th edn (2017), Ch.17.

[2]    For example, procuring a breach of contract might lead to physical damage to property if the contract concerned was to protect property from physical damage.

[3]    Wedderburn (1983) 46 M.L.R. 224 at 226. In *Revenue & Customs Commissioners v Total Network SL* [2008] UKHL 19; [2008] 1 A.C. 1174 at [224], Lord Neuberger apparently treated the ramshackle nature of the economic torts as a reason for not adopting a single consistent approach to what constitutes unlawful means in relation to the various torts. See generally H. Carty, "Intentional Violation of Economic Interests" (1988) 104 L.Q.R. 250; P. Sales and D. Stilitz, "Intentional Infliction of Harm by Unlawful Means" (1999) 115 L.Q.R. 411; Bagshaw (1998) 18 O.J.L.S. 729; H. Carty (1999) 19 L.S. 489 (joint tortfeasors and "accessory" liability for assistance); J. Eekalaar (1990) 106 L.Q.R. 223 (conspiracy); P. Loughlan (1989) 9 O.J.L.S. 260 (assisting breach of fiduciary duty); P.

[1714]

with those who make mistakes and take risks, and who bears the burden of proof on such matters, have inevitably become more prominent.

### 2.  Procuring a Breach of Contract

**23-16**    Knowingly and intentionally to procure or, as it is often put, to induce a third party to break his contract to the damage of the other contracting party without reasonable justification or excuse is a tort.[69] Such a tort was recognised in *Lumley v Gye*[70] by a majority in the Queen's Bench with respect to contracts for personal services, and later by the Court of Appeal.[71] It has now been held to apply to contracts of all kinds.[72] The ingredients of the tort were restated by the House of Lords in *OBG Ltd v Allan* with a view to drawing a clear line between this, the *Lumley v Gye* tort, and the tort of intentionally causing loss by unlawful means.[73]

### (a)  Breach

#### (i)  Breach of a valid and subsisting contract

**23-17**    In *Allen v Flood* Lord Herschell declared "a breach of contract" to be "the essence" of the cause of action,[74] and in *OBG Ltd v Allan*[75] the House of Lords reiterated this fundamental proposition: "one cannot be liable for inducing a breach unless there has been a breach. No secondary liability without primary liability." Thus the court expressly rejected the view that had become orthodox between these two cases, that the tort could be committed by deliberate and direct interference with the performance of a contract without causing any breach.[76] This view, which had

---

[69]  *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1. Subsequently, the elements of this tort have been discussed by the Court of Appeal in *Meretz Investments NV v ACP Ltd* [2007] EWCA Civ 1303; [2008] Ch. 244; and *Allen v Pollock* [2020] EWCA Civ 258; [2020] Q.B. 781. In *Global Resources Group Ltd v Mackay* [2008] CSOH 148; 2009 S.L.T. 104 Lord Hodge having noted at [6] the parties' agreement that there were no material differences between the laws of Scotland and England in relation to this delict or tort, observed at [9] that Scots judges had drawn extensively on English law in defining this delict; but as he pointed out, cf. their views on recklessness, para.23-35. For a critique of the tort see Howarth (2005) 68 M.L.R. 195.

[70]  (1853) 2 El. & Bl. 216. An account of the litigation in its historical context is provided by S. Waddams, "Johanna Wagner and the Rival Opera Houses" (2001) 117 L.Q.R. 431.

[71]  *Bowen v Hall* (1881) 6 Q.B.D. 333 CA; *Temperton v Russell* [1893] 1 Q.B. 715, where the dicta must not be given a scope wider than the text indicates: *Allen v Flood* [1898] A.C. 1; *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] A.C. 435 at 466.

[72]  See *Jasperson v Dominion Tobacco Co* [1923] A.C. 709 PC at 713; *DC Thomson & Co Ltd v Deakin* [1952] Ch. 646 at 677, per Evershed MR, and at 693, per Jenkins LJ. As to its application to contracts affecting land, see *Pritchard v Briggs* [1980] Ch. 338 CA, discussed para.23-47.

[73]  *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1, per Lord Hoffmann at [8] and [39]–[44]; per Lord Nicholls at [168]–[193]. cf. the analysis of the tort in terms of eight essential elements in *Sar Petroleum Inc v Peace Hills Trust Co* 2010 NBCA 22; (2010) 318 D.L.R. (4th) 70 at [40]. Compare the summary of five essential elements in *Daebo Shipping Co Ltd v Ship Go Star* [2012] FCAFC 156; (2012) 207 F.C.R. 220; (2012) 294 A.L.R. 635 at [88]; *TSG Franchise Management Pty Ltd v Cigarette & Gift Warehouse (Franchising) Pty Ltd (No.2)* [2016] FCA 674; (2017) 340 A.L.R. 230 at [57].

[74]  [1898] A.C. 1 at 121: "an unlawful act—namely, a breach of contract—was regarded as the gist of the action", at 123.

[75]  *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 at [44], per Lord Hoffmann; see also [189], per Lord Nicholls, [264], per Lord Walker, [302] per Baroness Hale, and at [319] per Lord Brown.

[76]  This view, now rejected, was clearly expressed by Lord Denning MR in *Torquay Hotel Co Ltd v*

treated acts of direct (and indirect) interference with the performance of contracts as tortious by way of an extension of the *Lumley v Gye* tort, was replaced in the *OBG* case by a restatement that confines this tort to situations where a *breach* of contract has been intentionally procured; tort liability will only be imposed for instances of interference with contractual performance (falling short of breach) when these fall within the scope of the separate tort of intentionally causing loss by the use of unlawful means. Consequently, the tort of procuring a breach of contract cannot be committed by persuading a person not to enter a contract. Similarly, where a defendant induces a party to exercise a right to terminate a contract the *Lumley v Gye* tort is not committed.[77] However, an injunction will lie even if no contract exists if the defendant has made it clear by his threats that he will, if one is concluded, procure its breach.[78]

In *Allen v Pollock*, Lewison LJ stated: "It seems to me to be clear that in order for a person to be liable in tort for inducing a breach of contract, the contract in question must be a binding and enforceable contract."[79] Thus, if the contract is void, for example, on grounds of incapacity,[80] no tort is committed by procuring a "breach" of it.[81] Nor is it tortious to induce a breach of a contract which is unlawful as being in unreasonable restraint of trade, although if the contract is severable, liability may arise for procuring breach of the remaining lawful terms of it, such as an outstanding negative covenant.[82] Where the contract is determinable, the defendant incurs no liability merely by inducing the contracting party to determine the contract lawfully, for there is then no breach.[83] It must follow therefore that it

**23-18**

---

*Cousins* [1969] 2 Ch. 106; and approved by the House of Lords in *Merkur Island Shipping Corpn v Laughton* [1983] 2 A.C. 570, at 608, per Lord Diplock.

[77] In *Sanders v Snell* [1998] HCA 64; (1998) 196 C.L.R. 329; (1998) 157 A.L.R. 491 at [23], the High Court of Australia stated that "To persuade or direct a contracting party to terminate the contract lawfully is not to procure a breach of the contract", citing *Sid Ross Agency v Actors and Announcers Equity Association* [1971] 1 N.S.W.L.R. 760 at 765, per Jacobs JA; *DC Thomson & Co Ltd v Deakin* [1952] Ch. 646 at 702, per Morris LJ; *Greig v Insole* [1978] 1 W.L.R. 302 at 333, per Slade J; *Cutsforth v Mansfield Inns Ltd* [1986] 1 W.L.R. 558 at 563, per Sir Neil Lawson.

[78] See *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch. 106 CA (defendants intended to procure non-performance of "existing contracts by Esso and future contracts by Alternative Fuels so as to prevent those companies supplying oil to the Imperial Hotel": per Lord Denning MR at 141; no contract subsisted with Alternative Fuels; defendants liable to injunction in respect of both; see also *Winn LJ at 146); and see *Union Traffic Ltd v TGWU* [1989] I.C.R. 98 at 105–106, per Bingham LJ and at 111–113, per Lloyd LJ.

[79] *Allen v Pollock* [2020] EWCA Civ 258; [2020] Q.B. 781 at [25].

[80] *De Francesco v Barnum* (1890) 45 Ch. D. 430; and later proceedings between different parties, 63 L.T. 514. There is no rule that a minor cannot commit the tort of procuring a breach of a contract: *Take-Two Interactive Software Inc v James* [2020] EWHC 179 (Pat) at [34], though the point does not seem to have been argued.

[81] So too now a contract not made in writing for the sale of an interest in land: s.2 of the Law of Property (Miscellaneous Provisions) Act 1989, despite *Yaxley v Gotts* [2000] Ch. 162, CA. For some other statutory exceptions see the Contracts (Rights of Third Parties) Act 1999.

[82] *Rickless v United Artists Corp* [1988] Q.B. 40 CA at 59, per Bingham LJ; *British Motor Trade Association v Gray*, 1951 S.C. 586; *Northern Messenger (Calgary) Ltd v Frost* (1966) 57 D.L.R. (2d) 456.

[83] per Slesser LJ in *McManus v Bowes* [1938] 1 K.B. 98 at 127. In *Torquay Hotel Co Ltd v Cousins* [1969] 2 Ch. 106 at 117 Stamp J doubted the correctness of the dicta of Slesser LJ in *McManus v Bowes*; but the Court of Appeal did not repeat those doubts, and it is submitted that the text represents the law, despite the dicta of Diplock LJ in *Emerald Construction Co Ltd v Lowthian* [1966] 1 W.L.R. 691 at 703–704; see now *Cutsforth v Mansfield Inns* [1986] 1 W.L.R. 558 at 563, which supports the text. See too, per Morris LJ in *DC Thomson & Co Ltd v Deakin* [1952] Ch. 646 at 702 (where contract "lawfully terminated, there is no violation"); per Lord James in *Denaby and Cadeby Main*

ECONOMIC TORTS

is no tort to procure the breach of a voidable contract, at least where the person induced is the party who enjoys the right to rescind.[84] It is uncertain whether the tort is committed by procuring breach of a contract which is merely unenforceable by action.[85] There is, however, authority for the view that in order to establish his claim the claimant must show that he is able and willing to perform the contract.[86]

**23-19**      The view that the breach must be one that goes to the root of the contract has not survived into the modern law.[87] It is enough if the breach is of the only remaining obligation of a contract otherwise fulfilled (such as a valid covenant not to compete by an employee who has long ago left the employment).[88] Some cases have apparently misunderstood Lord Diplock's reference to "prevention of due performance of a *primary* obligation under a contract"[89] as meaning that certain terms in the contract may be insufficiently important to be "primary obligations".[90] But Lord Diplock was seeking to explain why a defendant might be liable for procuring a breach of a performance obligation even if the contract includes an exemption

---

*Collieries Ltd v Yorkshire Miners' Association* [1906] A.C. 384 at 406; *Poslusns v Toronto Stock Exchange* (1964) 46 D.L.R. (2d) 210; affirmed (1968) 67 D.L.R. (2d) 165; *White v Riley* [1921] 1 Ch. 1 at 15, 26 and 32; and per Stuart-Smith LJ in *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 at 970.

[84]   *Proform Sports Management Ltd v Proactive Sports Management Ltd* [2006] EWHC 2903 (Ch); [2007] 1 All E.R. 542 at [33], where it was held that there can be no liability for procuring breach of a voidable contract with a minor, on the facts a representation agreement between the claimant and the professional footballer Wayne Rooney: "[i]t does not matter whether the contract has already been avoided" (per Judge Hodge QC, [2006] EWHC 2903 (Ch); [2007] 1 All E.R. 542). The old case of *Keene v Boycott* (1795) 2 H.Bl. 511, to the contrary is not, it is submitted, now good law. Quaere where the contract is an "unconscionable bargain" or procured by economic duress; see Siopsis (1984) 100 L.Q.R. 523; but see as to the former, *Alec Lobb (Garages) Ltd v Total Oil (Great Britain) Ltd* [1985] 1 W.L.R. 173 CA.

[85]   e.g. formerly under s.5 of the Financial Services Act 1986 (cf. Lawson [1988] J.B.L. 281); see now s.20 of the Financial Services and Markets Act 2000; or formerly s.40 of the Law of Property Act 1925, now repealed by s.2 of the Law of Property (Miscellaneous Provisions) Act 1989. It has been held in Canada that procuring breach of such a contract is not tortious: *Brown v Spamberger and Bunting* (1959) 21 D.L.R. (2d) 630. *Smith v Morrison* [1974] 1 W.L.R. 659, suggests that the same answer should be given in England, especially if it is desired to exclude the tort from the area of land law (see R.J. Smith (1977) 41 Conv. (N.S.) 318). But contrast *Austin v Olsen* (1868) L.R. 3 Q.B. 208 at 211, per Mellor J; and *Unident Ltd v Delong* (1982) 131 D.L.R. (3d) 225 (technical unenforceability through lack of signature; tort action lies). On illegal employment contracts, see Jefferson (1996) 25 I.L.J. 234.

[86]   *Long v Smithson* (1918) 88 L.J.K.B. 223. cf. the case law on when workers taking industrial action short of a strike can pursue claims in contract against their employers: *Chappell v Times Newspapers Ltd* [1975] I.C.R. 145 at 174–5; *Henthorn v Central Electricity Generating Board* [1980] I.R.L.R. 361 CA; *Miles v Wakefield MDC* [1987] A.C. 539 HL; *Wiluszynski v Tower Hamlets LBC* [1989] I.C.R. 493 CA; *British Telecommunications Plc v Ticehurst* [1992] I.C.R. 383 CA especially at 399–405, per Ralph Gibson LJ; cf. *Bond v CAV Ltd* [1983] I.R.L.R. 360. See too *Kenny v An Post* [1988] I.R. 285 (rest break practice, not contractual right).

[87]   See Evershed MR in *DC Thomson & Co Ltd v Deakin* [1952] Ch. 646 at 689–690, doubting that view put by Porter J in *De Jetley, Marks v Greenwood* [1936] 1 All E.R. 863 at 872. It has received no support in any of the leading modern authorities.

[88]   Bingham LJ in *Rickless v United Artists Corp* [1988] Q.B. 40 CA at 58–59.

[89]   per Lord Diplock in *Merkur Island Shipping Corp v Laughton* [1983] 2 A.C. 570 at 608 (emphasis added); and *Dimbleby & Sons Ltd v NUJ* [1984] 1 W.L.R. 427 at 434–435 ("primary obligations to publish advertisements"). cf. Peter Gibson LJ in *OBG Ltd v Allan* [2005] EWCA Civ 106; [2005] Q.B. 762 at [47] stressing the need for the alleged tortfeasor having intended to prevent the performance of a primary obligation under the contract.

[90]   For example, Stuart-Smith J in *News Group Newspapers Ltd v SOGAT (No.2)* [1987] I.C.R. 181 at 209 ("it is doubtful if this is a primary obligation of the contract").

clause, excusing a party from liability in damages; the idea being that the breach of the primary obligation to perform remains, even though the secondary obligation, to pay damages on breach, has been removed.[91] In *Torquay Hotel Co Ltd v Cousins*,[92] an injunction was granted against defendants who were taking action in a labour dispute calculated to cause a supplier to stop supplies under a standing contract, even though a clause in the contract stated: "neither party shall be liable for any failure to fulfil any term of this agreement if fulfilment is delayed, hindered or prevented by any circumstance whatever which is not within their immediate control including … labour disputes." But it was important that the clause turned out on construction to be "an exception from liability for non-performance rather than an exception from obligation to perform".[93] Had it been the latter no liability for inducing any breach could have arisen.[94] In *OBG Ltd v Allan*,[95] while the House of Lords rejected Lord Denning MR's suggested extension of the *Lumley v Gye* tort to include interference short of breach, the importance of this construction of the exclusion clause in the reasoning of the majority of the Court of Appeal in the *Torquay Hotel* case appears to have been overlooked by both Lord Hoffmann and Lord Nicholls. There can be no liability, however, for procuring a person to refrain from doing something that he was at liberty not to do. Thus it cannot be a tort to induce a party to abstain from performance of a contract that is "not a synallagmatic contract at all but a mere unilateral or 'if' contract without any obligations on the part of [the claimant] as to its duration".[96] Similarly, it is not a tort to induce a person *to* perform his contractual obligations.[97]

---

[91]  See Lord Diplock in *Merkur Island Shipping Corp v Laughton* [1983] 2 A.C. 570 at 608; and per Neill LJ and per Stuart-Smith LJ in *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 at 952 and 963 (reversed on other grounds, [1989] 1 W.L.R. 939 HL).

[92]  [1969] 2 Ch. 106; Lord Denning MR also thought that the defendants could not rely upon events of which they were themselves the cause, but the example which he gave involves the use of unlawful means: [1969] 2 Ch. 106 at 137–138. The general principle he enunciated was relied upon in *Falconer v ASLEF* [1986] I.R.L.R. 331 at 334, but was disapproved as erroneous in *Cheall v APEX* [1983] 2 A.C. 180 HL.

[93]  per Russell LJ [1969] 2 Ch. 106 at 143; see also, per Winn LJ at 146–147. This ratio was accepted in *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 at 952 (reversed on other grounds, [1989] 1 W.L.R. 939, HL), per Neill LJ: "the primary obligation to make deliveries under the contract … remained even though the oil company was relieved from its secondary obligation to make monetary compensation for breach"; so too, Butler-Sloss LJ at 959 (no liability where "absence of any cause of action" under the contract). See on this distinction *Photo Productions Ltd v Securicor Transport Ltd* [1980] A.C. 827 HL, which supports it (see especially, per Lord Diplock at 849); on the construction of exemption clauses see Treitel, *Law of Contract*, 14th edn (2015) paras 7-014 to 7-033. See the clauses in *Merkur Island Shipping Corp v Laughton* [1983] 2 A.C. 570, HL at 607; and in *Falconer v ASLEF* [1986] I.R.L.R. 331 at 334 (clause providing that B.R. "may withdraw any service"; passenger recovers damages against union; sed quaere whether there was any obligation left to perform or merely a statement of intent?) See now also the Unfair Contract Terms Act 1977 (a defendant could not benefit from a clause nullified by that statute; cf. Treitel, *The Law of Contract*, (2015), paras 7-051 to 7-094); cf. Consumer Rights Act 2015; and Treitel, *The Law of Contract*, (2015), paras 7-095 to 7-122.

[94]  Sed quaere whether a defendant in such a case, who could not know the exact character of the clause, might be liable for a threat to induce a breach: consider Diplock LJ in *Emerald Construction v Lowthian* [1966] 1 W.L.R. 691 CA.

[95]  [2007] UKHL 21; [2008] 1 A.C. 1.

[96]  Lord Diplock in *Dimbleby & Sons v NUJ* [1984] 1 W.L.R. 427 at 434.

[97]  *Central Canada Potash Co Ltd v Government of Saskatchewan* (1979) 88 D.L.R. (3d) 609 SCC at 640. But the tort may be committed even if the obligations of one party are fully performed: *Rickless v United Artists Corp* [1988] Q.B. 40.

ECONOMIC TORTS

### (ii)  Bare interference without breach

**23-20**  The extension of the *Lumley v Gye* tort suggested by Lord Denning MR in *Torquay Hotel Co Ltd v Cousins*[98] and seemingly endorsed by the House of Lords in *Merkur Island Shipping Corp v Laughton*[99] to include "interference" with the performance of a contract which does not cause any breach, was rejected by the House of Lords in *OBG Ltd v Allan* where the leading speeches of both Lord Hoffmann and Lord Nicholls expressly confined the *Lumley v Gye* tort to inducing *breach* of a contract.[100] Any liability for interference with the performance of a contract short of causing its breach can only arise under the separate tort of intentionally causing loss by the use of unlawful means.[101] Once unlawful means and an intention to harm the claimant are present, consequential damage deliberately caused may be actionable; the intentional harm tort is available whether or not the non-performance of any contract involved a breach of it,[102] and even if the loss results simply from contractual performance becoming less valuable to the claimant.

### (iii)  Breach of other obligations

**23-21**  The civil liability bequeathed by *Lumley v Gye*, is not restricted to procuring breach of a contract. In *OBG Ltd v Allan* Lord Nicholls explained how the tort in *Lumley v Gye* developed as an emanation of a general principle of liability for procuring actionable wrongs.[103] But whilst this general principle clearly exists,[104] it is doubtful whether cases involving the specific tort of procuring breach should be treated as direct authorities as to its scope; it might be argued, for instance, that the rules that determine when a defendant will be liable for having procured another to commit a wrong that is actionable under the general law, such as battery or trespass to land, may not be the same as those that determine whether a defendant should be liable for having procured another to act in a way that is only wrongful because the other has made a contract that obliges him not to act in this way.[105] Nonetheless, there are several situations where the actionable wrongs procured by

---

[98]  [1969] 2 Ch. 106 at 137–138. See too Winn LJ at 147, suggesting that inducing a party to use an optional mode of *performance* which is allowed by the contract could be tortious.

[99]  [1983] 2 A.C. 570 at 606–607, per Lord Diplock. See also *News Group Newspapers Ltd v SOGAT* [1987] I.C.R. 181; *Falconer v ASLEF* [1986] I.R.L.R. 331.

[100]  [2007] UKHL 21; [2008] 1 A.C. 1 at [44] and [189] respectively. In *Alleslev-Krofchak v Valcom Ltd* 2010 ONCA 557; (2010) 322 D.L.R. (4th) 193 (Ont CA) at [92] it was held that frustration of the contract was not sufficient.

[101]  See para.23-78 onwards. For a critique of the extension of the *Lumley v Gye* tort to cover bare interference without breach see the 19th edition of this work paras 25-31 to 25-35.

[102]  See *Dimbleby & Sons Ltd v NUJ* [1984] 1 W.L.R. 427 HL. It has been suggested persuasively that the "primary obligation" analysis is not here necessary: see Carty (1988) 104 L.Q.R. 257.

[103]  [2007] UKHL 21; [2008] 1 A.C. 1 at [169]–[171]; *Lumley v Gye* (1853) 2 El. & Bl. 216 at 232, per Erle J; *Allen v Flood* [1898] A.C. 1 at 96, per Lord Watson.

[104]  *Fish & Fish Ltd v Sea Shepherd UK* [2015] UKSC 10; [2015] A.C. 1229 at [19], "A defendant may incur joint liability by procuring the commission of a tort by inducement, incitement or persuasion": citing *CBS Songs Ltd v Amstrad Consumer Electronics Plc* [1988] A.C. 1013, 1058, per Lord Templeman.

[105]  This distinction may explain the emphasis on knowledge of the contract in the context of the *Lumley v Gye* tort, on which see below para.23-29, and perhaps also the availability of a defence of justification, on which see below para.23-57.

Procuring a Breach of Contract

defendants seem very similar to breaches of contract, so the potential liability has been treated as associated with the tort in *Lumley v Gye*.

**Statutory duties**     So, it is a tort knowingly and intentionally to induce a breach of statutory duty[106]—at least where the statutory provision affords a right to the claimant because the contravention is, on the true construction of the statute, actionable by him.[107] This tort of inducing a breach of statutory duty requires "a cause of action between obligor and obligee",[108] so the claimant must show "that on its true construction the statute which imposed the prohibition gave rise to a civil remedy".[109] Whilst the existence of the liability is clear, there are grounds for doubting whether this is truly an extension of the *Lumley v Gye* tort, as opposed to a situation where a procurer can be held jointly liable for the tort of breach of statutory duty.[110] The strongest arguments for the former view may be that a defendant can be liable for procuring a breach of a statutory duty that he could not himself have breached, as is the case with respect to procuring a breach of contract, and in some circumstances, particularly involving the public sector, a statute may impose obligations which are substantively similar to the sorts of obligations that are commonly created by contract in the private sector.

**23-22**

**Equitable obligations**     The question whether those who procure others to break their equitable obligations commit an extended form of the *Lumley v Gye* tort is not straightforward. Two features combine to make matters complicated. First, in many circumstances equitable obligations run parallel to contractual obligations; indeed, frequently it will be possible to "imply" a contractual term corresponding to the equitable obligation. Secondly, however, equity has developed its own, separate, principles of accessory liability, particularly with respect to "knowing receipt" and "dishonest assistance". So far as these principles reflect a careful balancing of the competing interests, they provide a strong reason for not striving to develop an overlapping, but potentially inconsistent, regime based on the *Lumley v Gye* tort.

**23-23**

The equitable principles governing the position of third parties divide between "recipients" and "accessories"; they have been authoritatively established by Lord Nicholls in the *Royal Brunei Airlines* decision,[111] where a company holding money

**23-24**

---

[106] *F v Wirrall MBC* [1991] Fam. 69 at 114–115, per Stuart-Smith LJ. This may severely restrict, if not effectively remove, the right to take industrial action from workers who are subject to statutory duties since it will generally be tortious for a trade union to call on its members to take such action as an inducement to breach these duties: see *Ministry of Justice v Prison Officers' Association* [2017] EWHC 1839 (QB); [2018] I.C.R. 181.

[107] *Lonrho Ltd v Shell Petroleum (No.2)* [1982] A.C. 173 HL; *Meade v Haringey LBC* [1979] 1 W.L.R. 637 CA; *Cutler v Wandsworth Stadium Ltd* [1949] A.C. 398 HL; *Lonrho Plc v Fayed* [1992] 2 Q.B. 479 at 488, per Dillon LJ (affirmed on different grounds [1992] 1 A.C. 448 HL); *BBC Enterprises v Hi-Tech Xtravision* [1991] 2 A.C. 327 HL.

[108] per Butler-Sloss LJ in *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 at 959; *Lonrho Ltd v Shell Petroleum (No.2)* [1982] A.C. 173 HL.

[109] per Dillon LJ in *Lonrho Plc v Fayed* [1990] 2 Q.B. 479 at 488 (affirmed on other grounds [1992] 1 A.C. 448 HL).

[110] In *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 at [189], Lord Nicholls chose to "leave open the question of how far the *Lumley v Gye* principle applies equally to inducing a breach of other actionable obligations such as statutory duties or equitable or fiduciary obligations." P.S. Davies, *Accessory Liability* (2015), 184, treats the liability as an example of accessory liability for a tort and "based on general common law principles".

[111] *Royal Brunei Airlines v Tan* [1995] 2 A.C. 378 PC, reviewing the English and Commonwealth decisions and commentary, and settling the meaning of the leading authority *Barnes v Addy* (1874) L.R.

[1729]

on trust for the airline used it, as the defendant its managing director arranged, to relieve its own cash-flow problems. He was held liable as an "accessory" to the breach of trust (and the company was liable too, because his knowledge was the company's knowledge). "Knowing assistance" arises when the third party had, as here, assisted and procured the breach of duty; he was liable to account if he had acted dishonestly, i.e. not as an honest person would in all the circumstances (not quite the test of "knowingly and intentionally" in the parallel tort liability). Without a finding of dishonesty, this limb of liability cannot extend to a party who participates by releasing confidential information (which may be the "trust property").[112] But if "knowing receipt" is alleged, i.e. that he had "knowingly received" trust property or assets resulting from it, the claimant must prove that he knew or ought to have known that it was traceable to the breach of duty.[113] The existence of the equitable principles explains why, in 1990, the Court of Appeal held that "procuring a breach of trust" was not tortious; such a tort was not needed given equity's traditional remedies against third parties.[114] Similarly, it appears that there is no general *tort* of "procuring a breach of fiduciary duty".[115]

**23-25**    There are cases, however, where a claimant has successfully relied on a tort that alleges the procuring of a breach of an equitable obligation. For example, an employer has been permitted to sue defendants who induced agents to break duties to account which could be regarded either as in the terms in their contracts[116]

---

9 Ch. App. 244 at 251–252; liability for "knowing receipt" by a third party requires proof that he had such knowledge that his receipt was traceable to a breach of trust or fiduciary duty as to make it unconscionable for him to retain the benefit and must be distinguished from liability for "assisting breach" of trust or fiduciary duty, which requires proof of dishonesty.

[112] *Satnam Investments v Dunlop Haywood Ltd* [1999] 3 All E.R. 652 CA (trade competitor did not participate in others' breach of fiduciary duty owed to S by publishing confidential information; nor did it act dishonestly, even when it took advantage of the commercial opportunity for itself). On "knowing receipt" see Lord Nicholls Ch.15 in Cornish, et al., *Restitution: Past, Present and Future* and Harpum, also in Cornish et al. Ch.16, pp.247–250.

[113] *Royal Brunei Airlines v Tan* [1995] 2 A.C. 378 PC; *El Ajou v Dollar Land Holdings* [1994] 2 All E.R. 685 at 700, Hoffmann J; *Bank of Credit and Commerce International SA v Ali (No.2)* [2001] UKHL 8; [2002] 1 A.C. 251; *Citadel General Assurance v Lloyd's Bank of Canada* (1998) 152 D.L.R. (4th) 411 (SCC: bank liable for knowing receipt, not procurement or assistance); *BCCI v Akindele* [2001] Ch. 437 CA; *Walker v Stones* [2001] Q.B. 902 CA; *Trustor AB v Smallbone (No.3)* [2001] 1 W.L.R. 1177; Nolan [2000] C.L.J. 447 (knowing receipt); *Casio Computer Co Ltd v Sayo* [2001] EWCA Civ 661 (knowing assistance).

[114] *Metall und Rohstoff AG v Donaldson, Lufkin & Jenrette Inc* [1990] 1 Q.B. 391 CA at 473–481 (overruled on other matters: *Lonrho v Fayed* [1992] A.C. 448).

[115] In *FM Capital Partners Ltd v Marino* [2018] EWHC 1768 (Comm) at [82], Cockerill J summarised the conditions for liability for dishonestly assisting a breach of fiduciary duty, noting that they were not seriously in issue in the case: this liability is potentially both broader than liability for procuring a breach of contract—in that it can cover acts that assist, induce or procure a breach—and narrower—in that the defendant must have acted dishonestly in providing the assistance. (An appeal on a different point was dismissed: [2020] EWCA Civ 245; [2020] 3 W.L.R. 109.) See also Loughlan (1989) 9 O.J.L.S. 260; also Carty (1999) 19 L.S. 489 at 510–514; cf. Sales [1990] C.L.J. 491. See also *Iranian Offshore Engineering & Construction Co v Dean Investment Holdings SA* [2019] EWHC 472 (Comm). In some circumstances it may be possible to formulate a claim as being one for the tort of conspiracy to cause harm by the use of unlawful means—those means being a breach of fiduciary duty—as a way of avoiding the need to prove dishonesty; but this approach will require proof that the conspirators shared a common intention of causing harm to the claimant.

[116] *Boulting v Association of Cinematograph and Allied Technicians* [1963] 2 Q.B. 606 (directors induced to break fiduciary—alternatively contractual—duties owed to company); *Associated British Ports v TGWU* [1989] 1 W.L.R. 939 CA (reversed on different grounds); *Bent's Brewery v Hogan* [1945] 2 All E.R. 570 (employee's duty of confidence in equity or as implied term in contract); see

or as equitable obligations, by relying on the latter, when the former was protected from action.[117] It must be noted that the contract of employment as such does not import a "fiduciary duty".[118] But the cases cited where an employer could rely on equitable obligations are essentially situations where the equitable and common law wrongs are recognised as having some "correspondence", as with the duty to account which is parallel to the duty of "loyalty and fidelity" in an employment contract, with equitable remedies as its "counterpart".[119]

**Judgments**    In *Marex Financial Ltd v Sevilleja*[120] Knowles J held that there was a "good arguable case" that it was a tort to procure a company not to pay a judgment debt. There are also cases where a third party has been ordered not to behave in a way that would undermine an equitable remedy that has been granted: for example, after granting an injunction to prevent a breach of contract the court may extend the order against further parties who have knowledge of the breach where that is necessary to make the injunction effective.[121] But no tort will be committed by a defendant who intentionally procures another to take steps that will reduce the effectiveness of any remedy that a claimant may subsequently obtain. Thus, where A, a party to a covenant made with the claimant (B) prohibiting transfer of certain property, passes that property to a third party (C), the transferee C may be liable for knowingly procuring the breach and incur liability to a "secondary remedy",

**23-26**

---

[117] too, overlapping duties in whole or part, *Norbrook Ltd v King and Sands* [1984] I.R.L.R. 200 at 206; *Hivac v Park Royal Scientific Instruments Co* [1946] Ch. 169; compare *Faccenda Chicken v Fowler* [1987] Ch. 117 CA; Smith (1999) 115 L.Q.R. 245. On bribes see *Att Gen of Hong Kong v Reid* [1994] 1 A.C. 324 PC. On the wrong of inducing a breach of a common carrier's duties: *James v Commonwealth* (1988) 62 C.L.R. 364 at 370.

[117] *Prudential Assurance v Lorenz* (1971) 11 K.I.R. 78 (agents in dispute with employer induced not to render an account of monies). See too *Dixon v Dixon* [1904] 1 Ch. 161 (right of receiver in equity to stop ex-partner encouraging employees to leave). The choice of terminology ("breach of contractual term" or "equitable wrong") may be very important where a trade union or workers have a statutory protection against such torts as inducing breach of contract in furtherance of a trade dispute: see TULRCA 1992 s.219.

[118] *Nottingham University v Fishel* [2000] I.C.R. 1462: but the contract or part of it may create such a duty to act solely in the interests of the employer; the duty of "loyalty" does not extend that far: Elias J at 1490ff. (See Sims (2001) 30 I.L.J. 101). But see Buckley LJ in *Secretary of State for Employment v ASLEF (No.2)* [1972] I.C.R. 19 at 62. See too *Symbian Ltd v Christensen* [2001] I.R.L.R. 77 (duty of fidelity). For Commonwealth discussions of fiduciary duty and the contract of employment see R. McCallum and A. Stewart "Employee Loyalty in Australia" (1999) 20 Comp. Lab. Law and Policy Jo. 155, 160; and J. Oakley "Employee Duty of Loyalty—a Canadian Perspective" (1999) 20 Comp. Lab. Law and Policy Jo 185, 190–194.

[119] *Coulthard v Disco Mix Club Ltd* [2000] 1 W.L.R. 707 (an incisive analysis by Jules Sher QC on limitation periods); followed in *CIA de Seguros Imperio v Heath REBX Ltd* [2001] 1 W.L.R. 112 CA (limitation in equitable claims); see too, analogies with tort on duties to account in *Nationwide Building Society v Various Solicitors (No.3)* [1999] P.N.L.R. 606.

[120] *Marex Financial Ltd v Sevilleja* [2017] EWHC 918 (Comm); [2017] 4 W.L.R. 105. The separate question raised as to whether any part of the claim was precluded by the "No Reflective Loss Rule" was discussed further on appeal, and eventually decided in the claimant's favour by the Supreme Court: [2020] UKSC 31; [2020] 3 W.L.R. 255.

[121] *Sefton v Tophams (No.2)* [1965] Ch. 1140 (possibly even if there is no tort by the third party, a matter not discussed in HL: [1967] A.C. 50); applying *Manchester Ship Canal v Manchester Racecourse* [1901] 2 Ch. 37 (treated as an ordinary inducing breach of contract case in *Pritchard v Briggs* [1980] Ch. 338 at 392–394, per Goff LJ); the extension against a further party may rest on the enforcement in rem of rights inherent in the contract: Kitto J, *Att Gen (South Wales) v Perpetual Trustee Ltd* (1952) 85 C.L.R. 237 at 297 (see [1955] A.C. 457 PC); Tettenborn [1982] C.L.J. 58, 81-85; Cohen-Grabelsky (1982) 45 M.L.R. 241, 264; and *RCA Corp v Pollard* [1983] Ch. 135.

such as an injunction ordering re-transfer of the property to B. But if C transfers the property to a fourth party (D) *before* any such remedy is sought by B, then D is not liable in tort, being a lawful transferee in the "onward transfer", even if all parties have full knowledge of the facts and even if it is assumed that D procured the transfer by C.[122]

**23-27    Breach of confidence[123]**    Despite some doubts about its nature as a species of tortious liability,[124] breach of the duty not to disclose confidential information now appears to be a genus permitting several different types of actionable wrong.[125] Whatever the correct characterisation of breach of confidence as a cause of action, third parties who receive confidential information may be liable for failing to respect its confidential character. The circumstances in which it is received may be such that this liability is analogous to that for inducing breach of contract.

### (b)    Knowledge and intention

**23-28**    "An act of inducement is not by itself actionable."[126] The procurer must act with the requisite knowledge of the existence of the contract and intention to procure a breach.[127] It is not enough for a claimant to prove that a breach of contract was the natural consequence of the defendant's conduct[128]; he must show that the breach was an end in itself or the means to an end.[129]

---

[122] *Law Debenture Trust Corp v Ural Caspian Oil Corp* [1995] Ch. 152 CA, reversing Hoffmann J (even if C and D are companies in the same group and no attempt is made to "pierce the corporate veils", per Bingham MR at 165; but see the doubts of Saville LJ at 172–173, and Beldam LJ at 168–170; procurement was assumed in the Court of Appeal and conspiracy was not pleaded). Contrast liability for an act amounting to contempt because it interferes with the rights of a party who *has already obtained* an injunction: *Acrow (Automation) Ltd v Rex Chainbelt Inc* [1971] 1 W.L.R. 1676 CA, a form of "unlawful interference".

[123] See W. Cornish, D. Llewellyn and T. Aplin, *Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 9th edn (2019), Ch.8.

[124] See *Van Camp Chocolates v Aulsebrookes* [1984] 1 N.Z.L.R. 354, where Cooke J doubted whether it was a tort based on "unlawful means" even if it caused intended damage (which was not the case there); the claimant would have a cause of action under the equitable "principles relating to breach of confidence" at 360. See generally Ch.26.

[125] See Ch.26; Cornish, Llewellyn & Aplin, *Intellectual Property: Patents, Copyright, Trade Marks and Allied Rights*, 9th edn (2019), Ch.8; cf. Meagher, Gummow, Lehane, *Equity: Doctrines and Remedies*, 5th edn (2014), Ch.41.

[126] per Lord Devlin in *Rookes v Barnard* [1964] A.C. 1129 at 1212. Nor is an act facilitating breach without more: *Credit Lyonnais Bank Nederland NV v Export Credits Guarantee Department* [2000] 1 AC. 486 HL at 496 and 500.

[127] *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1, per Lord Hoffmann at [39]–[41] and Lord Nicholls at [192]. cf. *Qantas Airways v Transport Workers Union of Australia* [2011] FCA 470; (2011) 280 A.L.R. 503 at [442]–[444] noting the view that although the requirement of knowledge was sometimes expressed as separate, it was in fact an aspect of intention; sufficient knowledge meant sufficient to ground an intention to interfere with contractual rights: *Allstate Life Insurance Co v Australia and New Zealand Banking Group Ltd* (1995) 130 A.L.R. 469. There may be some advantage in treating the two elements as distinct, since a defendant may avoid liability either by establishing that he did not know of the contractual terms concerned or by establishing that he did not intend his actions to bring about a breach of the terms by the party concerned.

[128] *Stott v Gamble* [1916] 2 K.B. 504; *Rickless v United Artists Corp* [1986] F.S.R. 507 at 518–524; affirmed [1988] Q.B. 40 CA; *DC Thomson & Co Ltd v Deakin* [1952] Ch. 646 at 663 and 698; *Central Canada Potash Co Ltd v Govt of Saskatchewan* (1979) 88 D.L.R. (3d) 609 SCC at 641–642.

