**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CITADEL SECURITIES AMERICAS LLC,
CITADEL SECURITIES AMERICAS SERVICES LLC,
CITADEL SECURITIES (EUROPE) LIMITED, and
CITADEL MANAGEMENT (EUROPE) II LIMITED,

        *Plaintiffs*,

    *v.*

PORTOFINO TECHNOLOGIES AG,
PORTOFINO TECHNOLOGIES USA, INC.,
JEAN CANZONERI, and JOHN DOES 1-10,

        *Defendants.*

Case No. 23 Civ. 5222 (GHW)

<u>ORAL ARGUMENT REQUESTED</u>

---

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO PORTOFINO**
**TECHNOLOGIES AG AND PORTOFINO TECHNOLOGIES USA, INC'S**
<u>**MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

Timothy S. Martin
Gabrielle E. Tenzer
Michael Ferrara
Christopher R. Le Coney
Andrew L. Chesley
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
tmartin@kaplanhecker.com
gtenzer@kaplanhecker.com
mferrara@kaplanhecker.com
cleconey@kaplanhecker.com
achesley@kaplanhecker.com

October 27, 2023

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ...........................................................................................................4

       A.    Citadel Securities' Trade Secrets Are Essential to Its
Success as a Market Maker .................................................... 4

       B.    Citadel Securities Has Used Its Trade Secrets for
High-Frequency Crypto Trading ........................................... 5

       C.    Portofino Was Founded by Citadel Securities Employees
Using Citadel Securities' Trade Secrets ................................ 7

       D.    Portofino Used Citadel Securities' Trade Secrets to Raise
Funds from Investors and Develop Its Competing HFT
Business.................................................................................. 8

       E.    Portofino Expanded Its Operations and Poached
Citadel Securities Employees Until Emerging from "Stealth
Mode" in September 2022....................................................... 9

ARGUMENT ..............................................................................................................12

    I.    THE SOUTHERN DISTRICT OF NEW YORK IS A
PREFERABLE AND CONVENIENT FORUM FOR THIS
ACTION.............................................................................................12

       A.    Citadel Securities' Choice of New York Is Entitled to
Significant Deference .......................................................... 13

       B.    England Is Not a Preferable Forum ..................................... 17

    II.    THIS COURT HAS PERSONAL JURISDICTION OVER
PORTOFINO AS TO EACH OF CITADEL SECURITIES'
CLAIMS............................................................................................21

       A.    This Court Has Personal Jurisdiction over Portofino under
CPLR 302(a)(1)................................................................... 21

       B.    This Court Has Personal Jurisdiction over Portofino under
CPLR 302(a)(2)................................................................... 25

       C.    This Court Has Personal Jurisdiction over Portofino under
CPLR 302(a)(3)................................................................... 26

III.    THE AMENDED COMPLAINT PROPERLY ALLEGES EACH
CAUSE OF ACTION AGAINST PORTOFINO..........................................27

    A.    The Amended Complaint Alleges Trade Secret
Misappropriation ............................................................................ 28

    B.    The Amended Complaint Alleges Tortious Interference
with Contracts ................................................................................. 35

    C.    The Amended Complaint Alleges Unfair Competition.................... 38

    D.    The Amended Complaint Alleges Unjust Enrichment..................... 39

IV.    THIS ACTION SHOULD NOT BE STAYED................................................39

CONCLUSION .......................................................................................................41

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*106 N. Broadway, LLC v. Lawrence*,
   189 A.D.3d 733 (2d Dep't 2020) ...................................................................... 35

*Aenergy, S.A. v. Republic of Angola*,
   31 F.4th 119 (2d Cir. 2022) ............................................................................. 16

*Aenergy, S.A. v. Republic of Angola*,
   2021 WL 1998725 (S.D.N.Y. May 19, 2021) ................................................. 16

*Al Thani v. Hanke*,
   2022 WL 489052 (S.D.N.Y. Feb. 17, 2022) ................................................... 25

*Alfandary v. Nikko Asset Mgm't Co.*,
   337 F. Supp. 3d 343 (S.D.N.Y. 2018) ............................................................. 20

*ArcelorMittal N. Am. Holdings LLC v. Essar Global Fund Ltd.*,
   2022 WL 4334665 (S.D.N.Y. Sept. 19, 2022) ............................................... 40

*Ash v. Richards*,
   572 F. App'x 52 (2d Cir. 2014) ...................................................................... 21

*Aziyz v. Cameca*,
   2023 WL 6065850 (N.D.N.Y. Sept. 18, 2023) ............................................... 22

*Berdeaux v. OneCoin Ltd.*,
   561 F. Supp. 3d 379 (S.D.N.Y. 2021) ............................................................. 12

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
   2023 WL 2711417 (S.D.N.Y. Mar. 30, 2023) .......................................... 15, 17

*Bus. Networks of N.Y., Inc. v. Complete Network Sols., Inc.*,
   1999 WL 126088 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 19, 1999) ......................... 35

*Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*,
   155 F.3d 603 (2d Cir. 1998) ...................................................................... 15, 16

*Carijano v. Occidental Petroleum Corp.*,
   643 F.3d 1216 (9th Cir. 2011) ........................................................................ 13

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
   602 F. Supp. 3d 663 (S.D.N.Y. 2022) ...................................................... 28, 34

*Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*,
    801 F. Supp. 2d 211 (S.D.N.Y. 2011)................................................................... 17

*Cont'l Indus. Grp., Inc. v. Altunkilic*,
    2016 WL 11796844 (S.D.N.Y. Apr. 6, 2016) ........................................................ 27

*CrossBorder Sols., Inc. v. Macias, Gini, & O'Connell, LLP*,
    2022 WL 562934 (S.D.N.Y. Feb. 23, 2022)........................................................... 27

*DASH Regul. Techs., LLC v. Axiom Software Lab'ys Inc.*,
    2023 WL 2586104 (S.D.N.Y. Mar. 21, 2023).......................................................... 29

*Deutsche Bank Secs., Inc. v. Mont. Bd. of Invs*,
    850 N.E.2d 1140 (N.Y. 2006)................................................................................. 22

*DiRienzo v. Philip Servs. Corp.*,
    294 F.3d 21 (2d Cir. 2002) ............................................................................. 18, 20

*DiStefano v. Carozzi N. Am., Inc.*,
    286 F.3d 81 (2d Cir. 2001) ..................................................................................... 25

*DoorDash, Inc. v. City of New York*,
    --- F. Supp. 3d ---, 2023 WL 6118229 (S.D.N.Y. Sept. 19, 2023) .................... 12, 28

*EarthWeb, Inc. v. Schlack*,
    71 F. Supp. 2d 299 (S.D.N.Y. 1999)....................................................................... 34

*Elcan Indus., Inc. v. Cuccolini, S.R.L.*,
    2014 WL 1173343 (S.D.N.Y. Mar. 21, 2014) ......................................................... 26

*Everard Findlay Consulting, LLC v. Republic of Suriname*,
    2022 WL 845757 (S.D.N.Y. Mar. 22, 2022)...................................... 13, 17, 18, 19

*Falconwood Corp. v. In-Touch Technologies, Ltd.*,
    227 A.D.2d 215 (1st Dep't 1996) ........................................................................... 35

*Fasano v. Li*,
    47 F.4th 91 (2d Cir. 2022) ...................................................................................... 19

*First Union Nat'l Bank v. Paribas*,
    135 F. Supp. 2d 443 (S.D.N.Y. 2001)...................................................................... 15

*Four Seasons Solar Prods. Corp. v. Solarium Sys., Inc.*,
    1987 WL 4818 (E.D.N.Y. May 6, 1987) ................................................................. 27

*Google LLC v. Starovikov*,
    2022 WL 1239656 (S.D.N.Y. Apr. 27, 2022) ......................................................... 13

*Guidi v. Inter-Continental Hotels Corp.*,
  224 F.3d 142 (2d Cir. 2000) ...................................................................................... 14, 16

*Gulf Oil Corp. v. Gilbert*,
  330 U.S. 501 (1947) ................................................................................................... 17, 21

*Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*,
  137 F. Supp. 2d 431 (S.D.N.Y. 2001) .............................................................................. 19

*Hesse v. Godiva Chocolatier, Inc.*,
  463 F. Supp. 3d 453 (S.D.N.Y. 2020) .............................................................................. 36

*Iacovacci v. Brevet Holdings, LLC*,
  437 F. Supp. 3d 367 (S.D.N.Y. 2020) ........................................................................ 28, 29

*IBM v. Liberty Mut. Ins. Co.*,
  363 F.3d 137 (2d Cir. 2004) ............................................................................................ 20

*IBM v. Papermaster*,
  2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ................................................................. 34

*In re Amazon, Inc. Ebook Antitr. Litig.*,
  2022 WL 4586209 (S.D.N.Y. Sept. 29, 2022) ................................................................. 39

*In re Magnetic Audiotape Antitr. Litig.*,
  334 F.3d 204 (2d Cir. 2003) ............................................................................................ 21

*Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*,
  871 F. Supp. 709 (S.D.N.Y. 1995) .................................................................................. 38

*Iragorri v. United Techs. Corp.*,
  274 F.3d 65 (2d Cir. 2001) ........................................................................... 12, 13, 14, 21

*Keswani v. Sovereign Jewelry, Inc.*,
  2021 WL 4461332 (S.D.N.Y. Sept. 29, 2021) ................................................................. 40

*Kraus USA, Inc. v. Magarik*,
  2020 WL 2415670 (S.D.N.Y. May 12, 2020) .................................................................. 28

*Kravitz v. Binda*,
  2020 WL 927534 (S.D.N.Y. Jan. 21, 2020) .................................................................... 20

*Kumaran v. Nat'l Futures Ass'n, LLC*,
  2022 WL 1805936 (S.D.N.Y. June 2, 2022) .................................................................... 34

*L & R Expl. Venture v. Grynberg*,
  22 A.D.3d 221 (1st Dep't 2005) .................................................................. 22, 24

*Lavvan, Inc. v. Amyris, Inc.*,
  2021 WL 3173054 (S.D.N.Y. July 26, 2021) .............................................. 31

*Lawrence v. NYC Medical Practice, P.C.*,
  2019 WL 4194576 (S.D.N.Y. Sept. 3, 2019) .............................................. 32

*LinkCo, Inc. v. Fujitsu Ltd.*,
  230 F. Supp. 2d 492 (S.D.N.Y. 2002) .......................................................... 38

*LivePerson, Inc. v. 24/7 Customer, Inc.*,
  83 F. Supp. 3d 501 (S.D.N.Y. 2015) ....................................................... 23, 37

*Marks v. Energy Materials Corp.*,
  2015 WL 3616973 (S.D.N.Y. June 9, 2015) ................................................ 34

*Massaquoi v. Virgin Atl. Airways*,
  945 F. Supp. 58 (S.D.N.Y. 1996) ................................................................. 13

*McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*,
  295 F. Supp. 3d 404 (S.D.N.Y. 2017) ..................................................... 22, 23

*Medcenter Holdings Inc. v. WebMD Health Corp.*,
  2021 WL 1178129 (S.D.N.Y. Mar. 29, 2021) ............................................. 20

*Medidata Sols., Inc. v. Veeva Sys. Inc.*,
  2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018) ...................................... 26, 32, 33

*Medtech Prod. Inc. v. Ranir, LLC*,
  596 F. Supp. 2d 778 (S.D.N.Y. 2008) .......................................................... 32

*Metito (Overseas) Ltd. v. Gen. Elec. Co.*,
  2006 WL 3230301 (S.D.N.Y. Nov. 7, 2006) ............................................... 19

*Mfg. Tech., Inc. v. Kroger Co.*,
  2006 WL 3714445 (S.D.N.Y. Dec. 13, 2006) .............................................. 27

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp.*,
  709 F.3d 109 (2d Cir. 2013) ........................................................................ 23

*Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*,
  297 F. Supp. 2d 463 (N.D.N.Y. 2003) ..................................................... 17, 40