[129] *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C.1 at [42]–[43], per Lord Hoffmann; see too *Sar Petroleum Inc v Peace Hills Trust Co* 2010 NBCA 22; (2010) 318 D.L.R. (4th) 70 at [51]–[55] where

CHAPTER 26

## BREACH OF CONFIDENCE AND PRIVACY

TABLE OF CONTENTS

1.   GENERAL INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-01
2.   ACTION FOR BREACH OF CONFIDENCE  . . . . . . . . . . . . . . . . . . .  26-05
   (a)   Information in respect of which an action for breach of
         confidence may arise  . . . . . . . . . . . . . . . . . . . . . . . . .  26-09
   (b)   Where an obligation of confidence arises  . . . . . . . . . . . .  26-12
   (c)   Breach  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-20
   (d)   Defences  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-26
       (i)   Cessation of obligations  . . . . . . . . . . . . . . . . . . . .  26-26
       (ii)  Public interest  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-27
   (e)   Remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-33
3.   THE ACTION FOR MISUSE OF PRIVATE INFORMATION/PRIVACY  . . . .  26-37
   (a)   The reasonable expectation of privacy  . . . . . . . . . . . . . .  26-42
   (b)   Competing interests  . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-49
   (c)   Relevant statutory provisions  . . . . . . . . . . . . . . . . . . . .  26-54
   (d)   Remedies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26-56

## 1.   GENERAL INTRODUCTION

**The traditional action for breach of confidence**[1]    The jurisdiction to provide    **26-01**
remedies for breach of confidence is well established in English law.[2] Lord Goff
noted that as a broad general principle, a duty of confidence arises when confidential
information comes to the knowledge of a person, in circumstances where he has
notice, or is held to have agreed, that the information is confidential, with the ef-
fect that it would be just in all the circumstances that he should be precluded from
disclosing the information to others.[3] And traditionally there has been no limit in
principle to the kind of information which might be the subject of a claim for breach
of confidence, the four main classes of information which the courts have tradition-
ally protected by this action[4] being: personal confidences, trade secrets,[5] artistic and
literary confidences[6] and state secrets.[7]

---

[1]   For more detailed consideration see Gurry, *Breach of Confidence*, 2nd edn (2012); Law Commis-
sion Report No.110, *Breach of Confidence* (1981), Cmnd.8388.
[2]   For the nineteenth century origins of the modern law, see *Prince Albert v Strange* (1849) 2 De. G
& Sm. 652; *Morrison v Moat* (1851) 9 Hare 241; (1852) 21 L.J. Rep. (N.S.) Ch. 248 (medical
formula).
[3]   *Att Gen v Guardian Newspapers Ltd (No.2)* [1990] 1 A.C. 109.
[4]   Simon Brown LJ in *R. v Department for Health Ex p. Source Informatics* [2001] Q.B. 424.
[5]   As well as classic trade secrets such as manufacturing formulae and methods, the law will protect a
wide range of information useful in trade including customer lists (*Robb v Green* [1895] 2 Q.B. 315);
possibly management techniques (*Stephenson Jordan & Harrison v McDonald & Evans* (1951) 68
R.P.C. 190; (1952) 69 R.P.C. 10); market reports (*PCR Ltd v Dow Jones Telerate Ltd* [1998] F.S.R.
170—claim in confidence failed on facts). The UK is bound by the TRIPs Agreement to protect com-

property, Lord Walker did acknowledge that "the prevailing current view is that confidential information is not strictly property".[24] Where the obligation of confidence arises (either expressly or impliedly) in a contractual relationship, the breach of confidence may be categorised as a breach of contract. However, the obligation can arise in a non-contractual setting. Here, the most favoured basis for the action to date is that of an equitable principle of good faith.[25] As far as commercial confidences are concerned, Evans LJ held that claims for breach of confidence "do not arise in tort" in *Kitechnology BV v Unicor GmbH*.[26] (It should be noted that the Supreme Court of Canada in *Cadbury Schweppes Inc v FBI Foods Ltd*[27] viewed the action as sui generis, while the Court of Appeal in *Douglas v Hello! (No.3)*[28] found the suggestion that a claim for breach of confidence fell to be "categorised as a restitutionary claim for unjust enrichment" persuasive). However there is growing judicial support for the recognition of the action for misuse of private information as a tort.[29]

## 2. Action for Breach of Confidence

**26-05**    **Action for breach of confidence**    This section explores the action for breach of confidence. Confidential information in its commercial context includes trade secrets,[30] artistic and literary confidences and state secrets. However, it should be

---

24    See the discussion by Lord Walker [2012] UKSC 28; [2013] 1 A.C. 1 at [24]–[39]. Mummery LJ in *Fairstar Heavy Transport N.V. v Adkins* [2013] EWCA Civ 886; [2014] F.S.R. 8 at [47]–[48], though refusing to be drawn into the controversy, noted "some kinds of information, such as non-patentable know-how, are more akin to property in their specificity and exclusivity than say, personal information about private life".

25    In *Seager v Copydex Ltd* [1967] 1 W.L.R. 923, Lord Denning said: "The law on this subject does not depend on any implied contract. It depends on the broad principle of equity that he who has received information in confidence shall not take unfair advantage of it." *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [22], Lord Neuberger: "an action in breach of confidence is based ultimately on conscience".

26    [1995] F.S.R. 765. And see *Vidal-Hall v Google Inc* [2014] EWHC 13 (QB); [2014] 1 W.L.R. 4155, Tugendhat J; though cf. *Walsh v Shanahan* [2013] EWCA Civ 411 at [55], Rimer LJ. Common design could be invoked against a defendant in a claim based on breach of confidence, *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556, Lord Neuberger (discussed below, especially at para.26-18).

27    [2000] F.S.R. 491. And see Lord Phillips MR in *Douglas v Hello! Ltd (No.3)* [2005] EWCA Civ 595; [2006] Q.B. 125 at [96].

28    *Douglas v Hello! Ltd (No.3)* [2005] EWCA Civ 595; [2006] Q.B. 125 at [97], per Lord Phillips MR.

29    See Lord Woolf in *A v B* [2002] EWCA Civ 337; [2003] Q.B. 195 at [4]; Lord Nicholls in *Campbell v MGN Ltd* [2004] UKHL 22; [2004] 2 A.C. 457 at [14]; Buxton LJ in *McKennitt v Ash* [2006] EWCA Civ 1714; [2008] Q.B. 73 at [8]; Lord Neuberger MR in *Imerman v Tchenguiz* [2010] EWCA Civ 908; [2011] Fam. 116 at [65]. In *Mosley v News Group Newspapers Ltd* [2008] EWHC 1777 (QB); [2008] E.M.L.R. 20 at [181]–[184] Eady J reviewed the debate as to whether or not this action is a tort; and note Tugendhat J in *Vidal-Hall v Google Inc* [2014] EWHC 13 (QB); [2014] 1 W.L.R. 4155 at [68]–[70]. In *Vidal-Hall v Google Inc* [2015] EWCA Civ 311; [2016] Q.B. 1003 at [43], Lord Dyson MR commented: "We cannot find any satisfactory or principled answer to the question why misuse of private information should not be characterised as a tort for the purposes of service out of the jurisdiction." And see *Ahuja v Politika Novine I Magazini Doo* [2015] EWHC 3380 (QB); [2016] 1 W.L.R. 1414, Tugendhat J; *Axon v Ministry of Defence* [2016] EWHC 787 (QB); [2016] E.M.L.R. 20 at [72], Nicol J, "the tort or remedy for misuse of private information". On service out of the jurisdiction see amendments to Practice Direction 6B and gateway 21 which covers claims for "breach of confidence or misuse of private information".

30    The Trade Secrets Directive 2016/943 (on the protection of undisclosed know-how and business information (trade secrets) against their unlawful acquisition, use and disclosure) which involves

Action for Breach of Confidence

noted that with state secrets[31] the trivia exception[32] may not apply[33] and the state needs to show there is a public interest in preventing the disclosure of the information.[34] The application of the Official Secrets Act 1989 should also be noted. In *OBG Ltd v Allan* the House of Lords characterised the action for breach of confidence as "moving forward rather than drawing back".[35] However, notwithstanding this, the continued requirement for confidentiality in this action is accepted.[36] Where trade secrets are concerned it should be noted that the Trade Secrets Directive 2016/943 (on the protection of undisclosed know-how and business information (trade secrets) against their unlawful acquisition, use and disclosure) was incorporated into domestic law by the Trade Secrets (Enforcement, etc.) Regulations 2018.[37]

**Requirements**   Traditionally, there are three requirements for liability for breach of confidence. These principles are derived from *Coco v AN Clark (Engineers) Ltd*, per Megarry J.[38] First, the information in respect of which relief is sought must have the "necessary quality of confidence about it".[39] Secondly, the information must have been imparted in circumstances importing an obligation of confidence. The use of the word "imparted", however, is now clearly too limited for the modern action, it now being established that there is no need for an initial confidential relationship.[40] Thirdly, there must be an unauthorised use or disclosure of that information.[41] It is an open question whether detriment to the claimant is an es-   **26-06**

---

minimum protection that States must provide for the unlawful acquisition, use or disclosure of trade secrets, was incorporated into domestic law by the Trade Secrets (Enforcement, etc.) Regulations 2018 (SI 2018/597), in force 9 June 2018.

[31] In an appropriate case, the Attorney General may sue on behalf of the Crown, e.g. *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109. In Scotland, the Lord Advocate is the appropriate claimant.

[32] See para.26-10.

[33] *Lord Advocate v Scotsman Publications Ltd* [1990] 1 A.C. 812; Lord Griffiths in *Att Gen v Guardian Newspapers (No.2)* [1990] A.C. 109 at 269.

[34] Lord Keith in *Att Gen v Guardian Newspapers (No.2)* [1990] A.C. 109 at 260. Lord Goff at 282 said "that publication would be to its 'detriment' in the sense that the public interest requires that it should not be published".

[35] Baroness Hale in *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 at [307].

[36] On the relationship between breach of confidence and defamation see *Viagogo Ltd v Myles* [2012] EWHC 433 (Ch), Hildyard J at [25]; [35]. For the relationship between misuse of private information/privacy and defamation see para.26-41.

[37] SI 2018/597. See fn.30. There is a statutory definition of trade secret in Regulation 2. The IPO Explanatory Memorandum (*http://www.legislation.gov.uk/uksi/2018/597/memorandum* [Accessed 12 June 2020]) notes the existing protection based on inter alia the action for breach of confidence and states that the SI "addresses those areas where gaps occur or where the implementation of the provisions of the Directive will ensure legal certainty…". On the relationship of the Regulations and the action for breach of confidence see reg.3.

[38] [1969] R.P.C. 41 at 47. In *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1, Lord Hoffmann applied Megarry J's framework for the action as set out in *Coco v AN Clark (Engineers) Ltd* [1969] R.P.C. 41.

[39] per Lord Greene MR in *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* (1948) 65 R.P.C. 203 at 215.

[40] See para.26-12.

[41] *Wade v British Sky Broadcasting Ltd* [2016] EWCA Civ 1214: as in a claim for copyright infringement, the evidential burden of proof might shift to the defendant once the claimant showed sufficient similarities and opportunity so as to raise an inference of breach.

sential ingredient of the cause of action for breach of confidence[42] but a claimant must at least show apprehended damage in future, if an injunction is to be granted.[43]

**26-07**    **Limiting principles**    In *Att Gen v Guardian Newspapers (No.2)* Lord Goff identified three limiting principles on the duty of confidence.[44] First, the principle of confidentiality only applies to information to the extent that it remains confidential. Once it has entered the public domain (which means no more than that the information in question is so generally accessible that in all the circumstances, it cannot be regarded as confidential) then the principle of confidentiality can have no application to it.[45] Secondly, the duty of confidence applies neither to useless information nor to trivia.[46] Thirdly, the public interest that confidence should be preserved may be outweighed by some other countervailing public interest, which favours use or disclosure, either to the world at large or, at least, to appropriate authorities.[47] That may require the court to carry out a balancing operation, weighing the public interest in maintaining confidence against the public interest favouring use or disclosure.[48] Where free speech issues are concerned, the impact of art.10 of the ECHR will have to be addressed[49] so that the issue becomes whether restraining disclosure of the confidential information is a justifiable interference with the art.10 right to freedom of expression.

**26-08**    **Parties**    Only the party to whom the duty of confidence is owed has a right of action to protect it.[50] The claimant is usually the owner[51] of the confidential material or one whose confidential communications are otherwise protected by the law. However the majority of the House of Lords in *OBG Ltd v Allan*[52] determined that on the facts an obligation of confidence was also owed to an exclusive licensee of the information concerned. This case involved Hello! magazine's publication of unauthorised photographs of Michael Douglas and Catherine Zeta-Jones's wedding reception. The celebrity magazine OK! had contracted with the couple for "exclusive" rights over approved wedding photographs. The photographs were

---

[42] See para.26-25

[43] See para.26-33. With personal confidences, there is probably no need to show detriment, per Lord Keith in *Att Gen v Guardian Newspapers* [1990] A.C. 109 at 256.

[44] *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109, 280. In *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 Lord Walker (in his minority judgment) also stressed the limiting principles outlined by Lord Goff.

[45] But see para.26-09.

[46] See para.26-10.

[47] As to the public interest in disclosure of confidential information, see paras 26-27 to 26-32.

[48] These principles are distilled from the speeches of their Lordships in *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109 especially at 281–282, per Lord Goff.

[49] See para.26-29; Lindsay J in *Douglas v Hello! (No.3)* [2003] EWHC 786 (Ch); [2003] 3 All E.R. 996: given ECHR art.10(2) there could be a conflict between art.10(1), freedom of expression and the rights under the law of confidence even where privacy rights under art.8 not involved, *HML PM Ltd v Canary Riverside Management Ltd* [2019] EWHC 3496 (QB) Nicol J at [60].

[50] *Fraser v Evans* [1969] 1 Q.B. 349 ("the party complaining must be the person who is entitled to the confidence and to have it respected"). In *Jones v IOS (RUK) Ltd* [2012] EWHC 348 (Ch) (HH Judge Hodge QC) it was held that the claimant had to have "sufficient interest in the information" (see [40]). And see *Abbey v Gilligan* [2012] EWHC 3217 (QB); [2013] E.M.L.R. 12 Tugendhat J at [40]–[41].

[51] It is common to speak of the "owner" of the information but, because the courts have not held that information is property as traditionally conceived, use of the term "person to whom the duty is owed" is perhaps less controversial.

[52] [2007] UKHL 21; [2008] 1 A.C. 1.

taken on a private occasion where there had been an express prohibition by the couple on unauthorised photography. In the Court of Appeal the Douglases' breach of confidence claim (which contained both privacy and commercial aspects) succeeded[53] but OK!'s claims failed. OK!'s appeal to the House of Lords was based inter alia on the alleged duty of confidence owed to them in the photographic images of the wedding. Unlike the Court of Appeal, the majority of the House of Lords—Lords Hoffmann, Brown and Baroness Hale—held that the obligation of confidence extended to OK!, as exclusive licensee, because "everyone knew that the obligation of confidence was imposed for the benefit of OK! as well as the Douglases" and "they paid or the benefit of the obligation of confidence imposed on all those present".[54] The minority—Lords Nicholls and Walker—found no duty owed to OK! in respect of the unauthorised pictures.[55] As far as defendants are concerned, the position of those receiving information innocently is considered below, as is the position of indirect recipients and those on whom it is sought to impose secondary liability.[56] In *Warwickshire CC v Matalia*[57] the claimant county council had commissioned test papers from a university (which retained copyright) for use in local schools. The same paper was to be used for different sittings of the test. After the first sitting the defendant published details of the test—obtained from pupils who had sat the test—on his website. The county council had locus standi to bring a claim for breach of confidence: "As the provider and administrator of the tests the Council had a substantial and legitimate interest in the maintenance of confidentiality".[58] The defendant owed a duty of confidence to the claimant. The confidential character of the information was obvious to the defendant "whether or not the children who supplied the information to him were themselves under any duty of confidence".[59]

### (a)    Information in respect of which an action for breach of confidence may arise

**The quality of confidence**    An action for breach of confidence will only arise if the information in question has the necessary quality of confidence about it.[60] There

**26-09**

---

[53] *Douglas v Hello (No.3)* [2005] EWCA Civ 595; [2006] Q.B. 125.

[54] Lord Hoffmann in *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 at [114] and [117].

[55] Lord Walker contended that "OK! no more had a monopoly in any possible photographs of the spectacle than it had in the spectacle itself": [2007] UKHL 21; [2008] 1 A.C. 1 at [296], citing the High Court of Australia in Victoria Park Racing and Recreation Grounds Ltd v Taylor (1937) 58 C.L.R. 479 in support.

[56] Lord Griffiths, *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109 at 268: "the duty of confidence is, as a general rule, also imposed on a third party who is in possession of information which he knows is subject to an obligation of confidence." See generally paras 26-17 to 26-18. As for vicarious liability, see Lord Neuberger in *Vestergaard Fransden S/A v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556.

[57] [2017] EWCA Civ 991; [2017] E.C.C. 25.

[58] [2017] EWCA Civ 991; [2017] E.C.C. 25 at [30], per David Richards LJ.

[59] See the discussion [2017] EWCA Civ 991; [2017] E.C.C. 25 at [46]–[47].

[60] per Lord Greene MR in *Saltman Engineering Co Ltd v Campbell Engineering Co* (1948) 65 R.P.C. 203 at 215. The authors of Gurry on *Breach of Confidence*, 2nd edn (2012) note at para.5–14 that "the basic attribute which information must possess before it can be considered confidential is inaccessibility". Zacaroli J in *The Racing Partnership Ltd v Done Brothers (Cash Betting) Ltd* [2019] EWHC 1156 (Ch); [2019] 3 W.L.R. 779 stressed on the facts the ability to control commercially valuable information.

can be relative secrecy[61] but the information must not be "public property and public knowledge",[62] not "so generally accessible that, in all the circumstances, it cannot be regarded as confidential".[63] Even where the circumstances of communication involve confidentiality there can be no breach of confidence in revealing to others something which is already common knowledge.[64] However, limited or only partial dissemination may not amount to accessibility while matters which the public could find out about if they made the effort, or did the necessary work, may not necessarily be regarded as being in the public domain and therefore incapable of being protected.[65] In *Barclays Bank Plc v Guardian News and Media Ltd*[66] confidential documents (published in whole) appeared for four hours on defendant's website, with reference to these documents also made in the defendant's newspaper. Confidentiality continued to exist in the documents: though "generic" availability of material on the internet would mean that it was likely it had lost its confidential character " ... very limited dissemination and only partial dissemination, perhaps in some remote or expert site that is generally not available to the public without a great deal of effort, may not result in such loss of confidentiality".[67] Something that has been constructed solely from materials in the public domain may possess the necessary quality of confidentiality. In *Saltman v Campbell*, it was said that what makes certain information confidential "is the fact that the maker of the document has used his brain and then produced a result which can only be produced by someone who goes through the same process".[68] Thus, manufacturing information may be confidential even if is possible to "reverse engineer" an article from materials in the public domain but to do so would take much longer without knowledge

---

[61] "It is a question of degree": Sir John Donaldson MR in *Att Gen v Guardian (No.2)* [1990] A.C. 109 at 177. See also *Shelley Films Ltd v Rex Features Ltd* [1994] E.M.L.R. 134 at 148–149; *Creation Records Ltd v News Group Newspapers Ltd* [1997] E.M.L.R. 444 at 461–464.

[62] per Lord Greene MR in *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* (1948) 65 R.P.C. 203. The majority of the Court of Appeal in *Schering Chemicals Ltd v Falkman Ltd* [1982] Q.B. 1 awarded an interlocutory injunction although the information was already in the public domain, as the defendant had revived the memory of matters prejudicial to the claimant (see Shaw LJ at [28] and Templeman LJ at [37]). However, the majority view was criticised by Lord Oliver in *Att Gen v Guardian Newspapers* [1987] 1 W.L.R. 1248 at 1319; and doubted in *BBC v HarperCollins Publishers Ltd* [2010] EWHC 2424 (Ch); [2011] E.M.L.R. 6, Morgan J.

[63] *Lord Goff Att Gen v Guardian (No.2)* [1990] A.C. 109 at 282. It is submitted that the better view is that information disclosed in breach of confidence still enters the public domain (see para.26-35, but cf. the view in *Speed Seal Products v Paddington* [1985] 1 W.L.R. 1327).

[64] cf. the position where private confidences are involved, para.26-43. It should also be noted that in *Douglas v Hello!* though the authorised and unauthorised photographs portrayed basically the same information the majority did not find that the photographic images of the wedding were in the public domain even when the authorised photographs were published by OK!. Each photograph was protected as "the secret consists no less of each and every visual image of the wedding than of the wedding as a whole" (per Lord Brown [2007] UKHL 21; [2008] 1 A.C. 1 at [329]). This interpretation of the facts enabled the majority to impose an obligation of confidence, owed to the exclusive licensee. Lords Walker and Nicholls dissented on this point.

[65] See *Coco v AN Clark (Engineers)* [1969] R.P.C. 41. And see also the discussion of the "springboard" doctrine, para.26-35.

[66] [2009] EWHC 591 (QB), per Blake J.

[67] [2009] EWHC 591 (QB) at [22]. Blake J also noted (at [26]) that it was "unattractive" for the defendant to rely on the publication by others if that publication was caused by their own wrongful publication on their website. On "theoretical accessibility" see *Venables v News Group Newspapers Ltd* [2001] Fam. 430 (Butler-Sloss P.).

[68] *Saltman Engineering Co v Campbell Engineering Co* (1948) 65 R.P.C. 203.

Action for Breach of Confidence

of the information.[69] However, Jacob J in *Mars UK Ltd v Teknowledge*[70] held that the mere fact information was encrypted in a freely available product did not impose an obligation of confidence (especially as the product did not warn that such encryption was involved). Circumventing such encryption was not analogous to eavesdropping or the use of long-lens photography.

**Information protected by the action**    The confidential information need not be complex to attract protection: "the simpler the idea, the more likely it is to require protection."[71] So, in *Fraser v Thames Television*[72] the idea for a television series was held to be capable of protection. The mere fact that the confidential information is not embodied in a document but may be carried away (for example by an ex-employee) in his head is not of itself a reason against restraining misuse.[73] However, Lord Goff stated that neither "useless" information nor "trivia" will be protected,[74] though what exactly is meant by the latter concept is not clear.[75] Nor will "vague aspirations or concepts" be protected, at least where entertainment ideas are in issue.[76] Hirst J in *Fraser v Thames Television*[77] noted that "the content of the idea [must be] clearly identifiable, original, of potential commercial attractiveness and capable of being realised in actuality". In *OBG Ltd v Allan*[78] the photographic images were held to be information. It should also be noted that Megarry J, in *Coco v AN Clark (Engineers) Ltd*[79] stated that the secret must represent "in some considerable degree [the confider's] independent efforts". A non-selective list of materials in the public domain will not be treated as confidential, even if putting it together involved some time and effort.[80] Evidence as to whether information should be regarded as confidential may be provided by the reasonable belief in this fact by the original possessor of that information.[81] Whether information should be treated as confidential will be judged in the light of the usage and practices of the particular industry concerned. Thus, the knowledge of the existence of a patent, which is a published document, may provide the basis for an action.[82]

**26-10**

---

[69]  See also *Alfa Laval Cheese Systems Ltd v Wincanton Engineering Systems Ltd* [1990] F.S.R. 583.

[70]  [2000] F.S.R. 138. cf. *Volkswagen AG v Garcia* [2013] EWHC 1832 (Ch); [2014] F.S.R. 12 Birss J, which also involved reverse engineering but where the confidential information had been obtained from an illegitimate source.

[71]  *Coco v AN Clark (Engineers) Ltd* [1969] R.P.C. 41

[72]  [1984] Q.B. 44.

[73]  *Printers Finishers Ltd v Holloway* [1965] 1 W.L.R. 1. See below on the position of ex-employees.

[74]  *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109 at 282.

[75]  Lord Walker in his dissenting judgment in *OBG Ltd v Allan* viewed this as an important limitation: [2007] UKHL 21; [2008] 1 A.C. 1 at [294]. "Tittle-tattle" will not be protected, per Megarry J in *Coco v AN Clark (Engineers) Ltd* [1969] R.P.C. 41 at 48.

[76]  *De Maudsley v Palumbo* [1996] F.S.R. 447. This concept was also applied to a design idea for a decorative pendant in *Sales v Stomberg* [2005] EWHC 1624 (Ch); [2006] F.S.R. 7.

[77]  [1984] Q.B. 44 at [65]–[66]. In *Bailey v Graham* [2011] EWHC 3098 (Ch) at [104], Judge Pelling QC, questioned whether a recipe for sauce was sufficiently certain to have the necessary quality of confidence, citing *De Maudsley v Palumbo* [1996] F.S.R. 447 that the material relied upon must be capable of being realised as an actuality (judgment upheld—on the issue of witness and parties' credibility—in [2012] EWCA Civ 1469).

[78]  [2007] UKHL 21; [2008] 1 A.C. 1.

[79]  [1969] R.P.C.41 at [47]–[48].

[80]  *Ocular Sciences Ltd v Aspect Vision Care Ltd* [1997] R.P.C. 289 at 375, Laddie J demanding that "there must be some product of the skill of the human brain".

[81]  *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117; *Thomas Marshall (Exports) Ltd v Guinle* [1979] Ch. 227.

[82]  *Cranleigh Precision Engineering v Bryant* [1965] 1 W.L.R. 1293.

Breach of Confidence and Privacy

**26-11**  **Need for identification of the confidential information**  The confidential information sought to be protected must generally be identified and particularised in the statement of case.[83] This is particularly important if an injunction is sought—a fortiori, an interim injunction[84]—when the court will require a claimant to identify with precision the information in respect of which relief is sought.[85] The courts are familiar with employers or manufacturers who are of the opinion that they have legitimate ground for complaint based merely on the belief that someone (usually an ex-employee) may be using something of theirs that has not been published.[86] This is not enough, and many motions for interim relief based on such tenuous grounds have failed.[87]

### (b)  Where an obligation of confidence arises

**26-12**  **Circumstances giving rise to an obligation of confidence**  It must be proved that the defendant was under a legal obligation of confidence. Lord Goff in *AG v Guardian Newspapers (No.2)*[88] referred to the "broad general principle" that a duty of confidence arises when confidential information comes to the knowledge of a person in circumstances where he has notice that the information is confidential "with the effect that it would be just … that he should be precluded from disclosing the information to others".[89] A wide range of circumstances can give rise to an obligation of confidence. They have in common that the person receiving the information was or should have been aware of the confidence attaching to the information.[90] Knowledge can include circumstances where the confidant has

---

[83]  *Ocular Sciences Ltd v Aspect Vision Care Ltd* [1997] R.P.C. 289. Applied, *Bains v Moore* [2017] EWHC 242 (QB); [2017] E.M.L.R. 20, Tugendhat J.

[84]  *PA Thomas & Co v Mould* [1968] 2 Q.B. 913.

[85]  *CMI-Centers for Medical Innovation GmbH v Phytopharm Plc* [1999] F.S.R. 235, interim injunctive relief is unlikely to be granted where no attempt has been made to disentangle material which is confidential from that which is not.

[86]  If the claimant fails to give proper particulars the court may infer that the true purpose of the action was harassment and the action will be struck out as an abuse of process, see Laddie J in *Ocular Sciences Ltd v Aspect Vision Care Ltd* [1997] R.P.C. 289.

[87]  See, for example, *Lock International Plc v Beswick* [1989] 1 W.L.R. 1268, where Hoffmann J drew attention to the need for critical scrutiny of that which was claimed to be confidential.

[88]  [1990] 1 A.C. 190 at 281.

[89]  An obligation of confidence can be imposed after the information has been communicated provided the information remains outside the public domain: *Surface Technology Plc v Young* [2002] F.S.R. 25. In *Abbey v Gilligan* [2012] EWHC 3217 (QB); [2013] E.M.L.R. 12 at [63] Tugendhat J, with regard to the law of confidentiality and leaks to journalists, noted that "a journalist considering whether or not to publish information must, in many cases, have an opportunity to read the information to make that decision. It cannot be right that the court should in such cases too readily find that the obtaining or reading of the information is a breach of confidence".

[90]  See *Coco v AN Clark (Engineers) Ltd* [1969] R.P.C. 41. In *Carflow Products v Linwood Securities* [1996] F.S.R. 424 Jacob J in determining whether a disclosure was made in confidence preferred the subjective approach to the objective approach. But note constructive knowledge accepted by Lord Goff *Att Gen v Guardian Newspapers Ltd (No.2)* [1990] 1 A.C. 109 at 281; Lord Hoffmann in *Campbell v MGN Ltd* [2004] UKHL 22; [2004] 2 A.C. 457 at 48; Lord Neuberger in *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [23]. He noted, at [25], liability for breach of confidence could also arise where a defendant learns of a trade secret in circumstances where she reasonably does not appreciate that it is confidential, but subsequently appreciates that it is in fact confidential. And see Arnold J in *Primary Group (UK) Ltd v The Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] R.P.C. 26 at [210]–[223].

deliberately closed his eyes to the obvious.[91] In the vast majority of cases the duty of confidence will arise from a transaction or relationship between the parties.[92] However, it has become clear (especially since the judgment of Lord Goff in *Att Gen v Guardian Newspapers Ltd (No.2)*[93] that a duty of confidentiality may arise independently of any pre-existing relationship. The scope of the duty may also be in issue. In *R v Department of Health Ex p Source Infomatics (No.1)*[94] Simon Brown LJ noted that the touchstone by which to judge the scope of the confidant's duty and whether it had been breached was "his own conscience". The position of indirect recipients of information disclosed by a person owing an obligation of confidence and the issue of secondary liability are discussed below.[95]

**Confidences arising from specific contractual provision or a relationship**    An **26-13** obligation to treat certain information as being confidential is frequently expressly imposed by contract.[96] Examples include terms in agreements licensing industrial know-how and contracts of employment.[97] It may be that the express obligation of confidence does not survive the repudiation of the contract by the party seeking to enforce such an express contractual provision.[98] In the absence of express provision, the courts have been willing to imply a term of confidentiality in circumstances where this is clearly called for in the context of the relationship existing between the parties.[99] There are a number of distinct cases where the courts have held that an obligation of confidence arises. These include commercial relationships. So where, for instance, two parties enter into an agreement to exploit an industrial process or invention[100] a relationship of confidentiality is readily inferred. Likewise, when apparatus,[101] drawings or specifications[102] or other ideas[103] are provided for

---

[91] *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109 at 281B. Note the discussion of secondary liability in para.26-18.

[92] Reviewed in paras 26-13 to 26-15.

[93] [1990] 1 A.C. 109.

[94] [2001] Q.B. 424 at [31].

[95] Paras 26-17 to 26-18.

[96] The Court of Appeal in *Campbell v Frisbee* [2002] EWCA Civ 1374; [2003] I.C.R. 141 at [22] stated that it was arguable that "a duty of confidentiality that has been expressly assumed under contract carries more weight, when balanced against the restriction of the right of freedom of expression, than a duty that is not buttressed by express agreement"; and see *Associated Newspapers Ltd v HRH Prince of Wales* [2006] EWCA Civ 1776; [2008] Ch. 57 (para.26-50), commented upon by Sharp LJ in *Mionis v Democratic Press SA* [2017] EWCA Civ 1194; [2018] Q.B. 662 at [69]. However, cf. the observations of Walker LJ in *London Regional Transport v Mayor of London* [2001] EWCA Civ 1491; [2003] E.M.L.R. 4 at [46].

[97] See, e.g. *Peter Pan Manufacturing Corporation v Corsets Silhouette Ltd* [1964] 1 W.L.R. 96; *Att Gen v Barker* [1990] 3 All E.R. 257.

[98] Applying the principle in *General Billposting v Atkinson* [1909] A.C. 118 HL (a restraint clause in an employment contract lapsed when the employee was wrongfully dismissed). However, the Court of Appeal in *Campbell v Frisbee* [2002] EWCA Civ 1374; [2003] I.C.R. 141 at [16]–[22] raised the possibility that an obligation of confidence could survive the repudiation of the contract (though this involved private confidences).

[99] *Saltman Engineering Co Ltd v Campbell Engineering Co* (1948) 65 R.P.C. 203 at [211]; *Ackroyds (London) Ltd v Islington Plastics Ltd* [1962] R.P.C. 97; *Coco v AN Clark (Engineers) Ltd* [1969] R.P.C. 41.

[100] *Gallay Ltd's Application* [1959] R.P.C. 141; *James Industries Ltd's Patent* [1987] R.P.C. 235; cf. *Strachan and Henshaw Ltd v Pakcel Ltd* (1949) 66 R.P.C. 49; *Fomento Industrial SA v Mentmore Manufacturing* [1956] R.P.C. 87.

[101] *Ackroyds (London) Ltd v Islington Plastics Ltd* [1962] R.P.C. 97.

[102] *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* (1948) 65 R.P.C. 203; *Seager v*

use for a specific purpose, their use for any other purpose will be restrained. A confidential relationship may also arise by trade custom.[104] Again, a director may have a fiduciary relationship with his company[105] or a partner with his co-partners,[106] which will give rise to a duty of confidence. And where professional advisors such as lawyers,[107] bankers[108] and accountants[109] are involved it is usual if not inevitable that confidential matters will be disclosed, so that such advisors will be restrained from divulging and making use of confidential information.[110] (Lawyers are in a special position, in that their clients can invoke the law relating to professional privilege[111]). While these categories provide useful guidance as to the approach of the courts, there is no reason to believe that the obligation is limited to these particular categories.[112] A duty of confidence often survives the termination of the relationship which gave rise to it.[113] In *CF Partners (UK) LLP v Barclays Bank Plc*,[114] Hildyard J noted that "whilst it will not usually be unconscionable to

---

*Copydex Ltd* [1967] 1 W.L.R. 923; *Coco v AN Clark (Engineers) Ltd* [1969] R.P.C. 41; *Prince Albert v Strange* (1869) 2 De G. & Sm. 652; (1869) 1 Mac. G. 25.

[103] *Fraser v Thames Television Ltd* [1984] Q.B. 44 (idea for television series). The Supreme Court of Canada in *Cadbury Schweppes Inc v FBI Foods Ltd* [2000] F.S.R. 491 held that the recipe for a tomato juice and clam broth drink was confidential although "nothing special"; cf. *Bailey v Graham* [2011] EWHC 3098 (Ch), Judge Pelling QC.

[104] *Lac Minerals Ltd v International Corona Resources Ltd* [1990] F.S.R. 441 Sup. Ct of Canada.

[105] *Nordenfelt v Maxim Nordenfelt Guns & Ammunition Co Ltd* [1894] A.C. 535; *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293; *Thomas Marshall v Guinle* [1979] Ch. 227; *Electro Cad Australia Pty Ltd v Mejati* [1995] F.S.R. 291 (High Court Malaysia): director's fiduciary duties stronger than those owed by ordinary employee and could extend to period after resignation.

[106] *Aas v Benham* [1891] 2 Ch. 244. But a duty of confidence does not necessarily give rise to a fiduciary relationship: *Arklow Investments Ltd v Maclean* [2000] 1 W.L.R. 594.

[107] *A Firm of Solicitors, Re* [1997] Ch. 1. In *Ratiu v Conway* [2005] EWCA Civ 1302; [2006] 1 All E.R. 571. Auld LJ compared the fiduciary duty owed by a solicitor with the duty of confidentiality owed by a solicitor to a client. The latter is a separate obligation which can outlast the solicitor/client relationship—see Lord Millett in *Bolkiah v KPMG* [1999] 2 A.C. 222 at 235. In *Lillicrap v Nadler & Son* [1993] 1 W.L.R. 94 the Court of Appeal held that where a client sued his solicitor he waived his claim to confidence relating to matters relevant to the issue of the claim.

[108] *Tournier v National Provincial* [1924] 1 K.B. 461 (discussed in *Primary Group (UK) Ltd v The Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] R.P.C. 26 at [180], Arnold J); *XAG v A Bank* [1983] 2 All E.R. 464.

[109] *Prince Jefri Bolkiah v KPMG* [1999] 2 A.C. 222.

[110] Professional advisors such as solicitors or accountants owe a strict duty of confidence requiring more than merely taking all reasonable steps to keep relevant information confidential: *Prince Jefri Bolkiah v KPMG* [1999] 2 A.C. 222. Other professional advisors such as doctors (*X v Y* [1988] 2 All E.R. 648); hospitals (*Ashworth Hospital Authority v MGN Ltd* [2002] UKHL 29; [2002] 1 W.L.R. 2033) may receive confidential information of course but given the information they receive is likely to be of a personal nature their duty will be subject to the approach which has now evolved for such confidences.

[111] On the distinction between legal professional privilege and the duty of confidence see *Webster v James Chapman & Co* [1989] 3 All E.R. 939. And on patent agents in respect of civil proceedings see Copyright Designs and Patents Act 1988 s.280. In *Kousouros v O'Halloran* [2014] EWHC 2294 (Ch); [2015] W.T.L.R. 1023 at [65] Simon J stated that once a privileged document comes into the hands of an opposing party, the law of confidence comes into play.

[112] The class of persons who may come under an obligation of confidence is not closed: a TV company has been held to come under a duty of confidence in respect of protecting the identity of a supergrass in the course of filming, *Nicholls v BBC* [1999] E.M.L.R. 791.

[113] See, e.g. the life-long duty of confidence to the Crown owed by former members of the S.I.S.: *Att Gen v Guardian Newspapers Ltd (No.2)* [1990] 1 A.C. 109; *Att Gen v Blake* [1998] Ch. 439.

[114] [2014] EWHC 3049 (Ch) at [133], citing Lord Neuberger's emphasis on conscience in *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556. Further "there may be equitable reasons for declining to regard the equitable obligation as confined by a contractual restriction" (at [134]).

use information in conformity with, or in a manner that does not offend, the terms consensually agreed, and the contract will shape the commitment, contract does not necessarily assuage conscience, and equity may yet give force to conscience."

**Rights against employees**    An express duty of confidence may be imposed by a    **26-14**
contract of employment.[115] In other cases, the courts have found a term to be
implied.[116] Implied in a contract of employment is an undertaking by the employee
to serve the employer with "good faith and fidelity".[117] The right of an employer to
restrain an employee from divulging confidential information to others[118] or from
making use of it for his own benefit[119] or that of a subsequent employer is well
established.[120] The result can occasionally be to put an employee in a worse posi-
tion than the rest of the world, which may acquire and be at liberty to use the
information in legitimate ways. Many kinds of confidential information in the pos-
session of employees have been protected. For example, an employee may not
copy,[121] take away with him or use confidential documents such as lists of custom-
ers,[122] technical specifications,[123] particulars of secret processes[124] or materials sup-
plied for his employer's use.[125] An employee will be restrained from making use of
a secret even if he carries it in his head, especially if he deliberately commits it to
memory.[126] But if the employer has already published a trade secret, the employee
will not be restrained from further publishing it.[127] He may also work for another
employer in his spare time, provided that such employment does not involve the
disclosure or use of trade secrets, or is such as to inflict great harm on his

---

[115] *Wessex Dairies v Smith* [1935] 2 K.B. 80; *Att Gen v Barker* [1990] 3 All E.R. 257; *Thomas Marshall v Guinle* [1979] Ch. 227. But see discussion of the rights of "whistleblowers" in the Public Interest Disclosure Act 1998 in para.26-32: any agreement that purports to preclude a worker from making a "protected disclosure" is void (PIDA 1998 s.1, inserting new s.43J into the Employment Rights Act 1996).