*Ole Media Mgmt., L.P. v. EMI April Music, Inc.*,
  2013 WL 2531277 (S.D.N.Y. June 10, 2013) ........................................... 39, 40

*Pauwels v. Deloitte LLP,*
    83 F.4th 171 (2d Cir. 2023) ................................................................................. 39

*Pauwels v. Deloitte LLP,*
    2020 WL 818742 (S.D.N.Y. Feb. 19, 2020) ........................................................ 31

*Pellerin v. Honeywell Int'l, Inc.,*
    877 F. Supp. 2d 983 (S.D. Cal. 2012) ................................................................. 34

*Petersen Energía Inversora S.A.U. v. Argentine Republic,*
    2020 WL 3034824 (S.D.N.Y. June 5, 2020) .................................................. 13, 18

*Pictometry Int'l v. Air Am. Flight Ctr.,*
    394 F. Supp. 3d 320 (W.D.N.Y. 2019) ................................................................. 23

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235 (1981) ........................................................................................ 13, 16

*PT United Can Co. v. Crown Cork & Seal Co.,*
    138 F.3d 65 (2d Cir. 1998) ................................................................................... 16

*Recovery Racing III, LLC v. Brown,*
    2021 WL 9678666 (E.D.N.Y. Oct. 28, 2021) .................................................. 23, 38

*RIGroup LLC v. Trefonisco Mgmt. Ltd.,*
    949 F. Supp. 2d 546 (S.D.N.Y. 2013) ............................................................ 12, 15

*RLM Commc'ns, Inc. v. Tuschen,*
    831 F.3d 190 (4th Cir. 2016) ............................................................................... 35

*Seetransport Wiking Trader v. Navimpex Centrala Navala,*
    989 F.2d 572 (2d Cir. 1993) ................................................................................ 24

*Sierra Rutile Ltd. v. Katz,*
    937 F.2d 743 (2d Cir. 1991) ................................................................................ 39

*Tesla Wall Sys., LLC v. Related Cos., L.P.,*
    2017 WL 6507110 (S.D.N.Y. Dec. 18, 2017) ................................................. 29, 30

*Trahan v. Lazar,*
    457 F. Supp. 3d 323 (S.D.N.Y. 2020) ................................................................. 29

*Wilmington Tr., Nat'l Ass'n v. Rafiq,*
    2023 WL 6237680 (S.D.N.Y. Sept. 26, 2023) ................................................ 26, 35

*Zirvi v. Flatley*,
  433 F. Supp. 3d 448 (S.D.N.Y. 2020)......................................................................26

*Zurich Am. Life Ins. Co. v. Nagel*,
  538 F. Supp. 3d 396 (S.D.N.Y. 2021)......................................................................32

**STATUTES**

18 U.S.C. § 1837 ............................................................................................................28

18 U.S.C. § 1839 ............................................................................................................32

**OTHER AUTHORITIES**

Defend Trade Secrets Act of 2016, Pub. L. 114-153, 130 Stat. 376.............................20

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened
  for signature* Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231.............................19

John A. Drake, Inevitable Disclosure Under DTSA, 62 No. 10 DRI for Def. 12 (Oct. 2020) .....34

Plaintiffs Citadel Securities Americas LLC, Citadel Securities Americas Services LLC, Citadel Securities (Europe) Limited, and Citadel Management (Europe) II Limited (collectively, "Citadel Securities") respectfully submit this memorandum of law in opposition to the Motion to Dismiss the Amended Complaint filed by Portofino Technologies AG and Portofino Technologies USA, Inc. (together, "Portofino").

## PRELIMINARY STATEMENT

Portofino's motion should be denied. Portofino has moved to dismiss a complaint, but not the Amended Complaint at issue here. Instead, Portofino's motion addresses a different complaint, a so-called "European dispute" in a foreign jurisdiction, governed by different laws, and involving different parties asserting different claims—a dispute to which Portofino is not even a party. That is not the complaint being litigated here. The Amended Complaint before *this* Court is not about a handful of former employees' breaches of their employment agreements. Nor is it limited to events that occurred in London. Nor is it governed by English law. Portofino devotes substantial effort to arguing about an arbitration against non-parties to this action that was properly brought in London pursuant to contractual terms and foreign laws that have zero relevance here. Portofino invents and argues against a straw man.

*This* case is about Portofino, a cross-border, high-frequency trading firm incorporated in Switzerland and Delaware with clients around the world (and likely in New York) and dozens of employees in offices across three (if not more) countries. Portofino stole Citadel Securities' New York and U.S.-developed trade secrets and employees from New York and elsewhere and is funded by New York investors who were told explicitly that Portofino's employees' experience with Citadel Securities' trade secrets was "a crucial differentiating factor," and that Portofino would "replicate" Citadel Securities' business model to create a competitor. *This* case is about a scheme of deceitful misconduct that transpired and caused injury on both sides of the Atlantic, including,

in significant part, here in New York. *This* case is governed by U.S. and New York law. Put simply, *this* case is properly before, and deserves to be heard by, this Court.

Portofino attempts to evade this Court's jurisdiction by disavowing its admissions and public representations about its business activities in New York that clearly have a direct nexus to Citadel Securities' claims. And Portofino denies the appropriateness of this forum by ignoring its theft of U.S.- and New York-developed trade secrets and New York employees, and the Amended Complaint's well-pled allegations that such misconduct violates the Defend Trade Secrets Act ("DTSA") and New York law. The question before this Court is whether Portofino's misconduct and the injury it caused relate to New York and should be remedied here. The answer is yes.

Dismissal for *forum non conveniens* is not warranted. Rather, deference to Citadel Securities' choice of forum is appropriate. Represented by two of its affiliates here in the United States and two in Europe, Citadel Securities brought suit here because New York is where much of the relevant misconduct and injury occurred. This is not a "do-over" of the London employment arbitration, which is many months away from being heard and to which, in any event, Portofino is not a party. And the balance of public and private factors hardly points toward adjudicating these claims in England, much less strongly favors that forum, as is required for dismissal.

Portofino's motion to dismiss for lack of personal jurisdiction fails for similar reasons. The Amended Complaint alleges Portofino engaged in business activities in New York that have a clear nexus to Citadel Securities' claims. Portofino stole Citadel Securities' trade secrets and confidential information from New York and elsewhere in the United States to build a rival trading business that, to this day, publicly touts a New York office. Portofino also advertised open positions in New York for employees who would use Citadel Securities' stolen trade secrets and confidential information in New York. And Portofino leveraged those stolen trade secrets and confidential information to raise millions of dollars in capital from New York investors with the promise of

2

"replicat[ing]" Citadel Securities' business. Any of these facts, standing alone, would be sufficient to confer jurisdiction; taken together, there is no dispute that jurisdiction can be exercised under New York's long-arm statute. And that is even before considering acts Portofino committed here in furtherance of its misconduct, or its tortious acts abroad that caused injury here in New York.

Equally unavailing are Portofino's arguments for dismissal under Federal Rule of Civil Procedure 12(b)(6). *First*, the Amended Complaint describes the stolen trade secrets and confidential information in more than sufficient detail to put Portofino on notice of what it stole. And it pleads misappropriation based on Portofino's acquisition through improper means, as well as its brazen use of the trade secrets and confidential information to pitch investors and operate its business, all while Portofino's founders were lying about their plans to Citadel Securities. *Second*, the Amended Complaint states a claim for tortious interference with allegations more than adequate to plead Portofino knowingly induced Citadel Securities' former employees, Vincent Prieur and Taym Moustapha, to join Portofino—bringing Citadel Securities' trade secrets with them. And *third*, the unfair competition and unjust enrichment claims, premised in part on Portofino's trade secret theft but also on other actionable misconduct and injury—including Portofino's theft and use of Citadel Securities' confidential information and other work product that does not qualify as "trade secrets"—are properly pled under New York law and stand independent of Citadel Securities' trade secret misappropriation claims.

For all these reasons, there is no basis to dismiss the Amended Complaint. Nor is there any necessity warranting a stay in favor of a foreign arbitration that involves different parties and claims, seeks different relief under different laws, and to which Portofino is not a party.

**BACKGROUND**

**A.  Citadel Securities' Trade Secrets Are Essential to Its Success as a Market Maker**

Citadel Securities is one of the world's leading market makers in a broad range of assets and securities. ¶¶ 39, 134.[1] As a "market maker," Citadel Securities buys and sells assets or securities for itself or investors, either using available inventory or sourcing from an exchange or other market venue, thereby providing liquidity and efficient pricing to market participants and retail and institutional investors around the world. ¶¶ 40-41.

Citadel Securities' success as a market maker is based on trade secrets and other confidential and proprietary information it has developed over many years and at great expense. Significantly, many of Citadel Securities' trade secrets are asset-neutral, meaning they are broadly applicable to all of the assets in which Citadel Securities trades, whether those assets are U.S. equities, European options, or crypto. ¶ 51. The asset-neutral nature of the trade secrets allows them to be developed and used by Citadel Securities' businesses around the world, including in New York. ¶ 168.

Citadel Securities' trade secrets include its confidential and proprietary research methodology ("Research Methodology"), which includes Citadel Securities' know-how and processes, quantitative analyses, strategies, automated and high-frequency trading ("HFT") algorithms, and implementing code. ¶ 47. The Research Methodology also includes Citadel Securities' models for valuation, pricing, forecasting, volatility, and associated forms of risk. *Id.*

Citadel Securities uses its Research Methodology to develop and update its HFT model, which incorporates algorithmic, systematic, and automated trading systems and strategies ("Trading Strategies"). ¶ 48. The Trading Strategies are another set of valuable trade secrets that

---

[1] References to "¶ __" are to paragraphs of the Amended Complaint, ECF 25. References to "MOL __" are to the Memorandum of Law in Support of Portofino's Motion to Dismiss, ECF 43. References to "Ex. __" are to exhibits to the Declaration of Timothy S. Martin in Support of Plaintiffs' Oppositions to Defendants' Motions to Dismiss, ECF 51.

allow Citadel Securities to trade securities and other assets at faster speeds and at greater volumes than its competitors. ¶ 44.

Citadel Securities' trade secrets also include its confidential and proprietary quantitative modeling and testing simulations ("Simulations"), which are built using historical market and institutional data, and then adjusted with proprietary statistical information and analysis to reflect real-world market behavior with enhanced precision. ¶ 49. Citadel Securities uses its Simulations to fine tune and calibrate the Trading Strategies that are developed using its Research Methodology, thereby further improving their performance. *Id.*

Citadel Securities' valuable confidential and proprietary information also includes product and market research and analysis, evaluations of competitors, and operational considerations like resource allocation, design and staffing, and recruiting and hiring efforts and objectives ("Business Plans and Strategies"), ¶ 52, which, together with its Research Methodology, Trading Strategies, and Simulations, comprise the firm's valuable, highly confidential, and proprietary trade secrets essential to developing and operating its HFT market-making business ("Trade Secrets"), ¶ 45.

Because Citadel Securities' Trade Secrets are critical to the firm's success and highly valuable, Citadel Securities goes to great lengths to protect them from disclosure and use by others. ¶ 53. Citadel Securities has implemented robust security protocols across its operations that include physical and electronic access restrictions and other measures. *Id.* Citadel Securities also requires that employees who have access to the firm's Trade Secrets and confidential information sign non-disclosure, non-compete, and non-solicitation agreements that protect against the unauthorized use or disclosure of the firm's Trade Secrets and confidential information. ¶¶ 54-60.