[116] *Robb v Green* [1895] 2 Q.B. 315; *Hivac Ltd v Park Royal Scientific Instruments Ltd* [1946] Ch. 169; *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117. In *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [30]–[31], Lord Neuberger refused to imply strict li-ability into the confidentiality clause.

[117] *Robb v Green* [1895] 2 Q.B. 315, per Smith LJ. The general principles were reviewed in *Lancashire Fires Ltd v SA Lyons & Co Ltd* [1997] I.R.L.R. 113; [1996] F.S.R. 629. More senior employees may owe a fiduciary duty: *Crowson Fabrics Ltd v Rider* [2007] EWHC 2942 (Ch); [2008] F.S.R. 17 at [77]–[85].

[118] *Saltri III Ltd v MD Mezzanine SA* [2012] EWHC 1270 (Comm) Hamblen J: where an employee was seconded to another employer, the documents produced during the secondment were prima facie confidential to the company to whom he had been seconded.

[119] *Normalec Ltd v Britton* [1983] F.S.R. 318; *Att Gen v Guardian Newspapers Ltd* [1990] 1 A.C. 109.

[120] *Morrison v Moat* (1851) 9 Hare 241.

[121] *Louis v Smellie* (1895) 73 L.T. 226.

[122] *Robb v Green* [1895] 2 Q.B. 315; *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117; *Roger Bullivant Ltd v Ellis* [1987] I.C.R. 464.

[123] *Merryweather v Moore* [1892] 2 Ch. 518. *Johnson & Bloy (Holdings) Ltd v Wolstenholme Rink Plc* [1989] F.S.R. 135.

[124] *Lamb v Evans* [1893] 1 Ch. 218.

[125] *Lamb v Evans* [1893] 1 Ch. 218.

[126] *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117; *Johnson & Bloy (Holdings) Ltd v Wolstenholme Rink Plc* [1989] F.S.R. 135; and *Lansing Linde Ltd v Kerr* [1991] 1 W.L.R. 251.

[127] *Mustad v Dosen* [1964] 1 W.L.R. 109 (Note); [1963] R.P.C. 41; *Cranleigh Precision Engineering v Bryant* [1965] 1 W.L.R. 1293. As to the statutory protection for a "whistle-blowing" employee, see para.26-32.

employer.[128] Likewise, inventions made by an employee in his spare time belong to him and not to his employer, provided that he is not employed to invent.[129]

**26-15**    **Rights against ex-employees**    The duty of confidentiality is highest while the employment is continuing.[130] In general, an employee may compete with his ex-employer after leaving his employment; and although he may not use information properly classed as trade secrets or their equivalent,[131] imparted to him in the course of his employment, he may use his general knowledge and skills so acquired.[132] This may include, for example, detailed knowledge of machinery and processes,[133] even though it might have been a breach of confidence to have disclosed such matters while still employed.[134] In *Faccenda Chicken Ltd v Fowler*[135] the Court of Appeal considered the scope of those obligations implied in the post-employment situation. Four factors were relevant in deciding whether information constituted a trade secret (or its equivalent) for these purposes: the nature of the employment; the nature of the information; whether the employer impressed upon the employee the confidentiality of the information and whether the information could be easily isolated from the other information which the employee is free to use or disclose. A restrictive covenant not to compete with a former employer or with the purchaser of a business[136] will be enforced provided that it protects the employer's legitimate business interests (whether trade secrets, goodwill or trade connection) and is reasonable in extent and in duration.[137] There is authority for the proposition that

---

[128] *Hivac Ltd v Park Royal Scientific Instruments Ltd* [1946] Ch. 169. As to what spare time work is permissible for a technical employee, see *Lancashire Fires Ltd v SA Lyons & Co Ltd* [1997] I.R.L.R. 113; [1996] F.S.R. 629.

[129] *Electrolux Ltd v Hudson* [1977] F.S.R. 312; *Prout v British Gas Plc* [1992] F.S.R. 478 (employee suggestion scheme).

[130] *Normalec Ltd v Britton* [1983] F.S.R. 318. Where trade secrets are concerned it should be noted that the Trade Secrets Directive 2016/943 (on the protection of undisclosed know-how and business information (trade secrets) against their unlawful acquisition, use and disclosure) was incorporated into domestic law by the Trade Secrets (Enforcement, etc.) Regulations 2018 (SI 2018/597).

[131] "Information of a sufficiently high degree of confidentiality as to amount to a trade secret", Neill LJ, *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117 at 136. It is arguable that an ex-employee who proposes to disclose rather than use confidential information (in its wider sense) may be bound by the duty of confidentiality: *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117 at 136–138.

[132] *Mason v Provident Clothing & Supply Co Ltd* [1913] A.C. 724; *Hivac Ltd v Park Royal Scientific Instruments Ltd* [1946] Ch. 169; *Stephenson, Jordan and Harrison v Macdonald and Evans* (1952) 69 R.P.C. 10; *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117; cf. *Thomas Marshall v Guinle* [1979] Ch. 227; *Lancashire Fires Ltd v SA Lyons & Co Ltd* [1997] I.R.L.R. 113. However, note *Force India Formula One Team Ltd v 1 Malaysia Racing Team Sdn Bhd* [2013] EWCA Civ 780; [2013] R.P.C. 36 at [67], information does not cease to be confidential simply because memorable.

[133] *Printers Finishers v Holloway* [1965] 1 W.L.R. 1; *Balston Ltd v Headline Filters Ltd* [1987] F.S.R. 330.

[134] In *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [44]–[45], the Supreme Court underlined the need for the law to "maintain a realistic and fair balance" between protecting trade secrets and not inhibiting competition. Goulding J in *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117 divided information into three classes: trivial/easily accessible from public sources; confidential during employment but once learned, necessarily becomes part of the employee's skill and knowledge; "specified trade secrets, so confidential that … they cannot lawfully be used for anyone's benefit but the master's".

[135] [1987] Ch. 117.

[136] *Nordenfelt v Maxim Nordenfelt* [1894] A.C. 535; cf. *Herbert Morris Ltd v Saxelby* [1916] 1 A.C. 688.

[137] *Faccenda Chicken Ltd v Fowler* [1987] Ch. 117 at [137]; *FSS Travel & Leisure Systems Ltd v Johnson* [1998] I.R.L.R. 382 and see Silber J in *CEF Holdings Ltd v Munday* [2012] EWHC 1524 (QB); [2012] F.S.R. 35. In *Force India Formula One Team Ltd v 1 Malaysia Racing Team Sdn Bhd*

it may be possible to protect by a suitably limited express covenant, confidential information which is not protectable by an implied term of the contract of employment.[138] As to relief, the court will attempt to avoid generating a "new form of industrial slavery" by granting injunctive relief in terms which effectively prevents the employee from working for anyone except the claimant.[139] If the employer wrongfully repudiates the contract *General Billposting Co Ltd v Atkinson*[140] indicates that he will be unable to enforce a restrictive covenant contained within it against the employee.

**Confidentiality independent of a pre-existing relationship**    Where a person **26-16** obtains obviously confidential information, either deliberately or accidentally, an obligation of confidence may arise. Lord Goff in *Att Gen v Guardian Newspapers Ltd (No.2)*[141] said that "a duty of confidence arises when confidential information comes to the knowledge of a person … in circumstances where he has notice … that the information is confidential, with the effect that he should be precluded from disclosing the information to others". He instanced an obviously confidential document being wafted by an electric fan out of a window into a crowded street. An example of such chance possession of an obviously confidential document can be found in the facts of *English & American Insurance Co Ltd v Herbert Smith*.[142] The obligation can therefore attach to "strangers". Examples include: discovery of a private diary dropped in a public place[143]; taping confidential material said in a

---

[138] *Balston Ltd v Headline Filters Ltd* [1987] F.S.R. 330, per Scott J In *Force India Formula One Team Ltd v 1 Malaysia Racing Team Sdn Bhd* [2013] EWCA Civ 780; [2013] R.P.C. 36 at [60] Lewison LJ agreed with Scott J in declining to read Faccenda as holding that confidential information not protected by the implied term could not be protected by an express term. (See also *Lancashire Fires Ltd v SA Lyons & Co Ltd* [1997] I.R.L.R. 113). *Invista Textiles UK Ltd v Botes* [2019] EWHC 58 (Ch); [2019] I.R.L.R. 977 at [46]–[48], Birss J, contains a useful review of case law on restrictive covenants.

[2013] EWCA Civ 780; [2013] R.P.C. 36 at [66]–[67] Lewison LJ discusses the distinction between information and skill/expertise. "Garden leave" arrangements—where the worker is still employed but not required to attend for work—would not as such be subject to restraint of trade principles, though arguably an excessive period might be, see the comment Dillon LJ in *Provident Financial Group Plc v Hayward* [1989] I.C.R. 160; [1989] 3 All E.R. 298. *D v P* [2016] EWCA Civ 87; [2016] I.C.R. 688: the starting point in the consideration of a claim by an employer to enforce an employee's negative covenant is that the ordinary remedy is an injunction. The Supreme Court in *Tillman v Egon Zehnder Ltd* [2019] UKSC 32; [2020] A.C. 154 considered the issue when, where part of a post-employment covenant was in restraint of trade, the circumstances in which the court should seek to remove it so as to leave the ex-employee bound by the remainder.

[139] See, per Templeman LJ in *GD Searle & Co Ltd v Celltech Ltd* [1982] F.S.R. 92.

[140] [1909] A.C. 118 (cf. if the breach did not constitute a repudiation or was not accepted by the employee: *Rock Refrigeration Ltd v Jones* [1997] I.C.R. 938; [1997] 1 All E.R. 1 CA). However, in *Campbell v Frisbee* [2002] EWCA Civ 1374; [2003] I.C.R. 141 (a case concerning personal information) Lord Phillips MR noted (at [22]) "we do not believe that the effect on duties of confidence assumed under contract when the contract in question is wrongly repudiated is clearly established"; and note Gurry, *Breach of Confidence*, 2nd edn (2012), para.12.149.

[141] [1990] 1 A.C. 109 at [281]–[282], referred to by Lord Neuberger MR in *Tchenguiz v Imerman* [2010] EWCA Civ 908; [2011] Fam. 116 at [64]: "the law of confidence was authoritatively extended to apply to cases where the defendant had come by the information without the consent of the claimant."

[142] [1988] F.S.R. 232, per Jacob J in *Mars UK Ltd v Teknowledge Ltd* [2000] F.S.R. 138 at [35]. The court will also restrain the use of privileged documents handed over by mistake in disclosure, if the mistake would have been obvious to a reasonable solicitor: *Derby & Co Ltd v Weldon (No.8)* [1991] 1 W.L.R. 73; *IBM Corp v Phoenix International (Computers) Ltd* [1995] 1 All E.R. 413.

[143] obiter, per Lord Goff in *Att Gen v Guardian Newspapers (No.2)* [1990] A.C. 109 at 281.

private telephone conversation[144]; taking a photograph of a closed and secret film set.[145] In such cases, though the court sometimes highlights improper behaviour on the part of the defendant, the duty of confidence arises from knowledge that the information is confidential.[146]

**26-17    Indirect recipients of confidential information[147]**    A third party to whom confidential information is relayed by a party under an obligation of confidence may also owe an obligation of confidence to the claimant not to use or disclose that information. That is certainly the case where the third party is aware[148] of the confidentiality attaching to the information, even if that awareness arises subsequently to the receipt of that information.[149] Even bona fide purchasers without notice of the information might be bound by any confidentiality attaching to the information, once they know of its status. However in such cases the court may decide to award an injunction rather than damages In *Valeo Vision SA v Flexible Lamps*, Aldous J said "although the court may step in to grant injunctive relief ... only in cases where the conscience of the defendant is bound would it be appropriate to grant relief by way of damages".[150] The test for knowledge—as with direct recipients—would appear to be an objective one viz would a reasonable person have appreciated that the information was confidential.[151]

**26-18    Secondary or accessory liability**    The issue of secondary or accessory liability (assisting in a misuse of confidential information by another) was raised in *Vestergaard Frandsen A/S v Bestnet Europe Ltd*.[152] Lord Neuberger noted that "while a recipient of confidential information may be said to be primarily liable in a case of its misuse, a person who assists her in the misuse can be liable, in a secondary sense ... [though] she would normally have to know that the recipient

---

144 *Francome v Mirror Group Newspapers Ltd* [1984] 1 W.L.R. 892.

145 *Shelley Films Ltd v Rex Features Ltd* [1994] E.M.L.R. 134. The newspaper was enjoined on the basis that it ought, as a reasonable person, to know that the claimant intended the information to be kept confidential. Lord Walker in *OBG Ltd v Allan* [2007] UKHL 21; [2008] 1 A.C. 1 at [289]–[290], though supporting the decision in *Shelley Films Ltd v Rex Features Ltd* [1994] E.M.L.R. 134, cast doubt on the decision in *Creation Records Ltd v News Group Newspapers Ltd* [1997] E.M.L.R. 444.

146 Either per se, or because it has been clearly "fenced off" as confidential/secret.

147 Of course if the third party induced a breach of contract in order to obtain the information he would be liable for the tort of that name, *British Industrial Plastics v Ferguson* [1940] 1 All E.R. 479.

148 *Lord Keith Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109 at 260: " ... a third party who comes into possession of confidential information which he knows to be such, may come under a duty not to pass it on to anyone else." In *Primary Group (UK) Ltd v The Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] R.P.C. 26 at [223] Arnold J said that an objective reasonable person test with regard to knowledge should be used here also.

149 *Valeo Vision SA v Flexible Lamps Ltd* [1995] R.P.C. 205 referring to the judgment of Sir John Donaldson MR in *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109.

150 [1995] R.P.C. 205 at 228. However, note Lord Neuberger MR in *Tchenguiz v Imerman* [2010] EWCA Civ 908; [2011] Fam. 116 at [74]: "here the confidential information has been passed by the defendant to a third party, the claimant's rights will prevail as against the third party, unless he was a bona fide purchaser of the information without notice of its confidential nature." See Jones "Restitution of Benefits Obtained in Breach of Another's Confidence" (1970) 86 L.Q.R. 463; Law Commission, *Report on Breach of Confidence* (1981), Cmnd.8388.

151 See, e.g. Lord Neuberger in *Vestergaard Frandsen S/A v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [25]; Arnold J in *Primary Group (UK) Ltd v The Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] R.P.C. 26 at [238].

152 [2013] UKSC 31; [2013] 1 W.L.R. 1556.

Action for Breach of Confidence

was abusing confidential information".[153] Knowledge in this context would include "blind-eye knowledge" or a reckless disregard of others' possible rights (see Lord Nicholls in *Royal Brunei Airlines Sdn Bhd v Tan*).[154] The defendant, a former employee of the claimant company, had established a competing company unaware that this new company's product had been developed using the claimant's confidential information. The defendant was honestly unaware that there had been a misuse: an allegation that she was "playing with fire" or "taking a risk" did not as such suffice, though the fact that she took a risk might render it easier to hold that she was dishonest. On the issue of knowing assistance see also the earlier Court of Appeal decision in *Thomas v Pearce*.[155] Although Lord Neuberger noted the approach of equity "in this area" he also accepted that in principle the doctrine of common design applied to this action. Here the defendant's conscience must have been touched by knowledge of the misuse and the defendant would have to share with the others "each of the features of the design which make it unlawful". On the facts the defendant had neither received the trade secrets nor did she know they had been misused.[156]

**Statutory obligations/public bodies**    Statutes may prohibit the communication of confidential information.[157] Most provide for criminal sanctions but some also found civil causes of action. As to state secrets, the principal general statute is the Official Secrets Act 1989.[158] Certain public bodies are under a duty to keep confidential information and documents that come to their attention in the course of their duties.[159] Whether they breach such an obligation by releasing such information may depend on whether such release is in the public interest and/or whether

26-19

---

[153]  [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [26].

[154]  [1995] 2 A.C. 378 PC, especially at 390F–391D.

[155]  [2000] F.S.R. 718, "more is required than merely careless, naive or stupid behaviour". In *Primary Group (UK) Ltd v The Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] R.P.C. 26 at [234] Arnold J commented that *Thomas v Pearce* may be good law on the correct test for accessory liability but is no longer good law on the question of the test for imposing an equitable obligation of confidence.

[156]  [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [34]. (And see *Marathon Asset Management LLP v Seddon* [2017] EWHC 300 (Comm); [2017] I.C.R. 791, Leggatt J, at [132]). *Unilever Plc v Gillette Ltd* [1989] R.P.C. 583, CA, a patent case, was distinguished as not applying to confidential information and involving possible strict liability, see [36]–[37]; cf. *Lancashire Fires Ltd v SA Lyons & Co* [1996] F.S.R. 629 where it had been conceded that the principle in *Unilever* applied to confidential information cases. See Lord Neuberger in *Vestergaard* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [38]–[39].

[157]  The principal general statute regulating the use of personal data—some of which is not necessarily confidential—is the Data Protection Act 2018; see further para.26-54.

[158]  The Attorney General may obtain an injunction to restrain breach of the Act and may also obtain an injunction to prevent a defendant from obtaining payment or other benefit from a breach of the duties of confidence imposed by it: *Att Gen v Blake* [1998] Ch. 439 CA.

[159]  The mere fact that information has been collected by a public body subject to public law obligations does not, ipso facto, make it confidential: see *Elliott v Chief Constable of Wiltshire*, *The Times*, 5 December 1996. In *Marcel v Commissioner of Police of the Metropolis* [1992] Ch. 225 a duty of confidence was owed in respect of information obtained by the police under the Police and Criminal Evidence Act 1984. See also *R. (on application of Ingenious Media Holdings Plc) v Revenue and Customs Commissioners* [2016] UKSC 54; [2016] 1 W.L.R. 4164; the discussion by Tugendhat J in *Mitchell v News Group Newspapers Ltd* [2014] EWHC 879 (QB) (application in defamation proceedings for non-party disclosure of witness evidence obtained by the Metropolitan Police Commissioner in the course of an investigation under the Police Reform Act 2002).

BREACH OF CONFIDENCE AND PRIVACY

the purpose for which they received such information was being served.[160] For example, a photograph[161] taken by the police of a suspect under compulsion or a statement taken under caution[162] is confidential, but the police may make reasonable use of material so obtained for the purposes of the prevention and detection of crime.[163] It is necessary to consider what the legislation contemplated as the purposes for which the information could be used. The Copyright Designs and Patents Act 1988 contains specific provisions concerning photographs taken for private and domestic purposes.[164]

### (c)    Breach

**26-20**    **Use and disclosure**    It is a breach of confidence to use[165] or disclose the information without the consent of the person to whom the duty is owed.[166] (However, a co-owner of confidential information cannot prevent another co-owner from making use of it in the absence of a contractual, fiduciary or other special relationship.[167]) The defendant might be liable even though he has only disclosed the substance of the information.[168] Lord Neuberger MR in *Tchenguiz v Imerman*[169] said that it is a breach of confidence for a defendant without authority "to examine, or to make, retain or supply copies to a third party of a document, whose contents are, and were (or ought to have been) appreciated by the defendant to be,

---

[160] See paras 26-30 and 26-31.

[161] *Hellewell v Chief Constable of Derbyshire* [1995] 1 W.L.R. 804.

[162] *Taylor v Serious Fraud Office* [1999] 2 A.C. 177; *Woolgar v Chief Constable of the Sussex Police* [2000] 1 W.L.R. 25; *Bunn v BBC* [1998] 3 All E.R. 552.

[163] *Hellewell v Chief Constable of Derbyshire* [1995] 1 W.L.R. 804. See also *Malone v Metropolitan Police Commissioner* [1979] Ch. 344; and *R. v Chief Constable of the North Wales Police Ex p. AB* [1999] Q.B. 396. However it should be noted that now in certain cases art.8 ECHR will be engaged and where public bodies are involved that will have direct effect.

[164] s.85, one of the moral rights. Other statutes provide for circumstances in which information may be disclosed: see Contempt of Court Act 1981 s.10.

[165] As to whether being galvanised into action by information constitutes misuse see *Arklow Investments Ltd v Maclean* [2000] 1 W.L.R. 594. In *CF Partners (UK) LLP v Barclays Bank Plc* [2014] EWHC 3049 at [984] Hildyard J commented that: "misuse may be inferred from the fact that the defendant, having obtained the confidential information, is influenced by it (whilst it retains its quality of confidentiality) in determining and then embarking on a course of conduct otherwise than for the purposes for which it was provided".

[166] Under the Freedom of Information Act 2000 public authorities are under a duty to disclose information; however s.40 provides an exemption for "personal data" under the Data Protection Act 2018 and s.41 for information provided in confidence. And see the Environmental Information Regulations 2004 (SI 2004/3391) reg.12(5)(e): confidentiality to be preserved to protect a legitimate economic interest. The majority of the Supreme Court in *Kennedy v The Charity Commission* [2014] UKSC 20; [2015] A.C. 455 considered that art.10 ECHR does not impose on public authorities a general duty of disclosure of information.

[167] *Murray v Yorkshire Fund Managers Ltd* [1998] 1 W.L.R. 951; cf. *Orr-Adams v Bailey* [2013] EWPCC 30, Recorder Amanda Michaels.

[168] *Prince Albert v Strange* (1849) 2 De. G & Sm. 652 (the description in the catalogue of the claimant's etchings).

[169] [2010] EWCA Civ 908; [2011] Fam. 116 at [69] and [72]. And see *Primary Group (UK) Ltd v The Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] R.P.C. 26 at [243] per Arnold J. See also *Warwickshire CC v Matalia* [2018] EWHC 1340 (Ch), HH Judge Simon Barker QC (for the background facts see para.26-08): the defendant by continuing to seek to obtain and actually obtaining the confidential information without authority was in breach of confidence, even without the dissemination or publication of that information (citing *Tchenguiz v Imerman* [2010] EWCA Civ 908; [2011] Fam. 116).

confidential to the claimant". Though this was a case involving private information, this would also apply to commercial information, given that it was stressed that such unauthorised acts might jeopardise the confidentiality of the information.

**Involuntary or accidental use**    Involuntary or accidental use of confidential information may still result in breach. Information may be communicated in confidence to a recipient who may not even particularly wish to receive it but who subsequently makes use of it unconsciously, not deliberately intending plagiarism (circumstances which have a parallel in the subconscious copying of copyright material). In such a case the court has granted relief.[170] Such a case should be distinguished from one where the defendant never attracted a duty of confidence.[171] Another example of inadvertent use arises in connection with inadequate "Chinese walls". The court will grant relief to prevent a professional firm in possession of a claimant's confidential information from acting against him, unless the defendant establishes that there is no risk of information being misused.[172]

**26-21**

**Negligent disclosure**    The recipient of information communicated in confidence owes a duty of care to preserve its confidentiality. It follows that, if he releases it negligently, he may be liable for the consequences of its disclosure, but only to the extent that these are themselves actionable and can reasonably be foreseen, in accordance with the general principles of liability in tort.[173]

**26-22**

**Disclosure of information improperly obtained**    Information may come into a party's hands not by being communicated directly to him but by dishonest means or a trick.[174] The use of information improperly obtained will be restrained even where, for instance, a document might be relevant in legal proceedings.[175] That is

**26-23**

---

[170] *Seager v Copydex* [1967] 1 W.L.R. 923. *Paymaster (Jamaica) Ltd v Grace Kennedy Remittance Services Ltd* [2017] UKPC 40; [2018] Bus. L.R. 492 at [41]: conscious plagiarism not a necessary component for a claim for breach of confidence.

[171] *Thomas v Pearce* [2000] F.S.R. 718; *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] UKSC 31; [2013] 1 W.L.R. 1556 at [24], per Lord Neuberger MR, with reference to *Seager v Copydex*: "once it was found that they had received the information in confidence, their state of mind when using the information was irrelevant to the question of whether they had abused the confidence".

[172] *Prince Jefri Bolkiah v KPMG* [1999] 2 A.C. 222. There is a heavy evidential burden in showing that there is no risk of information passing through a Chinese wall. *Marks & Spencer Plc v Freshfields Bruckhaus Deringer* [2004] EWCA Civ 741; [2005] P.N.L.R. 4: the principle in *Bolkiah* not confined to "same transaction" cases; rather applies where there is a real risk of a conflict of interest. And see *Georgian American Alloys Inc v White & Case LLP* [2014] EWHC 94 (Comm); [2014] 1 C.L.C. 86, Field J. An attempt to extend the "Bolkiah" principle and barring-out relief to cover ordinary employees was rejected in *Caterpillar Logistics Services (UK)Ltd v Huesca de Crean* [2012] EWCA Civ 156; [2012] 3 All E.R. 129 at [49]; whether the principle also applied to a former in-house litigator led to an obiter difference of views in the Court of Appeal in *Generics (UK) Ltd v Yeda Research & Development Co Ltd* [2012] EWCA Civ 726; [2013] F.S.R. 13.

[173] *Weld-Blundell v Stephens* [1920] A.C. 956; *Furniss v Fitchett* [1958] N.Z.L.R. 396. *Lady Archer v Williams* [2003] EWHC 1670 (QB); [2003] E.M.L.R. 38; the defendant was liable for a newspaper's publication of some of the private information she had released to others in breach of confidence. It must have been obvious that there was a substantial risk that the information she was disclosing to various parties would find its way into the newspapers.

[174] *ITC Film Distributors v Video Exchange Ltd* [1982] Ch. 431 (the defendant had obtained possession of his opponents' papers, including privileged material, by a trick).

[175] *Lord Ashburton v Pape* [1913] 2 Ch. 469; *ITC Film Distributors v Video Exchange Ltd* [1982] Ch. 431. It may be, however, that *Ashburton v Pape* had to be understood as based on privilege, not just on confidentiality, see Lloyd J in *A v B (Copyright: Diary Pages)* [2000] E.M.L.R. 1007; and *Lord*

so even if the information has passed to another[176] who originally received it innocently.[177]

**26-24    Use by regulatory authorities[178] and for legal proceedings**    Documents which are confidential may nonetheless be disclosable in legal proceedings, unless covered by public policy[179] or on one of the established grounds of privilege.[180] However, the courts have developed means of ensuring that particularly confidential disclosure documents receive due protection.[181]

**26-25    The issue of detriment**    There is some debate as to whether the claimant must also prove harm or detriment where other than personal confidential information is involved. See for example Megarry J in *Coco v AN Clark (Engineers) Ltd*[182] who expressly kept open the possibility that detriment was not after all required and Lord Goff in *Att Gen v Guardian Newspapers (No.2)*[183] who wished "to keep open the question whether detriment to the plaintiff is an essential ingredient of an action for breach of confidence". In the case of state secrets, however, it should be recalled that the Crown must show a public interest in restraining disclosure. Where private

---

*Neuberger MR in Tchenguiz v Imerman* [2010] EWCA Civ 908; [2011] Fam. 116 at [61]; *Brake v Guy* [2019] EWHC 3332 (Ch), John Jarvis QC, sitting as Judge of the High Court. And see *DSM SFG Group Holdings Ltd v Kelly* [2019] EWCA Civ 2256; [2020] E.M.L.R. 10.

[176] *Prince Albert v Strange* (1849) 1 De G. & Sm. 652; 64 E.R. 293; (1849) 1 Mac. G. 25; 41 E.R. 1171 (on appeal); *Liquid Veneer Co Ltd v Scott* (1912) 29 R.P.C. 639; *Argyll v Argyll* [1967] Ch. 302; *Att Gen v Guardian Newspapers Ltd* [1990] 1 A.C. 109.

[177] *Printers & Finishers Ltd v Holloway* [1965] 1 W.L.R. 1; *Butler v Board of Trade* [1971] Ch. 680 at 690; *Derby & Co v Weldon (No.8)* [1991] 1 W.L.R. 73. Usually, there will be constructive notice of impropriety. Where there is not, the use of confidential information may perhaps not be restrained until after notice has been received: *Malone v Commissioner of Police of the Metropolis (No.2)* [1979] Ch. 344 at 361.

[178] As to regulatory authorities, see para.26-30. Under the Investigatory Powers Act 2016 UK intelligence/law enforcement agencies were granted new powers to intercept communications and powers of bulk communications data acquisition. In *R. (on the application of NCCL) v Secretary of State for the Home Department* [2018] EWHC 975 (Admin); [2019] Q.B. 481 the Investigatory Powers Act 2016 Pt 4 (on the retention of data) was held to be incompatible with fundamental rights in EU law. In *Big Brother Watch v United Kingdom (58170/13), The Times,* 23 November 2018, ECtHR, the right to intercept internet communications in bulk under s.8(4) of the Regulation of Investigatory Powers Act 2000 was held to have breached art.8.

[179] *Att Gen v Clough* [1963] 1 Q.B. 773; *Att Gen v Mulholland* [1963] 2 Q.B. 477; *D v NSPCC* [1978] A.C. 171; *British Steel Corp v Granada Television Ltd* [1981] A.C. 1096. *Smithkline Beecham Plc v Generics (UK) Ltd* [2003] EWCA Civ 1109; [2004] 1 W.L.R. 1479 (whether confidential documents, disclosed in settled patent proceedings could be used in parallel proceedings). In general, medical records are not protected against disclosure in court proceedings for which they are relevant unless the public interest in preserving confidentiality outweighs the public interest in the administration of justice: see *D v NSPCC* [1978] A.C. 171. And note *Re A (A Child) Disclosure of Third Party Information* [2012] UKSC 60; [2013] 2 A.C. 66: Local Authority should disclose in contact proceedings allegations made in confidence of sexual abuse made against the child's father by a third party.

[180] *Wheeler v Le Marchant* (1881) L.R. 17 Ch. D. 675. And the courts will restrain the use of professionally privileged confidential information that has come into a party's hands accidentally where the mistake was obvious; *Derby & Co Ltd v Weldon (No.8)* [1991] 1 W.L.R. 73; *IBM v Phoenix International (Computers) Ltd* [1995] 1 All E.R. 413.

[181] For example, by means of confidentiality clubs of persons able to see disclosure documents.

[182] [1969] R.P.C. 41 at 48.

[183] [1990] 1 A.C. 109 at 282. Mummery LJ in *Federal Bank of the Middle East Ltd v Hadkinson* [2000] 2 All E.R. 395, 413 suggested that if detriment were required the diversion of business opportunities could suffice.

Action for Breach of Confidence

information is concerned it seems likely that the invasion of privacy per se suffices.[184]

### (d)   Defences

#### (i)   Cessation of obligations

**Cessation of obligations**   That the obligation to maintain confidence has ceased is a defence to a breach of confidence action. This may arise in a number of circumstances, by agreement or release,[185] for instance. Or the information may have entered the public domain. A person is not under a duty to maintain confidentiality of information which has ceased to be confidential.[186] The information may indeed cease to be confidential through effluxion of time.[187] Sometimes information is acquired confidentially which could have been independently ascertained by due inquiry. Although a person in possession of such information will be restrained from making use of it as a short cut to compete with its owner, there must come a time when such an advantage no longer obtains. So, a trader who has received information in confidence for a limited purpose, and who has not made use of it during the period of the confidential relationship between the parties, will not subsequently be restrained from using it when it is no longer secret.[188] When the owner of confidential information himself makes it public, for instance by publishing it in a patent specification, he cannot then be heard to say that it is still confidential.[189] It is unclear what the position is where someone other than the "owner" makes the information public.[190]

**26-26**

#### (ii)   Public interest

**Public interest—general**   There are, broadly speaking, two aspects to the public interest defence. The first encompasses the disclosure of matters of real public concern;[191] though it should be noted that interference with freedom of expression has to be justified even where there is no public interest in a particular publication.[192] The second applies to the use or disclosure of the information in question for other public purposes.[193]

**26-27**

**Disclosure of matters of real public concern**[194]   There is a clearly established defence of disclosure of matters of public interest in the action for breach of

**26-28**

---

[184] *Att Gen v Guardian Newspapers (No.2)* [1990] A.C. 109 at 256, per Lord Keith.

[185] *Ackroyds (London) Ltd v Islington Plastics Ltd* [1962] R.P.C. 97.

[186] See, e.g. *Att Gen v Blake* [1998] Ch. 439 CA. Information may cease to be confidential by being read to or by the court in open court: see *Bunn v BBC* [1998] 3 All E.R. 552.

[187] See *Arklow Investments Ltd v Maclean* [2000] 1 W.L.R. 594 Privy Council (NZ).

[188] *Peter Pan Manufacturing Corporation v Corsets Silhouette Ltd* [1964] 1 W.L.R. 96.

[189] *Mustad v Dosen* [1964] 1 W.L.R. 109 (Note); [1963] R.P.C. 41.

[190] See para.26-35. In *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293 a former director was restrained from making use of a patent specification which he learned about through his fiduciary relationship with his former company, from which he had not been released. However this decision may be coloured by the breach of fiduciary duty.

[191] See para.26-28.

[192] See para.26-29.

[193] See paras 26-30 to 26-31.

[194] In cases where there is a clear public interest that information should be more widely known, the

confidence. The much quoted dictum: "The true doctrine is that there is no equity in the disclosure of iniquity"[195] is merely an example of the broader principle that the disclosure of confidential information will not be restrained when there is a just cause or excuse for disclosing it.[196] The defence of public interest certainly covers "matters carried out or contemplated in breach of the country's security, or in breach of the law, including statutory duty, fraud, or otherwise destructive of the country or its people, including matters medically dangerous to the public: and doubtless other misdeeds of similar gravity"[197] but it is not limited to these categories.[198] The general principle is that disclosure should be made to one who has a proper interest in receiving the information.[199] The question is whether the information is such that it ought to be disclosed to a competent authority,[200] or whether it ought to be made available to the public at large through the media.[201] In the following cases (all prior to the Human Rights Act 1998) the information concerned was of "real public concern" and disclosure permitted: unreliability of intoximeters used in the course of testing the breath of drivers, disclosed by employees to newspaper[202]; medical practices alleged to be dangerous[203]; accountants disclosing information about their client, a collapsed bank, to a Bank of England inquiry.[204] In all these cases there is a conflict between two public interests: that of maintaining confidentiality and that of making matters or public interest known to those with a proper interest. A balancing act has to be performed.[205] It has been the case in the past that in undertaking this balancing act the courts have acknowledged the relevance of freedom of expression. However, this consideration is now enhanced by the Human Rights Act 1998.[206] This should be borne in mind when reviewing cases on the public interest defence that pre-date the Human Rights Act 1998.[207] In

---

court will not hold a defendant to a specific undertaking not to disclose it: *Hubbard v Vosper* [1972] 2 Q.B. 84.

[195] *Gartside v Outram* (1857) 26 L.J. Ch. 113.

[196] It does not extend only to the detection or prevention of wrongdoing: *Lion Laboratories Ltd v Evans* [1985] Q.B. 526. The burden lies on the defendant to justify the defence: see *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109.

[197] See *Beloff v Pressdram Ltd* [1973] 1 All E.R. 241; *British Steel v Granada Television Ltd* [1981] A.C. 1096.

[198] See *Lion Laboratories Ltd v Evans* [1985] Q.B. 526, per Stephenson LJ. See also the categories of information mentioned in the Public Interest Disclosure Act 1998, para.26-32, though the House of Lords made clear in *Cream Holdings Ltd v Banerjee* [2004] UKHL 44; [2005] 1 A.C. 253 that these "whistleblower" provisions added protection to employees; they were not intended to cut down the circumstances where public interest might apply to the publication of private information. There is a public interest in correcting misleading public statements: *Viagogo Ltd v Myles* [2012] EWHC 433 (Ch), Hildyard J.

[199] See, e.g. *Initial Services v Putterill* [1968] 1 Q.B. 396; *Francome v Mirror Group Newspapers Ltd* [1984] 1 W.L.R. 892 (only limited disclosure required).

[200] *Re A Company's Application* [1989] Ch. 477 (no injunction granted to prohibit disclosure of financial affairs to regulatory body).

[201] *Initial Services Ltd v Putterill* [1968] 1 Q.B. 396; *Hubbard v Vosper* [1972] 2 Q.B. 84; *Lion Laboratories Ltd v Evans* [1985] Q.B. 526.

[202] *Lion Laboratories Ltd v Evans* [1985] Q.B. 526.

[203] *Hubbard v Vosper* [1972] 2 Q.B. 84.

[204] *Price Waterhouse v BCCI Holdings (Luxembourg) SA* [1992] B.C.L.C. 583, principles reviewed and restated by Millett J.

[205] *Lion Laboratories Ltd v Evans* [1985] Q.B. 526; *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109.

[206] The issue of public interest/art.10 and privacy is discussed in para.26-49.

[207] For cases post-Human Rights Act 1998 see *London Regional Transport v Mayor of London* [2001]

*Brevan Howard Asset Management LLP v Reuters Ltd*[208] the defendant claimed that the public interest applied. The judge, with whom the Court of Appeal agreed, held that *HRH Prince of Wales v Associated Newspapers Ltd*[209] applied in a commercial confidence case. There is an important public interest in the observance of duties of confidence; it is not enough to justify publication that the information is a matter of public interest. Sir Terence Etherton MR said that "the fact that information relates to information received in confidence is a factor that art.10(2) recognises as of itself justifying restrictions on freedom of expression".[210] There was nothing inconsistent between the application of the *Prince of Wales* case and the jurisprudence of the ECtHR.[211]

**The effect of the Human Rights Act 1998**    Article 10 of the Convention for the Protection of Human Rights and Fundamental Freedoms provides:    **26-29**

"(1)    Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers …

(2)    The exercise of these freedoms, since it carries with it duties and responsibilities may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society … for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence …"

Thus art.10 recognises that preventing breach of confidence may be an exception to the right to freedom of expression. However, s.12 of the Human Rights Act 1998, provides that in considering whether to grant relief[212] which might affect the exercise of the Convention right to freedom of expression, the court must have particular regard to the importance[213] of that right and certain other factors.[214] Lord Woolf in *A v B Plc* noted that "even where there is no public interest in a particular publication interference with freedom of expression has to be justified".[215] At issue is whether there is a compelling social need to prevent disclosure in order to protect the confidential information; any restriction imposed on the art.10 right by a court must be rational, fair and not arbitrary and the right must be impaired no

---

EWCA Civ 1491; [2003] E.M.L.R. 4; *Jockey Club v Buffham* [2002] EWHC 1866 (QB); [2003] Q.B. 462.

[208] [2017] EWCA Civ 950; [2017] E.M.L.R. 28.

[209] [2006] EWCA Civ 1776; [2008] Ch. 57.

[210] [2017] EWCA Civ 950; [2017] E.M.L.R. 28 at [62].

[211] [2017] EWCA Civ 950; [2017] E.M.L.R. 28 at [66]. The difference in outcomes in *London Regional Transport v Mayor of London* [2001] EWCA Civ 1491; [2003] E.M.L.R. 4; and *Northern Rock Plc v The Financial Times Ltd* [2007] EWHC 2677 (QB) was explained (at [71]–[72]). Non-disclosure agreements and the public interest were discussed in *ABC v Telegraph Media Group Ltd* [2018] EWCA Civ 2329; [2019] 2 All E.R. 684. The Court of Appeal stressed the public interest in upholding contractual bargains (see *Mionis v Democratic Press SA* [2017] EWCA Civ 1194; [2018] Q.B. 662). See also *Linklaters LLP v Mellish* [2019] EWHC 177 (QB) Warby J. And see para.26-50.