**B.  Citadel Securities Has Used Its Trade Secrets for High-Frequency Crypto Trading**

Citadel Securities invested substantial money, time, and human resources to apply its asset-neutral Trade Secrets to high-frequency, algorithmic, systematic, and automated trading strategies

for crypto. ¶ 61. This investment was in addition to existing trading in various crypto-related products. ¶ 65. As early as March 2018, Citadel Securities employees, including now-Portofino co-founder Alex Casimo, were discussing business opportunities for Citadel Securities in crypto. ¶¶ 62-63. In the ensuing years, Citadel Securities continued to develop plans and strategies for crypto trading. ¶¶ 64-66. Among those involved was Vincent Prieur, a former New York-based employee of Citadel Securities whom Portofino successfully recruited in early 2022. ¶¶ 67, 122. In spring 2021, while still at Citadel Securities, Prieur was tasked with leading a team to prepare and deliver a presentation on Citadel Securities' crypto-related business plans, strategies, and opportunities. ¶¶ 67, 166. The presentation included detailed data about crypto exchanges' operations, in-depth analysis of crypto products and market trends, evaluations of likely competitors, and staffing proposals. *Id.* Citadel Securities subsequently assembled teams to build the operational framework and technological platforms needed to engage in high-frequency crypto trading. ¶ 69. Those efforts culminated in the launch of Citadel Securities' internal algorithmic crypto trading business in early 2022, shortly before Prieur departed to join Portofino. ¶ 70.

In addition to its internal crypto trading business, Citadel Securities announced in January 2022 a substantial crypto-focused investment by Sequoia Capital and Paradigm. ¶ 71. In June of that same year, Citadel Securities announced it was entering into a joint venture with a high-frequency trading firm and a crypto-focused venture capital firm to establish a liquidity-aggregating crypto trading platform. ¶ 72. This joint venture, called EDX Markets, officially launched on September 13, 2022. ¶ 73. The joint venture relies on Citadel Securities' Trade Secrets and confidential information that incorporate the work of Prieur and others. *Id.*

### C. Portofino Was Founded by Citadel Securities Employees Using Citadel Securities' Trade Secrets

Portofino is a self-described HFT firm that seeks to operate as a market-maker on centralized and decentralized crypto exchanges. ¶ 4. Portofino was founded by former Citadel Securities employees Leonard Lancia and Alex Casimo by fall 2020 at the latest, while they were both still employed by Citadel Securities. ¶¶ 89-104.

From September 2018 to March 2021, Lancia worked at Citadel Securities as a senior Quantitative Researcher and Head of Systematic European Options Market Making. ¶ 75. Lancia's principal project during his tenure at Citadel Securities was building a new line of business—Systematic European Options Trading—that was based on Citadel Securities' existing U.S. Options Trading business. ¶¶ 76-77. In developing Citadel Securities' European options trading desk, Lancia used Citadel Securities' Trade Secrets and worked closely with Citadel Securities' Head of U.S. Options Trading, who is based in New York and runs Citadel Securities' U.S. options trading desk. ¶¶ 77, 79. Specifically, Lancia used the Trade Secrets to write code for that platform, determine pricing and forecast risk, and develop and test Trading Strategies. ¶ 78.

Casimo was a senior Business Manager at Citadel Securities in the Office of the Chief Operating Officer ("COO") from January 2018 to March 2021. ¶ 80. In his role, Casimo was aware of Citadel Securities' plans and strategies regarding high-frequency, algorithmic, systematic, and automated trading in various assets, including crypto. ¶ 81. As early as March 2018, Casimo was involved in internal discussions about the firm's plans to trade crypto and crypto-adjacent financial products, and he knew which employees at Citadel Securities had experience and interest in working in crypto. ¶ 82. By 2019, Casimo was aware that Citadel Securities had started trading futures in bitcoin, a type of cryptocurrency. ¶¶ 65, 82.

Because Portofino's founders' positions at Citadel Securities gave them direct knowledge of Citadel Securities' Trade Secrets, they were subject to agreements broadly prohibiting them from engaging in competitive activity for a "Restricted Period" following the termination of their employment. ¶¶ 57, 85. They were also subject to non-solicitation and non-disclosure agreements. ¶¶ 85, 87-88. Lancia was also subject to an additional agreement that barred him from working in "high frequency trading, algorithmic trading, systematic trading or automated trading businesses" for another seven months after the end of his initial Restricted Period. ¶ 86.

### D. Portofino Used Citadel Securities' Trade Secrets to Raise Funds from Investors and Develop Its Competing HFT Business

In early fall 2020, months *before* resigning from Citadel Securities, Portofino's founders began soliciting investments for Portofino. ¶ 96. For instance, on September 22, 2020, Casimo emailed a partner at a crypto-focused venture capital firm to pitch "a new opportunity to muscle in on this crypto game." *Id.* He attached Portofino's "pitch document," which touted its founders' experience as "senior leaders at a global High Frequency Trading firm," including their "track record of building market making businesses." *Id.* This experience with Citadel Securities' Trade Secrets was, according to the pitch materials, "a crucial differentiating factor" for Portofino. *Id.*

In October 2020, Casimo told this same venture capital partner that Portofino was in discussions with others to raise funds and indicated that "February 2021 would be [Portofino's] official start date." ¶ 100. Portofino's founders sent the venture capital partner a new pitchbook, this one boasting of Portofino's plans to "[r]eplicate the most successful trading business model in traditional financial markets in crypto-currency markets." *Id.* This pitchbook also indicated that Portofino had built an "MVP HFT market making model" and a "[b]eta version of 'rebate collection' strategy," all while Portofino's founders remained employees of Citadel Securities and

had access to Citadel Securities' Trade Secrets. ¶ 8. Portofino's knowledge and use of Citadel Securities' Trade Secrets was a key component of its pitch to potential investors. ¶¶ 8, 10, 100.

The pitch was successful. By late 2020 and/or early 2021, Portofino had obtained funding from outside investors. ¶ 101. Defendant Jean Canzoneri, a self-proclaimed "business angel," was one such investor. ¶ 9. Canzoneri invested in Portofino in January 2021. ¶ 103. Portofino's founders gave notice to Citadel Securities in March 2021. Portofino registered its official company website on March 13, 2021, just one day after Lancia, and five days before Casimo, formally left Citadel Securities. ¶ 105. In April 2021, just a month into the founders' Restricted Periods, Portofino was incorporated in Zug, Switzerland. ¶ 106.

Portofino secured additional directors, employees, and funding, and began trading in "stealth mode." ¶¶ 107-114. As part of Portofino's solicitation of investors, in summer 2021, Lancia traveled to the United States—including, Citadel Securities has reason to believe, to New York—to solicit investors using Citadel Securities' Trade Secrets. ¶ 115. By December 2021, less than a year after its founders had resigned from Citadel Securities, Portofino had closed two fundraising rounds and was actively trading on crypto exchanges. ¶ 121. Portofino was only able to do so by exploiting its many connections to Citadel Securities, including Citadel Securities' Trade Secrets.

### E. Portofino Expanded Its Operations and Poached Citadel Securities Employees Until Emerging from "Stealth Mode" in September 2022

Both when they left Citadel Securities and for months afterwards, Portofino's founders lied to Citadel Securities about their intentions to start a competing company. ¶¶ 139-140. When he left, Lancia led Citadel Securities to believe he had no new role, no other offers of employment, and was "[s]till thinking about whether he want[ed] to stay in finance." ¶ 139. Casimo similarly dissembled, claiming that he was leaving—with no new job—because Citadel Securities was not sufficiently invested in Europe and the firm's priorities were inconsistent with his. ¶ 140. In reality,

by the time they left Citadel Securities, Portofino's founders had been building and operating Portofino for some time, and Portofino was already actively soliciting investors.

Lancia waited more than six months to disclose Portofino's existence to Citadel Securities, and even then, he did not tell Citadel Securities that Portofino was engaged in market-making. ¶ 142. Instead, he lied, saying Portofino's business was the "development, sale and licensing of software," *id.*, and claiming he did not have "daily responsibilities." ¶ 144. When Citadel Securities pressed for details in December 2021, Lancia continued to mislead, describing Portofino's business as an "app that is a distributed ledger technology," the "scope of applications" of which "is not fully understood at this point." ¶ 145. Casimo was similarly deceptive when confronted. He described an October 2020 investor call as a "phone call with an acquaintance," and described Portofino only as a "technology / blockchain company," asserting that "Citadel [Securities does] not participate in this sector"—a statement he knew was untrue. ¶¶ 146-147.

Using funds it had already started obtaining from investors, Portofino continued building its competing enterprise and began recruiting employees around the world, including in New York. For example, in May 2022, Portofino's in-house recruiter posted a series of job openings on LinkedIn, advertising open roles at Portofino's offices in New York. ¶¶ 127-128. Portofino specifically targeted Citadel Securities employees who had knowledge of Citadel Securities' Trade Secrets, allowing Portofino to shortcut the labor- and resource-intensive process of developing its HFT business. One of these employees was the New York-based Prieur who, like Casimo, worked in Citadel Securities' Office of the COO. ¶¶ 80, 180. Prieur was an especially important hire for Portofino because of his extensive knowledge of Citadel Securities' Business Plans and Strategies for trading in crypto. ¶ 182. Based on Prieur's work on Citadel Securities' crypto business plans, his supervisor had dubbed Prieur Citadel Securities' "aggregator of all things crypto in the U.S."

¶¶ 166, 185. Prieur, like Portofino's founders, was subject to non-compete and non-disclosure agreements that protected Citadel Securities' Trade Secrets. ¶ 187.

In October 2021, Casimo met Prieur in person in a concerted push to lure Prieur from Citadel Securities. ¶ 118. Casimo told Prieur that Portofino had already raised funds from investors and had ambitious plans to grow into a crypto trading firm, and invited Prieur to visit the company's headquarters in November 2021. ¶¶ 118-119. Two months later, in January 2022, Prieur contacted a senior Citadel Securities executive working on crypto projects. ¶ 122. Claiming that he was "centralizing all our crypto efforts globally," Prieur asked to meet with the executive to "align" on Citadel Securities' global crypto plans. *Id.* That same month, Prieur informed Citadel Securities that he was leaving. *Id.* Per his separation agreement, Prieur was barred from working for Portofino through June 2023. ¶ 192. He promptly violated that agreement and began working for Portofino in April 2022, bringing with him knowledge of Citadel Securities' crypto-related Business Plans and Strategies, and other Citadel Securities Trade Secrets and confidential information. ¶ 123.

Prieur was not the only Citadel Securities employee Portofino targeted for recruitment. Taym Moustapha, who worked on the European options trading desk that Lancia established, had direct knowledge of the code for essential components of Citadel Securities' Trade Secrets, including its Research Methodology and Trading Strategies. ¶ 172. Like Prieur, Moustapha's work at Portofino involved using the Trade Secrets he had learned at Citadel Securities in violation of his non-disclosure agreement. ¶ 179. In June 2022, Citadel Securities initiated arbitration against Lancia, Casimo, and Moustapha for their breaches of their employment agreements before the London Court of International Arbitration (the "Employee Arbitration"). ¶ 120 n.10.

On September 15, 2022, Portofino emerged from self-proclaimed "stealth mode" with a press release that promoted its founders' ties to Citadel Securities and claimed Portofino had already traded "billions" of dollars in crypto assets. ¶ 130. Portofino claimed it had 35 employees

"dispersed between offices in Switzerland, London, New York, and Singapore." *Id.* Portofino also announced that it had obtained $50 million in venture capital funding, including investments by two New York-based firms, Valar Ventures and Coatue Management. *Id.* To this day, Portofino holds itself out on LinkedIn as having five offices around the world, including in New York. ¶ 22; *see also* ECF 48-1 at 3; Ex. A. Directly competing with Citadel Securities, Portofino operates a HFT trading business that is built on Citadel Securities' Trade Secrets and confidential information and run by former Citadel Securities employees.

## ARGUMENT

Portofino moves to dismiss the Amended Complaint for *forum non conveniens*, lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), and failure to state a claim under Federal Rule of Civil Procure 12(b)(6).[2] For the purpose of deciding Portofino's motion, the allegations in Citadel Securities' Amended Complaint are taken as true, with all reasonable inferences drawn in Citadel Securities' favor. *See RIGroup LLC v. Trefonisco Mgmt. Ltd.*, 949 F. Supp. 2d 546, 549 (S.D.N.Y. 2013) (*forum non conveniens*); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 395 (S.D.N.Y. 2021) (personal jurisdiction); *DoorDash, Inc. v. City of New York*, --- F. Supp. 3d ---, 2023 WL 6118229, at *11 (S.D.N.Y. Sept. 19, 2023) (failure to state a claim).