[212] This clearly applies to injunctions (and indeed s.12(3) deals specifically with prior restraints). However a claim for damages would also appear to be included: Lindsay J in *Douglas v Hello! Ltd (No.3)* [2003] EWHC 786 (Ch); [2003] 3 All E.R. 996 at [203].

[213] The European Court of Human Rights has stated that the pressing social need for the restriction on freedom of expression must be "convincingly established" (*Handyside v United Kingdom* (1976) 1 E.H.R.R. 737). As to the impact of the Convention on cases of disclosure of state confidences, see *Observer v United Kingdom* (1991) 14 E.H.R.R. 153.

[214] Human Rights Act 1998 s.12. And see *Viagogo Ltd v Myles* [2012] EWHC 433 (Ch), Hildyard J.

[215] [2002] EWCA Civ 337; [2003] Q.B. 195.

more than is necessary. Where journalistic disclosure is involved[216] the journalist should be given sufficient latitude to allow disclosure necessary to add credibility to a legitimate story.[217] In a case not involving private information, where the defendant raised press freedom of speech, *Barclays Bank Plc v Guardian News and Media Ltd*,[218] Blake J considered the application of s.12(4) of the Human Rights Act 1998. He noted that though on the facts the defendant could use the contents of and selectively quote from the claimants' confidential documents to stimulate public debate, that did not necessarily give them complete freedom to publish in full that confidential information. Where the claimant alleges a misuse of private information the matter becomes more complex.[219]

**26-30**    **Use and disclosure for other public purposes**    There are several cases in which the courts have permitted a public body to assist another regulatory body to perform public functions by passing certain confidential information to appropriate recipients.[220] In *Hellewell v Chief Constable of Derbyshire*[221] the police were held to be entitled to make reasonable use of a photograph, taken under compulsion, for the purposes of the prevention and detection of crime, the investigation of alleged offences and the apprehension of suspects or persons unlawfully at large. And in *Woolgar v Chief Constable of the Sussex Police*[222] the police were held entitled to disclose contents of a police interview of a nurse to the professional nursing body. The doctrine is limited: for example, the police are not entitled to disclose seized documents to a third party for use in civil litigation.[223]

---

[216] s.12(4) where the proceedings "relate to material which the respondent claims, or which appears to the court, to be journalistic, literary or artistic material (or to conduct connected with such material)", the court must also have particular regard to "(a) the extent to which (i) the material has, or is about to become, available to the public; or (ii) it is, or would be, in the public interest for the material to be published; (b) any relevant privacy code". Stewart J in *AMM v News Group Newspapers* [2014] EWHC 4063 (QB) noted that the relevant privacy code referred to in s.12(4)(b) was the IPSO Editors Code of Practice. Note that IPSO is not recognised under the Royal Charter: to date only IMPRESS is an approved regulator.

[217] See *Campbell v MGN Ltd* [2004] UKHL 22; [2004] 2 A.C. 457 (Lord Hope cites *Jersild v Denmark* (1994) 19 E.H.R.R. 1 at [31]: freedom of the press to exercise its own judgment in the presentation of journalistic material). In *Heythrop Zoological Gardens Ltd v Captive Animals Protection Society* [2016] EWHC 1370 (IPEC); [2017] F.S.R. 10 at [60] Birss J noted that "today campaigning organisations carry out an important journalistic function".

[218] [2009] EWHC 591 (QB) at [27]–[32]. See also *BBC v HarperCollins Publishers Ltd* [2010] EWHC 2424 (Ch); [2011] E.M.L.R. 6, with reference to s.12(3).

[219] See para.26-49.

[220] See also *R. v Chief Constable of the North Wales Police Ex p. AB* [1999] Q.B. 396 DC and CA (police held entitled to provide information to local site owner concerning persons with criminal record of paedophilia if there was a "pressing need" and, if possible, after providing opportunity to comment on proposed disclosure). The European Court of Human Rights has held that it is not a breach of the Convention right to respect for private life for medical records to be disclosed to a social security office for assessment of a compensation claim: *MS v Sweden* (1997) 3 B.H.R.C. 248, noting that there were "relevant and sufficient reasons for the communication … and the measure was not disproportionate to the aim pursued". As to the position of information imparted during the course of family proceedings in chambers see *S v S (Judgment in Chambers: Disclosure)* [1997] 1 W.L.R. 1621.

[221] [1995] 1 W.L.R. 804.

[222] [2000] 1 W.L.R. 25 CA.

[223] *Marcel v Commissioner of Police of the Metropolis* [1992] Ch. 225 (information obtained by the police under Police and Criminal Evidence Act 1984 disclosed to third party who was bringing a civil claim). *R. (on application of Ingenious Media Holdings plc) v Revenue and Customs Commissioners* [2016] UKSC 54; [2016] 1 W.L.R. 4164: Lord Toulson summarised the "Marcel principle"

**Use of confidential product approval data**    There is, in general, a public interest in freeing the use of confidential information submitted in the course of a statutory regulatory process for making medicines available to the public In *R. v Licensing Authority Ex p. Smith Kline & French Laboratories* the licensing authority was entitled to use the confidential information provided by SKF to assess applications by generic producers but this does not apply to data submitted pursuant to a voluntary industry scheme.[224]    **26-31**

**Public Interest Disclosure Act 1998**    This Act amends the Employment Rights Act 1996 and protects workers who disclose certain kinds of information from suffering detriment,[225] including dismissal. The Act protects workers in respect of "qualifying disclosures"[226] to certain specified persons or institutions, including the employer where the disclosure is reasonably believed by the worker to be in the public interest.[227] There are special provisions for disclosures of "exceptionally serious failure".[228] Qualifying disclosures are disclosures which in the reasonable belief of the worker making the disclosure tend to show, for example, that a criminal offence has been committed, that legal obligations are not being complied with, that a miscarriage of justice has occurred or that health, safety or the environment are endangered.    **26-32**

### (e)    Remedies[229]

**Injunction**    Injunctions are usually sought and are regularly granted but may be limited in duration where the basis of relief lies in the "springboard doctrine".[230] An    **26-33**

---

at [17]. In *Mitchell v News Group Newspapers Ltd* [2014] EWHC 879 (QB) at [16]–[18] Tugendhat J discussed the competing public interests in cases where a civil party sought to make use of statements made to the police in the course of a criminal investigation (see also his discussion of *Frankson v Home Office* [2003] EWCA Civ 655; [2003] 1 W.L.R. 1952). Note in *Hoechst UK Ltd v Chemiculture Ltd* [1993] F.S.R. 270 the broad statutory purposes meant that there was no impropriety in disclosure by a public authority to a person for whom, given the purposes of the statute, the information was of mutual interest and concern). For more detailed consideration see Gurry, *Breach of Confidence*, 2nd edn (2012), Ch.13. Where personal information is involved note the application of Human Rights Act 1998 and Data Protection Act 2018.

[224] *R. v Licensing Authority Ex p. Smith Kline & French Laboratories* [1990] 1 A.C. 64 ("right and duty of licensing authority to make use of all the information supplied … in considering whether to grant or reject any other application"); cf. use of such information submitted under non-statutory scheme: *R. v MAFF Ex p. Portman Agrochemicals Ltd* [1994] 3 C.M.L.R. 18 at [39], Brooke J. A number of EU Directives provide limitations on the use that regulatory authorities may make of confidential data in granting product approval to competitor's products.

[225] By s.47B of the Employment Rights Act 1996. This section does not apply where the worker is an employee and the detriment amounts to a dismissal: s.47B(2)—this is governed by s.103A of the Employment Rights Act 1996.

[226] Employment Rights Act 1996 s.43B.

[227] Employment Rights Act 1996 s.43C–43G. The Enterprise and Regulatory Reform Act 2013 ss.17 to 20, made changes to these provisions, in particular amending s.43B by inserting the need for a reasonable belief that the disclosure is in the public interest.

[228] Employment Rights Act 1996 s.43H.

[229] It is unclear whether the Enforcement Directive 2004/48 (see Intellectual Property (Enforcement etc) Regulations 2006 (SI 2006/1028)) which concerns the enforcement of "intellectual property rights" (art.1) applies to a breach of confidence claim. Lewison LJ in *Force India Formula One Team Ltd v 1 Malaysia Racing Team Sdn Bhd* [2013] EWCA Civ 780; [2013] R.P.C. 36 at [108] was sceptical that it applied (it had been accepted by the parties in *Vestergaard Frandsen A/S v BestNet Europe Ltd* [2011] EWCA Civ 424 at [56] that the Directive applied to a claim for misuse of trade secrets).

Breach of Confidence and Privacy

injunction may be qualified so as to permit disclosure of the information to proper authorities to receive it in the public interest[231] and may be refused altogether when the court takes the view that damages are the only appropriate remedy.[232] Where art.10, freedom of expression, is not involved, interim injunctions are generally granted on the usual principles[233] but may be refused where, for example, the result would be to stop a plant from working entirely.[234] Section 12 of the Human Rights Act 1998 makes special provision where the court is considering relief which, if granted, might affect the exercise of the Convention right to freedom of expression. Where interim injunctions are sought, s.12(3) imposes a threshold test which has to be satisfied before a court may grant interim relief: publication before trial is not to be restrained unless the court is satisfied that the applicant is *likely to establish* that publication should not be allowed. The House of Lords in *Cream Holdings Ltd v Banerjee*[235] considered the meaning and application of the word "likely" in this provision. "Likely" was held to be a varying standard, dependent on the circumstances of the case. As the principal purpose of s.12(3) of the Human Rights Act 1998 was the protection of free speech at the interim stage the general approach was that the applicant should satisfy the court that it was more likely than not that he would succeed at trail (i.e. a higher level than the *American Cyanamid* one). However, the court might apply a lower standard "where the circumstances so required". Instances of such circumstances included potential grave effects of disclosure or where the court required a short-lived injunction to give a proper consideration to the application for the interim injunction. Declaratory relief may be available on the usual principles.[236] An injunction will be refused if it is futile because (say) the relevant material is in the public domain already and no further damage will be done.[237] In *Northern Rock Plc v Financial Times Ltd*[238] the defendant had posted the entire contents of ten pages of the claimants' confidential and commercially sensitive memorandum on its website. Information derived from this was included in various media reports of the commercial difficulties experienced by the claimant. The court refused an injunction to restrain republication of the extracts that had already appeared as this would be futile but granted an interim injunction to restrain publication of the information—"extensive word for word

---

As to the burden of proof: as in copyright claims, the evidential burden may pass to the defendant where similarities and an opportunity to copy existed: *Wade v British Sky Broadcasting Ltd* [2016] EWCA Civ 1214.

[230] *Roger Bullivant Ltd v Ellis* [1987] I.C.R. 464. (See para.26-35).

[231] *Initial Services v Putterill* [1968] 1 Q.B. 396; *A Company's Application, Re* [1989] Ch. 477.

[232] For circumstances in which an injunction will be granted or refused and the acts that the injunction will be tailored to prohibit, see *Ocular Sciences Ltd v Aspect Vision Care Ltd* [1997] R.P.C. 289 at [395]–[416]. See also *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* (1948) 65 R.P.C. 203; *Seager v Copydex (No.2)* [1969] 1 W.L.R. 809 (public and private information combined); *Potters-Ballotini Ltd v Weston-Baker* [1977] R.P.C. 202.

[233] *American Cyanamid v Ethicon* [1975] A.C. 396. In appropriate cases, they will be granted to restrain a defendant from fulfilling orders already made: *PSM International Ltd v Whitehouse* [1992] F.S.R. 489. In exceptional cases, where the claimant lacks means, the court may relax the requirement to provide a cross-undertaking: *Bunn v BBC* [1998] 3 All E.R. 552 at [558].

[234] *Potter-Ballotini Ltd v Weston-Baker* [1977] R.P.C. 202. In restraint of trade cases *American Cyanamid* may not be applied if not appropriate on the facts, see *Lansing Linde Ltd v Kerr* [1991] 1 W.L.R. 251 CA.

[235] [2004] UKHL 44; [2005] 1 A.C. 253. And see *Heythrop Zoological Gardens Ltd v Captive Animals Protection Society* [2016] EWHC 1370 (IPEC); [2017] F.S.R. 10, Birss J.

[236] But is rarely sought or granted, see *Seager v Copydex (No.2)* [1969] 1 W.L.R. 809.

[237] *Att Gen v Guardian Newspapers (No.2)* [1990] 1 A.C. 109.

[238] [2007] EWHC 2677 (QB), per Tugendhat J.

copying"—that had only appeared on the website, further publication of which might cause further harm (the website attracting only a limited readership). Relief may be refused when a claimant has not come to the court with "clean hands".[239]

**Damages or account of profits**[240]    The purpose of damages in a confidential information case is to put the claimant in the position he would have been in if the defendant had not wrongly obtained and used the claimant's confidential information.[241] Awards of damages are often calculated on the basis of the capitalisation of an appropriate royalty for the use of the information or a willing buyer/willing seller basis, or, if the information would have been available from an expert consultant, what such a consultant would charge for it, but each case will have to be considered on its facts.[242] The court can award damages on the basis of the claimant's loss of manufacturing profit where such loss is proved.[243] The court may award damages even where an injunction is inappropriate because the information has been disclosed through the defendant's wrongful act.[244] The Court of Appeal in *Vestergaard Frandsen A/S (now called MVF 3 APS) v Bestnet Europe Ltd* considered the approach to damages in respect of derived products which do not themselves constitute a misuse of confidential information. Floyd LJ noted " … one must seek to determine … what recoverable harm can be traced back to the initial

**26-34**

---

[239] *Hubbard v Vosper* [1972] 2 Q.B. 84. For discussion of confidence actions brought to circumvent *Bonnard v Perryman* where the real purpose was to protect business reputation see *Tillery Valley Foods v Channel 4 Television* [2004] EWHC 1075 (Ch), Mann J (at [21]); *Viagogo v Myles* [2012] EWHC 433 (Ch), Hildyard J at [80]–[81].

[240] Sales J applied *Wrotham Park* damages rules to a contractual breach of confidence case in *Vercoe v Rutland Fund Management Ltd* [2010] EWHC 424 (Ch). Note Lord Reed in *Morris-Garner v One Step (Support) Ltd* [2018] UKSC 20; [2019] A.C. 649 preferred the expression "negotiating damages" to the term "*Wrotham Park* damages" and at [84] commented on *Vercoe*: "in effect the court awarded damages based on the commercial value of the information which the defendants misused". In the absence of a contractual obligation, there is uncertainty as to the theoretical basis of an award of damages. See Gurry, *Breach of Confidence*, 2nd edn (2012), Ch.19.

[241] *Dowson & Mason Ltd v Potter* [1986] 1 W.L.R. 1419. And see *Vestergaard Frandsen A/S (now called MVF 3 Aps) v Bestnet Europe Ltd* [2016] EWCA Civ 541; [2017] F.S.R. 5 at [79]–[84]. There is no English decision whether exemplary damages are available though note Lindsay J in *Douglas v Hello! Ltd (No.3)* [2003] EWHC 786 (Ch); [2003] 3 All E.R. 996 at [273]: "I am content to assume, without deciding, that exemplary damages re available in respect of breach of confidence." And note the Australian decision *Harris v Digital Pulse Pty* [2003] NSWCA 10; (2003) 56 N.S.W.L.R. 298; (2003) 197 A.L.R. 626. On exemplary damages and publishers of news-related material see discussion of ss.34–38 of the Crime and Courts Act 2013 (see para.26-60). Relevant claims include claims for breach of confidence; misuse of private information. Aggravated damages are dealt with in s.39.

[242] *Seager v Copydex (No.2)* [1969] 1 W.L.R. 809 at 813 (Lord Denning MR); *Gorne v Scales* [2006] EWCA Civ 311 at [74], the market value of the information on a willing seller/buyer basis; *Force India Formula One Team Ltd v 1 Malaysia Racing Team Sdn Bhd* [2013] EWCA Civ 780; [2013] R.P.C. 36 at [103] Lewison LJ, consultant's fee measure of damages where "that is an alternative means of obtaining an equivalent benefit from an alternative source"; *Talbot v General Television Corp Pty* [1981] R.P.C. 1 (Supreme Court of Victoria) (diminished value of television concept in claimant's hands after the breach of confidence had occurred). In *Cadbury Schweppes Inc v FBI Foods Ltd* [2000] F.S.R. 491 the Supreme Court of Canada awarded loss of profits, the assessment of which was tailored to give a broadly equitable result, without mathematical exactitude.

[243] *Dowson & Mason Ltd v Potter* [1986] 1 W.L.R. 1419 (employer's loss of profit); *Vercoe v Rutland Fund Management Ltd* [2010] EWHC 424 (Ch) Sales J at [344]; *Vestergaard Frandsen A/S (now called MVF 3 Aps) v Bestnet Europe Ltd* [2016] EWCA Civ 541; [2017] F.S.R. 5 [66]–[67], Floyd LJ.

[244] *Creation Records v News Group Newspapers Ltd* [1997] E.M.L.R. 444.

wrongful use of the confidential information in order to develop the product".[245] Damages are normally assessed in an inquiry as to damages although the court has jurisdiction to refuse an inquiry where either that would be fruitless (*McDonald's Hamburgers Ltd v Burgerking (UK) Ltd*)[246] or the defendant acted innocently (*Valeo Vision SA v Flexible Lamps*).[247] In the alternative, the court may order an account of profits.[248] In exceptional cases, in which the defendant has promised not to disclose information but does so for his profit, it may be possible to obtain restitutionary damages for breach of an agreement to keep the confidence.[249] Where valuable property was acquired as a result of the misuse of confidential information, the Canadian court imposed a constructive trust in *Lac Minerals Ltd v International Corona Resources Ltd*.[250]

**26-35**    **The "springboard doctrine"**    Very often, part of the confidential information is in the public domain and part is not[251]; or the complete package of confidential information, as such, is not in the public domain but could be arrived at by diligent enquiry or routine research.[252] Where the owner of the confidential information has himself made it public, for instance by publishing it in a patent specification, no difficulty arises: relief will be refused.[253] But where a material amount of work would have to be done to arrive at it, the position is different.[254] It is here that the springboard doctrine arises. The courts will not permit someone who has come into possession of such information to take a short cut and make use of it in order to steal a march on his competitors or to compete with the person from whom he obtained

---

[245]    [2016] EWCA Civ 541; [2017] F.S.R. 5 at [87]. And see [86]: "it is a matter of degree whether the extent and importance of the use of the confidential information is such that continued exploitation of the derived matter should be viewed as continued use of the information". On the facts, an award based on quasi-consultancy fees was upheld and there was no "accelerated entry". See also the earlier striking out application in this case, *Vestergaard Frandsen A/S v Bestnet Europe Ltd* [2013] EWCA Civ 428 at [21]–[23] for the discussion on the difference between lost profits/royalty/market value awards. On the concept of a derived product see Laddie J in *Ocular Sciences Ltd v Aspect Vision Care Ltd (No.2)* [1997] R.P.C. 289 at 396.

[246]    [1987] F.S.R. 112.

[247]    [1995] R.P.C. 205.

[248]    In *Marathon Asset Management LLP v Seddon* [2017] EWHC 300 (Comm); [2017] I.C.R. 791 Leggatt J discussed the difference between licence fee damages and an account of profits (see [223]–[239]).

[249]    *Att Gen v Blake* [1998] Ch. 439. See Birks, "The Remedies for Abuse of Confidential Information" [1990] L.M.C.L.Q. 460.

[250]    [1990] F.S.R. 441 Sup. Ct of Canada; considered in *Ocular Sciences v Aspect Vision Care* [1997] R.P.C. 289 (Laddie J, not "an easy topic", at [412]). In *Lac Minerals* the misuse was central to the acquisition of the property. However in *United Pan Europe Communications NV v Deutsche Bank AG* [2000] 2 B.C.L.C. 461 Morritt LJ noted that the mere relevance of the misuse might be sufficient (for more detailed consideration see Gurry, *Breach of Confidence*, 2nd edn (2012) 20.20). There is some authority for the proposition that, in special circumstances, all the defendant's fruits of a breach of confidence belong in equity to the claimant: *Att Gen v Guardian Newspapers Ltd (No.2)* [1990] 1 A.C. 109. The principle must be applied with care: *Ocular Sciences v Aspect Vision Care*, above.

[251]    See, e.g. *Seager v Copydex* [1967] 1 W.L.R. 923; *House of Spring Gardens Ltd v Point Blank Ltd* [1985] F.S.R. 327 (Ir.).

[252]    *Terrapin Ltd v Builders Supply Co (Hayes) Ltd* [1967] R.P.C. 375.

[253]    *Mustad v Dosen* [1964] 1 W.L.R. 109 (Note); [1963] R.P.C. 41; *Franchi v Franchi* [1967] R.P.C. 149.

[254]    *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293; [1966] R.P.C. 81 at [87]; cf. *Mustad v Dosen* [1964] 1 W.L.R. 109 (Note); *Speed Seal Products Ltd v Paddington* [1985] 1 W.L.R. 1327.

it in confidence.[255] Thus, one who has obtained possession of such a package will not be permitted to make use of it unless he obtains it independently from a legitimate source.[256] But such a disability will not be continued indefinitely; an injunction will only be granted over the period during which the unfair advantage continues.[257] However, though this is a legally difficult area,[258] the springboard doctrine does not as such extend the duty of confidence even after the information has entered the public domain: once the information ceases to be confidential Lord Goff contended "the subject matter is gone: the obligation is therefore also gone".[259] And that will be so if the information becomes public knowledge not only by the confider's act but also that of a third party and, indeed, arguably even where the confidentiality is destroyed by the act of the confidant. Laddie J in *Ocular Sciences Ltd v Aspect Vision Care Ltd* was "attracted" by Lord Goff's analysis. He noted "if a continuing activity of the defendant does not constitute a breach of confidence then it ought not to be injuncted even if it produces an unfair benefit to the defendant", though the defendant would still be liable in damages and an account of profits could include profits accruing to him from any subsequent exploitation of the information.[260] However, it may be that in the circumstances the information at issue retains a limited degree of confidentiality even after some disclosure, in which case an injunction may be granted but only for a limited time.[261]

**Delivery up or destruction upon oath**    An order to effect delivery up of infringing items or their modification so as not to infringe is used in patent actions and is equally appropriate in actions based on breach of confidence. The return of

**26-36**

---

[255] *Terrapin Ltd v Builders Supply Co (Hayes) Ltd* [1967] R.P.C. 375; *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293. In *QBE Management Services (UK) Ltd v Dymoke* [2012] EWHC 80 (QB); [2012] I.R.L.R. 458 at [8] Haddon-Cave J provides a summary of principles governing the grant of springboard relief. And see *Force India Formula One Team Ltd v 1 Malaysia Racing Team Sdn Bhd* [2013] EWCA Civ 780; [2013] R.P.C. 36 at [72]–[76].

[256] *Lamb v Evans* [1893] 1 Ch. 218. Or works it out again from scratch: *Northern Office Micro Computers (Pty) v Rosenstein* [1982] F.S.R. 124 Sup. Ct of SA.

[257] *Peter Pan Manufacturing Co v Corsets Silhouette Ltd* [1964] 1 W.L.R. 96; *Potters-Ballotini v Weston-Baker* [1977] R.P.C. 202; *Roger Bullivant Ltd v Ellis* [1987] I.C.R. 464. Simler J in *Devere Holding Co Ltd v Belgravia Wealth Management Europe Kft* [2014] EWHC 3189 (QB) at [39]: "the claimants must show that the defendants have gained an unfair competitive advantage over the claimants and that that advantage still exists and will continue to have that effect unless the relief sought is granted". The court should be concerned that it does not, in granting an injunction, give the injured party more protection than he realistically needs, and in particular, discourage or prohibit what in the course of time becomes quite legitimate competition.

[258] The Court of Appeal in *EPI Environmental Technologies Inc v Symphony Plastic Technologies Plc* [2006] EWCA Civ 3; [2006] 1 W.L.R. 495 at [73].

[259] Lord Goff in *AG v Guardian Newspapers (No.2)* [1990] 1 A.C. 190 at 287. He commented that the reasoning contra in *Speed Seal Products Ltd v Paddington* [1985] 1 W.L.R. 1327 "cannot to my mind be supported".

[260] [1997] R.P.C. 289 at 401. And in *Vestergaard Frandsen A/S v BestNet Europe Ltd* [2009] EWHC 1456 (Ch); [2010] F.S.R. 2, Arnold J at [42]–[96] reviewing the authorities noted that no injunction should be granted to restrain continued misuse of confidential information once the information had ceased to be confidential, whether the information had been published by the confidant, a stranger or the confider himself.

[261] As the law stands, it is not clear whether an injunction can be granted to prevent a defendant from benefiting from a past misuse of confidential information. In *BBC v HarperCollins Publishers Ltd* [2010] EWHC 2424 (Ch); [2011] E.M.L.R. 6 at [60] Morgan J held that an injunction was not to be awarded to punish the defendant or deprive him of a benefit, as opposed to protecting the claimant against further harm, unlawfully caused, and *Schering Chemicals Ltd v Falkman Ltd* [1982] Q.B. 1 was not to be relied upon as establishing that a court can award an injunction even after the material in question is no longer confidential.

Breach of Confidence and Privacy

confidential documents presents no difficulties,[262] but the courts are understandably reluctant to order the destruction of machinery, and the usual order is for modification to take out that part which makes use of information obtained in breach of confidence.[263] An order may, however, be made for the delivery up of offending goods.[264]

### 3.    The Action for Misuse of Private Information/Privacy

**26-37    The action for misuse of private information acknowledged**    In recent years the action for breach of confidence has been developed to protect privacy interests.[265] This has been influenced by the incorporation of the ECHR by the Human Rights Act 1998 and, in particular, the Convention right to respect for private life, contained in art.8. This provides:

> "(1)    Everyone has the right to respect for his private and family life, his home and his correspondence.
> (2)    There shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society in the interests of national security, public safety or the economic well-being of the country, for the prevention of disorder or crime, for the protection of health or morals, or for the protection of the rights or freedoms of others."[266]

An important landmark in this process is the House of Lords' decision in *Campbell v MGN Ltd*.[267] Here Lord Hoffmann noted that "English law has adapted the action for breach of confidence to provide a remedy for the unauthorised disclosure of personal information … this development has been mediated by the analogy of the right to disentitle them to a reasonable expectation of privacy article 8 of the European Convention on Human Rights".[268] In that case the defendant newspaper published the fact of the claimant's drug addiction and treatment. It also published details of that treatment, together with a covertly taken photograph of the claimant attending for treatment. The claimant, a celebrity model, accepted that as she had lied about her addiction, the truth about her addiction and the fact of seeking treatment was not protected. The majority of the House of Lords (Baroness Hale, Lords Hope and Carswell) however held that the *details* of the treatment and the accompanying photograph linked to the treatment went too far. This was private information, over and above setting the record straight, the disclosure of which was

---

[262]    *Alperton Rubber Co v Manning* (1917) 86 L.J. Ch. 377; *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* (1948) 65 R.P.C. 203.

[263]    *Saltman Engineering Co Ltd v Campbell Engineering Co Ltd* (1948) 65 R.P.C. 203; *Ocular Sciences Ltd v Aspect Vision Care Ltd* [1997] R.P.C. 289.

[264]    *Reid and Sigrist Ltd v Moss* (1932) 49 R.P.C. 461; *Peter Pan Manufacturing Corp v Corsets Silhouette Ltd* [1964] 1 W.L.R. 96.

[265]    See for example, Sedley LJ in *Douglas v Hello! Ltd* [2001] Q.B. 967 at 1002: "the law has to protect not only those people whose trust has been abused but those who simply find themselves subjected to an unwanted intrusion into their personal lives." There is a statutory right to privacy in photographs taken for private or domestic purposes: s.85 of the Copyright, Designs and Patents Act 1988.

[266]    The notion of necessity implies that an interference corresponds to a pressing social need and that it is proportionate to the legitimate aim pursued: *Olsson v Sweden* (1988) 11 E.H.R.R. 259. Article 10, freedom of expression, may also afford privacy protection as certain kinds of surveillance may interfere with rights of freedom of expression under art.10: see *Halford v UK* (1997) 24 E.H.R.R. 523; [1997] I.R.L.R. 471, where the point was argued but not decided in the light of the finding of a violation of art.8.

[267]    [2004] UKHL 22; [2004] 2 A.C. 457.

[268]    [2004] UKHL 22; [2004] 2 A.C. 457 at [118].

## IN THE HIGH COURT OF JUSTICE - CHANCERY DIVISION

Before: MR. JUSTICE MEGARRY

28th June and 1st July, 1968.

## COCO  v.  A.N. CLARK (ENGINEERS) LIMITED

Confidential information - Misuse of - Moped engine - Interlocutory injunction - Elements of breach of confidence - No prima facie case of infringement or that information was confidential - Defendants' undertaking to pay royalty into joint account - Interlocutory injunction not appropriate.

    The plaintiff designed a moped engine and sought the co-operation of the defendants in its manufacture. After the plaintiff had disclosed to the defendants all the details of his design and proposals for its manufacture, the parties fell out and the defendants decided to manufacture their own engine. The plaintiff alleged that the defendants had deliberately broken with him with a view to using his design without compensation, and when the defendants brought out their own design which closely resembled the plaintiff's, he brought a motion for an interlocutory injunction to restrain the defendants from misusing information communicated to them in confidence solely for the purposes of the joint venture. The defendants denied that any confidential information had been supplied to them, or used by them in their engine.

    Held,  (1) that of the three elements essential to a cause of action for breach of confidence, namely (a) that the information was of a confidential nature, (b) that it was communicated in circumstances importing an obligation of confidence and (c) that there was an unauthorised use of the information, only the second condition was satisfied by the plaintiff.

    Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd. (1948) 65 R.P.C. 203 and Seager v. Copydex Ltd. [1967] R.P.C. 349 followed.

        (2) That where, as here, the information was communicated allegedly in confidence in the expectation that the plaintiff would receive a monetary reward therefor, it was doubtful whether an injunction against using the information was the appropriate remedy if a dispute occurred.

        (3) That the plaintiff had not established a strong prima facie case that the information was confidential in nature, or a prima facie case of infringement, as the evidence adduced by him had failed to reveal that the similarities between the two engines were achieved by the use of the information, or that his engine had original qualities which would amount to confidential information.

[Reported by Anne Lyons, Barrister-at-Law]

Coco v. A.N. Clark (Engineers) Ltd.

(4) That unlike the Terrapin case, interlocutory relief was not appropriate in the present case as there was no cross-examination of witnesses on the hearing on motion; the plaintiff's charge of fraud could not be determined on affidavit evidence on motion and the plaintiff's engine was not in production and did not need the same degree of protection

Terrapin v. Builders' Supply Co. (Hayes) Ltd. [1960] R.P.C. 128 distinguished.

(5) That the motion would be dismissed subject to an undertaking given by the defendants that they would keep an account of a royalty of 5/0d. per engine produced, put all such royalties into a special joint bank account on trusts, and supply a monthly account of the total number of engines made to the plaintiff's solicitors and counsel, subject to undertakings of secrecy by them.

This was a motion for an interlocutory injunction brought by the plaintiff, Marco Paolo Coco against the defendants A.N. Clark (Engineers) Limited to restrain them from misusing confidential information. The facts of the case appear from the following judgment.

W.J. Mowbray, instructed by Tatton Gaskell & Tatton, appeared for the plaintiff. R.S. Alexander, instructed by Waterhouse & Co., for Glanvilles (Portsmouth), appeared for the defendants

## JUDGMENT

MEGARRY, J. - In this case, questions of some interest arise in relation to the equitable doctrine of confidential communication. The subject-matter of the dispute is a two-stroke engine for a moped, or motor-assisted cycle. Mr. Mowbray, for the plaintiff, moves for an interlocutory injunction against the defendant company. The relief claimed on the motion is an order that the defendants do not until after trial of this action or until further order in the meantime, without the previous consent of the plaintiff, "make or sell by any director, employee, servant or agent any Scamp moped or any other machine in the design, development or manufacture of which the defendant has used directly or indirectly any confidential information the property of the plaintiff".

In essence, the plaintiff's case is as follows. In 1965 he began market research into the possibility of producing and selling a new moped; and, being skilled in such matters, he proceeded to design such a machine. By March 1967 the first batch of pistons to his design had been made for him in Italy and sent to him in England. In April 1967 there was the first contact between him and the defendant company about the proposed moped, and

- 416 -

Coco  v.  A.N. Clark (Engineers) Ltd.

the company expressed interest in making it   By a letter dated 24th April 1967 the company suggested to the plaintiff that he should bring the prototype that he had built down to the works of the company with him, and this was done.  Over the next three months there were many discussions between the parties, and the plaintiff supplied the company with information, drawings and other aids towards the production of the moped, such as a list of possible suppliers of parts for the machine; and this came to be known by the plaintiff's name as the Coco moped.  The company in its turn did work on the plaintiff's ideas, and also put forward for the plaintiff's consideration certain draft documents to regulate the financial and other arrangements between them; but these documents were never signed, nor were terms ever agreed in any other way.

On 20th July 1967 there came the breach between the parties.  Mr. A.N Clark, the managing director of the defendant company, told the plaintiff that the method of transmission in the Coco moped was creating a very big problem and that the company had decided to make its own moped to a design different from that of the plaintiff.  The transmission of the Coco was by means of roller friction on to the rear tyre, and this was said to create serious problems of wear in that tyre.  The plaintiff says that he was given no opportunity of finding a source of supply of suitable tyres, and that within a fortnight he in fact had found two such sources on the Continent.  The defendant company has exhibited certain correspondence with eight tyre companies to show that such tyres could not be obtained; but, with one exception that of Michelin of Clermont-Ferrand, these letters do not go outside the United Kingdom.  A letter of the defendants dated 17th April 1968 states. "We had investigated tyre sources in England, Holland, France, Denmark, Sweden and Germany and had not been able to find a manufacturer who would even consider producing the special tyre required even if an order for 20,000 tyres was offered".  At present there is before me, however, nothing in evidence which relates to any search in Holland, Denmark, Sweden or Germany.

The plaintiff's belief, stated in his first affidavit, is that "at some time before 20th July 1967 Mr. Clark made up his mind to get my engine for the defendant without paying for it"; and he regards the abrupt termination of negotiations on the professed ground of problems about the tyres as being a mere excuse.  This, as Mr. Mowbray accepted during the argument, is in substance a charge of fraud.  Mr. Mowbray has also been critical of the statement made by the defendant company in a letter to the plaintiff dated 24th July 1967 that no part of the plaintiff's original design would be used in the engine to be made by the defendant company.

- 417 -

## Coco v. A.N. Clark (Engineers) Ltd.

After the breach, the plaintiff at first accepted the defendant company's assurance that the moped which the company was going to produce, known as the Scamp moped, would be to a different design. However, as more and more details of this machine became available through advertisements in trade papers in February and March 1968 the plaintiff became more and more suspicious that the engine would in substance be the same as his engine, and that the defendant company was making use of the information which he had provided for the purposes of the proposed Coco moped. In a letter dated 17th April 1968 the defendant company admitted that the piston and carburetter were of the same type, and this confirmed the plaintiff's suspicions. He relies strongly upon the piston being one that he had designed, obtained from the Italian company that had manufactured samples for him to his design. Mr. Clark says that he does not believe that there is any element of significant originality in the piston and that the defendant company had no difficulty in ordering it; but, subject to a saving for any further evidence that might emerge, the defendant company accepts that the piston used in the Scamp is in fact that designed by the plaintiff.

The writ in this case was issued on 14th May 1968 and the notice of motion was served on the same day. In the meantime, the Scamp moped had gone into production, and about 200 a week are now being sold. The Coco moped is not in production and there is no suggestion of any plans for putting it into production. The plaintiff's evidence includes that of a consultant engineer, demonstrating many resemblances between the two engines; but of course at this stage of the proceedings there has been no cross-examination. I should make it clear that there is no issue between the parties on anything save the engine, and that no question of patents arises.

Mr. Mowbray bases himself on the defendant company's misuse of information given to the company under circumstances of confidence. The essence of his case is breach of confidence. He expressly disclaims any contention that he could enjoin mere copying such as might have occurred if the Coco had been manufactured and put on the market by the plaintiff, and the defendant company had then bought one of them, dismantled it and slavishly copied it. Mr. Mowbray says that what happened here was that the plaintiff supplied confidential information to the defendant company for one particular purpose, namely, a joint venture in producing the Coco, and that for the defendant company to use this information for its own purposes without the plaintiff's consent is a breach of confidence. The argument before me has fallen under two main heads: first, whether there has been any breach of the obligation of confidence, and, secondly, whether the case is one where an injunction ought to be granted. I will consider these two heads in turn.

- 418 -

Coco. v. A.N. Clark (Engineers) Ltd.

The equitable jurisdiction in cases of breach of confidence is ancient;
confidence is the cousin of trust. The Statute of Uses, 1535, is framed in
terms of "use, confidence or trust"; and a couplet, attributed to Sir Thomas
More, Lord Chancellor avers that ;

> "Three things are to be helpt in Conscience;
> Fraud, Accident and things of Confidence".

(See 1 Rolle's Abridgement 374). In the middle of the last century, the
great case of Prince Albert v. Strange (1849) 1 MacN. & G. 25 reasserted
the doctrine. In the case before me, it is common ground that there is no
question of any breach of contract, for no contract ever came into existence.
Accordingly, what I have to consider is the pure equitable doctrine of con-
fidence, unaffected by contract. Furthermore, I am here in the realms of
commerce, and there is no question of any marital relationship such as
arose in Duchess of Argyll v. Duke of Argyll [1967] Ch. 302. Thus limited,
what are the essentials of the doctrine?

Of the various authorities cited to me, I have found Saltman Engineering
Co. Ltd. v. Campbell Engineering Co. Ltd. (1948) 65 R.P.C. 203;
Terrapin Ltd. v. Builders' Supply Co. (Hayes) Ltd. [1960] R.P.C. 128 and
Seager v. Copydex Ltd. [1967] 1 W.L.R. 923; [1967] R.P.C. 349 of the
most assistance. All are decisions of the Court of Appeal. I think it is
quite plain from the Saltman case that the obligation of confidence may exist
where, as in this case, there is no contractual relationship between the
parties. In cases of contract, the primary question is no doubt that of
construing the contract and any terms implied in it. Where there is no con-
tract, however, the question must be one of what it is that suffices to bring
the obligation into being; and there is the further question of what amounts
to a breach of that obligation.

In my judgment, three elements are normally required if, apart from
contract, a case of breach of confidence is to succeed. First, the inform-
ation itself, in the words of Lord Greene, M.R. in the Saltman case on page
215, must "have the necessary quality of confidence about it". Secondly,
that information must have been imparted in circumstances importing an
obligation of confidence. Thirdly, there must be an unauthorised use of
that information to the detriment of the party communicating it. I must
briefly examine each of these requirements in turn.