## I. THE SOUTHERN DISTRICT OF NEW YORK IS A PREFERABLE AND CONVENIENT FORUM FOR THIS ACTION

To prevail on its motion to dismiss for *forum non conveniens*, Portofino must show that the Southern District of New York is "genuinely inconvenient and [its] selected forum significantly preferable" under the three-step test applied in this Circuit. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 74-75 (2d Cir. 2001) (en banc). "First, the Court must determine the degree of deference properly afforded Plaintiffs' choice of forum. Second, the Court must decide whether the

---

[2] Portofino also seeks a stay, MOL 32, which is discussed below. *See infra* at 39-40.

alternative forum proposed by Defendants is adequate to adjudicate the parties' dispute. Third, the Court balances the competing private and public interests implicated in the choice of forum." *Petersen Energía Inversora S.A.U. v. Argentine Republic*, 2020 WL 3034824, at *6 (S.D.N.Y. June 5, 2020) (cleaned up)*. Portofino bears a "heavy burden at each stage of the analysis." *Massaquoi v. Virgin Atl. Airways*, 945 F. Supp. 58, 61 (S.D.N.Y. 1996). And where, as here, one or more "plaintiffs is an American citizen and the alternative forum is a foreign one," Portofino faces an even greater burden to overcome the heightened deference afforded Citadel Securities' choice of forum. *Google LLC v. Starovikov*, 2022 WL 1239656, at *6 (S.D.N.Y. Apr. 27, 2022) (cleaned up); *see also Iragorri*, 274 F.3d at 72-73. Because Portofino has not met its burden, its motion to dismiss should be denied.

### A. Citadel Securities' Choice of New York Is Entitled to Significant Deference

As the Second Circuit has made clear, "a court reviewing a motion to dismiss for *forum non conveniens* should begin with the assumption that the plaintiff's choice of forum will stand." *Iragorri*, 274 F.3d at 71. That is particularly true where, as here, Plaintiffs include U.S. entities who have sued in the United States, in which case Citadel Securities' choice is entitled to "great deference." *Id.* Moreover, the presumption in favor of a plaintiff's choice of forum "is fortified where an American plaintiff brings suit against a foreign entity and the alternative forum is foreign." *Everard Findlay Consulting, LLC v. Republic of Suriname*, 2022 WL 845757, at *4 (S.D.N.Y. Mar. 22, 2022) (cleaned up).

Portofino would have this Court look past the U.S. Plaintiffs and consider only Citadel Securities (Europe) Limited and Citadel Management (Europe) II Limited, who it incorrectly asserts "lack a bona fide connection to this jurisdiction." MOL 17. But even where only one out of many plaintiffs is domestic, that plaintiff's choice of forum is due deference under *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981). *See, e.g.*, *Carijano v. Occidental Petroleum Corp.*, 643

F.3d 1216, 1228-29 (9th Cir. 2011) (affirming denial of motion to dismiss on *forum non conveniens* grounds where only one of twenty-six plaintiffs was domestic).

Here, all four Plaintiffs are legitimate parties in interest, and all four were harmed by Portofino's misconduct in New York. Two Plaintiffs are formed under U.S. law; the other two are wholly owned by U.S. entities. ¶¶ 18-21. They are all part of the same multinational corporate structure. Consequently, as the Amended Complaint makes clear, Citadel Securities' employees work closely across offices and Citadel Securities' Trade Secrets were and are used by Citadel Securities employees around the world. *See* ¶ 168. The theft of those Trade Secrets has therefore reverberated across Plaintiffs (and other Citadel Securities affiliates), and the impact is not limited to those Citadel Securities entities that employed Portofino's founders and employees.

Portofino also ignores the Amended Complaint's extensive allegations that Portofino's misconduct injured all four Plaintiffs in the United States and in New York specifically, which for *forum non conveniens* purposes establishes a "bona fide connection to the . . . forum of choice." *Iragorri*, 274 F.3d at 72; *see Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 n.4 (2d Cir. 2000) (noting that where a defendant proposes a foreign forum, a domestic plaintiff's "home forum" for purposes of evaluating the deference due is "any federal district in the United States, not the particular district where the plaintiff lives"). At every stage of Portofino's theft, the asset-neutral Trade Secrets it stole were developed in, resided in, used in, and/or directly stolen from Citadel Securities' New York office in whole or in part. *See* ¶¶ 73, 79, 168, 180, 194. For example, through Lancia's long-running deceit, Portofino stole Citadel Securities' Trade Secrets that Lancia learned while working closely "with Citadel Securities' Head of U.S. Options Trading, who is based in Citadel Securities' New York office and runs Citadel Securities' U.S. options trading desk also located in New York." ¶ 79. Through its poaching of Prieur—Citadel Securities' New York-based "aggregator of all things crypto"—Portofino stole Trade Secrets and Business Plans and

Strategies that Prieur had developed and/or learned about in New York. *See* ¶¶ 166, 180, 194. EDX Markets, Citadel Securities' crypto exchange joint venture headquartered in New York, was developed with and continues to use the Trade Secrets and other confidential information that Portofino stole. ¶ 73. And notwithstanding Portofino's description of two of the Plaintiff entities as "Citadel Europe," those two entities are owned by U.S. parent companies. ¶¶ 20-21. In short, the Trade Secrets are all ultimately owned by domestic Citadel Securities entities.

In the face of the bona fide connection between this case and New York, Portofino tries to twist this case into one purportedly focused on Lancia and Casimo's employment agreements. *See* MOL 15. But those agreements are not the basis for *any* claim asserted in this action, which lies against Portofino, the company, and seeks relief for misconduct for which Portofino is liable. *See* ¶¶ 229-236, 243-249, 252-256, 261-265, 272-276; *see also Better Holdco, Inc. v. Beeline Loans, Inc.*, 2023 WL 2711417, at *5, *36 (S.D.N.Y. Mar. 30, 2023) (allowing claim against corporate defendant for trade secret theft to proceed where involved employee had already settled related claims). Portofino further claims, without any factual basis, that the stolen information belonged to Citadel Securities' European affiliates. MOL 17. But this is contradicted by the Amended Complaint's detailed recounting of the substantial connections the Trade Secrets and confidential information have to New York, which is accepted as true for the purpose of deciding this motion. *See RIGroup*, 949 F. Supp. 2d at 549.

The cases Portofino cites for the proposition that the U.S. Plaintiffs are not the real parties in interest, MOL 17, do not advance Portofino's position and are all easily distinguished. In *First Union Nat'l Bank v. Paribas*, all of the conduct relevant to the lawsuit occurred overseas; in contrast to this action, there were no allegations regarding any of the plaintiff's employees or property being in New York. 135 F. Supp. 2d 443, 445 (S.D.N.Y. 2001). Similarly distinguishable is *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603 (2d Cir. 1998). There, a

Netherlands Antilles-based plaintiff sought letters of credit from two banks in England. *Id.* at 605. The plaintiff's U.S. affiliate only became involved when disputes arose over the letters of credit, leading the court to find the case was fundamentally an English dispute. *Id.* at 612*.* In *PT United Can Co. v. Crown Cork & Seal Co.*, there was no U.S. plaintiff, only a single Indonesian corporation. 138 F.3d 65, 68 (2d Cir. 1998). And in *Piper Aircraft*, unlike here, the plaintiffs had virtually no connection to their chosen forum: the Scottish representatives of the estates of Scottish citizens who died in a plane crash in Scotland chose to bring their suit against airplane and parts manufacturers in Pennsylvania. 454 U.S. at 238-39.

Portofino next asserts, without any basis, that Citadel Securities is engaged in forum-shopping because it wants a "do-over" of the Employee Arbitration. MOL 18. But there is nothing to "do over." The tribunal hearing will not happen until May 2024 and there have not been any decisions on the merits of any of the parties' claims. ECF 43-1 ¶ 8. Accordingly, this case is completely unlike the sole case Portofino cites, *Aenergy, S.A. v. Republic of Angola*, 31 F.4th 119, 129 (2d Cir. 2022). MOL 18. In that case, the Second Circuit affirmed the district court's dismissal of an action that the Angolan corporate plaintiff filed in New York only after it had lost a prior administrative action, lost its appeal of that decision to the Angolan President, and had pled in its complaint that the Angolan Supreme Court had "'done nothing'" to help. *Aenergy, S.A. v. Republic of Angola*, 2021 WL 1998725, at *6, *13-14 (S.D.N.Y. May 19, 2021).

The fact that certain Plaintiffs have brought the Employee Arbitration against their former employees for different, contract-based claims is of zero significance. Unless the "parties to the American and foreign actions [a]re identical," which they are not here, the Second Circuit has held that "[t]he existence of related litigation" is not "a relevant factor in the *forum non conveniens* analysis." *Guidi*, 224 F.3d at 148. Even if Citadel Securities were to prevail in the Employee Arbitration (which it anticipates it will), that would not necessarily remedy *Portofino's* theft and

use of the Trade Secrets. *See Norbrook Lab'ys Ltd. v. G.C. Hanford Mfg. Co.*, 297 F. Supp. 2d 463, 472, 493 (N.D.N.Y. 2003) (granting preliminary injunction preventing corporate defendant from using trade secrets obtained through its hiring of plaintiff's former employee, who was subject to proceedings in Northern Ireland but not a party to the New York case against defendant); *see also Better Holdco*, 2023 WL 2711417, at *5, *36 (denying company defendant's summary judgment motion on liability for trade secret theft where employee involved in the theft had already settled).

### B.  England Is Not a Preferable Forum

Even if Citadel Securities' choice of New York were not entitled to strong deference, which it is, Portofino would still need to establish that *its* proposed forum—England—is not only adequate, but so superior under the public and private interest factors set forth in *Gulf Oil Corp. v. Gilbert* that Citadel Securities should be denied its chosen forum. 330 U.S. 501, 508-09 (1947). "The mere existence of" an alternative forum "with some nexus to [the] lawsuit is insufficient to upset" a plaintiff's forum selection on its own. *Constellation Energy Commodities Grp. Inc. v. Transfield ER Cape Ltd.*, 801 F. Supp. 2d 211, 221 (S.D.N.Y. 2011). "Because of the substantial deference owed to [plaintiff's] choice of forum, [defendant] has the burden of demonstrating that the balance of private and public interest factors weighs *heavily* in its favor." *Everard Findlay*, 2022 WL 845757, at *7 (emphasis added). Because Portofino has not established that the private and public interests weigh "heavily" in favor of England, its motion should be denied.

### *1.  The Convenience of the Parties Does Not Weigh in Favor of England*

Portofino begins by arguing that the private *Gulf Oil* factors weigh in favor of England, claiming that most of the evidence and witnesses in this case are located in London or Switzerland. MOL 14-15. To begin, Portofino does not explain why evidence and witnesses being located in Switzerland cuts in favor of litigating in England rather than New York. In any event, Portofino's contention that "most" relevant evidence will be in Europe, MOL 14, is simply incorrect. In fact,

many of the key documents will be Citadel Securities' documents, which are either located in the United States or accessible from its overseas offices via electronic transmission. Likewise, many of the key witnesses who will be able to testify about Citadel Securities' Trade Secrets and Portofino's theft of those Trade Secrets are Citadel Securities' witnesses, who are also located in the United States. These individuals will include, among others, Prieur's Citadel Securities colleagues in New York, the head of Citadel Securities' U.S. Equity Options Trading in New York who developed the Trade Secrets Lancia stole, as well as Casimo's U.S.-based supervisor whom Casimo pumped for information regarding Citadel Securities' plans in the crypto space just before he left for Portofino. ¶¶ 64, 79. Similarly, the list of third parties located outside of England is as long as, or longer than, the list of those located in England. For example, other than 7percent Ventures, none of the Portofino investors presently known to Citadel Securities are in England. The three major investors that Portofino announced when it emerged from "stealth mode" in September 2022 are located in either New York (Valar Ventures and Coatue Management) or Germany (Global Founders Capital). ¶ 130. Greenfield Capital, whom Portofino calls out in its motion, is also in Germany. MOL 15.