First, the information must be of a confidential nature. As Lord Greene
said in the Saltman case at page 215 "something which is public property and
public knowledge" cannot per se provide any foundation for proceedings for
breach of confidence. However confidential the circumstances of communi-
cation, there can be no breach of confidence in revealing to others something

- 419 -

Coco v. A N. Clark (Engineers) Ltd.

which is already common knowledge   But this must not be taken too far
Something that has been constructed solely from materials in the public
domain may possess the necessary quality of confidentiality: for something
new and confidential may have been brought into being by the application of
the skill and ingenuity of the human brain   Novelty depends on the thing
itself. and not upon the quality of its constituent parts.  Indeed. often the
more striking the novelty. the more commonplace its components.  Mr.
Mowbray demurs to the concept that some degree of originality is requisite.
But whether it is described as originality or novelty or ingenuity or other-
wise, I think there must be some product of the human brain which suffices
to confer a confidential nature upon the information: and, expressed in
those terms. I think that Mr  Mowbray accepts the concept.

    The difficulty comes. as Lord Denning, M.R. pointed out in the Seager
case on page 931. when the information used is partly public and partly
private; for then the recipient must somehow segregate the two and,
although free to use the former, must take no advantage of the communi-
cation of the latter.  To this subject I must in due course return.  I must
also return to a further point. namely, that where confidential information
is communicated in circumstances of confidence the obligation thus created
endures. perhaps in a modified form. even after all the information has
been published or is ascertainable by the public: for the recipient must not
use the communication as a spring-board (see the Seager case. pages 931 and
933). I should add that. as shown by Cranleigh Precision Engineering Ltd.
v  Bryant [1965] 1 W.L R. 1293; [1966] R.P.C  81  the mere simplicity of
an idea does not prevent it being confidential (see pages 1309 and 1310).
Indeed. the simpler an idea, the more likely it is to need protection.

    The second requirement is that the information must have been commun-
icated in circumstances importing an obligation of confidence   However
secret and confidential the information  there can be no binding obligation of
confidence if that information is blurted out in public or is communicated in
other circumstances which negative any duty of holding it confidential.  From
the authorities cited to me. I have not been able to derive any very precise
idea of what test is to be applied in determining whether the circumstances
import an obligation of confidence.  In the Argyll case at page 330. Ungoed-
Thomas  J  concluded his discussion of the circumstances in which the pub-
lication of marital communications should be restrained as being confidential
by saying: "If this was a well-developed jurisdiction doubtless there would
be guides and tests to aid in exercising it".  In the absence of such guides or
tests he then in effect concluded that part of the communications there in
question would on any reasonable test emerge as confidential.  It may be that
that hard-worked creature. the reasonable man. may be pressed into service
once more.  for I do not see why he should not labour in equity as well as at
law  It seems to me that if the circumstances are such that any reasonable

- 420 -

Coco  v.  A.N. Clark  (Engineers)  Ltd.

man standing in the shoes of the recipient of the information would have
realised that upon reasonable grounds the information was being given to him
in confidence, then this should suffice to impose upon him the equitable obli-
gation of confidence. In particular, where information of commercial or
industrial value is given on a business-like basis and with some avowed com-
mon object in mind, such as a joint venture or the manufacture of articles by
one party for the other. I would regard the recipient as carrying a heavy
burden if he seeks to repel a contention that he was bound by an obligation of
confidence: see the Saltman case at page 216. On that footing, for reasons
that will appear, I do not think I need explore this head further. I merely
add that I doubt whether equity would intervene unless the circumstances are
of sufficient gravity; equity ought not to be invoked merely to protect trivial
tittle-tattle, however confidential.

Thirdly, there must be an unauthorised use of the information to the
detriment of the person communicating it. Some of the statements of prin-
ciple in the cases omit any mention of detriment; others include it. At first
sight, it seems that detriment ought to be present if equity is to be induced
to intervene; but I can conceive of cases where a plaintiff might have sub-
stantial motives for seeking the aid of equity and yet suffer nothing which
could fairly be called detriment to him, as when the confidential information
shows him in a favourable light but gravely injures some relation or friend
of his whom he wishes to protect. The point does not arise for decision in
this case, for detriment to the plaintiff plainly exists  I need therefore say
no more than that although for the purposes of this case I have stated the
proposition in the stricter form, I wish to keep open the possibility of the
true proposition being that in the wider form.

Before I turn to the second main head, that of interlocutory relief, I
should mention one point on the substantive law that caused me some difficulty
during the argument. This is what may be called the "spring-board" doctrine
in the Seager case at page 931. Lord Denning quoted a sentence from the
judgment of Roxburgh, J. in the Terrapin case, which was quoted and adopted
as correct by Roskill. J. in the Cranleigh case. It runs as follows.

> "As I understand it, the essence of this branch of the law, what-
> ever the origin of it may be, is that a person who has obtained inform-
> ation in confidence is not allowed to use it as a spring-board for acti-
> vities detrimental to the person who made the confidential communic-
> ation, and spring-board it remains even when all the features have been
> published or can be ascertained by actual inspection by any member of
> the public".

Salmon, L J. in the Seager case on page 933 also states: "The law does not
allow the use of such information even as a spring-board for activities
detrimental to the plaintiff".

### Coco  v.  A.N.  Clark  (Engineers)  Ltd.

Quite apart from authority, I would recognise the principle enshrined in those words as being salutary. Nevertheless, I am not entirely clear how it is to be put into practical effect in every case. Suppose a case where there is a confidential communication of information which is partly public and partly private; suppose that the recipient of the information adds in confidence ideas of his own, improving the initial scheme; and suppose that the parties then part, with no agreement concluded between them. How is a conscientious recipient of the ideas to comply with the requirements that equity lays upon him? For in the words of Lord Denning at page 931 in the Seager case, he

> "must take special care to use only the material which is in the public
> domain. He should go to the public source and get it: or, at any rate,
> not be in a better position than if he had gone to the public source.
> He should not get a start over others by using the information which
> he received in confidence".

Suppose that the only confidential information communicated is that some important component should be made of aluminium instead of steel and with significant variations in its design and dimensions. The recipient knows that this change will transform a failure into a success. He knows that, if he had persevered himself, he might have come upon the solution in a week or in a year. Yet he is under a duty not to use the confidential information as a spring-board or as giving him a start.

What puzzles me is how, as a law-abiding citizen, he is to perform that duty. He could, I suppose, commission someone else to make the discovery anew, carefully abstaining from saying anything to him about aluminium or the design and dimensions which will achieve success; but this seems to me to be artificial in the extreme. Yet until this step is taken and the discovery made anew, he cannot make use of his own added ideas for the further improvement of the design which he had already communicated in confidence to the original communicator, ideas which would perhaps make a success into a triumph. He cannot build his superstructure so long as he is forbidden to use the foundations. Nor is the original communicator in a much better case. He is free to use his own original idea, which converted failure into success; but he cannot take advantage of the original recipient's further ideas, of which he knows, until such time as he or someone commissioned by him would, unaided by any confidence, have discovered them.

For those who are not law-abiding and conscientious citizens there is, I suppose, a simple answer: ignore the duty, use the information, and then pay damages. This may be the course which Lord Denning envisaged in the Seager case: for after stating that the recipient should not get a start over

- 422 -

Coco  v.  A.N.  Clark  (Engineers)  Ltd.

others by using the confidential information, he continued on page 932:
"At any rate, he should not get a start without paying for it. It may not be
a case for injunction or even for an account, but only for damages, depend-
ing on the worth of the confidential information to him in saving him time
and trouble". I also recognise that a conscientious and law-abiding citizen,
having received confidential information in confidence, may accept that
when negotiations break down the only honourable course is to withdraw
altogether from the field in question until his informant or someone else
has put the information into the public domain and he can no longer be said
to have any start. Communication thus imposes on him a unique disability.
He alone of all men must for an uncertain time abjure this field of endeavour,
however great his interest. I find this scarcely more reasonable than the
artificiality and uncertainty of postponing the use of the information until
others would have discovered it.

The relevance of the point, I think, is this. If the duty is a duty not to
use the information without consent, then it may be the proper subject of an
injunction restraining its use, even if there is an offer to pay a reasonable
sum for that use. If, on the other hand, the duty is merely a duty not to use
the information without paying a reasonable sum for it, then no such injunc-
tion should be granted. Despite the assistance of counsel, I feel far from
assured that I have got to the bottom of this matter. But I do feel consider-
able hesitation in expressing a doctrine of equity in terms that include a duty
which law-abiding citizens cannot reasonably be expected to perform. In
other words, the essence of the duty seems more likely to be that of not
using without paying, rather than of not using at all. It may be that in fields
other than industry and commerce (and I have in mind the Argyll case) the
duty may exist in the more stringent form; but in the circumstances present
in this case I think that the less stringent form is the more reasonable. No
doubt this matter may be canvassed and resolved at the trial; but on motion,
in a case where both the probabilities and the evidence support the view that
the fruits of any confidential communication were to sound in monetary com-
pensation to the communicator, I should be slow to hold that it was right to
enjoin the defendant company from making any use of the information.

I now turn to the second main head, namely that relating to whether this
is a proper case for the grant of an interlocutory injunction. Mr. Mowbray
cites Harman Pictures N.V. v. Osborne [1967] 1 W.L.R. 723 at 738 for the
proposition that, although he must show a strong prima facie case for the
existence of his right and at least that he is likely to succeed on this issue,
as regards the infringement of that right, he need show only a prima facie
case which is reasonably capable of succeeding. Even then, the remedy is
still discretionary, with the preservation of the status quo as the governing
principle. These requirements, he said, are satisfied in this case. With-
out controverting this proposition of law, Mr. Alexander asserted that the

– 423 –

Coco  v.  A.N.  Clark  (Engineers)  Ltd.

test had not been satisfied;  and it was thus that the parties joined issue
under this head.  In addition, Mr. Mowbray relied strongly on the Terrapin
case as carrying him far towards victory, whereas Mr. Alexander distin-
guished that case.  I shall have to return to this later.

     Having now considered the law, I can attempt to apply it to the facts of
this case.  With regard to the first main head, that of the substantive law,
I feel no difficulty about the second condition.  I think that the circumstances
under which the information was given were plainly circumstances which
imported an obligation of confidence.  From the first, the whole object of
the discussions was that the defendant company should manufacture a moped
based on the plaintiff's design, and the plaintiff imparted his information
with that object alone.  I cannot think that the information was given under
any circumstances save those of an implied obligation to preserve any
trade secrets that emerged.  If the reasonable man is overworked, so is
the officious bystander;  but just as he provides a convenient touchstone for
implied terms in contracts, so I think he may perform some useful function
in relation to the implied obligation of confidence.  If he had said to the
parties at the outset, "Do you not think that you ought to have an express
agreement that everything you are discussing is confidential?", I think the
parties would have testily suppressed him with a common "But it obviously
is".

     It will be observed that I have departed a little from the usual phrase
used in relation to implied terms, namely, "Oh. of course":  (see Shirlaw
v. Southern Foundries (1926) Ltd, [1939] 2 K.B. 206 at 221, per
MacKinnon, L.J.  I do this in view of what Cross, J. pointed out in
Gardner v. Coutts & Co. [1968] 1 W.L.R. 173 at 177.  As I observed in an
unreported case, re Griffiths and Hine's Contract on 8th February 1968,
when the hypothetical bystander executes his office and suggests to the
parties the inclusion of some express provision in the agreement which they
are drafting, what the parties answer in unison may be, "Obviously, we
shall include it", or it may be, "Of course, that is already included";  and
it is only in the latter case that the test will be satisfied and the term
accordingly prima facie implied into the contract.

     In relation to the obligation of confidence the corresponding proposition
would be that I must be satisfied not merely that, if asked, the parties
would have thereupon made an express agreement that the discussion was
to be confidential, but that, if asked, the parties would have said that it was
obviously already a confidential discussion.  Even applying that more
stringent test. I feel no doubt on the evidence before me that there was here
an implied obligation of confidence.  The circumstances of the disclosure in
this case seem to me to be redolent of trust and confidence.  Business men

Coco  v.  A.N.  Clark  (Engineers)  Ltd.

naturally concentrate on their business, and very sensibly do not constantly
take legal advice before opening their mouths or writing a letter, so that
business may flow and not stagnate. I think the court, despite the caution
which must be exercised before implying any obligation, must be ready to
make those implications upon which the sane and fair conduct of business is
likely to depend. Certainly where the circumstances are such that in the
case of a contract the offices of the officious bystander would produce an
implied term, in other cases equity would, I think, be at least as ready to
imply the equitable obligation. For as Mr. Mowbray pointed out, in equity
the question is not one of inserting terms into a contract which is presumed
to have expressed all that the parties intended, but is merely one of impos·
ing an obligation based on good conscience in a field unoccupied by any con-
tract. In the case before me I would imply a term if there were a contract,
and so, a fortiori, I imply the equitable obligation. This fortunately makes
it unnecessary for me to attempt to resolve the degree of less compelling
circumstances which would suffice to establish that obligation.

I turn to the first and third conditions  It is far less clear whether they
are satisfied. How far is the information confidential in nature, and how far
has the defendant company made an unauthorised use of any information that
was confidential in nature? If there has been any such use, it clearly has
been an unauthorised use to the detriment of the plaintiff; but the plaintiff's
claim must fail if what the defendant company has without authority used to
his detriment was not confidential in nature  The plaintiff founds his case on
what during the argument was described as a complex of confidential simil-
arities between the two engines. The defendant company points to the fact
that the components of the Scamp engine are available to anyone on the open
market. Even the piston, designed by the plaintiff, is obtainable thus. The
plaintiff's engineering expert deposes to many resemblances between the two
engines, under the heads of cylinder dimensions, combustion chamber,
pistons, connecting rods, inlet and exhaust ports, flywheel magneto, car-
buretter, silences and speed ratio. It will be seen that some of these items
relate to design and others to the components used; and plainly the two
engines enjoy a number of close and important similarities. But, as Mr.
Alexander pointed out with force, that is not enough. What matters is how
far the Scamp achieves these similarities by drawing on confidential inform-
ation imparted by the plaintiff in confidence, and how far these factors had
produced in the Coco an engine which had › ·y originality or other qualities
that could provide information of a confidential nature. I remain in almost
complete darkness as to the extent to which the ideas were common to the
moped world. I have read the last paragraph of the expert's affidavit many
t imes, and on each occasion it has conveyed to me doubt rather than convic-
tion. When at the trial he gives evidence viva voce and is cross-examined,
this matter may well be resolved one way or the other. I can only say that,
on this motion, that evidence and the evidence of the plaintiff have in my

Coco v. A.N. Clark (Engineers) Ltd.

judgment fallen well short of what is requisite for interlocutory relief. Subject to one matter, I do not think that the plaintiff has shown either a strong prima facie case for the existence of his right which is likely to succeed, or a prima facie case of infringement which is reasonably capable of succeeding.

The one matter that I have in mind is the Terrapin case; and on the issue of interlocutory relief I think that this was Mr. Mowbray's strongest authority. That case concerned a certain new type of portable building which was manufactured and marketed both by the plaintiff company and by two of the defendant companies. The plaintiff company alleged that the defendant companies had been enabled to manufacture these new buildings by making use of information communicated to them in confidence by the plaintiff company during a five year contract by one of the defendant companies for the manufacture of an earlier type of building for the plaintiff company, and as part of the negotiations for a new contract; and when the five years expired the defendant company proceeded to manufacture and market on its own account the new type of building. The plaintiffs moved for an interlocutory injunction to restrain the defendants from selling any buildings made with the aid of this information, and Roxburgh, J. heard the cross-examination of certain witnesses in an attempt to resolve a sharp conflict of evidence. The upshot was that he accepted the evidence of the plaintiff company rather than that of the defendants, and granted the injunction.

The Court of Appeal, with Sellers, L.J. dissenting, dismissed an appeal. Mr. Mowbray relied strongly on a passage in the judgment of Lord Evershed, M.R. on page 134. Lord Evershed said:

"The issues, therefore, involved were three: first, was the information given at all by Major Bolt to Mr. Van Moere; second, if it was given, was it in the circumstances confidential, and third, it an affirmative answer be given to the first two questions, was it used by the defendants? If all three questions are answered in the affirmative, there is no doubt that the defendants were doing something which they were disentitled to do. Moreover, as I conceive, if a prima facie case (and I avoid adding epithets such as strong, medium, weak or otherwise) were shown on the motion for the view that the three questions I have indicated should be answered, favourably to the plaintiffs, then, prima facie again, it would appear to me clear that the plaintiffs were entitled to interlocutory relief".

The approach of Romer, L.J. was similar, whereas Sellers, L.J. dissented in essence on the way in which the decision on the motion would prejudge the case and preclude a fair trial.

- 426 -

Coco  v.  A.N.  Clark  (Engineers)  Ltd.

There is indeed much force in Mr. Mowbray's argument based on this case; but there are important differences between that case and this. First and perhaps most important, as Mr. Alexander pointed out, there is the fact that in that case there had been cross-examination of witnesses on the hearing of the motion, whereas there has been no such cross-examination here. Where the affidavit evidence is in conflict, as it was in that case and in this, the difference which such cross-examination may produce is indeed significant; for it will often make it possible to resolve many of the conflicts of evidence for the purposes of the motion. Two passages in Lord Evershed's judgment seem to me to be consistent with making this distinction. On page 132 he says: "I of course agree that if the true position is that the real issue of fact is one which the judge on the motion could not properly resolve, then prima facie his duty would be to adjourn the matter to the trial". On page 133 he says:

> "If on the material which was before him the learned judge was able, however limited that material was, to reach a clear conclusion of fact, then I conceive he was entitled to act accordingly, and nonetheless so because upon a final analysis with a lot more material a different conclusion might be or may be reached – though of course a judge will obviously be chary of acting on disputed issues of fact if there is ground for supposing that the final conclusion might make the earlier view unjustified".

Secondly, it seems plain that, although there was a conflict of evidence in that case, the plaintiff did not charge fraud; fraud was not in issue. On page 138 Lord Evershed rejected in very firm language any suggestion of deliberate perjury on the part of the defendant company's witnesses. Nor can I find any suggestion of initial fraud anywhere in that case. In the case now before me, on the other hand, although the word "fraud" does not in terms appear in the affidavit evidence, it is quite clear that the plaintiff charges fraud; and when I put this to Mr. Mowbray he made no bones about it. How this charge of fraud will fare at the trial I cannot say. I have already referred to the passage in the plaintiff's first affidavit where he expresses the belief "that at some time before 20th July 1967 Mr. Clark made up his mind to get my engine for the defendant without paying for it". Mr. Alexander's comment on this passage is that the charge simply could not stand in the face of the defendant company's letter dated 21st July 1967 the date after the breach between the parties, when the defendant offered the plaintiff royalty of 5/0d. per engine on the first 50,000 engines made. An offer which might amount to £12,500 made in a letter exhibited to the plaintiff's first affidavit, was plainly wholly irreconcilable with the words "without paying for it" in that affidavit. Mr. Mowbray, while reserving all rights on this matter for the trial of action, no longer relies upon this charge on the motion as showing any dishonesty. Be that as it may, it seems to me

- 427 -

## Coco v. A.N. Clark (Engineers) Ltd.

that it would be an exceptional case in which it would be possible to make a finding of fraud on affidavit evidence on motion when there is a marked conflict of evidence on the point; and I am quite clear that this case is not exceptional in that sense. Nor am I prepared to find fraud on the defendant company's letter of 24th July, where much turns on the meaning of the protean word "original". Further, to find on motion a non-fraudulent case of misappropriation of confidential information when what is charged is fraudulent misappropriation requires a fine balance and considerable conviction, which I do not feel. In my judgment (and I borrow Lord Evershed's words) the true position is that the real issue of fact is one which on this motion I cannot properly resolve, so that prima facie my duty is to adjourn the matter to the trial. If I had felt that certitude which Roxburgh, J. evidently felt and had reached "a clear conclusion of fact" (I again quote), then I would act as he did; but I do not, and so I will not.

Thirdly, the Terrapin case was a contest between two companies which were both producing their rival products. Here I have a case where the defendant company is in production, but the plaintiff is not; and although the plaintiff has a marketable product, as Mr. Mowbray points out, there is no evidence before me to suggest whether the plaintiff ever intends to attempt to produce Coco engines and, if so, when. It seems to me that one factor which should be considered in the granting or refusing of interlocutory relief is what the suppliant is trying to protect. A product on the market may need protection against rivals in cases where a mere idea for a product, neither on the market now nor planned to be put on the market at any forseeable date, may not. Furthermore, I must bear in mind the effect on the defendant company of granting the injunction sought: for it would halt their production and throw idle some 35 to 40 of their staff, as well as removing from the British market the only moped with a British made engine and leaving its place vacant for a rival moped with a British engine which it is said, is now being developed.

It may be that what I have said presages a simple refusal of interlocutory relief; but I do not think that this would be right. Mr. Alexander has offered to undertake that the defendant company will keep an account of a royalty of 5/0d. per Scamp engine manufactured, this being the amount offered by the defendant company when the negotiations broke down. He has also assented to Mr. Mowbray's suggestion that arrangements should be made to pay this royalty into a special joint bank account on trusts which would protect the plaintiff in the event of any financial disaster to the defendant company. In addition, the defendant company offers an undertaking to provide the plaintiffs solicitors by the seventh day of every month with a true account of the total number of Scamp engines made in the previous months, the plaintiff's solicitors undertaking not to divulge these numbers to the plaintiff or anyone else

- 428 -

Coco v. A.N. Clark (Engineers) Ltd.

without the consent of the defendant company or the leave of the court. These seem to me to be entirely proper arrangements. A royalty at the rate of 5/0d. per engine on the first 50,000 made was in large degree agreed to by the plaintiff in his letter of 22nd July, although he there sought a mode of payment of the same total sum, namely, £12,500, which did not depend upon the rate of manufacture. If the defendant company is right, of course, there will be no obligation to pay the plaintiff anything. If the defendant company is wrong it must make a payment which may be more than 5/0d. per engine or may be less. But, doing the best I can on the material now before me, it seems to me that this rate of payment is a sensible figure to adopt for the interim period until the trial of the action. Accordingly subject to undertakings being given by the defendant company on the basis that I have mentioned, I dismiss the motion.

# Wade & Anr v British Sky Broadcasting Limited

 **No Substantial Judicial Treatment**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
1 December 2016

Case No: A3/2014/1401

Court of Appeal (Civil Division)

**[2016] EWCA Civ 1214, 2016 WL 06989197**

Before: Lord Justice Briggs Lord Justice Floyd and Lord Justice Christopher Clarke

Date: 01/12/2016

On Appeal from Chancery Division

Mr Justice Birss

HC12A02971

Hearing date: 22 November 2016

**Representation**

Ms Christina Michalos (instructed by Payne Hicks Beach ) for the Appellants.
Mr John Baldwin QC and Ms Lindsay Lane (instructed by Charles Russell Speechlys ) for the Respondents.

**Approved Judgment**

Lord Justice Briggs:

1. This appeal arises out of an unsuccessful claim for mis-use of confidential information. The claim was brought by the co-creators and promoters of a proposed television talent show who believe that the gist of their innovative format was copied by the defendant British Sky Broadcasting Limited ("Sky") in order to produce a television programme which, although differently named, was suspiciously similar to their own. They allege that the appearance of a combination of original features in both formats, coupled with the short time between their pitch of their format to Sky, and the later televising of its talent show, raises the irresistible inference that, consciously or unconsciously, the key features of their format were misused by being copied, without their consent, by Sky.

2. By contrast with the law relating to private confidences, which has been transformed by the influence of the Human Rights Convention , the law relating to mis-use of confidential information in a business context has been well settled for very many years. The following well-known dictum of Megarry J in *Coco v A N Clark (Engineers) Limited [1969] RPC 41* , at 47 has stood the test of time:

"In my judgment, three elements are normally required if, apart from contract, a case of breach of confidence is to succeed. First, the information itself … must "have the necessary quality of confidence about it." Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorised use of that information to the detriment of the party communicating it."

3.  The law as to the burden of proof in a claim of this kind is also well settled. It derives from the law relating to breach of copyright. Although the legal burden rests on the claimants throughout, the evidential burden may shift to the defendant where the claimants demonstrate sufficient similarities between their work and the defendant's work, coupled with a sufficient opportunity for the defendant to copy their work, to raise an inference that copying actually took place. The defendant may then seek to rebut that inference by evidence which proves independent derivation. The same principles are equally applicable to misuse of confidential information where, as here, the allegation is that confidential information consisting of original aspects of the claimants' format have been misused by being incorporated in the defendant's format without their consent.

4.  It is also well settled that misuse in the form of copying of this kind need not always be conscious or deliberate. The defendant or its staff may be shown to have learned of the relevant features of the claimants' format, and then to have been prompted in the creation of its own format by the presence of those derived features in their sub-conscious memory: see for example *Talbot v General Television Corporation PTY Limited [1981] RPC 1* , per Harris J at 11, a decision of the Supreme Court of Victoria on rather similar facts.

5.  The law is less clear about the analysis which is called for when (a) no single feature of the claimants' format alleged to have been misused by copying has, on its own, the necessary quality of confidence about it; (b) the claimants' format is as a whole of confidential quality but is not copied, lock stock and barrel, by the defendant; but (c) a combination of features of the claimants' format is copied by the defendant which are alleged to have the necessary quality of confidence about them, in the aggregate, but where the two formats, viewed as a whole, have important differences between them. As will shortly appear, this difficulty was not one which the trial judge found it necessary to resolve, and nor do I.

6.  After a four day trial in the Chancery Division, Birss J dismissed the claim. He found that there was a sufficient basis in the existence of a combination of similar features between the two talent shows and the time-line between the claimants' communication of theirs to the defendant and its production of its own show to justify an inference, although not a very powerful inference, sufficient to transfer the evidential burden of proof to Sky. But he found that the detailed evidential proof, by documents and witnesses deployed by Sky, demonstrated that its show, including the combination of similar elements, had been created independently, without either deliberate or sub-conscious copying. The claimants therefore failed to satisfy Megarry J's third condition in Coco v Clark . As to the question whether the claimants' format had the necessary quality of confidence about it, the judge concluded that the show in its totality did so, but that none of the individual elements relied upon did so, viewed separately. It was not alleged that the claimants' format had been copied lock, stock and barrel by Sky. Since he had concluded that Sky's show was independently created, without copying of any ideas from the claimants' format, he found it unnecessary to decide whether the alleged combination of similar features satisfied Megarry J's first condition.

7.  In concise and well-focussed submissions for the claimants Ms Christina Michalos (who did not appear below) pursued three main themes drawn from rather extensive grounds of appeal. First, she submitted that the judge's analysis was vitiated by errors of law. He had failed to approach the issues in the right order. He should have concentrated on the alleged combination of common factors between the two shows and decided whether it had the necessary quality of confidence, rather than

looking at individual factors separately. He should have carried out a detailed chronological analysis of the development of the defendant's show and, in particular, the changes in its format by which it converged with features of the claimants' show. Had he done so he would have concluded that the inference of copying was overwhelming.

8.  Secondly, she submitted that the judge had failed to apply the civil burden of proof, by assuming that the claimants needed to deploy "strong evidence" to displace the defendant's case of independent creation.

9.  Finally, she advanced a number of specific submissions about the detail of the judge's analysis under the common heading that inferential findings which he made were wrong.

10.  In conclusion she submitted that if any of her three themes were made good, there could in reality be no alternative outcome than a re-trial.

11.  Mr John Baldwin QC and Ms Lindsay Lane for Sky resisted all those submissions. Pursuant to a Respondent's Notice, they submitted in addition first that the judge should have grappled with the question whether the alleged combination of copied features had the necessary quality of confidence about it, and concluded that it did not. Secondly they submitted that the claimants' case of deliberate or sub-conscious copying had not been properly put to Sky's witnesses in cross examination. It was no excuse that, having rejected an open offer of settlement, the claimants had lost their legal representation shortly before trial, and continued as litigants in person.

12.  These submissions and counter-submissions do not mask the reality of this appeal, which is that it is essentially about a finding of fact, namely that the defendant did not actually use the claimants' information in the production of its show, whether or not, in combination, the similar features had the necessary quality of confidence about them. This court is therefore constrained by well known principles about the approach to factual appeals. They are sufficiently summarised by Lewison LJ in the following passage from *Fine & Country Limited v Okotoks Limited [2013] EWCA Civ 672* , at paragraphs 50-53, under the heading "the role of the appeal court":

> "50.  The Court of Appeal is not here to retry the case. Our function is to review the judgment and order of the trial judge to see if it is wrong. If the judge has applied the wrong legal test, then it is our duty to say so. But in many cases the appellant's complaint is not that the judge has misdirected himself in law, but that he has incorrectly applied the right test. In the case of many of the grounds of appeal this is the position here. Many of the points which the judge was called upon to decide were essentially value judgments, or what in the current jargon are called multi-factorial assessments. An appeal court must be especially cautious about interfering with a trial judge's decisions of this kind. There are many examples of statements to this effect. I take as representative Lord Hoffmann's statement in *Designers Guild Ltd v Russell Williams (Textiles) Ltd [2000] 1 WLR 2416* , 2423:
>
> > "Secondly, because the decision involves the application of a not altogether precise legal standard to a combination of features of varying importance, I think that this falls within the class of case in which an

appellate court should not reverse a judge's decision unless he has erred in principle."

51.  Where the appeal is (or involves) an appeal against a finding of fact, the role of an appeal court is as stated by Lord Mance in *Datec Electronics Holdings Ltd v United Parcels Service Ltd [2007] UKHL 23 [2007] 1 WLR 1325* at [46] approving a passage from the judgment of Clarke LJ in *Assicurazioni Generali SpA v Arab Insurance Group [2003] 1 WLR 577* , 580 – 581 as follows:

"14.  The approach of the court to any particular case will depend upon the nature of the issues kind of case determined by the judge. This has been recognised recently in, for example, *Todd v Adams & Chope (trading as Trelawney Fishing Co) [2002] 2 Lloyd's Rep 293* and *Bessant v South Cone Inc [2002] EWCA Civ 763* . In some cases the trial judge will have reached conclusions of primary fact based almost entirely upon the view which he formed of the oral evidence of the witnesses. In most cases, however, the position is more complex. In many such cases the judge will have reached his conclusions of primary fact as a result partly of the view he formed of the oral evidence and partly from an analysis of the documents. In other such cases, the judge will have made findings of primary fact based entirely or almost entirely on the documents. Some findings of primary fact will be the result of direct evidence, whereas others will depend upon inference from direct evidence of such facts.

15.  In appeals against conclusions of primary fact the approach of an appellate court will depend upon the weight to be attached to the findings of the judge and that weight will depend upon the extent to which, as the trial judge, the judge has an advantage over the appellate court; the greater that advantage the more reluctant the appellate court should be to interfere. As I see it, that was the approach of the Court of Appeal on a 'rehearing' under the RSC and should be its approach on a 'review' under the CPR 1998 .

16.  Some conclusions of fact are, however, not conclusions of primary fact of the kind to which I have just referred. They involve an assessment of a number of different factors which have to be weighed against each other. This is sometimes called an evaluation of the facts and is often a matter of degree upon which different judges can legitimately differ. Such cases may be closely analogous to the exercise of a discretion and, in my opinion, appellate courts should approach them in a similar way."

52.  I would add to that citation the statement of Lord Steyn in *Smith New Court Securities Ltd v Citibank NA [1997] AC 254* , 274:

"The principle is well settled that where there has been no misdirection on an issue of fact by the trial judge the presumption is that his

> conclusion on issues of fact is correct. The Court of Appeal will only reverse the trial judge on an issue of fact when it is convinced that his view is wrong. In such a case, if the Court of Appeal is left in doubt as to the correctness of the conclusion, it will not disturb it."

53.  This corresponds with the test set out in CPR Part ."

## The Factual Framework

13.  The appellants and first and second claimants Mr Brian Wade and Ms Geraldine Perry enjoyed a successful career in the music industry. Sky is a well known telecommunications company which provides television, internet and fixed line telephone services in the UK. Part of its business consists of commissioning and deploying TV programmes from independent production companies. In about 2006 the claimants came up with an idea for a prime-time TV programme which they called "The Real Deal" ("TRD"). It was to be a music talent show featuring singer-songwriters who wrote and performed their own material. At the initial auditions, contestants would be invited to perform in front of a panel of off-screen judges. Those who were successful would be invited to a second audition, at which eight contestants would be selected to participate in televised finals. The finals would take the form of live Saturday night broadcasts in which each contestant would perform an original song of their own composition. Their performances would be critiqued by a judging panel consisting of celebrity singer-songwriters.

14.  At the end of each live show, one contestant would be eliminated in what is generally called a "whittle" format. On the day after each show, the contestants' original songs would become available for internet download, and would be eligible for inclusion in the national pop charts, their position depending upon the number of downloads which occurred. At the end of the series, the winning contestant would be awarded a recording contract with a major record label. By employing a music talent show format which was a proven ratings success, and featuring singer-songwriters who wrote and performed their own material, TRD was aimed to position itself as a more authentic yet equally successful rival to existing programmes such as the X Factor and Britain's Got Talent.

15.  In order to maximize their prospects of success, the claimants formed a group called The Real Deal Partnership ("the Partnership"). In January 2007 they recruited a Mr Lester Mordue, the former head of programming at MTV. In 2008 they recruited Mr Tim Van Someren, an experienced television director. The Partnership (which may have been a joint venture rather than a partnership in the strict legal sense) then sought to interest TV companies in TRD but, in the event, without success.

16.  A pitch to the BBC in November 2008 led to the Partnership concluding that TRD would be likely to secure better ratings if contestants began by singing "covers" (i.e. known songs by other artists) rather than their own compositions. They therefore revised the format of TRD so that contestants would sing covers during the first four televised shows, while behind the scenes footage generated public interest in them as potential singer-songwriters. In the remaining shows they would sing a cover and an original song of their own, and only the original songs would be downloadable.

17.  This was the format which the Partnership presented to Sky, based upon a series of PowerPoint slides (called in the litigation "the deck"). They used the deck to pitch TRD to Ms Clare Hollywood, a commissioning editor at Sky, on 17 June

2009. On her initially enthusiastic response, they sent her copies of the deck. In subsequent email exchanges they were told that Ms Hollywood needed to get their proposal considered and if possible approved by Mr Stuart Murphy, a director of programmes at Sky.

18.  In January 2010, possibly in response to an informal tender for a music talent programme, a company called Princess Productions ("Princess"), owned or controlled by a member of the Murdoch family, pitched to Sky a programme then called "Got to Sing" ("GtS"). At that stage the main feature of GtS was that it enabled contestants (who could be singers or players) to enter the competition by using a mobile phone application by which they could record themselves performing on their own mobile phones. After Ms Hollywood, Mr Murphy and Mr Duncan Gray, Sky's Head of Entertainment had discussed this and other responses to the informal tender, Ms Hollywood emailed Mr Van Someren (on behalf of the Partnership) to inform him that Sky would not be commissioning TRD.

19.  There followed an intensifying level of communication between Sky and Princess, in particular at meetings on 16 March and 8 April 2010, during the course of which Princess's proposal underwent a series of revisions, including more than one change of name, before it emerged into the public gaze in August and September 2010 as a talent show called "Must Be The Music" ("MBTM"), filming of auditions having started in July. I shall for convenience refer to Princess's proposed show throughout as MBTM, but this should not mask the real changes to the format which were made between the time when it was first pitched to Sky in January 2010, and when it was finalised, filmed and shown in the summer of that year.

20.  In its final form, MBTM did not pursue the dedicated mobile phone application. Nonetheless it remained open to all comers (whereas TRD had planned to recruit contestants by invitation). It was never limited to songs, still less to singer-songwriters as the only contestants, although in the event the finalists turned out to be singer-songwriters. The format enabled same-day downloading of contestants' televised performances with eligibility for the pop charts, but did not at any time include the whittle method of selection of finalists or winners. The performers themselves were to be the main beneficiaries from income generated by downloads. By contrast with TRD, the winner's prize was not a recording contract, but a substantial money prize, coupled with facilities for making a recording in a leading studio. From start to finish, the individuals identified as proposed judges in the Princess pitch of MBTM were in fact (bar one or two exceptions in the earlier pitches) singer-songwriters. In TRD, the three proposed off-screen judges included only one singer-songwriter, but the judges in the proposed televised part of the competition were all to be singer-songwriters. I shall refer to other features of TRD and MBTM in due course, when considering the third part of Ms Michalos's submissions.

21.  The first series of MBTM did not achieve the desired ratings, and Sky cancelled the show early in 2011, although it was sold and later televised, with some success, in several series in Poland.

22.  In the meantime, MBTM had come to the claimants' attention. Mr Van Someren had been engaged by Princess to direct MBTM. The detail of the announcement of auditions for MBTM by Sky in June 2010 led the claimants to conclude, notwithstanding Mr Van Someren's assurances to the contrary, that their ideas, as set out in the deck for TRD, had been copied. They were encouraged in that view by receiving congratulations on the broadcast of MBTM from a Mr London (to whom they had pitched TRD in March 2008 when he was executive producer of entertainment at RDF television), on his mistaken assumption that MBTM was a re-named version of TRD.

**The Trial**

23.  As the judge said (at paragraph 23) the claimants' case at trial was that the coincidences of similarity and timing between TRD and MBTM were too great to be accounted for by independent creation, so that Sky must have acted in breach of confidence. Disclosure of the successive iterations of the slides depicting MBTM (under its various earlier names) enabled the claimants to invite the court to compare it in great detail with the deck (depicting TRD) copies of which, it was common

ground, had been in Sky's possession at the material time. In addition to themselves, the claimants called as witnesses the other members of the Partnership, including Mr Van Someren, although he had by then directed MBTM. They also called Mr London to confirm his opinion about MBTM being derived from TRD, to which I have referred.

24.  For its part, Sky's main case was that, regardless of the level and detail of similarities and dis-similarities between TRD and MBTM, every element of MBTM had been independently created without regard to TRD or the deck. Sky said that the deck had never been seen by anyone other than Ms Hollywood. Separately, Sky contended that no individual part or combination of parts of TRD enjoyed the requisite quality of confidence, although it was not disputed that the occasion upon which TRD had been explained to Sky was sufficiently confidential to satisfy the second of Megarry J's conditions in Coco v Clark .

25.  Sky called no less than ten witnesses in an endeavour (which succeeded before the judge) to provide comprehensive evidence of the process whereby MBTM had been conceived and developed, from start to finish, by Princess in collaboration with Sky. The witnesses included Ms Hollywood, her boss Mr Murphy and Mr Lucas Green, a series producer at Princess who, it was said, had provided the main inspiration for the key selling features of MBTM in the form in which it finally reached the public.

26.  Eight out of ten of Sky's witnesses gave oral evidence and were (to the extent of their abilities), cross-examined by the claimants as litigants in person. It does not appear that the written evidence of the two witnesses who were not cross-examined played a significant part in the judge's deliberations.

27.  It is evident both from the judgment and from the transcript of the trial that the judge was alert to the difficulties facing the claimants as advocates and (in particular) cross-examiners in a challenging trial. To the extent reasonably possible, he made due allowance for their difficulties, both by excusing them for failures to put part of their case to witnesses, and by asking questions of witnesses himself, in a manner which did not require or imply his descent into the arena. It is also evident from the judgment (at paragraphs 26-47) that the process of oral evidence in chief and, albeit limited, cross-examination was sufficient to enable the judge to form clear and nuanced views about the credibility and weight of the oral evidence.