Because party and non-party documents and witnesses are located in New York, Portofino cannot point to any unduly burdensome evidentiary hurdles that would support forcing Citadel Securities to litigate its claims in England. *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) (reversing dismissal for *forum non conveniens* where defendants "failed to explain how transporting the documents or copies of them would be 'oppressive' or 'vexatious'"); *see also Everard Findlay*, 2022 WL 845757, at *7 (denying dismissal for *forum non conveniens* where majority of documents were in Suriname but certain relevant witnesses and documents were in New York); *Petersen Energía Inversora*, 2020 WL 3034824, at *11 & n.11 (holding that following the Covid-19 pandemic, "depositions can be conducted via videoconference; documents located

overseas can be uploaded easily and reviewed by the parties via e-discovery platforms; and, if it comes to it, the parties can request that the Court allow trial witnesses to testify via video pursuant to the good cause exception in Fed. R. Civ. P. 43"); *Metito (Overseas) Ltd. v. Gen. Elec. Co.*, 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) ("For many years, courts . . . have recognized that modern technologies can make the location of witnesses and evidence less important to the *forum non conveniens* analysis."). Portofino's supposed concern about compelling "unwilling" third-party witnesses is equally unavailing. *See* MOL 14-15. Lack of compulsory process for third-parties abroad does not warrant dismissal where, as here, a defendant fails "to identify with specificity the witnesses who will be *necessary* to litigate this action but whose presence in a New York court will be difficult to secure." *Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*, 137 F. Supp. 2d 431, 436 (S.D.N.Y. 2001) (emphasis added). Portofino does not name a single prospective witness and gives no reason to think that anyone affiliated with the two English entities it identifies are necessary for this litigation yet will decline to participate. *See* MOL 15.[3]

### 2.    *The Interests of England and the United States Do Not Favor Dismissal*

Portofino's argument that England has a greater interest than the United States in this case under the "public interest" *Gulf Oil* factors, MOL 15-16, is also wrong. *First*, this case is, in significant part, a controversy local to the United States. *See Fasano v. Li*, 47 F.4th 91, 100 (2d Cir. 2022) (noting the "interest in having local forums decide local disputes"). As the Amended Complaint makes clear, Plaintiffs—all formed under U.S. law or solely owned by U.S. entities— seek redress for the theft from New York of Trade Secrets that were developed and used in

---

[3] Even if Portofino's speculation that unnamed third-party witnesses "may" be unwilling to testify is correct, MOL 15, testimony from those "witnesses whose attendance cannot be compelled can be obtained, for example, through the use of letters rogatory," *Everard Findlay,* 2022 WL 845757, at *7, or the Hague Convention on evidence, to which the United Kingdom is a contracting state, Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature* Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231.

New York and that Portofino, on information and belief, is using to the disadvantage of Citadel Securities' New York-based business. *See* ¶¶ 18-21, 73, 79, 168, 180, 194.

     *Second*, protecting Citadel Securities' Trade Secrets and confidential information that Portofino stole from New York is a textbook example of the type of U.S. interest that counsels against dismissal to a foreign forum. *See Kravitz v. Binda*, 2020 WL 927534, at *12 (S.D.N.Y. Jan. 21, 2020) (noting that "the United States has an interest in vindicating the rights of corporations incorporated here"). That interest is further reinforced by the "strong national interest" that the United States has in having U.S. courts hear claims arising from federal statutes like DTSA that are designed to protect American interests both at home and abroad and that apply extraterritorially. *See Alfandary v. Nikko Asset Mgm't Co.*, 337 F. Supp. 3d 343, 356 (S.D.N.Y. 2018); *see also Medcenter Holdings Inc. v. WebMD Health Corp.*, 2021 WL 1178129, at *6 (S.D.N.Y. Mar. 29, 2021) (holding DTSA applies extraterritorially); Defend Trade Secrets Act of 2016, Pub. L. 114-153, 130 Stat. 376, 383-84 § 5 ("It is the sense of Congress that . . . (1) trade secret theft occurs . . . *around the world*; (2) trade secret theft, *wherever it occurs*, harms the companies that own the trade secrets and the employees of the companies." (emphases added)).

     *Third*, dismissing this case in favor of England would not avoid "difficult"—or any—conflict of law issues. *See DiRienzo*, 294 F.3d at 31. While conceding that U.S. law governs the DTSA and tortious interference claims, Portofino nonetheless argues that English law will somehow apply to "most of this case" under New York choice of law principles. MOL 16. But Portofino neglects the first step in a choice of law analysis: the identification of a true conflict. *See, e.g.*, *IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("Choice of law does not matter . . . unless the laws

of the competing jurisdictions are actually in conflict."). In fact, Portofino *agrees* that the relevant laws of England and the United States have no substantive differences. *See* MOL 24, 29.[4]

This is not "one of those rather rare cases" where dismissal should be granted for *forum non conveniens*. *Gulf Oil*, 330 U.S. at 509. Portofino has shown neither that litigating in New York would be "genuinely inconvenient" nor that litigating in England would be "significantly preferable." *Iragorri*, 274 F.3d at 74-75. Because Portofino has not carried its heavy burden to overcome the deference that is due Citadel Securities' choice of forum, its motion should be denied.

## II.   THIS COURT HAS PERSONAL JURISDICTION OVER PORTOFINO AS TO EACH OF CITADEL SECURITIES' CLAIMS

Portofino's argument that the Court lacks personal jurisdiction over most of Citadel Securities' claims—save for its tortious poaching of Prieur, MOL 18—likewise fails. Absent an evidentiary hearing on jurisdiction, Citadel Securities "need only make a *prima facie* showing of personal jurisdiction over the defendant" to defeat Portofino's motion. *Ash v. Richards*, 572 F. App'x 52, 53 (2d Cir. 2014) (summary order) (cleaned up). A *prima facie* showing consists of "an averment of facts that, if credited, . . . would suffice to establish jurisdiction over the defendant." *In re Magnetic Audiotape Antitr. Litig.*, 334 F.3d 204, 206 (2d Cir. 2003). Because the Amended Complaint's allegations regarding conduct and injury in New York suffice to establish this Court's jurisdiction pursuant to not just one, but *each* prong of New York's long-arm statute, CPLR 302(a), Portofino's motion to dismiss for lack of personal jurisdiction should be denied.

### A.   This Court Has Personal Jurisdiction over Portofino under CPLR 302(a)(1)

Under CPLR 302(a)(1), this Court may exercise personal jurisdiction over an out-of-state defendant "who in person or through an agent . . . transacts any business within the state." CPLR 302(a)(1). "By this 'single act statute' . . . proof of one transaction in New York is sufficient to

---

[4] Nothing in the Declaration of Edward Brown, submitted with Portofino's motion, is to the contrary. ECF No. 43-3.

invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Deutsche Bank Secs., Inc. v. Mont. Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006) (cleaned up); *see also McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani*, 295 F. Supp. 3d 404, 411 (S.D.N.Y. 2017) (requiring an "articulable nexus between the business transacted and the cause of action sued upon" (cleaned up)).

### 1. *The Amended Complaint Alleges that Portofino Transacts Business in New York*

Although Portofino argues that it is not subject to personal jurisdiction because it "has no business, operations, or clients in New York," MOL 19, the Amended Complaint is replete with allegations of Portofino's purposeful activities in New York, almost all of which are supported by reference to publicly available materials published or posted by Portofino itself. To this day, Portofino holds itself out as having a New York office on its LinkedIn page and in the press. *See* ¶¶ 22 & n.3, 130; Ex. A. Its in-house recruiter posted numerous New York-based job openings on LinkedIn for positions related to Portofino's use of Citadel Securities' Trade Secrets in its competing HFT market-making business. *See* ¶¶ 127-128. And Portofino does not dispute that it has received millions in funding from New York-based Valar Ventures and Coatue Management. MOL 20; *see* ¶ 130. These allegations more than suffice to establish that Portofino transacts business in New York for purposes of CPLR 302(a)(1). *See, e.g., Aziyz v. Cameca*, 2023 WL 6065850, at *10 (N.D.N.Y. Sept. 18, 2023) (finding defendants "transacted business in New York . . . by soliciting New York residents for employment"); *L & R Expl. Venture v. Grynberg*, 22 A.D.3d 221, 221 (1st Dep't 2005) (holding that "solicit[ing] significant amounts from . . . New York investors . . . support[ed] a finding that [the defendant's] contacts with New York were sufficient to confer jurisdiction"). And Portofino's claim that it has traded "billions" in crypto, *see* ¶ 160, establishes the "reasonable inference" that its trading has included transactions on behalf of

clients in New York. *See e.g.*, *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp.*, 709 F.3d 109, 121 (2d Cir. 2013) (explaining that courts may draw a "reasonable inference" where facts are "suggestive of" misconduct, even where "competing inferences may also be compelling").

### 2.   *The Amended Complaint's Claims Relate to New York Business Activities*

These business activities all establish an "articulable nexus" with Citadel Securities' claims in this action. Establishing such a nexus is not a high bar. In particular, CPLR 302(a)(1) "does not require 'a causal link.'" *McGraw-Hill*, 295 F. Supp. 3d at 411 (quoting *Licci v. Lebanese Can. Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)). Rather, all that is needed is a "'relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former.'" *Id.* (quoting *Licci*, 732 F.3d at 168).

Here, the articulable nexus is Portofino's use of Citadel Securities' Trade Secrets in New York to develop and operate a competing business in the HFT market-making space. ¶¶ 15, 161, 165, 209; *see Pictometry Int'l v. Air Am. Flight Ctr.*, 394 F. Supp. 3d 320, 333-34 (W.D.N.Y. 2019) (exercising personal jurisdiction over a non-domiciliary defendant where defendant had allegedly used plaintiff's trade secrets to perform services for a third party located in New York). Portofino's use of Citadel Securities' Trade Secrets to recruit New York employees, pitch New York investors, and trade on behalf of New York clients, as alleged in the Amended Complaint, confers jurisdiction. Citadel Securities' unfair competition claim, premised upon Portofino's use of Citadel Securities' confidential information that does not constitute trade secrets, is similarly related to Portofino's business transactions in New York. *See Recovery Racing III, LLC v. Brown*, 2021 WL 9678666, at *6-7 (E.D.N.Y. Oct. 28, 2021). And to the extent Portofino profited from trades it made using Citadel Securities' Trade Secrets and confidential information, its gains constitute unjust enrichment. *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015).

Portofino's recent admission that it has investors in New York, ECF 50 at 1, is fatal to its attempt to escape the Court's jurisdiction. Acquiring investor capital was a necessary precursor to Portofino's leveraging of Citadel Securities' Trade Secrets in its business. Therefore, fundraising from New York investors necessarily creates the requisite articulable nexus. *Cf. Grynberg*, 22 A.D.3d at 221. Moreover, the Portofino pitch materials cited in the Amended Complaint reveal just how much Portofino relied on its possession of Citadel Securities' Trade Secrets and confidential information to pitch itself to investors, including in New York. *See* ¶¶ 2-9. Portofino explicitly told investors its business "objective" was to "[r]eplicate the most successful trading business model in traditional financial markets in crypto-currency markets"—an unmistakable reference to Portofino's founders' experience at Citadel Securities, which Portofino told investors was "a crucial differentiating factor" in its favor. ¶¶ 7, 96, 159. This is not a "wink and a nod" or speaking "in code." ECF 48 at 5. Portofino said the quiet part out loud: it copied Citadel Securities. Portofino cannot now claim that soliciting investors in New York in this way—by touting its use of Citadel Securities' Trade Secrets—bears "no nexus" to Citadel Securities' claims.