28.  Since the documentary material was by no means conclusive as to the origin of the various elements of MBTM, this was a case in which the credibility and weight of the oral evidence went to the heart of Sky's case of independent creation, as to which the judge was therefore much better placed than this court, both in relation to findings of primary fact and in relation to the drawing of factual inferences, as I shall seek to demonstrate in due course.

**The Judgment**

29.  The reserved judgment of this experienced intellectual property judge (delivered within a month of the trial) speaks for itself. It needs no summary or interpretation. It is published on BAILII under the neutral case citation [2014] EWHC Civ 634 (Ch). Without wasting words, it gives an amply sufficient explanation of the judge's reasoning for his dismissal of the claim. Nonetheless, since the first main theme of Ms Michalos's submissions is that the judge approached the issues in the wrong way, it is necessary to summarise the structure of the judgment.

30.  Having introduced the parties and the background (paragraphs 1-19) and summarised the parties' cases (paragraphs 20-25) the judge then described in general but sufficient terms his perceptions as to the credibility of the witnesses and the weight of their evidence (at paragraphs 26-47). He then gave a brief summary of the applicable law at paragraphs 48-58 in a manner which is not criticised on appeal.

© 2023 Thomson Reuters.

31.  For present purposes the meat of the judgment begins under the heading "Assessment" at paragraphs 59-60, in which he outlines a three-staged structure, first of considering the inferences which might be drawn from the similarities and time-frame (an approach which he derived by analogy with copyright cases, again without criticism on this appeal) then considering the evidence of independent derivation, and then looking at the matter overall.

32.  At paragraphs 61-62 the judge concludes that the second condition in Coco v Clark is satisfied and that, viewed as a whole, the deck also satisfied the first condition. But he said that this was of no particular assistance in a case where the complaint is not that the whole of TRD as set out in the deck was copied or published, but that ideas within it were used in MBTM. Again, that is not challenged on appeal.

33.  At paragraphs 64-66 the judge identifies eight elements in the deck relied upon by the claimants as copied ideas, six relating to the way in which the show would work, and two relating to branding. He then identifies six other aspects of the deck which may be said to illustrate differences between TRD and MBTM. After an analysis of the key features, under the headings downloading and singer-songwriters, and concluding that, viewed separately, none of them had the necessary quality of confidentiality, he concludes, at paragraph 76:

> "There are no other individual ideas in the deck which on their own have the necessary quality of confidence but that does not mean the claimants have no rights. A line exists somewhere between the full detail of the deck as a whole, which I have accepted as being protectable, and the individual ideas taken alone, none of which I have accepted. The question is where that line is to be drawn."

34.  The judge then looks for a potentially qualifying combination of features within the deck which might, together, have the necessary quality of confidence. At paragraph 81 he identifies this combination:

> "(i)  Chart eligible downloads during the run of the show.
>
> (ii)  Judges being exclusively singer-songwriters.
>
> (iii)  Contestants being singer-songwriters.
>
> (iv)  Prime time."

He continues:

> "At this stage I entertain a doubt whether this combination fairly reflects the content of the deck. It is in danger of being a combination created with hindsight cherry picking elements from the deck, rather than a reflection of what the claimants really conceived. However I will suspend judgment on the combination point until I have considered the other issues and return to it at the end."

35.  Under the heading "Comparison with Must Be The Music" the judge then undertakes a detailed analysis of what he describes as "the key similarities between the programmes which are relied on", dealing with each of them in turn, then with key differences relied upon by Sky. The similarities were:

  i)  Chart eligible downloads during the run of the series.
  ii)  Singer-songwriters.
  iii)  Prime time rather than edgy.
  iv)  The word "real".
  v)  Badges.

At paragraph 99, he concludes:

> "Some of the points made by the claimants are very weak but at the heart of the claimants' case is an argument based on the timing, including the fact that the deck was in Sky's possession for many months, coupled with major points of similarity relating to downloads and the emphasis on singer-songwriters as judges and contestants. Even though it is true there are a number of differences between the deck and the show as broadcast, without an explanation from Sky, I would not be prepared simply to dismiss the inference that Sky derived ideas from the deck for The Real Deal. It is perfectly obvious why the claimants are concerned in this case. However the inference cannot be taken too far. The inference has some substance but it is not at all overwhelming."

36.  At paragraphs 100-106, under the heading "Sky's positive case of independent derivation" the judge then looks in detail at Sky's evidential case and concludes, at para 101:

> "I have mentioned all of the witnesses called by Sky. Taken together their evidence would make good Sky's case which I have summarised above. An important point is that Sky has called all the relevant individuals to establish its version of events. There are no gaps."

He then deals with, and rejects, Sky's submission that a challenge to its evidential case was fatally flawed by the absence of requisite cross-examination. At paragraphs 105-106 he concludes:

> "105  First, honest evidence may not be cogent enough to rebut an inference of derivation derived from the circumstances. Giving honest evidence is not the same thing as a finding that the witnesses are correct in their assessment of what happened.
>
> 106 Second, and of more importance on the facts of this case, the evidence from Sky's witnesses does not entirely rule out the possibility of a transfer of ideas which took place unwittingly, unconsciously or which has been genuinely and truly forgotten. Ms Hollywood clearly had the deck and liked the idea of The Real Deal. Perhaps she unwittingly influenced Mr Murphy or Mr Gray or both of them, and passed ideas from The Real Deal on to those individuals. After all they all worked very closely together in an open plan office environment. Or alternatively, although Mr Gray and Mr Murphy

© 2023 Thomson Reuters.

genuinely believe they never read the deck, perhaps they are mistaken. Perhaps one of them did skim it, the key ideas lodged in their mind and went on to influence the development of Must Be The Music."

37.  Since the question whether Sky had succeeded in its case of independent derivation remained open at that stage of the analysis, the judge then proceeded to consider a series of "tell tale indications" in the evidence, relied upon by the claimants, as destructive of Sky's case. I shall have to return to some of them but, for present purposes, it is sufficient to recite the judge's overall conclusions, at paragraphs 120-121:

> "120  I have addressed the various tell tale indications relied on to show a link between Must Be The Music and The Real Deal individually. Even when I consider them as a whole, they do not amount to strong evidence to support the inference that aspects of Must Be The Music were derived from The Real Deal.
>
> 121  I will now consider the evidence as a whole. Sky's evidence was cogent and taken as a whole presented a clear and persuasive picture. There are similarities between the show and some ideas in the deck but the evidence explained their origin. The inference that the ideas which Must Be The Music embodies in common with The Real Deal must have been derived from the deck is not strong enough to leave me in any real doubt about the right conclusion in this case. I accept Sky's evidence. I find that Must Be The Music was created entirely independently of The Real Deal."

38.  Having thus concluded that the third condition in Coco v Clark was not satisfied, because there had been no use of the claimants' confidential material, the judge briefly noted at paragraph 122 that it was unnecessary for him to have to decide whether the particular combination of elements shared between TRD and MBTM had the necessary quality of confidence to satisfy the first condition.

**Errors in approach – Grounds 1–5**

39.  It is difficult to deal with the first five of the claimants' grounds of appeal entirely separately. I have found it easier to address them by reference to the manner and order in which they were dealt with in Ms Michalos's helpful oral submissions.

40.  Her overarching point was that the judge had simply failed to see the wood for the trees. This manifested itself, she submitted, in the following ways. First he had failed to stand back and look at the compelling inference to be derived from the time-line, consisting in essence of the presentation of TRD to Sky in June 2009, its rejection in February 2010 and the first broadcast of MBTM in August 2010. He had not even conducted a detailed chronological analysis of the development of MBTM.

41.  Secondly, Ms Michalos pointed to what she said was a persistent tendency of the judge to look at the individual elements of TRD, rather than at their effect in combination, both for the purpose of deciding whether they enjoyed the requisite quality of confidence and for the forensic purpose of deciding whether there had been copying. She submitted that the judge ought not to have parked the first of those issues, at paragraphs 81 and 122. He should have resolved that issue first.

42.  Thirdly, Ms Michalos submitted that the judge gave no sufficient thought to the question whether there had been subconscious copying, and blinded himself to that probability by his erroneous conclusion that there were "no gaps" in Sky's evidence about independent creation.

43.  To make good the first and third of these submissions Ms Michalos took us very carefully through a chronological analysis of the way in which the Princess pitch which started life as GtS and ended as MBTM developed over time. As a forensic analysis of a documentary trail, based upon successive versions of MBTM in slide presentations on different dates, it was an impressive exercise, tending to show that, at certain times the MBTM concept appeared to diverge away from ideas to be found in TRD, and at other times to converge with them. She also used her analysis to support her challenge to the judge's conclusion that there were "no gaps" in Sky's evidence about independent creation. This submission really focussed on a meeting between representatives of Sky and Princess on 8 April 2010, of which there were no minutes or attendance notes, and about which Sky's representatives at the meeting had no detailed recollection.

44.  Taking Ms Michalos's points in turn, I am not persuaded by the first point about a failure to focus on the time-line or detailed chronology. In his thumbnail sketch of the claimants' case at paragraph 23, the judge identified timing as lying at the heart of it. At paragraph 99 he stated in terms that timing lay at the heart of the claimants' case and that it was a major factor in his decision that the evidential burden shifted to Sky to prove independent creation. Furthermore, his detailed analysis of the claimants "tell tale indications in the evidence" following paragraph 107 demonstrates a perceptive and detailed command of the order of relevant events.

45.  More generally, it by no means follows from the fact that a judge chooses to express the reasons for his decision by using a particular, non-chronological, structure, that he has not in fact carried out the chronological analysis about the apparent absence of which the claimants complain. Very few judges consider it incumbent upon them to set out the whole of their thought processes in a judgment, and judgments would tend to be far too long if they did.

46.  Next, I reject Ms Michalos's point about a failure to look at relevant aspects of the ideas in TRD in combination, rather than individually. It was, to my mind, perfectly appropriate for the judge to start with an analysis of each of the allegedly confidential aspects of TRD, before looking at any particular combination of them. But the judge plainly did then look at what he regarded as the best available combination, from the claimants' perspective, both for the purposes of beginning an analysis of whether that combination had the requisite quality of confidence, and for the quite separate purpose of his forensic examination of the allegation of copying. He embarked upon the first of those at paragraphs 76 to 81. At paragraph 81 he plainly sought to choose the best possible combination from the claimants' perspective, because he introduced the four elements of it by the phrase:

"One might say that the claimants should then rely on the combination of …"

47.  Similarly, the judge introduces his detailed analysis of the comparison to be made between TRD and MBTM by identifying the combination of "key similarities between the programmes" as consisting of five elements which overlapped with, but were not identical to, the four elements which he had identified for qualification for the requisite quality of confidence. Of course it was incumbent upon him then to look very carefully at each, but his conclusions at paragraph 99 (favourable to the claimants in leading to a reversal of the evidential burden of proof) were based upon an overall review of the combined effect of those items, viewed in the aggregate and coupled with the inference to be drawn from the time-line.

Finally, his review of the alleged "tell tale indications in the evidence" by which the claimants sought to challenge Sky's case of independent creation, at paragraphs 107-121, involved considering all those points "as a whole" at paragraph 120 and the entirety of the evidence "as a whole" in paragraph 121.

48.  I was initially attracted to Ms Michalos's submission that the judge went too far in his conclusion, at paragraph 101, that there were "no gaps" in Sky's evidential case about independent creation, in particular by reference to the important meeting on 8 April between representatives of Sky and Princess, following which there was some element of convergence between Princess's developing ideas and those to be found in the deck.

49.  I have nonetheless not been persuaded by the submission, for the following reasons. First, set in its context, the judge's reference to "no gaps" is part of a paragraph which places emphasis on the fact that Sky had called as witnesses everyone who appeared to have been involved in the collaboration with Princess on what became MBTM, both from Sky's own staff and those involved on behalf of Princess. He was not, I think, suggesting that every meeting or exchange between those involved in a rapidly developing planned TV programme which underwent numerous amendments was minutely recorded in documents, attendance notes, minutes or the conscious recollection of witnesses. There was in fact documentation from which most of the story could be gleaned, but it had not been prepared for the purpose of demonstrating from whose minds or previous experience particular ideas had emerged. Nor could it be expected that the witnesses would remember every stage in a detailed process occurring three and a half years previously (that is before they made their witness statements) during the course of busy lives which were by no means, in the case of most of them, devoted wholly or even predominantly to MBTM.

50.  In particular, Mr Baldwin demonstrated that, although Sky's representatives attending the important 8 April 2010 meeting had no very helpful recollection of what occurred, this was to be contrasted with the recollection of Mr Steinberg of Princess, whom the judge found (at paragraph 41) to be a good witness. No other part of Ms Michalos's analysis of the "no gaps" point was even as initially persuasive as (before hearing Mr Baldwin) it had appeared to be in relation to the 8 April meeting.

**Burden of Proof**

51.  This was a short point, and Ms Michalos's submissions about it commendably followed suit. In my judgment, it was not a good point.

52.  The submission is based upon the judge's description, in paragraph 120, of the combined effect of the "tell tale indications" as not amounting to "strong evidence to support the inference that aspects of Must Be The Music were derived from The Real Deal." The submission was that this showed the judge failing to apply the civil standard of proof, namely balance of probabilities.

53.  The judge's reference to "strong evidence" must be read in context. He had, throughout, demonstrated a wholly appropriate perception that, in weighing contrasting evidence, it is constantly necessary to have regard to its strength or weight. Thus at paragraph 59 he said:

> "One may end up testing the cogency of the evidence of independent derivation against the strength of the inference of copying."

At paragraph 99 he found that there was sufficient in the time-line coupled with the similarities between the two programmes to give rise to an inference of copying, but he said:

> "However this inference cannot be taken too far. The inference has some substance but it is not at all overwhelming."

His analysis of the tell tale indications from paragraphs 107 to 119 is replete with nuanced assessments of the strength or weakness of the various matters relied upon, in the context of a conclusion that, prima facie, Sky had discharged the burden of showing independent creation (paragraph 101), but not without leaving open the possibility of sub-conscious copying (paragraph 106), so that it was necessary to see whether Sky's positive case had been overturned by evidence of any sufficient strength (paragraphs 120-121). Indeed, his overall conclusion about the evidence, at paragraph 121, was that, balancing all of it and considering its weight he was not "in any real doubt about the right conclusion in this case". In other words he found Sky's positive case of independent creation to have been proved to a standard well in excess of a mere balance of probabilities.

**Wrong Inferences**

54.  For the legal basis of these submissions Ms Michalos relied upon the same passages from *Assicurazioni Generali Sp v Arab Insurance Group [2003] 1 WLR 577* as are referred to in the citation from the Okotoks case above, as having been approved by the Supreme Court in *Datec Electronics Holdings Limited v United Parcel Service Limited [2007] 1WLR 1325* , by Lord Mance, at paragraph 46. He cites at greater length from the Arab Insurance case than does Lewison LJ in the Okotoks case, but the substance is to the same effect.

55.  Ms Michalos's point was that where a challenge is made to inferences drawn by the trial judge, then the appellate court may not be as inhibited from a departure from the trial judge's conclusions as it would be in a case where everything depends upon the relative credibility of evidence given and challenged orally. This may be true up to a point, where for example inferences are drawn from unchallenged primary facts. But even then, the appellate court must give real respect to the trial judge's multi-factorial assessment.

56.  In the present case by contrast, the task for the judge was to balance what he regarded as a relatively weak inference of copying (whether sub-conscious or not) from the combined effect of the apparent similarities between the two programmes and the time-line with the mainly primary fact evidence of independent creation put forward by Sky's witnesses, all but two of whom gave their evidence orally and were cross-examined, and about whose credibility the judge thought it important to reach conclusions. To my mind, the result is that this court is affected both by the undoubted advantage which the judge had in hearing and seeing the witnesses on the one hand, and the respect due to him in his conduct of what, balancing that evidence against inferences, was on any view a multi-factorial exercise of judgment. When there are added to those factors the additional points that, first, this judge was very experienced in the field of intellectual property and secondly, that the judgment, read as a whole, has inherent weight as a logical, careful, detailed and perceptive analysis, this limb of the claimants' appeal has to surmount very serious hurdles.

57.  Ms Michalos focussed her written and oral submissions on three specific findings of the judge. The first was (or was alleged to be) the judge's conclusion that the pop chart eligible downloading of songs performed on a talent show during the run of the show was not an original feature in MBTM. The allegation that it was original was the necessary stepping stone to the inference that it must therefore have been copied from TRD, as portrayed in the deck. Her criticism was focussed upon paragraphs 87-88 of the judgment, where the judge addresses it as one of the alleged key similarities between the two programmes. He concludes, at paragraph 87, that Sky, and particularly Mr Gray when giving evidence, were wrong not to

accept that chart eligible downloading in MBTM was a first, in terms of UK prime-time talent shows, having been described in July 2010 by the Independent newspaper as an idea "nothing short of genius". But in paragraph 88 he continued:

> "This is not inconsistent with the fact that the general idea of downloads from a music talent show was not new or original."

58. This assessment needs to be read in conjunction with paragraphs 68-70 of the judgment, in which the judge concluded that chart eligible downloading from a talent show was a well known idea by 2010, having been considered, but rejected, for inclusion in the X Factor because of the practical impossibility of combining chart eligible downloading during the run of the show with a process of elimination based upon the "whittle" system. In short, if the public can see by reference to the pop charts how competing performers' songs downloaded from the show are doing then all the excitement generated by the whittle process is lost.

59. The model for TRD put forward in the deck proposed both a whittle process for elimination and chart eligible downloading, but with no explanation how that difficulty of using them in the same talent show could be resolved. The evidence before the judge (particularly from Mr Green of Princess) was that he had been aware of this conundrum, and of the use of non-chart eligible downloads in the American talent show "American Idol", and had some experience of the techniques of downloading from a previous but rather different show called "Orange Unsigned Act" in which he had been involved. The evidence amply demonstrated, and the judge was entitled to conclude, that the "genius" embodied in the use of chart eligible downloading in MBTM arose not from its having been the first time when the idea was conceived of, but the first occasion when the solution to the problem of associating it with a TV talent show had been identified, namely using some process for elimination other than whittle.

60. In my judgment that analysis of the judge was both rational and firmly based upon evidence which he was prepared to believe, so that it is unchallengeable on appeal.

61. The second allegedly wrong inference was the judge's conclusions, at paragraphs 93 and 110-114, that the fact that Sky and Princess toyed with the phrase "The Real Deal" and made use of the word "Real" in connection with MBTM was only a "small point" in favour of an inference of copying and, although "striking", in fact "nothing more than a coincidence".

62. The underlying uncontroversial facts were that the phrase "The Real Deal" was considered by Sky among a very long list of other potential candidates as a name for what ultimately became MBTM, and that the word "real" was used more than once in MBTM as a way of connoting authenticity, and distancing its content from talent shows such as the X Factor. At paragraph 112 the judge acknowledged the possibility that the phrase "real deal" or "The Real Deal" might have derived from the claimants, but there was evidence before him that it did not in fact, and his conclusion on balance that the phrase was independently conceived of as one of a large number of potential ways of pointing to authenticity was neither vitiated by any error of principle or lack of reasonableness. His separate conclusion that the use of "real" to denote authenticity is a perfectly ordinary means of expressing the point, giving rise to nothing more than the smallest indication of similarity with TRD, seems to me to be unassailable. More generally, the phrase "The Real Deal" was not in the event actually used in the promotion or televising of MBTM although the word "real" was. All in all, this seems to me to be, as the judge said, such a small point as to form no real weight in his decision making, and no real substance in a challenge to his overall conclusion by way of appeal.

63.  The third wrong inference put forward by the appellants relates to the common use, both in TRD and MBTM, of badges as part of the branding of the programmes. The deck illustrated circular (probably metal) lapel badges as a constant branding feature in the promotion of TRD, using the phrase "The Real Deal" on the badges themselves. The slides promoting MBTM did no such thing, but the later advertising material for the programme itself did from time to time depict campaigning badges of a broadly similar shape being used to try and help artists achieve chart positions for their music and containing phrases such as "help us to get to number 1".

64.  Having dealt (at paragraph 96) with the claimants' allegation that the temporary removal of the MBTM badges from its publicity after their complaint suggested an acknowledgment by Sky that it had been copied and rejected it on primary evidence from Sky which he accepted, the judge concluded as follows:

> "97.  I think the badges argument is a better point than the "real" point but it is not strong. The lapel badges used for Must Be The Music are not like the branding badges in the deck for The Real Deal". The similarity is simply the idea of badges."

65.  This conclusion formed part of the judge's detailed analysis of the points pointing towards or away from an inference, based on time-line and similarities, that there had been copying. It was a point in favour of the claimants' case rather than against it, and the judge found in the event that the inference was made good, for the purpose of shifting the evidential burden of proof: see paragraph 99.

66.  The real complaint in this part of the appeal is therefore about the weight which the judge ascribed to the badging point, rather than to any wrong inference. But considerations of weight in a multi-factorial assessment of this kind are pre-eminently a matter for the trial judge, with which an appellate court will only interfere with caution. For my part, I cannot see any substance in the criticism. The question whether the use of badging in MBTM raised a prima facie inference of copying was pre-eminently a matter for the trial judge. Even without the benefit of the oral evidence that there was in fact no copying, I would have been hard put to have given the point any greater weight in the overall balance than did the judge. On any view, his analysis disclosed no error of principle, and the outcome cannot sensibly be described as beyond any reasonable range of legitimate responses to the evidence about this point presented to him.

**The Respondent's Notice**

67.  My conclusion that none of the grounds of appeal have been made good by the appellants makes it unnecessary for me to address the content of the Respondent's Notice. It follows from a conclusion that the judge was entitled to find that all elements in MBTM were independently created, rather than copied, consciously or sub-consciously, from TRD, that it is just as unnecessary for me, as it was for the judge, to deal with the perhaps quite difficult question whether any particular combination of the factors relied upon by the claimants as enjoying the necessary quality of confidence satisfied that condition.

68.  It is also unnecessary for me to reach any conclusion about the alternative submission from Sky that a challenge to independent creation was disabled by a failure of cross examination. The real question is not simply whether there was or was not the requisite cross examination, still less whether cross examination is a merely professional obligation not affecting litigants in person. The real question is whether it would be fair or just to conclude issues against a party or its witnesses on grounds of which they had no real notice. It appears that, albeit expressed with considerable brevity, the judge did not think that the combination of Mr Wade's efforts as a litigant in person and his own questioning of the witnesses gave rise

to any potential injustice in his addressing the real issues in the case. I would only say that it would have taken rather more persuasion than Mr Baldwin attempted to lead me with any confidence to a contrary conclusion.

**Conclusion**

69.  For the reasons given above I would dismiss this appeal.

Lord Justice Floyd:

70.  I agree.

Lord Justice Christopher Clarke

71.  I also agree.

Crown copyright

117

1 Ch.

A

[COURT OF APPEAL]

FACCENDA CHICKEN LTD. v. FOWLER AND OTHERS

FOWLER v. FACCENDA CHICKEN LTD.

B

1985  Oct. 21, 22, 23;                    Kerr, Neill and Nourse L.JJ.
       Dec. 5

*Confidential Information—Breach of confidence—Employment—Sales-
men acquiring skill and knowledge during course of employment—
Salesmen leaving and forming company in competition with
employer's business—Whether knowledge of employer's customers
confidential—Whether use of knowledge in breach of implied
term of contract—Whether actionable conspiracy*

C

The first defendant, while employed as the plaintiffs' sales
manager, established an operation whereby fresh chickens were
daily offered for sale from itinerant refrigerated vans. Each of
the van salesmen employed by the plaintiffs covered a different
sector in the plaintiffs' business area and, after a few weeks,
knew the names and addresses of the customers in their sector;
the detailed routes taken for the supplying of customers; the
customers' requirements; the times of deliveries; and the prices
paid, which varied from customer to customer (the "sales
information"). The first defendant subsequently resigned from
the plaintiffs' employment and formed his own company to
carry on a similar business in the same area. Eight of the
plaintiffs' employees, including several van salesmen, went to
work for him. In an action brought by the plaintiffs against the
first defendant, his company, and the eight former employees,
the plaintiffs alleged that the employees had used and disclosed
the sales information for the assistance of the first defendant's
business to the plaintiffs' detriment and in breach of the alleged
implied term of their contracts of employment that neither
during the currency of their employment nor thereafter would
they use confidential information or trade secrets gained by
them in the course of their employment. The plaintiffs claimed,
inter alia, an injunction and damages for breaches of the
respective contracts of employment and/or breach of confidence.
The first defendant brought an action against the plaintiffs for
alleged commission due to him from them and the plaintiffs
counterclaimed damages for breach of contract by the abuse of
confidential information. None of the employees' contracts of
employment with the plaintiffs contained express terms against
the unauthorised use of confidential information or trade secrets
gained by them in the course of their employment.

Goulding J. held that information gained by an employee in
the course of his employment fell into three classes: information
which was so easily accessible to the public that an employee
was at liberty to impart it to anyone during his employment or
afterwards; confidential information which he could not use or
disclose during his employment without breaching his duty of
fidelity to his employer, but which, in the absence of an express
restrictive covenant, he was at liberty to use thereafter; and
specific trade secrets which he was not entitled to use either
during or after his employment. He held that the sales

118

A

information came within the second category of confidential information and that, accordingly, there being no express term in the contracts of employment restraining its use, the employees were at liberty to use and disclose it in competition with the plaintiffs once they had left their employment. He accordingly dismissed the plaintiffs' action and counterclaim.

On the plaintiffs' appeal:—

B

*Held,* dismissing the appeal, that, in the absence of express terms, an employee was bound by his implied duty of good faith to his employer not to use or disclose for the duration of his employment confidential information gained in the course of the employment, and was furthermore bound by an implied term of his contract of employment not to use or disclose, either during his employment or thereafter, information which was not merely confidential but which was properly to be described as a trade secret; but that no term was to be implied which imposed upon

C

him an obligation binding upon him after his employment had ceased not to use or disclose confidential information short of a trade secret; and that, accordingly, since neither the sales information nor the information relating to prices amounted to a trade secret, the employees were at liberty to use and disclose the information once they had left the plaintiffs' employment (post, pp. 135G–H, 136B–D, 137B–E, 138C, D, 140C–F).

D

*Robb v. Green* [1895] 2 Q.B. 315, C.A.; *Amber Size and Chemical Co. Ltd. v. Menzel* [1913] 2 Ch. 239; *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80, C.A. and *Printers & Finishers Ltd. v. Holloway* [1965] 1 W.L.R. 1; [1965] R.P.C. 239 applied.

*Per curiam.* An employer cannot extend the period of protection of confidential information of the category that is only protected during the duration of the employment by means of a restrictive covenant (post, p. 137E–G).

E

Decision of Goulding J. [1984] I.C.R. 589 affirmed.

The following cases are referred to in the judgment of the court:

*Amber Size and Chemical Co. Ltd. v. Menzel* [1913] 2 Ch. 239
*Cranleigh Precision Engineering Ltd. v. Bryant* [1965] 1 W.L.R. 1293; [1964] 3 All E.R. 289

F

*Leng (Sir W. C.) & Co. Ltd. v. Andrews* [1909] 1 Ch. 763, C.A.
*Littlewoods Organisation Ltd. v. Harris* [1977] 1 W.L.R. 1472; [1978] 1 All E.R. 1026, C.A.
*Marshall (Thomas) (Exports) Ltd. v. Guinle* [1979] Ch. 227; [1978] 3 W.L.R. 116; [1978] I.C.R. 905; [1978] 3 All E.R. 193
*Morris (Herbert) Ltd. v. Saxelby* [1916] 1 A.C. 688, H.L.(E.)
*Printers & Finishers Ltd. v. Holloway* [1965] 1 W.L.R. 1; (Note) [1964] 3 All E.R. 54; [1964] 3 All E.R. 731; [1965] R.P.C. 239

G

*Reid & Sigrist Ltd. v. Moss and Mechanism Ltd.* (1932) 49 R.P.C. 461
*Robb v. Green* [1895] 2 Q.B. 1, 315, C.A.
*Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd.* (1948) 65 R.P.C. 203, C.A.
*Seager v. Copydex Ltd.* [1967] 1 W.L.R. 923; [1967] 2 All E.R. 415, C.A.

H

*United Indigo Chemical Co. Ltd. v. Robinson* (1931) 49 R.P.C. 178
*Vokes Ltd. v. Heather* (1945) 62 R.P.C. 135, C.A.
*Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80, C.A.
*Worsley (E.) & Co. Ltd. v. Cooper* [1939] 1 All E.R. 290

A    The following additional cases were cited in argument:

    *Ackroyds (London) Ltd. v. Islington Plastics Ltd.* [1962] R.P.C. 97
    *Baker v. Gibbons* [1972] 1 W.L.R. 693; [1972] 2 All E.R. 759
    *Coco v. A. N. Clark (Engineers) Ltd.* [1969] R.P.C. 41
    *Commercial Plastics Ltd. v. Vincent* [1965] 1 Q.B. 623; [1964] 3 W.L.R.
      820; [1964] 3 All E.R. 546, C.A.
    *Coral Index Ltd. v. Regent Index Ltd.* [1970] R.P.C. 147

B    *Diamond Stylus Co. Ltd. v. Bauden Precision Diamonds Ltd.* [1973] R.P.C.
      675
    *Hivac Ltd. v. Park Royal Scientific Instruments Ltd.* [1946] Ch. 169; [1946] 1
      All E.R. 350, C.A.
    *Lamb v. Evans* [1893] 1 Ch. 218, C.A.
    *Louis v. Smellie* (1895) 73 L.T. 226, C.A.
    *Mason v. Provident Clothing and Supply Co. Ltd.* [1913] A.C. 724, H.L.(E.)

C    *Stephenson Jordan & Harrison Ltd. v. MacDonald & Evans* (1951) 69
      R.P.C. 10, C.A.
    *Under Water Welders & Repairers Ltd. v. Street and Longthorne* [1968]
      R.P.C. 498
    *United Stirling Corporation Ltd. v. Felton and Mannion* [1974] R.P.C. 162
    *Yates Circuit Foil Co. Ltd. v. Electrofoils Ltd.* [1976[ 2 F.S.R. 345

D    APPEALS from Goulding J.
    By writ dated 10 September 1981 in the first action (in the Chancery
Division) the plaintiffs, Faccenda Chicken Ltd., claimed against the
defendants (the first nine being individuals formerly in the employment
of the plaintiff but being subsequently employed by the tenth defendant,
Fowler Quality Poultry Products Ltd.) (1) an order that the nine named
defendants be restrained from using and disclosing confidential trade

E    secrets and other confidential material of and appertaining to the
plaintiffs' business and obtained by them whilst they were severally in
the employment of the plaintiffs; (2) an order that the tenth defendant
be restrained from using and disclosing any and all of the aforesaid
confidential trade secrets and other confidential material of and
appertaining to the plaintiffs' business and communicated to it or to any
of its servants or agents on its behalf by any of the other defendants to

F    the action, their servants or agents; (3) damages against the individual
defendants for breaches of their several contracts of employment with
the plaintiffs and/or for breaches of confidence and/or for conspiracy to
use and disclose confidential material obtained by them of the plaintiffs'
business affairs and arising out of the activities of the tenth defendant in
the business as wholesalers and/or retailers of poultry products and those
of the first nine defendants in permitting and/or assisting in the operation

G    of such business to the detriment of the plaintiffs' business goodwill and
connection; (4) further and other relief; (5) costs.
    By writ dated 16 September 1982 in the second action (in the
Queen's Bench Division and transferred to the Chancery Division on
15 March 1983) Barry Fowler, the first defendant in the Chancery
action, claimed against Faccenda Chicken Ltd. £22,975 for outstanding

H    commission said to be due to him and interest on that sum. In a
counterclaim Faccenda Chicken Ltd. sought damages under three heads:
(1) breach of contract by abuse of confidential information; (2) alleged
wrongful disposals or conversion of chickens in November 1980;

120

(3) alleged conspiracy between Barry Fowler and two of the defendants    A
to obtain the disclosure to him of certain weekly costings of Faccenda
Chicken Ltd.

Giving judgment on 8 November 1983, Goulding J. [1984] I.C.R. 589
held that the individual defendants had necessarily acquired the sales
information in the course of their employment with the plaintiffs; that
the information, which had become part of their skill and knowledge,
was confidential; and that although those defendants could not use or    B
disclose the information while they remained in the plaintiffs' employment
without breach of their implied duty or fidelity, once they had left the
employment they were free to use the information in competition with
the plaintiffs. The judge dismissed the plaintiffs' claim and counterclaim.

By notice dated 12 December 1983 and amended on 11 May 1984,
the plaintiffs appealed against the judge's order on the grounds that (1)    C
the judge erred in law in holding that in addition to non-confidential
information there were two categories of confidential information that
might be acquired by an employee in the course of his service (i) that
which (unless restrained by express covenant) he was free to use or
disclose for his own benefit and/or to his ex-employer's detriment once
his employment had terminated; and (ii) that which he was never free to
use or disclose, except for his employer's benefit. (2) The judge should    D
have held that where confidential information had been acquired by an
employee in the course of his service (i) he did not become free to use
or disclose it for his own benefit and/or to his employer's detriment,
merely by leaving his employer's service; and (ii) that was so whether or
not a covenant in restraint of trade had or could have been validly
imposed on the employee in order to protect that information. (3)    E
Alternatively, that on the pleadings in the action it was not open to the
judge to find in relation to the confidential information the subject of
the action which had been acquired by the first defendant in the course
of his service that he was not free to use or disclose it for his own
benefit or to the plaintiffs' detriment during his employment but was
free to do so after the cessation thereof. (4) Alternatively, that if
contrary to the plaintiffs' contention the judge had not erred in the    F
respects mentioned above he misdirected himself in holding on the facts
found that the sales information and prices charged to the plaintiffs'
various customers, being part of the sales information, fell within
paragraph (1)(i) above and not into paragraph (1)(ii) above. (5) The
judge failed to distinguish between the effect in law of the different
constituent parts of the sales information. In particular, the plaintiffs    G
would contend that the information of the prices charged by them to
their several customers was secret, and that if (contrary to the plaintiffs'
contentions) the judge had not erred in the respects mentioned in (1)
above, he misdirected himself in holding that the information fell into
category (1)(i). (6) The judge having held that (a) the sales information
would be of value to competitors of the plaintiffs; (b) persons outside
the plaintiffs' employment could only obtain approximate knowledge of    H
the prices at which the plaintiffs sold their goods to their several
customers and (c) a difference of even 1p per pound might be important
in the competitive trade, the judge misdirected himself in placing that

**1 Ch.**            Faccenda Chicken Ltd. v. Fowler (C.A.)

A  information regarding prices acquired by the plaintiffs' former salesmen in category (1)(i). It was alleged that if such category rightly existed, the information should have been placed in category (1)(ii). (7) The judge should have held on the facts found by him that the sales information and the prices were trade secrets of the plaintiffs. (8) The judge erred in law in holding that the so called springboard doctrine was considerably limited by a servant's freedom to compete with his former employer

B  after lawful termination of his employment.

The facts are stated in the judgment.

C  *Conrad Dehn Q.C.* and *John Trench* for the plaintiffs. The issue in this case is whether the first defendant, when setting up a business in competition with his previous employers, and in employing their former employees, was entitled to make use of information gained by reason of that former employment.

The judge erred in holding that there were three categories of information acquired by an employee in the course of his employment: (1) non-confidential information which was trivial or easily accessible from public sources; (2) confidential information which an employee

D  could not use except for his employer's benefit during his employment but which, unless restrained by covenant, he was free to use or disclose for his own benefit or to his employer's detriment once his employment terminated (this would include information which an employee had to treat as confidential but which, once learned, "necessarily" remained in his head and became part of his skill and knowledge applied in the course of his employer's business); and (3) confidential information

E  which an employee was never free to use or disclose except with his employer's authority.

The judge was wrong as to the content and legal effect of such classification and if his classification was correct he was wrong in holding that the confidential information consisting of the sales information, in particular the prices charged to the plaintiffs' customers, fell into category (2) and not (3).

F  If confidential information is imparted by X to Y in circumstances which involve an obligation of confidence, the law is that Y is not permitted to use or disclose it except with X's authority, alternatively, to X's detriment: see *Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd.* (1948) 65 R.P.C. 203, 213, 215, 216, 218; *Cranleigh Precision Engineering Ltd. v. Bryant* [1965] 1 W.L.R. 1293, 1295D, 1310G, 1311G;

G  *Seager v. Copydex Ltd.* [1967] 1 W.L.R. 923, 931, 933; *Coco v. A. N. Clark (Engineers) Ltd.* [1969] R.P.C. 41, 46–48, 51 and *United Stirling Corporation Ltd. v. Felton and Mannion* [1974] R.P.C. 162, 167. The acquisition by an employee in the course of his service of information which he must treat as confidential is an example of this situation: see *Louis v. Smellie* (1895) 73 L.T. 226, 228; *Amber Size and Chemical Co.*

H  *Ltd. v. Menzel* [1913] 2 Ch. 239, 245; *Reid & Sigrist Ltd. v. Moss and Mechanism Ltd.* (1932) 49 R.P.C. 461, 462, 480, 481; *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80, 89 (an example of an employee's breach of duty of good faith after his employment has terminated); *Cranleigh Precision Engineering Ltd. v. Bryant* [1965] 1 W.L.R. 1293, 1310–1311;

Ch. 1987—6

A

*United Stirling Corporation Ltd. v. Felton and Mannion*, at p. 167; *Yates Circuit Foil Co. Ltd. v. Electrofoils Ltd.* [1976] 2 F.S.R. 345, 380–381 and *Thomas Marshall (Exports) Ltd. v. Guinle* [1979] Ch. 227, 247–248. To copy information acquired in the course of employment is a breach of the employee's duty of good faith to his employer. It would be difficult to accuse an employee of bad faith where he could not help but learn information, but it would be a clear breach of his duty of good faith intentionally to learn information for the purpose of using it to his employer's detriment.

B

There is no special law of confidential information which applies in the case of master and servant. In such cases the court will imply a contractual term at least as restrictive as that above and as alleged and admitted here: see also *Under Water Welders & Repairers Ltd. v. Street and Longthorne* [1968] R.P.C. 498, 507; *Thomas Marshall (Exports) Ltd. v. Guinle*, at p. 247 and *Reid & Sigrist Ltd. v. Moss and Mechanism Ltd.*, at p. 480.

C

There is only one category of confidential information. Once acquired it may never be disclosed except with permission. However, some confidential information is more important than others and its importance will determine whether and if so to what extent a covenant against competition imposed on an employee to protect it will be regarded as reasonable and upheld by a court. Confidential information sufficiently important to be described as a trade secret will generally justify a covenant against competition. An employee is entitled to make use, after his employment, of matters of a general nature learned as a result of good instruction. But it would be a breach of his duty of good faith to reveal at any time confidential information let alone trade secrets such as, in this case, prices.