### 3. *The Casimo Declaration Does Not Resolve the Jurisdictional Analysis*

Portofino asserts that a declaration submitted by Portofino's co-founder, Alex Casimo, establishes Portofino's lack of business activity in New York. *See* ECF 43-1 ¶¶ 5-7; MOL 19. This attempt to walk away from Portofino's own public statements linking Portofino to New York falls short, as already explained to the Court. *See* ECF 48, 49. Among other things, Casimo does not actually say Portofino *never* serviced clients or recruited employees in New York, only that it does not *currently* have clients or employees here. *Compare* ¶¶ 2-9, 15-16, 110, 127-128, 166-167, *with* ECF 43-1 ¶¶ 4, 6. Casimo's carefully couched statements about the present do not contradict the Amended Complaint's allegations about the past, which "must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *Seetransport Wiking Trader v. Navimpex*

*Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993) (cleaned up). Taking "the pleadings and affidavits in the light most favorable to [Citadel Securities]," and "resolving all doubts in [Citadel Securities'] favor," Portofino has not rebutted the Amended Complaint's allegations regarding its business activities in New York. *DiStefano v. Carozzi N. Am., Inc*., 286 F.3d 81, 84 (2d Cir. 2001).

### B. This Court Has Personal Jurisdiction over Portofino under CPLR 302(a)(2)

CPLR 302(a)(2) confers jurisdiction over causes of action arising from tortious conduct committed in New York. Portofino contends that this Court lacks jurisdiction over Citadel Securities' claims pursuant to CPLR 302(a)(2) because "all the conduct occurred physically outside of New York." MOL 20. This assertion ignores the Amended Complaint's clear allegations of conduct that took place physically in New York, including Prieur's theft of Trade Secrets from New York and Lancia's travel to New York to solicit investors using Citadel Securities' stolen Trade Secrets. ¶ 115. Portofino's use of Citadel Securities' Trade Secrets to pitch investors in New York by itself is sufficient to confer jurisdiction. *See Al Thani v. Hanke*, 2022 WL 489052, at *6 (S.D.N.Y. Feb. 17, 2022) (holding defendant's knowledge of agent's meeting in New York sufficient to confer jurisdiction under CPLR 302(a)(2)).

As for Prieur, Portofino tries to dismiss his central role in Portofino's misappropriation as conclusory speculation, ignoring the Amended Complaint's numerous, specific allegations about Prieur's knowledge of Citadel Securities' Trade Secrets and confidential information, the value such knowledge provided to Portofino, and his misappropriation of Citadel Securities' Trade Secrets and confidential information from the New York office where he worked. ¶¶ 117-118, 166-168, 180-194, 209. At the time Portofino was incorporated, Prieur was in New York evaluating existing crypto market participants and likely competitors to Citadel Securities' crypto market-making plans, describing considerations for structuring Citadel Securities' in-house crypto market-making function, and outlining detailed staffing proposals. He was Citadel Securities' designated

"aggregator of all things crypto in the U.S."; he was, in his own words, working to "centraliz[e] all [of Citadel Securities'] crypto efforts globally"; and he was "[l]ead[ing] [Citadel Securities'] foray into crypto." ¶¶ 166, 183. Portofino's hiring of Prieur, and concomitant misappropriation of Citadel Securities' Trade Secrets and confidential information through his hiring, was an essential part of Portofino's scheme that happened in New York.[5]

### C.  This Court Has Personal Jurisdiction over Portofino under CPLR 302(a)(3)

Finally, under CPLR 302(a)(3)(ii), New York courts have jurisdiction over defendants whose tortious conduct abroad causes injury in New York where the defendant "expect[ed] or should reasonably [have] expect[ed]" its tortious conduct to have consequences in New York "and derive[d] substantial revenue from interstate or international commerce." Portofino does not make, and thus has waived, any argument that it could not have expected its conduct would have consequences in New York or that it does not derive substantial revenue from interstate or international commerce. *See Wilmington Tr., Nat'l Ass'n v. Rafiq*, 2023 WL 6237680, at *4 (S.D.N.Y. Sept. 26, 2023). Such an argument would, in any case, strain credulity.[6] Rather, Portofino argues that this Court lacks jurisdiction because its theft of the Trade Secrets did not cause injury in New York. MOL 20. Portofino's argument misses the mark.

To establish injury under CPLR 302(a)(3), a plaintiff must demonstrate more than "indirect financial loss resulting from the fact that the injured person resides or is domiciled there." *Elcan*

---

[5] Portofino asserts that the Court must evaluate the actions it took to misappropriate Citadel Securities' Trade Secrets independently, instead of understanding them as part of one scheme. *See* MOL 21 n.14. That is not the law. Courts treat individual acts of misappropriation executed by a defendant or its agents at different points in time as part of the same misappropriation. *See, e.g., Medidata Sols., Inc. v. Veeva Sys. Inc.*, 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018) (listing several steps defendant took to misappropriate plaintiff's trade secrets and finding that "taken together, [the] allegations plausibly raise[d] an inference that [defendant] misappropriated [plaintiff's] trade secrets"). Nothing in *Zirvi v. Flatley*, 433 F. Supp. 3d 448 (S.D.N.Y. 2020), stands for the proposition that acts of misappropriation executed at different points in time constitute separate claims. *See* MOL 21 n.14.

[6] *First*, Portofino generates revenue from international commerce. Casimo's declaration admits as much, noting the company has offices in multiple countries. ECF 43-1 ¶ 4. *Second*, Portofino knew its misconduct would have consequences in New York; if nothing else, it has raised tens of millions of dollars from New York investors. ¶ 130.

*Indus., Inc. v. Cuccolini, S.R.L.*, 2014 WL 1173343, at *5 (S.D.N.Y. Mar. 21, 2014) (quoting *Fantis Foods, Inc. v. Standard Importing Co.*, 402 N.E.2d 122, 126 (N.Y. 1980)); *see also* MOL 20-21. But it is black-letter law that the theft of "proprietary information" or "business relationships" in New York—far from being "indirect financial loss"—is a type of injury sufficient to confer jurisdiction under 302(a)(3). *See Cont'l Indus. Grp., Inc. v. Altunkilic*, 2016 WL 11796844, at *3 (S.D.N.Y. Apr. 6, 2016). On that basis, courts have long exercised jurisdiction over claims of trade secret theft executed from outside New York where the stolen secrets' value in New York was diminished by the misappropriation. *See, e.g.*, *CrossBorder Sols., Inc. v. Macias, Gini, & O'Connell, LLP*, 2022 WL 562934, at *5 (S.D.N.Y. Feb. 23, 2022) (holding plaintiff adequately alleged jurisdiction under CPLR 302(a)(3) where defendant knowingly recruited plaintiff's employee from New York and "encouraged the theft of trade secrets and confidential and proprietary information"); *Mfg. Tech., Inc. v. Kroger Co.*, 2006 WL 3714445, at *2 (S.D.N.Y. Dec. 13, 2006) (finding plaintiff made prima facie case for jurisdiction under CPLR 302(a)(3) because "the injury from the alleged trade secret theft is felt within New York State no matter where the theft took place"); *Four Seasons Solar Prods. Corp. v. Solarium Sys., Inc.*, 1987 WL 4818, at *3 (E.D.N.Y. May 6, 1987) (similar).[7]

## III. THE AMENDED COMPLAINT PROPERLY ALLEGES EACH CAUSE OF ACTION AGAINST PORTOFINO

Portofino also moves to dismiss every count in the Amended Complaint for failure to state a claim under Rule 12(b)(6), arguing that the "core" of Citadel Securities' complaint is Portofino's

---

[7] In a motion pending before this Court, Citadel Securities seeks limited, narrowly tailored jurisdictional discovery relevant to Portofino's motion to dismiss for lack of personal jurisdiction. *See* ECF 48. Citadel Securities believes such discovery (including documents recently produced by Portofino's founders in the Employee Arbitration) will confirm that Portofino solicited and obtained millions of dollars from New York investors by promoting its experience with Citadel Securities' Trade Secrets and its building for itself the same HFT model that its founders built previously at Citadel Securities using Citadel Securities' Trade Secrets. This more than provides an articulable nexus connecting Portofino's solicitation of New York investors with its theft of Citadel Securities' Trade Secrets sufficient to confer personal jurisdiction under CPLR 302(a)(1).

founders' violations of their employment agreements. MOL 23. Not so. Those claims are being adjudicated in the Employee Arbitration. *This* case is about *Portofino's* acquisition and use of Citadel Securities' Trade Secrets and confidential information and its tortious poaching of Citadel Securities' employees. To defeat Portofino's motion, the Amended Complaint need only allege "facts to support the *reasonable* inference that the defendant has acted unlawfully." *See DoorDash*, 2023 WL 6118229, at *11 (emphasis added)*. The Amended Complaint's allegations, and all reasonable inferences drawn therefrom, more than satisfy this standard.[8]

### A.  The Amended Complaint Alleges Trade Secret Misappropriation

"To state a claim for trade secret misappropriation under [] DTSA, a plaintiff must plausibly allege that (i) it possessed a trade secret, and (ii) the defendant misappropriated the trade secret." *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 671 (S.D.N.Y. 2022) (cleaned up). Because "the elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim, "a complaint sufficiently pleading a DTSA claim also states a claim for misappropriation of trade secrets under New York law." *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (cleaned up). Accordingly, Citadel Securities' claims under DTSA and New York common law rise and fall together. *See Kraus USA, Inc. v. Magarik*, 2020 WL 2415670, at *5 (S.D.N.Y. May 12, 2020).[9]

---

[8] Portofino is wrong that English law controls "most" of Citadel Securities' claims. *See* MOL 23-24. The Amended Complaint pleads claims under U.S. and New York common law. And, as discussed above, Portofino fails to establish that there is any actual conflict between U.S. and New York law on the one hand, and English law on the other. *See supra* at 20-21. As a result, where there is no such conflict, the Court should apply U.S. and New York law. *See id.*

[9] Portofino argues that DTSA does not apply extraterritorially. *See* MOL 28-29. Portofino is wrong. Portofino has committed acts in furtherance of its misappropriation in the United States—including but not limited to Prieur's taking of Trade Secrets from Citadel Securities' New York office. *See* 18 U.S.C. § 1837; ¶ 123. DTSA thus applies to Portofino's theft of Citadel Securities' Trade Secrets abroad. *See supra* at 20.

### 1. *The Amended Complaint Pleads Trade Secrets with the Requisite Specificity*

In assessing whether information qualifies as a trade secret under DTSA and New York common law, courts examine "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Trahan v. Lazar*, 457 F. Supp. 3d 323, 342 (S.D.N.Y. 2020) (cleaned up). These are "guideposts, not elements," and a plaintiff need not "plead every single factor." *Iacovacci*, 437 F. Supp. 3d at 380.

The Amended Complaint adequately pleads the existence of Citadel Securities' Trade Secrets, including its Research Methodology, Trading Strategies, Simulations, and Business Plans and Strategies. ¶ 45; *see also* ¶¶ 47-52. These Trade Secrets are closely guarded and are not known to Citadel Securities' competitors. ¶¶ 46, 53-58. Extensive security measures limit access by employees and prevent access by outsiders. ¶¶ 53-54. Through their complexity and quality, the Trade Secrets give Citadel Securities a competitive advantage that is central to the firm's success. ¶¶ 45-46. And Citadel Securities spent years developing, investing in, and improving these Trade Secrets. ¶ 46. As a result, they are not easily duplicated absent misappropriation. ¶ 212.

Selectively quoting a single paragraph from the Amended Complaint, Portofino complains it does not know what it is accused of stealing because the pleading only provides "general categories." MOL 25-26. This argument misapprehends the law. "[T]rade secrets need not be disclosed in detail." *Tesla Wall Sys., LLC v. Related Cos., L.P.*, 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017) (cleaned up). Rather, identifying the "general contours" of the Trade Secrets is all that is required to put Portofino on notice of what it is alleged to have stolen. *DASH*

*Regul. Techs., LLC v. Axiom Software Lab'ys Inc.*, 2023 WL 2586104, at \*4 (S.D.N.Y. Mar. 21, 2023). The Amended Complaint easily clears this bar.