D

E

The judge was wrong in confining category (1) information to that which was trivial or easily accessible from public sources. It is a necessary but not sufficient condition of information being confidential that it should be neither trivial nor easily accessible from public sources: see *Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd.*, 65 R.P.C. 203, 215. There is much information which is not trivial and easily accessible but which is not confidential; for example, information about the employer's organisation and general method of business (*Sir W. C. Leng & Co. Ltd. v. Andrews* [1909] 1 Ch. 763, 774; *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 704–705 and *Stephenson Jordan & Harrison Ltd. v. MacDonald & Evans* (1951) 69 R.P.C. 10, 14–16); general technical knowledge (*Commercial Plastics Ltd. v. Vincent* [1965] 1 Q.B. 623, 641B) and the names of customers (*Baker v. Gibbons* [1972] 1 W.L.R. 693, 694, 700, 702), as distinct from the particular prices which individual customers are charged. The covenant against competition which can be imposed to protect goodwill is not to restrain the use of names of customers but the abuse of influence over them: see *Herbert Morris Ltd. v. Saxelby*, at pp. 702, 709, 710. This explains why an ex-employee, unless restrained by covenant, is permitted to canvass his former employer's customers: see *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80, 89.

F

G

H

1 Ch.                    Faccenda Chicken Ltd. v. Fowler (C.A.)

A    As to the judge's category (2), while there may be information which is subject to a limited restriction during the continuance of the employee's employment, it is not confidential information. Such information includes information about the employer's organisation and general methods of business, general technical knowledge, the things a good employer will teach an employee, and the names of his customers. An employee will generally not be able to use such information for his own benefit during

B    his employment because of restraints imposed by his contract of employment: see *Wessex Dairies Ltd. v. Smith*, at pp. 85, 88 and *Hivac Ltd. v. Park Royal Scientific Instruments Ltd.* [1946] Ch. 169, 174, 180. Employees have been restrained from using, after termination of their employment, lists of names made during their employment (as in *Lamb v. Evans* [1893] 1 Ch. 218, 226, 229–230, 235–236 and *Robb v. Green*

C    [1895] 2 Q.B. 1, 13, 16–17; 315, 316–317) not because the information was confidential, but because of the employees' improper conduct in making the lists: see also *Coral Index Ltd. v. Regent Index Ltd.* [1970] R.P.C. 147, 149 and *Diamond Stylus Co. Ltd. v. Bauden Precision Diamonds Ltd.* [1973] R.P.C. 675, 678.

The judge's definition of category (2) information cannot be correct: what necessarily remains in an employee's head and forms part of his

D    skill and knowledge will include non-confidential information; the definition applies equally to category (3) information (compare *Amber Size and Chemical Co. Ltd. v. Menzel* [1913] 2 Ch. 239, 242); the same information may remain in one employee's head but not another's; and the information may not remain in the employee's head for ever. In *United Indigo Chemical Co. Ltd. v. Robinson* (1931) 49 R.P.C. 178,

E    179, 181, 186, the employee was not told and did not know that the process in question was confidential. Likewise in *E. Worsley & Co. Ltd. v. Cooper* [1939] 1 All E.R. 290, 307, the information was not imparted in confidence: see also at pp. 308A–D, 310A. The fact that confidential information is not embodied in a document but is carried away in the employee's head is not a reason against the grant of an injunction preventing its use or disclosure: see *Printers & Finishers Ltd. v.*

F    *Holloway* [1965] 1 W.L.R. 1, 5A and *Amber Size and Chemical Co. Ltd. v. Menzel*. Although it may not be physically or by injunction possible to stop the employee using the information, because of difficulties of proof and enforcement, it does not follow that damages should not be awarded where misuse and damage are proved: see *United Indigo Chemical Co. Ltd. v. Robinson*, 49 R.P.C. 178, 187, 194 and *Littlewoods*

G    *Organisation Ltd. v. Harris* [1977] 1 W.L.R. 1472, 1478–1479.

The judge's category (2) is inconsistent with *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, in which the House of Lords distinguished between the general skill and knowledge which an employee of any ability must necessarily obtain from any employer in that line and knowledge of any matter or skill in which his former employer could be said to have any property at all (see at pp. 704–705, 710, 711, 714). That

H    distinction was also suggested to constitute the distinction between non-confidential information and possible confidential information, at pp. 705, 714: see also *Mason v. Provident Clothing and Supply Co. Ltd.* [1913] A.C. 724, 740–741, where Lord Shaw of Dunfermline distinguished

A

between knowledge which was as "real and objective as the possession of material goods" and the subjective equipment of the workman which becomes part of himself and was to be used for his own maintenance and advancement.

The judge was wrong in deciding what the effect of information being in each category was. An employee might, whilst employed, be restrained by his obligation of good faith from disclosing even non-confidential information to a competitor. There is no good reason why an employee who has acquired confidential information should be freed from his duty not to disclose it merely by leaving his employment, possibly after a very short time (*Reid & Sigrist Ltd. v. Moss and Mechanism Ltd.*, 49 R.P.C. 461, 481), whereas confidential information acquired by, for example, an independent contractor would be protected indefinitely: see *Ackroyds (London) Ltd. v. Islington Plastics Ltd.* [1962] R.P.C. 97, 103–104, 105. The effect of the judge's classification leads to uncertainty and unfairness. In order to explain and justify differing restraints on recipients of confidential information depending on whether or not they acquired the information in the course of their employment, would require the implication of a term in the contract of employment dealing with the matter, but there is no justification for such a term. Such a term would be inconsistent with the implied obligation of faithful service, and contrary to public policy. Because of the implied obligation of faithful service in a contract of service the restraints on an employee should be even greater after termination than upon others: see *Robb v. Green* [1895] 2 Q.B. 315 and *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80.

The judge was wrong in saying that an employer could restrain the use by the employee of category 2 information after the termination of the employment by means of a restrictive covenant. Such a covenant is in general of only limited use because of the difficulty of proving a breach: see *United Indigo Chemical Co. Ltd. v. Robinson*, 49 R.P.C. 178, 187 and *Littlewoods Organisation Ltd. v. Harris* [1977] 1 W.L.R. 1472, 1479B. But a covenant against competition is only enforceable if it is reasonable: see *Commercial Plastics Ltd. v. Vincent* [1965] 1 Q.B. 623, 640. A covenant to protect confidential information short of a trade secret may not be valid: see *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 711–712 and *Commercial Plastics Ltd. v. Vincent*, at pp. 642 and 647. On that basis the purpose of such a covenant would be to make more effective the protection after termination of employment of information in category 3, not to protect information in category 2. The court's reluctance to grant an injunction to enforce an implied obligation of confidence because of the difficulties of proof of breach, is no reason for saying that no such obligation exists. Proof of breach and conspiracy to commit such breaches may be proved and damages awarded: see *Robb v. Green*, at pp. 19–20; and *Seager v. Copydex Ltd.* [1967] 1 W.L.R. 923, 932. Thus, on the basis of the judge's categorisation, category 2 could only be protected, after termination of the employment, by claims for an injunction to restrain threatened wrongful use or disclosure, or for damages on proof of wrongful use or disclosure.

B

C

D

E

F

G

H

A    Contrary to the judge's findings, the sales information was protected from disclosure after the first defendant's employment ended. In as much as the court upholds his categorisation, he was wrong to put the sales information in category 2 and not category 3. The judge found that the sales information would be of value to competitors; that persons outside the plaintiffs' employment would only obtain approximate knowledge of the prices charged to individual customers; and that a

B    difference of even one penny in the pound might be important in the competitive trade; that the information was confidential information received by an employee to advance his employer's business which he had no right to reveal to anyone else. The information was not general knowledge of something which the employees learned by means of directions or instructions from their employers: see *Sir W. C. Leng &*

C    *Co. Ltd. v. Andrews* [1909] 1 Ch. 763, 773; and *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80, 89; nor was it "general technical knowledge" within the meaning of *Commercial Plastics Ltd. v. Vincent* [1965] 1 Q.B. 623, 640D, 641B, D, F, 642A. Such information, in particular information about prices, is a trade secret and therefore within category 3: see *Robb v. Green* [1895] 2 Q.B. 1, 11, 17; *Sir W. C. Leng & Co. Ltd. v.*

D    *Andrews* [1909] 1 Ch. 763, 774; *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 704, 705 and *Thomas Marshall (Exports) Ltd. v. Guinle* [1979] Ch. 227, 248D. A man of ordinary honesty and intelligence would recognise such information to be the property of his former employer and not to do with as he liked and that it was improper to put such information at the disposal of his new employer: see *Printers & Finishers Ltd. v. Holloway* [1965] 1 W.L.R. 1, 5B, 6D. Knowledge of sales

E    information is readily separable by an employee from his general knowledge of his employer's business and acquired skill (*Printers & Finishers Ltd. v. Holloway,* at p. 6C).

    A person who has obtained information in confidence is not allowed to use it as a springboard for activities detrimental to him who imparted it even if all features have been published or are available for inspection:

F    see *Cranleigh Precision Engineering Ltd. v. Bryant* [1965] 1 W.L.R. 1293, 1317–1319 and *Seager v. Copydex Ltd.* [1967] 1 W.L.R. 923, 931–932, 933. An ex-employee should not be exempt from the rule merely because he is prima facie permitted to compete with his former employer and canvass his customers.

    *Peter Crawford Q.C.* and *James Gibbons* for the defendants. The

G    appeal involves the consideration of three relevant legal principles: (1) the employee's duty to serve his master faithfully (the duty of fidelity, or good faith); (2) the freedom of an individual to use his knowledge and talents freely (the freedom to work); and (3) the equitable obligation of confidence. *Mason v. Provident Clothing & Supply Co. Ltd.* [1913] A.C. 724, 739, is the first example of the balancing exercise between an employee's duty of fidelity and an

H    individual's freedom to work.

    The duty of fidelity includes the duty not to disclose the employer's affairs to his detriment and the duty not to misuse his employer's property, for example lists and plans. The duty not to disclose may be

126

A

the same as saying that the protected information is confidential. In an ordinary contract of employment the duties cease on termination of the contract: see *Robb v. Green* [1895] 2 Q.B. 1, 14, *per* Hawkins J. and *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80, 88–89. It should be borne in mind that in *Thomas Marshall (Exports) Ltd. v. Guinle* [1979] Ch. 227, the contract of employment, and therefore the duty of fidelity, was still in being. During the continuation of a contract of employment

B

the employee is plainly under a duty to observe his master's interests and this imposes upon him the obligation of "confidence" in relation to his master's affairs.

An employee's contractual obligations may, by agreement, be extended beyond the contract, but such extensions, by way of restrictive covenants against competition and the like are subject to the court's supervision and will only be enforced if they are reasonable: see for

C

example *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 690. That case makes it clear, however, that if an employer wishes to restrict an employee after the termination of his contract of employment, he must set it down in black and white. Such a provision will only be upheld if there is some interest of the employer which is protected. Such interests would include trade secrets and the interest in not having his customers solicited or enticed away from him: see pp. 701–702. But a covenant

D

against competition per se will not be upheld: see also *Littlewoods Organisation Ltd. v. Harris* [1977] 1 W.L.R. 1472.

The individual's freedom to work includes the liberty of an ex-employee to use his skills and knowledge freely, including the skills and knowledge honestly acquired in the course of his previous employment: see *United Indigo Chemical Co. Ltd. v. Robinson,* 49 R.P.C. 178, which

E

is very closely analogous to the present case. *Reid & Sigrist Ltd. v. Moss and Mechanism Ltd.,* 49 R.P.C. 461, is to be distinguished from *United Indigo.* In *Reid* it was an express term of the contract of service that the information imparted was secret and should not be disclosed, thus, there was a specific covenant against disclosure and the information sought to be protected was capable of being regarded as a trade secret. In *E.*

F

*Worsley & Co. Ltd. v. Cooper* [1939] 1 All E.R. 290, where the defendant was in an executive position similar to the first defendant in the present case (see p. 295), there was no express covenant; no warning as to the secrecy of the material; the information was obtained openly and honestly and inevitably acquired; it was not obtained as a result of communication by the employer; and the information was not in the nature of a trade secret or secret process. In these respects the case is

G

analogous with the present. The freedom to work also includes the freedom to compete with a former employer and to canvass a former employer's customers, which necessarily involves the use of knowledge and skills obtained from the former employment including customers' names, addresses, preferences and prejudices. The exercise of this freedom is legitimate only if no documents are used or taken away for the purpose: to do that involves misuse of the employer's property

H

during the employment in breach of the duty of fidelity.

The obligation of confidence may arise either contractually or independently of contract, but only where the information can properly

**1 Ch.**                    Faccenda Chicken Ltd. v. Fowler (C.A.)

A  be described as "secret": see, for example *Amber Size and Chemical Co. Ltd. v. Menzel* [1913] 2 Ch. 239; and where the information is communicated in circumstances which impose a burden of confidence, such as communications from inventors to potential exploiters of the invention: see *Coco v. A. N. Clark (Engineers) Ltd.* [1969] R.P.C. 41. Such an obligation can arise in the context of an employer/employee relationship and may do so by implication in the case of secret information: see *Vokes Ltd. v. Heather* (1945) 62 R.P.C. 135, 141. But such an obligation arises by implication within such a relationship only exceptionally and in relation to highly secret and unusual information because of the ability of the parties to deal appropriately with trade or business information by contract: see *Littlewoods Organisation Ltd. v. Harris* [1977] 1 W.L.R. 1472; in which case it is subject to the court's jurisdiction based on reasonableness: see *Printers & Finishers Ltd. v. Holloway* [1965] 1 W.L.R. 1, 4, 5B, 6C. The obligation is also exceptional because of the existence of the freedom to work. *Printers & Finishers Ltd. v. Holloway* is strongly in favour of the first defendant. The case involved a highly secret process yet the employee was permitted to take the knowledge away and make use of it for his own benefit, even though he had been instructed to keep the information secret. The information was inseparable from his own skill and knowledge. The information was so secret that it was not disclosed in open court.

    In the present case it was never suggested to the defendants before or during their employment with the plaintiffs that any knowledge which they might acquire in the course of their employment would be secret, nor was it ever suggested that the sales information was communicated to any of the defendants in circumstances imposing a special obligation of confidence upon them. The information acquired was merely incidental to their performance of fairly low level employment.

    No particular importance is to be attached to prices because knowledge of prices became part of the salesman's know-how based on his experience of the customers. It was not a result of a specific pricing structure. In any event, knowledge of the price charged to a particular customer in that trade is no more a trade secret than the knowledge possessed by any retail shopkeeper of the likes and dislikes of his regular customers.

    The plaintiffs' submissions involve an unjustified extension of the obligation of confidence at the expense of the freedom to work because the information by its nature is not a trade secret; there are no circumstances justifying the continuation of the duty of fidelity in this respect after the termination of the employment; there was no suggestion at the inception or during the course of the employment that the salesmen or office staff would be recipients of secret information and the information was not obviously secret in nature. It is the court's duty and function to balance the competing interests as the earlier, though not the later, authorities show.

    The plaintiffs are seeking to obtain the benefits of covenants not to compete without the consent of the employee inherent in any covenant, and without the protection of the court's jurisdiction with regard to duration and extent.

Faccenda Chicken Ltd. v. Fowler (C.A.)                    **[1987]**

In the circumstances the judge was correct in holding that the sales    A
information was protected by the duty of fidelity during the course of
the employment, but not thereafter.

*Dehn Q.C.* replied.

*Cur. adv. vult.*    B

5 December.   The following judgment of the court was handed    B
down.

NEILL L.J. In these two appeals it will be necessary to consider the
interaction of three separate legal concepts. (1) The duty of an employee
during the period of his employment to act with good faith towards his
employer: this duty is sometimes called the duty of fidelity. (2) The duty    C
of an employee not to use or disclose after his employment ceased
any confidential information which he has obtained during his employment
about his employer's affairs. (3) The prima facie right of any person to
use and to exploit for the purpose of earning his living all the skill,
experience and knowledge which he has at his disposal, including skill,
experience and knowledge which he has acquired in the course of    D
previous periods of employment.

The two appeals are against the orders of Goulding J. dated
8 November 1983, whereby he rejected the claims by Faccenda Chicken
Ltd., the plaintiffs, that the defendants, the respondents to the appeals,
had improperly used confidential information obtained during their
employment by the plaintiffs and had conspired together to injure the
plaintiffs.    E

The events which gave rise to the claims which are the subject matter
of these appeals are set out with admirable clarity in the judgment of
Goulding J. reported in [1984] I.C.R. 589. We propose therefore from
time to time in the course of this judgment to adopt passages from the
judge's recital of the facts. In this case such a course is particularly
appropriate because we were not referred to any transcript of the
evidence, and both sides accepted before us that, for the purpose of    F
ascertaining any matter of fact, we should not look beyond the judge's
judgment.

The plaintiffs carry on the business of breeding, rearing, slaughtering
and selling chickens. Their premises are at Brackley in the county of
Northampton. The chickens are sold as fresh chickens which means that,
though after being slaughtered they are chilled in refrigerators until sale,
they are not actually frozen. At all material times Mr. Robin Michael    G
Faccenda has been the chairman and managing director of the plaintiffs.
In about 1973 the plaintiffs engaged Mr. Barry Fowler, the first
defendant, as sales manager.

The judge described the subsequent development of the business of
the plaintiffs in these terms, at p. 593:

"At that time [1973], and for some time afterwards, the company    H
sold its chickens to wholesalers, and did not approach retailers
directly. Mr. Fowler, who is agreed to be a businessman of
considerable ability, proposed to Mr. Faccenda the establishment of

1 Ch.                    Faccenda Chicken Ltd. v. Fowler (C.A.)

A      what he called a van sales operation, whereby itinerant refrigerated
       vehicles would daily offer fresh chickens to such traders as butchers,
       supermarkets and catering establishments. Starting at first in a small
       way, Mr. Fowler built up this branch of the business until it came to
       represent a substantial part, though always the smaller part, of the
       company's trade. There were in all 10 refrigerated vehicles, each
       driven by a salesman and travelling in a particular sector of the
B      Midlands. The sectors radiated in different directions from Brackley
       in Northamptonshire, where Faccenda Chicken Ltd. has its factory.
       Each salesman followed a different round within his sector on each
       of the five working days of the week, some customers receiving a
       call once a week and others twice a week, according to their
       requirements and the possibilities of the van sales organisation.
C      Thus, the whole operation was based on 50 journeys or rounds, one
       for each vehicle on each working day of the week. The journeys
       were, of course, not rigidly fixed, but variable from time to time as
       particular customers were gained or lost or their requirements
       changed. It is clear from the evidence that the weekly standing
       orders of customers were not contractually binding on them. The
       evidence shows in my judgment that each customer was freely
D      permitted to take less than his standing order when the salesman
       called, or to increase, or vary the composition of, his order if the
       goods he wanted on the particular day were available in the van
       when it called. Firm orders were placed on special occasions or by
       large customers by telephoning to the office of Faccenda Chicken
       Ltd. at Brackley, but the van salesman played no part in their
E      negotiation."

          It seems clear that by 1980 the van sales operation was prospering. The
       average weekly profit for the period which covered approximately the
       second half of 1980 was about £2,500.
          On 11 December 1980, however, the first defendant was arrested,
       together with another man, on a charge of stealing some of the plaintiffs'
F      chickens. The first defendant resigned immediately as sales manager,
       and, though at his trial in September 1981 he was acquitted of the
       charge of theft, his work with the plaintiffs was at an end.
          During the early part of 1981 the first defendant considered the
       purchase of an hotel in Cornwall, but the project fell through. Shortly
       afterwards he decided to set up his own business of selling fresh chickens
       from refrigerated vehicles. This business was to be carried on in the
G      Brackley area. Though he had no source of supply under his own
       control, there was no shortage of fresh chickens available for bulk
       purchase. In about May 1981 the first defendant advertised for employees
       under a box number in a local newspaper. As a result of this
       advertisement eight employees of the plaintiffs applied to join his new
       organisation. This was not surprising, because, although a box number
H      was used, the eight employees knew of the first defendant's intentions
       before the advertisement appeared. The applications were successful;
       the first defendant was pleased to be able to obtain staff whom he knew
       to be experienced and competent and who had worked with him before.

130

Faccenda Chicken Ltd. v. Fowler (C.A.)                    [1987]

In the course of the next few weeks the eight employees, consisting of a    A
supervisor (Mr. Finch), five van salesmen (that is, half the van salesmen
then employed by the plaintiffs, and two ladies who had been employed
in the plaintiffs' offices, gave notice and joined the first defendant. The
new business started its operations on 6 July 1981, although the first
defendant's company (Fowler Quality Poultry Products Ltd., the tenth
defendant) was not incorporated until August.

The loss of such a high proportion of their experienced staff had a    B
serious effect on the plaintiffs. Indeed, ever since the first defendant had
left at the end of 1980, the operations of the plaintiffs' van sales division
had been much less profitable, and after July 1981 the position
deteriorated further. Mr. Faccenda, not surprisingly, was dismayed by
what had happened, and on 10 September 1981, the date (it seems) of
the first defendant's acquittal, an action was started by the plaintiffs in    C
the Chancery Division against him and his company and the eight
former employees of the plaintiffs.

In these proceedings two alleged causes of action were relied upon.
(a) Breaches of implied terms of the contracts of employment that the
nine employees would faithfully serve the plaintiffs and

> "would not use confidential information and/or trade secrets gained    D
> by them and each of them whilst in the plaintiffs' employment to
> the disadvantage or detriment of the plaintiffs, whether during the
> currency of such employment or after its cessation."

(b) An unlawful conspiracy

> "together to injure the plaintiffs' goodwill and connection by
> unlawfully making use of the said confidential information and/or    E
> trade secrets of the plaintiffs gained by the individual defendants
> whilst in the plaintiffs' employment . . ."

A year later, on 16 September 1982, the first defendant issued a writ
in the Queen's Bench Division claiming nearly £23,000 in respect of
commission which he said was due to him. In these proceedings the
plaintiffs served a counterclaim which in effect repeated the allegations    F
of breaches of contract and conspiracy and also included a claim for
£435 in respect of the chickens which it was said the first defendant had
wrongly converted in 1980 and which had been the subject matter of the
criminal proceedings in which the first defendant had been acquitted.
The Queen's Bench action was transferred to the Chancery Division in
March 1983. On 27 June 1983 the two actions came on for hearing    G
together before Goulding J. After a hearing lasting 39 days, the judge,
in a reserved judgment delivered on 8 November 1983, dismissed the
claims by the plaintiffs for damages for breach of contract and for
conspiracy. At the same time he gave judgment for the first defendant
for £15,316 in respect of his claim for commission and interest after
making a deduction in respect of the amount claimed by the plaintiffs in
conversion, where a sum was conceded by way of set-off without any    H
admission of liability.

At the trial the claims for injunctions which had been included in the
writ in the Chancery action were not pursued owing to the lapse of time.

A   An injunction had been granted and certain undertakings had been given at an interlocutory stage, but it is not necessary for us to make any further reference to these matters as it is agreed that the interlocutory orders have no relevance to the issues now before the court. Moreover, we need only make passing reference to the fact that at the trial a substantial amount of time was taken to deal with allegations put forward on behalf of the plaintiffs to the effect that documents in the

B   possession of some of the employees during the period of their employment had been wrongly used or copied. The judge came to the conclusion that none of these allegations had been satisfactorily proved. We can therefore concentrate our attention on the matters round which the argument before us principally revolved.

   The main case put forward on behalf of the plaintiffs before Goulding

C   J., and the only factual basis for the claims relied upon before us, was that the first defendant and the other former employees of the plaintiffs as well as the new Fowler company had wrongly made use of confidential information which the first defendant and his colleagues had acquired while in the employment of the plaintiffs.

   This information, which was described by the judge compendiously as "the sales information," can be listed under five headings: (1) the

D   names and addresses of customers; (2) the most convenient routes to be taken to reach the individual customers; (3) the usual requirements of individual customers, both as to quantity and quality; (4) the days of the week and the time of day when deliveries were usually made to individual customers; (5) the prices charged to individual customers. It was submitted on behalf of the plaintiffs that this sales information could

E   be regarded as a package which, taken as a whole, constituted "confidential information" which could not be used to the detriment of the plaintiffs. In addition, however, particular attention was directed to the prices charged to individual customers, because, it was submitted, information as to prices was itself "confidential information," quite apart from the fact that such information formed a constituent element of the package of sales information. Thus our attention was drawn to the

F   following passage in the judgment, [1984] I.C.R. 589, 594:

     "Counsel for Faccenda . . . in the course of evidence and argument, paid special attention to the importance of knowing the prices paid by the respective customers . . . There has been much controversy regarding the extent to which one trader's prices are generally known to his rivals in the fresh chicken market. I find that an

G     experienced salesman quickly acquires a good idea of the prices obtained by his employer's competitors, but usually such knowledge is only approximate; and in this field accurate information is valuable, because a difference of even a penny a pound may be important."

   It was further said on behalf of the plaintiffs that by wrongfully

H   making use of this confidential sales information the first defendant and his colleagues had seriously damaged the plaintiffs' business. We understand that at the trial it was suggested that the damages amounted to no less than about £180,000, though it may be noted that the judge

132

Faccenda Chicken Ltd. v. Fowler (C.A.)                    [1987]

concluded that, even if he had decided the issue of liability in favour of    A
the plaintiffs, he would have assessed the damages at £5,000.

In his judgment Goulding J. dealt with the allegations made by the
plaintiffs in these terms, at pp. 596–597:

"A great deal of documentary and oral evidence was devoted to the
description and analysis of the trading activities both of the Fowler
business and of Faccenda Chicken Ltd. during the weeks (and    B
especially the first week) that followed the commencement of the
former. Faccenda Chicken Ltd. claims that it was the particular
target of the operation. It alleges that Mr. Fowler and his
confederates deliberately arranged to call on its customers on the
same days of the week as its own salesmen, and generally at a
somewhat earlier hour. It is also strongly contended that the
defendants pursued a deliberate policy of undercutting Faccenda    C
prices. I regard these allegations as greatly exaggerated. It is
certainly true that the majority of the customers of the new business
had previously been customers of Faccenda Chicken Ltd., and that
in many (though not all) cases they ceased to be so. It is difficult to
know what significance to attach to this fact without knowing to
what extent Faccenda Chicken Ltd. had acquired the whole of the    D
available market in the larger towns within a radius of (say) 50
miles from Brackley. My impression is that a large proportion of
the relevant retailers were buying Faccenda chickens, many of them
also purchasing chickens (probably of lower quality) from one or
more of Faccenda's competitors. As to the timing of calls on
customers, it was inevitable that the Fowler salesmen should use the
knowledge of customers' requirements that they had acquired as    E
Faccenda salesmen, but I do not find that routes and times were
deliberately planned and organised in the comprehensive way that
Faccenda Chicken Ltd. would have me believe. As to undercutting,
I accept the defendants' explanation of their pricing policy. It was
to obtain a minimum gross profit on chickens of 4p per pound.
Prices yielding a lower profit were quoted as a temporary
inducement, or introductory offer, for a period of two or three    F
weeks to potential customers thought to be of value. They were also
accepted when it was necessary, at the approach of the weekend, to
get rid of perishable stock in danger of deterioration. The result, in
cases where a fair comparison can be made, is that Fowler prices
generally undercut Faccenda prices, but there are also many
examples where they were the same or higher."    G

It was argued in this court on behalf of the defendants that, by
accepting their explanation of their pricing policy, the judge was in
effect making a finding that they had not made use of their knowledge
of the prices charged to individual customers of the plaintiffs when fixing
the prices they would charge the same individuals after they had become
customers of the tenth defendants. We are unable to accept this    H
argument.

It seems to us to be clear from reading the judgment as a whole that
the judge accepted that, to a greater or less extent, all the constituent

**1 Ch.**                  Faccenda Chicken Ltd. v. Fowler (C.A.)

A   elements of the sales information had been made use of for the purpose
    of the Fowler business. Furthermore, in the passages in his judgment in
    which he applied the principles of law to the facts of the case we can
    find no indication whatever that he intended to exclude the information
    about prices from the rest of the sales information of which the
    defendants had made use.

B       Accordingly, we propose to consider the matter on the basis that the
    defendants made use of the sales information for the purpose of the
    Fowler business and that this information included information about
    prices charged to individual customers of the plaintiffs.

        The judge came to the conclusion that, though use had been made
    by the defendants of the sales information, such use did not involve any
    breaches of contract by them or provide evidence of an actionable
C   conspiracy. In this court counsel for the plaintiffs criticised this conclusion
    on two broad grounds: (1) that the judge had misdirected himself in law
    as to the relevant principles to be applied to the use by an employee of
    information acquired during his employment; and (2) that in any event,
    in the circumstances of the case and on the findings of the judge, the
    sales information as a whole, or, alternatively, the information about
    prices, was confidential information or a trade secret which could not be
D   used by the defendants to the detriment of the plaintiffs.

        We propose to turn first to consider the submission that the judge
    misdirected himself in law. It will be convenient if we start by setting
    out some of the passages in his judgment in which Goulding J. dealt
    with the law. He said, at pp. 598–599:

        "Let me now deal with the alleged abuse of confidential information.
E   I must make it clear that anything I say about the law is intended to
    apply only to cases of master and servant. In my view information
    acquired by an employee in the course of his service, and not the
    subject of any relevant express agreement, may fall as regards
    confidence into any of three . classes. First there is information
    which, because of its trivial character or its easy accessibility from
    public sources of information, cannot be regarded by reasonable
F   persons or by the law as confidential at all. The servant is at liberty
    to impart it during his service or afterwards to anyone he pleases,
    even his master's competitor. An example might be a published
    patent specification well known to people in the industry
    concerned. . . . Secondly, there is information which the servant
    must treat as confidential (either because he is expressly told it is
G   confidential, or because from its character it obviously is so) but
    which once learned necessarily remains in the servant's head and
    becomes part of his own skill and knowledge applied in the course
    of his master's business. So long as the employment continues, he
    cannot otherwise use or disclose such information without infidelity
    and therefore breach of contract. But when he is no longer in the
    same service, the law allows him to use his full skill and knowledge
H   for his own benefit in competition with his former master; and . . .
    there seems to be no established distinction between the use of such
    information where its possessor trades as a principal, and where he
    enters the employment of a new master, even though the latter case

134

involves disclosure and not mere personal use of the information. If an employer wants to protect information of this kind, he can do so by an express stipulation restraining the servant from competing with him (within reasonable limits of time and space) after the termination of his employment."

The judge then referred, by way of examples of this type of information, to the information about a manufacturing process which was in issue in *United Indigo Chemical Co. Ltd. v. Robinson* (1931) 49 R.P.C. 178 and to the trade information in *E. Worsley & Co. Ltd. v. Cooper* [1939] 1 All E.R. 290. Goulding J. continued [1984] I.C.R. 589, 600:

"Thirdly, however, there are, to my mind, specific trade secrets so confidential that, even though they may necessarily have been learned by heart and even though the servant may have left the service, they cannot lawfully be used for anyone's benefit but the master's. An example is the secret process which was the subject matter of *Amber Size and Chemical Co. Ltd. v. Menzel* [1913] 2 Ch. 239."

Having explained his three-fold classification of information, the judge then applied the law to the facts. He said, at p. 600:

"In my judgment the sales information relied on by Faccenda Chicken Ltd. in the Chancery action falls into my second class, and cannot be protected in the absence of an express restrictive stipulation. The defendants being free to compete with Faccenda Chicken Ltd. and to solicit its customers, it is impossible, in my judgment, to say they must not use their own knowledge of the whereabouts and requirements of those customers, the prices they have been paying, and the routes by which they are conveniently visited."

Counsel for the plaintiffs made a number of criticisms of the judge's formulation of the law. We can summarise the most important of these criticisms: (a) that the judge erred in law in holding that there were two classes or categories of confidential information which an employee might acquire in the course of his service; there was only one such class or category. Confidential information remained confidential even after the employee had left the employer's service; (b) that the law of confidence relating to employees was merely a branch of the general law of confidence, and, though the obligations of an employee were based on an implied term of the contract of service, this was immaterial because the scope of the implied term was co-extensive with the obligations imposed by equity on a person to whom confidential information was entrusted in circumstances where no contract existed between the parties; (c) that the judge erred in law in holding that confidential information in his second class could be protected by a restrictive covenant. It was plain, it was submitted, that a restrictive covenant would not be enforced unless the protection sought was reasonably necessary to protect a trade secret or to prevent some personal influence over customers being abused in order to entice them away: see *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, *per* Lord

A    Parker of Waddington, at p. 709; (d) that although some of the
information, for example, the names and addresses of customers, could
not by itself be treated as confidential, the sales information did
constitute confidential information when looked at as a whole; (e) that
in any event information about the prices charged to individual customers
was confidential information; (f) that a clear distinction could be drawn
between the skill and general knowledge of a trade or business which an
B    employee might acquire in the course of his employment and which he
was entitled to use in subsequent employment, and the special knowledge
of a former employer's business which the employee could not use
thereafter. In support of this proposition and of the special importance
of prices, we were referred to the judgment of Farwell L.J. in *Sir W. C.
Leng & Co. Ltd. v. Andrews* [1909] 1 Ch. 763, where in a formulation
of principle (which was subsequently approved by Lord Atkinson in
C    *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 705) he said, at
p. 774:

"To acquire the knowledge of the reasonable mode of general
organisation and management of a business of this kind, and to
make use of such knowledge, cannot be regarded as a breach of
D    confidence in revealing anything acquired by reason of a person
having been in any particular service, although the person may have
learnt it in the course of being taught his trade; but it would be a
breach of confidence to reveal trade secrets, such as prices, [etc.],
or any secret process or things of a nature which the man was not
entitled to reveal."

E        Reference was also made to the judgment of Sir Robert
Megarry V.-C. in *Thomas Marshall (Exports) Ltd. v. Guinle* [1979] Ch.
227, 248D, where he said: "Costs and prices which are not generally
known may well constitute trade secrets or confidential information: . . ."
        In the course of his submissions in support of the appeal Mr. Dehn
took us on an instructive and valuable tour of many of the cases dealing
with the law of confidence in the context of the relationship between
F    employer and employee and also referred us to some of the cases on
restrictive covenants.
        It is not necessary, however, for us for the purpose of this judgment
to travel this ground again. It is sufficient to set out what we understand
to be the relevant principles of law. Having considered the cases to
which we were referred, we would venture to state these principles:
G        (1) Where the parties are, or have been, linked by a contract of
employment, the obligations of the employee are to be determined by
the contract between him and his employer: cf. *Vokes Ltd. v. Heather*
(1945) 62 R.P.C. 135, 141.
        (2) In the absence of any express term, the obligations of the
employee in respect of the use and disclosure of information are the
subject of implied terms.
H        (3) While the employee remains in the employment of the employer
the obligations are included in the implied term which imposes a duty of
good faith or fidelity on the employee. For the purposes of the present
appeal it is not necessary to consider the precise limits of this implied

136

A

term, but it may be noted: (a) that the extent of the duty of good faith will vary according to the nature of the contract (see *Vokes Ltd. v. Heather*, 62 R.P.C. 135); (b) that the duty of good faith will be broken if an employee makes or copies a list of the customers of the employer for use after his employment ends or deliberately memorises such a list, even though, except in special circumstances, there is no general restriction on an ex-employee canvassing or doing business with customers of his former employer: see *Robb v. Green* [1895] 2 Q.B. 315 and *Wessex Dairies Ltd. v. Smith* [1935] 2 K.B. 80.

B

(4) The implied term which imposes an obligation on the employee as to his conduct after the determination of the employment is more restricted in its scope than that which imposes a general duty of good faith. It is clear that the obligation not to use or disclose information may cover secret processes of manufacture such as chemical formulae (*Amber Size and Chemical Co. Ltd. v. Menzel* [1913] 2 Ch. 239), or designs or special methods of construction (*Reid & Sigrist Ltd. v. Moss and Mechanism Ltd.* (1932) 49 R.P.C. 461), and other information which is of a sufficiently high degree of confidentiality as to amount to a trade secret. The obligation does not extend, however, to cover all information which is given to or acquired by the employee while in his employment, and in particular may not cover information which is only "confidential" in the sense that an unauthorised disclosure of such information to a third party while the employment subsisted would be a clear breach of the duty of good faith. This distinction is clearly set out in the judgment of Cross J. in *Printers & Finishers Ltd. v. Holloway* [1965] 1 W.L.R. 1; [1965] R.P.C. 239 where he had to consider whether an ex-employee should be restrained by injunction from making use of his recollection of the contents of certain written printing instructions which had been made available to him when he was working in his former employers' flock printing factory. In his judgment, delivered on 29 April 1964 (not reported on this point in [1965] 1 W.L.R. 1), he said [1965] R.P.C. 239, 253:

C

D

E

F

"In this connection one must bear in mind that not all information which is given to a servant in confidence and which it would be a breach of his duty for him to disclose to another person during his employment is a trade secret which he can be prevented from using for his own advantage after the employment is over, even though he has entered into no express covenant with regard to the matter in hand. For example, the printing instructions were handed to Holloway to be used by him during his employment exclusively for the plaintiffs' benefit. It would have been a breach of duty on his part to divulge any of the contents to a stranger while he was employed, but many of these instructions are not really 'trade secrets' at all. Holloway was not, indeed, entitled to take a copy of the instructions away with him; but in so far as the instructions cannot be called 'trade secrets' and he carried them in his head, he is entitled to use them for his own benefit or the benefit of any future employer."

G

H

**1 Ch.**                    **Faccenda Chicken Ltd. v. Fowler (C.A.)**

A    The same distinction is to be found in *E. Worsley & Co. Ltd. v. Cooper* [1939] 1 All E.R. 290 where it was held that the defendant was entitled, after he had ceased to be employed, to make use of his knowledge of the source of the paper supplied to his previous employer. In our view it is quite plain that this knowledge was nevertheless "confidential" in the sense that it would have been a breach of the duty of good faith for the employee, while the employment subsisted, to have used it for his own
B    purposes or to have disclosed it to a competitor of his employer.

     (5) In order to determine whether any particular item of information falls within the implied term so as to prevent its use or disclosure by an employee after his employment has ceased, it is necessary to consider all the circumstances of the case. We are satisfied that the following matters are among those to which attention must be paid:

C    (a) The nature of the employment. Thus employment in a capacity where "confidential" material is habitually handled may impose a high obligation of confidentiality because the employee can be expected to realise its sensitive nature to a greater extent than if he were employed in a capacity where such material reaches him only occasionally or incidentally.

D    (b) The nature of the information itself. In our judgment the information will only be protected if it can properly be classed as a trade secret or as material which, while not properly to be described as a trade secret, is in all the circumstances of such a highly confidential nature as to require the same protection as a trade secret eo nomine. The restrictive covenant cases demonstrate that a covenant will not be upheld on the basis of the status of the information which might be disclosed by the former employee if he is not restrained, unless it can be
E    regarded as a trade secret or the equivalent of a trade secret: see, for example, *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 710 *per* Lord Parker of Waddington and *Littlewoods Organisation Ltd. v. Harris* [1977] 1 W.L.R. 1472, 1484 *per* Megaw L.J.

     We must therefore express our respectful disagreement with the passage in Goulding J.'s judgment at [1984] I.C.R. 589, 599E, where he
F    suggested that an employer can protect the use of information in his second category, even though it does not include either a trade secret or its equivalent, by means of a restrictive covenant. As Lord Parker of Waddington made clear in *Herbert Morris Ltd. v. Saxelby* [1916] 1 A.C. 688, 709, in a passage to which Mr. Dehn drew our attention, a restrictive covenant will not be enforced unless the protection sought is
G    reasonably necessary to protect a trade secret or to prevent some personal influence over customers being abused in order to entice them away.