*First*, the Amended Complaint explains that Citadel Securities' Research Methodology Trade Secrets consist of several distinct pieces of confidential and propriety information, including Citadel Securities' "know-how and processes, quantitative analysis, strategies, and automated and high-frequency trading algorithms and implementing code, as well as its valuation, pricing, forecasting, volatility, and other risk models," ¶ 47, all of which allow Citadel Securities "to trade smarter, at faster speeds, and at greater volumes," ¶ 44. On its own, that description is sufficient. *See Tesla Wall Systems*, 2017 WL 6507110, at \*9 (denying motion to dismiss trade secrets misappropriation claim where complaint simply pled theft of general "categories of information" including "technical data, internal pricing information, work product, research, [and] engineering designs"). But the Amended Complaint is even more specific, alleging that between 2018 and 2021, Portofino co-founder Lancia learned Citadel Securities' Research Methodology as it existed at the time in Citadel Securities' New York and U.S. offices, and used it to build, develop, and run Citadel Securities' Systematic European Options Trading business. ¶¶ 75-78. In short, Lancia's job was to use Citadel Securities' Trade Secrets to create a market-making trading business for European options. ¶¶ 77-78. And this is exactly what Lancia subsequently did for Portofino—create a market-making trading business for cryptocurrency—using those same stolen Trade Secrets.

*Second*, the Amended Complaint explains that Citadel Securities' Trading Strategies Trade Secrets include its proprietary approach for "buying and selling particular assets and securities." ¶ 48. Here, too, the Amended Complaint refers to specific Trading Strategies that Lancia relied upon, developed, and tested, using Trading Strategies that had been previously developed and deployed by the U.S. Options trading desk in New York. ¶ 168. And the Amended Complaint describes how Citadel Securities uses a third type of Trade Secrets, Simulations, to "fine tune and

calibrate Citadel Securities' Trading Strategies." ¶ 49. These Trading Strategies and Simulation Trade Secrets are pled with sufficient specificity. *See Pauwels v. Deloitte LLP*, 2020 WL 818742, at *4 (S.D.N.Y. Feb. 19, 2020) (holding trade secrets sufficiently pled where plaintiff alleged "proprietary set of formulas" that "incorporated [the plaintiff's] unique insight into the alternative energy market" and operated as a "valuation tool").

*Finally*, the Amended Complaint makes clear that the Business Plans and Strategies Portofino stole "include confidential and proprietary product and market research and analysis, evaluations of competitors, and operational considerations like resource allocation, the design and staffing of the business, and recruiting and hiring efforts and objectives." ¶ 52. These allegations are sufficient on their own. *See Lavvan, Inc. v. Amyris, Inc.*, 2021 WL 3173054, at *4 (S.D.N.Y. July 26, 2021) (holding plaintiff pled trade secrets where it described in "relatively broad terms: regulatory and business trade secrets about market opportunities and manufacturer selection"). But again, the Amended Complaint provides additional detail, alleging, for example, that the Business Plans and Strategies Prieur stole included detailed financial and geographic data about crypto exchanges; in-depth analysis of crypto products, including data on market trends and funding; and evaluations of existing crypto market-makers and potential competitors. ¶ 166.

Put simply, the Amended Complaint does not allege "non-descript" trade secrets. MOL 25. Portofino's argument that Citadel Securities' Trade Secrets "could be claimed by any trading firm or even any hedge fund" proves too much. *Id*. Under that argument, either *no* trading model is a protectible trade secret, or all strategies used across the industry are the same. Neither is true. The fact that other firms have their own confidential and proprietary trading models does not require Citadel Securities to plead in open court how *its* trading models are different and superior in order to survive a motion to dismiss. All that is required are allegations sufficiently detailed to "inform

[Portofino] of what they are alleged to have misappropriated." *Medidata Sols.*, 2018 WL 6173349, at *3. The Amended Complaint satisfies that standard.[10]

### 2. *The Amended Complaint Pleads Misappropriation by Portofino*

Portofino next contends that the Amended Complaint does not adequately allege Portofino's misappropriation of Citadel Securities' Trade Secrets. MOL 26-28. This, too, misses the mark. "[A] defendant misappropriates a trade secret (1) when it acquires a trade secret by improper means, or (2) discloses or uses the trade secret without consent." *Medidata Sols.*, 2018 WL 6173349, at *4 (citation omitted). Citadel Securities has pled both theories of misappropriation.

*First*, the Amended Complaint alleges Portofino acquired Citadel Securities' Trade Secrets through improper means. DTSA defines "improper means" to include "inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). New York similarly recognizes misappropriation where trade secrets are "discover[ed] by improper means." *Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 787 (S.D.N.Y. 2008). Portofino does not (and cannot) dispute that its founders and Prieur and Moustapha had access to Citadel Securities' Trade Secrets and that, as Citadel Securities employees, all four had a clear duty to refrain from disclosing the firm's confidential information, including but not limited to the Trade Secrets. *See Zurich Am. Life Ins. Co. v. Nagel*, 538 F. Supp. 3d 396, 403 (S.D.N.Y. 2021). Their employment agreements reinforced this obligation. ¶ 54. Portofino also does not (and cannot) dispute that it was aware of these duties. ¶¶ 54-60; MOL 4. Portofino thus knew that it had obtained Citadel Securities' Trade Secrets "under circumstances giving rise to a duty to maintain the secrecy." *Medidata Sols.*, 2018 WL 6173349,

---

[10] The sole case Portofino cites is easily distinguished. In *Lawrence v. NYC Medical Practice, P.C.*, the plaintiff alleged generic trade secrets without alleging "the information's value, the extent to which it is known by those within and outside of the business, the amount of effort or money spent to develop the information, and the ease with which information could be acquired or developed by outsiders." 2019 WL 4194576, at *5 (S.D.N.Y. Sept. 3, 2019). As this Court explained, by "only address[ing] one factor that courts consider when determining the 'contours of a trade secret,'" the plaintiff did not satisfy the specificity requirement. *Id*. Here, the Amended Complaint pleads all the factual matters the *Lawrence* plaintiffs failed to allege. *See* ¶¶ 44-60, 212.

at *4. As alleged, Portofino nonetheless "induced them to breach their confidentiality obligations . . . by divulging trade secrets." *Id.*; *see also* ¶¶ 82, 168, 179, 194.

The Amended Complaint also includes allegations supporting a reasonable inference that Portofino knew it was stealing Citadel Securities' Trade Secrets, and therefore acquired them by improper means. Portofino's founders deliberately and repeatedly lied to Citadel Securities about their plans for Portofino by, among other things, falsely claiming to have no future employment plans and misrepresenting the nature of Portofino's business. ¶¶ 138-151. They were not the only ones engaged in duplicity: shortly after Prieur visited Portofino's offices in January 2022, he contacted a senior Citadel Securities executive working on crypto in an apparent attempt to gain further insight into Citadel Securities' crypto initiatives to take with him to Portofino. ¶ 122. These allegations more than "plausibly suggest" that Portofino misappropriated Citadel Securities' Trade Secrets through improper means. *Medidata Sols.*, 2018 WL 6173349, at *4.

*Second*, the Amended Complaint alleges misappropriation on account of Portofino's *use* of the stolen Trade Secrets. Specifically, it alleges that Portofino used Citadel Securities' Trade Secrets to pitch a HFT market-making business model with features and functionality that reflected Citadel Securities' confidential research and technology. ¶¶ 7-8, 156-162. It also alleges that only through such use was Portofino able to bring its business to market on such an accelerated timeline and "replicate," as Portofino promised its investors it would, Citadel Securities' business model. ¶¶ 7-8, 158.[11] Such allegations support a plausible "inference that [Portofino] misappropriated [Citadel Securities'] trade secrets." *Medidata*, 2018 WL 6173349, at *4 (denying motion to dismiss

---

[11] Portofino strains to argue that its reference to replicating "the most successful business model" in traditional financial markets was about high-frequency trading in general, not Citadel Securities' Trade Secrets in particular. MOL 27. This ignores that Portofino emphasized its founders' experience with Citadel Securities' Trade Secrets, going so far as to identify that experience as a "crucial differentiating factor." *See* ¶¶ 8, 96, 156-159. And the message resonated with investors, who praised the founders' "fantastic expertise." ¶ 159.

misappropriation claim where complaint alleged defendant "marketed and offered products with specific features and functionality that had been the focus of confidential research and technology initiatives at [plaintiff], and that [defendant] used [plaintiff's] trade secrets to introduce competing products in record time"); *see Catalyst Advisors*, 602 F. Supp. 3d at 671.[12]

Portofino complains that "just because Lancia, Casimo, Prieur, and Moustapha had access to Citadel Securities' trade secrets" does not mean that "they must be using those same trade secrets at Portofino." MOL 26. Even assuming that Portofino's mischaracterization were true (which it is not), the Amended Complaint's allegations nonetheless plead misappropriation under the "inevitable disclosure" doctrine. Federal courts applying New York law have held it reasonable to infer a plaintiff's former employee has misappropriated trade secrets where there is a "substantial risk" the defendant will use trade secrets known by plaintiff's former employee "in his new employment." *IBM v. Papermaster*, 2008 WL 4974508, at *7 (S.D.N.Y. Nov. 21, 2008); *see also EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999).[13] The Amended Complaint pleads a substantial risk here. *See* ¶¶ 161-166.

The cases Portofino cites do not hold otherwise. *See* MOL 27-28. Two apply the law of *other states* that do not recognize the inevitable disclosure doctrine and are thus inapposite. *See Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 989 (S.D. Cal. 2012) (noting, right before the language Portofino quotes, that "California law does not recognize the 'inevitable disclosure

---

[12] Portofino's citation to *Kumaran v. National Futures Association, LLC*, 2022 WL 1805936 (S.D.N.Y. June 2, 2022), falls flat. *See* MOL 26. In that case, unlike here, a *pro se* plaintiff submitted a "prolix and rambling amended complaint" that alleged misappropriation and use without any "factual enhancement" to support her allegations. *Kumaran*, 2022 WL 1805936, at *6, *8. And in *Marks v. Energy Materials Corp.*, the complaint did not plausibly allege that the defendant knew the trade secrets belonged to someone else, nor did it "attempt[] to allege the use of a trade secret in breach of an agreement, confidential relationship, or duty," 2015 WL 3616973, at *5 (S.D.N.Y. June 9, 2015), making *Marks* inapposite. *See* MOL 26.

[13] The inevitable disclosure doctrine also applies to Citadel Securities' DTSA claim. *See* John A. Drake, Inevitable Disclosure Under DTSA, 62 No. 10 DRI for Def. 12 (Oct. 2020) (noting that the general "trend has been for courts to apply their state's approach to the inevitable disclosure doctrine" to DTSA actions).

doctrine'"); *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 199-202 (4th Cir. 2016) (applying North Carolina law). *Falconwood Corp. v. In-Touch Technologies, Ltd.*, decided under New York law, did not involve former employees but instead allegations that the defendant stole trade secrets from its partner in a joint venture. 227 A.D.2d 215, 215-16 (1st Dep't 1996). And in *Business Networks of New York, Inc. v. Complete Network Solutions, Inc.*, notwithstanding misappropriation allegations that amounted to "[t]he mere access to such material and information, without more," the court *denied* defendant's motion to dismiss plaintiff's trade secret misappropriation claims. 1999 WL 126088, at *4 (N.Y. Sup. Ct. N.Y. Cnty. Feb. 19, 1999).

### B.  The Amended Complaint Alleges Tortious Interference with Contracts

Portofino's arguments attacking the sufficiency of Citadel Securities' tortious interference claims are equally lacking. Under New York law, tortious interference with a contractual relationship requires "[1] the existence of a valid contract between [the plaintiff] and a third party, [2] the defendant's knowledge of that contract, [3] the defendant's intentional procurement of the third party's breach of that contract without justification, and [4] damages." *106 N. Broadway, LLC v. Lawrence*, 189 A.D.3d 733, 740 (2d Dep't 2020).