     In our view the circumstances in which a restrictive covenant would be appropriate and could be successfully invoked emerge very clearly from the words used by Cross J. in *Printers & Finishers Ltd. v. Holloway* [1965] 1 W.L.R. 1, 6 (in a passage quoted later in his
H    judgment by Goulding J. [1984] I.C.R. 589, 601):

     "If the managing director is right in thinking that there are features in the plaintiffs' process which can fairly be regarded as trade secrets and which their employees will inevitably carry away with

                                          Ch. 1987—7

138

A

them in their heads, then the proper way for the plaintiffs to protect themselves would be by exacting covenants from their employees restricting their field of activity after they have left their employment, not by asking the court to extend the general equitable doctrine to prevent breaking confidence beyond all reasonable bounds."

B

It is clearly impossible to provide a list of matters which will qualify as trade secrets or their equivalent. Secret processes of manufacture provide obvious examples, but innumerable other pieces of information are *capable* of being trade secrets, though the secrecy of some information may be only short-lived. In addition, the fact that the circulation of certain information is restricted to a limited number of individuals may throw light on the status of the information and its degree of confidentiality.

C

(c) Whether the employer impressed on the employee the confidentiality of the information. Thus, though an employer cannot prevent the use or disclosure *merely* by telling the employee that certain information is confidential, the attitude of the employer towards the information provides evidence which may assist in determining whether or not the information can properly be regarded as a trade secret. It is to be observed that in *E. Worsley & Co. Ltd. v. Cooper* [1939] 1 All E.R. 290, 307D, Morton J. attached significance to the fact that no warning had been given to the defendant that "the source from which the paper came was to be treated as confidential."

D

(d) Whether the relevant information can be easily isolated from other information which the employee is free to use or disclose. In *Printers & Finishers Ltd. v. Holloway* [1965] R.P.C. 239, Cross J. considered the protection which might be afforded to information which had been memorised by an ex-employee. He put on one side the memorising of a formula or a list of customers or what had been said (obviously in confidence) at a particular meeting, and continued, at p. 256:

E

"The employee might well not realise that the feature or expedient in question was in fact peculiar to his late employer's process and factory; but even if he did, such knowledge is not readily separable from his general knowledge of the flock printing process and his acquired skill in manipulating a flock printing plant, and I do not think that any man of average intelligence and honesty would think that there was anything improper in his putting his memory of particular features of his late employer's plant at the disposal of his new employer."

F

G

For our part we would not regard the separability of the information in question as being conclusive, but the fact that the alleged "confidential" information is part of a package and that the remainder of the package is not confidential is likely to throw light on whether the information in question is really a trade secret.

These then are the principles of law which we consider to be applicable to a case such as the present one. We would wish to leave open, however, for further examination on some other occasion the question whether additional protection should be afforded to an employer

H

A   where the former employee is not seeking to earn his living by making use of the body of skill, knowledge and experience which he has acquired in the course of his career, but is merely selling to a third party information which he acquired in confidence in the course of his former employment.

B   We now turn to the facts of the instant case. It will be remembered that the case for the plaintiffs was that the first defendant and his colleagues were in breach of an implied term of their contracts of employment in using or disclosing the sales information that they had acquired while in the employment of the plaintiffs or, alternatively, that they were in breach of this implied term by using or disclosing their knowledge of the prices charged by the plaintiffs to individual customers. It will also be remembered that the sales information contained five

C   elements: the names and addresses of customers; the most convenient routes to be taken to reach the individual customers; the usual requirements of individual customers; the days of the week and times of day when deliveries were made to individual customers; and the prices charged to individual customers.

D   Mr. Dehn was prepared to concede that, if these pieces of information were looked at separately, some of them did not constitute confidential information at all. Thus he accepted that the defendants were entitled to make use of any recollection they might have of the names and addresses of the plaintiffs' customers as well as of the most convenient routes by which the premises of such customers could be reached. Moreover, we did not understand him to argue otherwise than rather faintly that the defendants would have been in breach of contract if they had merely

E   made use of their knowledge of the usual requirements of the plaintiffs' customers or of the times when deliveries were made to them.

The central plank of Mr. Dehn's argument was that any information about the prices charged to individual customers of the plaintiffs was confidential, and that, as this information about prices formed part of the package of sales information, the package taken as a whole was confidential too. It is therefore necessary to consider the information

F   about prices more closely. It seems clear that, apart from the fact that the three main groups of customers—butchers, chains of shops and catering establishments—were charged slightly different prices, there were a number of individual variations inside these groups to take account, no doubt, of such matters as the size of the orders placed and the length of time that the traders concerned had been customers. It was

G   this information, submitted Mr. Dehn, which was confidential. Counsel relied in particular on the following passage in the judgment of Goulding J. [1984] I.C.R. 589, 594:

"I find that an experienced salesman quickly acquires a good idea of the prices obtained by his employer's competitors, but usually such knowledge is only approximate; and in this field accurate information is valuable, because a difference of even a penny a pound may be

H   important."

He also relied on the references to the confidentiality of prices in the three authorities which we have already mentioned.

We find ourselves unable to accept Mr. Dehn's submissions either as    A
to the information about prices or as to the sales information as a
whole. We can well appreciate that in certain circumstances information
about prices can be invested with a sufficient degree of confidentiality to
render that information a trade secret or its equivalent. The price put
forward in a tender document is an obvious example. But there may be
many other cases where the circumstances show that a price or prices
are matters of great importance and highly confidential.    B

Information about the price to be charged for a new model of a car
or some other product or about the prices negotiated, for example, for
various grades of oil in a highly competitive market in which it is known
that prices are to be kept secret from competitors occur to us as
providing possible further instances of information which is entitled to
protection as having the requisite degree of confidentiality.

But in the present case the following factors appear to us to lead to    C
the clear conclusion that neither the information about prices nor the
sales information as a whole had the degree of confidentiality necessary
to support the plaintiffs' case. We would list these factors as follows.
(1) The sales information contained some material which the plaintiffs
conceded was not confidential if looked at in isolation. (2) The
information about the prices was not clearly severable from the rest of
the sales information. (3) Neither the sales information in general, nor    D
the information about the prices in particular, though of some value to a
competitor, could reasonably be regarded as plainly secret or sensitive.
(4) The sales information, including the information about prices, was
necessarily acquired by the defendants in order that they could do their
work. Moreover, as the judge observed in the course of his judgment,
each salesman could quickly commit the whole of the sales information
relating to his own area to memory. (5) The sales information was    E
generally known among the van drivers who were employees, as were
the secretaries, at quite a junior level. This was not a case where the
relevant information was restricted to senior management or to
confidential staff. (6) There was no evidence that the plaintiffs had ever
given any express instructions that the sales information or the
information about prices was to be treated as confidential. We are
satisfied that, in the light of all the matters set out by the judge in his
judgment, neither the sales information as a whole nor the information    F
about prices looked at by itself fell within the class of confidential
information which an employee is bound by an implied term of his
contract of employment or otherwise not to use or disclose after his
employment has come to an end.

Accordingly these appeals must be dismissed.

*Appeals dismissed with costs.*
*Legal aid taxation for legally aided*    G
    *defendants.*
*Leave to appeal refused.*
*Stay of execution extended for one*
    *month, and, subject to petition to*
    *House of Lords being lodged, until*
    *hearing of that petition.*

*Solicitors: Penningtons for Shoosmiths & Harrison, Banbury; Johnson*    H
*& Gaunt, Banbury.*

I. C.

1556

**Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))**          [2013] 1 WLR

Supreme Court                                                                                         *A*

## *Vestergaard Frandsen A/S and others v Bestnet Europe Ltd and others*

### [2013] UKSC 31

2013  April 24;                          Lord Neuberger of Abbotsbury PSC, Lord Clarke of          *B*
    May 22                          Stone-cum-Ebony, Lord Sumption,
                                   Lord Reed, Lord Carnwath JJSC

*Confidential information — Breach of confidence — Trade secrets — Former
employee of claimants starting new business which developed product using
claimants' trade secrets — Former employee not knowing trade secrets and
unaware that they were being misused — Whether in breach of express or*          *C*
*implied terms of employment contract with claimants — Whether party to
common design involving misuse of trade secrets — Whether liable to claimants
for misuse of their confidential information*

The claimant companies developed techniques enabling them to manufacture
and sell long lasting insecticidal nets, which were designed to protect sleepers from
mosquitos and to reduce the mosquito population.   The sixth defendant was          *D*
employed by the claimants from late 2000, initially as a sales and marketing assistant
and then as a regional sales manager.   By clause 8 of her employment contract she
agreed to "keep absolutely confidential all information relating to the employment
and any knowledge gained in the course of the employment and which inherently
should not be disclosed to any third party".   In 2004 the sixth defendant left her job
and, with another former employee of the claimants and S, a consultant who had
played a major role in developing the claimants' techniques, started a business          *E*
manufacturing and selling a new long lasting insecticidal net.   Their new product was
developed by S using the claimants' trade secrets in breach of his duty of confidence
to the claimants.   The claimants brought proceedings seeking damages and other
relief for misuse of their confidential information against, inter alia, the sixth
defendant.   The judge found that the sixth defendant had never acquired the
confidential information used to create the new product and that she had been
unaware, at the relevant time, that the new product had been developed using the          *F*
claimants' trade secrets, but that she was still liable to the claimants in breach of
confidence under the express and/or implied terms of her contract.   The Court of
Appeal allowed the sixth defendant's appeal, holding that she was not liable to the
claimants for breach of confidence.

On the claimants' appeal—

*Held*, dismissing the appeal, (1) that the sixth defendant could not be liable to the
claimants for breach of confidence under the express terms of clause 8 of her contract          *G*
since the confidential information wrongly used by S to develop the new product was
neither information relating to her employment nor knowledge gained in the course
of her employment but was knowledge gained by S in the course of his consultancy
work for the claimants; and that to imply a term into the sixth defendant's contract to
the effect that she would not assist another person to abuse trade secrets owned by the
claimants, in circumstances where she did not know the trade secrets and was
unaware that they were being misused, would be wrong in principle since it was          *H*
inconsistent with the more limited terms of clause 8, unnecessary in order to give the
employment contract commercial effect and almost penal in nature, and such a term
was therefore neither obvious nor reasonable (post, paras 20, 21, 30–31).

(2) That, although common design could in principle be invoked against a
defendant in a claim based on misuse of confidential information, in order to be party

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  to a common design a defendant had to share with the other party or parties each of the features of the design which made it wrongful; that the sixth defendant could not be liable on the basis that she was party to a common design involving misuse of trade secrets since she did not share one of those features, namely the necessary state of knowledge or state of mind; that, in the absence of any finding of relevant dishonesty on her part, she could not be liable as party to the breach of confidence simply on the basis that she had worked for the claimants and then formed and worked for the business responsible for the design, manufacture and marketing of the new product; and that, in a modern economy, the law had to maintain a realistic and fair balance between effectively protecting trade secrets and not unreasonably inhibiting competition in the market place and, on the facts found by the judge, it would be inconsistent with maintaining that balance, and oppressive, to hold the sixth defendant liable to the claimants for misuse of their confidential information (post, paras 20–22, 28, 33–35, 42–43, 44, 45–46).

C       *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, PC applied.
       *Seager v Copydex Ltd* [1967] 1 WLR 923, CA; *Unilever plc v Gillette (UK) Ltd* [1989] RPC 583, CA and *Lancashire Fires Ltd v SA Lyons & Co Ltd* [1996] FSR 629, CA distinguished.

       *Per curiam.* Although the protection of intellectual property is vital to the economic prosperity of the country, the law should not discourage former employees from benefiting society and advancing themselves by imposing unfair potential difficulties on their honest attempts to compete with their former employers (post, para 44).

D       Decision of the Court of Appeal [2011] EWCA Civ 424 affirmed.

The following cases are referred to in the judgment of Lord Neuberger of Abbotsbury PSC:

E  *Attorney General v Guardian Newspapers Ltd (No 2)* [1990] 1 AC 109; [1988] 3 WLR 776; [1988] 3 All ER 545, HL(E)
*Coco v AN Clark (Engineers) Ltd* [1969] RPC 41
*Lancashire Fires Ltd v SA Lyons & Co Ltd* [1996] FSR 629, CA
*Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC
*Seager v Copydex Ltd* [1967] 1 WLR 923; [1967] 2 All ER 415, CA
*Unilever plc v Gillette (UK) Ltd* [1989] RPC 583, CA

F  No additional cases were cited in argument.

**APPEAL** from the Court of Appeal
       The claimants, Vestergaard Frandsen A/S (now known as MVF 3 ApS), Vestergaard Frandsen SA and Disease Control Textiles SA, brought proceedings for misuse of confidential information against the defendants, Bestnet Europe Ltd, 3T Europe Ltd, Intection Ltd, Intelligent Insect Control G  Ltd, Torben Holm Larsen and Trine Angeline Sig. In judgments dated 3 April 2009 [2009] EWHC 657 (Ch) and 26 June 2009 [2010] FSR 29 Arnold J, inter alia, gave judgment for the claimants against the sixth defendant.
       The sixth defendant appealed. On 20 April 2011, the Court of Appeal (Jacob, Jackson LJJ and Sir John Chadwick) [2011] EWCA Civ 424 allowed H  the appeal.
       On 23 November 2011 the Supreme Court (Lord Hope of Craighead DPSC, Lord Clarke of Stone-cum-Ebony and Lord Wilson JJSC) granted an application by the claimants for permission to appeal, pursuant to which they appealed. The issue for the Supreme Court, as set out in the parties'

1558
Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))                    [2013] 1 WLR
Lord Neuberger of Abbotsbury PSC

A

statement of agreed facts and issues, was the extent to which a party, who herself was the subject of an admitted duty or obligation of confidentiality, had to have actual or constructive knowledge that the acts complained of constituted a breach of that duty or obligation if she were to be found liable and, in particular, whether (a) it was a defence to a claim for misuse of confidential information for a defendant to establish that, although the information disclosed or used was a trade secret of the claimant, she was not aware or did not believe that she was using that information; (b) it was a defence to a claim for misuse of confidential information for a defendant to establish that she incorrectly but honestly believed that the information being used was not subject to the obligation of confidentiality; and (c) where misuse of confidential information was established in respect of one defendant and another defendant was alleged to be liable for the acts of that first defendant on grounds of common design and that the acts of the former had been authorised, directed, counselled and procured by the latter, it was a requirement that the latter knew or had reason to believe that the acts of the former constituted a misuse of confidential information.

B

C

The facts are stated in the judgment of Lord Neuberger of Abbotsbury PSC.

*Mark Platts-Mills QC* and *Tom Moody-Stuart* (instructed by *Field Fisher Waterhouse LLP*) for the claimants.
*Alastair Wilson QC* and *George Hamer* (instructed by *McGuireWoods LLP*) for the sixth defendant.

D

The court took time for consideration.

22 May 2013. **LORD NEUBERGER OF ABBOTSBURY PSC** (with whom **LORD CLARKE OF STONE-CUM-EBONY, LORD SUMPTION, LORD REED** and **LORD CARNWATH JJSC** agreed) handed down the following judgment.

E

1    This is an appeal brought by three companies, MVF 3 ApS (formerly known as Vestergaard Frandsen A/S), Vestergaard Frandsen SA, and Disease Control Textiles SA, which are effectively in common ownership, and can conveniently be referred to compendiously as "Vestergaard".  Their appeal is against the Court of Appeal's reversal of a decision by Arnold J that Mrs Trine Sig was liable to Vestergaard for misuse of their trade secrets after she ceased her employment with them.

F

*The basic factual background*

G

2    A major aspect of Vestergaard's business is the development, manufacture and marketing of insecticidal bednets, whose purpose is to prevent the sleeper from being bitten by mosquitos, and also to reduce the mosquito population.  An important challenge of the relevant technology is to find ways of ensuring that such bednets retain their insecticidal activity over a long period of time, despite vicissitudes such as repeated washing.  To that end, Vestergaard developed techniques (which I shall call "the techniques") which enabled them to manufacture and sell long lasting insecticidal nets, known as LLINs.  The techniques involved incorporating insecticide and other additives into molten polyethylene, before it is extruded into filaments, which are then knitted to form LLINs.

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

[2013] 1 WLR          Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))
Lord Neuberger of Abbotsbury PSC

A     **3**  Mrs Sig was employed by Vestergaard from late 2000, initially as a sales and marketing assistant, and later as a regional sales manager for Europe and Latin America. By clause 8 of her employment contract, she agreed to:

> "keep absolutely confidential all information relating to the employment and any knowledge gained in the course of the employment and which inherently should not be disclosed to any third party. The absolute duty of confidentiality also applies after [Mrs Sig] has terminated the employment . . ."

B

**4**  Mr Larsen, a chemical engineer, was employed by Vestergaard in November 2000 as head of production. His employment contract included provisions (i) preventing him from competing with Vestergaard for a period of one year after his employment ceased, and (ii) requiring him to respect the confidentiality of Vestergaard's trade secrets.

C

**5**  Dr Skovmand, a consultant biologist specialising in insect control, started working as a consultant for Vestergaard in 1998 until some time in 2005. He had no formal service contract. During the time he worked for Vestergaard, Dr Skovmand played a major role in developing the techniques. In particular, he helped to identify a way of preventing the insecticide from being lost during the extrusion of the polyethylene. At the beginning of 2004, he was seeking to prevent the loss of insecticide by evaporation caused by the high temperature of the polyethylene during manufacturing.

D

**6**  The information concerning the techniques was contained in a so-called "Fence database" maintained by Vestergaard.

E

**7**  In the spring of 2004, Mr Larsen and Mrs Sig decided to start a new business manufacturing and selling LLINs in competition with Vestergaard. They discussed this with Dr Skovmand, who agreed to work with them, on the basis that he would have a financial interest in the new business. Accordingly, Mrs Sig resigned from her job with immediate effect in June 2004, and Mr Larsen did so a month later, and his employment ceased at the end of August 2004.

F

**8**  By this time, the new business had already been under way for some five months, because in early April 2004 Dr Skovmand set about developing a new LLIN for Mr Larsen and Mrs Sig, using a polyester base. About a month later, Dr Skovmand informed them that he would be able to develop a LLIN more quickly if he used polyethylene rather than polyester. Mrs Sig instructed him to proceed on this basis, because he told her that a polyethylene-based LLIN, which was in due course manufactured and called Netprotect, could be placed on the market by the end of 2004.

G

**9**  In early August 2004, Mr Larsen and Mrs Sig formed a Danish company ("Intection"), with Mrs Sig as the sole director, for the purpose of developing, manufacturing and marketing the Netprotect product. The following month, Mrs Sig and Mr Larsen went to India with a view to finding prospective manufacturers for the product. In their discussions with the prospective manufacturers, they stipulated that any agreement with Intection would contain confidentiality provisions in relation to the details of the manufacturing of the product.

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A

10   Meanwhile, with the assistance of Mr Larsen, Dr Skovmand was organising the testing of Netprotect products, and those tests proved sufficiently successful for Intection to arrange a launch for October 2005.

11   Vestergaard learned of this, and sought to stop the testing and future marketing of the new product. They issued proceedings in Denmark against Intection, and, by an amendment to those proceedings made in June 2005, they alleged breach of their trade secrets. In October 2005, the day before the proceedings were due to be heard, Mrs Sig resigned as a director of Intection, which then ceased to trade.

B

12   A new English company, Bestnet Europe Ltd ("Bestnet"), was immediately formed, with Mrs Sig as the sole director, and her father, another investor, and Dr Skovmand, as the main shareholders. The judge found [2009] EWHC 657 (Ch) at [109] that Mr Larsen and Mrs Sig moved the business to England "with the express intention of trying to avoid the consequences of the Danish litigation".

C

13   Mrs Sig and Mr Larsen provided their services to Bestnet through another English company, 3T Europe Ltd ("3T"), whereas Dr Skovmand worked directly for Bestnet in connection with the testing, development, and projected manufacturing and marketing of Netprotect. His work was successful, and Netprotect LLINs were, from some time in 2006, manufactured for and marketed by Bestnet.

D

*The procedural history*

14   In early 2007, Vestergaard began the present proceedings seeking damages and other relief for misuse of their confidential information, against Bestnet, 3T, Mr Larsen, and Mrs Sig (and two other companies which need no further mention). Following a 16-day hearing, Arnold J gave a judgment [2009] EWHC 657 on 3 April 2009, in which he had to deal with a large number of issues of fact, expert evidence and law.

E

15   Of particular relevance for present purposes, the judge made the following findings.

(i) Dr Skovmand was under a duty to Vestergaard not to use any confidential information which he had acquired in the course of his consultancy work for Vestergaard.

F

(iii) The contents of the Fence database constituted confidential information, namely trade secrets, owned by Vestergaard.

(iv) Dr Skovmand knew of this confidential information as a result of working for Vestergaard, and he had appreciated at all times that it constituted Vestergaard's trade secrets.

G

(iv) Dr Skovmand had used such information about the techniques in the Fence database as a starting point for the development of the Netprotect product.

(v) By July 2004 at the latest, Mr Larsen was aware of the fact that Dr Skovmand was using confidential information in the Fence database to develop that product.

(vi) While in the employ of Vestergaard, Mrs Sig did not have access to the Fence database, and at no time did she have knowledge of any of the trade secrets which it contained.

H

(vii) Although, by September 2004, Mrs Sig was aware that the Netprotect product was based on trade secrets, she believed that they

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    originated from Dr Skovmand's work for Intection (and, subsequently, Bestnet).

(viii) By June 2005 Mrs Sig was aware of Vestergaard's allegations, the judge did not reject her evidence that she had not appreciated that the Netprotect product was conceived with the assistance of Vestergaard's trade secrets.

B    (ix) At trial, Dr Skovmand and Mr Larsen had put forward an untrue account of the development of Netprotect, including the production of forged documents, but there was no suggestion that Mrs Sig was involved in that.

16    Unsurprisingly in the light of these findings, the judge found that Dr Skovmand was liable in breach of confidence to Vestergaard (although there was no question of a judgment against Dr Skovmand, as he was not a

C    party to the proceedings). The judge then stated [2009] EWHC 657 at [625], that, if Dr Skovmand had "committed an actionable breach of confidence", it was "not dispute[d] that . . . Mr Larsen, Mrs Sig, Bestnet [and] 3T . . . were also liable on one basis or another".

17    Counsel for Mrs Sig then challenged the proposition that she did not dispute liability, and the judge reconsidered her liability at a further hearing

D    concerned with remedies. Following that hearing, the judge gave a second judgment [2010] FSR 29 on 26 June 2009, in which he said, at paras 23–24:

"23. Mrs Sig was subject to an express obligation of confidentiality contained in clause 8 of her contract of employment. This obligation explicitly continued after termination of her employment. After termination, however, the obligation is only enforceable in so far as it

E    prevents Mrs Sig from misusing [Vestergaard]'s trade secrets. In the absence of an express term, Mrs Sig would be subject to an implied term to that effect. Although Mrs Sig was not personally involved in devising the initial Netprotect recipes or carrying out the trials, she was closely involved in setting up . . . Bestnet and in the commercial side of the development of Netprotect. In my judgment, this is sufficient to render her liable for breach of her own obligation of confidence."

F    "24. Counsel . . . submitted that Mrs Sig could not be liable for breach of confidence absent a finding that she knew that the initial Netprotect recipes were derived from the Fence database. I do not agree. A person can be liable for breach of confidence even if he is not conscious of the fact that what he is doing amounts to misuse of confidential information: see *Seager v Copydex Ltd* [1967] 1 WLR 923. I would agree that a person

G    who is not otherwise subject to an obligation of confidence (e g by contract) will not come under an equitable obligation of confidence purely as a result of the receipt of confidential information unless and until he or she has notice (objectively assessed by reference to a reasonable person standing in the shoes of the recipient) that the information is confidential; but that is a different point."

H    18    A number of the aspects of the two judgments were appealed by the defendants to the Court of Appeal, which, in a judgment [2011] EWCA Civ 424 given by Jacob LJ (with which Jackson LJ and Sir John Chadwick agreed), upheld Arnold J on all points, save one. That point was the judge's conclusion that Mrs Sig was liable in breach of confidence: paras 44–50.

© 2013 The Incorporated Council of Law Reporting for England and Wales

1562
Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))                [2013] 1 WLR
Lord Neuberger of Abbotsbury PSC

Jacob LJ said that *Seager v Copydex Ltd* [1967] 1 WLR 923 was    A
distinguishable because "there the defendants were actually using the
information which had been imparted to them, albeit they were doing so
unconsciously.  That is not so in the case of Mrs Sig."  In the
following paragraph, he said that he did not "consider that there can be an implied
term imposing strict liability.  There is no business reason to imply a term of
that harsh extent.  All the principles of implication of a term into a contract    B
(which I do not set out here—they are too well known) militate against it."

19    Vestergaard now appeal to this court.

*Breach of confidence: preliminary observations*

20    Vestergaard's contention that Mrs Sig is liable for breach of
confidence is, as I understand it, put on three different bases.  First, she is said
to be liable under her employment contract, either pursuant to the express    C
terms of clause 8 or pursuant to an implied term.  Secondly, she is said to be
liable on the basis that she was party to a common design, namely the design,
manufacture and marketing of Netprotect, which involved Vestergaard's
trade secrets being misused.  Thirdly, she is said to be liable for being party to
the breach of confidence, as she had worked for Vestergaard, and then
formed and worked for the companies which were responsible for the    D
design, manufacture and marketing of Netprotect.

21    In my opinion, each of these three arguments must fail because of the
combination of two crucial facts.  The first is that Mrs Sig did not herself
ever acquire the confidential information in question, whether during the
time of her employment with Vestergaard or afterwards.  The second crucial
fact is that, until some point during the currency of these proceedings    E
(possibly not until Arnold J gave his first judgment), Mrs Sig was unaware
that the Netprotect product had been developed using Vestergaard's trade
secrets.

22    It would seem surprising if Mrs Sig could be liable for breaching
Vestergaard's rights of confidence through the misuse of its trade secrets,
given that she did not know (i) the identity of those secrets, and (ii) that they
were being, or had been, used, let alone misused.  The absence of such    F
knowledge would appear to preclude liability, at least without the existence
of special facts.  After all, an action in breach of confidence is based
ultimately on conscience.  As Megarry J said in *Coco v A N Clark
(Engineers) Ltd* [1969] RPC 41, 46, "the equitable jurisdiction in cases of
breach of confidence is ancient; confidence is the cousin of trust."

23    The classic case of breach of confidence involves the claimant's    G
confidential information, such as a trade secret, being used inconsistently
with its confidential nature by a defendant, who received it in circumstances
where she had agreed, or ought to have appreciated, that it was confidential:
see e g per Lord Goff of Chieveley in *Attorney General v Guardian
Newspapers Ltd (No 2)* [1990] 1 AC 109, 281.  Thus, in order for the
conscience of the recipient to be affected, she must have agreed, or must    H
know, that the information is confidential.

24    The decision in *Seager v Copydex Ltd* [1967] 1 WLR 923, on which
Arnold J relied, was an entirely orthodox application of this approach.
The plaintiff passed on to the defendants a trade secret about his new design
of carpet grip, and although the defendants realised that the secret was

© 2013 The Incorporated Council of Law Reporting for England and Wales

A    imparted in confidence, they went on to use that information to design a new form of carpet grip, which they marketed. What rendered the case unusual was that the defendants (i) did not realise that they had used the information, as they had done so unconsciously, and (ii) believed that the law solely precluded them from infringing the plaintiff's patent. However, neither of those facts enabled them to avoid liability, as, once it was found that they had received the information in confidence, their state of mind when using the information was irrelevant to the question of whether they had abused the confidence.

B

25  Liability for breach of confidence is not, of course, limited to such classic cases. Thus, depending on the other facts of the case, a defendant who learns of a trade secret in circumstances where she reasonably does not appreciate that it is confidential, may none the less be liable to respect its confidentiality from the moment she is told, or otherwise appreciates, that it is in fact confidential. From that moment, it can be said that her conscience is affected in a way which should be recognised by equity.

C

26  Further, while a recipient of confidential information may be said to be primarily liable in a case of its misuse, a person who assists her in the misuse can be liable, in a secondary sense. However, as I see it, consistently with the approach of equity in this area, she would normally have to know that the recipient was abusing confidential information. Knowledge in this context would of course not be limited to her actual knowledge, and it would include what is sometimes called "blind-eye knowledge". The best analysis of what that involves is to be found in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378, especially at pp 390F–391D, where Lord Nicholls of Birkenhead approved the notion of "commercially unacceptable conduct in the particular context involved", and suggested that "acting in reckless disregard of others' rights or possible rights can be a tell-tale sign of dishonesty".

D

E

27  Further, even a person who did not know that the information which is being abused is confidential could nonetheless be liable if there were relevant additional facts. Thus, if a person who directly misuses a claimant's trade secret does so in the course of her employment by a third party, then the third party could (at least arguably) be liable to the claimant for the breach of confidence. However, that would simply involve the application of one well established legal principle, vicarious liability, to another, misuse of confidential information.

F

28  In this case, subject to considering Vestergaard's arguments in a little more detail, the position would seem to me to be as follows. First, unless her employment contract with Vestergaard imposed such a liability, Mrs Sig could not be primarily liable for misuse of confidential information, because she received no confidential information, or at least no relevant confidential information. Secondly, subject to the same qualification, she could not be secondarily liable for such misuse, as she did not know that Dr Skovmand was using, or had used, Vestergaard's confidential information in order to develop the Netprotect product. Thirdly, it was not contended that Mrs Sig could be vicariously liable for any misuse of Vestergaard's confidential information by Dr Skovmand (perhaps unsurprisingly, as it would seem that Dr Skovmand worked for Intection and then Bestnet, as did Mrs Sig, either as director, or through 3T).

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

1564
Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))          [2013] 1 WLR
Lord Neuberger of Abbotsbury PSC

29   I turn, then, to consider the three grounds upon which it is said that, despite these points, Mrs Sig is liable to Vestergaard.                    A

*The first ground: the terms of Mrs Sig's contract*

30   The express provisions of clause 8 of her employment contract are of no assistance to Vestergaard's case. The confidential information wrongly used by Dr Skovmand to develop the Netprotect product was plainly neither "information relating to [her] employment" nor "knowledge gained in the course of [her] employment". It was knowledge gained by Dr Skovmand in the course of his consultancy work for Vestergaard.          B

31   It is not seriously arguable that a term can properly be implied into Mrs Sig's employment contract to the effect that she would not assist another person to abuse trade secrets owned by Vestergaard, in circumstances where she did not know the trade secrets and was unaware that they were being misused. To impose such a strict liability on Mrs Sig appears to me to be wrong in principle as it is (i) inconsistent with the imposition of the more limited express terms of clause 8, (ii) unnecessary in order to give the employment contract commercial effect, and (iii) almost penal in nature, and thus incapable of satisfying either of the well established tests of obviousness and reasonableness.          C

D

*The second ground: common design*

32   I turn, then, to the second, and most strongly advanced, ground upon which Vestergaard's case rests, namely that Mrs Sig was liable for breach of confidence on the basis of common design. This argument proceeds on the basis that Dr Skovmand, Mr Larsen and Mrs Sig all worked together to design, manufacture and market Netprotect products, and as these products were designed by Dr Skovmand in a way which involved his wrongfully misusing Vestergaard's trade secrets so as to render him liable for breach of confidence, Mrs Sig and Mr Larsen are liable together with him.          E

33   I accept that common design can, in principle, be invoked against a defendant in a claim based on misuse of confidential information; I am also prepared to assume that, in the light of the findings made by the judge, Mr Larsen was liable on that ground (as he knew that Dr Skovmand was misusing, and had used, Vestergaard's trade secrets when designing Netprotect). However, I cannot see how Mrs Sig could be so liable, in the light of her state of mind as summarised in para 22 above.          F

34   As Lord Sumption JSC pointed out in argument, in order for a defendant to be party to a common design, she must share with the other party, or parties, to the design, each of the features of the design which make it wrongful. If, and only if, all those features are shared, the fact that some parties to the common design did only some of the relevant acts, while others did only some other relevant acts, will not stop them all from being jointly liable. In this case, Mrs Sig neither had the trade secrets nor knew that they were being misused, and therefore she did not share one of the features of the design which rendered it wrongful, namely the necessary state of knowledge or state of mind. Accordingly, although she was party to the activities which may have rendered other parties liable for misuse of confidential information, she cannot be liable under common design.          G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

A  35  A driver of the motor car who transports a person to and from a bank to enable him to rob it, would be liable in tort for the robbery under common design or some similar principle, but only if she knew that her passenger intended to rob, or had robbed, the bank. So, in this case, given the ingredients of the wrong of misuse of confidential information, and given that she never had any relevant confidential information, Mrs Sig cannot be held liable in common design for exploiting with others, on behalf of Intection and then Bestnet, a product which, unknown to her, was being and had been developed through the wrongful use of Vestergaard's trade secrets.

B

36  We were taken to two decisions, which, it was suggested, are inconsistent with that conclusion. The first is *Unilever plc v Gillette (UK) Ltd* [1989] RPC 583, 609, where Mustill LJ said that, in order to show that a defendant was secondarily liable for infringement of a patent, "there [was no] need for a common design to infringe", as it was "enough if the parties combine to secure the doing of acts which in the event prove to be infringements". I do not doubt the correctness of that statement, but it has no application here.

C

37  Patent infringement is a wrong of strict liability: it requires no knowledge or intention on the part of the alleged infringer, whose state of mind is wholly irrelevant to the issue of whether she infringes the patent. Thus, the fact that the alleged infringer did not know of the existence, contents or effect of the patent is completely irrelevant to the question of infringement, even if she had thought the invention up for herself. Accordingly, it is entirely logical that a person who, while wholly innocent of the existence, contents or effect of the patent, is none the less secondarily liable if she assists the primary infringer in her patent-infringing acts. It cannot possibly follow that the same approach is appropriate in a case for a person who assists the primary misuser of trade secrets, given that it is necessary to establish the latter's knowledge and/or state of mind (as explained in paras 22–25 above) before she can be liable for the misuse.

D

E

38  The second case relied on by Vestergaard is *Lancashire Fires Ltd v SA Lyons & Co Ltd* [1996] FSR 629. In that case, an injunction to restrain the misuse of the plaintiff's confidential information was granted against a Ms Magnall on the ground she had had "a common design with [another] to manufacture [certain products] and the process used was found to be confidential to the plaintiff": p 677. It appears that, while she had been aware of the nature of the process, Ms Magnall had not been aware of the fact that the manufacture of those products involved a process which had been wrongly developed with the benefit of the plaintiff's trade secrets. Sir Thomas Bingham MR said, at p 677, that it was "just that Susan Magnall should be precluded from disclosing the information to others" and therefore granted an injunction against her.

F

G

39  As already explained in para 25 above, I have no difficulty with the idea that a person who receives and uses confidential information, but does not appreciate that it is confidential, can be liable for using that information once she appreciates that it is indeed confidential. Accordingly, in this case, the grant of an injunction against Mrs Sig, if she was threatening to use or pass on Vestergaard's trade secrets, might well be justified, once it could be shown that she appreciated, or, perhaps, ought to have appreciated, that they were confidential to Vestergaard. However, I do not see how that can

H

© 2013 The Incorporated Council of Law Reporting for England and Wales

1566
Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))          [2013] 1 WLR
Lord Neuberger of Abbotsbury PSC

entitle Vestergaard to damages from Mrs Sig in respect of losses suffered    A
from misuse of their trade secrets at a time when Mrs Sig was honestly
unaware of the fact that there had been any misuse of their trade secrets.
I note that in the *Lancashire* case, immediately after the short passage I have
just quoted, Sir Thomas Bingham MR added, at p 678, that "if the plaintiff
seeks financial relief against Susan Magnall, we shall need to hear further
argument before deciding the point". (I should add that it appears that the
*Lancashire* case may not have been as fully argued as it might have been in    B
one respect, in that, at least at first instance, it was apparently conceded that
the principle in the *Unilever* case, as discussed above, applied to confidential
information cases, whereas, for the reason I have given in para 37 above, this
is wrong.)

### The third ground: Mrs Sig's unusual position    C

40   In so far as I understand the third way of putting Vestergaard's case,
(i) it involves saying that Mrs Sig had "blind-eye knowledge" of the fact that
Dr Skovmand was using Vestergaard's trade secrets, or (ii) it amounts to
contending that Mrs Sig should be liable for misuse of confidential
information, as she must have appreciated that she was, to use a well worn
metaphor, playing with fire, when she started up the new business with    D
Mr Larsen, employing Dr Skovmand, in 2004.

41   These two alternative ways of presenting Vestergaard's third ground
are quite close in their import, and in a sense they can both be said to involve
an attempt to conflate the first and second grounds, albeit in a somewhat
incoherent way. In the end they each must fail, essentially because of
findings of fact made (or, in many respects, understandably not made) by the
judge.    E

42   So far as argument (i) is concerned, it cannot succeed without a
finding against Mrs Sig of dishonesty of the sort characterised by Lord
Nicholls in the *Royal Brunei* case [1995] 2 AC 378, as discussed in para 26
above. There is no such finding, and it seems to me clear from the
conclusions which the judge did reach, as summarised in para 15 above, that
there was no basis for his making any finding of relevant dishonesty on the
part of Mrs Sig.    F

43   As to argument (ii), it is not enough to render a defendant
secondarily liable for misuse of trade secrets by another to establish that she
took a risk in acting as she did. The fact that she took a risk might often
render it easier to hold that she was dishonest, but, by definition, it is not
enough on its own. To revert to the metaphor, if one plays with fire, one is
more likely to be burnt, but it does not of itself mean that one is burnt.    G

### Conclusion

44   Looking at this case a little more broadly, I would add this.
Particularly in a modern economy, the law has to maintain a realistic and fair
balance between (i) effectively protecting trade secrets (and other intellectual
property rights) and (ii) not unreasonably inhibiting competition in the    H
market place. The importance to the economic prosperity of the country of
research and development in the commercial world is self-evident, and the
protection of intellectual property, including trade secrets, is one of the vital
contributions of the law to that end. On the other hand, the law should not

© 2013 The Incorporated Council of Law Reporting for England and Wales

1567

[2013] 1 WLR                Vestergaard Frandsen A/S v Bestnet Europe Ltd (SC(E))
                                                    Lord Neuberger of Abbotsbury PSC

A  discourage former employees from benefiting society and advancing themselves by imposing unfair potential difficulties on their honest attempts to compete with their former employers.

45    In my judgment, quite apart from being inconsistent with legal principle for the reasons discussed above, it would be inconsistent with maintaining that balance to hold Mrs Sig liable to Vestergaard for misuse of their confidential information on the facts found by the judge. Given that

B  she did not learn of any relevant trade secrets owned by Vestergaard when she was employed by them, and did not appreciate that any such secrets were being used by an employee of the company of which she was a founder and director, it would be oppressive to hold Mrs Sig (as opposed to the employee or the company) liable to Vestergaard for breach of confidential information, whether or not she had previously worked for Vestergaard

C  pursuant to a contract containing a standard sort of provision aimed at protecting Vestergaard's trade secrets.

46    Accordingly, I would dismiss Vestergaard's appeal.

*Appeal dismissed.*

Jill Sutherland, *Barrister*

D

———

E

F

G

H

© 2013 The Incorporated Council of Law Reporting for England and Wales