Critically, Portofino does not dispute that the Amended Complaint pleads three of the four elements of a tortious interference claim as to both Prieur and Moustapha. Portofino does not dispute that Prieur and Moustapha had valid, binding employment contracts with Citadel Securities that included non-compete and non-disclosure agreements. ¶¶ 173, 187. Nor does Portofino dispute that it knew about those contracts. ¶¶ 174, 188. Nor does Portfino dispute that its recruitment of Prieur and Moustapha caused Citadel Securities damages. ¶ 256. These elements are thus conceded for the purpose of this motion. *See Wilmington Tr., Nat'l Ass'n*, 2023 WL 6237680, at *4.

As for the fourth element—Portofino's intentional procurement of Prieur and Moustapha's breaches of their employment contracts—the Amended Complaint states a claim with respect to

two separate contracts. *First*, as alleged, Portofino recruited Prieur and Moustapha to obtain Citadel Securities' Trade Secrets and confidential information, inducing each of them to breach their non-disclosure agreement's prohibition against "directly or indirectly, us[ing], disclos[ing], access[ing], copy[ing], transfer[ring], transmit[ting], retain[ing], stor[ing] or otherwise utiliz[ing] any Confidential Information except as authorized," and continuing "after [their] employment" ended. Ex. B; ¶ 232. Portofino ignores these allegations. *See* MOL 30 n.18.

*Second*, by recruiting Prieur and Moustapha to leave Citadel Securities and join Portofino before their Restricted Periods had expired, ¶¶ 177-178, 192-193, Portofino tortiously induced them to breach their non-compete agreements, in which they promised not to engage in business activities similar to those "engaged in by Citadel at any time during [their] employment or that Citadel proposed or planned to engage in at any time in the twelve (12) month period" prior to their termination. *See, e.g.*, ECF 43-3 at 22 of 25 (Moustapha employment agreements). Portofino argues that the Amended Complaint does not allege any breach of those agreements because Portofino could not have known that Citadel Securities was planning to enter the crypto space and "there are no facts pleaded" to suggest it did. MOL 30 n.18. This argument is meritless. It relies on public statements that are not judicially noticeable for their truth, *see Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020), and which, in any event, do not contradict the Amended Complaint's allegations that Portofino was privy to Citadel Securities' internal, confidential conversations about Citadel Securities' plans relating to crypto trading, *see* ¶¶ 62-65, 81-82.

Even if Citadel Securities had not started work on crypto-related projects prior to Prieur and Moustapha's departures (which it did), the employees nonetheless breached their non-competes by joining Portofino. Without any limitation to a particular region or asset class, their agreements explicitly provide that former employees cannot "directly or indirectly, use or rely upon [Citadel Securities'] Confidential Information" for a competitor that "engages in, or proposes or plans to

engage in, any activity that is identical or materially similar to" Citadel Securities' business activities. ECF 43-2 at 22 of 25; *see also* ¶ 57. Because Portofino is an "HFT market maker," ¶ 4, Prieur's and Moustapha's work for Portofino breached their non-competes.

The suggestion that Portofino did not know Citadel Securities was entering the crypto space is flatly contradicted by the Amended Complaint. Casimo knew about Citadel Securities' involvement in crypto as early as March 2018, when he received Slack messages that discussed "New businesses & M&A\Cryptocurrency." ¶ 63. In April 2018, he asked for, and received, information about Citadel Securities' plans for crypto trading. ¶ 64. In September 2019, he reviewed Slack messages in a channel about Citadel Securities' crypto business plans that noted the firm had developed the "capability" and "record[ed] market data" in order to begin trading crypto—and had "even fitted a couple of alpha." ¶¶ 63, 65. Casimo was also aware that Citadel Securities had started trading bitcoin futures. ¶¶ 65, 82. These allegations alone are sufficient to establish a reasonable inference that Portofino knew Citadel Securities had begun, or at the very least was working on plans, to operate in the crypto space, such that its recruitment of Prieur and Moustapha would violate their non-competes. *Cf. LivePerson*, 83 F. Supp. 3d at 517 (relying on documentary and circumstantial evidence to infer defendant's knowledge).

But there is more. Prieur led a team that prepared and delivered an internal presentation on Citadel Securities' crypto-related business plan, strategies, and opportunities. ¶¶ 67, 166; *see also supra* at 6. Indeed, Prieur was the firm's designated "aggregator of all things crypto in the U.S." ¶ 185. By March 2022, Citadel Securities had already implemented Prieur's presentation and initiated crypto trading. ¶¶ 69-70. Portofino wanted to recruit Prieur precisely because of his crypto-related experience at Citadel Securities. ¶¶ 118, 209.

Together, these allegations establish the reasonable inferences that (1) Portofino knew about the crypto expertise and information that Prieur obtained at Citadel Securities, (2) sought him out

to work at Portofino *because of that knowledge*, and (3) understood (since Portofino's founders were subject to the same employment agreements with Citadel Securities) that Prieur would violate his non-compete agreement by coming to work for Portofino and disclosing Citadel Securities' Trade Secrets and confidential information. In short, the Amended Complaint alleges a knowing inducement of Prieur's breach, and therefore a claim for tortious interference.

Moustapha is no different. In a May 2023 press release, Portofino bragged about its "experienced Quantitative Trading team, led by Taym Moustapha (ex-Head of Trading for European Equities at Citadel Securities) that ensures our systems are operating as intended." ¶ 137. The Amended Complaint alleges Portofino was aware it was inducing Moustapha to breach his contract with Citadel Securities by hiring him, ¶ 174, thereby establishing the intent required to sustain Citadel Securities' tortious interference claim as to Moustapha as well.

### C.  The Amended Complaint Alleges Unfair Competition

The parties agree that Citadel Securities' unfair competition claim is based, in part, on Portofino's misappropriation of Citadel Securities' Trade Secrets. MOL 28. Indeed, because the misappropriation claims are adequately pled, so too is the unfair competition claim. *See Recovery Racing III*, 2021 WL 9678666, at *6 ("New York courts . . . have accepted the misappropriation of another's commercial advantage as a cornerstone of the tort of unfair competition." (cleaned up)).

But the Amended Complaint's unfair competition claim is also based, in part, on Portofino's misappropriation of Citadel Securities' "confidential information," a category of proprietary information that under New York law is distinct from trade secrets and includes corporate documents like license agreements, contract proposals, and customer lists. *See, e.g.*, *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 500-01 (S.D.N.Y. 2002); *Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs., Inc.*, 871 F. Supp. 709, 731 & n.22 (S.D.N.Y. 1995). Accordingly, even if

the Court were to dismiss the trade secret claims for failure to plead a trade secret, Citadel Securities' unfair competition claim would still survive. *See, e.g.*, ¶ 166.

### D. The Amended Complaint Alleges Unjust Enrichment

Citadel Securities' unjust enrichment claim likewise stands on its own. In *Pauwels v. Deloitte LLP*, the Second Circuit recently held that even though the plaintiff had failed to properly allege full-blown misappropriation, he nevertheless pled unjust enrichment by alleging the defendant had profited from using his work without compensating him. 83 F.4th 171, 187 (2d Cir. 2023). Like in *Pauwels*, Citadel Securities has pled that Portofino profited from Citadel Securities' work without providing compensation for it. ¶¶ 272-276. And Citadel Securities has pled that Portofino used the property it stole from Citadel Securities to accelerate its own development and emergence from "stealth mode," thereby enriching itself at Citadel Securities' expense. ¶¶ 215-217; *Pauwels*, 83 F.4th at 186 (plaintiff pled unjust enrichment by alleging that misappropriation allowed defendant to "avoid the time and expense of . . . developing their own model . . . which would have taken more time and been more expensive than just copying the" plaintiff's model (cleaned up)).[14]

## IV.   THIS ACTION SHOULD NOT BE STAYED

Finally, Portofino has not met its "heavy burden of showing" that, in the alternative, a stay pending resolution of the Employee Arbitration is a "necessity." *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991). A stay pursuant to the "prior pending action" doctrine, *see* MOL 32-33, is evaluated against federal courts' "'virtually unflagging obligation . . . to exercise the jurisdiction given them.'" *Ole Media Mgmt., L.P. v. EMI April Music, Inc.*, 2013 WL 2531277, at *3 (S.D.N.Y. June 10, 2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424

---

[14] Should the Court be inclined to grant Portofino's motion to dismiss, Citadel Securities respectfully requests the opportunity to file a Second Amended Complaint. *See In re Amazon, Inc. Ebook Antitr. Litig.*, 2022 WL 4586209, at *2 (S.D.N.Y. Sept. 29, 2022) (noting that amendment is not futile where "Plaintiffs have not yet had the opportunity to amend the complaint with the benefit of a ruling from the Court").

U.S. 800, 817 (1976)). A motion for a stay is assessed under five factors: (1) similarity of the parties and issues; (2) interests of judicial economy; (3) order in which the actions were filed; (4) adequacy of the alternative forum; and (5) convenience of, and potential prejudice to, either party. *Id.* at *3-6. None of these considerations favor a stay here.

*First*, the parties and issues in this action are not the parties and issues in the Employee Arbitration. Only two of the seven parties in this case are involved in the English proceedings, and Citadel Securities seeks relief here against Portofino *the company* for misconduct and injury suffered in New York and elsewhere. *See supra* at 15-17. *Second*, the interests of judicial economy do not favor staying this action because there will be no "[s]ubstantial efficiencies" gained, given the different parties here litigating issues "not presented in the foreign proceeding." *Keswani v. Sovereign Jewelry, Inc.*, 2021 WL 4461332, at *8 (S.D.N.Y. Sept. 29, 2021). *Third*, because the parties and claims in this case are different from those involved in the Employee Arbitration, the order in which the actions were filed is irrelevant. *See ArcelorMittal N. Am. Holdings LLC v. Essar Global Fund Ltd.*, 2022 WL 4334665, at *22 (S.D.N.Y. Sept. 19, 2022). *Fourth*, there is no reason to believe the Employee Arbitration is an adequate forum for adjudicating Citadel Securities' claims against Portofino, which is not a party to the agreements giving rise to that proceeding. Portofino does not assert that it can be joined to the Employee Arbitration and be bound by the tribunal's orders, which may explain why Portofino abandoned its prior argument that this case should be compelled to arbitration. *See* ECF 28 at 3.

*Finally*, as explained above, New York is a proper and convenient forum to adjudicate Citadel Securities' claims. *See supra* at 12-21. And while Portofino has not established that it will be prejudiced by litigating this case while its employees arbitrate in England, Citadel Securities will continue to suffer significant prejudice if this action is stayed and Portofino is allowed to continue using Citadel Securities' Trade Secrets. *See Norbrook Lab'ys*, 297 F. Supp. 2d at 493.

## CONCLUSION

For the reasons set forth above, Citadel Securities submits that Portofino's motion to dismiss the Amended Complaint, or, in the alternative, to stay this action, should be denied.

Dated: New York, New York                    Respectfully submitted,
      October 27, 2023

                                        */s/ Timothy S. Martin*
                                        Timothy S. Martin
                                        Gabrielle E. Tenzer
                                        Michael Ferrara
                                        Christopher R. Le Coney
                                        Andrew L. Chesley
                                        KAPLAN HECKER & FINK LLP
                                        350 Fifth Avenue, 63rd Floor
                                        New York, New York 10118
                                        (212) 763-0883
                                        tmartin@kaplanhecker.com
                                        gtenzer@kaplanhecker.com
                                        mferrara@kaplanhecker.com
                                        cleconey@kaplanhecker.com
                                        achesley@kaplanhecker.com

                                        *Counsel for Citadel Securities Americas LLC, Citadel Securities Americas Services LLC, Citadel Securities (Europe) Limited, and Citadel Management (Europe) II Limited*